**IN THE COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **VERIDYNE CORPORATION** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v** | ) | **No. 06-150C** |
| | ) | **(Judge Block)** |
| | ) | |
| **THE UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S REPLY TO DEFENDANT'S COUNTERCLAIM (SPECIAL PLEA IN FRAUD)**

For its Reply to Defendant's Counterclaim (Special Plea In Fraud), Plaintiff Veridyne Corporation (hereinafter "Veridyne") admits, denies and alleges as follows:

71. Denies the allegations set forth in the first sentence of paragraph 71 and alleges that Veridyne has remained a small business, pursuant to Small Business Administration ("SBA") Size Standards, since its inception in 1986. By way of further response, Veridyne's June, 1989 certification by SBA for participation in the 8(a) Program was set at the standard nine (9) years, meaning Veridyne was always scheduled to "graduate" from the 8(a) Program in June of 1998. Denies the allegations in the second sentence of paragraph 71 as stated and alleges the Veridyne contacted MARAD officials to inquire as to whether the contract at issue in this litigation ("the Contract") could be continued past completion of the fourth Option Year, which was due to expire in or about March of 2000.

72. Denies the allegations in the first sentence of paragraph 72, and alleges that MARAD officials initially informed Veridyne that no additional years could be added to the Contract; it was only after Veridyne's then counsel provided MARAD with legal support that MARAD agreed to consider an extension. The second

sentence of paragraph 72 contains a legal conclusion to which no response is necessary and, to the extent it is an allegation of fact, it is denied as stated. Veridyne's June 1998 "graduation" from the 8(a) Program had been scheduled since its June 1989 admission to the Program; thus no one had a "belief" as to such graduation; both Veridyne and MARAD officials knew precisely when Veridyne was scheduled to graduate. The third sentence of paragraph 72 is denied as stated. Veridyne was instructed by MARAD to submit its proposal to extend the Contract by March 30, 1998 so that it could be submitted by MARAD to SBA for approval by mid-April.

73. The first sentence of paragraph 73 represents a legal conclusion to which no response is necessary. To the extent the first sentence represents a statement of fact, it is denied and Veridyne alleges that the cited statute and the regulation promulgated thereunder (13 CFR §124.506) provide that "a procurement offered and accepted for [the 8(a) Program] must be competed among eligible [8(a) Program] Participants," if, (i) there is a reasonable expectation that at least two eligible Participants will submit offers, and, (ii) the anticipated award price exceeds $5,000,000 for manufacturing and $3,000,000 for all other contracts. See 13 CFR § 124.506(a). An un-priced option or extension to an 8(a) contract is considered a new contract action. See 13 CFR §124.514(c). The third sentence of paragraph 73 is denied and Veridyne alleges that MARAD Program Office officials, satisfied with Veridyne's performance, requested that MARAD Acquisition officials consider the extension. By way of further response, the Contract, as originally awarded, was not the result of a competition, but, rather, was awarded to Veridyne on a sole source basis; its dollar value exceeded $20 million. The third sentence of paragraph 73 is

denied and Veridyne alleges that it was informed by MARAD that the Contract could be extended only in an estimated amount that did not exceed $3 million.

74. Paragraph 73 is denied as stated. Veridyne's proposal, which formed the basis for Modification 23, made clear that, as was the case with work ordered during the Contract's original Five (5) year term, "the specific tasking of work will be through the issuance of Work Orders and Technical Directives" by MARAD. By way of further response, Modification 23 specifically stated:

> 3. The scope of work and all terms and conditions of the contract are unchanged. Funds are obligated by Delivery Orders issued under this contract, therefore no funds are committed at this time.

By way of still further response, Modification 23 stated that MARAD was only obligated to order TEN (10%) PERCENT of the estimated dollar value for each of the Five (5) option years, or total of $299,999.48.

75. The first sentence of paragraph 75 is admitted. By way of further response, Veridyne was instructed by MARAD to submit a proposal with a not to exceed estimated cost of $3,000,000 and to delineate what services could be provided to MARAD for that estimated amount. The second sentence of paragraph 75 is denied. Veridyne denies that its estimate was inaccurate, since the proposal and Mod 23 both clearly stated that Veridyne would only provide services in response to individual work orders issued by authorized MARAD officials (thus Modification 23 stated that no funds were obligated thereby). By way of further response, Modification 23 also stated that MARAD was only obligated to order TEN (10%) PERCENT of the estimated services set forth therein (i.e., $299,999.48); after that amount, additional work orders were totally discretionary on the part of MARAD. Veridyne is without knowledge or information sufficient to form a belief as to the truth

of the first clause of the third sentence of paragraph 75; as to the second clause of the third sentence, Veridyne admits that Mr. Patterson made the statement. By way of further response, Mr. Patterson's statement was made several years after the estimate, when MARAD had issued some $30 million worth of work orders during the Five (5) year extension, and in response to a question by an investigator from the DOT Inspector General's office (Mr. Kevin Durkin), who asked what Mr. Patterson thought of the Modification 23 estimates, based on the quantity of work MARAD had actually ordered. The fourth sentence of paragraph 75 is denied. Veridyne denies that its estimate was inaccurate and denies that it knew of what some MARAD officials were "aware," or that anyone at MARAD was "relying" on Veridyne's estimate. By way of further response, Veridyne was directed to submit a proposal in an amount not to exceed $3 million and to delineate what services it could provide MARAD for that amount. As set forth in the proposal and Modification 23, any services provided by Veridyne during the additional Five (5) years were to be in response to Work Orders, issued by authorized MARAD officials, the issuance of which was not within Veridyne's control. The value of the work orders guaranteed to Veridyne under Modification 23 was $299,999.48; after that amount was reached, any additional work orders were totally discretionary on the part of MARAD.

76. The first sentence of paragraph 76 is admitted. By way of further response, in addition to MARAD, SBA also executed Modification 23, on May 20, 1998. The second sentence of paragraph 23 is denied. Veridyne denies that its estimate of performance costs was "false" or inaccurate. Veridyne's proposal to extend the Contract and Modification 23 itself both provided that work would be performed by Veridyne in response to individual MARAD work orders. Per Modification 23, MARAD only committed to order $299,999.48 worth of services

from Veridyne; after that amount was reached, issuance of any additional work orders was totally discretionary on the part of MARAD.

77. The allegation of paragraph 77 is denied. Veridyne's lawsuit is premised on moneys owed it for services provided pursuant to individual work orders issued by authorized MARAD officials, as is further described, *infra*. By way of further response, Veridyne performed no services pursuant to Modification 23; Modification 23 incorporated all the terms and conditions of the Contract, including the requirement that services provided by Veridyne be provided pursuant to individual MARAD work orders. Modification 23 also specifically stated that funds would only be "obligated by Delivery Orders issued under this contract," and that, "no funds are committed at this time."

78. The allegations in paragraph 78 represent conclusions of law to which no response is required. To the extent they represent allegations of fact, the allegations are denied.

79. Veridyne incorporates its responses to paragraphs 71-78 of Defendant's Counterclaim.

80. The allegations of paragraph 80 are denied. Modification 23 had an estimate based on MARAD's instruction, as is set forth, supra. There was no "cost" associated with Modification 23; Modification 23 specifically stated that no funds were obligated thereby.

81. The allegations in paragraph 81 are denied. Veridyne denies that it is making any claim "related to Modification 23," or that it has "corruptly practiced or attempted to practice" fraud against Defendant. Veridyne's claims in the instant lawsuit are premised on individual work orders issued by MARAD officials acting

within their authority, i.e., Work Order Nos. 812 – 815, 817-819 and 822 – 823, which Veridyne was contractually-obligated to honor.

82. The allegations of paragraph 82 represent either a legal conclusion or a characterization of the relief sought by Defendant, neither of which requires a response from Veridyne.

AFFIRMATIVE DEFENSES

83. In June of 1989 Veridyne was certified by SBA for participation in SBA's 8(a) Program supporting minority-owned businesses; Veridyne was admitted to the Program for the standard nine (9) year term, meaning it was scheduled to "graduate" from the Program in June of 1998.

84. In late 1997 or early 1998, Veridyne approached MARAD officials and inquired as to whether the Contract could be extended for additional performance years, since Veridyne was scheduled to graduate from the 8(a) in June of 1998; it was told that was not possible.

85. Veridyne's counsel at the time provided MARAD with legal support for the proposition that the Contract could be extended by adding additional years, even beyond Veridyne's graduation from the 8(a) Program, so long as the extension was accomplished while Veridyne was still in the 8(a) Program; Veridyne was then advised by MARAD officials that an extension of the Contract was possible and would be considered.

86. A meeting was convened on February 19, 1998 with MARAD Contracting Officer Rita Jackson to discuss the extension; Veridyne was represented at the meeting by its then Executive Vice President, Michael Genna.

87. Following the meeting, Mr. Genna sent Ms. Jackson a letter confirming what had been discussed regarding a Contract extension; the issues included

Veridyne's acknowledgement that the estimated cost in any proposal Veridyne would submit would be in an amount, "NTE [not to exceed] $3,000,000 in the aggregate."

88. Ms Jackson then sent Veridyne a letter stating that the MARAD Program Office had requested extension of the Contract, and that based upon Veridyne's presentation at the February 19 meeting and concurrence by MARAD's counsel, MARAD was willing to consider a proposal from Veridyne for an extension of the Contract; Ms. Jackson requested that Veridyne deliver its proposal for extension of the Contract to MARAD by March 30, so that it could be submitted by MARAD to SBA for its approval by mid-April.

89. Veridyne submitted its cost proposal for extension of the Contract on March 30, 1998; as discussed at the February 19 meeting, Veridyne proposed to provide services in an amount less than $3,000,000 (including award fees) over an additional Five (5) years; Veridyne also acknowledged that, as was the case with work ordered by MARAD during the first Five (5) years under the Contract, "the specific tasking of work [during the extension] will be through the issuance of Work Orders and Technical Directives."

90. The discussions between MARAD and Veridyne culminated in the execution of Modification 0023 to the Contract, by MARAD Contracting Officer Wayne Cutrell and Veridyne's President Samuel J. Patterson on May 18, 1998, and by SBA Contracting Officer Ollie Adams on May 20.

91. Modification 0023, stated, in pertinent part, as follows:

> 1. This modification is issued to provide five additional (1) (sic) year option periods to this contract. The current contract has one option period remaining, Option Period Four, which begins March 27, 1998 [sic, 1999] through March 26, 2000. <u>Upon the discretion of the Contracting Officer</u>, a written notice will be provided

> to the contractor giving notice of the beginning of the first of five additional one year option periods. This first period is designated Option Year Five, beginning March 27, 2000 through March 26, 2001. The option periods will be exercised at the sole discretion of the Government.
>
> * * *
>
> 3. The scope of work and all terms and conditions of the contract are unchanged. Funds are obligated by Delivery Orders issued under this contract, therefore no funds are committed at this time.

Modification 0023, page 2 of 7 (emphasis supplied).

92. Modification 0023, in sum and substance, added five (5) additional option years; March 27, 2000, through March 26, 2001, March 27, 2001 through March 26, 2002, March 27, 2002 through March 26, 2003, March 27, 2003 through March 26, 2004 and March 27, 2004 through March 26, 2005; Modification 0023 provided the following estimated costs and award fee pool (by period):

| | | |
|---|---|---|
| Option Year Five Period | $1,202,982.00 | $87,783.00 |
| Option Year Six Period | $ 808,316.00 | $57,718.00 |
| Option Year Seven Period | $ 379,669.00 | $27,528.00 |
| Option Year Eight Period | $ 230,962.00 | $18,400.00 |
| Option Year Nine Period | $ 172,769.00 | $13,821.00 |

However, Modification 23 also stated that MARAD was only obligated to order TEN (10%) of each year's estimated amount, meaning the only work guaranteed to Veridyne under Modification was some $299,985.00; any additional work orders were totally discretionary on the part of MARAD.

93. On March 22, 2000, MARAD Contracting Officer Erica Williams, acting within the scope of her authority, issued unilateral modification 0032 to the Contract, extending the contract term for an additional year (i.e., the first option year of the Modification 0023 extension), from March 27, 2000 through March 26, 2001; as stated in Modification 0032, no funds were obligated thereby, as funding would be obligated by the issuance of individual work orders issued under the Contract.

94. By September 30, of 2000, Veridyne had invoiced approximately $3,168,088 in costs, all incurred in response to work orders issued by MARAD contracting officers during Option Year Five (i.e., the first year of the Modification 0023 extension).

95. Based on its invoicing for its work on the work orders described in ¶ 19, supra, by September 30, 2000, MARAD had ordered in excess of the estimated work for the entire additional five years established in Modification 0023, and Veridyne had billed the entire award fee; MARAD then disallowed the provisional fees included in Veridyne invoices 150 and 151.

96. By unilateral Modification 0033, dated March 23, 2001, MARAD Contracting Officer Williams, acting within the scope of her authority, exercised the second option under Modification 0023, extending the contract period from March 27, 2001 through March 26, 2002 (the second year of the Modification 0023 extension).

97. By letter dated April 25, 2001 MARAD Contracting Officer Benedict J. Burnowski proposed a new award fee pool, as follows:

| | |
|---|---|
| Option Year 5 | $370,099 |
| Option Year 6 | $339,931 |
| Option Year 7 | $311,517 |
| Option Year 8 | $311,517 |
| Option Year 9 | $311,517 |
| | $1,644,581 |

98. Following further discussions between Mr. Burnowski and Veridyne, Mr. Burnowski sent Veridyne a "draft" bilateral modification (i.e., 0035) to the Contract; the draft modification provided, in part, as follows:

> 1. Where the Government has exceeded the maximum order limitations for option years 5 through 9 of this contract, the Contractor agrees to honor any and all orders, including those that exceed the maximum order

limitation, from the Government up to a maximum of 645,407 labor hours (inclusive of labor hours incurred by its first tier subcontractor, INS) for the consideration set forth in paragraph 14.2 below. Please note that while the contract does not include FAR clause 52.216-19, Order Limitations, section B of the contract states that this is an Indefinite Delivery, Indefinite Quantity type contract and this contract type requires the inclusion of the aforementioned clause.

2. It is estimated that the work necessary to accomplish the requirements of this contract for the performance period covered by option year 5 through 9 will require an increase in the total estimated cost by $29,614,729 from $2,794,698 to $32,409,427.39 by reason of this modification. The fee is increased $2,044,750 from $205,250 to $2,250,000 of which $843,750.00 shall be base fee and $1,406,250.00 shall be the maximum award fee available. The year by year changes to total estimated cost and fee are shown in the revised section B for option years 5 and 9 is made part of this modification.

99. Modification 0035 was executed by Veridyne pursuant to Mr. Burnowski's instructions, but was never formally executed by MARAD; however MARAD and Veridyne proceeded to operate in accordance with its parameters, as confirmed in a signed written communication from MARAD Contracting Officer Williams, acting within the scope of her authority, stating that "this is the version of Mod 35 we are currently working against."

100. On March 22, 2002, MARAD Contract Officer Williams, acting within the scope of her authority, executed unilateral Modification 0038 to the Contract, exercising the option to extend the term for the period March 27, 2002 through March 26, 2003 (i.e., the second year under the Modification 0023 extension); no funds were obligated thereby as funding was to be obligated by individual Delivery Orders.

101. On March 20, 2003, MARAD Contracting Officer William, acting within the scope of her authority, executed unilateral Modification 0046 to the Contract,

extending the Contract for the period March 27, 2003 through March 26, 2004 (i.e., the fourth year under the Modification 0023 extension); no funds were obligated thereby, as funding was to be obligated "incrementally."

102. On March 19, 2004, MARAD Contracting Officer Williams, acting within the scope of her authority, executed unilateral Modification 0052 to the Contract, exercising the option to extend the term for the period March 27, 2004 through March 26, 2005 (i.e., the fifth and final year under the Modification 0023 extension); no funds were obligated thereby, as funds were to be obligated by individual work orders.

103. Following the Modification 0052 exercise of the fifth option year under the Modification 0023 extension, on April 20, 2000 MARAD Contracting Officer Williams, acting within the scope of her authority, issued FIVE (5) new work orders to Veridyne under the Contract, i.e., Nos. 812, 813, 814, 815 and 817.

104. On April 21, 2004 MARAD Contracting Officer Williams, acting within the scope of her authority, issued Two (2) additional work orders to Veridyne under the Contract, i.e., Nos. 819 and 822.

105. On August 25, 2004 MARAD Contracting Officer Williams, acting within the scope of her authority, issued another work order to Veridyne under the Contract, i.e., No. 823.

106. Of the invoices MARAD has refused to pay, the first SEVEN (7), i.e., Nos. 260 through 266 are all for services provided by Veridyne under Work Order Nos. 812 – 815, 817, 819 and 822 – 823; the final invoice, i.e., No. 267 is for costs continuing until the originally scheduled completion date for the Contract, i.e., March 27, 2005.

107. The exercise of no less than Four (4) of the options authorized in Modification 0023 by MARAD Contracting Officer Williams, acting within the scope of her authority and with full knowledge that all the estimated services in Modification 0023 had been ordered, amounts to a ratification of Modification 0023, thereby vitiating any alleged defect in that modification's execution.

108. Modification 0035 amounts to a ratification of Modification 0023, thereby vitiating any alleged defect in Modification 0023's execution.

109. The issuance of Work Orders 812 – 815, 817, 819 and 822 – 823 by MARAD Contracting Officer Williams, acting within the scope of her authority and with knowledge that MARAD had previously ordered services in excess of the estimate in Modification 0023, waived any alleged defect in Modification 0023's execution.

Wherefore, Plaintiff Veridyne respectfully requests that Defendant's Counterclaim (Special Plea In Fraud) be dismissed and that it be awarded the amounts sought in its Amended Complaint, together with such other relief as the Court deems just and proper.

Respectfully submitted,

s/ Marc Lamer

Marc Lamer
Attorney for Plaintiff

Date: August 21, 2006