**No. 06-150C**
**Judge Block**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**VERIDYNE CORPORATION**

**Plaintiff,**

**v.**

**THE UNITED STATES OF AMERICA**

**Defendant.**

---

# PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM OF LAW

---

**Marc Lamer**
**Attorney for Plaintiff**

**Kostos and Lamer, P.C.**
**1608 Walnut Street**
**Suite 1300**
**Philadelphia, PA 19103**
**(215) 545-0570**

# TABLE OF CONTENTS

**Page**

Table of Contents…………………………………………………………………………… i

Table of Authorities………………………………………………………………………… ii

Statutes and Regulations…………………………………………………………………..iii

Table of Contents for Appendix…………………………………………………………….iv

Plaintiff's Motion For Partial Summary Judgment……………………………………..1

Memorandum Of Law In Support Of Plaintiff's Motion For Partial
Summary Judgment…………………………………………………………..................1

I. Introduction…………………………………………………………………………..1

II. Statement of Facts………………………………………………………………….1

III. Argument………………………………………………………………………….....1

A. Standards For The Granting Of Summary Judgment……….........1

B. Background………………………………………………………..............2

C. Modification 0023 Was Valid On Its Face…………………………....3

D. Veridyne Is Entitled To Payment Under The Theory
Of Equitable Estoppel………………………………………………..6

E. To The Extent Execution Of Modification 0023 May
Have Been Unauthorized, It Was Subsequently
Ratified Institutionally………………………………………………..9

IV. Conclusion……………………………………………………………............13

## TABLE OF AUTHORITIES

Page

**Cases**

AT&T and Lucent Tec., Inc. v. U.S., 177 F.3d, 1368, 1375-76 (Fed. Cir. 1999)…………………………………………………………………....3,5,6

Broad Avenue Laundry & Tailoring v. U.S., 681 F.2d 746 (Ct. Cl.1982)……………7

Burnside-Ott Aviation Training Center v. U.S., 985 F.2d 1574, 1582 (Fed. Cir. 1993)……………………………………………………………………….2

Celotex v. Catrett, 477 U.S. 317 (1986)………………………………………………2

Dalmatch Group, Ltd. v. United States 40 Fed. Cl. 431, 438 (1998)…………………9

Del-Rio Drilling Programs Inc. v. U.S., 146 F.3d 1358, 1363 (Fed Cir. 1998)………………………………………………………………………..2

Digicon Corp. v. United States, 56 Fed. Cl. 425, 426 (2003)…………………………9

Emeco Indus., Inc. v U.S. 485 F.2d 652 (Ct. Cl. 1973)………………………………..7

Eyherabide v. U.S., 345 F.2d 565, 570 (Ct. Cl. 1965)…………………………………2

Federal Crop Ins. Corp. v. Merril, 332 U.S. 380 (1947)……………………….............3

Heckler, Sec. Of Health & Human Services v. Community Health Services of Crawford Co., 467 U.S. 51, 57-60 (1984)…………………………………7

Janowski v. United States, 133 F.3d 888, 892 (Fed. Cir. 1998)……………………..9

John Reiner & Co. v. U.S., 163 Ct. Cl. 381, 386-87, 325 F.2d 438 (1963)..............5,6

K&R Engineering Company, Inc. v. The United States, 616 F.2d 469 (Ct. Cl. 1980)…………………………………………………………………………...12

Portmann v. U.S., 674 F.2d 1155 (7th Cir.1982)………………………………………7

Pure Gold, Inc. v. Syntex (USA) Inc., 739 F.2d 624, 627 (Fed. Cir. 1984)…………2

Schweiker v. Hansen, 450 U.S. 785 (1981)…………………………………………6

Silverman v. United States, 230 Ct. Cl. 701, 679 F.2d 865 (1982))…………….…...9

United Pac. Ins. Co. v. Roche, 401 F.3d 1362, 1371 (Fed. Cir. 2000)……………..8

## TABLE OF AUTHORITIES (Cont'd)

### Statutes and Regulations

**Page**

31 U.S.C. §1341…………………………………………………………………………..3

31 U.S.C. §1501(a)(1)(A)……………………………………………………………………...2

13 C.F.R. §124.506(a)(1)(ii)……………………………………………………………......4

13 C.F.R §124.506(d)……………………………………………………………………..5,8

**TABLE OF CONTENTS**
**OF APPENDIX**

**Page**

**Volume I**

1. Declaration of Samuel J. Patterson……………………………………………………1

2. Contract DTMA91-95-C-00024 (“the Contract”) (“Exhibit “A”)…………………........22

3. Subcontract 0303-95-1-00055 (Exhibit “B”)……………………………….............80

4. Modification 0001 to the Contract (Exhibit “C”)…………………………………...84

5. Letter dated February 25, 1998 from Michael Genna to
Rita Jackson (Exhibit “D”)………………………………………………………...89

6. Letter dated March 10, 1999 from Rita Jackson to
Samuel J. Patterson (Exhibit “E”)………………………………………...............92

7. Veridyne Cost Proposal for Contract Extension (Exhibit “F”)..............................93

8. Modification 0023 to the Contract (Exhibit “G”)…….……………………..............151

9. Modification 0026 to the Contract (Exhibit “H”)…….……………………………….159

10. Modification 0032 to the Contract (Exhibit “I”)……………………..…………………...161

11. Letter dated September 26, 2000 from Erica Williams
to Samuel J. Patterson (Exhibit “J”)………………………………......................163

12. Letter dated October 18, 2000 from Glenn I. Downer to
Benedict J. Burnowski (Exhibit “K”)……..………………………………….............164

13. Letter dated November 6, 2000 from Glenn I. Downer to
Erica Williams (Exhibit “L”)…………………..…………………….........................167

14. Letter dated February 7, 2001 from Erica Williams to
Samuel J. Patterson (Exhibit “M”)……………………………………....................174

15. Modification 0033 to the Contract (Exhibit “N”)……………………….................176

**TABLE OF CONTENTS**
**OF APPENDIX (Continued)**

**Page**

16. Letter dated April 25, 2001 from Benedict J. Burnowski to Glenn I. Downer (Exhibit "O")……178

17. Cover letter from Benedict J. Burnowski to Samuel Patterson with Draft Modification 0035 to the Contract (Exhibit "P")……187

**Volume II**

1. Draft Modification 0035 to the Contract, executed by Veridyne with note from Erica Williams. (Exhibit "Q")……194

2. Modification 0036 to the Contract (Exhibit "R")……208

3. Modification 0038 to the Contract (Exhibit "S")……209

4. Modification 0039 to the Contract (Exhibit "T")……211

5. Modification 0040 to the Contract (Exhibit "U")……214

6. Modification 0041 to the Contract (Exhibit "V")……217

7. Modification 0042 to the Contract (Exhibit "W")……221

8. Modification 0044 to the Contract (Exhibit "X")……223

9. Modification 0045 to the Contract (Exhibit "Y")……226

10. Modification 0046 to the Contract (Exhibit "Z")……230

11. Modification 0048 to the Contract (Exhibit "AA")……231

12. Modification 0049 to the Contract (Exhibit "AB")……235

13. Modification 0050 to the Contract (Exhibit "AC")……237

14. Modification 0051 to the Contract (Exhibit "AD")……240

15. Modification 0052 to the Contract (Exhibit "AE")……243

16. Work Order No. 812 (Exhibit "AF")……245

**TABLE OF CONTENTS**
**OF APPENDIX (Continued)**

**Page**

17. Work Order No. 813 (Exhibit "AG")……………………………………………….260

18. Work Order No. 814 (Exhibit "AH")…………………………...................... 270

19. Work Order No. 815 (Exhibit "AI")……………………………………………278

20. Work Order No. 817 (Exhibit "AJ")…………………………………………........... 294

21. Work Order No. 819 (Exhibit "AK")……………………………………………..307

22. Work Order No. 822 (Exhibit "AL")…………………………………………….. 318

23. Modification 0001 to Work Order No. 813 (Exhibit "AM")……..……………………..326

24. Modification 0001 to Work Order No. 812 (Exhibit "AN")…………………….……329

25. Modification 0053 to the Contract (Exhibit "AO")………..……………………………332

26. Modification 0001 to Work Order No. 822 (Exhibit "AP")……….……….............334

27. Modification 0002 to Work Order No. 812 (Exhibit "AQ")…..……………………..337

28. Modification 0002 to Work Order No. 813 (Exhibit "AR")…..……………………340

29. Modification 0001 to Work Order No. 815 (Exhibit "AS")……………………............343

30. Modification 0002 to Work Order No. 822 (Exhibit "AT")……………………...........346

31. Modification 0002 to Work Order No. 815 (Exhibit "AU")……………………............349

32. Modification 0003 to Work Order No. 815 (Exhibit "AV")………………...............352

33. Work Order No. 823 (Exhibit "AW")……………………………………………………355

34. Modification 0055 to the Contract (Exhibit "AX")…………………........................361

**Volume III**

1. Veridyne Invoice No. 260 (Exhibit "AY")………………………………………….....365

2. Veridyne Invoice No. 261 (Exhibit "AZ")……………………………….…………….431

**TABLE OF CONTENTS**
**OF APPENDIX (Continued)**

**Page**

3. Veridyne Invoice No. 262 (Exhibit "BA")……..……….………………………….491

**Volume IV**

1. Veridyne Invoice No. 263 (Exhibit "BB")…………………………………........575

2. Veridyne Invoice No. 264 (Exhibit "BC")……………………………….………623

3. Veridyne Invoice No. 265 (Exhibit "BD")………..……………………………...685

**Volume V**

1. Veridyne Invoice No. 266 (Exhibit "BE")……….....……………………………...768

2. Veridyne Invoice No. 267 (Exhibit "BF")…………………………………........890

3. Copy of Veridyne claim letter (Exhibit "BG")……………………………….927

4. Letter dated August 29, 2005 from Director of MARAD's
Office of Acquisition to Veridyne (Exhibit "BH")……………................................928

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Rule 56, Rules of the United States Court of Federal Claims, Plaintiff, Veridyne, Inc. ("Veridyne"), respectfully moves the Court to grant it partial Summary Judgment. Specifically, Veridyne seeks judgment in its favor on Count I of its Amended Complaint in the amount of $2,267,163.96. This motion is supported by the Declaration of Veridyne's President, Samuel J. Patterson, plus the exhibits attached thereto, Plaintiff's Proposed Findings of Uncontroverted Fact and the attached Memorandum of Law.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**I. Introduction**

Plaintiff Veridyne, Inc. ("Veridyne" or "Plaintiff") has moved the Court, pursuant to R.C.F.C. 56, for partial Summary Judgment in its favor (*i.e.*, on Count I of its Amended Complaint). It is requesting judgment in its favor in the amount of $2,267,163.96, representing payment for services provided to Defendant pursuant to several work orders issued to Plaintiff by authorized contracting officers, as is more fully set forth *infra*.

**II. Statement of Facts**

For its Statement of Facts, Veridyne hereby incorporates its Proposed Findings of Uncontroverted Fact, submitted herewith.

**III. Argument**

**A. Standards For The Granting Of Summary Judgment**

A Motion for Summary Judgment will lie whenever there is no genuine issue as

to any material fact and the moving party is entitled to Judgment as a matter of law. Celotex v. Catrett, 477 U.S. 317 (1986).

Even if some factual issues were to remain unresolved, Summary Judgment still remains proper where the non-moving party fails to submit proof contradicting the moving party's assertions. That failure to come forward and set forth specific contradictory evidence that could be offered at trial results in the motion being granted. Pure Gold, Inc. v. Syntex (USA) Inc., 739 F.2d 624, 627 (Fed. Cir. 1984); Burnside-Ott Aviation Training Center v. U.S., 985 F.2d 1574, 1582 (Fed. Cir. 1993).

**B. Background**

Government officials' actions "cannot be characterized as unauthorized merely because [those actions] may have been mistaken, imprudent or wrongful." Del-Rio Drilling Programs Inc. v. U.S., 146 F.3d 1358, 1363 (Fed Cir. 1998), citing Eyherabide v. U.S., 345 F.2d 565, 570 (Ct. Cl. 1965).[1]

Here several critical evidentiary factors must be noted:

First, the (tri-partite) Contract, the execution of which was overseen by two government agencies, was, as entered into, in full compliance with 31 U.S.C. §1501 (a)(1)(A), Documentary Evidence Requirement for Government Obligations, in that it and all of its modifications and extensions were in writing and for a purpose authorized by law, *i.e.*, the purchase of needed services; each individual action was clearly within

1 The Del-Rio Case was decided in a slightly different setting; therein the plaintiff sued under the Tucker Act on both "taking claims" and a breach of contract claim. The Court made it clear its reasoning applied to both types of claims. 146 F.3d 1367.

the MARAD contracting officer's scope of authority.[2]

Second, there is no suggestion, nor can there be, that the work orders issued to Veridyne, which Veridyne was obligated to fulfill by the terms of the Contract, violated in any way the Anti-Deficiency Act, 31 U.S.C. § 1341. For each order, appropriated funds were available and allocated for the purchase of the required services, which were ordered when required by MARAD.

Third, no fault of any kind was found with the services rendered by Veridyne and utilized by MARAD. The agency rated Veridyne's overall performance as "superior".

Finally, even after MARAD was clearly aware that the continued issuance of further work orders would cause the ordered services to exceed the maximum estimated ordering amount set forth in Modification 0023, it consciously exercised further contract extension options and issued additional service work orders under the Contract as extended. MARAD utilized services rendered by Veridyne and then ultimately refused to pay for those services, thereby inflicting great economic harm on Veridyne.

### C. Modification 0023 Was Valid On Its Face

No one disputes the general rule that Government agents operate under limited authority, which, when exceeded, does not obligate the public fisc. Federal Crop Ins. Corp. v. Merril, 332 U.S. 380 (1947); however, there are well-grounded exceptions, pertinent and applicable here. AT&T and Lucent Tec., Inc. v. U.S., 177 F.3d, 1368,

2 There was one written contract modification (Modification 0035) which, on its face, was never executed by the MARAD; however, a stamp of approval was given to that modification by the contracting officer in a signed writing which informed Veridyne that the "draft" Modification 0035 is "[what] we are currently operating against." See A. 207

1375-76 (Fed. Cir. 1999).

The Merril reasoning, *supra*, limits its applicability to entitlement situations where the unauthorized Government agent's action would charge the public treasury for something specifically prohibited by Congress. In that case, a Department of Agriculture agent mistakenly told a farmer that the Government insurance program covered a spring wheat crop reseeded on winter wheat acreage. Congress never authorized such insurance. After the spring wheat crop failed, the Supreme Court ultimately enforced the Act of Congress and denied payment to the injured farmer, reasoning that to do otherwise would permit an agent of the executive branch to usurp and invade the province granted Congress by the Constitution, thereby violating the separation of powers doctrine.

The instant case is a far cry from Merril; it is not an entitlement case. MARAD had adopted a business posture in its dealings with Plaintiff. MARAD and its contracting officers had the authority to buy services such as those which Veridyne provided, and SBA clearly had the authority to grant exceptions to the three million dollar contract limit imposed by its own regulation.[3] Further, the purchases were from funds appropriated for general purposes, including the purchase of the services ordered and utilized by MARAD. Here, there was no unauthorized raid on the public fisc. What the two Government agencies (MARAD and SBA) countenanced was permitting the MARAD contracting officers to satisfy MARAD's legitimate service needs from an 8(a) contractor, without competitive bidding, though beyond the $3,000,000 limit imposed by

3 As it obviously did upon execution of the Contract, since SBA executed both the Contract (A. 22) and the Subcontract (A. 81) when the dollar amount exceeded $3,000,000.

SBA regulation, *i.e.*, 13 CFR §124.506(a)(1)(ii), a regulation which permits waivers of that limit. See 13 CFR §124.506(d). Because that regulation is waivable, the contractor is not necessarily privy to that internal action, and because under IDIQ contracts the quantities to be ordered are uncertain, what MARAD was going to order, beyond a stated minimum, was unknown.[4] Under such a scenario the alleged illegality, if there was any, cannot be classified as "plain", and it has been held that a court should only "impose the binding stamp of nullity when the illegality is plain", John Reiner & Co. v. U.S., 163 Ct. Cl. 381, 386-87, 325 F.2d 438 (1963).

Equally important, equally instructional and equally controlling is AT&T and Lucent Tec., supra, at pp 1375-76 where the Court of Appeals for the Federal Circuit made the following observations:

> "The fact that a procurement practice is prohibited does not necessarily mean that it is therefore actionable. The discipline to be administered in such cases is a responsibility of the cognizant procurement officials within the agency [and not] this court"
>
> * * *
>
> "Precedent reinforces our conclusion that the ... contract is not void ab initio. The invalidation of a contract after it has been fully performed is not favored."
>
> * * *
>
> "In Reiner the court recognized the dilemma of a contractor who becomes aware, while deep in performance of a contract, of a possible procurement illegality he did not cause: the contractor must either continue to perform a contract of uncertain validity or discontinue performance and risk severe penalties..."

---

4 In fact, Modification 0023 only required that MARAD order 10% of the established dollar value. See, A. 154-158.

Finally, the court concluded, after examining precedent, that

> "when a contract or a provision thereof is in violation of law but has been performed, the courts have variously sustained the contract, reformed it to correct the illegal term, or allowed recovery under an implied contract theory; the courts have not, however, simply declared the contract "void ab initio." Id.

Here the alleged illegality was far from "plain". All the services provided by Veridyne were pursuant to individual work orders issued by MARAD Contracting Officers, precisely as had been the practice throughout contract performance. Had Veridyne even suspected that the work orders issued by the contracting officers were beyond their authority, it would have been presented with a dilemma as envisioned in John Reiner, supra. Had Veridyne refused to perform the work orders as ordered, presumably it would have been terminated for default, subjected to the risk of being assessed reprocurement costs, its performance record for future procurements affected, and its government contracting business seriously jeopardized.

**D. Veridyne Is Entitled To Payment Under The Theory Of Equitable Estoppel.**

As recognized by AT&T and Lucent Tec., supra, where a contract is in violation of law but performance has been rendered, various remedial procedures are available to avoid forfeiture.

Here one appropriate remedy is an estoppel in pais, also known as equitable estoppel.

Although the Supreme Court in Schweiker v. Hansen, 450 U.S. 785 (1981), an entitlement case, declared that the general rule that the United States is not estopped

by the unauthorized commitments of its agents, is alive and well; it did, nevertheless, leave the door open to exceptions, especially where "countervailing interest of citizens in some minimum standard of decency, honor and reliability in their dealings with the Government" is involved. See comments of Mr. Justice Stevens in Heckler, Sec. Of Health & Human Services v. Community Health Services of Crawford Co., 467 U.S. 51, 57-60 (1984)

Evidence that the door to estoppel is open was clearly recognized by the Federal Circuit's predecessor, the Court of Claims in Broad Avenue Laundry & Tailoring v. U.S., 681 F.2d 746 (1982). In that decision, the Court cited, in support of its approval of an estoppel against the United States, the Seventh Circuit's decision in Portmann v. U.S., 674 F.2d 1155 (1982). The Court of Claims briefed the Portmann case as follows:

> The claim of estoppel was against the U.S. Postal Service by the owner of a package lost in the mail. The blunder by the postal clerk was to assure the mailer that insurance offered by the Service included "document reconstruction," though in fact by regulation it did not. The court upheld the estoppel on consideration of all the factors. The fact the government had gone into the market place as vendor, and that the right claimed was contractual and not merely to an entitlement, were seen as distinguishing factors that justified an estoppel despite Schweiker v. Hansen.

681 F2d at 748. Here, of course, MARAD entered the market place to purchase much-needed services. No entitlement was involved and the requirements for an estoppel in pais are present.

The elements for an estoppel have been distilled into the following, in: Emeco Indus., Inc. v U.S. 485 F.2d 652 (Ct. Cl. 1973):

1) the party to be estopped must be aware of the existence of an important fact;

2) it must have intended its conduct be acted upon;

3) the other party must have been unaware of the existence of the aforementioned important fact;

4) and it must have relied on the former's conduct to its detriment.

Here only MARAD and SBA would know whether 13 CFR §124.506(d) had been complied with (*i.e.*, that a waiver of the $3,000,000 contract limit had been granted to MARAD to exceed the estimate set forth in Modification 0023). Clearly MARAD intended its conduct in issuing work orders be acted upon by Veridyne. Veridyne, the 8(a) contractor, equally clearly, was in no position to know whether an additional waiver of the three million dollar limit had been granted at some point after Modification. 0023, or, indeed, whether such additional waiver was even necessary. Finally there can be no question as to Veridyne's detrimental reliance. Were MARAD to have its way, the fruit of Veridyne's work would be forfeited creating the spectacle of having an 8a company subsidizing the Government to the extent of millions of dollars.

If additional affirmative misconduct on the part of the Government is required for estoppel, United Pac. Ins. Co. v. Roche, 401 F.3d 1362, 1371 (Fed. Cir. 2000), that misconduct can be found in the fact that even when MARAD was aware that the orders it had issued exceeded the three million dollars set forth in Modification 0023, it continued to issue work orders to Veridyne, even extending the contract at least three times by invoking additional options in Modification 0023, and, until virtually the very end, paying Veridyne for the services it rendered pursuant to those purchase orders.

**E. To The Extent Execution Of Modification 0023 May Have Been Unauthorized, It Was Subsequently Ratified Institutionally.**

It is well-settled that where the Government seeks and receives the benefits from or otherwise unauthorized contract. There is an institutional ratification of that contract. See, Digicon Corp. v. United States, 56 Fed. Cl. 425, 426 (2003), citing Janowski v. United States, 133 F.3d 888, 892 (Fed. Cir. 1998) (citing Silverman v. United States, 230 Ct. Cl. 701, 679 F.2d 865 (1982)); Dalmatch Group, Ltd. v. United States 40 Fed. Cl. 431, 438 (1998). In Digicon Corp., supra, the court cited the following as evidence of institutional ratification:

> Here, the Air Force demonstrated its acceptance of the Task Order (the "contract") by executing an express written agreement, explicitly and repeatedly recognizing the existence of the contract, and by benefiting from the products and services provided by Digicon under the contract for sixteen (16) months. The Air Force further confirmed its intent to treat the contract as a binding commitment by making over $16 million in payments and attempting to exit the agreement under the terms of the contract. Lastly, Ms. Kathy Williams, a contracting officer with unlimited contracting authority, was directly involved in the implementation and oversight of the contract. These indicia of intent sufficiently demonstrate the government's institutional ratification of the contract.

56 Fed. Cl. at 426.

Veridyne would respectfully submit, that if the actions of the Government in Digicon Corp. amounted to an institutional ratification, then there can be no doubt the same occurred in this situation. Veridyne would respectfully direct the Court to the following:

1. By September of 2000 (at the latest) MARAD was aware that work orders

issued to Veridyne in the first of the five (5) additional years added by Modification 0023 had exhausted the entire estimated dollar value of the modification. See Exhibit "J" to Patterson Declaration, A. 163.

2. That resulted in MARAD Contracting Officer Williams requesting Veridyne to submit a proposal with a new estimate, which Veridyne did on November 6, 2000; the new estimate totaled nearly $7 million. See Exhibit "L" to Patterson Declaration; A. 167-173.

3. On March 23, 2001, MARAD Contracting Officer Williams issued unilateral Modification 0033 to the Contract, extending it for another year (*i.e.*, the second of the five (5) years added via Modification 0023). See Exhibit "N" to Patterson Declaration; A. 176-177.

4. After the Contract was extended via unilateral Modification 0033, MARAD issued no less then seven (7) work orders pursuant to which Veridyne provided some $4,466,612 worth of services for which it billed MARAD and received payment. Patterson Declaration, ¶¶ 38-39; A. 9.

5. Following a June, 2001 meeting, MARAD Contracting Officer Burnowski sent Veridyne "Draft" Modification 0035, which provided a new estimate for work orders during the five (5) years covered by Modification 0023: $32,409,427.39. See Exhibit "P" to Patterson Declaration; A. 187-193.

6. Per Mr. Burnowski's instructions, Veridyne signed and returned "Draft" Modification 0035 to MARAD; while the modification was never executed by MARAD, Veridyne was informed in a hand-written note from Contracting Officer Williams that,

"this is the version of Mod 0035 we are currently working against." See Patterson Declaration, ¶ 44 and Exhibit "Q;" A. 11; 194-207.

7. On March 22, 2002, MARAD Contracting Officer Williams extended the Contract for the third of Modification 0023's five (5) years via unilateral Modification 0038. See Exhibit "S" to Patterson Declaration; A. 209-210.

8. Following the issuance of Modification 0038, Contracting Officer Williams issued eight (8) work orders, pursuant to which Veridyne provided MARAD with some $8,507,780.00 worth of services, submitted its invoices and received payment. Patterson Declaration, ¶¶ 48-49; A. 12.

9. On March 20, 2003, MARAD Contracting Officer Williams issued unilateral Modification 0046 to the Contract, extending it for the fourth option year under Modification 0023. See Exhibit "Z" to Patterson Declaration; A. 230.

10. Following the issuance of unilateral Modification 0046, Contracting Officer Williams issued seven (7) new work orders, pursuant to which Veridyne provided MARAD with some $6,949,701.00 worth of services for which it invoiced and received payment. Patterson Declaration, ¶¶ 56-57; A. 14.

11. On March 19, 2004, Contracting Officer Williams issued unilateral Modification 0052 to the Contract extending it for the fifth and final year of the Modification 0023 extension. See Exhibit "AE" to Patterson Declaration; A. 243-244.

12. Following the issuance of Modification 0052, Contracting Officer Williams issued seven (7) new work orders; with subsequent modifications, the seven (7) work orders totaled some $2,888,269.00 worth of services ordered by MARAD. See

Patterson Declaration, ¶¶ 63 through 71 and Exhibits "AF" through "AV;" A. 15-17; 245-354.

13. Veridyne provided MARAD with the services ordered in the seven (7) work orders issued in the fifth option year under Modification 0023 and, by August 31, submitted invoices totaling $1,133,301.54 which MARAD paid in full. See Patterson Declaration, ¶ 73; A. 18.

Clearly, MARAD's actions after it knew that the entire estimated dollar value of Modification 0023 had been ordered amount to an institutional ratification of Modifications 0023 (and 0035). Nor does the terminology of "fraud" or "void ab initio" change the outcome. In the seminal case of K&R Engineering Company, Inc. v. The United States, 616 F.2d 469 (Ct. Cl. 1980), the court held that a contract tainted by illegally was void ab initio, thereby denying the contractor any recovery and allowing the Government to recover payments made before the illegality was discovered. However, the count pointed out that the Government had acted promptly once it discovered the illegality. Contrast that situation with the instant situation wherein MARAD was aware by no later than June 2001 that it would not only exceed the $3 million dollars estimated in Modification 0023 with its orders to Veridyne, but would exceed it ten-fold. See Draft Modification 0035; A. 187-193. Yet MARAD continued to issue work orders to Veridyne, accept services from Veridyne pursuant to those work orders and pay Veridyne for those services for another three (3) years. Surely the Government must have lost the right to pull out its "void ab initio" card by that point.

## IV. Conclusion

Based on the foregoing, Plaintiff's Motion For Partial Summary Judgment should be granted, and judgment in the amount of $2,267,163.96 should be entered in its favor.

Respectfully submitted,

/s/ Marc Lamer

Marc Lamer
Attorney for Plaintiff

Date: November 3, 2006