No. 06-150C
Judge Block

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

VERIDYNE CORPORATION

Plaintiff,

v.

THE UNITED STATES OF AMERICA

Defendant.

# APPENDIX TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

VOLUME I
Pages 1 – 193

Marc Lamer
Attorney for Plaintiff

Kostos and Lamer, P.C.
1608 Walnut Street
Suite 1300
Philadelphia, PA 19103
(215) 545-0570

# TABLE OF CONTENTS
# FOR APPENDIX
# Volume I

**Page**

1. Declaration of Samuel J. Patterson ........................................ 1
2. Contract DTMA91-95-C-00024 ("the Contract") ("Exhibit "A") ................22
3. Subcontract 0303-95-1-00055 (Exhibit "B") ....................................80
4. Modification 0001 to the Contract (Exhibit "C") ..............................84
5. Letter dated February 25, 1998 from Michael Genna to Rita Jackson (Exhibit "D") ........................................................89
6. Letter dated March 10, 1999 from Rita Jackson to Samuel J. Patterson (Exhibit "E") ...........................................92
7. Veridyne Cost Proposal for Contract Extension (Exhibit "F") .................93
8. Modification 0023 to the Contract (Exhibit "G") .............................151
9. Modification 0026 to the Contract (Exhibit "H") .............................159
10. Modification 0032 to the Contract (Exhibit "I") ...........................161
11. Letter dated September 26, 2000 from Erica Williams to Samuel J. Patterson (Exhibit "J") .....................................163
12. Letter dated October 18, 2000 from Glenn I. Downer to Benedict J. Burnowski (Exhibit "K") ......................................164
13. Letter dated November 6, 2000 from Glenn I. Downer to Erica Williams (Exhibit "L") ................................................167
14. Letter dated February 7, 2001 from Erica Williams to Samuel J. Patterson (Exhibit "M") .........................................174
15. Modification 0033 to the Contract (Exhibit "N") ...........................176
16. Letter dated April 25, 2001 from Benedict J. Burnowski to Glenn I. Downer (Exhibit "O") ...............................................178

**TABLE OF CONTENTS**
**FOR APPENDIX**
**Volume I (Cont'd)**

**Page**

17. Cover letter from Benedict J. Burnowski to Samuel Patterson with Draft Modification 0035 to the Contract (Exhibit "P")....................187

**IN THE COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **VERIDYNE CORPORATION** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v** | ) | **No. 06-150C** |
| | ) | |
| | ) | |
| **THE UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DECLARATION OF SAMUEL J. PATTERSON**

1. I am the President of Veridyne Corporation ("Veridyne"), plaintiff in the above-entitled action, and I am authorized to make this Declaration on its behalf.

2. Veridyne was formed in 1986, under its then name Shepard Patterson & Associates, Inc. (for clarity purposes, the entity will be referred to as "Veridyne" throughout), to engage in the business of consulting in the area of information technology; Veridyne is, and has always been since its inception, a "small business," as that term is defined in the regulations and size standards promulgated by the United States Small Business Administration ("SBA").

3. In June of 1989 Veridyne was certified by SBA for participation in SBA's 8(a) Program supporting minority-owned businesses; Veridyne was admitted to the 8(a) Program for the standard nine (9) year term, meaning it was at all times scheduled to "graduate" from the 8(a) Program in June of 1998; Veridyne received its first significant 8(a) Program contract in 1992.

4. In late 1994, Veridyne became aware of an opportunity to secure an 8(a) Program contract with the Department of Transportation's Maritime Administration ("MARAD") to provide logistic support services.

5. The 8(a) Program contractor performing the services for MARAD in late 1994 or early 1995 was a company known as Information Network Services ("INS").

6. INS was scheduled to graduate from the 8(a) Program in 1995, and MARAD officials were desirous of maintaining the requirement as one that was set aside for 8(a) Program contractors.

7. Veridyne submitted a proposal to MARAD for award of a contract; there was no competition as such, since the procurement was conducted as a "sole source" directed to Veridyne under the 8(a) Program.

8. On March 14, 1995, MARAD awarded Contract DTMA91-95-C-00024 (the "Contract") to SBA, under the 8(a) Program. A copy of the Contract is attached hereto as Exhibit "A."

9. SBA then awarded Subcontract No. 0303-95-1-00055 (the "Subcontract") to Veridyne. A copy of the Subcontract is attached hereto as Exhibit "B."

10. The Contract was an indefinite delivery, indefinite quantity, Cost Plus Award Fee Contract, covering a base year and four one (1) year options. See Exhibit A, pages A-1 and B-1 through B-6.

11. In "Brief Description Of Services," on page B-1, the Contract described the services to be provided by Veridyne as follows:

> This is an Indefinite Delivery, Indefinite Quantity, Cost Plus Award Fee Contract. The total purpose of this contract is to provide for comprehensive logistic support services necessary to maintain and enhance, where necessary, MARAD's Logistics Programs in support of the Ready Reserve Force (RRF) and its overall mission. The Contractor resources shall manage the Equipment Configuration and Spare Parts Management Information System (ECSMIS) programs and be available to respond

to the various logistics support requirements of the RRF.

* * * *

See Exhibit "A," page B-1.

12. In "Statement Of Work," C.2, the Contract provided that Veridyne would provide services to MARAD, "as needed in accordance with authorized written work orders." See Exhibit "A," page C-2.

13. In "Work Order Procedures," F.7 on page F-3, the Contract provided, in (d), as follows: "The Contractor shall perform work under this contract as specified in the written work orders issued by the Contracting Officer." See Exhibit "A," page F-7.

14. The Contract also provided the following estimated cost and "award fee pool," by year:

| | | |
|---|---|---|
| Base Year Period | $2,789,874.56 | $323,189.96 |
| Option Year One Period | $3,754,201.14 | $300,336.09 |
| Option Year Two Period | $4,283,181.76 | $342,654.54 |
| Option Year Three Period | $4,305,572.15 | $344,445.77 |
| Option Year Four Period | $4,426.697.39 | $354,135.79 |

See Exhibit "A," pages B-1 through B-6.

15. In terms of the award fee, the Contract provided for a maximum award fee of Eight (8%) Percent, with half of that figure, <u>i.e.</u>, Four (4%) Percent, payable semi-monthly as a provisional fee; thereafter, based on MARAD's evaluation of Veridyne's performance per contract quarter, Veridyne could receive additional award fees up to the Eight (8%) Percent maximum figure; it could also be required to repay part (or all) of the provisional award fees it had received in a quarter, if MARAD judged Veridyne's performance to have been unacceptable. See G-6, Payment Of Provisional Award Fee, Exhibit "A," page G-3.

16. MARAD established the following performance for determination of the award fees Veridyne could receive:

| | | | |
|---|---|---|---|
| Superior Rating: | 4 | Fee: | 8% |
| Highly Satisfactory Rating: | 3 | Fee | 6%-7% |
| Satisfactory Rating: | 2 | Fee | 4%-5% |
| Marginal Rating: | 1 | Fee | 1%-3% |
| Unsatisfactory Rating: | 0 | Fee | 0% |

See, e.g., Modification 0001 to the Contract, page 4. A copy of Modification 0001 is attached hereto as Exhibit "C."

17. Veridyne began performing on the Contract in 1995, in all cases pursuant to work orders issued by MARAD contracting officers.

18. From the date of Award (i.e., March 27, 1995), through the fourth option year, Veridyne received authorized work orders totaling approximately $20.1 million; in terms of award fees, Veridyne received the full 8% award fee for virtually all of the TWENTY (20) performance quarters, based on its performance having been rated "Superior" (i.e., an average point rating of at least 3.75) by MARAD; Veridyne, therefore, received some $1.564 million in award fees.

19. In late 1997 or early 1998, I approached MARAD officials and inquired as to whether the Contract could be extended for additional performance years, since Veridyne was scheduled to graduate from the 8(a) Program in June of 1998; I was told that was not possible.

20. Veridyne's counsel at the time provided MARAD with legal support for the proposition that the Contract could be extended by adding additional years, even beyond Veridyne's graduation from the 8(a) Program, so long as the extension was accomplished while Veridyne was still in the 8(a) Program; I was then advised by MARAD officials that an extension of the Contract was possible and would be considered.

21. A meeting was convened on February 19, 1998 with MARAD Contracting Officer Rita Jackson to discuss the extension idea; Veridyne was represented at the meeting by its then Executive Vice President, Michael Genna.

22. Following the meeting, Mr. Genna sent Ms. Jackson a letter confirming what had been discussed regarding a Contract extension; the issues included Veridyne's acknowledgement that the estimated cost in any proposal Veridyne would submit would be a figure, "NTE [not to exceed] $3,000,000 in the aggregate." A copy of Mr. Genna's February 25, 1998 letter is attached hereto as Exhibit "D."

23. Ms. Jackson then sent me a letter stating that the MARAD Program Office had requested extension of the Contract, and that, based on upon Veridyne's presentation at the February 19 meeting and concurrence by MARAD's counsel, MARAD was willing to consider a proposal from Veridyne for extension of the Contract; Ms Jackson requested Veridyne's proposal by March 30, 1998, so that MARAD could forward the proposal to SBA for its approval by mid-April. A copy of Ms. Jackson's March 10, 1998 letter is attached hereto as Exhibit "E."

24. Veridyne submitted its cost proposal for extension of the Contract on March 30, 1998; as discussed at the February 19 meeting, Veridyne proposed to provide services in an amount slightly less than $3,000,000 (including award fees) over an additional FIVE (5) years; Veridyne also acknowledged that, as was the case with work ordered by MARAD during the first FIVE (5) years under the Contract, "the specific tasking of work [during the extension] will be through the issuance of Work Orders and Technical Directives." A copy of Veridyne's Cost Proposal for extension of the Contract is attached hereto as Exhibit "F."

25. The discussions between MARAD and Veridyne culminated in the execution of Modification 0023 to the Contract, by MARAD and Veridyne on May 18,

1998, and by SBA on May 20. A copy of Modification 0023 is attached hereto as Exhibit "G."

26. Modification 0023, described itself as follows:

> 1. This modification is issued to provide five additional (1) (sic) year option periods to this contract. The current contract has one option period remaining, Option Period Four, which begins March 27, 1998 [sic, 1999] through March 26, 2000. Upon the discretion of the Contracting Officer, a written notice will be provided to the contractor giving notice of the beginning of the first of five additional one year option periods. This first period is designated Option Year Five, beginning March 27, 2000 through March 26, 2001. The option periods will be exercised at the sole discretion of the Government.
>
> * * *
>
> 3. The scope of work and all terms and conditions of the contract are unchanged. Funds are obligated by Delivery Orders issued under this contract, therefore no funds are committed at this time.

See Modification 0023 (i.e., Exhibit "G"), page 2 of 7 (emphasis supplied).

27. Modification 0023, in sum and substance, added five (5) additional option years; March 27, 2000, through March 26, 2001, March 27, 2001 through March 26, 2002, March 27, 2002 through March 26, 2003, March 27, 2003 through March 26, 2004 and March 27, 2004 through March 26, 2005; Modification 0023 provided the following estimated costs and award fee pool (by period):

| | | |
|---|---|---|
| Option Year Five Period | $1,202,982.00 | $87,783.00 |
| Option Year Six Period | $ 808,316.00 | $57,718.00 |
| Option Year Seven Period | $ 379,669.00 | $27,528.00 |
| Option Year Eight Period | $ 230,962.00 | $18,400.00 |
| Option Year Nine Period | $ 172,769.00 | $13,821.00; |

however, Modification 0023 also stated that MARAD was only obligated to order TEN (10%) PERCENT of each year's estimated amount, meaning the only work guaranteed to Veridyne under Modification 0023 was $299,985.00.

28. On March 25, 1999 MARAD Contracting Officer Erica Williams issued unilateral Modification 0026 to the Contract, extending the term of the Contract from March 27, 1999 through March 26, 2000 (i.e., Option Year Four under the original award); as stated in Modification 0026, no funds were obligated thereby, as funding would be obligated by individual Delivery Orders issued under the contract. A copy of Modification 0026 is attached hereto as Exhibit "H."

29. On March 22, 2000, MARAD Contracting Officer Williams issued unilateral modification 0032 to the Contract, extending the contract term for an additional year (i.e., the first year of the Modification 0023 extension), from March 27, 2000 through March 26, 2001; as stated in Modification 0032, no funds were obligated thereby, as funding would be obligated by the issuance of individual Delivery Orders issued under the Contract. A copy of Modification 0032 is attached hereto as Exhibit "I."

30. Following the issuance of Modification 0032 on March 22, 2000, MARAD Contracting Officer Williams issued Task Orders 412 through 419 on April 12, 2000; including subsequent modifications issued by MARAD, the total value of Task Orders 412 through 419 was $7,225,141.30, broken down as follows.

| | |
|---|---|
| Task Order 412 | $788,204.00 |
| Task Order 413 | $705,323.00 |
| Task Order 414 | $2,834,391.00 |
| Task Order 415 | $1,428,420.50 |
| Task Order 416 | $643,033.00 |
| Task Order 417 | $459,967.80 |
| Task Order 418 | $47,052.00 |
| Task Order 419 | $318,743.00 |

31. By September of 2000, Veridyne had invoiced approximately $3,168,088 in costs, all incurred in response to work orders issued by MARAD

contracting officers during Option Year Five (i.e., the first year of the Modification 0023 extension).

32. Based on Veridyne's invoicing for services provided in response to the work orders described in ¶ 30, supra, by September 2000 MARAD clearly knew that it had, by that time, ordered more than the estimated work for the entire additional five years established in Modification 0023, and that Veridyne had billed the entire five-year award fee; thus, MARAD disallowed $1,862.50 of the provisional fees included in Veridyne Invoice No. 150. A copy of the September 26, 2000 letter from MARAD Contracting Officer Williams is attached hereto as Exhibit "J."

33. By letter dated October 18, Veridyne proposed adjustments to the award fees in the Contract. A copy of the October 18, 2000 letter is attached hereto as Exhibit "K."

34. At the request of MARAD Contracting Officer Williams, on November 6, 2000 Veridyne submitted a proposal outlining new estimates for Option Years 5 through 9 under the Contract; the amount of the estimates totaled $6,926,981.27, including $3,294,811.27 which had already been invoiced through September 30, 2000 for work ordered by MARAD during Option Year 5. A copy of Veridyne's November 6, 2000 letter is attached hereto as Exhibit "L."

35. By letter dated February 7, 2001, MARAD Contracting Officer Williams informed Veridyne that in addition to the $1,862.50 in provisional fees that had been disallowed from Invoice No. 150, another $89,585.86 in provisional fees had been disallowed from Veridyne's subsequent invoices; the letter further informed Veridyne that, pending resolution of the changes in the estimate for the Option Year 5-9 work, Veridyne could invoice the total provisional fees disallowed ($91,448.36), subject to

adjustment (i.e., possible repayment to MARAD) once a final resolution was reached. A copy of the February 7 letter is attached hereto at Exhibit "M."

36. In any event, Veridyne provided MARAD with all of the services ordered under Task Orders 412 through 419, submitted its invoices for the services and, ultimately, received payment in full.

37. By unilateral Modification 0033, dated March 23, 2001(i.e., prior to resolution of the estimated cost of the full five year extension), MARAD Contracting Officer Williams exercised the second option under Modification 0023, extending the contract period from March 27, 2001 through March 26, 2002 (the second year of the Modification 0023 extension). A copy of Modification 0033 is attached hereto as Exhibit "N."

38. Shortly after issuance of Modification 0033 exercising option year two under Modification 0023, on April 12, 2001 MARAD Contracting Officer Williams issued Task Orders 512 through 515 and 517 through 519; including subsequent modifications issued by MARAD, the total value of Task Orders 512 through 515 and 517 through 519 was $4,466,612, broken down as follows:

| | |
|---|---|
| Task Order 512 | $226,114.00 |
| Task Order 513 | $385,210.00 |
| Task Order 514 | $2,852,451.00 |
| Task Order 515 | $673,225.00 |
| Task Order 517 | $122,276.00 |
| Task Order 518 | $20,000.00 |
| Task Order 519 | $187,336.00 |

39. Veridyne provided MARAD with all the services ordered under Task Orders 512 through 515 and 517 through 519, submitted its invoices for those services and received full payment from MARAD.

40. By letter dated April 25, 2001 MARAD Contracting Officer Benedict J. Burnowski proposed a new award fee pool, as follows:

| | |
|---|---|
| Option Year 5 | $370,099 |
| Option Year 6 | $339,931 |
| Option Year 7 | $311,517 |
| Option Year 8 | $311,517 |
| Option Year 9 | $311,517 |
| | $1,644,581 |

A copy of the April 25 letter is attached hereto as Exhibit "O."

41. Following Mr. Burnowski's April 25, 2001 letter, he and representatives of Veridyne met on or about June 25, 2001, to negotiate a revised estimate for Option Years 5-9.

42. Following the June 25 meeting, MARAD Contracting Officer. Burnowski sent Veridyne a "draft" bilateral modification (i.e., 0035) to the Contract); the draft modification provided, in part, as follows:

> 1. Where the Government has exceeded the maximum order limitations for option years 5 through 9 of this contract, the Contractor agrees to honor any and all orders, including those that exceed the maximum order limitation, from the Government up to a maximum of 645,407 labor hours (inclusive of labor hours incurred by its first tier subcontractor, INS) for the consideration set forth in paragraph 14.2 below. Please note that while the contract does not include FAR clause 52.216-19, Order Limitations, section B of the contract states that this is an Indefinite Delivery, Indefinite Quantity type contract and this contract type requires the inclusion of the aforementioned clause.
>
> 2. It is estimated that the work necessary to accomplish the requirements of this contract for the performance period covered by option year 5 through 9 will require an increase in the total estimated cost by $29,614,729 from $2,794,698 to $32,409,427.39 by reason of this modification. The fee is increased $2,044,750 from $205,250 to $2,250,000 of which $843,750.00 shall be base fee and $1,406,250.00 shall be the maximum award fee available. The year by year changes to total estimated cost and fee are shown in the revised section B for option years 5 and 9 is made

part of this modification.

A copy of the draft modification is attached hereto as Exhibit "P."

43. According to Mr. Burnowski's undated transmittal letter, "Draft" Modification 0035 "reflects and implements the agreement reached in our discussions of June 25, 2001;" execution of the modification, according to the letter, was "conditioned on the review and approval of MARAD's Contract Review Team." See Exhibit "P" page 1.

44. As instructed by MARAD Contracting Officer Burnowski in his transmittal letter, Veridyne executed Modification 0035 and returned it to Mr. Burnowski; though it was never formally executed by MARAD, nevertheless, MARAD and Veridyne proceeded to operate in accordance with Modification 0035's parameters, as confirmed in a written communication signed by MARAD Contracting Officer Williams, stating that "this is the version of Mod 0035 [i.e., the version executed by Veridyne] we are currently working against." A copy of Modification 0035, as executed by Leonard Freiberg for Veridyne, together with Ms. Williams note is attached hereto as Exhibit "Q."

45. On September 28, 2001, MARAD Contracting Officer Burnowski executed unilateral Modification 0036 to the Contract, increasing the total award fee by $263,152.00. A copy of Modification 0036 is attached hereto as Exhibit "R."

46. On March 22, 2002, MARAD Contract Officer Williams executed unilateral Modification 0038 to the Contract, exercising the option to extend the term for the period March 27, 2002 through March 26, 2003 (i.e., the second year under the Modification 0023 extension); no funds were obligated thereby as funding was to be obligated by individual Delivery Orders. A copy of Modification 0038 is attached hereto as Exhibit "S."

47. On March 28, 2002 (i.e., the day after commencement of the third option year under Modification 0023), MARAD Contracting Officer Williams issued Task Orders 612 through 615 and 617 – 618; subsequently two (2) additional task orders were issued to Veridyne by Contracting Officer Williams during Option Year 7, i.e., Nos. 619 and 622.

48. The dollar value for Work Orders 612 through 615, 617 through 619 and 622, including subsequent modifications issued by MARAD, was $8,507,780.00, broken down as follows:

| | |
|---|---|
| Task Order 612 | $475,419.00 |
| Task Order 613 | $650,633.00 |
| Task Order 614 | $3,882,278.00 |
| Task Order 615 | $1,757,273.00 |
| Task Order 617 | $468,448.00 |
| Task Order 618 | $20,883.00 |
| Task Order 619 | $437,896.00 |
| Task Order 622 | $835,000.00 |

49. Veridyne provided MARAD with all of the services under Task Orders 612 through 615, 617 through 619 and 622, submitted its invoices for those services and received full payment from MARAD.

50. On April 24, 2002, MARAD Contracting Officer Williams executed unilateral Modifications 0039 and 0040 to the Contract, authorizing Veridyne to bill the full award fee of $72,607.24 for the periods October through December 2001 and January through March 2002, based on Veridyne's performance having been evaluated as "Superior" for each period (i.e., average point scores of 3.92173913 and 3.879032258 respectively). Copies of Modifications 0039 and 0040 are attached hereto as Exhibit "T" and "U."

51. On August 12, 2002, MARAD Contracting Officer Williams executed unilateral Modification 0041 to the Contract, authorizing Veridyne to bill the full

award fee of $66,593.01 for the period April through June, 2002, based on Veridyne's performance having been rated "Superior" for the period (i.e., a perfect 4.0 average point score). A copy of Modification 0041 is attached hereto as Exhibit "V."

52. On September 26, 2002, MARAD Contracting Officer Williams executed unilateral Modification 0042 to the Contract, adding funding in the amount of $66,593.01 to the award fee pool. A copy of Modification 0042 is attached hereto as Exhibit "W."

53. On October 25, 2002, MARAD Contracting Officer Williams executed unilateral Modification 0044 to the Contract, authorizing Veridyne to invoice the full award fee of $66,593.01 for the period July through September, 2002, based on Veridyne's performance having been rated "Superior" for the period (i.e., an average point score of 3.831858407). A copy of Modification 0044 is attached hereto as Exhibit "X."

54. On February 26, 2003, MARAD Contracting Officer Williams executed unilateral Modification 0045 to the Contract, authorizing Veridyne to invoice the full award fee of $66,593.01 for the period October through December, 2002, based on Veridyne's performance having been rated "Superior" for the period (i.e., an average point score of 3.831858407). A copy of Modification 0045 is attached hereto as Exhibit "Y."

55. On March 20, 2003, MARAD Contracting Officer William executed unilateral Modification 0046 to the Contract, extending the Contract for the period March 27, 2003 through March 26, 2004 (i.e., the fourth year under the Modification 0023 extension); no funds were obligated thereby, as funding was to be obligated "incrementally." A copy of Modification 0046 is attached hereto as Exhibit "Z."

56. Subsequent to the issuance of Modification 0040 extending the contract for the fourth year under Modification 0023, MARAD Contracting Officer Williams issued Task Orders 712 through 715, 717, 719 and 720; including subsequent modifications, the total value of Task Orders 712 through 715, 717, 719 and 722, including subsequent modifications issued by MARAD, was $6,949,701..00, broken down as follows:

| | |
|---|---|
| Task Order 712 | $436,133.00 |
| Task Order 713 | $496,241.00 |
| Task Order 714 | $3,842,694.00 |
| Task Order 715 | $1,546,857.00 |
| Task Order 717 | $212,045.00 |
| Task Order 719 | $86,792.00 |
| Task Order 720 | $328,937.00 |

57. Veridyne provided MARAD with all the services ordered under Task Orders 712 through 715, 717, 719 and 720, submitted its invoices for those services and received full payment from MARAD.

58. On May 15, 2003, MARAD Contracting Officer Williams executed unilateral Modification 0048 to the Contract, authorizing Veridyne to invoice the full award fee of $66,593.01 for the period January through March, 2003, based on Veridyne's performance having been rated "Superior" for the period (i.e., an average point score of 3.941747573). A copy of Modification 0048 is attached hereto as Exhibit "AA."

59. On August 15, 2003, MARAD Contracting Officer Williams executed unilateral Modification 0049 to the Contract, authorizing Veridyne to invoice the full award fee of $66,593.01 for the period of April through June, 2003, based on Veridyne's performance having been rated "Superior" for the period (i.e., an average

point of 3.95862069). A copy of Modification 0049 is attached hereto as Exhibit "AB."

60. On November 5, 2003, MARAD Contracting Officer Williams executed unilateral Modification 0050 to the Contract, authorizing Veridyne to invoice the full award fee of $66,593.01 for the period of July through September, 2003, based on Veridyne's performance having been rated "Superior" for the period (i.e., an average point of score 3.97972973). A copy of Modification 0050 is attached hereto as Exhibit "AC."

61. On January 28, 2004, MARAD Contracting Officer Williams executed unilateral Modification 0051 to the Contract, authorizing Veridyne to invoice for the full award fee of $66,593.01 for the period October through December, 2003, based on Veridyne's performance having been rated "Superior" for that period (i.e., an average point score of 3.979452055). A copy of Modification 0051 is attached hereto as Exhibit "AD."

62. On March 19, 2004, MARAD Contracting Officer Williams executed unilateral Modification 0052 to the Contract, exercising the option to extend the term for the period March 27, 2004 through March 26, 2005 (i.e., the fifth and final year under the Modification 0023 extension); no funds were obligated thereby, as funds were to be obligated by individual work orders. A copy of Modification 0052 is attached hereto as Exhibit "AE."

63. On April 20, 2004, MARAD Contracting Officer Williams issued Work Order Nos. 812, 813, 814, 815 and 817, in the amounts of $114,000.00, $80,000.00, $935,000.00, $382,000.00 and $51,000.00 respectively, to Veridyne under the Contract. Copies of Work Order Nos. 812 – 815 and 817 are attached hereto as Exhibits "AF," AG," AH," "AI" and "AJ."

64. On April 21, 2004, MARAD Contracting Officer William issued Work Order Nos. 819 and 822, in the amounts of $10,000.00 and $90,000.00 respectively, to Veridyne under the Contract. Copies of Work Order Nos. 819 and 822 are attached hereto as Exhibits "AK" and "AL."

65. Also on April 21, 2004, MARAD Contracting Officer Williams issued unilateral Modification 0001 to Work Order 813, adding $20,000.00 in funding, thereby bringing total funding for that work order to $100,000.00. A copy of Modification 0001 to Work Order 813 is attached hereto as Exhibit "AM."

66. On May 13, 2004, MARAD Contracting Officer Williams issued unilateral Modification 0001 to work order 812, adding $21,000.00 in funding, thereby bringing total funding for that work order to $135,000.00. A copy of Modification 0001 to Work Order 812 is attached hereto as Exhibit "AN."

67. On May 18, 2004, MARAD Contracting Officer Williams executed unilateral Modification 0053 to the Contract, authorizing Veridyne to invoice for full award fee of $66,593.01 for the period January through March, 2004, based on Veridyne's performance having been rated "Superior" for the period (i.e., an average point score of 3.895104845). A copy of Modification 0053 is attached hereto as Exhibit "AO."

68. On June 23, 2004, MARAD Contracting Officer Williams issued unilateral Modification 0001 to work order 822, adding $40,269.00 in funding, thereby bringing total funding for that work order to $130,269.00. A copy of Modification 0001 to Work Order 822 is attached hereto as Exhibit "AP."

69. On June 30, 2004, MARAD Contracting Officer Williams issued Four (4) unilateral modifications to "open" work orders, as follows:

a) Modification 0002 to Work Order 812, adding $94,000 in funding, thereby bringing total funding for that work order to $229,000.00;

b) Modification 0002 to Work Order 813, adding $52,000.00 in funding, thereby bringing total funding for that Work Order to $152,000.00;

c) Modification 0001 to Work Order 815, adding $418,000 in funding thereby bringing total funding for that work order to $800,000.00; and

d) Modification 0002 to work order 822, adding $81,000.00 in funding, thereby bringing total funding for that work order to $211,269.00.

Copies of Modifications 0002 to Work Order 812, 0003 to Work Order 813, 0001 to Work Order 815 and 0002 to Work Order 822 are attached hereto as Exhibits "AQ," "AR," "AS" and "AT."

70. On July 1, 2004, MARAD Contracting Officer Williams issued unilateral Modification 0002 to Work Order 815; adding $250,000.00 in funding, thereby bringing total funding for that Work Order to $1,050,000.00. A copy of Modification 0002 to Work Order 815 is attached hereto as Exhibit "AU."

71. On August 3, 2004, MARAD Contracting Officer Williams issued unilateral Modification 0003 to Work Order 815, adding $250,000.00 in funding, thereby bringing total funding for that work order to $1,300,000.00. A copy of Modification 0003 to Work Order 815 is attached hereto as Exhibit "AV."

72. On August 25, 2004, MARAD Contracting officer Williams issued Work Order No. 823, in the amount of $260,000.00, to Veridyne under the Contract; Work Order No. 823 covered the completion of Work Orders 812-815, 817, 819 and 822 and the transitioning of the work under the Contract to whomever the successful



17

contractor was that ultimately received the award of the follow-on contract. A copy of Work Order No. 823 is attached hereto as Exhibit "AW."

73. As of August 31, 2004, Veridyne had invoiced MARAD a total of $1,133,301.54 in connection with Work Order 812 – 817, 819 and 822; MARAD paid that amount in full.

74. On September 14, 2004, MARAD Contracting Officer Williams executed unilateral Modification 0055 to the Contract authorizing Veridyne to invoice $44,418.00 for award fee for the period April through June, 2004; notwithstanding the fact that Veridyne's performance for the period had been rated "Superior" overall, with an average point score of 3.715447154 (25 of 29 evaluations rated as "4"), the Performance Evaluation Board and Fee Determining Official reduced the award fee by one-third (1/3), due to Veridyne only having been awarded a rating of "2" (i.e., "Satisfactory") for 3 of 29 ratings. A copy of Modification 0055 is attached hereto as Exhibit "AX."

75. On September 28, 2004, Veridyne submitted Invoice No. 260, in the amount of $246,116.05, for services rendered to MARAD during the period September 1 through September 15, 2004, in connection with Work Orders 812 – 817, 819 and 822. A copy of Invoice 260 is attached hereto as Exhibit "AY."

76. On October 15, 2004, Veridyne submitted Invoice No. 261, in the amount of $345,740.95, for services rendered to MARAD during the period September 16 through September 30 in connection with Work Orders 812 – 817, 819 and 822. A copy of Invoice 261 is attached hereto as Exhibit "AZ."

77. On November 1, 2004, Veridyne submitted Invoice No. 262, in the amount of $224,416.16, for services provided to MARAD during the period October

1 through October 15 in connection with Work Orders 812 – 817, 819 and 822. A copy of Invoice No. 262 is attached hereto as Exhibit "BA."

78. On November 15, 2004, Veridyne submitted Invoice No. 263, in the amount of $244,905.45, for services provided to MARAD during the period October 16 through October 31 in connection with work orders 812 through 817, 819 and 822. A copy of Invoice 263 is attached hereto as Exhibit "BB."

79. On November 24, 2004, Veridyne submitted Invoice No. 264, in the amount of $202,818.19, for services provided to MARAD during the period November 1 through November 15 in connection with Work Orders 812 – 817, 819 and 822. A copy of Invoice No. 264 is attached hereto as Exhibit "BC."

80. On or about December 7, 2004, Veridyne was informed by MARAD's General Counsel that MARAD considered Modification 0023 to the Contract to have been void ab initio, on the basis that Veridyne had to have known that MARAD would order more than the estimated $2,999,994.80 set forth in Modification 0023, thereby making Veridyne's acceptance of Modification 0023 tantamount to fraud; Veridyne's contract performance was then suspended by MARAD's General Counsel, who also informed Veridyne that invoices 260 through 265 would not be paid.

81. Subsequently, Veridyne submitted three (3) additional invoices: No. 265, dated December 15, 2004, in the amount of $288,871.74 for services provided to MARAD during the period of November 16 through November 30 in connection with Work Order Nos. 812 through 815 and 822; No. 266, dated December 30, 2004, in the amount of $491,185.05, for services rendered to MARAD during the period December 1 through 31, 2004 in connection with Work Orders 812 through 817, 819 and 822 – 823, and No. 267, dated March 31, 2005, for services rendered to

MARAD in connection with closing down operations. Copies of Invoices 265, 266 and 267 are attached hereto as Exhibits "BD," "BE" and "BF."

82. As with the earlier Five (5) invoices, MARAD refused to pay Invoices 265, 266 and 267, bringing the total of invoice payments due Veridyne and withheld by MARAD to $2,267,163.96.

83. After several months of fruitless effort aimed at convincing MARAD to pay Veridyne's invoices, by letter dated June 13, 2005, I re-submitted Invoices 260 through 267 as a certified claim ("the Claim"), pursuant to the Contracts Disputes Act; a Final Decision was requested in the letter. Veridyne's "computer copy" of the claim letter (without attachments) is attached hereto as Exhibit "BG."

84. Veridyne was informed by way of a letter dated August 29, 2005 from the Director of MARAD's Office of Acquisition that no Final Decision would be issued in response to the Claim, because "the matter involves allegations of fraud." A copy of the August 29 letter is attached hereto as Exhibit "BH."

85. After more than sixty (60) days elapsed from submittal of the Claim, Veridyne instituted this action in the Court of Federal Claims as a "deemed denial" of the Claim.

86. If there were fraud (using the unreal subjunctive), Veridyne was not a party to it and was victimized by it.

87. I am aware that on more than one (1) occasion, the MARAD General Counsel requested that the U.S. Attorney for the Northern District of Virginia initiate a criminal prosecution of Veridyne; however, I am informed that the U.S. Attorney declined prosecution each time.

Signed under penalty of perjury this day of , 2006 at Broomall, Pennsylvania.

Samuel J. Patterson

# AWARD/CONTRACT

1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 350) ▶ RATING | PAGE A1 OF PAGES A1

2. CONTRACT (Proc. Inst. Ident.) NO.: DTMA91-95-C-00024

3. EFFECTIVE DATE: See Blk 20C

4. REQUISITION/PURCHASE REQUEST/PROJECT NO.:

5. ISSUED BY CODE
Department of Transportation
Maritime Administration, MAR-380
Office of Acquisition, Room 7314
400 Seventh St., S.W.
Washington, DC 20590

6. ADMINISTERED BY (If other than Item 5) CODE

7. NAME AND ADDRESS OF CONTRACTOR (No., street, city, county, State and ZIP Code)
U. S. Small Business Administration
Philadelphia Regional Office
475 Allendale Road, Suite 201
King of Prussia, Pennsylvania 19406

CODE | FACILITY CODE

8. DELIVERY
☐ FOB ORIGIN ☐ OTHER (See below)

9. DISCOUNT FOR PROMPT PAYMENT

10. SUBMIT INVOICES (4 copies unless otherwise specified) TO THE ADDRESS SHOWN IN: ▶ ITEM 12

11. SHIP TO/MARK FOR CODE
See Section F

12. PAYMENT WILL BE MADE BY CODE
See Section G

13. AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION:
☐ 10 U.S.C. 2304(c)( ) ☐ 41 U.S.C. 253(c)( )

14. ACCOUNTING AND APPROPRIATION DATA
Subject to FAR 52.232-18 AVAILABILITY OF FUNDS (APR 1984) Cited on Delivery Orders

| 15A. ITEM NO. | 15B. SUPPLIES/SERVICES | 15C. QUANTITY | 15D. UNIT | 15E. UNIT PRICE | 15F. AMOUNT |
|---|---|---|---|---|---|
| | This is an indefinite delivery, indefinite quantity, Cost Plus Award Fee Contract. Contractual contents are as shown in number 16 below. Funds are obligated by delivery orders and work will be authorized by work orders issued against the delivery orders. Govt. Guarantee is 10% | | | | |

15G. TOTAL AMOUNT OF CONTRACT ▶ $ 21,124,289.17

## 16. TABLE OF CONTENTS


| (✓) | SEC. | DESCRIPTION | PAGE(S) | (✓) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | PART I — THE SCHEDULE | | | | PART II — CONTRACT CLAUSES | |
| X | A | SOLICITATION/CONTRACT FORM | A1 | X | I | CONTRACT CLAUSES | I1-I19 |
| X | B | SUPPLIES OR SERVICES AND PRICES/COSTS | B1-B6 | | | PART III — LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH. | |
| X | C | DESCRIPTION/SPECS./WORK STATEMENT | C1-C11 | X | J | LIST OF ATTACHMENTS | J1 |
| X | D | PACKAGING AND MARKING | D1 | | | PART IV — REPRESENTATIONS AND INSTRUCTIONS | |
| X | E | INSPECTION AND ACCEPTANCE | E1 | | K | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS | |
| X | F | DELIVERIES OR PERFORMANCE | F1-F5 | | L | INSTRS., CONDS., AND NOTICES TO OFFERORS | |
| X | G | CONTRACT ADMINISTRATION DATA | G1-G6 | | M | EVALUATION FACTORS FOR AWARD | |
| X | H | SPECIAL CONTRACT REQUIREMENTS | H1-H7 | | | | |


*CONTRACTING OFFICER WILL COMPLETE ITEM 17 OR 18 AS APPLICABLE*

17. ☐ CONTRACTOR'S NEGOTIATED AGREEMENT *(Contractor is required to sign this document and return ______ copies to issuing office.)* Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. *(Attachments are listed herein.)*

18. ☐ AWARD *(Contractor is not required to sign this document.)* Your offer on Solicitation Number ______ including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary.

19A. NAME AND TITLE OF SIGNER (Type or print)
DELORES ELLIS
CONTRACTING OFFICER

20A. NAME OF CONTRACTING OFFICER
WAYNE A. CUTRELL
Contracting Officer

19B. NAME OF CONTRACTOR
BY [signature] (Signature of person authorized to sign)

19C. DATE SIGNED 3/27/95

20B. UNITED STATES OF AMERICA
BY [signature] (Signature of Contracting Officer)

20C. DATE SIGNED 3/14/95

NSN 7540-01-152-8069 STANDARD FORM 26 (REV. 4-85)

Blumberg No. 5137 A

## SECTION B - SUPPLIES OR SERVICES AND PRICE/COSTS

B1. Brief Description Of Services

This is an Indefinite Delivery, Indefinite Quantity, Cost Plus Award Fee Contract. The total purpose of this contract is to provide for comprehensive logistic support services necessary to maintain and enhance, where necessary, MARAD's Logistics Programs in support of the Ready Reserve Force (RRF) and its overall mission. The contractor resources shall manage the Equipment Configuraton and Spare Parts Management Information System (ECSMIS) programs and be available to respond to the various logistics support requirements of the RRF. A complete description of the required services is contained in SECTION C - DESCRIPTION/SPECIFICATIONS/WORK STATEMENT.

B2. Compensation

A. Estimated Cost and Award Fee

To provide a brief understanding of this contracts compensation the following is provided which estimates cost and award fee for the base year.

The estimated cost (exclusive of any fees) for performance of the base period of this contract is $2,789,874.56.

The base fee for performance of the base period of this contract is $00.00. A provisional fee of 4%, in accordance with Section G6, shall be paid in direct ratio to the level of effort expended; that is, the percent of fee shall be paid equal to the percent of effort expended as determined by the Performance Evaluation Board. Payment shall be subject to the withholding provisions of the clause "Allowable Cost and Payment" incorporated herein.

The maximum amount of award fee that may be earned for the base period of this contract is $223,189.96. Award fee shall be paid in accordance with I.9 Payment of Award Fee and I.10 Determination of Award Fee Earned.

B. Limitation of Cost

Subject to the provisions of FAR Clause 52.232-20 of the General Provisions, the total cost to the Government, including all direct and indirect costs, for the performance of this contract, inclusive of award fee, shall not exceed the estimated cost of this contract. However, a ceiling of 20% has been placed upon indirect cost for this contract.

Contract No. DTMA91-95-C-00024

**PART I - THE SCHEDULE**
**SECTION B - SUPPLIES OR SERVICES AND PRICE/COSTS**

The total labor hours listed below are the maximum estimated hours/cost required during the 12 month contract period. The minimum for the CLINs estimated below is 10%, which is the Total Government Guaranteed Amount.(**) **There is NO base fee. There is a provisional fee of 4%, allocated from the total award fee pool, see Section G6.**

**BASIC YEAR PERIOD**

| CLIN | | | | |
|---|---|---|---|---|
| **01PH** | **Phase-In/Phase-Out Period - Begins the date of contract award, Not to Exceed 90 days. In accordance with Section H.16 and proposals. NTE$19,000.** | | | |
| 0001 | **Base Year** - Non-personal Logistics Services in support of the Ready Reserve Force (RRF). Labor categories, services as specified in Section C. | | | |
| | **Total Hours** | 46,000 Hours | 1 LOT | $ NSP* |
| 0001AA | **Total Estimated Cost For 46,000 Labor Hours** | | 1 LOT | $1,309,551.86 |
| 0001AB | **Other Direct Cost** (Includes G&A) | | | $1,480,322.70 |
| | **Total Estimated Cost** | | | $2,789,874.56 |
| 0001AC | **Total Award Fee Pool** | | | $ 223,189.96 |
| | **Total Base Year Amount** | | | $3,013,064.52 |
| ** | **Total Guarantee for Base Year** | | | **$ 301,306.45** |

**Note: The overhead rate will be in effect for a period of 3 months at which time MARAD will authorize a DCAA audit to obtain a current overhead rate. Upon receipt of the DCAA overhead rate the contract will be modified to incorporate prospectively and retrospectively, DCAA's recommended overhead rate. The contractor has agreed to accept the DCAA rate and has hereby waived any legal recourse to dispute.**

*Not Separately Priced

Contract No. DTMA91-95-C-00024

## PART I - THE SCHEDULE
## SECTION B - SUPPLIES OR SERVICES AND PRICE/COSTS

The total labor hours listed below are the maximum estimated hours/cost required during the 12 month contract period. The minimum for the CLINs estimated below is 10%, which is the Total Government Guaranteed Amount.(**) **There is NO base fee. There is a provisional fee of 4%, allocated from the total award fee pool, see Section G6.**

### OPTION YEAR ONE PERIOD

| CLIN | | | | |
|---|---|---|---|---|
| 0002 | **Option Year One** - Non-personal Logistics Services in support of the Ready Reserve Force (RRF). Labor categories, services as specified in Section C. | | | |
| | **Total Hours** | **58,880 Hours** | 1 LOT | $ NSP* |
| 0002AA | **Total Estimated Cost For 58,880 Labor Hours** | | 1 LOT | $1,697,486.20 |
| 0002AB | **Other Direct Cost** (Includes G&A) | | | $2,056,714.94 |
| | **Total Estimated Cost** | | | $3,754,201.14 |
| 0002AC | **Total Award Fee Pool** | | | $ 300,336.09 |
| | **Total Option Year One Amount** | | | $4,054,537.23 |
| ** | **Total Guarantee for Option Year One** | | | **$ 405,453.72** |

*Not Separately Priced

Contract No. DTMA91-95-C-00024

## PART I - THE SCHEDULE
## SECTION B - SUPPLIES OR SERVICES AND PRICE/COSTS

The total labor hours listed below are the maximum estimated hours/cost requied during the 12 month contract period. The minimum for the CLINs estimated below is 10%, which is the Total Government Guaranteed Amount.(**) **There is NO base fee. There is a provisional fee of 4%, allocated from the total award fee pool, see Section G6.**

### OPTION YEAR TWO PERIOD

| CLIN | | | | |
|---|---|---|---|---|
| 0003 | **Option Year Two** - Non-personal Logistics Services in support of the Ready Reserve Force (RRF). Labor categories, services as specified in Section C. | | | |
| | **Total Hours** | **69,920 Hours** | 1 LOT | $ NSP* |
| 0003AA | **Total Estimated Cost For 69,920 Labor Hours** | | 1 LOT | $1,979,102.92 |
| 0003AB | **Other Direct Cost** (Includes G&A) | | | $2,304,078.84 |
| | **Total Estimated Cost** | | | $4,283,181.76 |
| 0003AC | **Total Award Fee Pool** | | | $ 342,654.54 |
| | **Total Option Year Two Amount** | | | $4,625,836.30 |
| ** | **Total Guarantee for Option Year Two** | | | **$ 462,583.63** |

*Not Separately Priced

Contract No. DTMA91-95-C-00024

## PART I - THE SCHEDULE
## SECTION B - SUPPLIES OR SERVICES AND PRICE/COSTS

The total labor hours listed below are the maximum estimated hours/cost requireded during the 12 month contract period. The minimum for the CLINs estimated below is 10%, which is the Total Government Guaranteed Amount.(**) **There is NO base fee. There is a provisional fee of 4%, allocated from the total award fee pool, see Section G6.**

### OPTION YEAR THREE PERIOD

| CLIN | | | | |
|---|---|---|---|---|
| 0004 | **Option Year Three** - Non-personal Logistics Services in support of the Ready Reserve Force (RRF). Labor categories, services as specified in Section C. | | | |
| | **Total Hours** | 69,920 Hours | 1 LOT | $ NSP* |
| 0004AA | **Total Estimated Cost For 69,920 Labor Hours** | | 1 LOT | $1,992,220.04 |
| 0004AB | **Other Direct Cost** (Includes G&A) | | | $2,313,352.11 |
| | **Total Estimated Cost** | | | $4,305,572.15 |
| 0004AC | **Total Award Fee Pool** | | | $ 344,445.77 |
| | **Total Option Year Three Amount** | | | $4,650,017.92 |
| ** | **Total Guarantee for Option Year Three** | | | **$ 465,001.79** |

*Not Separately Priced

## PART I - THE SCHEDULE
## SECTION B - SUPPLIES OR SERVICES AND PRICE/COSTS

The total labor hours listed below are the maximum estimated hours/cost required during the 12 month contract period. The minimum for the CLINs estimated below is 10%, which is the Total Government Guaranteed Amount.(**) **There is NO base fee. There is a provisional fee of 4%, allocated from the total award fee pool, see Section G6.**

### OPTION YEAR FOUR PERIOD

| CLIN | | | | |
|---|---|---|---|---|
| 0005 | **Option Year Four** - Non-personal Logistics Services in support of the Ready Reserve Force (RRF). Labor categories, services as specified in Section C. | | | |
| | **Total Hours** | **69,920 Hours** | 1 LOT | $ NSP* |
| 0005AA | **Total Estimated Cost For 69,920 Labor Hours** | | 1 LOT | $2,051,030.15 |
| 0005AB | **Other Direct Cost** (Includes G&A) | | | $2,375,667.24 |
| | **Total Estimated Cost** | | | $4,426,697.39 |
| 0005AC | **Total Award Fee Pool** | | | $ 354,135.79 |
| | **Total Option Year Four Amount** | | | $4,780,833.18 |
| ** | **Total Guarantee for Option Year Four** | | | **$ 478,083.32** |

*Not Separately Priced

## SECTION C - DESCRIPTION/SPECIFICATIONS/WORK STATEMENT

### C.1 GENERAL.

C.1.1 The purpose of this contract is to provide for the logistics support services necessary to maintain and enhance, where necessary, MARAD'S Logistics Programs in support of the Ready Reserve Force (RRF) and its overall mission.

The data system of the RRF Logistics Support System is the Equipment Configuration and Spare Parts Management Information System (ECSMIS). This system is the focal point for the integration of all the logistics support actions associated with the maintenance and continued improvement to the logistics readiness posture of the RRF. ECSMIS encompasses all the databases and Wide Area Network (WAN) communications in support of MARAD's Logistics Support System.

ECSMIS tracks configurations, including equipment, maintenance history, spare parts, vessel drawings, controlled equipage and lashing gear. It also contains procurement related data and a transaction history file. The application runs under DOS and accesses over 400 megabytes of data residing on a Novell file server. Data indexing is enhanced through the DBFSix replaceable database driver and the Clipper Fast Text Search (CFTS) indexing engine. Variable length fields, referential arrays and classy objects are stored in files accessed through the Flexfile Application Programming Interface (API). The program is written in the Clipper 5.01 programming language using the Classy library to add fully object oriented support. The program can also be accessed, via modem, through the Gilmore Remote API. The program requires 600 kb free DOS memory to run, with at least 2 MB total random access memory on the host PC. There are several support programs, also written in Clipper, which use ProVision Windows and ObjectDB. The hardware and software for ECSMIS is government furnished, see F.9. A data dictionary of the master ECSMIS tables is included as an attachment, see Section J.

Contractor acquired resources will manage the ECSMIS programs, be readily available to aid in the analysis, planning and execution of supply related logistics support and respond to the various logistics support requirements of the Ready Reserve Force. This support is extremely important to MARAD's overall efforts to continue improving logistics support for the Ready Reserve Force and overall National Defense Reserve Fleet. The contractor will be required to assume full responsibility for performance of the system during a phase-in period, estimated to be between sixty and ninety days, following contract award.

## C.2 STATEMENT OF WORK

The Contractor shall provide the following non-personal support services as needed in accordance with authorized written work orders. The following descriptions briefly define specific duties which may be required under this contract.

### C.2.1 AUTOMATED PROGRAMS SUPPORT AND DATA MANAGEMENT

1. Performs all the duties associated with overall system management of MARAD's RRF Equipment Configuration and Spare Parts Management Information System (ECSMIS) and all other automated programs in support of MARAD's Logistics Support Program which interface with ECSMIS. This includes, but is not necessarily limited to: system maintenance and enhancement, including hardware, software and documentation; system analysis, management reporting, the preparation of procedural guidance, and training. The contractor will be expected to maintain the ECSMIS system on line, 24 hours a day, 7 days a week. Downtime allowed for backups, maintenance, etc. should not exceed 10 hours per week and should normally be accomplished on weekends.

2. Monitor and maintain the integrity of the logistics data input and output from the various program sources including but not limited to Ship Manager SAL updates, PC-SAL downloads, Provisioning updates, Procurement reviews and program receipts, Equipment validations and Spare Part inventories.

3. Provide special reports as requested utilizing ECSMIS and associated programs.

### C.2.2 EQUIPMENT VALIDATION AND SPARE PARTS INVENTORY

The contractor shall be capable of conducting wall to wall or partial equipment validations and spare part inventories, including technical documentation on NDRF vessels. Tasks may also require various levels of inventories at MARAD warehouses, contractor sites or other sites deemed necessary to fulfill MARAD's mission. All work will be conducted in accordance with MARAD's Validation and Inventory Guide, attachment J-7. Functions associated with shore-based inventories include:

(1) Item management reviews to identify excess and obsolescence

(2) Physical inventories and associated research to reconcile inventory discrepancies.

(3) Identification and resolutions of material management and inventory control problems.

(4) Item identification and cataloging

(5) Estimating unit costs of inventory items

C.2.3 SPARE PARTS REPLENISHMENT PROGRAM

The contractor shall be capable of conducting research associated with reutilizing spare parts stripped from scrap ships and developing information to facilitate procurement and FEDSTRIP requisitioning of spare parts and equipment.

C.2.4 PROVISIONING PROGRAM

The contractor shall be capable if tasked to conduct spare part provisioning reviews for specific RRF equipment. The following areas of provisioning and allowance support may be performed by the contractor.

(1) Review and recommendations concerning provisioning support programs.

(2) Review and evaluation of Provisioning Technical Documentation and Supplemental Provisioning Technical Documentation.

(3) Determination of shipboard allowance quantities and requirements for shore-based insurance issues.

C.2.5 LOGISTICS SUPPORT OF SHIP OVERHAULS AND CONVERSIONS

The contractor shall be capable if tasked to provide on site logistics support services for major ship overhauls and conversions.

C.2.6 SYSTEM PLANNING, REVIEW, ANALYSIS AND DOCUMENTATION

The contractor shall be capable of developing system planning documents; conduct cost/benefit/feasibility studies; develop and prepare for publication guidance relative to the supply logistics arena. Functions including:

(1) Review of System and Materials

(2) Develop system alternatives and planning documents in accordance with provided guidance by the logistics staff through authorized task orders.

(3) Cost, benefit and/or feasibility studies

(4) Writing and maintenance of procedural guidance in accordance with provided policies and procedures.

(5) Develop Supply Management Information Systems in accordance with provided functional requirement documents.

(6) Trend Analysis and Recommendations

C.2.7 **AUTOMATED DATA PROCESSING**

The contractor shall be capable of performing the following automated data processing support functions:

(1) Providing contract deliverables in machine readable format consistent with system requirements.

(2) Providing application program development support services.

(3) Providing application program maintenance support services.

(4) Periodically, there will be requirements for the contractor to procure ADP equipment, hardware and software, for the purpose of supporting MARAD's Shipboard Automated System (PC-SAL). The equipment hardware and software will be state of the art and capable of performing all logistics software related functions.

All hardware and software procured will be as prescribed by MARAD and become MARAD property.

C.2.8 **FACILITIES**

The contractor shall provide a support facility to perform receipt inspection and acceptance for all materials from the Federal Supply System to package, label and stage material by ship for subsequent delivery and process Ship Manager ordered material. The facility shall be located in Newport News, Virginia. The facility must have office and storage space and be a minimum of 11,900 square feet.

Include with information requested in Section L, a detailed description of the facility with location.

## C.3 REQUIRED LABOR CATEGORIES

### C.3.1 PROJECT MANAGER

The Project Manager will develop and implement management direction and over see multiple engineering and technical or software projects through completion, including administrative and technical tracking and quality.

The Project Manager shall be qualified to implement management guidance to perform all specific tasking within the scope of work of this solicitation. Specific qualifications are set forth in Section C.4.

### C.3.2 SENIOR ANALYST

The Senior Analyst will provide management guidance to develop, design, and implement systems and systems enhancements. Document system specifications and definitizes user requirements. Provides solutions to problems encountered in the overall logistics support program.

### C.3.3 SYSTEM ANALYST II

The System Analyst II will conduct system analysis, design, system enhancements, documentation and implementation functions. Analyzes problems to include relevant factors, gathering pertinent information and recognizing solutions relative to the logistics support program.

### C.3.4 SYSTEM ANALYST I

The System Analyst I will assist in conducting system analysis, design, system enhancements, documentation and implementation functions. Analyzes problems to include relevant factors, gathering pertinent information and recognizing solutions relative to the logistics support program.

### C.3.5 MAINTENANCE DATA ANALYST II

The Maintenance Data Analyst will manage the screening of deficiencies against Parts Master/Haystack to identify stock numbered items and identification data. Identify, locate and contact vendors, distributors and manufacturers to obtain prices, availability and

maximum technical characteristics information. Makes recommendations for purchase actions and problem items requiring research.

C.3.6 **MAINTENANCE DATA ANALYST I**

A Maintenance Data Analyst I is defined as an individual possessing knowledge and skills in (a) using technical references to identify items of support (spare parts, special tools, test equipment, etc.) needed to perform repair and overhaul of shipboard equipments and (b) using automated supply and maintenance systems to track transactions related to shipboard equipment, repair parts and other material.

C.3.7 **DATA OPERATOR**

Data OP will analyze problems and include relevant factors, gathering pertinent information and recognizing solutions, operating computer consoles and conducting thorough and accurate data entry work.

C.4 **KEY PERSONNEL**

A. The contractor shall submit resumes on all personnel identified as the functional expert(s). The contractor must verify that the individual fully meets the specified requirements. Each resume will reflect whether the individual is a full time, part time, contingent hire, or consultant. All resumes must be certified by the individual as to the correctness of the content.

B. Specific qualifications of the key personnel shall be as follows:

1. Project Manager. The contractor must designate one individual to be responsible for the overall management of the contract. That person must have at least an undergraduate degree from an accredited institution, with an advanced degree preferred; must have a minimum of ten years professional experience and at least five years as the program manager of programs of similar complexity and size; must have experience at the working level with direct involvement in tasks that include logistics support and automated programs development; must have been directly involved in providing similar program support.

2. Functional Experts. The offerers must designate one fully qualified individual meeting the requirements as outlined in the below areas. The individual may be in any labor category as defined in Section C.3. The contractors may offer additional individuals who fully meet the requirements. The degree to which individuals meet the requirements must be clearly defined.

a. Automated Programs. The individual(s) must have at least five years experience in the design development, and implementation of systems and systems enhancements and the proven ability to translate user requirements into responsive automated state of the art data systems; must have experience with the object oriented programming paradigm as implemented with Classy and Clipper 5.0; must have working experience with the third party libraries listed in the SOW; must have experience programming for a multi-user Novell LAN environment with knowledge of transaction processing with rollback capability. Accreditation as a Novell Certified Netware Engineer (CNE) is a plus.

b. Provisioning. The individual(s) must have at least five years hands on experience in the operation and maintenance of shipboard equipment and systems; must demonstrate a clear understanding of MARAD's provisioning philosophy. Expertise in boilers, diesel engines, and pumps is a plus.

c. Procurement. The individual(s) must have at least five years experience in the determination of operational requirements; must have working knowledge of the Federal Supply System and commercial procurement practices. Expertise in use of Haystack, PartsMaster, CD-FICHE, or equivalent is a plus.

d. Engineering/Maintenance. The individual(s) must have an engineering degree and at least five years of engineering experience maintaining shipboard equipment and systems; must have working knowledge of the shipboard interface with ECSMIS programs in the SOW. Licensed engineer is a plus.

e. Logistics. The individual(s) must have at least five years experience in planning and performing logistics support programs for shipboard systems; must have a working knowledge of logistics related data, including shipboard equipment characteristics, equipment technical documentation, and parts identification information and sources; must have a working knowledge of repair part research methods; must have hands-on experience in supply maintenance interface. Shipboard experience in a technical role is a plus.

## C.5 <u>TERMS AND DEFINITIONS</u>

**TERMS AND DEFINITIONS RELATIVE TO SPECIFIC TASKS ARE LOCATED WITHIN THE DOCUMENTS ATTACHED, SEE SECTION J FOR LISTING.**

## C.6 CONTRACT DELIVERABLES

The contractor shall provide the deliverables described below upon completion of the specific tasking, to the address in F.9:

1. Load the following documentation into the Equipment Configuration and Spare Parts Management Information System (ECSMIS):
   - Equipment Records
   - Spare Parts Records
   - Controlled Equipment Data
   - Technical Manuals Data
   - Blue Prints and Vendor's Plans Data
   - Lashing Gear

2. Upon MAR-614 Quality Assurance (QA) approval of ECSMIS Database, the contractor will provide the following deliverables:
   - Insert spare part box lists
   - Attach Metal ID tags to bulkhead mounted spares
   - Apply MARAD Seals
   - Ship's Seal Log
   - One copy of printed SAL document to MAR-614

   Note: Contractor will perform a final clean-up of ECSMIS database prior to printing of the SAL document for QA by MAR-614.

3. The final SAL shall consist of the following:
   a. Introduction
   b. Indices
      - Equipment Name Sequence
      - Equipment Number Sequence
   c. SAL Equipment Pages
   d. Repair Parts Lists
      - Nomenclature Sequence
      - Part Number Sequence List
   e. Special Tools (Nomenclature Sequence)
   f. Controlled Material (Nomenclature Sequence)
   g. Technical Manuals (Equipment Name Sequence)
   h. Drawings
      - Drawing Title Sequence
      - MARAD Number Sequence

-Ship Drawing Number Sequence
-Manufacturer Drawing Number Sequence

4. Contractor will provide Spare Parts lists, sorted by equipment number, for each repair part box and each location within a storeroom. Once developed the contractor will place these listings in the appropriate spare part box/storeroom location. Spare parts list will be comprised of the following data:

(1) Nomenclature
(2) Manufacturer
(3) Part Number/National Stock Number (NSN)
(4) Unit of Issue
(5) Allowance Quantity
(6) On hand quantity
(7) Location/Box Number
(8) Equipment Name
(9) Equipment Number

**NOTE:** Spare Parts Lists are to contain extra lines for items that may be added to the contents of the box or storeroom in the future.

5. Contractor will provide Spare Part Box Locator lists for each storeroom that contains spare part boxes. Once developed, the contractor will attach these listings to

an appropriate, highly visible location within the storeroom. Spare Part Box Locator lists will be in box number sequence (e.g., EE-1, EE-2, EM-1, EM-2, etc.) and be comprised of the following data:

(1) Storeroom
(2) Spare part box number
(3) Shelf location

**NOTE:** Spare Part Box Locator list should contain extra lines for boxes that may be added to the contents of the storeroom in the future.

6. The contractor will provide a complete download of the ECSMIS database and required programs each month to the following: MAR-614, MARAD Central, South Atlantic, and Western regions.

7. Contractor will provide documentation (e.g., shipping invoice, signed receipt) to MAR-614 for the shipment and receipt of those items mentioned paragraph 6 above.

8. At the beginning of the sixth week after contract award and every month thereafter, the contractor shall submit to the MARAD Contracting Officer three copies of a progress report for the previous month which shall include:

a. An updated work order list which will concisely summarize the status of each order. The summary shall include but not be limited to: start date, estimated completion date, actual completion date, estimated man hours, estimated total cost, actual man hours by labor category, actual cumulative man hours by labor category, actual cumulative man hours expended and actual cumulative cost.

b. Summary of work accomplished.

c. Liaison Activities.

d. Visits or Trips made or scheduled.

e. Summary of problem areas.

f. Any other items that the Contractor shall bring to the attention of MARAD.

9. The Contractor shall submit to the MARAD Contracting Officer two copies of a Cost and Man-hour Accounting Report with the Progress Report which shall include:

a. The man hours and cost estimated and expended on each work order every month showing dates of expenditure per work order.

b. The cumulative up-to-date man hours for each labor category and cost expended on each work order.

c. The man hours and cost budgeted for each work order each month.

d. The estimated percentage of total completion for each work order.

e. Balance of man hours, Overhead and Direct Costs (ODC's) and Total Cost dollars remaining.

f. The number of tasks completed and the final man hours and cost data for each completed task.

g. Balance of total contract man hours, ODC's and Total Cost remaining for the current contract.

10. The information contained in the monthly man hour/costs reports shall be organized to permit MARAD to quickly and easily correlate the reported man hour and cost expenditure data with contractor invoices submitted. If the Contractor employs a sub-contractor(s) then the prime Contractor shall submit the above reports for that sub-contractor(s) every month in addition to the Prime Contractor monthly reports.

11. When the contracting officer deems necessary, periodic bi-monthly meeting will be held. These meeting will enable the contracting officer and/or contractor to discuss any current or foreseeable problems.

## SECTION D - PACKAGING AND MARKING

### D.1 M1252.210-04 PRESERVATION AND PACKAGING (MARAD) (AUG 1991)

The Contractor shall ensure that the material to be furnished under this contract is packaged in a manner to ensure prompt, intact delivery. As a minimum, this shall consist of the Contractor's standard commercial packaging.

### D.2 M1252.210-05 MARKING REQUIREMENTS (MARAD) (AUG 1991)

Each package shall be marked with the appropriate delivery address, contract number, and name and address of the contractor, for return address purposes, on the outside of the packing container.