IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| VERIDYNE CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 06-150<br>(Judge Block) |

**DECLARATION OF BENEDICT J. BURNOWSKI**

I, Benedict J. Burnowski, hereby declare under penalty of perjury, pursuant to 28 U.S.C.§ 1746, that the following is true and correct:

1. I have been employed as a contracting officer with the Department of Transportation, Maritime Administration ("MARAD") since 1988.

2. The Vessel Acquisition Team administered two contracts for the Division of Logistics Support both with Veridyne: the Logistics Support Contract and one for spare parts provisioning. Ms. Erica Williams was the Contracting Officer responsible for both contracts. I have been her team leader since January 2000, with oversight responsibility for these contracts and Contracting Officer responsibilities for any procurement actions that exceeded her warrant. Ms. Williams was the contracting officer responsible for the logistics support contract DTMA91-95-C-00024 (the "contract") from about August 1998 through December 2004, when work stopped on the contract.

3. On March 14, 1995, the Maritime Administration ("MARAD") awarded the contract to the Small Business Administration (the "SBA") pursuant to its 8(a) program, which provides preferential treatment for small businesses owned by socially or economically disadvantaged individuals.

4. On March 27, 1995, SBA awarded Subcontract No. 0303-95-1-00055 to Veridyne Corporation (then known as Shepard-Patterson & Associates, hereinafter referred to as "Veridyne") pursuant to the 8(a) program. The subcontract called for Veridyne to perform all of the services required by the contract. A true and correct copy of the contract and subcontract is attached as Exhibit 1 hereto.

5. At the time of the contract award, Veridyne was a qualified contractor under the SBA 8(a) program.

6. The estimated contract price was $21.1 million. The contract called for Veridyne to support the Ready Reserve Force, a fleet of ships kept in a state of constant readiness for use in national emergencies. The contract was a combined indefinite delivery, indefinite quantity and cost-plus award fee contract with one base year, and four option years.

7. The Government approved invoices from Veridyne totaling $20,324,289.15 over the five years of the contract. That amount was paid as follows:

| | | |
|---|---|---|
| Initial Contract | 1995-1996 | $2,582,051.20 |
| First Option Year | 1996-1997 | $3,774,669.32 |
| Second Option Year | 1997-1998 | $4,316,679.61 |
| Third Option Year | 1998-1999 | $4,036,100.25 |
| Fourth Option Year | 1999-2000 | $5,614,798.80 |

8. Veridyne was scheduled to "graduate" from the SBA 8(a) program in June 1998. This meant that if the contract remained part of the 8(a) program and a new contract was awarded, as usual, during the last year of the contract (1999-2000), Veridyne would not have been eligible for the award.

9. During or before February 1998, discussions began between MARAD and Veridyne regarding the possibility of extending the contract for an additional five years prior to Veridyne's graduation from the 8(a) program. MARAD indicated it would consider a proposal from Veridyne.

10. On March 30, 1998, Mr. Michael Genna of Veridyne submitted a proposal for the five-year extension. The cover letter to the proposal explained, "[w]e understand that the scope of the work will remain the same as is established in the current contract ... ." In addition, its proposal stated that "all terms and conditions are the same, and the original scope and technical content remain intact." The proposal represented that the expected cost to the Government for the five year extension was $2,999,949.

11. Veridyne's proposal priced significantly less labor hours and projected costs than it was billing under the ongoing contract at that time.

12. The labor hours estimated and actually incurred for the first five years of the contract appear below, along with the estimated labor hours pursuant to Veridyne's proposal:

| **Years 1-5** | | | **Years 6-10** | |
|---|---|---|---|---|
| | Est. | Act. | | Est. |
| Initial Contract | 46,000 | 36,505 | Option Year 5 | 31,826 |
| Option Year 1 | 58,800 | 40,819 | Option Year 6 | 20,124 |
| Option Year 2 | 69,920 | 47,253 | Option Year 7 | 8,892 |
| Option Year 3 | 69,920 | 57,568 | Option Year 8 | 6,084 |
| Option Year 4 | 69,920 | 58,340 | Option Year 9 | 3,944 |

13. Modification 23 extending Veridyne's contract five years, from March 27, 2000 until March 26, 2005 was executed by MARAD and Veridyne on May 18, 1998 and by SBA on May 20, 1998. It stated that "[t]he scope of work and all terms and conditions of the contract are unchanged." A true and correct copy of Modification 23 is attached as Exhibit 2 hereto. It provided the following price structure:

| | | |
|---|---|---|
| Option Year 5 | 2000-2001 | $1,290,765.00 |
| Option Year 6 | 2001-2002 | $866,034.00 |
| Option Year 7 | 2002-2003 | $407,197.00 |
| Option Year 8 | 2003-2004 | $249,362.00 |
| Option Year 9 | 2004-2005 | $186,590.00 |

14. In 2000, within six months of the beginning of work on Option Year 5, the first year added by Modification 23, Veridyne had billed the Government more than entire estimated cost of the modification for all five years. MARAD approved invoices from Veridyne totaling the following amounts for each year of Modification 23:

| | | |
|---|---|---|
| Option Year 5 | 2000-2001 | $7,099,213.61 |
| Option Year 6 | 2001-2002 | $7,229,004.53 |
| Option Year 7 | 2002-2003 | $6,906,239.30 |
| Option Year 8 | 2003-2004 | $6,599,865.97 |
| Option Year 9 | 2004-2005 | $3,300,607.71 |

15. MARAD approved invoices from Veridyne totaling $31,134,931.12 under the contract extension, from its inception on March 27, 2000 to December 2004.

16. In October and November 2000, Veridyne proposed amending the contract to increase its fees to reflect the actual amounts being expended and a more realistic estimate of future expenditures. A true and correct copy of the proposal letters from Veridyne are attached hereto as Exhibit 3.

17. As the parties began to negotiate an increase in the contract, concerns arose in MARAD regarding the cost estimates which resulted in the non-competitive award of Modification 23. The parties continued to negotiate this proposed modification ("Proposed Modification 35") but it was never executed by MARAD.

18. The matter was referred to the Department of Transportation, Office of Inspector General (the "Inspector General") for investigation in the summer of 2001.

19. While awaiting the results of the Inspector General's investigation into Modification 23, MARAD continued to place orders for work pursuant to the contract. These orders were placed for the sole purpose of fulfilling MARAD's logistics requirements, which were critical as many Ready Reserve Force vessels were activated in support of the wars in Afghanistan and Iraq.

20. The Inspector General released his report in September 2004. Soon after, MARAD informed Veridyne of the Inspector General's finding of fraud and notified Veridyne that it would place no further orders under the contract.

21. In December 2004, MARAD ordered a stoppage of all remaining work on the contract and retrieved the government's property from Veridyne's facilities.

22. At that time, Veridyne had six outstanding invoices for work already performed under the contract. After MARAD ordered the work stoppage, Veridyne submitted two additional invoices which billed for the remaining work and termination costs.

23. MARAD refused to pay these invoices, asserting that the contract was void ab initio. A true and correct copy of the letter from MARAD's Chief Counsel informing Veridyne of its decision is attached hereto as Exhibit 4.

24. Veridyne then submitted a certified claim for payment of the outstanding invoices. MARAD did not issue a decision after 60 days since the matter involved fraud.

25. Modification 23 required MARAD to order just 10% of the estimated dollar amount for each year of the contract extension. MARAD issued, and paid for, work orders exceeding the minimum amount in each year of the contract extension. See para. 14.

26. The award fee pool for the base period of the contract was $223,189.96.

27. On September 14, 2004, the Performance Evaluation Board and Fee Determining Official reduced the award fee by one-third (1/3). The DOT-IG audit had revealed significant problems in Veridyne's coding of shipping documents and the valuation of parts. Since senior management at Veridyne had been aware of the problem for over a year and failed inform MARAD, the problem was considered a significant management failure warranting a reduction in the award fee, especially since MARAD would have to spend considerable time and effort to correct past financial data relied upon by MARAD and other agencies.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge and belief, based on my personal knowledge and the official records of the Department of Transportation Maritime Administration.

Executed on: March 23, 2007

Benedict Burhowski