IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| VERIDYNE CORPORATION, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 06-150C (Judge Block) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**Declaration of Kevin T. Durkin**

I, Kevin Durkin, declare under penalty of perjury:

1. From approximately April 21, 2003, to June 10, 2005, I was a special agent ("SA") with the Office of the Inspector General, Department of Transportation ("DOT IG"). Currently, I am an [agent] with the Office of Inspector General, United States Postal Service in the Richmond field office.

2. On July 20, 2001, the Maritime Administration referred to the DOT IG an apparent fraud and violation of competition requirements of the Small Business Act, 15 USC 637(a)(1)(D). The agency had provided a package expressing concern with Modification 023 ("Modification 23") to contract DTMA91-95-C-00024, a contract between MARAD and an 8(a) contractor, Veridyne (formerly Shephard Patterson and Associates), for logistics support services. Executed in 1998, Modification 23 had extended an existing five-year 8(a) contract valued at $21 million by five years at an estimated cost of just under $3 million, and thus represented a possible fraud and potential violation of competition requirements.

3. On July 11, 2003, the DOT IG initiated an investigation into the circumstances surrounding the award of Modification 23. I was assigned to investigate the matter along with Special Agent (SA) Michael Pugliese.

4. On December 15, 2003, SA Pugliese and I interviewed Mr. Samuel J. Patterson at his place of business in Crystal City, Virginia. During that initial interview, Mr. Patterson was asked about how Veridyne had priced its proposal for the five-year extension; Mr. Patterson indicated Mr. Genna had prepared the estimate and that he, Patterson, had not been involved. When asked whether he was aware of a dollar requirement to keep the modification within the 8(a) program, Mr. Patterson stated that he knew there was a $3 million requirement and acknowledged that Veridyne's proposal was "about $3 million." He said no one at MARAD had ever specifically told him to bid under $3 million. At the end of the interview, Mr. Patterson acknowledged that the typical value of the MARAD contract on a yearly basis was greater than $3 million.

5. On February 23, 2004, SA Pugliese and I interviewed Mr. Michael Genna at his place of business in New Jersey. When asked about Modification 23, he explained to us that his only involvement was in the pricing and that Patterson had been involved in the contract extension negotiations meeting with various MARAD officials. Mr. Genna was not able to explain how the bid for Modification 23 could have been so much lower than the actual cost for the same work over the previous several years. When asked about the pricing of Modification 23, Mr. Genna stated that the estimate was based solely upon Mr. Patterson's instruction to keep it under $3 million and that he had gone over the pricing proposal with Patterson who had made adjustments in order to keep the estimate under $3 million. Mr. Genna stated that the "stepped-down" pricing model for the contract extension had been constructed in a manner designed to keep the bid under $3 million. Mr. Genna denied that anyone at MARAD told him to submit a bid just under the $3 million threshold. Mr. Genna informed us that he was aware that the estimate was, in his words, "not a good faith estimate."

6. On April 23, 2004, SA Pugliese and I re-interviewed Mr. Patterson at his offices in Broomall, Pennsylvania. When asked again about his involvement in Modification 23, Mr. Patterson admitted to being involved in the contract. He stressed the importance of the MARAD contract to Veridyne's business. He described the logistic support contract as an "anchor" contract and told SA Pugliese and me that "Without the [contract], there is no Veridyne." When confronted with Mr. Genna's statements that the estimate was inaccurate, not in good faith and was prepared for the purpose of satisfying the sole source threshold, Mr. Patterson agreed with those statements. When asked again about the pricing of Modification 23, Mr. Patterson agreed that his company's $3 million estimate was based solely on the SBA sole-source threshold and was not a good faith estimate. He said, "At the end of the day, that estimate sucked." When asked whether he believed Veridyne would only receive $2.9 million of work from MARAD on the contract extension, Patterson said that he knew that Veridyne would receive more work because it was "blowing through more money than that currently [1996-1998]." Mr. Patterson admitted that he had given bad estimates before on other contracts and stated his belief that it was standard practice in the 8(a) community to secure contracts in this manner. He also told me and SA Pugliese that "It doesn't matter that we limited competition with a bad estimate because we provided a good service."

7. On September 27, 2004, the DOT IG issued a report that concluded that the cost estimate Veridyne submitted to MARAD by Veridyne for Modification 23 was fraudulent and only served to secure the contract under the sole-source requirements of the SBA 8(a) program.

Kevin T. Durkin