IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| VERIDYNE CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 06-150C<br>(Judge Block) |

**DEFENDANT/COUNTER-CLAIMANT'S PROPOSED FINDINGS OF FACT**

1. On March 14, 1995, the Maritime Administration ("MARAD") awarded a logistics support contract to the Small Business Administration (the "SBA") which in turn awarded a subcontract (the "contract") on March 27, 1995 to Veridyne (then doing business as Sheppard-Patterson and Associates) under the SBA 8(a) program, which sets aside Government contracts for businesses owned by socially and economically disadvantaged individuals. Burnowski Decl. ¶ 3, 4, Exh. 1.

2. Veridyne was a qualified contractor under section 8(a) at the time. Id. at ¶ 5.

3. The contract was for supporting the Ready Reserve Force, a fleet of ships kept in a state of constant readiness for use in national emergencies. Id. at ¶ 6. The contract had one base year, with four option years. Id. The contract was a combined indefinite delivery, indefinite quantity cost-plus-award-fee contract. Id.

4. The contract projected that the total payment to Veridyne for all five years of the contract would be approximately $21 million. Id., Exh. 1. The Government paid Veridyne $20,324,289.15 over the five years of the contract. Id. at ¶ 7. The Government paid $2,582,051.20 under the initial contract (1995-96), $3,774,669.32 in the first option year (1996-97), $4,316,679.61 in the second option year (1997-98), $4,036,100.25 in the third option year (1998-99), $4,036,100.25 in the third option year (1998-1999) and $5,614,798.00 in the fourth option year (1999-2000). Id.

5. By early 1998, Veridyne recognized that it would soon "graduate" from the 8(a) program and, thus, would not be eligible for future contracts awarded pursuant to the program. Patterson Decl. ¶ 19.

6. If the contract remained part of the 8(a) program and had been competed in 2000, then Veridyne would not have been eligible for the award. Burnowski Decl. ¶ 8.

7. So that Veridyne could continue to perform contract services, Veridyne and MARAD officials agreed to execute a contract modification ("Modification 23") prior to Veridyne's graduation from the 8(a) program that would extend the existing contract for

five additional years. Patterson Decl. ¶ 19-20.

8. By law, Modification 23 could not have been issued without competitive bidding unless the value of the modification was less than $3 million. 15 U.S.C. § 637(a)(1)(D).

9. Veridyne was informed that the contract could only be extended if the estimated amount did not exceed $3 million. Pl. Reply to Counterclaim ¶ 73.

10. Veridyne submitted its proposal for Modification 23 to MARAD on March 30, 1998. Burnowski Decl. ¶ 10. As part of its proposal, Mr. Genna certified the accuracy and completeness of the cost and pricing data. Patterson Decl., Exh. F.

11. In its proposal, Veridyne indicated that "[w]e understand that the scope of the work will remain the same as is established in the current contract ... ." Id. Additionally, the proposal stated, "All contract terms and conditions are the same, and the original scope and technical content remain intact." Id.

12. In order to stay below the sole source threshold, Veridyne submitted a certified proposal for the five year extension priced at $2,999,949. Durkin Decl. ¶¶ 5, 6. Veridyne accomplished this by significantly underestimating the amount of labor hours necessary for performance of the contract. Burnowski Decl. ¶ 11.

13. Veridyne's experience with the contract showed its fees for the services to be provided pursuant to Modification 23 to significantly exceed $2,999,949 over a five year period. Burnowski Decl. ¶ 10, Exh 3.

14. The following shows Veridyne's estimate of labor hours for the first five years of the contract, the actual labor hours for those years and the estimate contained in Veridyne's proposal for the five years covered by the extension:

| **Years 1-5** | Est. | Act. | **Years 6-10** | Est. |
|---|---|---|---|---|
| Initial Contract | 46,000 | 36,505 | Option Year 5 | 31,826 |
| Option Year 1 | 58,800 | 40,819 | Option Year 6 | 20,124 |
| Option Year 2 | 69,920 | 47,253 | Option Year 7 | 8,892 |
| Option Year 3 | 69,920 | 57,568 | Option Year 8 | 6,084 |
| Option Year 4 | 69,920 | 58,340 | Option Year 9 | 3,944 |

Burnowski Decl. ¶ 12.

15. Veridyne's proposal did not explain why its labor estimates for the contract extension years were so significantly lower than its previous estimates and actual experience, notwithstanding the fact that the proposal purportedly assumed the same scope of work. Patterson Decl., Exh. F.

16. Modification 23 was executed by Veridyne and MARAD on May 18, 1998 and by SBA on May 20, 1998; it became effective on March 27, 2000. Burnowski Decl. ¶ ¶ 13, 15.

17. Modification 23 reflected estimated costs of $2,999,949. It also stated that "[t]he scope of work and all terms and conditions of the contract are unchanged." Id., Exh. 3.

18. Modification 23 contained the following maximum estimated labor hours:

| | |
|---|---|
| Option Year 5 | 32,000 |
| Option Year 6 | 23,000 |
| Option Year 7 | 17,000 |
| Option Year 8 | 7,000 |
| Option Year 9 | 4,000 |

Burnowski Decl., Exh. 2.

19. Within six months of the beginning of work under Modification 23, Veridyne had billed the Government more than the entire estimated cost of the modification for all five years. Burnowski Decl. ¶ 14.

20. The amount of money spent pursuant to Modification 23 from its inception in March 2000 to December 2004 was $31,134,931.12. Id. On a year by year basis, the Government paid Veridyne:

| | | |
|---|---|---|
| Option Year 5 | 2000-2001 | $7,099,213.61 |
| Option Year 6 | 2001-2002 | $7,229,004.53 |
| Option Year 7 | 2002-2003 | $6,906,239.30 |
| Option Year 8 | 2003-2004 | $6,599,865.97 |
| Option Year 9 | 2004-2005 | $3,300,607.71 |

Burnowski Decl. ¶ 14.

21. In October and November 2000, Veridyne proposed to amended the contract to reflect more realistic amounts of anticipated services and billings. Id. at ¶ 16, Exh. 3.

22. As the parties began negotiating an increase in the contract, concerns arose within MARAD that the estimates provided by Veridyne may have been fraudulent and the matter was referred to the Department of Transportation Inspector General (the "Inspector General") for investigation in the summer of 2001. Id. at ¶ 17, 18.

23. Proposed Modification 35 was never executed by MARAD. Id. at ¶ 17.

24. While awaiting the results of the Inspector General's investigation into Modification 23, MARAD continued to place orders for work pursuant to the contract. These orders were placed for the sole purpose of fulfilling MARAD's logistics requirements. The satisfication of these logistics requirements was critical because many of the Ready

Reserve Fleet vessels were activated in support of the wars in Afghanistan and Iraq. Burnowski Decl. ¶ 19.

25. On December 15, 2003, Special Agent ("SA") Kevin Durkin and SA Sam Pugliese of the Department of Transportation Inspector General's office interviewed Mr. Samuel J. Patterson at his place of business in Crystal City, Virginia. Durkin Decl. ¶ 4. Mr. Patterson is the founder and CEO of Veridyne.

26. During that interview, Mr. Patterson was asked about how Veridyne had priced its proposal for the five-year extension; Mr. Patterson indicated Mr. Genna had prepared the estimate and that he, Patterson, had not been involved. Id. When asked whether he was aware of a dollar requirement to keep the modification within the 8(a) program, Mr. Patterson stated that he knew there was a $3 million requirement and acknowledged that Veridyne's proposal was "about $3 million." Id. He said no one at MARAD had ever specifically told him to bid under $3 million. Id. Mr. Patterson acknowledged that the typical value of the MARAD contract on a yearly basis was greater than $3 million. Id.

27. On February 23, 2004, SA Durkin and SA Pugliese interviewed Mr. Michael Genna at his place of business in New Jersey. Durkin Decl. ¶ 5. Mr. Genna was the CFO of Veridyne at the time Modification 23 was proposed and executed.

28. When asked about Modification 23, Mr. Genna explained that his only involvement was in the pricing and that Patterson had been involved in the contract extension negotiations meeting with various MARAD officials. Id. Mr. Genna was not able to explain how the bid for Modification 23 could have been so much lower than the actual cost for the same work over the previous several years. Id. When asked about the pricing of Modification 23, Mr. Genna stated that the estimate was based solely upon Mr. Patterson's instruction to keep it under $3 million and that he had gone over the pricing proposal with Patterson who had made adjustments in order to keep the estimate under $3 million. Id. Mr. Genna stated that the pricing model for the contract extension had been constructed in a manner designed to keep the bid under $3 million. Id. Mr. Genna denied that anyone at MARAD told him to submit a bid just under the $3 million threshold. Id. Mr. Genna stated that he was aware that the estimate was, in his words, "not a good faith estimate." Id.

29. On April 23, 2004, SA Durkin and SA Pugliese re-interviewed Mr. Patterson at his offices in Broomall, Pennsylvania. Durkin Decl. ¶ 6. When asked again about his involvement in Modification 23, Mr. Patterson admitted to being involved in the contract. He stressed the importance of the MARAD contract to Veridyne's business. Id. He described the logistic support contract as an "anchor" contract and told SA Durkin and SA Pugliese that "Without the [contract], there is no Veridyne." Id. When confronted with Mr. Genna's statements that the estimate was inaccurate, not in good faith and was prepared for the purpose of satisfying the sole source threshold, Mr. Patterson agreed with those statements. Id. When asked again about the pricing of Modification 23, Mr. Patterson agreed that his company's $3 million estimate was based solely on the SBA sole-source threshold and was not a good faith estimate. Id. He said, "At the end of the

day, that estimate sucked." Id. When asked whether he believed Veridyne would only receive $2.9 million of work from MARAD on the contract extension, Patterson said that he knew that Veridyne would receive more work because it was "blowing through more money than that currently [1996-1998]." Id. Mr. Patterson admitted that he had given bad estimates before on other contracts and stated his belief that it was standard practice in the 8(a) community to secure contracts in this manner. Id. He also told SA Durkin and SA Pugliese that "It doesn't matter that we limited competition with a bad estimate because we provided a good service." Id.

30. In December 2004, following the Inspector General's report, MARAD ordered a stoppage of work on the contract. Burnowski Decl. ¶ 21.

31. At the time the work stoppage was ordered, Veridyne had six outstanding invoices for work already performed under the contract. Id. at ¶ 22.

32. After MARAD ordered the work stoppage, Veridyne submitted two additional invoices. Id.

33. MARAD refused to pay these invoices, asserting that the contract was void ab initio. Id. at ¶ 23, Exh. 5.

34. Veridyne then submitted a certified claim for payment of the outstanding invoices, which was deemed denied when the contracting officer did not issue a decision after 60 days. Id. at ¶ 24.

35. Modification 23 required only that the Government place minimum orders totaling 10 percent of the estimated amount for each year. Burnowski Decl. ¶ 25, Exh. 3; Pl. Mot. 5, fn. 4; Pl. Prosposed Findings of Uncontroverted Fact, ¶ 27; Pl. Reply to Counterclaim ¶ ¶ 74, 75, 92.

36. MARAD placed orders exceeding the minimum guarantee amount for each year of Modification 23. Burnowski Decl. ¶ 25.

37. MARAD fulfilled its obligations pursuant to Modification 23. Id.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Steven J. Gillingham
STEVEN J. GILLINGHAM
Assistant Director

s/ Robert E. Chandler
ROBERT E. CHANDLER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L St., N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel: (202) 514-4678

Attorneys for Defendant

Of Counsel:
Janis Rodriguez, Esq.
United States Department of Transportation

March 26, 2007

CERTIFICATE OF FILING

I hereby certify that on this 26th day of March 2007, a copy of the foregoing "Defendant/Counterclaimant's Proposed Findings of Fact" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Robert E. Chandler