IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| VERIDYNE CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 06-150C<br>(Judge Block) |

**<u>DEFENDANT/COUNTER-CLAIMANT'S RESPONSES TO PLAINTIFF'S PROPOSED FINDINGS OF FACT</u>**

1. Veridyne Corporation was formed in 1986, under its then name Shepard Patterson & Associates, Inc. (for clarity purposes, the entity will be herein- after referred to as "Veridyne"), to engage in the business of consulting in the area of information technology; Veridyne is, and has always been since its inception, a "small business," as that term is defined in the regulations and size standards promulgated by the United States Small business Administration ("SBA"). Patterson, ¶ 2; A 1.

Defendant is without sufficient knowledge of plaintiff's business history to form a belief as to the veracity of plaintiff's proposed finding, and therefore disagrees.

2. In June of 1989 Veridyne was certified by SBA for participation in SBA's 8(a) Program supporting minority-owned businesses; Veridyne was admitted to the 8(a) Program for the standard nine (9) year term, meaning it was at all times scheduled to "graduate" from the 8(a) Program in June of 1998; Veridyne received its first significant 8(a) Program contract in 1992. Patterson, ¶ 3; A 1.

Defendant is without sufficient knowledge of plaintiff's business history to form a belief as to the veracity of plaintiff's proposed finding, and therefore disagrees.

3. In late 1994, Veridyne became aware of an opportunity to secure an 8(a) Program contract with the Department of Transportation's Maritime Administration ("MARAD") to provide logistic support services. Patterson, ¶ 4; A 1.

Defendant is without sufficient knowledge of plaintiff's business history to form a belief as to the veracity of plaintiff's proposed finding, and therefore disagrees.

4. The 8(a) Program contractor performing the services for MARAD in late 1994 or early 1995 was a company known as Information Network Services ("INS"). Patterson, ¶ 5; A 2.

Defendant agrees.

5. INS was scheduled to graduate from the 8(a) Program in 1995, and MARAD officials were desirous of maintaining the requirement as one that was set aside for 8(a) contractors. Patterson, ¶ 6; A 2.

Defendant agrees.

6. Veridyne submitted a proposal to MARAD for award of a contract; there was no competition as such, since the procurement was conducted as a "sole source" directed to Veridyne under the 8(a) Program. Patterson, ¶ 7; A 2.

Defendant disagrees that the award was conducted as a sole source award, but agrees that the initial contract awarded to Veridyne was not subject to competition.

7. On March 14, 1995, MARAD awarded Contract DTMA91-95-C-00024 (the "Contract") to SBA, under the 8(a) Program. Patterson, ¶ 8; A 2; 22-79.

Defendant agrees.

8. SBA then awarded Subcontract No. 0303-95-1-00055 (the "Subcontract") to Veridyne. Patterson, ¶ 9; A 2; 80-83.

Defendant agrees.

9. The Contract was an indefinite delivery, indefinite quantity, Cost Plus Award Fee Contract, covering a base year and four one (1) year options; under such a contract form (chosen by MARAD), when and how many service hours would be ordered above the stated minimum is unknown, since the extent of the recurring need is unknown. Patterson, ¶ 10; A 2; 22-28.

Defendant disagrees that hours in excess of a stated minimum cannot be known under all indefinite delivery, indefinite quantity contracts. Such contracts often state a maximum number of hours. Defendant agrees that the contract was an indefinite delivery, indefinite quantity, cost plus award fee contract.

10. In "Brief Description Of Services," on page B-1, the Contract described the services to be provided by Veridyne as follows:

> This is an Indefinite Delivery, Indefinite Quantity, Cost Plus Award Fee Contract. The total purpose of this contract is to provide for comprehensive logistic support services necessary to maintain and enhance, where necessary, MARAD's Logistics Programs in support of the Ready Reserve Force (RRF) and its overall mission. The Contractor resources shall manage the Equipment Configuration and Spare Parts Management Infor- mation System (ECSMIS) programs and be available to respond to the various logistics support requirements of the RRF.

* * * *

Patterson, ¶ 11; A 2-3; 23.

Defendant agrees.

11. In "Statement Of Work," C.2, the Contract provided that Veridyne would provide services to MARAD, "as needed in accordance with authorized written work orders." Patterson, ¶ 12; A 3; 30.

Defendant agrees.

12. In "Work Order Procedures," F.7 on page F-3, the Contract provided, in (d), as follows: "The Contractor shall perform work under this contract as specified in the written work orders issued by the Contracting Officer." Patterson, ¶ 13; A 3; 44.

Defendant agrees.

13. The Contract provided the following estimated cost and "award fee pool," by year:

| | | |
|---|---|---|
| Base Year Period | $2,789,874.56 | $323,189.96 |
| Option Year One Period | $3,754,201.14 | $300,336.09 |
| Option Year Two Period | $4,283,181.76 | $342,654.54 |
| Option Year Three Period | $4,305,572.15 | $344,445.77 |
| Option Year Four Period | $4,426.697.39 | $354,135.79 |

Patterson, ¶ 14; A 3; 23-28

Defendant agrees, except that the award fee pool for the base period was $223,189.96. Burnowski Decl. ¶ 26.

14. In terms of Veridyne's award fee, the Contract provided for a maximum award fee of Eight (8%) Percent, with half of that figure, i.e., Four (4%) Percent, payable semi-monthly as a provisional fee; thereafter, based on MARAD's evaluation of Veridyne's performance per

contract quarter, Veridyne could receive additional award fees up to the Eight (8%) Percent maximum figure; it could also be required to repay part (or all) of the provisional award fees it had received in a quarter, if MARAD judged Veridyne's performance to have been unacceptable. Patterson, ¶ 15; A 3; 49.

Defendant agrees.

15. MARAD established the following performance ratings for determination of the award fees Veridyne could receive:

| | | |
|---|---|---|
| Superior Rating: | 4 | Fee: 8% |
| Highly Satisfactory Rating: | 3 | Fee 6%-7% |
| Satisfactory Rating: | 2 | Fee 4%-5% |
| Marginal Rating: | 1 | Fee 1%-3% |
| Unsatisfactory Rating: | 0 | Fee 0% |

Patterson, ¶16; A 4.

Defendant agrees.

16. Veridyne began performing on the Contract in 1995 pursuant to work orders issued by MARAD contracting officers. Patterson, ¶ 17; A 87.

Defendant agrees.

17. From the date of Award (i.e., March 27, 1995) through the fourth option year, Veridyne received authorized work orders totaling approximately $20.1 million; in terms of award fees, Veridyne received the full 8% award fee for virtually all of the TWENTY (20) performance quarters, based on its performance having been rated "Superior" (i.e., an average point rating of at least 3.75) by MARAD; Veridyne, therefore, received some $1.564 million in award fees. Patterson, ¶ 18; A 4.

Defendant agrees.

18. In late 1997 or early 1998, Veridyne's President, Samuel Patterson approached MARAD officials and inquired as to whether the Contract could be extended for additional performance years, since Veridyne was scheduled to graduate from the 8(a) Program in June of 1998; Mr. Patterson was told that was not possible. Patterson, ¶ 19; A 4.

Defendant agrees.

19. Veridyne's counsel at the time provided MARAD with legal support for the proposition that the Contract could be extended by adding additional years, even beyond Veridyne's graduation from the 8(a) Program, so long as the extension was accomplished while Veridyne was still in the 8(a) Program; Veridyne was then advised by MARAD officials that an extension of the Contract was possible and would be considered. Patterson, ¶ 20; A 4.

Defendant agrees.

20. A meeting was convened on February 19, 1998 with MARAD Contracting Officer Rita Jackson to discuss the extension; Veridyne was represented at the meeting by its then Executive Vice President, Michael Genna. Patterson, ¶ 21; A 5.

Defendant agrees a meeting was held between Mr. Genna and MARAD officials on or about February 19, 1998.

21. Following the meeting, Mr. Genna sent Ms. Jackson a letter confirming what had been discussed regarding a Contract extension; the issues included Veridyne's acknowledgement that the estimated cost in any proposal Veridyne would submit would be a figure, "NTE [not to exceed] $3,000,000 in the aggregate." Patterson, ¶ 22; A 5; 89-91.

Defendant agrees that Mr. Genna sent a letter to Ms. Jackson dated February 25, 1998, apparently after a meeting with MARAD. Defendant disagrees that the letter was "confirming what had been discussed at that meeting regarding the Contract extension." The letter states:

> A question was asked how Shephard-Patterson would handle pricing and cost proposal issues for an extension, if so granted. Below is a synopsis of salient points in which we believe the government would benefit in reducing its administrative effort, stabilizing costs, and increasing overall value to the operation. The key points are as follows: …

22. Ms Jackson then sent Veridyne a letter stating that the MARAD Program Office had requested extension of the Contract, and that based on upon Veridyne's presentation at the February 19 meeting and concurrence by MARAD's counsel, MARAD was willing to consider a proposal from Veridyne for an extension of the Contract; Ms. Jackson requested Veridyne's proposal by March 30, so that MARAD could forward it to SBA for its approval by mid-April. Patterson, ¶ 23; A 5; 92.

Defendant agrees.

23. Veridyne submitted its cost proposal for extension of the Contract on March 30, 1998; as discussed at the February 19 meeting, Veridyne proposed to provide services in an amount less than $3,000,000 (including award fees) over an additional Five (5) years; Veridyne also acknowledged that, as was the case with work ordered by MARAD during the first Five (5) years under the Contract, "the specific tasking of work [during the extension] will be through the issuance of Work Orders and Technical Directives." Patterson, ¶ 24; A 5; 93-150.

Defendant agrees.

24. The discussions between MARAD and Veridyne culminated in the execution of Modification 0023 to the Contract, by MARAD and Veridyne on May 18, 1998, and by SBA on May 20. Patterson, ¶ 25; A 5-6; 151-158.

Defendant agrees.

25. Modification 0023, described itself as follows:

> 1. This modification is issued to provide five additional (1) year option periods to this contract. The current contract has one option period remaining, Option Period Four, which begins March 27, 1998 [sic, 1999] through March 26, 2000. Upon the discretion of the Contracting Officer, a written notice will be provided to the contractor giving notice of the beginning of the first of five additional one year option periods. This first period is designated Option Year Five, beginning March 27, 2000 through March 26, 2001. The option periods will be exercised at the sole discretion of the Government.
>
> * * *
>
> 3. The scope of work and all terms and conditions of the contract are unchanged. Funds are obligated by Delivery Orders issued under this contract, therefore no funds are committed at this time.

Patterson, ¶ 26 (emphasis supplied); A 6; 152.

Defendant agrees.

26. Modification 0023, in sum and substance, added five (5) additional option years; March 27, 2000, through March 26, 2001, March 27, 2001 through March 26, 2002, March 27, 2002 through March 26, 2003, March 27, 2003 through March 26, 2004 and March 27, 2004 through March 26, 2005; Modification 0023 provided the following estimated costs and award fee pool (by period):

| | | |
|---|---|---|
| Option Year Five Period | $1,202,982.00 | $87,783.00 |
| Option Year Six Period | $ 808,316.00 | $57,718.00 |
| Option Year Seven Period | $ 379,669.00 | $27,528.00 |
| Option Year Eight Period | $ 230,962.00 | $18,400.00 |
| Option Year Nine Period | $ 172,769.00 | $13,821.00 |

Patterson, ¶ 27; A 6; 151-158.

Defendant agrees.

27. However, Modification 0023 also stated that MARAD was only obligated to order TEN (10%) PERCENT of each year's estimated amount, meaning the only work guaranteed to Veridyne under Modification 0023 was $299,985.00. Id.

Defendant agrees.

28. On March 25, 1999, MARAD Contracting Officer Erica Williams, issued unilateral Modification 0026 to the Contract, extending the term of the Contract from March 27, 1999 through March 26, 2000 (i.e., Option Year Four under the original contract award); as stated in Modification 0026 no funds were obligated thereby, as funding would be obligated in individual work orders issued under the contract. Patterson, ¶ 28; A 7; 159-160.

Defendant agrees.

29. On March 22, 2000, MARAD Contracting Officer Williams issued unilateral modification 0032 to the Contract, extending the contract term for an additional year (i.e., the first year of the Modification 0023 extension), from March 27, 2000 through March 26, 2001; as stated in Modification 0032, no funds were obligated thereby, as funding would be obligated in the individual work orders issued under the Contract. Patterson, ¶ 29; A 7; 161-162.

Defendant agrees.

30. Following the issuance of Modification 0032 on March 22, 2000, MARAD Contracting Officer Williams issued Task Orders 412 through 419 on April 12, 2000; including subsequent modifications, the total value of Task Orders 412 through 419, including subsequent modifications issued by MARAD, was $7,225,141.30, broken down as follows.

| | |
|---|---|
| Task Order 412 | $788,204.00 |
| Task Order 413 | $705,323.00 |
| Task Order 414 | $2,834,391.00 |
| Task Order 415 | $1,428,420.50 |
| Task Order 416 | $643,033.00 |
| Task Order 417 | $459,967.80 |
| Task Order 418 | $47,052.00 |
| Task Order 419 | $318,743.00 |

Patterson, ¶ 30; A 7.

Defendant agrees.

31. By September 30, of 2000 (i.e., six (6) months into Option Year Five), Veridyne had invoiced approximately $3,168,088 in costs, all incurred in response to work orders issued by MARAD contracting officers acting within the scope and ambit of their authority. Patterson, ¶ 31; A 7-8.

Defendant agrees.

32. Based on the work orders described in ¶ 30, supra, by September, 2000, MARAD was aware that it had issued work orders sufficient to expend the entire estimated dollar value of the FIVE (5) YEAR Modification 0023 extension, and Veridyne had billed the entire award fee established in Modification 0023; MARAD thus disallowed $1,862.50 of the provisional fees included in Veridyne Invoice No. 150. Patterson, ¶ 32; A 8; 163.

Defendant agrees.

33. By letter dated October 18, Veridyne proposed adjustments to the award fees in the Contract. Patterson, ¶ 33; A 8; 164-166.

Defendant agrees.

34. At the request of MARAD Contracting Officer Williams, on November 6, 2000 Veridyne submitted a proposal outlining new estimates for Option Years 5 through 9 under the Contract; the amount of the estimates totaled $6,926,981.27, including $3,294,811.27 which had already been invoiced through September 30, 2000 for work ordered by MARAD during Option Year 5. Patterson. ¶ 34; A 8; 167, 173.

Defendant agrees.

35. By letter dated February 7, 2001, MARAD Contracting Officer Williams informed Veridyne that in addition to the $1,862.50 in provisional fees that had been disallowed for Invoice No. 150, another $89,585.86 in provisional fees had been disallowed from Veridyne's invoices; the letter further informed Veridyne that, pending resolution of the changes for the Option Year 5-9 work, Veridyne could invoice the total provisional fees disallowed ($91,448.36), subject to adjustment once a final resolution was reached. Patterson, ¶ 35; A 8-9; 174-175.

Defendant agrees.

36. In any event, Veridyne provided MARAD with all of the services ordered under Task Orders 412 through 419, submitted its invoices for the services and, ultimately, received payment in full. Patterson, ¶ 36; A 9.

Defendant agrees.

37. By unilateral Modification 0033, dated March 23, 2001, notwithstanding the fact that the full estimated dollar value worth of work under Modification 0023 had been ordered, and prior to resolution of the new estimated cost for the five (5) year extension, MARAD Contracting Officer Williams exercised the second option under Modification 0023, extending the contract period from March 27, 2001 through March 26, 2002 (the second year of the Modification 0023 extension). Patterson, ¶ 37; A 9; 176-177.

Defendant agrees.

38. Shortly after issuance of Modification 0033 exercising option year two under Modification 0023, on April 12, 2001 MARAD Contracting Officer Williams issued Task Orders 512 through 515 and 517 through 519; including subsequent modifications, the total value of Task Orders 512 through 515 and 517 through 519, including subsequent modifications issued by MARAD, was $4,466,612, broken down as follows:

| | |
|---|---|
| Task Order 512 | $226,114.00 |
| Task Order 513 | $385,210.00 |
| Task Order 514 | $2,852,451.00 |
| Task Order 515 | $673,225.00 |
| Task Order 517 | $122,276.00 |
| Task Order 518 | $20,000.00 |
| Task Order 519 | $187,336.00 |

Patterson, ¶ 38; A 9.

Defendant agrees.

39. Veridyne provided MARAD with all the services ordered under Task Orders 512 through 515 and 517 through 519, submitted its invoices for those services and received full payment from MARAD. Patterson, ¶ 39; A 9.

Defendant agrees.

40. By letter dated April 25, 2001 MARAD Contracting Officer Benedict J. Burnowski proposed a new award fee pool, as follows:

Option Year 5 $370,099
Option Year 6 $339,931
Option Year 7 $311,517
Option Year 8 $311,517
Option Year 9 $311,517
$1,644,581

Patterson, ¶ 40; A 10; 178-186.

Defendant agrees.

41. Following Mr. Burnowski's April 25, 2001 letter, he and representatives of Veridyne met on or about June 25, 2001 to negotiate a revised estimate for Option Years 5-7. Patterson, ¶ 41; A 10.

Defendant agrees.

42. Following further discussions between Mr. Burnowski and Veridyne, Mr. Burnowski sent Veridyne a "draft" bilateral modification (i.e., 0035) to the Contract; the draft modification provided, in part, as follows:

Block 14 (Continued)

1. Where the Government has exceeded the maximum order limitations for option years 5 through 9 of this contract, the Contractor agrees to honor any and all orders, including those that exceed the maximum order limitation, from the Government up to a maximum of 645,407 labor hours (inclusive of labor hours incurred by its first tier subcontractor, INS) for the consideration set forth in paragraph 14.2 below. Please note that while the contract does not include FAR clause 52.216- 19, Order Limitations, section B of the contract states that this is an Indefinite Delivery, Indefinite Quantity type contract and this contract type requires the inclusion of the aforementioned clause.
2. It is estimated that the work necessary to accomplish the requirements of this contract for the performance period covered by option year 5 through 9 will require an increase in the total estimated cost by $29,614,729 from $2,794,698 to $32,409,427.39 by reason of this modification. The

> fee is increased $2,044,750 from $205,250 to $2,250,000 of which $843,750.00 shall be base fee and $1,406,250.00 shall be the maximum award fee available. The year by year changes to total estimated cost and fee are shown in the revised section B for option years 5 and 9 is made part of this modification.

Patterson, ¶ 42; A 10-11; 187-193.

Defendant agrees.

43. According to the Mr. Butnowski's [sic] undated letter transmitting "Draft" modification 0035 to Verification, the Modification reflected the agreement the parties had reached at their June 25, 2001 meeting; execution of Modification 0035 by MARAD, according to the letter, was "conditioned on the review and approval of MARAD's Contract Review Team." Patterson, ¶ 43; A 11; 187.

Defendant agrees.

44. In accordance with the instructions in the transmittal letter, Veridyne executed Modification 0035 and returned it to MARAD, though it was never formally executed by MARAD, nevertheless MARAD and Veridyne proceeded to operate in accordance with Modification 0035's parameters, as confirmed in a written communication signed by Contracting Officer Williams, stating that "this [i.e., the version executed by Veridyne] is the version of Mod 35 we are currently working against." Patterson, ¶ 44; A 11; 194-207.

Defendant agrees.

45. On September 28, 2001, MARAD Contracting Officer Burnowski executed unilateral Modification 0036 to the Contract, increasing the total award fee by $263,152.00. Patterson, ¶ 45; A 11; 194-207.

Defendant agrees.

46. On March 22, 2002, MARAD Contract Officer Williams executed unilateral Modification 0038 to the Contract, exercising the option to extend the term for the period March 27, 2002 through March 26, 2003 (i.e., the second performance year under the Modification 0023 extension); no funds were obligated thereby as funding was to be obligated in individual work orders. Patterson, ¶ 46; A 11; 209-210.

Defendant agrees.

47. On March 28, 2002 (i.e., the day after commencement of the third option year under Modification 0023), MARAD Contracting Officer Williams issued Task Orders 612 through 615 and 617 – 618; subsequently two (2) additional task orders were issued to Veridyne by Contracting Officer Williams during Option Year 7, i.e., Nos. 619 and 622. Patterson, ¶ 47; A 12.

Defendant agrees.

48. The dollar value of Work Orders 612 through 615, 617 through 619 and 622, including subsequent modifications issued by MARAD, was $8,507,780.00, broken down as follows:

| | |
|---|---|
| Task Order 612 | $475,419.00 |
| Task Order 613 | $650,633.00 |
| Task Order 614 | $3,882,278.00 |
| Task Order 615 | $1,757,273.00 |
| Task Order 617 | $468,448.00 |
| Task Order 618 | $20,883.00 |
| Task Order 619 | $437,896.00 |
| Task Order 622 | $835,000.00 |

Patterson, ¶ 48; A 12.

Defendant agrees.

49. Veridyne provided MARAD with all of the services under Task Orders 612 through 615, 617 through 619 and 622, submitted its invoices for those services and received full payment from MARAD. Patterson, ¶ 49; A 12.

Defendant agrees.

50. On April 24, 2002, MARAD Contracting Officer Williams executed unilateral Modifications 0039 and 0040 to the Contract, authorizing Veridyne to bill the full award fee of $72,607.24 for the periods October through December 2001 and January through March 2002, based on Veridyne's performance having been evaluated as "Superior" for each period (i.e., average point scores of 3.92173913 and 3.879032258 respectively). Patterson, ¶ 50; A 12; 211-216.

Defendant agrees.

51. On August 12, 2002, MARAD Contracting Officer Williams executed unilateral Modification 0041 to the Contract, authorizing Veridyne to bill the full award fee of $66,593.01 for the period April through June, 2002, based on Veridyne's performance having been rated "Superior" for the period (i.e., a perfect 4.0 average point score). Patterson, ¶ 51; A 12-13; 217-220.

Defendant agrees.

52. On September 26, 2002, MARAD Contracting Officer Williams executed unilateral Modification 0042 to the Contract, adding funding in the amount of $66,593.01 to the award fee pool. Patterson, ¶ 52; A 13; 221-222.

Defendant agrees.

53. On October 25, 2002, MARAD Contracting Officer Williams executed unilateral Modification 0044 to the Contract, authorizing Veridyne to invoice the full award fee of $66,593.01 for the period July through September, 2002, based on Veridyne's performance having been rated "Superior" for the period (i.e., an average point score of 3.831858407). Patterson, ¶ 53; A 13; 223-225.

Defendant agrees.

54. On February 26, 2003, MARAD Contracting Officer Williams executed unilateral Modification 0045 to Contract, authorizing Veridyne to invoice the full award fee of $66,593.01 for the period October through December, 2002, based on Veridyne's performance having been rated "Superior" for the period (i.e., an average point score of 3.831858407) Patterson, ¶ 54; A 13; 226-229.

Defendant agrees.

55. On March 20, 2003, MARAD Contracting Officer William executed unilateral Modification 0046 to the Contract, inter alia, extending the Contract for the period March 27, 2003 through March 26, 2004 (i.e., the fourth year under the Modification 0023 extension); no funds were obligated thereby, as funding was to be obligated "incrementally." Patterson, ¶ 55; A 13; 230.

Defendant agrees.

56. Subsequent to the issuance of Modification 0040 extending the contract for the fourth year under Modification 0023, MARAD Contracting Officer Williams issued Task Orders 712 through 715, 717, 719 and 720; including subsequent modifications, the total value of Task Orders 712 through 715, 717, 719 and 722, including subsequent modifications issued by MARAD, was $6,949,701..00, broken down as follows:

| | |
|---|---|
| Task Order 712 | $436,133.00 |
| Task Order 713 | $496,241.00 |
| Task Order 714 | $3,842,694.00 |
| Task Order 715 | $1,546,857.00 |
| Task Order 717 | $212,045.00 |
| Task Order 719 | $86,792.00 |
| Task Order 720 | $328,937.00 |

Patterson, ¶ 56; A 14.

Defendant agrees.

57. Veridyne provided MARAD with all the services ordered under Task Orders 712 through 715, 717, 719 and 720, submitted its invoices for those services and received full payment from MARAD. Patterson, ¶ 57; A 14.

Defendant agrees.

58. On May 15, 2003, MARAD Contracting Officer Williams executed unilateral Modification 0048 to the Contract, authorizing Veridyne to invoice the full award fee of $66,593.01 for the period January through March, 2003, based on Veridyne's performance having been rated "Superior" for the period (i.e., an average point score of 3.941747573). Patterson, ¶ 58; A 14; 231-234.

Defendant agrees.

59. On August 15, 2003, MARAD Contracting Officer Williams executed unilateral Modification 0049 to the Contract, authorizing Veridyne to invoice the full award fee of $66,593.01 for the period of April through June, 2003, based on Veridyne's performance having been rated "Superior" for the period (i.e., an average point of 3.95862069). Patterson, ¶ 59; A 14-15; 235-236.

Defendant agrees.

60. On November 5, 2003, MARAD Contracting Officer Williams executed unilateral Modification 0050 to the Contract, authorizing Veridyne to invoice the full award fee of $66,593.01 for the period of July through September, 2003, based on Veridyne's performance having been rated "Superior" for the period (i.e., an average point of score 3.97972973). Patterson, ¶ 60; A 15; 237-239.

Defendant agrees.

61. On January 28, 2004, MARAD Contracting Officer Williams executed unilateral Modification 0051 to the Contract, authorizing Veridyne to invoice the full award fee of $66,593.01 for the period October through December, 2003, based on Veridyne's performance having been rated "Superior" for that period (i.e., an average point score of 3.979452055). Patterson, ¶ 61; A 15; 240-242.

Defendant agrees.

62. On March 19, 2004, MARAD Contracting Officer Williams executed unilateral Modification 0052 to the Contract, exercising the option to extend the term for the period March 27, 2004 through March 26, 2005 (i.e., the fifth and final year under the Modification 0023 extension); no funds were obligated thereby, as funds were to be obligated in individual work orders. Patterson, ¶ 62; A 15; 243-244.

Defendant agrees.

63. On April 20, 2004, MARAD Contracting Officer Williams issued Work Order Nos. 812, 813, 814, 815 and 817, in the amounts of $114,000.00, $80,000.00, $935,000.00, $382,000.00 and $51,000.00 respectively, to Veridyne under the Contract. Patterson, ¶ 63; A 15; 245-306.

Defendant agrees.

64. On April 21, 2004, MARAD Contracting Officer William issued Work Order Nos. 819 and 822, in the amounts of $10,000.00 and $90,000.00 respectively, to Veridyne under the Contract. Patterson, ¶ 64; A 16; 307-325.

Defendant agrees.

65. Also on April 21, 2004, MARAD Contracting Officer Williams issued unilateral Modification 0001 to Work Order 813, adding $20,000.00 in funding, thereby bringing total funding for that work order to $100,000.00. Patterson, ¶ 65; A 16; 326-329.

Defendant agrees.

66. On May 13, 2004, MARAD Contracting Officer Williams issued unilateral Modification 0001 to work order 812, adding $21,000.00 in funding, thereby bringing total funding for that work order to $135,000.00. Patterson, ¶ 66; A 16; 329-331.

Defendant agrees.

67. On May 18, 2004, MARAD Contracting Officer Williams executed unilateral Modification 0053 to the Contract, authorizing Veridyne to invoice the full award fee of $66,593.01 for the period January through March, 2004, based on Veridyne's performance having been rated "Superior" for the period (i.e., an average point score of 3.895104845). Patterson, ¶ 67; A 16; 332-333.

Defendant agrees.

68. On June 23, 2004, MARAD Contracting Officer Williams issued unilateral Modification 0001 to work order 822, adding $40,269.00 in funding, thereby bringing total funding for that work order to $130,269.00. Patterson, ¶ 68; A 16; 334-336.

Defendant agrees.

69. On June 30, 2004, MARAD Contracting Officer Williams issued Four (4) unilateral modifications to "open" work orders, as follows:

a) Modification 0002 to Work Order 812, adding $94,000 in funding, thereby bringing total funding for that work order to $229,000.00;
b) Modification 0002 to Work Order 813, adding $52,000.00 in funding, thereby bringing total funding for that Work Order to $152,000.00;
c) Modification 0001 to Work Order 815, adding $418,000 in funding thereby bringing total funding for that work order to $800,000.00; and
d) Modification 0002 to work order 822, adding $81,000.00 in funding, thereby bringing total funding for that work order to $211,269.00.

Patterson, ¶ 69; A 16-17; 337-348.

Defendant agrees.

70. On July 1, 2004, MARAD Contracting Officer Williams issued unilateral Modification 0002 to Work Order 815, adding $250,000.00 in funding, thereby bringing total funding for that Work Order to $1,050,000.00. Patterson, ¶ 70; A 17; 349-351.

Defendant agrees.

71. On August 3, 2004, MARAD Contracting Officer Williams issued unilateral Modification 0003 to Work Order 815, adding $250,000.00 in funding, thereby bringing total funding for that work order to $1,300,000.00. Patterson, ¶ 71; A 17; 352-354.

Defendant agrees.

72. On August 25, 2004, MARAD Contracting officer Williams issued Work Order No. 823, in the amount of $260,000.00, to Veridyne under the Contract; Work Order No. 823 covered the completion of Work Orders 812-815, 817, 819 and 822 and the transitioning of the work under the Contract to whomever the successful contractor was that ultimately received the award of the follow-on contract. Patterson, ¶ 72; A 17-18; 355-360.

Defendant agrees.

73. As of August 31, 2004, Veridyne had invoiced MARAD a total of $1,133,301.54 in connection with Work Order 812 – 815, 817, 819 and 822; MARAD paid that amount in full. Patterson, ¶ 73; A 18.

Defendant agrees.

74. On September 14, 2004, MARAD Contracting Officer Williams executed unilateral Modification 0055 to the Contract, authorizing Veridyne to invoice $44,418.00 for award fee for the period April through June, 2004; notwithstanding the fact that Veridyne's performance for the period had been rated "Superior" overall, with an average point score of 3.715447154 (25 of 29 evaluations rated as "4"), the Performance Evaluation Board and Fee Determining Official reduced the award fee by one-third (1/3), due to Veridyne only having been awarded a rating of "2" (i.e., "Satisfactory") for 3 of 29 ratings. Patterson, ¶ 74; A 18; 361-364.

Defendant agrees.

75. On September 28, 2004, Veridyne submitted Invoice No. 260, in the amount of $246,116.05, for services rendered to MARAD during the period September 1 through September 15, 2004, in connection with Work Orders 812 – 815, 817, 819 and 822. Patterson, ¶ 75; A 18; 365-430.

Defendant agrees.

76. On October 15, 2004, Veridyne Invoice No. 261, in the amount of $345,740.95, for services rendered to MARAD during the period September 16 through September 30 in connection with Work Orders 812 – 815, 817, 819 and 822. Patterson, ¶ 76; A 18; 431-490.

Defendant agrees.

77. On November 1, 2004, Veridyne submitted Invoice No. 262, in the amount of $224,416.16, for services provided to MARAD during the period October 1 through October 15 in connection with Work Orders 812 – 815, 817, 819 and 822. Patterson, ¶ 77; A 18-19; 491-574.

Defendant agrees.

78. On November 15, 2004, Veridyne submitted Invoice No. 263, in the amount of $244,905.45, for services provided to MARAD during the period October 16 through October 31 in connection with work orders 812 - 815, 817, 819 and 822. Patterson, ¶ 78; A 19; 575-622.

Defendant agrees.

79. On November 24, 2004, Veridyne submitted Invoice No. 264, in the amount of $202,818.19, for services provided to MARAD during the period November 1 through November 15 in connection with Work Orders 812 – 815, 817, 819 and 822. Patterson, ¶ 79; A 19; 623-684.

Defendant agrees.

80. On or about December 7, 2004, Veridyne was informed by MARAD's General Counsel that MARAD considered Modification 0023 to the Contract to have been void ab initio, on the basis that Veridyne had to have known that MARAD would order more than the estimated $2,999,994.80 set forth in Modification 0023, thereby making Veridyne's acceptance of Modification 0023 tantamount to fraud; Veridyne's contract performance was suspended by MARAD's General Counsel, who also informed Veridyne that invoices 260 through 264 would not be paid. Patterson, ¶ 80; A 19.

Defendant agrees that MARAD asserted that the contract was void ab initio, but disagrees with plaintiff's characterization of the reasons therefore. Defendant's position with respect to the contract is set forth int Defendant/Counter-claimant's Response to Plaintiff's Motion for Partial Summary Judgment and Cross-Motion for Summary Judgment.

81. Subsequently Veridyne submitted three (3) additional invoices: No. 265, dated December 15, 2004, in the amount of $288,871.74 for services provided to MARAD during the period November 16 through November 30 in connection with Work Order Nos. 812 - 815 and 822; No. 266, dated December 30, 2004 in the amount of $491,185.05 for services rendered to MARAD during the period December 1 through December 31, 2004 in connection with Work Orders 812 – 815, 817, 819 and 822 – 823, and No. 267, dated March 31, 2005, for services rendered to MARAD in connection with closing down its operations. Patterson, ¶ 81; A 19-20; 685-926.

Defendant agrees.

82. As with the earlier Five (5) invoices MARAD, refused to pay Invoices 266 and 267, bringing the total of payments due Veridyne and withheld by MARAD to $2,267,163.96. Patterson, ¶ 82; A 20.

Defendant agrees.

83. After several months of fruitless effort aimed at convincing MARAD to pay its invoices, by letter dated June 13, 2005, Veridyne re-submitted Invoices 260 through 267 as a certified claim ("the Claim"), pursuant to the Contract Disputes Act; a Final Decision was requested in the letter. Patterson, ¶ 83; A 20; 927.

Defendant agrees.

84. Veridyne was informed by letter dated August 29, 2005 by the Director of MARAD's Office of Acquisition that no Final Decision would be issued on to the Claim, because "the matter involves allegations of fraud." Patterson, ¶ 84; A 20; 928.

Defendant agrees.

85. After more than sixty (60) days elapsed from submittal of the Claim, Veridyne instituted this action as a "deemed denial." Patterson, ¶ 85; A 20.

Defendant agrees.

86. No criminal prosecution of Veridyne (or any of its employees) has ever been instituted by the United States. Patterson, ¶ 86; A 20.

Defendant agrees that the United States has not undertaken any prosecutions with respect to the matters at issue in this case. Defendant is without sufficient knowledge of Veridyne's and its employee's criminal history to form a belief as to the veracity of plaintiff's proposed finding, and therefore disagrees.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Steven J. Gillingham
STEVEN J. GILLINGHAM
Assistant Director

s/ Robert E. Chandler
ROBERT E. CHANDLER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L St., N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel: (202) 514-4678

Attorneys for Defendant

Of Counsel:
Janis Rodriguez, Esq.
United States Department of Transportation

March 26, 2007

CERTIFICATE OF FILING

I hereby certify that on this 26th day of March 2007, a copy of the foregoing "Defendant/Counterclaimant's Responses to Plaintiff's Proposed Findings of Fact" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Robert E. Chandler