**No. 06-150C**
**Judge Block**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**VERIDYNE CORPORATION**

**Plaintiff,**

**v.**

**THE UNITED STATES OF AMERICA**

**Defendant.**

---

# PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FORPARTIAL SUMMARY JUDGMENT AND ITS RESPONSE TO DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

---

**Marc Lamer**
**Attorney for Plaintiff**

**Kostos and Lamer, P.C.**
**1608 Walnut Street**
**Suite 1300**
**Philadelphia, PA 19103**
**(215) 545-0570**

# TABLE OF CONTENTS


**Page**

Table of Contents…………………………………………………………………………… i

Table of Authorities………………………………………………………………………… ii

Statements and Regulations………………………………………………………….............iii

Table of Contents To Appendix……………………………………………………………iv

Plaintiff's Reply To Defendant's Response To Plaintiff's Motion For Partial Summary Judgment And It's Response To Defendant's Cross Motion For Summary Judgment………………………………….....1

I. Introduction…………………………………………………………………….1

II. Plaintiff's Counter-Statement Of Facts……………………………….............2

III. Plaintiff's Reply To Defendant's Response To Plaintiff's Motion For Partial Summary Judgment; The Contract Itself And Common Sense Dispel Any Notion Of Fraud……………..……………11

IV. Conclusion As To Plaintiff's Motion For Partial Summary Judgment……………………………………………………………..………....19

V. Defendant-Counterclaimant's Motion For Summary Judgment On Its Counterclaim (Special Plea In Fraud) And On Count III Of Plaintiff's Complaint Should Be Denied…………………………………………………………….............19

A. Defendant-Counterclaimant's Motion For Summary Judgment On Its Counterclaim (Special Plea In Fraud) For A Failure Of Proof……………………………………………….20

B. Defendant-Counterclaimant's Motion For Summary Judgment Dismissing Count III of Plaintiff's Complaint Should Also Be Denied Because It Is Premised On A Misstatement Of Fact And A Misreading Of The Contract……………………………..28

VI. Conclusion As To The Denial Of Defendant's Counterclaimant's Motion For Summary Judgment………………...........30

# TABLE OF AUTHORITIES

**Page**

**Cases**

AT& T and Lucent Tec v. U.S., 177 3d 1368, 1375-76 (1999)……………….............19

Coast Federal Bank FSB v. US, 323 F 3rd 1035, 1040-41(2003)……………………….15

Commercial Contractors, Inc. v. United States, 154 F3d at 1366……………………….21

Fry Communications, Inc. v. U.S., 22 Cl Ct 497 (1991)………………………………….18

Hanke v. Global Van Lines, Inc. 533 F.2d 1396 (8th Cir 1976)…………………………..24

Hlinka v. Bethlehem Steel Corporation, 863 F.2d 279, 282-83 (3rd Cir. 1988)…………24

J.E.T.S., Inc. v. United States, 838 F2d 1196 (Fed. Cir. 1988)…………………………..26

K & R Engineering Co., Inc. v. United States, 616 F.2d 469 (Ct. Cl. 1980)…………….27

Long Island Savings Bank, et al v. U.S., 476 F 3rd 917, 926 (2007)…………………….12

McCarthy v. United States, 229 Ct. Cl. 361, 670 F.2d 996, 1004 (1982)……………….21

Miller v United states, 550 F.2d 17, 23 (Ct. Cl. 1977)……………………………………..27

M-R-S Mfg. Co. v. United States 203 Ct. Cl. 551, 492 F.2d 835, 842 (1974)…………..26

Patterson v. County of Oneida, 375 F.3d 206, 219, (2nd Cir 2004)……………………22

Santa Fe Pacific R. Co. v. United States, 294 F.3d 1336, 1340 (Fed. Cir. 2002)……...27

Teg-Paragigm Envil v United States, 465 F. 3d 1329, 2336 (Fed. Cir 2006)…………..27

UMC Electronics Co. v United States, 249 F.3d 1337, 1338-39
(Fed. Cir. 2001)…………………………………………………………………………..20

Young-Montenay, Inc. v United States, 15 F.3d 1040, 1043 (Fed. Cir. 1994)…………21

**TABLE OF AUTHORITIES**
**(cont'd)**

**Page**

**Statutes and Regulations**


10 U.S.C. § 2306a(b)(1)……………………………………………………………….7, 26

10 U.S.C. § 2306a (e)(2)……………………………………………………………….7

28 U.S.C § 2514……………………………………………………………………20, 22

31 U.S.C. § 3729-3731………………………………………………………………..20

13 CFR § 124.501(d)…………………………………………………………………..17

13 CFR § 124.506……………………………………………………………………..14

FAR 2.101, 48 CFR § 2.01……………………………………………………………..4

FAR § 15.801, 48 CFR § 15.801……………………………………………………….4

FAR 16.501-2, 48 CFR § 16,501-2……………………………………………………...26

FAR 16.503(a), 48 CFR § 16.503(a)…………………………………………………13

FAR 16.504(a); 48 CFR § 16.504(a)…………………………………………………13

FAR 16.504(b); 48 CFR § 16.504(b)………………………………………………..13,14

Black's Law Dictionary, 660 (6th ed. 1990)…………………………………………….12

Keyes, Government Contracts Under the Federal Acquisition Regulation, 3rd ed., at pages 449-456……………………………………………….13

NASH, SCHOONER and O'BRIEN, Government Contract Reference Book, 2nd ed…………………………………………………………………….12

**TABLE OF CONTENTS TO**
**PLAINTIFF'S SUPPLEMENTAL APPENDIX**

**Page**

**Volume I**

1. Supplemental Declaration of Samuel J. Patterson…………………………………..1

2. Veridyne Work Order Detail, Contract DTMA91-95-C-00024
(Exhibit "A" to Patterson Supplemental Declaration)………………………………27

3. Billing Breakdown, Work Orders 001 through 319
(Exhibit "B" to Patterson Supplemental Declaration)………………………………51

4. Modifications 001, 002, 005, 006, 009, 012, 014, 015, 018, 020, 023, 024, 025, 027, 029, 030, 031 and 032 (Exhibit "C" to Patterson Supplemental Declaration)…………………………………………………………52

**Volume II**

5. Work Order 412, dated March 27, 2000 and modifications thereto
(Exhibit "D" to Patterson Supplemental Declaration)…………………………..…124

6. Work Order 413, dated March 27, 2000 and modifications thereto
(Exhibit "E" to Patterson Supplemental Declaration)…………………………........144

7. Work Order 414, dated March 27, 2000 and modifications thereto
(Exhibit "F" to Patterson Supplemental Declaration)………………………………162

8. Work Order 415, dated March 27, 2000 and modifications thereto
(Exhibit "G" to Patterson Supplemental Declaration)…………………………….....183

9. Work Order 416, dated March 27, 2000 and modifications thereto
(Exhibit "H" to Patterson Supplemental Declaration)………………………………204

10. Work Order 417, dated March 27, 2000 and modifications thereto
(Exhibit "I" to Patterson Supplemental Declaration)……………………………....221

11. Work Order 418, dated March 27, 2000 and modifications thereto
(Exhibit "J" to Patterson Supplemental Declaration)………………………………239

**TABLE OF CONTENTS TO**
**PLAINTIFF'S SUPPLEMENTAL APPENDIX**
**(cont'd)**

**Page**

**Volume II**

12. Work Order 419, dated March 27, 2000 and modifications thereto
(Exhibit "K" to Patterson Supplemental Declaration)……………………………246

13. Billing Breakdown, Work Orders 412 through 823
(Exhibit "L" to Patterson Supplemental Declaration)…………………………..258

**PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FORPARTIAL SUMMARY JUDGMENT AND ITS RESPONSE TO DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT**

## I.

## INTRODUCTION

Defendant's response to Plaintiff's Motion For Partial Summary Judgment and the basis for its own cross-motion, simply put, is that Modification 23 was tainted by fraud, which alleged fraud trumps all arguments made in Plaintiff's Memorandum of Law in support of its Motion for Partial Summary Judgment, by making the contract void ab initio, as though there were no contract at all. See Page 13 of Defendant-Counterclaimant's Response to Plaintiff's Motion for Partial Summary Judgment And Cross-Motion For Summary Judgment ("Defendant's Response"). The fraud alleged is that Plaintiff, although offering the Maritime Administration ("MARAD") only a maximum number of hours of service at specified rates, the total of which was $2.999 million, nevertheless defrauded MARAD, because somehow it knew the hours offered did not come close to the unspecified hours of service which MARAD wound up needing and ordering (but not fully paying for).

Defendant's theory of the case rests on the false premise that by certifying its costs and attesting to the fact that the contractual "scope of work" under Modification 23 would remain the same as the "scope of work" under the basic Contract, Plaintiff was proposing to provide the same level of service it had provided under the basic Contract, but at ONE-SEVENTH (1/7) the cost. The "scope of work," however was defined in the Contract, and related only to the types of services to be provided and had nothing to do with the volume of work.

## II.

## PLAINTIFF'S COUNTER-STATEMENT OF FACTS

Contract DTMA91-95-C-00024 ("the Contract') stated that it was an Indefinite Delivery, Indefinite Quantity ("IDIQ") cost plus award fee contract, which, according to the "Brief Description of Services" on page B-1, was to "provide comprehensive logistical support services necessary to maintain and enhance, where necessary, MARAD's Logistics Programs in support of the Ready Reserve Force (RRF) and its overall mission." Appendix To Plaintiff's Motion For Partial Summary Judgment ("Plaintiff's Appendix"), page 23. The Contract was an IDIQ contract, under which Veridyne was to provide logistic support services to MARAD, in response to specific work orders; under "Work Order Procedures" on page F-3), the Contract stated:

> (d) The Contractor shall perform work under this contract <u>as specified in the written work orders issued by the Contracting Officer</u>. A work order will be issued <u>only after the COTR</u> [Contracting Officer's Technical Representative] <u>and the</u> [contractor's] <u>Program Manager have agreed on the terms of the statement of work and a written estimate is received</u> [from the contractor] <u>by the Contracting Officer</u>

See Plaintiff's Appendix page 44 (emphasis supplied). The Contract then included estimated annual costs based on a stated "<u>maximum</u>" number of labor hours and other direct costs for each performance year. See Plaintiff's Appendix page 24 – 28 (emphasis supplied). The Contract's total estimated <u>cost</u>, based on the <u>maximum</u> level of services was $19,559,527 (<u>id.</u>). The Contract was awarded to Veridyne without competition. Declaration of Samuel J. Patterson, ¶ 7, Plaintiff's Appendix, page 2 (see Plaintiff's

Proposed Findings Of Uncontroverted Fact, ¶ 6 and Defendant's Response thereto).

All payments to Veridyne under the Contract were for services provided pursuant to work orders issued by MARAD contracting officers under the Work Order Procedures clause of the Contract (See Plaintiff's Proposed Findings Unconverted Fact, ¶12 and Defendant's Response thereto), meaning that in each case the COTR provided Veridyne with a proposed statement of work for each work order, Veridyne then provided an estimate of the cost of the work (based on the Contract's set hourly labor rates times the estimated number of labor hours for the task). While MARAD's total work orders issued to Veridyne amounted to the approximate total maximum contract value, taken by year, orders fell both below and above the yearly maximums. Cf. the amounts listed in Defendant's Proposed Findings Of Fact with the estimates in the Contract:

| | Payments to Veridyne by Year (from Defendant's Proposed Finding No. 4) | The Contract[1] |
|---|---|---|
| Base Year | $2,582,051.20 | $3,013,064.52 |
| Option Year 1 | $3,774,669.32 | $4,054,537.23 |
| Option Year 2 | $4,316,679.61 | $4,625,836.30 |
| Option Year 3 | $4,036,100.25 | $5,650,017.92 |
| Option Year 4 | $5,614,798.00 | $4,780,833.18 |

Of the payments made to Veridyne during the initial FIVE (5) YEARS, the subcontractor, Information Network Systems ("INS"),who MARAD officials wanted kept on when Veridyne received the Contract, received over $8 million for its employees' labor and

[1] Taken from Plaintiff's Appendix, page 24 – 28. Plaintiff would note that in Option Year Four work authorized by MARAD exceeded the Contract's maximum by nearly $1 million.

overhead (compared to $9.9 million paid to Veridyne for its employees labor and overhead). See Patterson Supp. Dec. ¶¶ 7-8, 35;[2] Plaintiff's Supplemental Appendix, pages 3, 9 and 51.[3]

In 1998, as Veridyne was nearing graduation from the SBA 8(a) Program, it inquired of MARAD as to whether a contract extension was possible. Patterson Declaration, ¶ 19; Plaintiff's Appendix, page 4. Ultimately, Veridyne was informed by MARAD that the Contract could be extended, but only in an amount "NTE" (not to exceed) $3 million. Patterson Declaration, ¶¶ 20 – 23; Plaintiff's Appendix, pages 4 – 5. Veridyne then submitted its extension proposal by letter dated March 30, 1998. Patterson Declaration, ¶ 24; Plaintiff's Appendix, page 5. The extension proposal included a "Certification Of Current Cost Or Pricing Date," certifying that, as required by Federal Acquisition Regulation ("FAR") § 15.801 (48 CFR § 15.801), the "cost or pricing data" included in the proposal was "accurate, complete and current" as of March 30, 1998. Plaintiff's Appendix, page 114. As was shown by the Executive Summary included with the extension proposal (Plaintiff's Appendix, pages 96 – 98), and the ensuing pages of cost breakdown (Plaintiff's Appendix pages 99 – 113), the "certification" related to "cost or pricing data," i.e., labor and indirect rates, and not how many hours of labor MARAD would in fact, order. Indeed, FAR 2.101 "Definitions," 48 CFR § 2.01, defines "cost or pricing data" (in pertinent part) as follows:

---

[2] Patterson Supp. Dec. refers to the Supplemental Declaration of Samuel J. Patterson, included in Plaintiff's Supplemental Appendix.

[3] Plaintiff's Supplemental Appendix refers to the Supplemental Appendix submitted herewith.

> The term "cost or pricing data" means:
>
> all facts that, as of the date of price agreement or, if applicable, an earlier date agreed upon between the parties that is as close as practicable to the date of agreement on price, prudent buyers and sellers would reasonably except to affect price negotiations significantly. Cost or pricing data are data requiring certification in accordance with 15.406-2. Cost or pricing data are factual, not judgmental; and are verifiable. While they do not indicate the accuracy of the prospective contractor's judgment about estimated future costs or projections, they do include the data forming the basis for that judgment. Cost or pricing data are more than historical accounting data; they are all the soundness of estimates of future costs and to the validity of determinations of costs already incurred.

(emphasis supplied). As to the "Scope of Work," the extension proposal stated as follows (in the transmission letter):

> We understand that the scope work will remain the same and, as is established in the current contract, the specific tasking of work will be through issuance of Work Orders and Technical Directives.

Plaintiff's Appendix, page 93 (emphasis supplied). More specifically, in the Executive Summary, Section 1.1, "General Assumptions," the extension proposal stated:

> Terms and conditions for this proposed extension are consistent with the existing contract. This extension is being priced as a Cost Plus Fixed Award Fee, IDIQ contract. All contract terms and conditions are the same, and the original scope and technical content remain intact.

Plaintiff's Appendix, page 96.

There is no question that Veridyne submitted a "certified proposal" priced at $2,999,949. However, that total was clearly arrived at by multiplying Veridyne's certified labor rates by the maximum number of hours of work MARAD could order. See Plaintiff's

Appendix, pages 109 – 113. Contrary to Defendant's repeated suggestion, Veridyne provided no estimate of the "amount of labor hours necessary for performance of the contract;" to the contrary, the proposed extension was for FIVE (5) additional years of the IDIQ contract, under which MARAD would order such services as it, in its sole discretion, deemed necessary. Patterson Supp. Dec., ¶¶ 14; 20 – 22; Plaintiff's Supplemental Appendix pages 4 – 7. Moreover, nowhere in Veridyne's proposal did it make any representation that the maximum number of hours included therein would be sufficient to provide MARAD with all the logistical support services it might require. Id. Plaintiff's Supplemental Appendix, pages 4 – 7; Plaintiff's Appendix, pages 93 through 150. Likewise, nowhere in the original contract or in Veridyne's proposal for the FIVE (5) YEAR extension does it provide an "estimate" of the labor hours to be ordered by MARAD; rather the contract as awarded provided annual maximums that MARAD could order Plaintiff's Appendix, pages 23 – 28. For the extension, in accordance with MARAD's advice that the proposal was "NTE" $3,000,000, Veridyne proposed maximum hours totaling just under $3,000,000. Patterson Supp. Dec. ¶¶ 19 – 24; Supp. App. pages 6 – 7; Plaintiff's Appendix, pages 93 – 150.

It is worth pointing out that Defendant fails to provide any evidence (e.g., a declaration from any MARAD official who participated in the Contract extension) indicating that MARAD understood that Veridyne was proposing to provide services that had cost MARAD $20.5 million during the base performance period (counting award fees) for just under $3 million during the extension, or that MARAD relied on the number

of hours set forth in Veridyne's proposal. See 10 U.S.C. § 2306a(e)(2). Modification 23, prepared by MARAD (see Patterson Supp. Dec. ¶ 21, Plaintiff's Supplemental Appendix, page 6), simply reflected the maximum of $2,999,949 in cost and fees based on yearly figures for the maximum number of labor hours MARAD could order. See Plaintiff's Appendix, pages 151-158.

Further, Veridyne's proposal specifically explained the rationale behind the totals in the extension proposal for labor hours. As stated in the transmittal letter, Veridyne was given to understand by MARAD that the proposal was to be in an amount "NTE" (not to exceed) $3 million. Plaintiff's Appendix, page 89; Patterson Supp. Dec. ¶¶ 9-10, 20 – 24, Plaintiff's Supplemental Appendix pages 3, 6 – 7. The proposal then made clear that the "Total Estimated Cost:" was based on the maximum number of labor hours MARAD could order (e.g., 32,000 in Option Year Five), and included no money for services from the subcontractor, INS. See Plaintiff's Appendix, pages 93, 96-107. .

In terms of Veridyne's billings during the first year of the extension, all work was pursuant to work orders and/or technical directives issued by MARAD contracting officers (Work Order Nos. 412 – 419), in each case, though the work orders provided for performance periods of ONE (1) YEAR, they were issued without funding; funding was then authorized incrementally as work progressed (i.e., as funding was exhausted additional funding would be authorized if MARAD wanted additional services; see Contract Clause H.13, Plaintiff's Appendix, page 58), and in virtually every case the funding was authorized by, Benedict J. Burnowski. Patterson Supp. Dec. ¶¶ 40 – 50;

Plaintiff's Supplemental Appendix, pages 10 – 14, 132, 135 – 140; 149, 151 – 158, 168 – 174; 188, 191 – 200; 206, 208 – 215; 227, 230 – 235; 241, 243 – 245 and 252, 254 -255.[4] During the FIVE (5) YEAR extension MARAD contracting officers authorized a total of $31,134,931.12. However, of that total, some $2,044,053.59 remains unpaid by MARAD. Patterson Dec. ¶¶ 75 – 82; Plaintiff's Supplemental Appendix, pages 20 – 21; Plaintiff's Appendix pages 18 – 20. Of the total services authorized by Veridyne, billings by the subcontractor (INS) for its labor totaled $14.9 million, while Veridyne's billings for its employees' labor totaled only $14.5 million. Patterson Supp. Dec. ¶ 64; Plaintiff's Supplemental Appendix, pages 17 and 258.

With respect to the negotiation that led to the drafting of Modification 35, Veridyne's proposal was made after MARAD withheld award fees Veridyne had earned for work done pursuant to MARAD's authorizations; it was Benedict J. Burnowski who sent proposed modification 0035 (with the increased amounts) to Veridyne. Patterson Supp. Dec. ¶¶ 55 – 57; Plaintiff's Supplemental Appendix, pages 15 – 16; Plaintiff's Appendix, pages 160 – 193. While no one from MARAD formerly executed Modification 0035, Contracting Officer Erica Williams provided a hand-written notation to Veridyne stating that "this is the version of Mod 0035 we are currently working against." Patterson Dec. ¶ 44; Plaintiff's Appendix pages 11 and 207. Since the Contract was an IDIQ contract, as opposed to a requirements contract, MARAD could have, at any time, issued

[4] Of the THIRTY-TWO (32) separate funding authorizations issued by MARAD between April 1, 2000 and September 30, 2000 in connection with work orders 412 through 419, it appears that only TWO (2) were signed by a contracting officer other than Burnowski. See Plaintiff's Supplemental Appendix, pages 199 – 200 and 232.

one or more contracts for procurement of whatever logistics support services it required; instead, it exercised no less than four (4) more options to extend the Contract after it had authorized nearly $6 million worth of work during the first year of the FIVE (5) YEAR extension (i.e., March, 2001, March, 2002, March 2003 and March, 2004). See Patterson Supp. Dec. ¶¶ 52 and 60 through 62; Plaintiff's Supplemental Appendix pages 15 – 17; Plaintiff's Appendix, pages 176, 209, 230 and 243.

With respect to the interviews with Veridyne personnel which Defendant discusses, Mr. Patterson did say that no one at MARAD told Veridyne to "bid" under $3 million (indeed, there was no bidding involved); it was, however, conveyed to Veridyne that the proposal had to be under $3 million for MARAD to consider extending the contract, a fact reflected in the cover letter transmitting the proposal (see Plaintiff's Appendix, page 99). Patterson Supp. Dec. ¶¶ 72 – 75; Plaintiff's Supplemental Appendix pages 19 – 20. Veridyne would reiterate: there was never a "bid" for a contract extension; rather, Veridyne submitted an unsolicited proposal, with the understanding that it could not exceed $3 million, which was clearly stated in the transmittal letter (i.e., "NTE $3,000,000 in the aggregate"). As to how the dollar amount of the proposal was so much lower then the initial FIVE (5) YEAR term is clearly set forth in the proposal: Veridyne proposed considerably less of its own employees' labor hours and none for its subcontractor, INS. See Patterson Supp. Dec. ¶¶ 9-10, 20 – 27; 75, 82 – 85; Plaintiff Supplemental Appendix pages 3, 6-8, 75 and 21-22; Plaintiff's Appendix, pages 93, 104 – 107 and 154 – 158.

As to Defendant's version of Mr. Patterson's statements to the Inspector

General's investigator, Mr. Patterson's response to the statements Mr. Durkin alleges that Mr. Patterson made were as follows (as taken from ¶¶ 90 – 98 of his Supplemental Declaration, Plaintiff's Supplemental Appendix, pages 23 – 25):

a) With respect to the $2.99 million figure not having been "a good faith estimate"), Mr. Patterson said no such thing.

b) With respect to the second assertion ("At the end of the day, the estimate sucked"); the question put to Mr. Patterson, and in response to which this statement was offered was "Knowing what you know now (i.e., in April of 2004), what do you think of the estimate[?]," to which Mr. Patterson responded, "At the end of the day, that estimate sucked." (emphasis supplied).

c) Concerning the assertion that Mr. Patterson knew Veridyne would receive more than $2.9 million worth of work, Defendant does not indicate how Mr. Patterson could know what quantity of work MARAD, in its sole discretion, would order under the (IDIQ) Contract; and Patterson told Durkin that he could not know. Moreover, not even the MARAD officials knew what amount of services would ultimately be required, hence the use of an IDIQ contract (see FAR 16.501-2, 48 CFR § 16,501-2).

d) With respect to the assertion that Mr. Patterson admitted to having previously given "bad estimates" to the Government to secure contracts, Patterson denies having done that or having said that; what he said was that he understood it to be a practice among 8(a) contractors to keep proposals under $3 million so that the requirement would not have to be competed among all 8(a) contractors, but he never said that

Veridyne had done so.

e) With respect to the final assertion (i.e., that Mr. Patterson said, "It doesn't matter that Veridyne limited competition with a bad estimate because Veridyne provided a good service"), with the exception of his saying that Veridyne had provided MARAD with "a good service" (and adding that Veridyne had historically billed at below its DCAA-approved indirect rates), the rest of the purported quote is absolutely false; Mr. Patterson never said such a thing.

Veridyne admits that MARAD suspended performance under the Contract in December of 2004, however, according to Burnowski's Declaration the Inspector General's report was issued in September of 2004 (see ¶ 20); yet MARAD continued to accept services from Veridyne until December of 2004 (Burnowski Declaration, ¶ 21), services for which MARAD then refused to pay. Additionally, with respect to the Inspector General's report, which Veridyne has never seen, Veridyne would point out that neither it nor any of its principals were ever indicted, convicted, suspended or proposed for debarment by the Justice Department or the Department of Transportation. Patterson Supp. Dec., ¶ 101; Plaintiff's Supplemental Appendix page 25.

## III.

## PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT

## THE CONTRACT ITSELF AND COMMON SENSE DISPEL ANY NOTION OF FRAUD

Fraud is perpetrated when there has been an intentional perversion of truth for the

purpose of inducing someone to rely upon it and part with something of value or surrender a legal right. NASH, SCHOONER and O'BRIEN, Government Contract Reference Book, 2nd ed.

There must be (1) a false representation of a present or past fact, (2) a reliance upon that misrepresentation and (3) damage resulting from that reliance. Black's Law Dictionary, 660 (6th ed. 1990). The *sine qua non* quite obviously is the false representation and here there was none. For the contract extension, Veridyne promised a maximum number of hours at set per hour prices, the same as was set forth in the Contract as awarded. It never represented that those hours would satisfy all of MARAD's needs.

Although there had been uncertainty as to whether the False Claims Act, 28 USC § 2514 incorporated the common law definition of fraud as outlined above, the Court of Appeals for the Federal Circuit opined recently that detrimental reliance and injury seem not to be required. Long Island Savings Bank, et al v. United States, 476 F 3rd 917, 926 (2007). Nevertheless, and for certain, the Court makes it clear that there must be a misrepresentation (the *sine qua non*), for any fraud or forfeiture action under the False Claims Act. Here there exists no misrepresentation and no fraud as shown by the plain language of the Contract, by Veridyne's proposal for the extension and by the Modification 23 extension itself.[5]

[5] Modification 23 was drafted by MARAD not Veridyne. See Patterson Supp. Dec. ¶ 21, Plaintiff's Supplemental Appendix, page 6. The term "maximum estimated hours/cost requireded (sic)" does not appear in Veridyne's proposal but only in the MARAD drafted Modification itself. See, e.g., Plainitiff's Appendix 154.

First and foremost, the Contract in question, Modification 23 included, was not a requirements contract although the government in its Brief argues as though it were (and, apparently, some sort of fixed-price requirements contract as well). A requirements type contract, unlike the contract at hand, provides for filling <u>all</u> actual "requirements for supplies or services during a specified contract period...." FAR 16.503(a), 48 CFR § 16.503(a).

In this case, the Contract was an entirely different procurement vehicle. It was, as the Contract states and Defendant admits (¶10 of Defendant's Response to Plaintiff's Proposed Findings Of Uncontroverted Fact), an IDIQ contract. Such a contract, by regulation, provides for an unknown, indefinite quantity, within stated limits, of supplies or services during a fixed period of time. FAR 16.504(a); 48 CFR § 16.504(a). An IDIQ contract is used when the Government itself cannot predetermine, above a specified minimum, the precise quantities of supplies or service that the Government will require during the contract period. FAR 16.504(b); 48 CFR § 16.504(b). See also Professor Keyes' analysis of IDIQ Contracts as opposed to Requirements Contracts. <u>Keyes, Government Contracts Under the Federal Acquisition Regulation, 3rd ed.</u>, at pages 449-456.

In light of the procurement vehicle chosen for use by MARAD, one is compelled to ask, rhetorically of course, how can a contractor, let alone an 8(a) contractor, be held responsible for estimating (in advance) the Government's needs, when the Government itself cannot predetermine, above a specified minimum, the eventual <u>quantum</u> of its own

needs? See FAR 16.504(b); 48 CFR § 16.504(b).

As a matter of fact, a reading of Veridyne's extension proposal and Modification 23, which was, as noted supra, prepared by MARAD, reveals that Veridyne did not presume to tell MARAD what MARAD's, needs would be during the next five (5) years, just as it had not presumed to tell MARAD what MARAD's needs would be during the first five (5) years. What Veridyne offered and MARAD accepted both in the basic Contract and in Modification 23 were set numbers of hours of services at set hourly rates. The total number of hours offered in Modification 23 times the price per hour calculated to $2.999 million, clearly within the SBA limitation for 8(a) Contracts awarded without competition. See 13 CFR § 124.506. Veridyne was not subverting the SBA 8(a) Regulation, rather complying with it.

Modification 23, under Part I, Section B states, clearly, that for each option year what the maximum estimated hours to be required of Veridyne could be, and what the maximum cost to MARAD for those hours would be were MARAD, in its sole discretion, to order the maximum of hours offered by Veridyne (see Plaintiff's Appendix, pages 23 – 28). When totaled (maximum hours offered multiplied by the various prices per hour), the maximum value of Modification 23 is $2.999 million. The value of Modification 23's minimum (the only quantity MARAD was required to order) was 10% of $2.999 million or $299,000. There is nothing in Modification 23, (again which was drafted by MARAD) suggesting that Veridyne was offering to satisfy all of MARAD's needs. The Modification clearly sets out the limit of Veridyne's required services. It promised only to

perform, over a Five (5) Year period, a maximum of 83,000 hours of services for $2.999 million, if, and only if, that much performance was ordered by MARAD. The Government's argument, that Veridyne in its extension proposal or in Modification 23 was somehow fraudulently conveying to MARAD that it would provide the same level of service hours for $2.999 million that it had previously provided for $20 million, takes impermissible liberties with contract construction and, additionally, stretches common sense well beyond the breaking point.

Contract construction is essentially a matter of law and, as the Federal Circuit said in Coast Federal Bank FSB v. United States, 323 F 3rd 1035, 1040-41 (2003), "When the contractual language is unambiguous on its face, our inquiry ends and the plain language of the Agreement prevails." The language of Modification 23, drafted by MARAD, is unambiguous and literally speaks for itself. For each option period it states what the "total option year amount" (maximum) for that year is, and what the "total guarantee" (minimum) for that same year is. For the first option year under Modification 23, i.e., "option year five," the maximum which MARAD could order and which Veridyne was obligated to perform was 32,000 hours of service for $1,290,765.00. The minimum which MARAD was obligated to order was 3,200 hours for $129,076.50. This same clear expression is used for each of the five (5) option years covered by Modification 23. See Plaintiff's Appendix, pages 23 – 28.

Dispelling any notion of deception, over and above the clear language of Modification 23, is the fact that, in each and every case, as the cost of Veridyne's

services approached the (then current) limit in each work order's funding authorization, Veridyne notified MARAD, as the Contract required, that work was approaching the authorization limit. See Patterson Supp. Dec. ¶¶ 43, Plaintiff's Supplemental Appendix, pages 11 – 12. In each and every case MARAD continued to fund additional services. Patterson Supp. Dec. ¶¶ 44 – 52, Plaintiff's Supplemental Appendix pages 12 – 15.

The mechanics of ordering up these service hours is revealing. First MARAD issued a proposed statement of work. Once Veridyne accepted the work, MARAD issued the operative work or task order which was, initially, unfunded. Patterson Supp. Dec. ¶ 43, Plaintiff's Supplemental Appendix, pages 11 – 12. Funding was then authorized incrementally as work progressed, and in virtually every case the subsequent incremental funding of the work was authorized by Defendant's main declarant, Burnowski, a contracting officer and team leader with oversight responsibility (see Burnowski Declaration, ¶ 2). Patterson Supp. Dec. ¶ 44 – 52, Plaintiff's Supplemental Appendix, pages 12 – 15).[6]

Modification 23 as part of the IDIQ contract can only be read as written, and as dictated by the FAR. Such a reading reveals that this particular procurement vehicle, is authorized and limited to situations where the Government is unsure of its total needs, but nevertheless anticipates recurring needs. The right to order up this unknown quantity of service hours above the stated minimum ($2.999 Thousand), but within the maximum ($2.999 million), under the contract and Modification 23 resided solely within

[6] Burnowski conceals this approval of funding in his Declaration. The plain meaning of Modification 23, and the above-board way work was authorized up left no room for anyone to be deceived.

the discretion of the contracting agency, MARAD. For some reason or other MARAD, despite contract restraints, in its sole discretion chose to exceed Modification 23's stated maximum of $2.999 million.[7]

It must be noted that Defendant, in support of its fraud argument, presses a falsity. Repeatedly, at pages 9, 10, 16 and 22, it insinuates that because Veridyne's extension proposal stated that the "scope of the work and all terms and conditions" of the Contract would remain unchanged, Veridyne was offering to provide the same $20 million quantum of work expended during the first five years of the Contract at 1/7 of the price, i.e., $2.999 million.

Putting aside the absurdity of the argument, Defendant bases its thesis on a false premise, i.e., that the statement in its proposal for extension that Veridyne understood the "scope of work" would remain the same amounted to a proposal by Veridyne to provide MARAD with the same level of services as MARAD had purchased during the initial FIVE (%) YEARS (i.e., $20.5 million worth), but for just under $3 million. It is clear, though, that "scope of work" as used by Veridyne related only to the type of work

[7] Why the MARAD chose to order services over and above the$ 2.999 million limit imposed by Modification 23 is unclear. Modification 23 certainly allowed MARAD sufficient time to advertise, evaluate and award a competively-awarded contract for the services, if competition was desired. The fact that the $27 million overrun of orders to Veridyne occurred despite the stop gap measure provided by Modification 23 would suggest to any reasonable person that competition was not desired or available and the SBA Regulation's exception to competitive bidding had been invoked pursuant to 13 CFR § 124.501(d) as it had for the initial five (5) years of performance. Likewise suggesting a waiver to any reasonable person is the creation of Modification 35, drafted by MARAD, increasing the total dollar value of Modification 23 to some $30 million dollars. This also might suggest to any reasonable person that competition was unavailable. Although Modification 35 was never signed, Erica Williams, a MARAD contracting officer under Burnowski's supervision informed Veridyne in writing that it and MARAD were working under Modification 35. Plaintiff's Appendix, page 207.

contracted for, not the level. The way the Contract describes “scope of work” is, of course, controlling. Fry Communications, Inc. v. United States, 22 Cl Ct 497, 505 (1991). The “scope of work” is set forth at Contract Sections B1 and Section C (“Declaration/Specifications/Work Statement). Plaintiff’s Appendix, pages 23 and 29 – 39. Nowhere is there any mention of the level of services to be provided; only the types. The Contract’s maximum or total number of hours of work, if so ordered by MARAD, is specifically set out for the basic Contract term and each of the option years. Plaintiff’s Appendix, pages 23 – 28.[8] The “scope of work” has nothing to do with the maximum or minimum quantum of work to be ordered. It deals only with the type of work. Defendant’s tortured interpretation of the phrase “scope of work” turns the well-accepted rules of contract interpretation upside down. The “specifics” in a contract always take precedence over the general. See Restatement, Second, Contracts § 203(C)(d). Thus the specific allotment of hours in Modification 23, would always take precedence over general language elsewhere. Moreover, Defendant fails to offer any evidence (e.g., a declaration) from any MARAD official involved in the extension negotiations stating that MARAD understood Veridyne’s “Scope of Work” reference to mean the level of service.

---

[8] An analysis of MARAD’s ordering pattern during the first five years demonstrates little respect for the maximum hour/price limitation. In the fifth year of the first five years MARAD ordered and paid for well over the maximum hours/price limitations by 25%, approximately one million dollars thus setting the stage for a future course of conduct. See Plaintiff’s Statement of Genuine Issues, ¶ 4.

## IV.

## CONCLUSION AS TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Modification 23, negotiated with MARAD contract officials is plain on its face as to the rights and duties of each party. There was no deception; there was no fraud. MARAD had to order up at least the minimum amount of work, i.e., $2.999 thousand**;** at MARAD's sole discretion it could order up to $2.999 million worth of work. Since MARAD continued to order up and authorize funding for service hours over the stated maximums, Veridyne had every right to conclude that the MARAD Contracting Officers were acting within their authority to order needed services for which funding had been authorized. The thought that anyone, let alone trained MARAD contract authorities, could possibly believe that Veridyne in its extension proposal, was promising to provide $20 million dollars worth of services hours for $2.999 million is too improbable to admit to belief, and is an argument unworthy of the Sovereign. For reasons previously stated in Plaintiff's Motion for Partial Summary Judgment and its Memorandum of Law in support thereof, Plaintiff's Motion should be granted under any number of legal theories, as stated by the Court of Appeals for the Federal Circuit in AT& T and Lucent Tech v. United States, 177 3d 1368, 1375-76 (1999).

## V.

## PLAINTIFF'S RESPONSE TO DEFENDANT-COUNTERCLAIMANT'S MOTION FSUMMARY JUDGMENT ON ITS COUNTERCLAIM (SPECIAL PLEA IN FRAUD) AND FOR DISMISSAL OF COUNT III OF PLAINTIFF'S COMPLAINT

**A. Defendant-Counterclaimant's Motion For Summary Judgment On Its Counterclaim (Special Plea In Fraud) For A Failure Of Proof**

In its cross-motion for Summary Judgment, Defendant asserts that Veridyne's claims for payment should be forfeited pursuant to the Forfeiture Of Fraudulent Claims Act, 28 U.S.C. § 2514 ("FFCA"). Defendant also seeks recovery of all sums it paid to Veridyne over the life of the FIVE (5) YEAR Modification 23 extension. Presumably this claim is grounded in the False Claims Act, 31 U.S.C. § 3729-3731 ("FCA"), although nowhere does Defendant cite the FCA. Since there was no false statement and no intent to deceive, there is no fraud under any definition. Cf. Long Island Saving Bank v. United States, supra at 927. For reasons stated, supra, in Plaintiff's Reply to Defendant's Response to Plaintiff's Motion for Partial Summary Judgment, no fraud was perpetrated. The maximum hours and price which Veridyne offered and MARAD accepted appeared on the face of Modification 23. What MARAD ordered over the guaranteed minimum required (i.e., 10%) was totally within its discretion.

Over and above the fact that demonstrably there was no fraud, Defendant-Counterclaimant's Motion for Summary Judgment should be denied for failure to meet its burden. To sustain a claim under the FFCA, Defendant must prove its allegations by "clear and convincing evidence." See, UMC Electronics Co. v United States, 249 F.3d 1337, 1338-39 (Fed. Cir. 2001). The elements of a FFCA, violation are that the claimant presented and caused to be presented to an agent of the United States a claim for payment that was false or fraudulent, that the claimant knew the claim was false or

fraudulent, and that the claim was submitted with the intent to deceive the United States. See, e.g., Commercial Contractors, Inc. v United States, 154 F.3d 1357, 1362 (Fed. Cir.1998), citing Young-Montenay, Inc. v United States, 15 F.3d 1040, 1042 (Fed. Cir. 1994) and McCarthy v United States, 229 Ct. Cl. 361, 670 F.2d 996, 1003-04 (1982). Here, Defendant has established only that Veridyne submitted claims for payment (i.e., Invoices 260 – 267).

As to the main elements (i.e., falsity, knowledge and intent to deceive), their existence necessarily depends on what it was that Veridyne was proposing to MARAD (or at the very least what the MARAD negotiators believed Veridyne was proposing) in the extension proposal and, ultimately agreed to in Modification 23. Yet, in this case, Defendant has failed to submit declarations from any person with personal knowledge of 1) the negotiations leading up to the execution of Modification 23, 2) the meeting of the minds between MARAD and Veridyne in the drafting of Modification 23, and, 3) the circumstances surrounding the execution of Modification 23. There is no declaration from any of the MARAD contract officials who played any part in negotiating or approving Modification 23 stating that they understood Veridyne to have been offering to provide the same level of service for $2.99 million for which MARAD had previously paid Veridyne $20.5 million. Nor is there a declaration from anyone at MARAD involved with the negotiation and execution of Modification 23 suggesting that MARAD was misled by Veridyne's proposal. Rather there are two (2) declarations from non-participants in those negotiations, who did not come on the scene until Modification 23

was in place and work performed thereunder.

The discretionary use of affidavits, rather than other forms of proof, in Federal Court summary judgment proceedings is well recognized. However, the information which they convey must be admissible at trial and specifically, must be made on "personal knowledge." See F.R.C.P. 56(e); Patterson v. County of Oneida, 375 F.3d 206, 219, (2nd Cir 2004) ("Affidavits submitted in support of or in opposition to the summary judgment motion must 'be made on personal knowledge, shall set forth such facts as would be admissible in evidence and shall show affirmatively that the affiant is competent to testify to the matter stated therein.'").

Here the declarations submitted by Defendant lack the requisite personal knowledge of the negotiations, choice of procurement vehicle, choice of language and early contract performance leading up to both the basic Contract and particularly Modification 23. Declarant Durkin was not assigned to any aspect of the Contract until 11 July 2003, more than five years after the execution of Modification 23. See Durkin Declaration, ¶¶ 2-3. Clearly he could have no personal knowledge of the critical happenings before and during the execution of Modification 23, where the parties expressed their mutual assent. Similarly, Declarant Burnowski had no personal involvement with the Contract until January, 2000, well after the negotiations and execution of Modification 23 on 18 May 1998. See Burnowski Declaration, ¶ 2. In the absence of "credible evidence" of intent to defraud, there is no violation of 28 U.S.C. § 2514. McCarthy v. United States, 229 Ct. Cl. 361, 670 F.2d 996, 1004 (1982). See

also Commercial Contractors, Inc. v. United States, supra at 1366.

Moreover, each declaration is highly deceptive and sharply disputed by Veridyne in all material respects. (See e.g., Patterson Sup. Dec. ¶¶ 90-98)). For example, Burnowski dwells on Veridyne's "billings", carefully omitting that each and every billing was for services provided in response to individual work orders issued by MARAD contracting officers, as was Veridyne's contractual obligation. See ¶ 14 of Burnowski's Declaration. Burnowski also deceptively misleads the reader, in ¶ 27 of his Declaration, as to Veridyne's performance. Veridyne's performance overall received the highest "Superior" rating. In those few incidents where it did not receive a "Superior" rating it received the next to highest rating Highly Satisfactory. The ratings system used consisted of "Superior" the highest, with Highly Satisfactory the next highest followed by "Satisfactory" and "Unsatisfactory". See Patterson Supp. Dec. ¶¶ 36, 67-71, Plaintiff's Supplemental Appendix, pages 9-10, 18-19, Plaintiff's Appendix, pages 211-220, 223-229, 231-242, 332-333 and 361-364.

Further Burnowski fails to disclose that it was he who, in option year Five (5) (the first year under the Modification 23 extension) repeatedly authorized the additional funding of work orders previously issued (totaling some $6 million in the first six (6) months) each time Veridyne alerted MARAD that exhaustion of funding was near. See Patterson Supp. Dec. ¶¶ 40-50, Plaintiff's Supplemental Appendix, pages 135-140, 151-158, 169-174, 191-200, 208-215, 230-235, 243-245 and 254-255.

Additionally, Burnowski in ¶¶16-20, 24 of his Declaration fails to mention that it

was he and his office that prepared Modification 35, and he who sent it to Veridyne for signature. Although Modification 35 was never formally executed, the MARAD contracting officer, Erica Williams (who would have been under Burnowski's oversight supervision, as he was the "team leader"), who advised Veridyne, to the effect, that it and MARAD were nevertheless "operating against" Modification 35. Plaintiff's Appendix, page 207.

Indeed, the only suggestion of fraud in the Burnowski Declaration comes from his reference to a DOT Inspector General report which MARAD has, so far, kept from Veridyne. See Patterson Supp. Dec. ¶ 66, Plaintiff's Supplemental Appendix, page 18. The Burnowski Declaration, as to the fraud allegedly found by the DOT Inspector General, is, therefore, hearsay under the circumstances and inadmissible as evidence that there was any fraud. See, e.g., Patterson County Of Oneida, supra, at 219; Hlinka v. Bethlehem Steel Corporation, 863 F.2d 279, 282-83 (3rd Cir. 1988); Hanke v. Global Van Lines, Inc. 533 F.2d 1396 (8th Cir 1976).

Since Defendant offers no actual evidence supporting its contention that MARAD was deceived by Veridyne's extension proposal, it offers Veridyne's alleged confession in the form of Durkin's Declaration. However, Durkin's Declaration suffers from the same defects as Burnowski's. Since Durkin was far removed in time from the negotiations leading up to Modification 23, he has no personal knowledge as to whether anyone at MARAD was misled. Quoting Veridyne's former CFO, Genna, that the extension proposal was "not a good faith estimate," Durkin ignores the demonstrated

fact that Veridyne's proposal submitted to MARAD contained no estimate of what MARAD's requirements might be.[9] It proposed only a maximum number of work hours that it could be required to deliver and the minimum number of work hours MARAD was required to order and pay for.[10]

With respect to Durkin's interview with Patterson, again there is no written signed (by Patterson) statement, only Durkin's report of Patterson having admitted that the estimate in the extension proposal was "not a good faith estimate." Patterson denies the statement. See Patterson Supp. Dec. ¶ 91, Plaintiff's supplemental Appendix, page 23. Veridyne submitted no estimate to MARAD as to what MARAD's requirements would be. There is no such estimate to be found in its proposal. Indeed, how could it even presume to do so when the Contract itself speaks to the fact that MARAD itself could not estimate its own needs; hence it chose the form of an IDIQ contract. The estimate ultimately "sucked," "at the end of the day," because MARAD chose to order Veridyne to perform service hours in excess of those which Veridyne under (Modification 23) had promised to perform. As to Durkin's Declaration alleging Patterson said "it doesn't matter we limited competition with a bad estimate...", the Contract itself demonstrates that MARAD was free to buy logistic support services from any number of contractors in addition to Veridyne, so long as MARAD bought the

[9] Since at the time of the interview, Genna had not been employed by Veridyne for over FIVE (5) YEARS, Durkin's reporting of Genna's statement is inadmissible hearsay; Durkin's statement as to the DOT Inspector General's Report is also clearly inadmissible hearsay, the same as Burnowski's.

[10] There is, of course, no written signed statement from Genna to the effect that there was a bad faith estimate but even if there were such a statement it would be meaningless in light of Veridyne's proposal which made no estimate of the service hours which MARAD might require.

guaranteed 10% minimum from Veridyne.

Veridyne would also point out that Defendant seems to stress the fact that Veridyne provided the Truth In Negotiations Act ("TINA") certification of the cost or pricing data in its extension proposal. See 10 U.S.C. § 2306a. Indeed, Defendant seems to equate this certification with the one in J.E.T.S., Inc. v. United States, 838 F2d 1196 (Fed. Cir. 1988), wherein the contractor had falsely certified its small business status in order to receive a contract award. Defendant fails to address, however, what the "term" cost or pricing data" actually means in the context of Veridyne's certification.

As noted supra, the term refers to facts, not the contractor's judgments. See 10 U.S.C. § 2306a(b)(1) and FAR § 15.801, 48 CFR § 15.801. Moreover, as articulated by the Court of Claims, TINA's purpose "is to avoid excessive contract costs that result from a contractor having in its possession accurate, complete and current information when the Government does not possess the same data." M-R-S Mfg. Co. v. United States 203 Ct. Cl. 551, 492 F.2d 835, 842 (1974) (emphasis supplied). Nowhere does Defendant point to data that Veridyne had and MARAD did not. Indeed, the argument that Veridyne's certification of its cost and pricing data was somehow false requires this assumption Veridyne knew how much work the Contract allowed and how much MARAD had authorized during the first FIVE (5) YEARS, but that the MARAD negotiators somehow did not know; the argument would seem to border on the ridiculous.[11]

[11] Of course Defendant fails to offer a declaration from any of the MARAD personnel who were involved in the Modification 23 extension, attesting to the fact that they did not know what level of services MARAD had authorized during the initial FIVE (5) YEARS.

With respect to a FCA counterclaim, the elements are similar to those required for a FFCA. The Government must establish that the contractor submitted a claim for payment to an agent of the United States, that the claim was false or fraudulent, that the contractor knew the claim was false or fraudulent and that the United States suffered damages thereby. See 31 U.S.C. § 3729; Young-Montenay, Inc. v United States, supra at1043, citing Miller v United states, 550 F.2d 17, 23 (Ct. Cl. 1977). Absent specific evidence of knowledge that the claim was false or that the claim was intended to deceive, the Government's FCA claim must be denied. Commercial Contractors, Inc. v. United States, supra at 1366. For the same lack of evidence requiring that Defendant's motion for Summary Judgment on its FFCA claim be denied, its FCA counterclaim must be denied as well. Defendant has not proffered any uncontradicted evidence that Veridyne submitted a false claim. Moreover, it has failed to offer any evidence of damages. It merely asserts that the Modification 23 extension was void ab initio, thereby entitling it to the return demands of all sums paid to Veridyne over the course of the extension period, irrespective of whether the services provided were authorized and accepted by MARAD.[12]

As noted, supra, contract interpretation is a question of law. Teg-Paragigm Envil v United States, 465 F. 3d 1329, 1336 (Fed. Cir 2006). The relevant contract documents (the Contract, Modification 23) do not allow for the interpretation Defendant advances to support is fraud counterclaims. Moreover, summary disposition of

---

[12] Both the J.E.T.S decision, on which Defendant places much reliance and the decision in K & R Engineering Co., Inc. v. United States, 616 F.2d 469 (Ct. Cl. 1980), involved the denial of a contractor claims, not affirmative recoveries by the Government.

questions of contractual intent, if reasonably disputed, requires that all justifiable inferences be drawn in favor of the non-movant. Santa Fe Pacific R. Co. v. United States, 294 F.3d 1336, 1340 (Fed. Cir. 2002). Since Veridyne has disputed Defendant's only factual evidence of its contractual intent (i.e., the alleged confession in Durkin's Declaration), it is entitled to all justifiable inferences and, therefore, denial of Defendant's Motion for Summary Judgment on its Fraud Counterclaims.

**B. Defendant-Counterclaimant's Motion For Summary Judgment Dismissing Count III of Plaintiff's Complaint Should Also Be Denied Because It Is Premised On A Misstatement Of Fact And A Misreading Of The Contract.**

In the final section of its cross-motion, Defendant seeks Summary Judgment on Plaintiff's Count III breach of contract claim. According to Defendant, Modification 23 only required MARAD to order a minimum of 10% of the maximum or, approximately $299 Thousand. Thus, since Defendant ordered a total of $31,134,931.12 worth of services it fulfilled its requirements under Modification 23 and the Contract.

Defendant misstates the facts. According to Defendant, MARAD ordered and paid for $31,134,931.12 worth of services, citing Burnowski's Declaration, ¶ 25. Burnowski's Declaration says no such thing. In the earlier parts of his declaration (see ¶ 15) Burnowski refers to MARAD approving Veridyne invoices totaling the aforementioned sum. He then states, in ¶ 25, that MARAD "issued, and paid for work orders exceeding the minimum amount in each year," certainly leaving the impression that MARAD paid for the work it authorized. Defendant thus asserts that MARAD did not

breach the Contract. The argument represents one more example of Burnowski's deceptive declaration.

As is set forth in Plaintiff's Motion For Summary Judgment, MARAD refused to pay Veridyne invoices 260 through 265 for work under work orders 812 – 817, 819 and 822 – 23. See Patterson Declaration, ¶¶ 75 – 82, Plaintiff's Appendix, pages 18 – 20. Plaintiff would respectfully note, notwithstanding Defendant's assertion that MARAD ordered and paid for $31 million worth of services, Burnowski never actually states in his Declaration that Veridyne was paid that amount.[13] In fact, despite having approved Veridyne's invoices of over $31 million, MARAD denied payment on over $2.0 million of that amount. Id.

The Contract (incorporated in full into Modification 0023) required MARAD to pay Veridyne's invoices for work MARAD ordered and funded (see Section G.5 in the Contract, ("M1252.232-01 INVOICE REQUIREMENTS (MARAD) (AUG 1991)"), pursuant to the incorporated clauses entitled "Allowable Cost and Payment" and "Award Fee" (Plaintiff's Appendix, page 49). Thus, MARAD's failure to pay Veridyne's Invoices amounted to a breach of MARAD's obligations under Modification 0023, and therefore, the Contract.[14]

---

[13] Defendant's assertion is perplexing, since it has previously admitted that MARAD refused to pay Veridyne's Invoices for services provided by Veridyne between September 1 and December 31, 2004. See Plaintiff's Proposed Findings Of Fact, ¶¶ 75 – 81 and Defendant's Responses thereto.

[14] Veridyne assumes that Defendant is not arguing that it was only required to order 10% worth of services but was not contractually-obligated to pay for what it ordered and accepted.

## VI.

## CONCLUSION AS TO THE DENIAL OF DEFENDANT-COUNTERCLAIMANT'S MOTIONS FOR SUMMARY JUDGMENT

For both substantive and procedural reasons, the Government's Motion for Summary Judgment on its Counterclaims (Special Plea in Fraud) and its Motion For Summary Judgment dismissing Count III of Plaintiff's Complaint (Breach of Contract) should be denied.

Respectfully submitted,

s/ Marc Lamer

Marc Lamer
Attorney for Plaintiff

Date: May 9, 2007