IN THE COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **VERIDYNE CORPORATION** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v** | ) | **No. 06-150C** |
| | ) | **(Judge Block)** |
| | ) | |
| **THE UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF FACT

Plaintiff, Veridyne Corporation ("Veridyne") herewith submits its Response to Defendant's Proposed Findings Of Fact.

1. On March 14, 1995, the Maritime Administration ("MARAD") awarded a logistics support contract to the Small Business Administration (the "SBA") which in turn awarded a subcontract (the "contract") on March 27, 1995 to Veridyne (then doing business as Sheppard-Patterson and Associates) under the SBA 8(a) program, which sets aside Government contracts for businesses owned by socially and economically disadvantaged individuals. Burnowski Decl. ¶ 3, 4, Exh. 1.

Plaintiff's Response: Admitted, except that "Sheppard" is spelled "Shepard."

2. Veridyne was a qualified contractor under section 8(a) at the time. Id. at ¶ 5.

Plaintiff's Response: Admitted.

3. The contract was for supporting the Ready Reserve Force, a fleet of ships kept in a state of constant readiness for use in national emergencies. Id. at ¶ 6. The contract had one base year, with four option years. Id. The contract was a combined indefinite delivery, indefinite quantity cost-plus-award-fee contract. Id.

Plaintiff's Response: Denied as stated. Contract DTMA91-95-C-00024 ("the Contract') stated that it was an Indefinite Delivery, Indefinite Quantity ("IDIQ") cost plus award fee contract, which, according to the "Brief Description of Services" on page B-1, was to provide comprehensive logistical support services necessary to

maintain and enhance, where necessary, MARAD's Logistics Programs in support of the Ready Reserve Force (RRF) and its overall mission. Appendix to Plaintiff's Motion For Partial Summary Judgment ("Plaintiff's Appendix"), page 23.

4. The contract projected that the total payment to Veridyne for all five years of the contract would be approximately $21 million. Id., Exh. 1. The Government paid Veridyne $20,324,289.15 over the five years of the contract. Id. at ¶ 7. The Government paid $2,582,051.20 under the initial contract (1995-96), $3,774,669.32 in the first option year (1996-97), $4,316,679.61 in the second option year (1997-98), $4,036,100.25 in the third option year (1998-99), $4,036,100.25 in the third option year (1998-1999) and $5,614,798.00 in the fourth option year (1999-2000). Id.

Plaintiff's Response: Denied in part. The Contract was an IDIQ contract, under which Veridyne was to provide logistic support services to MARAD in response to specific work orders issued by MARAD; specifically, under "Work Order Procedures" on page F-3), the Contract stated:

> (d) The Contractor shall perform work under this contract as specified in the written work orders issued by the Contracting Officer. A work order will be issued only after the COTR [Contracting Officer's Technical Representative] and the [contractor's] Program Manager have agreed on the terms of the statement of work and a written estimate is received [from the contractor] by the Contracting Officer

See Plaintiff's Appendix page 44. The Contract then included estimated annual costs based on a stated maximum number of labor hours and other direct costs for each performance year. The only work guaranteed to Veridyne under the Contract was TEN (10%) PERCENT of each year's maximum. See Plaintiff's Appendix pages 24 – 28. Veridyne admits the amounts listed as having been paid to it during the initial FIVE (5) YEARS. By way of further answer, all payments were for services provided pursuant to work orders issued by MARAD contracting officers under the Work Order Procedures clause of the Contract (See Plaintiff's Proposed

Findings Unconverted Fact, ¶12 and Defendant's Response thereto), meaning that in each case the COTR would have provided Veridyne with a proposed statement of work for each work order, Veridyne would then have provided an estimate of the cost of the work (based on the Contract's set hourly labor rates times the estimated number and types of labor hours for the task). By way of still further response, while MARAD's total payments to Veridyne amounted to the approximate total maximum contract value, broken down by year MARAD's requirement for services fell both below and above the yearly maximums. Cf. the amounts listed in Defendant's Proposed Findings Of Fact with the estimates in the Contract:

| | Payments to Veridyne by Year (from Defendant's Proposed Finding No. 4) | The Contract[1] |
|---|---|---|
| Base Year | $2,582,051.20 | $3,013,064.52 |
| Option Year 1 | $3,774,669.32 | $4,054,537.23 |
| Option Year 2 | $4,316,679.61 | $4,625,836.30 |
| Option Year 3 | $4,036,100.25 | $5,650,017.92 |
| Option Year 4 | $5,614,798.00 | $4,780,833.18 |

Veridyne would also point out that of the payments to it during the initial FIVE (5) YEARS, the subcontractor, Information Network Systems ("INS"),who MARAD personnel wanted kept on when Veridyne received the Contract, received over $8 million for its employees' labor and overhead (compared to $9.9 million paid to Veridyne for its employees' labor and overhead). See Patterson Supp. Dec. ¶¶ 7-8, 35; Plaintiff's Supplemental Appendix, pages 3, 9 and 51.

5. By early 1998, Veridyne recognized that it would soon "graduate" from the 8(a) program and, thus, would not be eligible for future contracts awarded pursuant to the program. Patterson Decl. ¶ 19.

[1] Taken from Plaintiff's Appendix, pages 24-28. Plaintiff would note that in Option Year Four, services authorized by MARAD exceeded the maximum by nearly $1 million.

Plaintiff's Response: Denied. Defendant paraphrases ¶ 19 from the Patterson Declaration submitted with Plaintiff's Motion For Partial Summary Judgment, but then adds to it. That paragraph reads precisely as follows:

> 19. In late 1997 or early 1998, I approached MARAD officials and inquired as to whether the Contract could be extended for additional performance years, since Veridyne was scheduled to graduate from the 8(a) Program in June of 1998; I was told that was not possible.

Plaintiff's Appendix, page 4.

6. If the contract remained part of the 8(a) program and had been competed in 2000, then Veridyne would not have been eligible for the award. Burnowski Dec. ¶ 8.

Plaintiff's Response: Admitted.

7. So that Veridyne could continue to perform contract services, Veridyne and MARAD officials agreed to execute a contract modification ("Modification 23") prior to Veridyne's graduation from the 8(a) program that would extend the existing contract for five additional years. Patterson Dec. ¶ 19-20.

Plaintiff's Response: Admitted.

8. By law, Modification 23 could not have been issued without competitive bidding unless the value of the modification was less than $3 million. 15 U.S.C. § 637(a)(1)(D).

Plaintiff's Response: Denied. SBA's regulations allow for waivers of the $3 million limit; that was apparently how the Contract was originally awarded to Veridyne at a maximum value of some $20.5 million without competition. See 13 CFR § 124.507(d); see also, Declaration of Samuel J. Patterson, ¶ 7, Plaintiff's Appendix, page 2.

9. Veridyne was informed that the contract could only be extended if the estimated amount did not exceed $3 million. Pl. Reply to Counterclaim ¶ 73.

Plaintiff's Response: Denied as stated. The referenced paragraph cited from Plaintiff's Reply To Defendant's Amended Counterclaim (Special Plea In Fraud) (¶ 73) reads as follows in the last sentence (the pertinent part):

> …Veridyne alleges that it was informed by MARAD that the Contract could be extended only in an estimated amount that did not exceed $3 million.

(emphasis supplied).

10. Veridyne submitted its proposal for Modification 23 to MARAD on March 30, 1998. Burnowski Dec. ¶ 10. As part of its proposal, Mr. Genna certified the accuracy and completeness of the cost and pricing data. Patterson Decl., Exh. F.

Plaintiff's Response: Admitted. By way of further response, as is shown by the Executive Summary included with the extension proposal (Plaintiff's Appendix, pages 96 – 98) and the ensuing pages of cost breakdown (Plaintiff's Appendix pages 99 – 113), the "certification" to which Defendant refers was a Truth In Negotiations Act ("TINA") certification, clearly dealing with Veridyne's hourly labor rates and indirect expense and not the amount of services MARAD would in fact, require over the additional FIVE (5) YEARS. Indeed, FAR 2.101 defines cost or pricing data (in pertinent part) as follows:

> (a) Cost or Pricing Data Defined
>
> The term "cost or pricing data" means:
>
> all facts that, as of the date of price agreement or, if applicable, an earlier date agreed upon between the parties that is as close as practicable to the date of agreement on price, prudent buyers and sellers would reasonably expect to affect price negotiations significantly. Cost or pricing data are data requiring certification in accordance with 15.406-2. Cost or pricing data are factual, not judgmental; and are verifiable. While they do not indicate the accuracy of the prospective contractor's judgment about estimated future costs or projections, they do include the data forming the basis for that judgment. Cost or pricing data are more than his-

> torical accounting data; they are all the soundness of estimates of future costs and to the validity of determinations of costs already incurred.

(emphasis supplied). Veridyne's proposal for extension clearly set forth the data, information and assumptions on which the projected costs were based; Veridyne made no representation as to whether the stated maximum number of hours would be sufficient to satisfy all of MARAD's logistical support service needs. See Patterson Supp. Dec. ¶¶ 9-10, 18-22, Plaintiff's Supplemental Appendix, pages 3 and 6-7, Plaintiff's Appendix, pages 96-108.

11. In its proposal, Veridyne indicated that "[w]e understand that the scope of the work will remain the same as is established in the current contract ...." Id. Additionally, the proposal stated, "All contract terms and conditions are the same, and the original scope and technical content remain intact." Id.

Plaintiff's Response: Admitted. By way of further response, Defendant has omitted key language from its quotation. The initial quote referenced in the proposed finding reads as follows (in full):

> We understand that the scope work will remain the same and, as is established in the current contract, the specific tasking of work will be through issuance of Work Orders and Technical Directives.

Plaintiff's Appendix, page 93 (emphasis supplied). Additionally, in the proposal's Executive Summary, Section 1.1, "General Assumptions," Veridyne stated:

> Terms and conditions in this proposed extension are consistent with the existing contract. The extension is being priced as a Cost Plus Award Fee, IDIQ contract. All contract terms and conditions are the same, and the original scope\ and technical content remain intact.

Plaintiff's Appendix, page 96.

12. In order to stay below the sole source threshold, Veridyne submitted a certified proposal for the five year extension priced at $2,999,949. Durkin Dec. ¶¶

5, 6. Veridyne accomplished this by significantly underestimating the amount of labor hours necessary for performance of the contract. Burnowski Decl. ¶ 11.

Plaintiff's Response: Admitted in part; denied in part. It is admitted that Veridyne submitted a "certified proposal" priced at $2,999,949. By way of further answer that total was arrived at by multiplying Veridyne's certified labor rates by the maximum number of hours of work MARAD could order. The second sentence in ¶ 12 is denied. Veridyne made no estimate of the "amount of labor hours necessary for performance of the contract;" to the contrary, the proposed extension was for FIVE (5) additional years of the IDIQ contract under which MARAD would order such services as it, in its sole discretion, deemed necessary. Patterson Supp. Dec., ¶¶ 9 – 10, 14, 20 – 22;[2] Plaintiff's Supplemental Appendix[3] pages 3 – 7. Nowhere in Veridyne's proposal did it make any representation that the maximum number of hours included therein would be sufficient to provide MARAD with all the logistics support services it might require. Id; see also Plaintiff's Appendix, pages 93 through 150.

13. Veridyne's experience with the contract showed its fees for the services to be provided pursuant to Modification 23 to significantly exceed $2,999,949 over a five year period. Burnowski Decl. ¶ 10, Exh 3.

Plaintiff's Response: Denied. The Contract, as awarded by MARAD, was a cost plus award fee. Under the original FIVE (5) YEAR contract term, the maximum amount of "fees" Veridyne could have earned was set at:

| | |
|---|---|
| Base Year | $223,189.96 |
| Option Year 1 | $300,336.09 |

---

**2** Patterson Supp. Dec. refers to the Supplemental Declaration of Samuel J. Patterson included in Plaintiff's Supplemental Appendix.

**3** Plaintiff's Supplemental Appendix refers to the supplemental Appendix submitted herewith.

| | |
|---|---|
| Option Year 2 | $342,654.54 |
| Option Year 3 | $344,445.77 |
| Option Year 4 | $354,135.79 |
| Total: | $1,564,762.15 |

(see Plaintiff's Appendix pages 24 – 28); in fact, actual fees earned by Veridyne for work done under orders during the Contract's initial FIVE (5) YEAR term totaled $1,517,250.50 (see Patterson Supp. Dec. ¶ 36; Plaintiff's Supplemental Appendix, pages 9 – 10). Thus, Veridyne's "fees" for its services during the first FIVE (5) YEARS did not exceed $2,999,949; rather they were just over half that figure.

14. The following shows Veridyne's estimate of labor hours for the first five years of the contract, the actual labor hours for those years and the estimate contained in Veridyne's proposal for the five years covered by the extension:

| Years 1-5 | | | Years 6-10 | |
|---|---|---|---|---|
| | Est. | Act. | | Est. |
| Initial Contract | 46,000 | 36,505 | Option Year 5 | 31,826 |
| Option Year 1 | 58,800 | 40,819 | Option Year 6 | 20,124 |
| Option Year 2 | 69,920 | 47,253 | Option Year 7 | 8,892 |
| Option Year 3 | 69,920 | 57,568 | Option Year 8 | 6,084 |
| Option Year 4 | 69,920 | 58,340 | Option Year 9 | 3,944 |

Burnowski Dec. ¶ 12.

Plaintiff's Response: Denied. Initially, Veridyne would point out that the proposed finding misstates the referenced paragraph from the Burnowski declaration. Regarding the initial FIVE (5) YEARS, Burnowski does not claim the stated hours were "Veridyne's estimate." He simply lists what the Contract refers to as the annual "maximum" estimate of labor hours (emphasis in original), and states that the list shows the labor hours estimated against those and actually incurred during the first FIVE (5) YEARS. Veridyne might also point out that, as the Burnowski Declaration shows, he is not competent to testify to any aspect of the original negotiations or the negotiations leading up to Modification 23, since he did not

arrive on the scene until 2000; he claims no personal knowledge and his statements amount to nothing more that his reading of the documents attached to his Declaration. In fact, nowhere in the original contract (which was actually a document generated between MARAD and the Small Business Administration – see Plaintiff's Appendix, page 22), or in Veridyne's proposal for the FIVE (5) YEAR extension or in Modification 23 itself did Veridyne provide an "estimate" of the level of logistics support services MARAD would require; rather the contract, as awarded by MARAD to the Small Business Administration (which then awarded a subcontract to Veridyne), provided annual maximums that MARAD could order (Patterson Declaration, ¶¶ 8-9, Plaintiff's Appendix, pages 2 and 23 – 28); for the extension, Veridyne proposed to provide MARAD with hours totaling just under $3,000,000 that MARAD could order if it so chose. Patterson Supp. Dec. ¶¶ 9-10, 19 – 24; Plaintiff's Supplemental Appendix, pages 3 and 6 – 7; Plaintiff's Appendix, pages 93 – 150. Finally, Defendant's proposed finding would suggest that Veridyne had (or should have had) better information both on MARAD's historical and future needs for logistics services than MARAD did.

15. Veridyne's proposal did not explain why its labor estimates for the contract extension years were so significantly lower than its previous estimates and actual experience, notwithstanding the fact that the proposal purportedly assumed the same scope of work. Patterson Decl., Exh. F.

<u>Plaintiff's Response</u>: Denied. Veridyne's proposal specifically explained the rationale behind the totals in the extension proposal for labor hours; as stated in the transmittal letter, Veridyne was given to understand by MARAD that the proposal was to be in an amount "NTE" (not to exceed) $3 million. Plaintiff's Appendix, page 89; Patterson Supp. Dec. ¶¶ 20 – 24; Plaintiff's Supplemental

Appendix pages 6 – 7. Moreover, Defendant fails to provide any evidence (e.g., a declaration from any MARAD official who participated in the Contract extension) indicating that MARAD understood that Veridyne was proposing to provide the same level of services that had cost over $20 million during the initial FIVE (%) YEARS of Contract performance for just under $3 million during the second FIVE (5) YEARS, or that MARAD interpreted the number of hours set forth in Veridyne's proposal as being an estimate by Veridyne of all the logistical support services that MARAD would require during the FIVE (5) YEAR extension. See 10 U.S.C. § 2306a(e)(2).

16. Modification 23 was executed by Veridyne and MARAD on May 18, 1998 and by SBA on May 20, 1998; it became effective on March 27, 2000. Burnowski Decl. ¶ ¶ 13, 15.

Plaintiff's Response: Admitted.

17. Modification 23 reflected estimated costs of $2,999,949. It also stated that "[t]he scope of work and all terms and conditions of the contract are unchanged." Id., Exh. 3.

Plaintiff's Response: Denied. Modification 23 drafted by MARAD reflected a "maximum" of $2,999,949 in costs, based on yearly figures for the maximum number of labor hours MARAD could order. See Plaintiff's Appendix, pages 151-158 (emphasis in original); Patterson Supp. Dec. ¶ 21, Plaintiff's Supplemental Appendix, page 6.

18. Modification 23 contained the following maximum estimated labor hours:

Option Year 5 32,000
Option Year 6 23,000
Option Year 7 17,000
Option Year 8 7,000
Option Year 9 4,000

Burnowski Decl., Exh. 2.

Plaintiff's Response: Denied as stated. Modification 23 stated that "the labor hours are the maximum estimated hours/cost requireded (sic);" by way of further answer, on each page setting forth the yearly figures, it was clearly set forth in the extension modification that the "Total estimated Cost:" was based on the maximum number of labor hours MARAD could order (e.g., 32,000 in Option Year Five). See Plaintiff's Appendix, pages 154-158 (emphasis in original).

19. Within six months of the beginning of work under Modification 23, Veridyne had billed the Government more than the entire estimated cost of the modification for all five years. Burnowski Decl. ¶ 14.

Plaintiff's Response: Admitted. By way of further response, all the work was pursuant to work orders and/or technical directives issued by MARAD contracting officers (Work Orders 412 through 419), and, in each case, the work orders were issued without any funding; funding was then authorized incrementally as work progressed, i.e., as funding was exhausted additional funding would have to be authorized if MARAD wanted additional services (see the Contract clause H.13 Incremental Funding Of Task Orders; Plaintiff's Appendix, page 58); in virtually every case the incremental funding was authorized by Benedict J. Burnowski, Defendant's principal declarant. Patterson Supp. Dec. ¶¶ 40 – 50; Plaintiff's Supplemental Appendix, pages 10 – 14, 135 – 140, 151 – 158, 169 – 174, 191 – 200, 208 – 215, 230 – 235, 243 – 245 and 254 -255.[4]

---

[4] Of the THIRTY-TWO (32) separate funding authorizations issued by MARAD between April 1, 2000 and September 30, 2000 in connection with work orders 412 through 419, it appears that only TWO (2) were signed by a contracting officer other than Burnowski. See Plaintiff's Supplemental Appendix, pages 199 – 200 and 232.

20. The amount of money spent pursuant to Modification 23 from its inception in March 2000 to December 2004 was $31,134,931.12. Id. On a year by year basis, the Government paid Veridyne:

| | | |
|---|---|---|
| Option Year 5 | 2000-2001 | $7,099,213.61 |
| Option Year 6 | 2001-2002 | $7,229,004.53 |
| Option Year 7 | 2002-2003 | $6,906,239.30 |
| Option Year 8 | 2003-2004 | $6,599,865.97 |
| Option Year 9 | 2004-2005 | $3,300,607.71 |

Burnowski Decl. ¶ 14.

Plaintiff's Response: Denied. The dollar value of the work authorized by MARAD may have been $31,134,931.12; however MARAD has not paid Veridyne for work done between September 1, 2004 and December 31, 2004; the total dollar value for work authorized but for which Veridyne was not paid is $2,044,053.59. Patterson Dec. ¶¶ 75 – 82; Plaintiff's Appendix pages 18 – 20. By way of further response, the recitation of the amounts authorized/paid is misleading. During the second FIVE (5) YEARS of the Contract, billings by the subcontractor (INS) for its labor totaled $14.9 million, while Veridyne's billings for its employees' labor totaled only $14.5 million. Patterson Supp. Dec. ¶ 64; Plaintiff's Supplemental Appendix, pages 17 and 258.

21. In October and November 2000, Veridyne proposed to amended the contract to reflect more realistic amounts of anticipated services and billings. Id. at ¶ 16, Exh. 3.

Plaintiff's Response: Admitted. By way of further response, Veridyne's proposal was made after MARAD withheld award fees Veridyne had earned for work done pursuant to MARAD's authorizations; it was Benedict J. Burnowski who sent proposed modification 0035 (with the increased annual maximums) to Veridyne.

Patterson Supp. Dec. ¶¶ 55 – 57; Plaintiff's Supplemental Appendix, pages 15 – 16; Plaintiff's Appendix, pages 160 – 193.

22. As the parties began negotiating an increase in the contract, concerns arose within MARAD that the estimates provided by Veridyne may have been fraudulent and the matter was referred to the Department of Transportation Inspector General (the "Inspector General") for investigation in the summer of 2001. Id. at ¶ 17, 18.

Plaintiff's Response: Plaintiff is without sufficient knowledge as to the veracity of Defendant's proposed finding as to what "concerns arose within MARAD;" since Defendant fails to identify any person who had such concerns, or even the person who made the referral, the finding is denied.

23. Proposed Modification 35 was never executed by MARAD. Id. at ¶ 17.

Plaintiff's Response: Denied as stated. While no one from MARAD formerly executed Modification 0035, MARAD Contracting Officer Erica Williams provided a hand-written notation to Veridyne stating that "this is the version of Mod 0035 we are currently working against." Patterson Dec. ¶ 44; Plaintiff's Appendix pages 11 and 207.

24. While awaiting the results of the Inspector General's investigation into Modification 23, MARAD continued to place orders for work pursuant to the contract. These orders were placed for the sole purpose of fulfilling MARAD's logistics requirements. The satisfication (sic) of these logistics requirements was critical because many of the Ready Reserve Fleet vessels were activated in support of the wars in Afghanistan and Iraq. Burnowski Decl. ¶ 19.

Plaintiff's Response: Plaintiff is without sufficient knowledge as to why MARAD continued to order and authorize services under the Contract, therefore the proposed findings is denied. By way of further response, Plaintiff would point out that since the Contract was an IDIQ contract, as opposed to a requirements contract, MARAD could have, at any time, issued one or more contracts for

procurement of whatever logistics support services it required; instead, it exercised no less than four (4) more options to extend the Contract (i.e., March, 2001, March, 2002, March, 2003 and March, 2004), after Burnowski had authorized nearly $6 million worth of services during the first year of the FIVE (5) YEAR extension. See Patterson Dec. ¶¶ 52 and 60 through 62; Plaintiff's Supplemental Appendix pages 15 – 17; Plaintiff's Appendix, pages 176, 209, 230 and 243.[5]

25. On December 15, 2003, Special Agent ("SA") Kevin Durkin and SA Sam Pugliese of the Department of Transportation Inspector General's office interviewed Mr. Samuel J. Patterson at his place of business in Crystal City, Virginia. Durkin Decl. ¶ 4. Mr. Patterson is the founder and CEO of Veridyne.

Plaintiff's Response: Admitted.

26. During that interview, Mr. Patterson was asked about how Veridyne had priced its proposal for the five-year extension; Mr. Patterson indicated Mr. Genna had prepared the estimate and that he, Patterson, had not been involved. Id. When asked whether he was aware of a dollar requirement to keep the modification within the 8(a) program, Mr. Patterson stated that he knew there was a $3 million requirement and acknowledged that Veridyne's proposal was "about $3 million." Id. He said no one at MARAD had ever specifically told him to bid under $3 million. Id. Mr. Patterson acknowledged that the typical value of the MARAD contract on a yearly basis was greater than $3 million. Id.

Plaintiff's Response: Denied. The proposed finding does not convey what transpired at the meeting. Mr. Patterson said that no one at MARAD told him to "bid" under $3 million (indeed, there was no bidding involved); it was, however, conveyed to Veridyne that the proposal had to be under $3 million for MARAD to consider extending the contract, a fact reflected in the cover letter transmitting the proposal. (see Plaintiff's Appendix, page 99). Patterson Supp. Dec. ¶¶ 72 – 75; Plaintiff's Supplemental Appendix pages 19 – 20. As to the statement that Mr.

[5] It is also worth noting that the war in Afghanistan did not begin until after the September 11, 2001 attacks, well after the March 2001 option exercise, while the war in Iraq did not begin until March, 2003, well after both the March 2001 and March, 2002 option exercises.

Patterson acknowledged that the typical value of the Contract exceeded $3 million per year, the statement is accurate but misleading. In the original FIVE (5) YEAR term, the maximum amount of work MARAD could order exceeded $3 million in each year, but the figures corresponded to a maximum number of labor hours and subcontractor work. See Patterson Supp. Dec., ¶¶ 76 – 82; Plaintiff's Supplemental Appendix pages 20 – 21; Plaintiff's Appendix, pages 24 – 28.

27. On February 23, 2004, SA Durkin and SA Pugliese interviewed Mr. Michael Genna at his place of business in New Jersey. Durkin Decl. ¶ 5. Mr. Genna was the CFO of Veridyne at the time Modification 23 was proposed and executed.

Plaintiff's Response: Plaintiff does not deny that Mr. Genna was interviewed; it cannot be sure of the date. Mr. Genna was Veridyne's CFO at the time of the Modification 23 extension negotiations.

28. When asked about Modification 23, Mr. Genna explained that his only involvement was in the pricing and that Patterson had been involved in the contract extension negotiations meeting with various MARAD officials. Id. Mr. Genna was not able to explain how the bid for Modification 23 could have been so much lower than the actual cost for the same work over the previous several years. Id. When asked about the pricing of Modification 23, Mr. Genna stated that the estimate was based solely upon Mr. Patterson's instruction to keep it under $3 million and that he had gone over the pricing proposal with Patterson who had made adjustments in order to keep the estimate under $3 million. Id. Mr. Genna stated that the pricing model for the contract extension had been constructed in a manner designed to keep the bid under $3 million. Id. Mr. Genna denied that anyone at MARAD told him to submit a bid just under the $3 million threshold. Id. Mr. Genna stated that he was aware that the estimate was, in his words, "not a good faith estimate." Id.

Plaintiff's Response: Plaintiff is without sufficient knowledge of the conversations between the agents and Mr. Genna to form a belief as to the veracity of the proposed finding; therefore it is denied. By way of further answer, there was never a "bid" for a contract extension; rather, Veridyne submitted what amounted to an unsolicited proposal for the extension (see e.g., FAR Subpart 15.6), with the

understanding that the proposal could not exceed $3 million, as was clearly stated in Mr. Genna's February 25, 1998 letter to Contracting Officer Rita Jackson (i.e., "NTE $3,000,000 in the appregate"). See Plaintiff's Appendix, pages 89 – 90. As to how the dollar amount of the proposal was so much lower then the initial FIVE (5) YEAR term is clearly set forth in the proposal: Veridyne proposed considerably less of its own employees' labor hours and none for its subcontractor, INS. See Patterson Supp. Dec. ¶¶ 9-10, 20 – 27; 75, 82 – 85; Plaintiff Supplemental Appendix pages 3, 6-8, 75 and 21-22; Plaintiff's Appendix, pages 97, 104 – 107 and 154 – 158.

29. On April 23, 2004, SA Durkin and SA Pugliese re-interviewed Mr. Patterson at his offices in Broomall, Pennsylvania. Durkin Decl. ¶ 6. When asked again about his involvement in Modification 23, Mr. Patterson admitted to being involved in the contract. He stressed the importance of the MARAD contract to Veridyne's business. Id. He described the logistic support contract as an "anchor" contract and told SA Durkin and SA Pugliese that "Without the [contract], there is no Veridyne." Id. When confronted with Mr. Genna's statements that the estimate was inaccurate, not in good faith and was prepared for the purpose of satisfying the sole source threshold, Mr. Patterson agreed with those statements. Id. When asked again about the pricing of Modification 23, Mr. Patterson agreed that his company's $3 million estimate was based solely on the SBA sole-source threshold and was not a good faith estimate. Id. He said, "At the end of the day, that estimate sucked." Id. When asked whether he believed Veridyne would only receive $2.9 million of work from MARAD on the contract extension, Patterson said that he knew that Veridyne would receive more work because it was "blowing through more money than that currently [1996-1998]." Id. Mr. Patterson admitted that he had given bad estimates before on other contracts and stated his belief that it was standard practice in the 8(a) community to secure contracts in this manner. Id. He also told SA Durkin and SA Pugliese that "It doesn't matter that we limited competition with a bad estimate because we provided a good service." Id.

Plaintiff's Response: Denied. Plaintiff categorically denies the statements attributed to Mr. Patterson. Mr. Patterson's responses to the statements Durkin alleges that Mr. Patterson made were as follows (as quoted from ¶¶ 90 – 98 of his Supplemental Declaration):

90. In ¶ 6 of his declaration Durkin states in sum and substance as follows:

a) that I admitted the $3,000,000 estimate in the proposal was not a good faith estimate;

b) that I said, "At the end of the day, that estimate sucked;"

c) that I knew Veridyne would receive more than 2.9 million worth of work from MARAD; and

d) that I "admitted" Veridyne had given "bad" estimates on previous occasions to secure other contracts;

e) that I said "It doesn't matter that we limited competition with a bad estimate because we provided a good service."

91. With respect to the first assertion ("not a good faith estimate"), I said no such thing; I told him that I had no way of knowing what MARAD would order.

92. With respect to the second assertion ("At the end of the day, estimate sucked"), the particular quote is accurate, but used deceptively; Durkin omits the question he put to me and to which my statement was offered in response; he asked, "Knowing what you know now (i.e., in April of 2004), what do you think of the estimate[?]," to which I responded, "At the end of the day, that estimate sucked." (emphasis supplied).

93. Concerning the third assertion (i.e., that I knew Veridyne would receive more than $2.9 million worth of work), Durkin does not indicate how I could know what quantity of work MARAD, in its sole discretion, would order under the (IDIQ) Contract; I had no way of knowing what MARAD would order, and I told Durkin that.

94. Not even the MARAD officials knew what amount of services would ultimately be required, hence the use of an IDIQ contract (see FAR 16.501-2) (and I would also reiterate that in the initial FIVE (5) contract years, MARAD only ordered 75% of the maximum amount of hours).

95. I will not deny that I certainly hoped MARAD would order more than $2.9 million (and said so in my original declaration); however, I understood that the amount of work that would be ordered was totally within MARAD's discretion (as the Contract specified); and, of course, it was my assumption that if Veridyne received a Task Order

from MARAD's authorized contracting officer, that MARAD had taken whatever steps it deemed necessary to generate a valid order.

96. With respect to the fourth assertion in Durkin's ¶ 6 (i.e., that I admitted to having previously given "bad estimates" to the Government to secure contracts), I deny having done that or having said that; what I said was that I understood it to be a practice among 8(a) contractors to keep proposals under $3 million so that the requirement would not have to be competed among 8(a) contractors, but I never said that Veridyne had done so; I also pointed out to Durkin that SBA can waive the $3 million limit when requested by the agency (as SBA apparently did when the Contract was originally awarded to Veridyne).

97. With respect to Durkin's final assertion in ¶ 6 (i.e., that I said, "It doesn't matter that we limited competition with a bad estimate because we provided a good service"), with the exception of my saying that we had provided MARAD with "a good service" (and my adding that Veridyne had historically billed at below our DCAA-approved indirect rates), the rest of the purported quote is absolutely false; I never said such a thing.

98. I also said to Durkin something along the lines of, "With all the MARAD scandals you read about in the papers, I don't know why you're wasting your time with me."

Plaintiff's Supplemental Appendix pages 23 – 25.

30. In December 2004, following the Inspector General's report, MARAD ordered a stoppage of work on the contract. Burnowski Decl. ¶ 21.

Plaintiff's Response: Admitted in part. It is admitted that MARAD suspended performance by Veridyne in December of 2004. By way of further answer, according to the Declaration of Benedict J. Burnowski, the Inspector General's report was issued in September of 2004 (see ¶ 20); yet MARAD continued to accept services from Veridyne until December of 2004 (Burnowski Declaration, ¶ 21). Additionally, with respect to the Inspector General's report, which Veridyne has never seen, Veridyne would point out that neither it nor any of its principals were ever indicted or convicted by the Department of Justice, or suspended or

proposed for debarment by the Department of Transportation. Patterson Supplemental Declaration, ¶ 101; Plaintiff's Supplemental Appendix page 25.

31. At the time the work stoppage was ordered, Veridyne had six outstanding invoices for work already performed under the contract. Id. at ¶ 22.

Plaintiff's Response: Admitted.

32. After MARAD ordered the work stoppage, Veridyne submitted two additional invoices. Id.

Plaintiff's Response: Admitted.

33. MARAD refused to pay these invoices, asserting that the contract was void ab initio. Id. at ¶ 23, Exh. 5.

Plaintiff's Response: Admitted.

34. Veridyne then submitted a certified claim for payment of the outstanding invoices, which was deemed denied when the contracting officer did not issue a decision after 60 days. Id. at ¶ 24.

Plaintiff's Response: Admitted.

35. Modification 23 required only that the Government place minimum orders totaling 10 percent of the estimated amount for each year. Burnowski Decl. ¶ 25, Exh. 3; Pl. Mot. 5, fn. 4; Pl. Proposed Findings of Uncontroverted Fact, ¶ 27; Pl. Reply to Counterclaim ¶ ¶74, 75, 92.

Plaintiff's Response: Admitted.

36. MARAD placed orders exceeding the minimum guarantee amount for each year of Modification 23. Burnowski Decl. ¶ 25.

Plaintiff's Response: Admitted.

37. MARAD fulfilled its obligations pursuant to Modification 23. Id.

Plaintiff's Response: Denied. Findings of Fact 36 and 37 would suggest that MARAD's obligation under Modification 0023 (which incorporated all terms of the Contract – see Modification 0023, page 2 of 7; Plaintiff's Appendix page 153) was only to order more than 10% of the minimum quantities, not to pay for the work it

ordered. The assertion is nonsense. The Contract (incorporated in full into Modification 0023, see Plaintiff's Appendix, page 153), required MARAD to pay Veridyne's invoices for services Veridyne provided under work orders issued and funded by MARAD's authorized contracting officers. See Section G.5 in the Contract ("M1252.232-01 INVOICE REQUIREMENTS (MARAD) (AUG 1991)"); see also, the clauses entitled "Allowable Cost and Payment" and "Award Fee" (Plaintiff's Appendix, pages 48- 49). Thus, MARAD's failure to pay Veridyne's invoices amounted to a breach of MARAD's obligations under Modification 0023.

Respectfully submitted,

s/ Marc Lamer

Marc Lamer
Attorney for Plaintiff

Date: May 9, 2007