No. 06-150C
Judge Block

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

VERIDYNE CORPORATION

Plaintiff,

v.

THE UNITED STATES OF AMERICA

Defendant.

# PLAINTIFF'S SUPPLEMENTAL APPENDIX

VOLUME I
Pages 1 – 123

Marc Lamer
Attorney for Plaintiff

Kostos and Lamer, P.C.
1608 Walnut Street
Suite 1300
Philadelphia, PA 19103
(215) 545-0570

# TABLE OF CONTENTS TO PLAINTIFF'S SUPPLEMENTAL APPENDIX (Volume I)

**Page**

**Document**

1. Supplemental Declaration of Samuel J. Patterson....................................1

2. Veridyne Work Order Detail, Contract DTMA91-95-C-00024 (Exhibit "A" to Patterson Supplemental Declaration)................................27

3. Billing Breakdown, Work Orders 001 through 319 (Exhibit "B" to Patterson Supplemental Declaration)................................51

4. Modifications 001, 002, 005, 006, 009, 012, 014, 015, 018, 020, 023, 024, 025, 027, 029, 030, 031 and 032 (Exhibit "C" to Patterson Supplemental Declaration)..........................................................52

**IN THE COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **VERIDYNE CORPORATION** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 06-150C** |
| | ) | **(Judge Block)** |
| | ) | |
| **THE UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Defendant.** | ) | |

**SUPPLEMENTAL DECLARATION OF SAMUEL J. PATTERSON**

1. I am the President of Veridyne Corporation (formerly Shepard-Patterson Associates, Inc.), plaintiff in the above-captioned action ("Veridyne"), and am authorized to make this Declaration on its behalf.

2. I have reviewed the declarations of Benedict J. Burnowski ("Burnowski") and Kevin T. Durkin ("Durkin"), submitted by Defendant in support of its Cross Motion for Summary Judgment ("Defendant's Motion"); I find them to be erroneous at best, intentionally deceptive at worst.

3. First, it is important to point out that neither Burnowski nor Durkin had any involvement (or were even present) during the negotiations between Veridyne and the Maritime Administration ("MARAD") leading to the execution of Contract DTMA91-95-C-00024 ("the Contract') in 1995 or the execution of Modification 0023 in May of 1998; at the time of the original negotiations MARAD was represented by Contracting Officers Rita Jackson and Wayne Cutrell, plus their superior, Tim Roark; Burnowski, as he states in his declaration, became Team Leader in January of 2000 (i.e., nearly two years after the negotiations which

resulted in Modification 0023), while Durkin, an investigator with the Department of Transportation Inspector General's Office, first became involved in or about July of 2003, i.e., over five years later, according to his Declaration.

4. Thus, neither Burnowski nor Durkin has any direct knowledge of the facts to which they have attested; see, for example, ¶¶ 8-9 of Burnowski's Declaration.

5. When Veridyne first became aware of a contracting opportunity with MARAD through the Small Business Administration ("SBA") 8(a) Program ("the Program"), the services were being provided to MARAD by a company called Information Network System ("INS"); INS was an 8(a) contractor which either had just graduated or was nearing its graduation from the Program.

6. Veridyne sought to have the logistics support services requirement set aside for it, as Veridyne was at the time (late 1994, early 1995) a certified 8(a) contractor.

7. SBA apparently agreed to the requirement being set aside for Veridyne, as we commenced direct negotiations with MARAD on a contract, however, the MARAD team (Roark, Cutrell and Jackson) wanted INS to be part of our team, acting, as a subcontractor to Veridyne, even though Veridyne and INS would be providing the same types of services; Veridyne wanted to secure this contract, so if MARAD wanted INS to be part of our team, then INS was going to be part of our team.

8. Thus our original proposal included INS doing slightly less than the amount of work to be done by Veridyne's own employees; this was reflected in

the Contract's yearly cost breakdown (where costs for INS were included under "Other Direct Costs" together with costs for travel, equipment and materials):

| | Veridyne Labor | Other Direct Costs |
|---|---|---|
| Basic Year | $1,309,551.86 | $1,480,322.70 |
| Option Year One | $1,697,486.20 | $2,056,714.94 |
| Option Year Two | $1,979,102.92 | $2,304,078.84 |
| Option Year Three | $1,992,220.04 | $2,313,352.11 |
| Option Year Four | $2,051,030.15 | $2,375,667.24 |

See Appendix to Plaintiff's Motion For Partial Summary Judgment (hereinafter, "Plaintiff's Appendix"), pages 24 – 28.

9. In his declaration, ¶¶ 10-14, Burnowski would have the Court believe that Veridyne proposed to MARAD some sort of contract extension, pursuant to which Veridyne would provide the same level of service to MARAD during the second FIVE (5) YEARS as it had provided during the initial FIVE (5) YEARS (roughly $20,000,000 worth), for just under THREE MILLION ($3,000,000) DOLLARS, i.e., roughly one-seventh (1/7) the cost), and that Veridyne then proceeded to invoice MARAD over THIRTY-ONE MILLION ($31,000,000) DOLLARS for that work, all on its own; the suggestion is not only untrue, but ridiculous as well.

10. What Veridyne offered in its unsolicited (i.e., we were not submitting a bid or proposal in response to and what MARAD accepted was a maximum number of hours spread over FIVE (5) YEARS at set per hour rates, allowing MARAD to use those hours as it, in its sole discretion, required; Veridyne was not asked to judge whether hours totaling slightly under $3 million would be sufficient to satisfy all of MARAD's requirements nor would Veridyne have been able to offer such a judgment to MARAD.

11. I pointed out in my original declaration (¶ 10), the Contract was an indefinite delivery, indefinite quantity contract, a fact which Defendant does not dispute (see Defendant Counter-Claimant Responses To Plaintiff's Proposed Findings Of Fact, ¶ 9); as the Federal Acquisition Regulation ("FAR") states in § 16.501-2 "General," such contracts "may be used to acquire supplies and/or services when the exact times and/or exact quantities of future deliveries are not known at the time of contract award."

12. As I pointed out in my original declaration, ¶ 12, the Contract provided, in Statement Of Work, that Veridyne would perform services "as needed in accordance with authorized written work orders;" Defendant has conceded that statement as true (see Defendant Counter-Claimant's Responses To Plaintiff's Proposed Findings Of Fact, ¶ 11).

13. Similarly, as I also pointed out in ¶ 13 of my Declaration, the Contract, in Work Order Procedures, provided, in (d), "The Contractor shall perform work under this contract as specified in the written as work orders issued by the Contracting Officer;" Defendant concedes this statement to be true, as well (id., at ¶ 12).

14. In ¶ 11 of his Declaration, Burnowski states:

> In its proposal [for extension of the Contract], Veridyne indicated that "[w]e understand that the scope of work will remain the same as is established in the current contract . . . ."

The statement again seems to imply that Veridyne was offering to provide the same level-of-service for $3,000,000 as it had previously provided for $20,000,000, or that Veridyne was telling MARAD that $3 million would be

sufficient to satisfy all of MARAD's logistics support needs; in fact, as the proposal that led to Modification 0023 shows, Veridyne was offering a maximum number of hours at set rates; those hours at the stated rates, if ordered to the maximum, came to just under $3,000,000.

15. Burnowski's Declaration simply states that the language quoted in his ¶ 11 was taken from Exhibit F to my Declaration, without citing a particular page; in fact, the quote is found in the proposal transmittal letter found on page 93 of "Plaintiff's Appendix," the complete quote reads as follows:

> We understood that the scope of work will remain the same as is established in the current contract and, as is the case in the current contract, the specific tasking of work will be through issuance of Work Orders and Technical Directives.

Plaintiff's Appendix, page 93 (emphasis supplied).

16. The Contract's "scope of work" has nothing to do with the number of hours or rates per hour; it deals instead with the types of services to be provided by Veridyne; that section of the Contract, entitled "Statement Of Work," reads as follows:

> C.2 Statement Of Work
>
> The Contractor shall provide the following non-personal support services as needed in accordance with authorized written work orders. The following descriptions briefly define specific duties which may be required under this contract.

Plaintiff's Appendix, page 30 (emphasis supplied).

17. Moreover, the language in Veridyne's proposal was taken, virtually word for word, from the MARAD's 10 March 1998 letter to me indicating that we could submit a proposal to extend the Contract; the letter stated, in pertinent part,

> "The scope of work will remain the same as is established in the current contract. Also, as in the current contract, actual tasking will be assigned using Work Order and Technical Directive structure."

Plaintiff's Appendix, page 92.

18. Further, in ¶ 10 of his Declaration, Burnowski states, "The proposal represented that the expected cost to the Government for the five year period was $2,999,949."

19. Once again, Mr. Burnowski mischaracterizes Veridyne's proposal, making it appear that Veridyne was proposing to provide the same level of services or accomplish the same amount of work as had been previously provided and accomplished for a total of $2,999,949.

20. As is clearly shown in the proposal, $2,999,949 was the cost for the maximum number of hours MARAD could order (see Plaintiff's Appendix, pages 103 through 107); as was also stated in the proposal, however, all work was to be provided in response to specific task orders and technical directives issued by MARAD as it required Veridyne's services. Plaintiff's Appendix, page 93.

21. The proposal's costs were then included in Modification 0023 (which was prepared by MARAD) exactly as proposed by Veridyne; for example for option year 5, i.e., the first year of the extension, Veridyne had proposed to provide 32,000 total hours for a maximum of $1,290,765.00 (with only $129,076.50 worth of orders guaranteed). See Plaintiff's Appendix, pages 103 and 154.

22. Thus, the $2,999,949 represented the maximum dollar value of Veridyne labor and other costs MARAD could order during the FIVE (5) YEAR extension.

23. In ¶ 11 of his declaration, Burnowski also states:

> Veridyne's proposal priced significantly less labor hours and projected costs than it was billing under the ongoing contract at that time.

(emphasis supplied).

24. Burnowski's declaration is correct; in order to keep the proposal under the $3,000,000 "cap" that we were led to believe by MARAD officials could not be exceeded, we offered MARAD significantly less hours and costs than had been included in the original contract term. Compare Plaintiff's Appendix, pages 25 – 28 with pages 103 – 107 and pages 154 – 158.

25. It is important to look again at the initial FIVE (5) YEAR term; more then half of the total projected costs were categorized as "Other Direct Costs," the vast majority of which were costs for the services of INS, the previous MARAD contractor, who MARAD wanted kept on as part of Veridyne's team.

26. I should make one other point concerning ¶ 11 in Burnowski's declaration; he refers to what Veridyne was "billing" under the original contract term; in fact, what Veridyne was "billing" was work done under task orders issued by MARAD contracting officers, which, under the Contract, Veridyne was obligated to perform (see "Work Order Procedures, (c), Plaintiff's Appendix, page 44); each work order was individually priced after the COTR provided Veridyne with a description of a project and Veridyne provided estimates of the number and types of labor hours required.

27. In addition, in the proposal to extend the Contract we excluded any costs for INS, since we could not have provided for such costs and reasonably kept the proposal under $3 million; the proposal specifically informed MARAD that the proposal included only travel and material costs (see Plaintiff's Appendix, page 97 (" An estimate for ODC(s) has been provided for travel and material;" emphasis supplied); with respect to INS, Veridyne simply stated that if MARAD chose to order services from INS (through the Contract), the billing rates for INS labor would be the same as for Veridyne labor (id).

28. In ¶ 12 of his declaration, Burnowski compares the hours estimated and actually expended during the original FIVE (5) YEAR contract term to the estimated hours included the FIVE (5) YEARS extension.

29. One thing that Burnowski's declaration shows is that simply because the Contract included an estimated number of hours, MARAD was not obligated to order or pay for that number of hours; listing the first FIVE (5) YEARS (as taken from Burnowski's Declaration, ¶12) shows the following comparison of maximum Veridyne hours, per the Contract, versus actual hours ordered (with a percentage calculation added):

| | EST | Actual | % |
|---|---|---|---|
| Base Year | 46,000 | 36,505 | 79.35 |
| 1st Option | 58,800 | 40,819 | 69.42 |
| 2nd Option | 69,920 | 47,253 | 67.58 |
| 3rd Option | 69,920 | 57,568 | 82.33 |
| 4Th Option | 69,920 | 58,340 | 83.43 |

30. Based on total estimated hours versus total actual hours ordered, the numbers were as follows for the first FIVE (5) YEARS:

| | |
|---|---|
| Estimated hours (total) | 314,560 |
| Actual hours ordered (total) | 240,485 |
| % actual to estimated | 76.45% |

31. Stated differently, during the initial FIVE (5) YEAR term of the Contract, MARAD ordered just over three-quarters of the maximum number of Veridyne's labor hours in the Contract.

32. Obviously, a question presents itself: if MARAD only ordered about three-quarters of the total hours available under the first FIVE (5) YEARS, then how did Veridyne invoice the full $20.5 million?

33. Veridyne invoiced the full $20.5 million, because MARAD's work orders also involved the use of INS, and INS's billings largely made up the difference.

34. Attached hereto as Exhibit "A," is a copy of Veridyne's Work Order Detail, showing the totals of Veridyne's Work Order billings, broken down by elements for the life of the Contract.

35. As shown of the spread sheet attached hereto as Exhibit "B," billings for the initial FIVE (5) YEARS of the Contract (extracted from Exhibit "A") broke down as follows:

| Total Cost Billed To MARAD | INS Portion of Billings | Other Direct Cost (travel, materials, equipment, etc.) | Veridyne's Labor, Overhead and G&A |
|---|---|---|---|
| $19,780,068.11 | $8,046,113.66 | $1,870,363.11 | $9,949,530.99 |

36. It is also worth pointing out the total award fees Veridyne billed and was paid during the first FIVE (5) YEARS; the Contract provided a maximum of $1,564,762.15 in award fees (see Plaintiff's Appendix, pages 24-28; actual award fees earned by Veridyne in the Base Year and Option Years 1-4 totaled 1,517,250.50. See copies of Contract modifications, 001 through 003, 005

through 006, 009, 012, 014 through 015, 018, 020, 022 through 025, 027 and 029 through 032, attached together hereto as Exhibit "C." (Note: there were two (2) modifications which were numbered "0023" by MARAD, this one and the extension modification).

37. In ¶ 14 of his declaration, Burnowski states:

> 14. In 2000, within six months of the beginning of work on Option Year 5, the first year added by Modification 23, Veridyne had billed the Government more than entire estimated cost of the modification for all five years. MARAD approved invoices from Veridyne totaling the following amounts for each year of Modification 23:

| | | |
|---|---|---|
| Option Year 5 | 2000-2001 | $7,099,213.61 |
| Option Year 6 | 2001-2002 | $7,229,004.53 |
| Option Year 7 | 2002-2003 | $6,906,239.30 |
| Option Year 8 | 2003-2004 | $6,599,865.97 |
| Option Year 9 | 2004-2005 | $3,300,607.71 |

38. Similarly, in ¶ 15 Burnowski states that MARAD approved "invoices from Veridyne totaling $31,134,931.12 under the contract extension from its inception on March 27, 2000 to December 2004."

39. First; once again Burnowski attempts to mislead the reader; he refers to what Veridyne billed, even though those billings were, in every case, in response to task orders issued by MARAD after MARAD sent Veridyne a proposed task order and after MARAD incrementally authorized the services ordered under each one.

40. For example, on March 27, 2000, (shortly after the commencement of the first year under the Modification 0023 extension) Veridyne received Eight (8) Work Orders from MARAD COTR Richard H. Williams, Chief of the Division of

Logistics Support; the Work Orders were assigned numbers 412 through 419. Copies of each Work Order plus the supporting documents therefor and modifications thereto are attached hereto as Exhibits "D" through "H."

41. Each Work Order was for services to be provided during the period March 27, 2000 through March 27, 2001, as follows:

| | |
|---|---|
| 412 | Ship Support Material Procurement |
| 413 | Spare Parts Provisioning Support |
| 414 | Ready Reserve Force Logistics Support |
| 415 | Data Management and System Support |
| 416 | Army Pre-Positioning Stock (APS) Logistics Support |
| 417 | MARAD Reutilization Material (MRM) Program |
| 418 | Off-Share Petroleum Discharge System (OPDS) Army Preposition Force (APF) Logistics Supports |
| 419 | School Ship Logistics Support |

See, Exhibit "D," pages 1-11; Exhibit "E," pages 1-7; Exhibit "F," pages 1-7; Exhibit "G," pages 1-8; Exhibit "H," pages 1-4; Exhibit "I," pages 1-9;Exhibit "J," pages 1-4; and Exhibit "K," pages 1-8.

42. In the case of each work order, no funding was put in place at initiation. See, e.g., Exhibit "D," page 1; Exhibit "E," page 7.

43. The initial non-funding of Work Orders 412 through 419 was consistent with how we had been working through the initial FIVE (5) YEARS and consistent with the Clause H.13, "Incremental Funding Of Task Orders," incorporated in the Contract on page H-6 (Plaintiff's Appendix, page 58); work orders were funded incrementally to allow MARAD to monitor expenditures; under the Contract's "Limitation of Funds" clause (FAR 52.232-22) Veridyne was required to notify MARAD when 75% of the funding on a work order had been exhausted so that MARAD could determine whether to add additional funding, in no event could

Veridyne work beyond available funding (except at its own risk) (see Contract, pages F-4, I-3 and H-6; Plaintiff's Appendix, pages 45, 58 and 62).

44. On June 6, 2000, the following funding amounts were put in place for work to be done under Work Orders 412 through 419:

| | |
|---|---|
| 412 | $190,000 |
| 413 | $100,000 |
| 414 | $753,000 |
| 415 | $262,000 |
| 416 | $130,000 |
| 417 | $ 50,000 |
| 418 | $ 50,000 |
| 419 | $163,000 |
| | $1,698,000 |

In all cases the funding authorization were signed by Benedict J. Burnowski, Contracting Officer. See Exhibit "D," pages 12-13; Exhibit "E," pages 8-9; Exhibit "F," page 8; Exhibit "G," pages 9-10; Exhibit "H," pages 5-6; Exhibit "I," pages 10-11; Exhibit "J," pages 5-6; Exhibit "K," page 9.

45. On June 19 and 20, 2000, additional funding was placed on Work Orders 413, 415, 416 and 417 as follows:

| | | |
|---|---|---|
| 413 | $ 30,000.00 | (new total: $130,000) |
| 414 | $ 55,000.00 | (new total: $808,000) |
| 415 | $135,000.00 | (new total: $397,000) |
| 416 | $ 90,000.00 | (new total: $220,000) |
| 417 | $ 83,647.00 | (new total: $133,647) |

The Work Order Modifications adding funding to Work Orders 413, 414, 415 and 416 were signed by Contracting Officer Benedict J. Burnowski (Exhibit "E," pages 10-11; Exhibit F, pages 9-10; Exhibit "G," pages 11-12; and Exhibit "H," pages 7-8), while the remaining one was signed by Contracting Officer Erica Williams (see Exhibit "H," page 12).

46. Thus, as of June 20, 2000, MARAD officials, mainly Burnowski, had authorized at least $2,091,000 worth of services under Work Orders 412 through 419; that figure exceeded by over $900,000 the figure for costs in Option Year Five (the first year of the extension) set forth in Modification 0023 (See Plaintiff's Appendix, page 154).

47. On August 16 and August 30, 2000, after Veridyne had advised MARAD that the funding to that point had been 75% exhausted, additional funding was authorized for Work Orders 412 through 419 as follows:

| | |
|---|---|
| 412 | $76,318.00 and $200,000 (new total: $466,318.00) |
| 413 | $73,533.00 and $170,000.00 (new total: $373,533.00) |
| 414 | $113,126 and $390,000 (new total: $1,311,126) |
| 415 | $72,801.00 and $302,000.00 (new total: $771,801.00) |
| 416 | $114,756.00 and $146,000.00 (new total: $480,756.00) |
| 417 | $175,000.00 (new total: $308,647.00) |
| 418 | $30,894.00 (new total: $80,894.00) |
| 419 | $100,493.00 (new total: $263,493.00) |

All the above funding addition were signed by Contracting Officer Benedict J. Burnowski (see Exhibit "D," pages 14 and 15; Exhibit "E," page 12-13; Exhibit F," pages 9-11; Exhibit "G," pages 12-13; Exhibit "H," pages 8-9; Exhibit "I," page 12; Exhibit "J," page 6; Exhibit "K," page 10.

48. Thus, as of August 16, 2000, MARAD officials (mainly Burnowski) had authorized at least $3, 856,568 in costs for work under Work Orders 412 through 419; this figure does not include Veridyne's award fees; virtually all of the funding was authorized by Burnowski.

49. On September 15, 2000, after the previously provided additional funding had been 75% exhausted, MARAD's Contracting Officer Benedict J. Burnowski

authorized the following additional funding of services under Work Orders 412 through 417.

| | | |
|---|---|---|
| 412 | $168,000.00 | (new total: $634,318.00) |
| 413 | $ 50,000.00 | (new total: $423,533.00) |
| 414 | $150,000.00 | (new total: $1,461,126.00) |
| 415 | $200,000.00 | (new total: $971,801.00) |
| 416 | $ 30,000.00 | (new total: $510,756.00) |
| 417 | $ 28,596.80 | (new total: $337,243.80) |

(See Exhibit "D," pages 16-17; Exhibit "E," pages 14-15; Exhibit "F," pages 12-13; Exhibit "G," pages 15-16; Exhibit "H," pages 11-12; Exhibit "I," pages 14-15).

50. Thus, between June 6, 2000 and September 15, 2000 (i.e., 103 days), MARAD had authorized at least $4,533,164.80 worth of services (costs only, i.e., not including Veridyne's award fees); virtually all of the incremental funding authorizations were signed by Benedict J. Burnowski.

51. On December 20, 2000, after Veridyne notified MARAD that funding on Work Orders 412 through 417 had been 75% exhausted, additional funding was authorized as follows:

| | | |
|---|---|---|
| 412 | $180,000.00 | (new total: $814,318.00) |
| 413 | $170,000.00 | (new total: $593,533.00) |
| 414 | $520,000.00 | (new total: $1,981,126.00) |
| 415 | $340,000.00 | (new total: $1,316.050.00) |
| 416 | $20,000.00 | (new total: $530,756.00) |
| 417 | $160,000.00 | (new total: $497,243.80) |

All of the additional funding authorizations were signed by Benedict J. Burnowski as Contracting Officer. See Exhibit "D," pages 18 -19; Exhibit "E," pages 16-17; Exhibit "F," pages 14-15; Exhibit "G," pages 19-20; Exhibit "H," pages 13-14; Exhibit "I," pages 16-17.

52. Thus by the end of December, 2000 the total funding authorized for work under Work Orders 412 through 419 was some $5,923,164.80 in costs or roughly double the maximum specified in Modification 0023 for the entire FIVE (5) YEAR extension; virtually all of the funding authorizations were signed by Benedict J. Burnowski as Contracting Officer.

53. I would also point out that Burnowski's ¶¶ 14 and 15 are dishonest in another respect; he recites the figures for what Veridyne "billed" during option years 5 through 9.

54. What Burnowski does not state is that over and above the nearly $4 million worth of services he had authorized in Option Year 5, he personally was involved in establishing the maximum billing figures for the remaining years.

55. After MARAD (i.e., Burnowski) had authorized in excess of $3,000,000 worth of services from Veridyne in Option Year 5, which resulted in Veridyne earning the entire FIVE (5) YEAR award fee pool in the first extension year (i.e., Option Year 5), MARAD withheld further award fees.

56. When Veridyne complained about the withheld award fees and proposed that MARAD and Veridyne agree on a new cost and fee structure for the Contract, it was Burnowski who negotiated the dollar figures that were ultimately included in Modification 0035. See Plaintiff's Appendix, pages 166 through 186.

57. Burnowski was the one who sent Veridyne proposed Modification 0035, showing the estimated costs (i.e., services excluding award fees) for the extension increasing from the totals in Modification 0023 to a maximum of

$32,409,427.39 worth of services, with the award fee increasing from $205,250.00 to $2,250,000. See Plaintiff's Appendix, pages 187 through 193.

58. Veridyne executed proposed Modification 0035 on July 13, 2001 (Plaintiff's Appendix, page 194); while no one for MARAD ever formerly executed it, Contracting Officer Erica Williams noted (by hand) that the version signed by Veridyne was the "version of Mod 35 we are currently operating against." Plaintiff's Appendix, page 207.

59. Burnowski then states in his declaration that the matter of the contract extension was referred to the Department of Transportation Inspector General for investigation in the Summer of 2001, but that MARAD continued to order services from Veridyne while it awaited the results of the investigation, because the services were necessary to fulfill MARAD's logistics requirements. See Burnowski Declaration, ¶¶ 18 – 19.

60. Burnowski neglects to mention that he sent Veridyne proposed Modification 0035 at the same time the matter was being referred to the Office of the Inspector general (presumably by Burnowski); Burnowski also fails to mention that MARAD continued to order services from Veridyne for over THREE (3) YEARS in accordance with the proposed Modification 0035 increased level of services; during that period, MARAD contracting officers formally exercised MARAD's options to extend the Contract for an additional year no less than THREE (3) more times, i.e., March, 2002, March, 2003 and March, 2004. See Plaintiff's Appendix, pages 209, 230 and 243.

61. At any point during Veridyne's performance, MARAD had the discretion to let the Contract expire and procure the services competitively if it so chose, yet it elected not to do so, even though, as Burnowski states, MARAD never formally executed proposed Modification 0035 increasing the maximum level of services MARAD could order.

62. Indeed, since the Contract was an IDIQ contract (as opposed to a requirements contract), only requiring MARAD to order 10% of the yearly estimated services, MARAD could have awarded any number of parallel contracts for the services being ordered from Veridyne.

63. Moreover, it is important to point out in connection with the payments to Veridyne during Option Years 5-9 that notwithstanding the fact that Veridyne's proposal for the extension had no allowances for costs associated with INS, MARAD opted to utilize INS's services through Veridyne's Contract; in fact, during Option Years 5-9, INS's share of total billings exceeded Veridyne's billings for its own labor, overhead and G&A.

64. Attached hereto as Exhibit "L" is a spread sheet similar to the one attached as Exhibit "B," breaking down the Option Year 5-9 billings (taken from Exhibit "A"); the breakdown shows:

| Billings to MARAD | INS Share of Billings | Other Direct Cost (travel, materials, equipment, etc.) | Veridyne's Labor, Overhead and G&A |
|---|---|---|---|
| $31,103,132.78 | $14,882,682.46 | $1,773,331.33 | $14,450,118.29 |

65. According to Burnowski, the Inspector General concluded Veridyne had committed fraud in connection with the extension of the Contract in a report issued in September of 2004, which caused MARAD, a) to stop placing orders

and, b) to refuse to pay for services which had been ordered by its contracting officers and which Veridyne had provided (see Burnowski Declaration, ¶¶ 20 – 23); however it was not until December of 2004 that Veridyne's Contract performance was suspended, a fact Defendant does not deny (see Defendant-Counterclaimant's Responses To Plaintiff's Proposed Findings Of Fact, ¶ 80.

66. With respect to this Inspector General's report, Veridyne's attorneys tried for the better part of a year to see a copy but were refused; I note that Burnowski does not attach a copy to his declaration either.

67. In the last paragraph of his declaration (i.e., ¶¶ 26and 27) Burnowski states that Veridyne's award fee was reduced by one-third (1/3), due to what Burnowski refers to as "significant problems" in Veridyne's performance, and that correction of the problems would require "considerable time and effort;" the positioning of these two paragraphs appears to be an attempt to suggest that the entire award fee for the base period was reduced by one-third (1/3).

68. Once again Burnowski is being intentionally deceptive and, for obvious reasons, does not attach a copy of the referenced review to his Declaration.

69. Even though the performance review, which, in fact, only covered the April 1 through June 30, 2004 quarter (see Plaintiff's Appendix, pages 361 through 364), was issued at the same time as the Inspector General's report, Veridyne was awarded an average point score of 3.715447154 for Veridyne, with 25 of 29 ratings having been scored as a perfect "4," i.e., "Superior" (on a scale of 1 – 4); further even though Veridyne's overall performance rating still qualified as "Superior," i.e., with a "4" being "Superior" and 3 being "Highly Satisfactory" and

Veridyne receiving an overall score of 3.715447154 out of a possible 4, Veridyne's award fee was nevertheless reduced by one-third (1/3), allegedly because 3 of the 29 individual evaluations were scored as a "2" (i.e., "Satisfactory"). See Plaintiff's Appendix, page 361.

70. Obviously Burnowski neglected to mention the actual scoring in the September 2004 evaluation, since the scoring did not reflect the "significant problems," he now claims were cited by MARAD.

71. Moreover, I would also point out that for the TEN (10) Quarters prior to the single instance cited by Mr. Burnowski, Veridyne was awarded the full amount of the award fees available, based on average ratings of "Superior" (i.e., higher then 3.5 on a scale of 1-4), including a perfect "4," for the second quarter of 2002. See Plaintiff's Appendix, pages 211 – 220, 223 – 229, 231 – 242 and 332 – 333.

72. With respect to the Declaration of Dunkin, in ¶4 Durkin relates his version of our first meeting in December of 2003, my recollection of the meeting is vastly different; according to Durkin, I said that no one at MARAD had told me to bid under $3 million, that is true, no one specifically told Veridyne to "bid" under $3,000,000.

73. Durkin's recitation of what I said is accurate in one sense; no one from MARAD told us to "bid" under $3,000,000; however it does not convey an accurate picture of what transpired or of what I said.

74. First, it is important to bear in mind that there was no bidding, per se; Veridyne already had the Contract, and what we were discussing with

Contracting Officer Rita Jackson and other officials at MARAD was an extension of that contract.

75. In our discussions, once MARAD agreed the Contract could be extended, it was conveyed clearly to Veridyne that MARAD would consider extending the Contract, so long as our proposal showed how an extension (as opposed to a new procurement) would save MARAD money (administration costs, for example), and so long as the proposal did not exceed $3,000,000; that was confirmed by Veridyne's Michael Genna's February 25, 1998 letter to Ms. Jackson, the MARAD Contracting Officer. See Exhibit "D" in my previous declaration, Plaintiff's Appendix page 89.

76. Durkin next says that I acknowledged that the typical value of the MARAD contract exceeded $3,000,000 on a yearly basis; that too is an accurate repetition of my response to Durkin's question; once again though, it is taken out of context, so it does not create an accurate picture.

77. As originally awarded the Contract was broken down into FIVE (5) ONE (1) year terms; only the first year was guaranteed and then only for 10% of the total amount. See Plaintiff's Appendix, pages 24 through 28.

78. The pricing for each year clearly exceeded $3,000,000; however, in each case the pricing was based on a maximum number of labor hours which could be ordered by MARAD, together with an estimate of other direct costs, including G&A, and Veridyne's subcontractor, INS.

79. For example, looking at the Base Year, $1,309,551.86 was allocated for Veridyne's labor; that was based on an estimate of 46,000 labor hours MARAD could order. Plaintiff's Appendix, page 24.

80. In addition to the cost for labor, the pricing included "other direct cost," which covered Veridyne's subcontractor (INS), other out-of-pocket expenses (e.g., travel, materials, equipment, etc.) and Veridyne's G&A. Id.

81. Looking at the FOUR (4) Option Years in the original Contract, each year specified pricing based on a maximum number of labor hours which could be ordered by MARAD:

| | | |
|---|---|---|
| Option Year One: | 58,880 hours; | $1,697,486.20 |
| Option Year Two: | 69,920 hours; | $1,979,102.92 |
| Option Year Three: | 69,920 hours; | $1,992,230.04 |
| Option Year Four | 69,920 hours; | $2,051,030.15 |

Plaintiff's Appendix, pages 25 – 28.

82. At our meeting, I stressed to Durkin that Veridyne was totally under MARAD's control as to what work it did; I said, "I don't tell the Government what to do, they direct me as to what to do."

83. In ¶ 5 of his declaration, Durkin states "Mr. Genna was not able to explain how the bid for Modification 23 could have been so much lower than the actual cost for the same work over the previous several years." (emphasis supplied).

84. Much like Burnowski's declaration, Durkin attempts to suggest that Veridyne had offered to provide the same level of service over the course of the FIVE (5) YEAR extension for just under $3,000,000, when the cost during the



21

first FIVE (5) YEARS had been so much higher (i.e., over $20,000,000); the suggestion is false and proven so by the proposal.

85. Clearly what Veridyne was offering for just under $3,000,000 was one-seventh (1/7) the level of service set forth in the base contract term.

86. As I explained above, pricing in the first five years was based on an estimated number of labor hours plus other direct costs; for years 1-5 the estimated (and maximum) labor hours (which MARAD could order at its discretion) were:

| | |
|---|---|
| Year 1: | 46,000 |
| Year 2: | 58,880 |
| Year 3: | 69,920 |
| Year 4: | 69,920 |
| Year 5: | 69,920 |

Plaintiff's Appendix, pages 24 – 28.

87. Contrast this with Veridyne's proposal for the extension (which ultimately became Modification 0023); it is obvious that nowhere near the same level of service was being offered:

| | | |
|---|---|---|
| Option Year Five: | 32,000 hours; | $1,122,982.00 |
| Option Year Six: | 23,000 hours; | $748,316.00 |
| Option Year Seven: | 17,000 hours; | $334,669.00 |
| Option Year Eight: | 7,000 hours; | $207,962.00 |
| Option Year Nine: | 4,000 hours; | $162,769.00 |

Plaintiff's Appendix, page 103 – 107 and 154 – 158.

88. Moreover, the suggestion that Veridyne was proposing to MARAD that it would supply $20,000,000 worth of services for $3,000,000 (about one-seventh

the estimate) is absurd on its face; anyone (with an ounce of common sense) reviewing such a proposal would have had to question it.

89. The other major difference between the initial five years and Veridyne's proposal for the additional five years, as I explained above, is that in the initial five years the estimate included significant use of Veridyne's subcontractor (INS) under "other direct costs;" in our extension proposal (and in Modification 23) we did not price the use of the subcontractor separately. cf. Plaintiff's Appendix, pages 103 – 107 and 154 – 158.

90. In ¶ 6 of his declaration Durkin states in sum and substance as follows:

a) that I admitted the $3,000,000 estimate in the proposal was not a good faith estimate;

b) that I said, "At the end of the day, that estimate sucked;"

c) that I knew Veridyne would receive more than 2.9 million worth of work from MARAD; and

d) that I "admitted" Veridyne had given "bad" estimates on previous occasions to secure other contracts;

e) that I said "It doesn't matter that we limited competition with a bad estimate because we provided a good service."

91. With respect to the first assertion ("not a good faith estimate"), I said no such thing; I told him that I had no way of knowing what MARAD would order.

92. With respect to the second assertion ("At the end of the day, that estimate sucked"), the particular quote is accurate, but used deceptively; Durkin omits the question he put to me and to which my statement was offered in response; he

asked, "Knowing what you know now (i.e., in April of 2004), what do you think of the estimate[?]," to which I responded, "At the end of the day, that estimate sucked." (emphasis supplied).

93. Concerning the third assertion (i.e., that I knew Veridyne would receive more than $2.9 million worth of work), Durkin does not indicate how I could know what quantity of work MARAD, in its sole discretion, would order under the (IDIQ) Contract; I had no way of knowing what MARAD would order, and I told Durkin that.

94. Not even the MARAD officials knew what amount of services would ultimately be required, hence the use of an IDIQ contract (see FAR 16.501-2) (and I would also reiterate that in the initial FIVE (5) contract years, MARAD only ordered 75% of the maximum amount of hours).

95. I will not deny that I certainly hoped MARAD would order more than $2.9 million (and said so in my original declaration); however, I understood that the amount of work that would be ordered was totally within MARAD's discretion (as the Contract specified); and, of course, it was my assumption that if Veridyne received a Task Order from MARAD's authorized contracting officer, that MARAD had taken whatever steps it deemed necessary to generate a valid order.

96. With respect to the fourth assertion in Durkin's ¶ 6 (i.e., that I admitted to having previously given "bad estimates" to the Government to secure contracts), I deny having done that or having said that; what I said was that I understood it to be a practice among 8(a) contractors to keep proposals under $3 million so that

the requirement would not have to be competed among 8(a) contractors, but I never said that Veridyne had done so; I also pointed out to Durkin that SBA can waive the $3 million limit when requested by the agency (as SBA apparently did when the Contract was originally awarded to Veridyne).

97. With respect to Durkin's final assertion in ¶ 6 (i.e., that I said, "It doesn't matter that we limited competition with a bad estimate because we provided a good service"), with the exception of my saying that we had provided MARAD with "a good service" (and my adding that Veridyne had historically billed at below our DCAA-approved indirect rates), the rest of the purported quote is absolutely false; I never said such a thing..

98. I also said to Durkin something along the lines of, "With all the MARAD scandals you read about in the papers, I don't know why you're wasting your time with me."

99. Moreover, the proof of my statement that we provided MARAD with a good service can be found in the performance evaluations we received over the life of the Contract, some of which I alluded to earlier in this declaration (¶ 71).

100. Finally, like Burnowski, Durkin talks about the Inspector General's report but fails to attach it to his declaration.

101. With respect to the Inspector General's report, I would repeat what I said in my original declaration: neither I nor Veridyne was ever indicted in connection with this contract (or any other for that matter); I would also point out that the Department of Transportation neither suspended Veridyne or me from contracting with the Government nor initiated debarment proceedings.

102. In conclusion, Durkin's declaration provides a totally false impression of his interaction with Veridyne.

Signed under penalty of perjury this 1st day of May, 2007 at Broomall, Pennsylvania.

Samuel J. Patterson