**IN THE COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **VERIDYNE CORPORATION** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v** | ) | **No. 06-150C** |
| | ) | **(Judge Block)** |
| | ) | |
| **THE UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S MOTION TO STRIKE PORTIONS OF TWO (2) DECLARATIONS SUBMITTED BY DEFENDANT**

## I. Introduction

Plaintiff Veridyne Corporation ("Veridyne") respectfully moves the Court for an order striking certain portions of two (2) declarations filed by Defendant with its Response To Plaintiff's Motion For Partial Summary Judgment And Cross-Motion For Summary Judgment. Specifically, Veridyne requests that the Court strike ¶¶ 5 and 7 of the Declaration of Kevin T. Durkin ("Durkin") and ¶¶ 3 – 13 and 20 of the Declaration of Broderick J. Burnowski ("Burnowski"). In the case of the Durkin Declaration, the two (2) paragraphs represent inadmissible hearsay, which the Court cannot consider, even in the context of proceedings on a motion for summary judgment. See Federal Rule Civil Procedure 56(e) and Federal Rule of Evidence 802. With respect to the Burnowski Declaration, ¶¶ 3 – 13 are inadmissible for lack of personal knowledge, while ¶ 20 contains inadmissible hearsay.

The paragraphs that Veridyne requests be stricken are as follows:

(a) From Durkin's Declaration:

* * *

> 5. On February 23, 2004, SA Pugliese and I interviewed Mr. Michael Genna at his place of business in New Jersey. When asked about Modification 23, he explained to us that his only involvement was in the pricing and that Patterson had been involved in the contract extension negotiations meeting with various MARAD officials. Mr. Genna was not able to explain how the bid for Modification 23 could have been so much lower than the actual cost for the same work over the previous several years. When asked about the pricing of Modification 23, Mr. Genna stated that the estimate was based solely upon Mr. Patterson's instruction to keep it under $3 million and that he had gone over the pricing proposal with Patterson who had made adjustments in order to keep the estimate under $3 million. Mr. Genna stated that the "stepped-down" pricing model for the contract extension had been constructed in a manner designed to keep the bid just under the $3 million. Mr. Genna denied that anyone at MARAD told him to submit a bid just under the $3 million threshold. Mr. Genna informed us that he was aware that the estimate was, in his words, "not a good faith estimate."

* * *

> 7. On September 27, 2004, the DOT IG issued a report that concluded that the cost estimate Veridyne submitted to MARAD by Veridyne for Modification 23 was fraudulent and only served to secure the contract under the sole-source requirements of the SBA 8(a) program.

* * * *

(b) From Burnowski's Declaration:

* * *

> 3. On March 14, 1995, the Maritime Administration ("MARA") awarded the contract to the Small Business Administration (the "SBA") pursuant to its 8(a) program, which provides preferential treatment for small businesses owned by socially or economically disadvantaged individuals.
>
> 4. On March 27, 1995, SBA awarded Subcontract No. 0303-95-1-00055 to Veridyne Corporation (then known as Shepard-Patterson Associates, hereinafter referred to as "Veridyne") pursuant to the 8(a) program. The subcontract called for Veridyne to perform all of the services required by the contract. A true and correct copy of the contract and subcontract

is attached as Exhibit 1 hereto.

5. At the time of the contract award, Veridyne was a qualified contractor under the SBA 8(a) program.

6. The estimate contract price was $21.1 million. The contract called for Veridyne to support the Ready Reserve Force, a fleet of ships kept in a state of constant readiness for use in national emergencies. The contract was a combined indefinite delivery, indefinite quantity and cost-plus award fee contract with one base year, and four option years.

7. The Government approval invoices from Veridyne totaling $20,324,289.15 over the five years of the contract. That amount was paid as follows:

| | | |
|---|---|---|
| Initial Contract | 1995-1996 | $2,582,051.20 |
| First Option Year | 1996-1997 | $3,774,669.32 |
| Second Option Year | 1997-1998 | $4,316.679.61 |
| Third Option Year | 1998-1999 | $4,036,100.80 |

8. Veridyne was scheduled to “graduate” from the 8(a) program in June 1998. This meant that if the contract remained part of the 8(a) program and a new contract was awarded, as usual, during the last year of the contract (1999-2000), Veridyne would not have been eligible for the award.

9. During or before February 1998, discussions began between MARAD and Veridyne regarding the possibility of extending the contract for an additional five years prior to Veridyne’s graduation from the 8(a) program. MARAD indicated it would consider a proposal from Veridyne.

10. On March 30, 1998, Mr. Michael Genna of Veridyne submitted a proposal for the five-year extension. The cover letter to the proposal explained, “[w]e understand that the scope of the work will remain the same as is established in the current contract….” In addition, its proposal stated that “all terms and conditions are the same, and the original scope of work and technical content remain intact.” The proposal represented that the expected cost to the Government for the five year extension was $2,999,949.

11. Veridyne’s proposal priced significantly less labor hours and projected costs than it was billing under the ongoing contract at that time.

12. The labor hours estimated and actually incurred for the first five

years of the contract appear below, along with the estimated labor hours pursuant to Veridyne's proposal:

| Years 1-5 | Est. | Act. | Years 6-10 | Est. |
|---|---|---|---|---|
| Initial Contract | 46,000 | 36,505 | Option Year 5 | 31,826 |
| Option Year 1 | 58,800 | 40,819 | Option Year 6 | 20,124 |
| Option Year 2 | 69,920 | 47,253 | Option Year 7 | 8,892 |
| Option Year 3 | 69,920 | 57,568 | Option Year 8 | 6,084 |
| Option Year 4 | 69,920 | 58,340 | Option Year 9 | 3,944 |

13. Modification 23 extending Veridyne's contract five years, from March 27, 2000 until March 26, 2005 was executed by MARAD and Veridyne on May 18, 1998 and by SBA on May 20, 1998. It stated that "[t]he scope of work and all terms and conditions of the contract are unchanged." A true and correct copy of Modification 23 is attached as Exhibit 2 hereto. It provided in the following price structure:

| | | |
|---|---|---|
| Option Year 5 | 2000-2001 | $1,290,765.00 |
| Option Year 6 | 2001-2002 | $ 866,034.00 |
| Option Year 7 | 2002-2003 | $ 407,197.00 |
| Option Year 8 | 2003-2004 | $ 249,362.00 |
| Option Year 9 | 2004-2005 | $ 186,590.00 |

* * *

20. The Inspector General released his report in September 2004, Soon after, MARAD informed Veridyne of the Inspector General's finding of fraud and notified Veridyne that it would place no further orders under contract.

* * * *

## II. Argument

FRCP 56(e) provides, in pertinent part, as follows:

> (e) Form of Affidavits; Further Testimony; Defense Required. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

The rule clearly requires that in a summary judgment proceeding, "an affiant set forth admissible facts establishing a genuine issue of material fact requiring trial." Keebler Company v. Murray Bakery Products, 860 F.2d 1386, 1389 (Fed. Cir.

1989). In order to be considered as having proffered admissible evidence, the affiant must be competent to testify to those facts at trial. Patterson v. County of Oneida, 375 F.3d 206, 219 (2nd Cir. 2004); Hlinka v. Bethlehem Steel Corporation, 863 F.2d 279, 282 (3rd Cir. 1988). Moreover, the affidavit may not contain inadmissible hearsay. Patterson v. County of Oneida, supra at 219; Protection Strategies, Incorporated v. The United States, Fed. Clms. No. 07-125C, Filed Under Seal: March 19, 2007, Reissued: April 2, 2007, Slip Op. at 8.

In the instant case Durkin's Declaration provides no foundation for the Court to allow him to testify regarding the content of the Inspector General's report (especially since there is no copy of the report attached to the declaration). As such, ¶ 7 of his declaration represents inadmissible hearsay under Federal Rule of Evidence 802 and must be disregarded, i.e., stricken. Scosche Industries, Inc. v. Visor Gear Incorporated, 121 F3d 675, 681 (Fed. Cir. 1997).

Concerning the statements attributed to Mr. Genna (¶ 5 of the Durkin Declaration), these are equally inadmissible as hearsay. Federal Rule of Evidence 801(d)(2)(D) provides as follows:

> (d) Statements which are not hearsay. A statement is not hearsay if –
>
> * * *
>
> (2) Admission by party – opponent. The statement is offered against a party and is
>
> * * *
>
> (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship.

(emphasis supplied). The Durkin Declaration fails to lay any foundation for the admission of Genna's alleged statements beyond stating that Patterson had attributed the numbers in the extension proposal to Genna. Indeed, Durkin fails to even identify Genna as an employee of Veridyne, let alone as someone employed by Veridyne at the time the statements were allegedly made.

In fact, as set forth in the attached Declaration of Mr. Patterson, Mr. Genna's employment by Veridyne ceased in March 1999, essentially some FIVE (5) YEARS before Durkin interviewed him. Thus, the statements attributed to Mr. Genna do not meet the requirements of Rule 801(d)(2)(D); "a party must lay sufficient foundation by establishing (1) the existence of the agency relationship, (2) that statement was made during the relationship, and (3) that it relates to a matter within the scope of the agency." Marcie v. Reinauer Transp. Cos., 397 F3d 120, 128-29 (2nd Cir. 2005) (quoting Pappas v. Middle Earth Cond. Ass'n 963 F.2d 534, 537 (2d Cir. 1992) (emphasis supplied). Since Defendant has not (and cannot) lay the necessary foundation for admission of Genna's alleged statements via the Durkin Declaration, ¶ 5 should be stricken.

With respect to the Burnowski Declaration, in ¶¶ 3 through 13 Burnowski relates facts concerning the award and administration of the Contract during the March, 1995 through May 1998 time period. However, by the terms of his own declaration (¶ 1) he was not the Contracting Officer during that time, Erica Williams was. Burnowski simply states that he became Ms. Williams' supervisor in January of 2000, meaning anywhere from 18 to 54 months after the events he describes in his Declaration. As such, his declaration amounts to little more than

his interpretation of documents in MARAD's contract file. See also, Supplemental Declaration of Samuel J. Patterson, ¶¶ 3 and 4.[1] Thus, with respect to ¶¶ 3 through 13, Burnowski's Declaration is inadmissible as not being based on personal knowledge. Patterson v. County of Oneida, supra.

Finally, ¶ 20 of Burnowski's Declaration is clearly inadmissible hearsay. Burnowski's recitation of the contents of the Inspector General's report is just as inadmissible Durkin's. Indeed, given Burnowski's lack of any first-hand knowledge of the information on which the report had to have been based, at least in part (e.g., the interview with Genna), his statement as to the contents of the report, which is not itself in evidence, amounts to double hearsay. See, Orjias v. Stevenson, 31 F.3d 995, 1004 (10th Cir 1994).

**III Conclusion**

Wherefore for all the foregoing reasons, Plaintiff Veridyne Corporation respectfully requests that the court strike ¶¶ 5 and 7 of the Durkin Declaration and ¶¶ 3-13 and 20 of the Burnowski Declaration.

Respectfully submitted,

s/ Marc Lamer

Marc Lamer

Date: May 23, 2007

[1] "Supplemental Declaration of Samuel J. Patterson ¶¶ _____" refers to the declaration submitted as part of Plaintiff's Supplemental Appendix.