No. 06-150C
(Judge Block)

IN THE UNITED STATES COURT OF THE FEDERAL CLAIMS

VERIDYNE CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT/COUNTER-CLAIMANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT/COUNTER-CLAIMANT'S CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFF'S MOTION TO STRIKE

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

STEVEN J. GILLINGHAM
Assistant Director

ROBERT E. CHANDLER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street N.W.
Washington, DC 20530
Tele: (202) 514-4678
Fax: (202) 514-8624

Attorneys for Defendant

Of Counsel:
Janis Rodriguez
Office of Chief Counsel
Department of Transportation

August 10, 2007

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

DEFENDANT/COUNTER-CLAIMANT'S REPLY TO PLAINTIFF'S DEFENDANT/COUNTER-CLAIMANT'S CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFF'S MOTION TO STRIKE . . . . . . . . . . . . . . . 1

I. Veridyne Made Misrepresentations Sufficient To Support The Governement's Fraud Counterclaim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

A. In Stating That "The Scope Of Work Will Remain The Same," Veridyne Represented That Its Proposal Was Based Upon The Same Volume Of Work As Required Pursuant To The Original Contract And, Therefore, The Labor And Cost Figures Included In The Proposal Constituted Misrepresentations . . . . . . . . . . . . . . . . . . . . . . . . . . 5

B. Even If Veridyne's Statement That "The Scope Of Work Will Remain The Same" Is Deemed To Refer To The Type Of Work To Be Performed Pursuant To The Contract, As Veridyne Suggests, The Labor And Cost Figures Contained In Veridyne's Proposal Still Constitute Misrepresentations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

C. Veridyne's Proposal Was Represented To Be An Estimate Based Upon A Projection Of The Volume Of Work . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

II. The Government Is Not Required to Prove Damages Or Reliance Upon Veridyne's Misrepresentations In Order To Prevail Upon Its Fraud Defenses Or Counterclaim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

III. The Government Is Entitled To Summary Judgment With Respect To Veridyne's Breach Of Contract Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

IV. The Court Should Deny Plaintiff's Motion To Strike Portions Of The Declarations Of Benedict Burnowski And Kevin Durkin . . . . . . . . . . . . . . . . . . . . . . . . 15

A. The Court Should Not Strike Paragraphs 3-13 and 20 From the Declaration of Benedict J. Burnowski . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

B. The Court Should Not Strike Paragraphs 5 and 7 From The Declaration Of Kevin T. Durkin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

APPENDIX

Supplemental Declaration of Benedict Burnowski . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1
Exhibit 1 - October 18, 2000 Letter from Glenn Downer . . . . . . . . . . . . . . . . . . A3
Exhibit 2 - May 14, 2001 Letter from Leonard Freiberg . . . . . . . . . . . . . . . . . . A5

# TABLE OF AUTHORITIES

## CASES


Cain v. Irvin,
2007 WL 2023581 (2007) ........................................................................................ 2

Continental Cas. Co. v. American Sec. Corp.,
443 F.2d 649 (D.C. Cir. 1970) ............................................................................. 16

J.E.T.S., Inc. v. United States,
838 F.2d 1196 (Fed. Cir. 1988) ............................................................................ 13

K&R Engineering Inc. v. United States,
616 F.2d 469 (Ct. Cl. 1980) ................................................................................. 13

Londrigan v. Federal Bureau of Investigation,
670 F.2d 1164, 1174 (D.C. Cir. 1981) ................................................................ 17

Long Island Savings Bank v. United States,
476 F.3d 917 (2007) ..................................................................................... 12, 13, 19

Ondis v. Barrows,
538 F.2d 904, (1st Cir. 1976) ............................................................................... 16

United States v. Mississippi Valley Generating Co.,
364 U.S. 520 (1961) .............................................................................................. 13

Vote v. United States,
753 F. Supp. 866, 868 (D. Nev. 1990) ................................................................ 17

Washington Cent. R. Co. Inc. v. National Mediation Bd.,
830 F. Supp. 1343, 1353 (E.D. Wash. 1993) ................................................. 16, 17


## STATUTES

**United States Codes**


15 U.S.C. § 637(a)(1)(D) ......................................................................... 1, 2, 4, 5

28 U.S.C. § 2514 .................................................................................................... 18

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| VERIDYNE CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 06-150C |
| v. | ) | (Judge Block) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT/COUNTERCLAIMANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFF'S MOTION TO STRIKE**

In our cross motion for summary judgment, we demonstrated that the contract upon which plaintiff bases its claims was procured through fraud and in violation of 15 U.S.C. § 637(a)(1)(D) and, therefore, the contract was void ab initio. As a result, the United States is entitled to summary judgment in its favor on Counts I, II and III of Veridyne's complaint and on the United States' counterclaim in fraud in the amount of $31,134,931.12. In addition, we requested that the Court find that Veridyne's claims have been forfeited pursuant to 28 U.S.C. § 2514 and grant summary judgment in favor of the United States on Counts I, II and III of Veridyne's complaint. Finally, we established that the Government is entitled to summary judgment with respect to Count III of Veridyne's complaint because, even if the contract were deemed not to be void, the Government did not breach the contract as alleged in Count III. The contract called for the Government to purchase a minimum dollar amount of services in each year of its existence, and the summary judgment evidence reflects that the Government made the required purchases.

The most significant feature of Veridyne's response is its omissions. Veridyne wholly fails to address our argument that the contract was void because it was awarded in violation of 15 U.S.C. § 637(a)(1)(D). Def. Resp. at 11. By failing to address this argument, Veridyne has waived any argument it may have in opposition to this defense and counterclaim. Rules of the Court of Federal Claims ("RCFC") 56(e); Cain v. Irvin, 2007 WL 2023581 (W.D. Kent. 2007). The Court therefore should grant summary judgment in favor of the Government on that basis. Also, Veridyne neglects entirely to address our responses to their ratification and estoppel arguments. Def. Resp. at 17-21.

In its response, Veridyne argues only that (i) the Government failed to demonstrate the fact of a misrepresentation by Veridyne, (ii) the Government failed to demonstrate that it relied upon a misrepresentation by Veridyne or that the Government was damaged by such a misrepresentation and (iii) that the Maritime Administration ("MARAD") breached its contract with Veridyne by failing to pay for services it received.

Contrary to Veridyne's assertions, however, the record contains substantial evidence of misrepresentations made by Veridyne in the procurement of the subject contract. Moreover, the United States need not demonstrate that it relied upon those misrepresentations in order to prevail upon its defenses or counterclaim. In addition, the Government has demonstrated that there is not a genuine issue of material fact with respect to Count III of Veridyne's amended complaint and that we are entitled to summary judgment with respect to Count III. Finally, even if the Government breached the contract by failing to pay invoices submitted by Veridyne, Veridyne is not entitled to the lost profits claimed in Count III as a matter of law.

## I. Veridyne Made Misrepresentations Sufficient to Support the Government's Fraud Counterclaim

Veridyne's proposal for the extension of the contract through Modification 23 (the "proposal") contained labor figures and cost projections that were unreasonably low given the anticipated and acknowledged work to be performed pursuant to the extension. In that way, Veridyne misstated those labor and cost figures so that the proposal could be used to justify the award of the extension without competition.

It is clear that both parties anticipated that the work to be performed pursuant to the contract extension (i.e., option years 5-9) would be the same as the work performed in the first five years of the contract. That is, Veridyne would "provide for the logistics support services necessary to maintain and enhance, where necessary, MARAD's Logistics Programs in support of the Ready Reserve Force (RRF) and its overall mission." Patterson Decl., Exh. A (29). In a letter dated March 10, 1998, MARAD Contracting Officer Rita C. Jackson indicated to Samuel Patterson, Veridyne's chief executive officer, that "the scope of work will remain the same" under the extended contract as it had been pursuant to the original contract. Patterson Decl., Exh. E. Patterson later told investigators that he believed that MARAD would order more than $3 million in services pursuant to the extension. Durkin Decl. ¶ 6. Moreover, Veridyne stated in its cover letter accompanying the proposal, dated March 30, 1998, that the proposal assumed that the "the scope of work will remain the same," thus confirming that it shared the Government's expectation with respect to the work to be performed and representing that its proposal was based upon that expectation. Patterson Decl., Exh. F.

Veridyne's proposal was not, however, based upon that expectation. Instead, Veridyne based its proposal solely on the need to remain below the three million dollar threshold set forth in 15 U.S.C. § 637(a)(1)(D), so that the contract extension could be awarded to Veridyne without competition. Durkin Decl. ¶ 6. In order to accomplish this, Veridyne grossly understated the labor hours required to provide the same scope of work and, consequently, understated the costs to the Government in extending the contract. Patterson Supp. Decl. ¶ ¶ 23-24. In its proposal, then, Veridyne (i) stated that in the proposal it had assumed the scope of work would be the same and (ii) provided labor and cost figures that clearly were inconsistent with that assumption.

Veridyne argues that it would have been absurd to believe that it would provide the same scope of services it had provided pursuant to the original contract for just three million dollars over five years. Pl. Resp. at 19. That is precisely the Government's point. Veridyne clearly could not have performed the same scope of services using the amount of labor contained in its proposal. And, therefore, it could not have performed the same scope of services for under three million dollars. The Government acknowledges that the cost figures provided by Veridyne were consistent with the labor figures it used. We contend, however, that Veridyne's labor and cost figures were not consistent with its representation that the scope of services would remain the same.

More importantly, while the misrepresentation of the amount of labor and the total contract amount might have been obvious to anyone intimately familiar with the contract, it would not have been so obvious to others within the Government whose approval was necessary to complete the transaction without soliciting competitive bids. The proposal could then be used within the Government to justify the award of the extension of the contract without competition.

Recall that 15 U.S.C. §637(a)(1)(D) requires that the contract be subject to competition if total costs are anticipated to be greater than three million dollars. Based upon the facts cited in the Government's moving brief and in this reply (i.e., the history of the amounts paid pursuant to the contract, Veridyne's impending graduation from the 8(a) program, the existence of the three million dollar threshold below which Veridyne could avoid competition), the Court may infer that Veridyne created its absurdly deflated proposal in order to create the appearance that the anticipated cost of the extension would be less than three million dollars.

As we explain in detail below, Veridyne's the labor and cost figures in Veridyne's proposal are misrepresentations regardless of whether the phrase "scope of work" is understood to mean the volume of work required pursuant to the contract, as suggested by the plain language of that phrase as well as the parties' correspondence interpreting that phrase, or it is understood to mean the type of work, as suggested by plaintiff. Pl. Resp. at 17-18. Moreover, Veridyne's proposal impliedly represented that the labor and cost figures contained therein were a projection of the volume of work anticipated pursuant to the contract. The Court therefore should reject Veridyne's argument that the Government has failed to prove the fact of a misrepresentation.

**A. In Stating That "The Scope Of Work Will Remain The Same," Veridyne Represented That Its Proposal Was Based Upon The Same Volume Of Work As Required Pursuant To The Original Contract And, Therefore, The Labor And Cost Figures Included In The Proposal Constituted Misrepresentations**

Veridyne represented in its cover letter dated March 30, 1998, that the attached proposal assumed that "the scope of work will remain the same." Patterson Decl., Exh. F. The plain meaning of that language and the correspondence between the parties indicates that, in making that statement, Veridyne represented that the accompanying proposal was based upon the same

volume of work as it had experienced in the preceding years pursuant to the original contract. Its proposal, however, was based upon a far narrower scope of work so that the proposal fell below the $3 million threshold required to avoid competing the contract. Thus, in light of Veridyne's representation that the proposal assumed the same scope of work as the previous contract, the number of labor hours and the total contract amounts included in its proposal were false.

Veridyne argues that the phrase "scope of work" referred to the type of work, not the volume of work. Pl. Resp. at 17-18. An examination of the correspondence surrounding the execution of Modification 23, however, indicates that the phrase "scope of work" as used in Veridyne's proposal letter was intended to refer to the anticipated volume of work pursuant to Modification 23.

The most telling indication that the phrase "scope of work" referred to the volume of work is the letter from MARAD Contracting Officer Rita C. Jackson to Samuel Patterson, dated March 10, 1998. Patterson Declaration, Exh. E. Verdiyne's proposal was a response to this letter. In the letter, Ms. Jackson indicates that the "scope of work will remain the same" and then asks for "a formal cost proposal" that "should identify the cost per year for this five year extension." The request for cost per year estimates would be meaningless unless related to the amount of work, and the only thing that the letter mentions that could be a source of such guidance is the fact that the extension would be for the same "scope of work." Viewing the proposal in its context as an answer to Ms. Jackson's letter, the only reasonable interpretation of the proposal and its "breakdown of costs for each of the five years" is that it misrepresented the proposal as a cost proposal for the same volume of work as provided pursuant to the original five years of the contract.

Subsequent correspondence between the parties regarding the contract confirms this understanding of the phrase "scope of work." In a letter dated October 18, 2000, from Veridyne Vice President Glenn Downer to MARAD's Contracting Officer Benedict Burnowski, Downer asks for an increase in the award fee because "the scope of work" of the contract had increased. ¶ 2. Burnowski Supp. Decl., Exh. 1. He then lists several "[e]xamples of this increased scope of work," each of which constitutes not a broadening of the type of work that Veridyne was doing, but rather an increase in the volume of the work:

(i) "Major logistics overhauls have been conducted or started on 5 RRF ships." ¶ 2. This is covered in the original contract Section C.2.5 providing that "[t]he contractor should be capable if tasked to provide on site logistics support services for major ship overhauls and conversions."

(ii) "Logistics overhauls are nearly completed on two school ships, and started on a third." ¶ 2. Also covered by Section C.2.5.

(iii) "Complete Logistics overhauls have been completed on the MCDS systems on all seven ships equipped with the system, bringing the system up to the support levels established by the US Navy." ¶ 2. Also covered by Section C.2.5.

(iv) "Support has been provided to the OPDS systems and ships in both pre and post exercise logistics support activities." ¶ 2. Falls under Veridyne's general logistics support functions.

(v) "Logistics Local Area Networks (LANs) have been ordered and installed and supported in two of the Region Logistics Shore Based Spares warehouses." ¶ 2. Section C.2.1 of the original contract tasks Veridyne "with overall system management" of "all . . . automated programs in support of MARAD's Logistics Support Program which interface with ECSMIS." This includes "system maintenance and enhancement, including hardware, software, and documentation."

Thus, when Downer used the phrase "scope of work" in reference to the contract, he clearly intended it to refer to the volume of work, not the type of work.

In a follow-up letter dated May 14, 2001, from Veridyne Vice President Leonard S. Freiburg, Jr., to MARAD's Burnowski, Mr. Freiburg refers to the above letter to reiterate Veridyne's claim for an increased award fee. Burnowski Decl., Exh. 2. Mr. Freiberg states that "[t]he scope of work in logistics overhauls remains well above that experienced in the early years of the contract. Where we typically had 2-3 ships in work at one time, we now have 4-5 ships undergoing active logistics overhauls simultaneously." ¶ 19. This clearly refers to an increased scope of work in terms of an increased quantity of work rather than an expansion of the type of work, and it supports our interpretation of the phrase.

**B. Even If Veridyne's Statement That "The Scope Of Work Will Remain The Same" Is Deemed To Refer To The Type Of Work To Be Performed Pursuant To The Contract, As Veridyne Suggests, The Labor And Cost Figures Contained In Veridyne's Proposal Still Constitute Misrepresentations**

Veridyne argues that its proposal was consistent with its statement that the scope of work would remain the same, if the phrase "scope of work" is understood to mean they type of work, because its proposal provided for it to perform the same type of work it had performed pursuant to the original contract. Pl. Resp. 17-18. Even if "scope of work" refers only to the type of work and not the quantity, as Veridyne argues, the proposal was not based upon the same type of work as the original contract and, therefore, was a misrepresentation.

Even though the tasking of the work was to be issued through work orders and technical directives from MARAD, the level of the work was not wholly within MARAD's discretion such that nothing certain could guide Veridyne's estimate. The original contract's specifications, adopted by Modification 23, task MARAD with certain exclusive responsibilities whose fulfillment would necessarily require at least a base quantum of work. In other words, there was

a fixed minimum amount of work required pursuant to the contract. The work required to fulfill these functions over the life of the extension was represented to be included in any estimate of costs for that extension, insofar as Veridyne represented that the proposal was based upon the same "scope [i.e., type] of work" as the original contract.

The contract's general description of work to be performed states, "Contractor acquired resources will manage the ECMIS programs, be readily available to aid in the analysis, planning and execution of supply related logistics support and respond to the various logistics support requirements of the Ready Reserve Force . . . . The contractor will be required to assume full responsibility for performance for the system during a phase-in period, estimated to be between sixty and ninety days, following contract award." Contract No. DTMA91-95-C-00024, § C.1.1.

The more detailed statement of work enumerates a list of duties, which it says will be tasked through work order. Most of these duties are qualified by the prefatory "The contractor shall be capable" (i.e., if asked by MARAD), which indicates that the duty is conditional and may or may not be tasked. However, for two of them, this prefatory phrase is missing and the mandate is certain:

i. "[The contractor p]erforms all the duties associated with overall system management of MARAD's RTF Equipment Configuration and Spare Parts Management Information System (ECSMIS) and all other automated programs in support of MARAD's Logistics Support Program which interface with ECSMIS. This includes, but is not necessarily limited to: system maintenance and enhancement, including hardware, software and documentation; system analysis, management reporting, the preparation of procedural guidance, and training. The contractor will be expected to maintain the ECSMIS system on line, 24 hours a day, 7 days a week." Furthermore, the contractor is to "[m]onitor and maintain the integrity of the logistics data input or output from the various program sources including but not limited to Ship Manager SAL updates, PC-SAL downloads, Provisioning updates, Procurement reviews and program receipts, Equipment validations and Spare Part inventories." Id. § C.2.1.

ii. “The contractor shall provide a support facility to perform receipt inspection and acceptance for all materials from the Federal Supply System to package, label, and stage material by ship for subsequent delivery and process Ship Manager ordered material. The facility shall be located in Newport News, Virginia. The facility must have office and storage space and be a minimum of 11,900 square feet.” Id. § C.2.8.

The contract also provides for “Required Labor Categories,” including Project Manager, Senior Analyst, System Analyst II, System Analyst I, Maintenance Data Analyst II, Maintenance Data Analyst I, and Data Operator. Id. § C.3. Veridyne’s proposal, however, failed to include a Maintenance Data Analyst II for the final option year, and failed to include a Maintenance Data Analyst I for the final three option years. Patterson Decl., Exh. F at 102. It further states that there must be at least one person who is an expert in each of the following areas: automated programs, provisioning, procurement, engineering/maintenance, and logistics, Id. § C.4, yet Veridyne’s proposal does not provide for such expertise. All of these categories and requirements for expertise would be necessary for performing the mandatory functions mentioned supra.

Thus, even though the contract was IDIQ, and even though all work would still need to be issued by work order, the language of the contract with respect to these responsibilities was enough to establish that at least these functions would be required of Veridyne for the duration of the contract. Yet Veridyne did not include labor figures, or the consequent cost figures, related to these types of non-discretionary services. Instead, it ignored them altogether in order to be able to present an artificially deflated proposal to the Government.

### C. Veridyne's Proposal Was Represented To Be An Estimate Based Upon A Projection Of The Volume Of Work

In response to our contention in our moving brief that the proposal was, itself, an estimate of the anticipated volume of work during the option years, Veridyne argues that because the work orders were issued at the discretion of MARAD and because the contract was IDIQ, Veridyne could not have been expected to provide an estimate for the actual level of work. The course of dealing and performance between MARAD and Veridyne demonstrates that this is not true.

First, the original contract had the same terms, but the estimate was reasonably in line with the actual cost of the contract. Burnowski Decl. ¶ ¶ 6-7. Second, in the letter dated May 14, 2001, from Veridyne's Freiberg to MARAD's Burnowski, Frieburg supports his request for an upward revision in the award fee with new estimates for the costs of the extension contract. Burnowski Decl., Exh. 2. He states that "[f]or a level-of-effort, term type contract with a very general scope of work, using actual costs and business projections is the most valid basis for estimating costs for the out-years. By taking this approach, Veridyne has been able to develop an extremely reliable projection for Option Years 5-9." Id. at ¶ 4.

Indeed, the evidence suggests that the proposal was to be a projection of total costs. The letter from MARAD Contracting Officer Rita C. Jackson to Samuel Patterson, dated March 10, 1998, to which the proposal was a response, requests "a formal cost proposal" that "should identify the cost per year for this five year extension." The requested for cost per year estimates would be meaningless if all MARAD really wanted was the number of hours that would fit within the $3 million limit, randomly allocated across the five year contract. Viewing the

proposal in its context as an answer to this letter, the proposal's "breakdown of costs for each of the five years" contained an implied representation that it was based upon some sort of projection of activity under the contract. Moreover, two sections of the proposal state that estimates (for general and administrative costs and for other direct costs) are based upon "anticipated business volumes expected over this time frame" and "anticipated activity." Patterson Decl., Exh. F, §§ 1.6-1.7.

Thus, contrary to Veridyne's assertions, the proposal was not presented as an estimate of the amount of work that MARAD could purchase for $3 million. Rather, it was a proposal for the contract extension that impliedly relied upon a projection of business activity over the duration of the extension. Those projections, however, were patently false and designed solely for the purpose of avoiding competition in the award of the extension.

## II. The Government Is Not Required to Prove Damages or Reliance Upon Veridyne's Misrepresentations In order to Prevail Upon Its Fraud Defenses or Counterclaim

Evidence of the Government's reliance upon Veridyne's misrepresentation or damages suffered by the Government in reliance upon such a misrepresentation is not relevant to the consideration of the Government's defenses in this case, and the Court should ignore Veridyne's many references to the purported lack of such evidence. Indeed, Veridyne has taken this view as well. After citing Black's Law Dictionary for the proposition that proof of a fraud claim requires (1) a false representation of fact, (2) reliance upon the misrepresentation and (3) damages resulting from reliance, Veridyne acknowledges that "detrimental reliance and injury seem not to be required" in order to prove the Government's forfeiture defense pursuant to 28 U.S.C. § 2514. Pl. Resp. at 12, (citing Long Island Savings Bank, et. al. v. United States, 476 F.3d 917, 926

(2007)). Nevertheless, at various points in its response brief, Veridyne points to an alleged lack of evidence of the Government's reliance upon Veridyne's misstatements or damages. Pl. Resp. at 6-7, 19, 21, 24, 26 (fn. 11 and accompanying text), 27.

Proof of reliance and damages, however, is not required in order for the Government to prevail upon its fraud defenses or counterclaim. As Veridyne correctly states, Long Island Savings Bank held that such proof is not required in order for the United States to successfully assert a forfeiture defense pursuant to 28 U.S.C. § 2514. Moreover, proof of damages is not required in order for the contract to be deemed void ab initio pursuant to Mississippi Valley and its progeny. United States v. Mississippi Valley Generating Co., 364 U.S. 520, 548 (1961) (there is "no burden on the Government to establish financial loss"); K & R Eng'g Co. v. United States, 616 F.2d 469, 475 (1980) ("It is therefore immaterial whether the particular taint has or has not in fact caused the government any financial loss or damages"). Similarly, proof of the Government's reliance upon misrepresentations by the contractor is not required. J.E.T.S., Inc. v. United States, 838 F.2d 1196, 1200 (Fed. Cir. 1988) (affirming summary judgment finding contract void ab initio based solely upon contractor's having been estopped to deny misrepresentation). Indeed, in Mississippi Valley, the Court held that the contract would be void even if the Government had knowledge of and approved of the activities that gave rise to the Court's finding of a conflict of interest. Mississippi Valley Generating Co., 364 U.S. at 561. In any event, the record in this case contains evidence of reliance by the Government. Clearly the Government relied upon Veridyne's misstated labor and cost figures because, if the proposal had not projected costs below $3 million, MARAD could not have awarded the contract to Veridyne without subjecting the award to competition pursuant to 15 U.S.C. § 637(a)(1)(D).

## III. The Government is Entitled to Summary Judgment with Respect to Veridyne's Breach of Contract Claim

In its amended complaint, Veridyne alleged as part of its Count III that "[t]he actions of MARAD's counsel in stopping Veridyne's performance[1] [after MARAD's counsel determined that the contract was void] put MARAD in breach of the Contract;" Veridyne argues, therefore, that it "is entitled to the lost profit it would have realized had the Contract not been breached." Amend. Compl. ¶ 65. In our response and cross motion, we requested that the Court enter summary judgment in favor of the Government with respect to Count III because, as Veridyne acknowledged, MARAD was obligated to order only $299,985 in services pursuant to the contract, and MARAD had, in fact, ordered and paid for an amount of services far in excess of that figure. Def. Resp. and Cross-motion at 22.

Veridyne's only argument in response is that the Government breached the contract by failing to pay several invoices submitted by Veridyne.[2] Even if Veridyne is correct, however, the Government's failure to pay the disputed invoices did not result in Veridyne's having lost profits pursuant to the contract, which is the basis for Count III. The plaintiff in a breach of contract

[1] We note that the Government did not "stop[] Veridyne's performance;" rather, the Government simply ceased placing orders pursuant to the contract, as it was entitled to do.

[2] Veridyne's argument on pages 28 and 29 about the amount actually paid by MARAD is not responsive to our argument. Veridyne correctly notes that it was not actually paid $31,134,931.12. That figure, used on page 22 of the Government's brief, was erroneously derived from the statement in Mr. Burnowski's declaration that MARAD had "approved" invoices in that amount. Burnowski Decl. ¶ 15. As the Government acknowledged in its response to plaintiff's proposed findings of fact, however, the Government did not pay invoices 260 through 265. The amount of the invoices paid by the Government, then, is the amount approved, $31,134,931.12, less the amount of the unpaid invoices. This issue, however, bears no relevance to the question of whether the United States is entitled to summary judgment with respect to Count III because, regardless of the exact amount, MARAD clearly ordered and paid for an amount of services in excess of its minimum obligations pursuant to the contract, a

action is entitled only to damages resulting from the particular breach, RESTATEMENT 2d OF CONTRACTS § 347, cmt. e, and Veridyne cannot explain how it might have lost future profits as a result of the Government's refusal to pay past invoices. Moreover, the breach alleged in Veridyne's response is not the same breach alleged in Count III of the amended complaint. Veridyne has wholly failed to address whether the Government's decision not to place additional orders pursuant to the contract was a breach of the contract or to proffer any summary judgment evidence contradicting the evidence relied upon by the Government. Thus, there is no dispute of material fact relevant with respect to to the determination of Count III, and the Government respectfully requests that the Court grant summary judgment in favor of the Government.

## IV. The Court Should Deny Plaintiff's Motion To Strike Portions Of The Declarations Of Benedict Burnowski And Kevin Durkin[3]

### A. The Court Should Not Strike Paragraphs 3-13 and 20 From the Declaration of Benedict J. Burnowski

Veridyne argues that the Court should strike paragraphs 3-13 and paragraph 20 from the declaration of Benedict Burnowski because, plaintiff alleges, the information contained in them is not within his personal knowledge. Veridyne correctly states that an affidavit in support of or in opposition to a motion for summary judgment must be based upon the affiant's personal knowledge. Rules of the Court of Federal Claims ("RCFC") 56(e). Veridyne further explains that, it believes, Burnowski lacks the requisite personal knowledge to support his declaration

---

proposition which Veridyne does not dispute.

[3] The Government notes that Veridyne's arguments that the Burnowski and Durkin declarations contain hearsay and include information about which the declarants lack personal knowledge, Pl. Resp. at 22-25, are substantially repeated in Veridyne's Motion to Strike, submitted May 23, 2007. For the convenience of the Court and the parties, the Government has included its response to Veridyne's motion to strike in Section III of this brief.

because he "had no personal involvement with the Contract until January, 2000." Pl. Resp. at 22. "Personal knowledge, however, is not strictly limited to activities in which the declarant has personally participated." Washington Cent. R. Co. Inc. v. National Mediation Bd., 830 F. Supp. 1343, 1353 (E.D. Wash. 1993). Moreover, an affiant's personal knowledge may be substantiated based upon his position and consequent responsibility or opportunity to know the relevant facts. Ondis v. Barrows, 538 F.2d 904, (1st Cir. 1976) (affirming the district court's denial of a motion to strike statements relating to the registration and listing of a security based upon affiant's position as office manager and fact that he was "personally familiar with the events surrounding" the public offering of the securities); Continental Cas. Co. v. American Sec. Corp., 443 F.2d 649 (D.C. Cir. 1970) (concluding that affidavit was sufficient where it was "by an officer … with the responsibility for processing claims, who made the affidavit on his own personal knowledge and on the records of the surety company with which his duties required him to be familiar").

Veridyne is incorrect, therefore, in arguing that Burnowski lacks the requisite personal knowledge to affirm the disputed paragraphs in his declaration simply because he did not assume his responsibilities as team leader until January 2000. Here, Burnowski had the requisite personal knowledge to support his declaration. Burnowski explicitly stated in his declaration that the statements therein were true and based upon his personal knowledge. Burnowski Decl. p. 2. Burnowski's personal knowledge was derived from his position as team leader with oversight responsibility for the relevant contract and as a contracting officer, starting in January 2000. Burnowski Supp. Decl. at ¶ ¶ 1, 6. Moreover, he became personally familiar with the events surrounding the execution of Modification 23, because those events were critical in making decisions with respect to the continued administration of the contract, particularly with

respect to the Proposed Modification 35. Id. That is, the performance of his duties as team leader required him to know the information contained in paragraphs 3-13 and paragraph 20 of his declaration. Id.

In addition, an affiant's personal knowledge may be acquired through the review of files and records. Londrigan v. Federal Bureau of Investigation, 670 F.2d 1164, 1174 (D.C. Cir. 1981) (concluding that FBI agent was competent to testify about the conduct of an investigation in which he had not participated based upon his review of the case file); Washington Cent., 830 F. Supp. at 1353; Vote v. United States, 753 F. Supp. 866, 868 (D. Nev. 1990) (holding that affidavit of Internal Revenue officer was based upon personal knowledge where it was based upon her "personal familiarity with plaintiff's case and her review of the plaintiff's file"). As indicated in his initial declaration, Burnowski's personal knowledge was acquired, in substantial part, based upon his review of official Department of Transportation records. Burnowski Decl. p. 4; Burnowski Supp. Decl. ¶ 5.

Thus, the statements in Burnowski's declaration are within his personal knowledge and are properly included in his declaration. The Court, therefore, should deny Veridyne's motion to

strike portions of his declaration.[4]

**B. The Court Should Not Strike**
**Paragraphs 5 and 7 From the Declaration of Kevin T. Durkin**

Veridyne contends that ¶ 5 of the Declaration of Kevin T. Durkin, which describes statements made by Michael Genna, Veridyne's former chief financial officer, should be stricken as hearsay. Pl. Mot. at 5. Veridyne explains that Genna was not an employee of Veridyne at the time he made the subject statements to Agent Durkin and, therefore, the statements may not be deemed admissions by a party opponent pursuant to FRE 801(d)(2)(D).

To the contrary, Mr. Genna's statements are not hearsay because they are not offered to prove the truth of the matter asserted. FRE 801(c). That is, his statements are offered, in part, to demonstrate that Veridyne had knowledge of the falsity of its proposal, which the United States is required to prove in order to prevail on its defense of forfeiture pursuant to 28 U.S.C. § 2514.

---

[4] We note that, if the Court were to grant Veridyne's motion to strike, the Court may still grant the Government's motion for summary judgment, because support for many of the stricken paragraphs may be found in the Declaration of Samuel Patterson and the exhibits to the Patterson Declaration. The following table indicates the portions of Burnowski's Declaration that are supported by Veridyne's summary judgment evidence:

| Burnowski Decl. | Patterson Decl. |
|---|---|
| ¶ 3 | ¶ 8 |
| ¶ 4 | ¶ 9, 11-13 |
| ¶ 5 | ¶ 2 |
| ¶ 6 | ¶ 11 |
| ¶ 8 | ¶ 3 |
| ¶ 9 | ¶ 20-21 |
| ¶ 10 | ¶ 24, Exh. F (A93) |
| ¶ 11 | Supp. Decl. ¶ ¶ 23-24 |
| ¶ 13 | Exh. D |

The remaining three paragraphs that are the subject of Veridyne's motion (¶ ¶ 7, 12 and 20) are within Burnowski's general knowledge as a result of his duties as team leader.

Long Island Savings Bank, 476 F.3d at 926. In this context, Mr. Genna's statements indicating that the proposal had been engineered to satisfy the $3 million threshold are offered not to demonstrate that the proposal actually was fraudulent (which we have demonstrate through other evidence), but to demonstrate that Mr. Genna, as Veridyne's chief financial officer, believed that the proposal had been engineered and, thus, was aware of the proposal's falsity. Def. Resp. and Cross-motion at 16 ("Genna's and Patterson's knowledge of the falsity of the proposal's representations is apparent from their statements to the Inspector General's agents."); Id. ("Here, the record demonstrates that both Genna and Patterson had knowledge of the falsity of the assumptions presented in the proposal").

In any event, Mr. Genna's statements were adopted by Mr. Patterson in his second interview with agents from the Department of Transportation Inspector General's office and, thus, Mr. Patterson's adoption of those statements is admissible pursuant to FRE 801(d)(2)(D). As Agent Durkin explained in his declaration "[w]hen confronted with Mr. Genna's statements that the estimate was inaccurate, not in good faith and was prepared for the purpose of satisfying the sole source threshold, Mr. Patterson agreed with those statements." Durkin Decl. ¶ 6. If Mr. Genna's statements to Agent Durkin are stricken, then, the Government is in the same position with respect to its motion for summary judgment because Mr. Patterson's statements, identical in substance to Mr. Genna's statements, are clearly admissible.

**CONCLUSION**

For the reasons stated in the Government's Cross-motion for Summary Judgment and in this Reply, we respectfully request that the Court grant summary judgment in favor of the United States.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Steven J. Gillingham
STEVEN J. GILLINGHAM
Assistant Director

s/ Robert E. Chandler
ROBERT E. CHANDLER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L St., N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel: (202) 514-4678

Attorneys for Defendant

Of Counsel:
Janis Rodriguez, Esq.
United States Department of Transportation

August 10, 2007

CERTIFICATE OF FILING

I hereby certify that on this 10th day of August 2007, a copy of the foregoing "Defendant/Counter-claimant's Reply to Plaintiff's Response to Defendant/Counter-Claimant's Cross Motion For Summary Judgment and Response To Plaintiff's Motion to Strike" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Robert E. Chandler

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| VERIDYNE CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 06-150<br>(Judge Block) |

**SUPPLEMENTAL DECLARATION OF BENEDICT J. BURNOWSKI**

I, Benedict J. Burnowski, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge and belief, based on my personal knowledge:

1. I have been employed as a contracting officer with the Department of Transportation, Maritime Administration ("MARAD") since 1988. I have been the Team Leader of the Vessel Acquisition Team since January 2000. The logistics support contract which is the subject of this litigation, DTMA91-95-C-00024 (the "Contract"), was administered by my team. Ms. Erica Williams, a member of that team, was the contracting officer responsible for the Contract from about August 1998 through December 2004, when work stopped on the Contract.

2. As Team Leader, I had oversight responsibility for the Contract. In addition, I was the Contracting Officer for any procurement actions that exceeded Ms. Williams' warrant.

3. In March 2000, Veridyne began performance on Option Year 5 of the Contract, the first option year of the extended 8(a) contract awarded via Modification 23. In the fall of 2000, Ms. Williams informed me that Veridyne was seeking an increase in the fixed and award fees established by Modification 23. Veridyne had already billed for more fee than was allotted for the first year of the five year extension and was seeking to increase the fees and the maximum estimated quantities for the remaining year and option years over those established in Modification 23.

4. As these actions exceeded Ms. Williams' warrant, I became the responsible Contracting Officer.

5. As the responsible Contracting Officer considering the actions proposed by Veridyne, it was necessary for me in my official capacity to become personally familiar with the contract in general and the events surrounding its administration as of that date. Since Veridyne was seeking to significantly increase the contract value and the fees established by Modification 23 in 1998, it was particularly necessary for me to become familiar with the events surrounding the execution of Modification 23. I obtained this familiarity by extensively reviewing the official contract files of the United States Department of Transportation, Maritime Administration and through conversations with other MARAD employees who had been and were involved in the administration of the contract in their official capacities.

6. Veridyne's Vice President Glenn Downer sent a letter dated October 18, 2000, addressed to me as MARAD's Contracting Officer, asking for an increase in the award fee because "the scope of work" of the contract had increased. A true and correct copy of that letter is attached hereto as Exhibit 1.

7. On May 14, 2001, Veridyne Vice President Leonard S. Freiburg, Jr. sent a follow up letter to me, reiterating Veridyne's claim for an increased award fee. A true and correct copy of that letter is attached hereto as Exhibit 2.

Executed on: August 10, 2007

8/10/7

Benedict J. Burnowski
Contracting Officer

SHEPARD PATTERSON
MANAGING PEOPLE, SYSTEMS & INFORMATION

Burnowski Supp. Decl.
Exhibit 1

October 18, 2000

U.S. Department of Transportation
Maritime Administration
400 7th Street, S.W., Room 7314
Washington, DC 20590

Attention: Mr. Benedict J. Burnowski, Contracting Officer

Subject: Funding, Contract DTMA91-95-C-00024, Option Years 5 - 9

Reference: 1. MARAD Letter Dated September 26, 20000, Invoice #150
2. MARAD Letter Dated September 26, 20000, Invoice #151

Dear Mr. Burnowski:

The reference letters disallow provisional fee amounts that were billed in excess of funding limitations. We did not realize that the May 1999 funding increases for the subject Option Years were only for Estimated Cost, with no commensurate increase for Award Fee. We understand these actions and we apologize for our oversight.

However, we believe that the May 1999 increases should have included increases in the Fee, because the scope of work associated with the increases had also grown substantially. Increased requirements for logistics services have been experienced in the full range of support provided. Examples of this increased scope of work are:

- Major logistics overhauls have been conducted or started on 5 RRF ships.
- Logistics overhauls are nearly completed on two school ships, and started on a third.
- Complete Logistics overhauls have been completed on the MCDS systems on all seven ships equipped with the system, bringing the system up to the support levels established by the US Navy.
- Support has been provided to the OPDS system and ships in both pre and post exercise logistics support activities.
- Logistics Local Area Networks (LANs) have been ordered and installed and supported in two of the Region Logistics Shore Based Spares warehouses.
- Modernization of the logistics information system applications has increased the number of program applications in design and development.

Now that Shepard - Patterson has been performing Option Year 5 for approximately 6 months, it appears that further upward revisions to Estimated Cost for Option Years 5 - 9 will also be required. For example, based upon actual costs (no fee) through September 15, 2000, total Option Year 5 Estimated Cost projects to approximately $7,000,000.

For these reasons, Shepard - Patterson & Associates hereby submits a proposal to re-fund the subject Option Years per the table attached. The fees proposed are based on the contract guidance of 8% of the revised Estimated Cost. The Estimated Costs for Option Years 7 through 9 assume an inflation factor of 4% per year applied to Estimated Cost from Option Year 6.

We request a new funding modification to the IDIQ that is formatted like Modification 23, which shows the breakouts of Estimated Cost and Fee per Option Year at a certain effective date. We will track and report

Burnowski Supp. Decl.
Exhibit 1

(in accordance with 52.232-22) our funding status in accordance with those Option Years funding, as though the current Option Year was fully funded. If we discover that the funding values are not accurate, we will propose and negotiate new Estimated Cost and Fee for a new IDIQ funding modification, as necessary. Each Work Order then may continue to carry a single NTE value, just as now. The latest Provisional Fee will be billed to each existing Work Order as is currently done, and the remaining fee will be billed as authorized during the MARAD quarterly PEB review.

Sincerely,

Glenn I. Downer
Vice President

Cc:
Erica Williams
Richard H. Williams
Patrick Carlton
Sam Patterson
Len Freiberg
Lou Vanderhorst

Burnowski Supp. Decl.
Exhibit 2

SHEPARD PATTERSON
MANAGING PEOPLE, SYSTEMS & INFORMATION

May 14, 2001

Mr. Benedict J. Burnowski
Contracting Officer
U.S. Department of Transportation
Maritime Administration
400 Seventh Street, S.W.
Washington, D.C. 20590

Subject: Contract DTMA91-95-C-00024, Estimates on Costs and Fee

Reference: MARAD Letter dated April 25, 2001, Same Subject

Dear Mr. Burnowski:

We appreciate your response to our proposals of October 18 and November 6, 2000 to revise cost and fee ceilings for option years 5-9 of the subject contract. We are pleased that you agree that the total estimated cost and fee for the contract should be adjusted. This letter will provide you with the information needed to satisfy your questions regarding the amounts for our proposed adjustments, and modifies our proposal where we agree with your comments.

**Topic One: Indirect Rates:**

In our October 18 and November 6 letter proposals we did not apply the rates offered by Shepard-Patterson in 1998, whereby we estimated that the overhead rate and G&A rate would decrease in each of the option years. Instead, we assumed a constant overhead of 65.4% and G&A of 14.9%. However, based on our current experience and projected expenses, we have adjusted our estimates of total costs and fees based on the reduced indirect rates in the table below, and have reflected them in the attached revised CLIN sheets. These rates were used in developing the attachments to this letter.

| | Option Year 5 | Option Year 6 | Option Year 7 | Option Year 8 | Option Year 9 |
|---|---|---|---|---|---|
| Overhead Rate: | 64.4% | 62.5% | 61.0% | 58.0% | 56.0% |
| G&A Rate: | 14.4% | 13.5% | 12.3% | 12.2% | 11.4% |



6810 DEERPATH ROAD • SUITE 415 • ELKRIDGE, MD 21075 • (410) 579-1982 • FAX: (410) 579-1657

Burnowski Supp. Decl.
Exhibit 2

We also recognize that our 1998 proposal contained an offer to cap the indirect rates presented at that time; however, apparently after negotiations, that portion of the proposal was not made a part of Modification 23. The rates proposed in the above table are estimated rates based on our corporate experience and are not offered as capped rates.

**Topic Two: Basis for Estimates**

For a level-of-effort, term type contract with a very general scope of work, using actual costs and business projections is the most valid basis for estimating costs for the out-years. By taking this approach, Shepard-Patterson has been able to develop an extremely reliable projection for Option Years 5-9.

As noted in our letter proposal of October 18, our cost estimate for completion of Option Year 5 was basically a projection of actual costs through the first six months of the Year, multiplied times two, plus an additional amount ($879,630) for external and carry-over funding. This was derived based on planning estimates regarding the extent of the project from the MARAD program office. From our letter:

> "Now that Shepard - Patterson has been performing Option Year 5 for approximately 6 months, it appears that further upward revisions to Estimated Cost for Option Years 5 - 9 will also be required. For example, based upon actual costs (no fee) through September 15, 2000, total Option Year 5 Estimated Cost projects to approximately $7,000,000, a 27% INCREASE over the current calculated Estimated Cost funding allowance of $5,465,584 ($5,553,367 Total - $87,783 Award Fee)."

Option Year 5 is now complete and it should be noted that our actual billings of $6,956,315 of total cost vs. our original projection of $7,010,680 made in October 2000, is accurate within 0.8%. With that knowledge, we can view our additional option year cost estimates with a high degree of confidence.

We have discussed the likely level of out year service activity with MARAD Operations personnel. For option Year 6, we expect the level of activity to decrease about 1%, with less carry-over funding and no external funding, but with costs affected by an inflation rate of 4%. Activity in Option Year 7 is expected to decrease an additional 1% with no carry-over or external funding, but with costs affected by an inflation rate of 4%. Option years 8 and 9 are expected to remain constant at the level for year 7 with no carry-over or external funding, but with the 4% inflation rate continuing.

Our revised CLIN sheets reflecting the above indirect rates and our best estimate of workload are provided as an attachment. For completeness, we have also included Option Year 5 even though performance for that year has been completed.

Burnowski Supp. Decl.
Exhibit 2

**Topic Three: Labor Hour Estimates**

Since the Government provided no precise future workload data to use in our proposal, the labor hour estimates were derived from the cost information projected for option years 5-9 as follows:

During the first six month of Modification 23 (Period ending September 30, 2000) the cumulative hours billed equaled 32,148.5 @ $3,168,088. A ratio was established and projected for the entire option year 5, resulting in an estimate of 71,142 CLIN AA hours ($7,010,680 / $3,168,088 x 32,148.5).

Option year 6 was then computed using the same approach after removing the 4% inflation factor included in the cost. For example: $6,696,854 AA Cost / 1.04 equals $6,439,282; followed by ($6,439,282 / $7,010,680 x 71,142), which results in 65,343 CLIN AA hours. This same technique was used for option years 7,8, and 9.

**Topic Four: Maximum Award Fee Pool**

Your letter provides a counter proposal of $1,644,581 for the maximum fee for the five years vs. $2,690,490 that we proposed on October 18 (now adjusted to $2,606,551 in the attached matrix). Your position appears to be based on the following concerns, which we believe are not applicable.

1. **MARAD Concern:** Shepard-Patterson is proposing to charge the award fee on a percentage of contract cost.

   **Response:** We do not propose to "charge" award fee; rather, we have only proposed a <u>maximum</u> award fee pool based on an analysis of historical data, a reasonable projection of the anticipated future work and risk. We believe that this to be a legitimate and usual proposal process.

   Earned Award Fee is that amount awarded over the base fee solely at the discretion of the Government, and <u>is totally dependent on our performance and not our cost.</u> The earned award fee can therefore vary considerably. Since the base fee in the contract is 0%, your concern is not applicable in this instance.

2. **MARAD Concern:** The written Scope of Work has remained the same for the duration of the contract; thus the award fee pool should only rise at the same rate as inflation.

   **Response:** The fact that the <u>written</u> Scope of Work in the contract has not changed does not mean that the Government has not changed the work over time. In a term type, level-of-effort contract, where the written Scope is always general, the work is changed when the <u>amount</u> of work originally projected by the Government increases, even if the <u>type</u> of work does not.

Burnowski Supp. Decl.
Exhibit 2

We have seen that the amount of essential work has increased extensively, and that even the type of work has been changed beyond that originally contemplated. In our letter of October 18, we noted:

- Major logistics overhauls have been conducted or started on 5 RRF ships.
- Logistics overhauls are nearly completed on two school ships, and started on a third.
- Complete Logistics overhauls have been completed on the MCDS systems on all seven ships equipped with the system, bringing the system up to the support levels established by the US Navy.
- Support has been provided to the OPDS system and ships in both pre and post exercise logistics support activities.
- Logistics Local Area Networks (LANs) have been ordered and installed and supported in two of the Region Logistics Shore Based Spares warehouses.
- Modernization of the logistics information system applications has increased the number of program applications in design and development.

These factors all remain valid today and project so into the future. The scope of work in logistics overhauls remains well above that experienced in the early years of the contract. Where we typically had 2-3 ships in work at one time, we now have 4-5 ships undergoing active logistics overhauls simultaneously. We continue to provide exceptional performance in this area even while executing lesser tasks on other ships during the overhauls.

In the area of logistics information system development, both the scope and technical complexity have increased over the early years of the contract. Initially, the IS activity largely involved the maintenance of legacy systems such as PC-SAL 3.2, ECSMIS 3.2, and the Procurement Tracking System (PTS). Beginning in Option Year 5 and continuing now and into the future, Shepard Patterson has been tasked to design and develop new technology applications such as a WEB-based Excess Material Reporting System (EMS), MARAD Procurement System (MPS), Windows PC-SAL and ECSMIS modernization, and Palm OS scanner applications. Current and future tasking involves modernization of the entire MARAD Logistics Support System to provide Internet accessible Logistics tracking and reporting of all information under the Division of Logistics Support purview. In a recent briefing to the MARAD Information Technology Steering Group, made up of senior MARAD management, and the MARAD Business Process Review panel, MAR-614 was applauded for its forward thinking and planning, and its disciplined approach to system development.

These examples illustrate the increased scope of work that has been experienced which, by the nature of the work, increases the complexity of the management task and the performance risks that are appropriately a consideration in establishing and awarding reasonable and fair fees.

Burnowski Supp. Decl.
Exhibit 2

Since it was not possible for the Government to anticipate the magnitude and complexity of these tasks when Modification 23 was released, the Government has subsequently increased the work through new Task Orders.

You have noted in your letter of April 25, 2001 that the ceilings in Modification 23 are not appropriate as a basis for determining the maximum award fee amounts because the objective of that Modification was to meet an SBA goal rather than develop accurate cost estimates. Instead, you have returned to the estimates in the first 5 years of the Contract because these amounts reflect genuine estimated costs. We agree that your reasoning is sound in this area.

However, by focusing only on the labor hours in CLIN AA of the original contract as the sole measure of work content, you fail to include the extensive and detailed subcontract effort directed and managed by Shepard-Patterson. There is however a viable remedy.

Using your approach of returning to the award fee pool used in the first five years of the contract, and comparing the estimated cost then with that projected cost for option years 5-9, we can achieve a very accurate valuation of the new pool. Since we have already demonstrated above that our cost estimate of option year 5 was extremely accurate, we have a very reliable baseline. This approach takes into consideration all elements of the work scope of the contract, not simply the Shepard-Patterson direct labor portion, and accounts for growth in the scope of work throughout the entire contract performance base.

Applying your methodology and formula, we arrive at the following maximum award fee pool:

AWARD FEE POOL

| | |
|---|---|
| 1. Option Year 5 | $ 556,966 |
| 2. Option Year 6 | $ 525,241 |
| 3. Option Year 7 | $ 493,354 |
| 4. Option Year 8 | $ 508,597 |
| 5. Option Year 9 | $ 522,393 |
| 6. Total Pool | $2,606,551 |

We derive these fee objectives as follows - $1,564,762 (total award fee pool for first five years) X 1.666 (projected work estimates for the last five years ($32,581,872) / work estimates in the contract for first five years ($19,559,527)) = $2,606,549[1]. Then, computing the award fee pools for each individual year by dividing that year's work estimate by the total work estimate and multiplying that percentage by the total award fee pool.

[1] Value here differs from above table due to rounding

Burnowski Supp. Decl.
Exhibit 2

**Topic Five: Award Fee Execution**

We concur with your proposed methodology that the award fee pool should be divided into quarterly increments consistent with the performance evaluation periods. We will then bill a total of one half of the quarterly pool value spread equally among the six invoices submitted each quarter.

**Summary:**

We have demonstrated clearly that the level of work and the complexity of work has increased beyond that anticipated in Modification 23. Using the methodology you recommended, we developed an award fee pool based on estimates in the initial contract and those estimated for option years 5-9. Based on what we can observe regarding the estimated cost for option year 5 and the actual results of the year, we believe the cost estimate for all years to be highly credible. As a result of our joint efforts I believe that we have achieved an improved award fee pool for the new option years. It is one that considers contractor risks and reasonable profit objective. Beyond that, the review process has resulted in a 3.1% savings in total costs and fees from the proposal submitted in November 2000.

I am sure we share a common belief that the Government's interest is best served when the award fee pool provides proper contractor incentive to help MARAD pursue its Ready Reserve Force goals. For the past six years, Shepard-Patterson has responded to the incentive and on numerous occasions attained the maximum award fee through exemplary service and quality performance. Our response to the challenge means we have succeeded in supplying the level of service that MARAD required to meet its Logistics Readiness objectives. This is precisely the result envisioned in establishing a realistic award fee pool value. The incentive resulted in outstanding accomplishment at reasonable cost to the Government.

We look forward to quick resolution of the estimated cost and fee adjustments to the contract as we are currently performing in option year 6. I will contact you to provide any appropriate supporting information or clarifications you may require, and to answer any questions regarding this letter. In the meantime, feel free to contact me at (410) 579 – 1982 or on my cell phone at (443)- 994-2073.

Thank you for your time and consideration. Sincerely,

Leonard S. Freiberg Jr.
Vice President
Finance & Administration

Attachments