**No. 06-150C**
**Judge Block**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**VERIDYNE, INC.**

**Plaintiff,**

**v.**

**THE UNITED STATES OF AMERICA**

**Defendant.**

---

# PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO STRIKE PORTIONS OF TWO DECLARATIONS SUBMITTED BY DEFENDANT

---

**Marc Lamer**
**Attorney for Plaintiff**

**Kostos and Lamer, P.C.**
**1608 Walnut Street**
**Suite 1300**
**Philadelphia, PA 19103**
**(215) 545-0570**

# TABLE OF CONTENTS

**Page**

Table of Contents…………………………………………………………………. i

Table of Authorities……………………………………………………………….ii

Statutes and Regulations…………………………………….…………………....ii

Plaintiff's Reply To Defendant's Response To Plaintiff's Motion
To Strike Portions Of Two Declarations Submitted by Defendant………………1

I. Background…………………………………………………………………..1

II. The Challenged Portions of the Durkin and Burnowski
Declarations, The Only Two Declarations Submitted By
Defendant, Shorn Of Their Hearsay And Inadmissible
Evidence, Are Irrelevant, And Can Neither Support
Defendant's Motion For Summary Judgment, Nor Defeat Plaintiff's……....2

A. Fraud cannot be shown on Motion for Summary
Judgment by inadmissible hearsay, slipped into the record
under the guise of "not offered for the truth asserted"
or by an alleged critical fact hotly disputed……………………….....2

1. Burnowski Declaration…………………………………….….2

2. Durkin Declaration……………………………………….……4

B. Contrary to Burnowski's "after the fact" the term "Scope of
Work," as used on page 2 in paragraph 3 of Modification
0023, can only be interpreted as relating to the work defined
and set forth in the Contract's "Statement of Work" section…….6

C. Settled Case Law precludes Burnowski's asserted
Interpretation of the phrase "Scope of Work" as used
in the Modification 0023…………………………………….……10

D. Plaintiff's Motion for Summary Judgment is unaffected
by what remains of the Durkin and Burnowski declarations,
and should be granted……………………………….…………..14

III. Conclusion……………………………………………………………..…15

# TABLE OF AUTHORITIES

**Page**

**Cases**

Coast Fed Bank, FSB v. U.S., 323 F.3d 1035, 40-41 (Fed. Cir. 2003)……….11

Commercial Contractors, Inc. v. United States, 154 F.3d 1357, 1362 (Fed. Cir, 1998)……………………………………………………………………..15

Continental Casualty Co. v. American Sec. Corp., 443 F.2d 649, 651 (D.C. Cir. 1976)…..................................................................................3

Londrigan v. FBI, 670 F.2d 1164, 1174-75 (D.C. Cir 1981)…………………..3, 4

M.A. Mortenson Co. v. U.S., 29 Fed. Cl. 82, 96 (1993)………….…………..11

Smith v. U.S., 348 U.S. 147 (1954)……………………………………………15

Strum v. United States, 190 Ct. Cl. 691, 421 F.2d 723 (1970)………………...12

U.S. v. Micieli, 594 F.2d 102 (5th Cir 1979)……………………………………15

Vote v. U.S., 753 F.Supp.866 at 868 (D. Nev. 1990), aff'd 930 F.2d 31. (9th Cir. 1991)……………………………………………………………………...3, 4

Young-Montenay, Inc. v. United States, 15 F.3d 1040, 1042 (Fed. Cir. 1994)……………………………………………………………………..15

**Statutes and Regulations**

28 U.S.C § 2514……………………………………………………………….15

**PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO STRIKE PORTIONS OF TWO DECLARATIONS SUBMITTED BY DEFENDANT [1]**

## I BACKGROUND

Defendant's Response to Plaintiff's Motion to Strike, in which Plaintiff requested that the Court strike portions of the only two declarations submitted by Defendant in support of it's contention that Modification 0023 to Contract DTMA91-95-C-0002 ("the Contract") between Plaintiff, the Small Business Administration ("SBA") and the Maritime Administration ("MARAD") was tainted by fraud in its inception is interwoven with Defendant's Reply to Plaintiff's Response to Defendants Cross Motion for Summary Judgment on Defendant's Counterclaim.[2] However neither the Response to Plaintiff's Motion to Strike, nor the interwoven Reply to Plaintiff's Motion for Partial Summary Judgment comes to grips with the salient issue in this case, as raised by the motions. That is to say, how was fraud even possible where there had been full disclosure, with all of Plaintiff's cards on the table and face up? That disclosure is embodied in an

---

1 "Plaintiff's Motion to Strike Portions of Two Declarations Submitted by Defendant" will hereafter be referred to as "Plaintiff's Motion to Strike."

2 That reply presents new argument, albeit with no citation to the record. For instance, in the last sentence on page 3, Defendant argues that MARAD had an "expectation" that Plaintiff would provide the same $20,000,000 worth of service it had provided under the Contract, for the $2.99 million set out in Modification 0023. Nowhere does Defendant identify who within MARAD had that expectation. Ms. Rita Jackson negotiated Modification 0023 on behalf of MARAD and Wayne Cutrell executed it for MARAD (see, infra), yet there is no declaration from either stating that they had such an expectation. Nor is there a declaration from any of the other government officials Defendant suggests' had such a preposterous expectation. Similarly in paragraph 5 of the new and Supplemental Declaration by Burnowski, Burnowski claims he got his personal knowledge "through conversations with other MARAD employees." Concealed from Plaintiff and the Court are the identities of the other employees and what they said. Moreover, Burnowski cannot possibly have personal knowledge of any assumptions made by those persons. Londrigan v. Federal Bureau of Investigation, 670 F.2d 1164 at 1175 (D.C. Cir 1981).

integrated document (Modification 0023) drafted by MARAD, and it cannot be trumped by the testimony of declarants who lack personal knowledge or by inadmissible hearsay.

Modification 0023, neither negotiated nor signed by either of the two individuals whose declarations are challenged in Plaintiff's Motion to Strike (i.e., Burnowski and Durkin), meticulously, openly and conspicuously sets forth the number of "Total Hours" offered for each year upon which MARAD, in its sole discretion, might order up, and, equally conspicuously, sets forth the pricing therefor. Both the hours and the price numbers are boldly underlined for each of the five one-year periods, in an obvious attention-getting effort desired by the drafter of Mod 0023, i.e., MARAD. In total, Modification 0023 provides MARAD 104,880 hours of Plaintiff's services for $2,999,999.

## II THE CHALLENGED PORTIONS OF THE DURKIN AND BURNOWSKI DECLARATIONS, THE ONLY TWO DECLARATIONS SUBMITTED BY DEFENDANT, SHORN OF THEIR HEARSAY AND INADMISSIBLE EVIDENCE, ARE IRRELEVANT, AND CAN NEITHER SUPPORT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, NOR DEFEAT PLAINTIFF'S

### A. Fraud cannot be shown on Motion for Summary Judgment by inadmissible hearsay, slipped into the record under the guise of "not offered for the truth asserted" or by an alleged critical fact hotly disputed.

1. Burnowski Declaration

Plaintiff's Motion To Strike challenged ¶¶ 3-13 of Burnowski's Declaration on the basis that the statements therein could not be based on Burnowski's personal knowledge. Defendant, in its attempt to finesse the evidentiary requirement that a declarant have personal knowledge, argues that Burnowski, the team leader who arrived on the scene well after the execution of Modification

0023, familiarized himself with the contract file. However, there is no way that Burnowski can testify to what the understanding of the parties was when they signed off on Modification 0023. Only the negotiators can testify to that, e.g., Defendant's Ms. Jackson. See Londrigan v. Federal Bureau of Investigation, 670 F.2d 1164, 1174-75 (D.C. Cir 1981).

Although "personal knowledge" is not strictly limited to activities in which a declarant actually participated, and such personal knowledge may come from a review of the contents of a file; nevertheless, where such personal knowledge was achieved through a review of a file, critical portions of that file. This is clear from Vote v. U.S., 753 F.Supp.866 at 868 (D. Nev. 1990), aff'd 930 F.2d 31. (9th Cir. 1991), cited by Defendant. In that case, a tax case, a declaration survived a motion to strike based on lack of personal knowledge because the movant taxpayer's own records were the basis of the declarant's knowledge, and most importantly, the declaration was accompanied by the crucial, admissible exhibits. See, footnote 2, on page 868 of Vote v. U.S., supra; see also Continental Casualty Company v American Security Corp., 443 F.2d 649, 651 (D.C. Cir. 1976).[3]

Thus, the Burnowski declaration offers no support for Defendant's contention that the phrase "the scope of work and all terms and conditions of the contract are unchanged," meant to MARAD's negotiator, Ms. Jackson and, that Plaintiff was falsely promising in Modification 0023 to provide the same level of service it had previously provided at 1/7 the cost. The existence of such a false

[3] While several documents from the MARAD contract file were attached to Burnowski's Declaration, nowhere does he identify what knowledge was derived from what document.

promise, which is in fact non-existent, is the pillar of air upon which Defendant rests its counterclaim.

Burnowski cannot testify as to what Ms. Jackson or others understood. In Londrigan v. Federal Bureau of Investigation, supra, at 1174-75, the Court of Appeals reversed a grant of Summary Judgment, where the declarant, even after reading the file, could not "have personal knowledge of any assumptions made by persons interviewed by other FBI agents."

Thus, even from the cases cited by Defendant in support of its argument that the Burnowski declaration passes the "personal knowledge/ admissible evidence" test based on his reading of a file, the failure to cite and include the relevant documents as part of the record makes the declaration vulnerable to a motion to strike, as does Burnowski's inability to testify as to another's understanding.

With respect ¶ 20 of the Burnowski Declaration (i.e., the MARAD Inspector General's Report allegedly finding fraud in the execution of Modification 0023), also challenged by Plaintiff's as hearsay, Defendant includes ¶ 20 in the title of this section of its Response to Plaintiff's Motion To Strike ("The Court Should Not Strike Paragraphs 3-13 and 20 From The Declaration Of Benedict J. Burnowski"). However Defendant offers no response to Plaintiff's hearsay challenge. Moreover, Defendant does not produce the document, as is required under the decisions Defendant cites. See Vote v. U.S., supra.

2. Durkin Declaration

As to the Durkin Declaration, which includes the out of court statements of a non-party (Michael Genna) suggesting that Veridyne's proposal for contract

extension was not made in "good faith," Defendant attempts to avoid the striking of these hearsay statements by claiming the hearsay is not being proffered for the truth asserted, but only to show knowledge on the part of Veridyne of a scheme to defraud. Shorn of the alleged truth it asserts, Genna's statements are valueless, remote and prejudicial. After all, Veridyne concedes that in proposing and agreeing to perform only 104,880 services hours for $2,999,999, as set forth in Modification 0023, it was complying with (not evading) SBA regulations limiting the value of a contract extension, as Veridyne had every right to do. It was simply taking advantage, to the extent permitted, of the opportunities created for it under the 8(a) program, a national desideratum, legislated by Congress and signed by the President.

The Durkin Declaration does claim that during the interview with Plaintiff's President, Mr. Patterson, Patterson conceded that the costs and hours in Modification 0023 were not "good faith" estimates.[4] As unlikely as such an admission seems on its face, its existence is nevertheless affirmatively disputed. See Patterson Supplemental Declaration, ¶ 91,[5] Supplemental Appendix, page 23.[6] Thus, without Genna's alleged statement, what remains is a disputed fact

---

[4] That interview was never reduced to writing for Mr. Patterson's signature, a protocol preferred in serious investigations.

[5] "Patterson Supplemental Declaration, ¶ ____" refers to the Supplemental Declaration of Samuel J. Patterson, submitted with Plaintiff's Reply To Defendant's Response To Plaintiff's Motion For Partial Summary Judgment And Response To Defendant's Cross Motion For Summary Judgment.

[6] "Supplemental Appendix, page ____" refers to Plaintiff's Supplemental Appendix, submitted with its Reply To Defendant's Response To Plaintiff's Motion For Partial Summary Judgment And Response To Defendant's Cross Motion For Summary Judgment.

that cannot support Defendant's Cross Motion for Summary Judgment.

Like its argument on the Burnowski Declaration, Defendant asks the Court to deny Plaintiff's hearsay challenge to ¶ 7 from the Durkin Declaration, which states the alleged conclusion of the MARAD Inspector General (i.e., "the Court Should Not Strike Paragraphs 5 and 7 From The Declaration Of Kevin T. Durkin"). Yet, as was the case with the Burnowski Declaration, Defendant offers no response to Plaintiff's hearsay challenge. Also, as is the case with the Burnowski Declaration, Defendant declines to produce the Report.

With hearsay, disputed facts and assumptions as to other persons' thoughts eliminated from the only two declarations submitted, the Defendant's Cross Motion for Summary Judgment is left wholly-unsupported and must be denied.

**B. Contrary to Burnowski's "after the fact" contentions, the term "Scope of Work," as used on page 2 in paragraph 3 of Modification 0023, can only be interpreted as relating to the work defined and set forth in the Contract's "Statement of Work" section.**

From the outset of the negotiations surrounding Modification 0023, all parties understood i.e., there was no secret, that the Contract, an Indefinite Delivery/Indefinite Quantity ("ID/IQ") contract could only be extended in a maximum amount of less than $3,000,000, which obviously limited the level of services MARAD could call upon Veridyne to provide. Veridyne certainly wanted to take full advantage of its rights under the 8(a) program. See Patterson

Declaration, ¶ 19,[7] Appendix, page 4.[8] Most emphatically Veridyne followed MARAD's guidance, and kept its extension proposal within the confines of the SBA regulation, limiting its unsolicited extension proposal to under $3,000,000. See Patterson Declaration, ¶ 22 and Exhibit "D." Appendix, pages 5 and 89.

Further, it was clearly understood that although Modification 0023 contemplated only 104,880 hours of service, the scope of the "work" that Veridyne was to provide to MARAD was to remain the same. Appendix, pages 153. That "work" is, again, meticulously set forth in the "Statement of Work" section of the Contract. See Appendix, pages 30-35. This clear understanding manifests itself in Modification 0023 as drafted by MARAD. Appendix pages 154-158.

The "work," as defined in the "Statement of Work" section of the Contract, consisted of a veritable smorgasbord of possible services from which MARAD could choose and order up within the confines of the contract price and the hours offered. Appendix, pages 30 through 35. Which specified tasks MARAD chose to order, and which ones it chose to ignore was, as always in an IDIQ contract, solely within MARAD's discretion. This was true of the Contract as awarded, and equally true of the tripartite supplemental agreement, i.e., Modification 0023.

Veridyne, during the negotiations leading up to Modification 0023 it is true, submitted a proposal suggesting how the 104,880 hours it was offering might be

---

7 Patterson Declaration, ¶ ____" refers to the Declaration of Samuel J. Patterson, submitted with Plaintiff's Motion For Partial Summary Judgment.

8 "Appendix, page ____" refers to the Appendix to Plaintiff's Motion For Partial Summary Judgment.

spread over the five years and the various tasks. Appendix, pages 99 through 113. Nevertheless, it was fully understood that how MARAD would utilize the hours offered, and on which tasks it would direct Veridyne to utilize those hours was in MARAD's complete control, as is the case with all IDIQ contracts. Patterson Supplemental Declaration, ¶¶ 10-12, Supplemental Appendix, pages 3-4. Veridyne's unsolicited proposal, submitted for negotiating purposes, was not accepted "as is" by MAAD. What the three parties, Veridyne, SBA, and MARAD agreed upon, and upon which their minds met, was a supplemental agreement (i.e., Modification 0023), drafted, and with language selected, not by Veridyne, but by MARAD. Appendix pages 151 through 158; Patterson Supplemental Declaration, ¶ 21, Supplemental Appendix, page 6. That document evidences the understanding that Modification 0023 was simply a part of an IDIQ contract, pursuant to which MARAD controlled which parts of the limited "work" it wanted performed and for how many hours. See, e.g. Appendix, page 154.

Burnowski, in his August 10, 2007 Supplemental Declaration, attempts to make the term "Scope of Work" as used in two Veridyne letters attached to his Supplemental Declaration mean the same as "Scope of Work" as used in Modification 0023 executed years before. From the context of those two letters, one dated 18 October 2000 and the other dated 14 May 2001, it is clear that the term as used there refers to the number of service hours MARAD had ordered and Veridyne provided. The authors of those two letters were, of course, not involved in the negotiation and execution of Modification 0023.

Moreover, the two Veridyne letters are clearly in response to MARAD

denying earned award fees to Veridyne because the total award fee set forth in Modification 0023 had been exceeded. See, e.g., Patterson Declaration, ¶¶ 32-33, Appendix, pages 8, 164-65. In his April 25, 2001 letter, (Appendix, pages 178-186) Burnowski (in paragraph one) correctly states, "The total estimated cost plus fees of [Modification 0023] was slightly less than $3 million." He continues: "Within six months of the start of the first option, covered by the extension ('option year 5') your firm had invoiced over $3 million against the contract." (emphasis supplied). Appendix, page 178. Burnowski neglects to inform the reader that MARAD, acting through himself as Contracting Officer, pre-authorized every dollar of services for which Veridyne had invoiced, by way of repeated incremental funding, even after being advised in writing by Veridyne each time the funding limits had been reached. See, Supplemental Declaration of Samuel J. Patterson, ¶¶ 26 and 39-43, Supplemental Appendix, pages 8, 10-12.[9]

It cannot be over-emphasized that this was not only an IDIQ contract, it was an IDIQ contract utilizing task orders that were incrementally funded; MARAD would direct Veridyne as to which tasks it wished performed; Veridyne would price a task and submit the pricing to MARAD. MARAD then had the

[9] There is humor in the tone of Burnowski's 25 April 2001 letter ("Within six months of the start of the first option…your firm had invoiced over $3 million against the contract.") One is reminded of the movie "Casablanca," wherein the Claude Raines character, Inspector Renault, orders Humphrey Bogart's Rick's Café closed for illegal gambling, uttering the famous line that he is "shocked" to learn that there is gambling going on, as he pockets his winnings.

option of authorizing or not authorizing performance of the task by Veridyne. To authorize performance, MARAD had to fund the work, before it could commence. Id. Thus, MARAD remained in complete control of Veridyne's performance, by its decision to fund each task order incrementally. Further, Veridyne was required by the Contract to alert MARAD, in writing, each time it was nearing exhaustion of the incremental funding then in-place; this was dutifully done by Veridyne. Id. MARAD, at that point, had the option to authorize further performance by Veridyne, by way of adding funding, or halting further performance by not providing additional funding. Yet, in each case, MARAD, acting through Burnowski himself, authorized Veridyne to provide additional services.

From the above, and staying with the previous card game analogy, it is obvious that, under this IDIQ contract of which Modification 0023, was a part, MARAD held and dealt the deck.

**C. Settled Case Law precludes Burnowski's asserted Interpretation of the phrase "Scope of Work" as used in the Modification 0023.**

In support of its contention that MARAD was hoodwinked, Defendant suggests that the phase "Scope of Work….remains unchanged," used in Modification 0023, meant that Veridyne was promising to provide the same quantity of services that it had provided during the Contract's initial five years (approximately $20,000,000) for $2,999,999 over the additional five years envisioned by Modification 0023. Stated another way, Defendant is asserting that Veridyne's extension proposal was that it would somehow provide a level of service that entailed 304,740 of its own employees' hours during the first five

years, plus virtually the same level of work by its subcontractor, INS, compressed into 104,880 Veridyne hours[10] during the second five years. The plain meaning of "Scope of Work" as used in Modification 0023 is clear; it refers only to the type of work described in the Contract's Statement of Work. See, Coast Fed Bank, FSB v. U.S., 323 F.3d 1035, 1040-41 (Fed. Cir. 2003).

Even if by alchemy or otherwise one were (using the unreal subjunctive) to find the term " Scope of Work" as used by MARAD in drafting Modification 0023 ambiguous, Modification 0023 would still have to be interpreted in such a way as to give reasonable meaning to all its parts. See, M.A. Mortenson Co. v. U.S., 29 Fed. Cl. 82, 96 (1993), wherein the court stated:

> When interpreting the language of a contract, a court must give reasonable meaning to all parts of the contract and not render portions of the contract meaningless. *Fortec Constructors v. United States*, 760 F.2d 1288, 1292 (Fed. Cir. 1985); *United States v. Johnson Controls, Inc.*, 713 F2d. 1541, 1555 (Fed. Cir. 1983). Otherwise stated, in ascertaining the intentions of the parties, the contract should be constructed in its entirely "so as to harmonize and give meaning to all its provisions." *Thanet Corp. v. United States*, 219 Ct. Cl. 743, 751 – 52, 524 F.2d 547, 551 (1971). [additional citations omitted] The language of a contract, moreover, must be

[10] Both Veridyne's proposal and the final agreement i.e., Modification 0023 reflected the elimination of any services hours to be provided by the subcontractor. Patterson Supplemental Declaration, ¶ 27, Supplemental Appendix, page 8.That elimination is clearly reflected in the "Other Direct Cost (Includes G&A)" figures. For instance the "Other Direct Cost" figure listed for the first year of the Contract is $1,480,322.70. Modification 0023, on the other hand, for the first year of the extension (Option year 5) lists only $80,000. Appendix, page 154. The difference between the two figures takes into account that Modification 0023 did not include any services previously provided by Veridyne's subcontractor, who had been selected by MARAD. See Patterson Supplemental Declaration, ¶¶ 5-8; Supplemental Appendix, pages 2-3. Had MARAD chosen, it could have contracted directly at any time with this subcontractor to supply services (as it did after Veridyne's performance was halted in December of 2004). Rather, MARAD continued to direct work to the subcontractor throughout the course of the Modification 0023 extension.

> given the meaning that would be derived from the contract by" a reasonably intelligent person acquainted with the contemporaneous circumstances." Hol-Gar Mfg. Corp.v. United States, 169 Ct. Cl. 384, 388, 351 F.2d 972, 975 (1965).

Quite obviously, were Defendant's strained and unreasonable interpretation to prevail, it would necessarily read out of Modification 0023 the boldly stated dollar and hour limitations, each of which is underlined in the MARAD drafted modification for emphasis. Thus, common sense and the well-settled law defeats Defendant's contention that Plaintiff was offering to perform $20,000,000 worth of service for $2,999,999.

Again, still delving into the unreal, even if one were to assume that both the Plaintiff's and MARAD's interpretations were reasonable, then Plaintiff would still prevail under the <u>contra</u> <u>proferentem</u> rule. See <u>Strum v. United States</u>, 190 Ct. Cl. 691, 421 F.2d 723 (1970), wherein the court said:

> [Contra proferentem] puts the risk of ambiguity, lack of clarity, and absence of proper warning on the drafting party which could have forestalled the controversy; it pushes the drafters toward improving contractual forms; and it saves contractors from hidden traps not of their own making.

691 Ct. Cl. at 697, 421 F.2d at 727.

In summary, under the undisputed facts, to wit: that the contract was an IDIQ contract with the MARAD in complete control of what services it bought and how much it would spend; that what MARAD ordered was incrementally funded so that Plaintiff could not begin performance even after MARAD issued an order and Plaintiff priced it; that Plaintiff's duty under the contract was to alert MARAD when the incremental funding for each task then in place was being approached

so as to allow MARAD the option of continuing or curtailing performance; that this duty Plaintiff faithfully, in writing, performed; that the contract funding limits were set out in Modification 0023 and underlined by MARAD for emphasis, as were the maximum number of hours which Plaintiff was to provide; that no one from MARAD who was involved in the negotiation or approval of Modification 0023 has suggested that their interpretation of the modification was any different from Plaintiff's, even though such a person (Ms. Rita Jackson) remains available to Defendant as a MARAD employee. Clearly there is no room for fraud under these facts.

Nor is there any room for fraud under the well established canons of contract construction, to wit: the contract document is the primary evidence of the parties agreement and speaks for itself; a contract is to be read as a whole giving reasonable meaning to all parts, so as not to render any part meaningless. For there to be an ambiguity, the differing interpretations must both be reasonable; and where there are two reasonable different interpretations, the non drafting party's interpretation prevails.

Under all of these precepts, too well accepted to require citation, (see Cibinic, Nash, and Nagel, Administration of Government Contracts, 4th ed, at pp 167-175), it is clear that Modification 0023 was intended and executed to offer services to MARAD only to the extent of $2,999,999 and only to the extent of 104,880 hours.

Defendant's contention that Scope of Work meant Plaintiff was offering 304,740 hours of its own services, plus an approximately equal amount of services from INS, rather then 104,880 hours is wholly unreasonable under the

undisputable facts and the law.

Both the Durkin and Burnowski declarations are covered with a shroud of suspicion. Neither individual was involved in the negotiation of Modification 0023, nor in its execution. It was contracting officer Ms. Rita Jackson who negotiated Modification 0023, and Contracting Officer Wayne Cutrell who signed it. Patterson Declaration, ¶¶ 21-23 and Exhibits D, E, F and G thereto; Appendix, pages 5, 89, 92, 93 and 151-152. Only the negotiators and signers of Modification 0023 can testify as to the mutual understanding the parties had as to the services Plaintiff was offering and as to the total value of Modification 0023. Although still fully available to the Defendant as a MARAD employee, Defendant has chosen not to submit a declaration from Ms Jackson. Instead Defendant relies on two non participants to support its Motion for Summary Judgment and Defeat Plaintiff's.

**D. Plaintiff's Motion for Summary Judgment is unaffected by what remains of the Durkin and Burnowski declarations, and should be granted.**

The only suggestion of fraud is contained in inadmissible hearsay, e.g., the alleged MARAD Inspector General's report, the out of court statements of a non party (Genna) and the alleged admission of Plaintiff's President, that the proposal for contract extension was not a "good faith" proposal, Patterson, which Patterson strongly disputes having made.

At first blush, it may appear that the disputed admission by Patterson would at least defeat Plaintiff's motion, but in reality it cannot. For an admission in the nature of a confession to be considered evidence of fraud, there must be evidence, aliunde, of the fraud. Here, absent the hearsay, and other

inadmissible evidence, there is no fraud corpus delecti. Certainly in criminal law one may not be convicted solely on the basis of his own admission; such an admission is deemed insufficient evidence. Smith v. U.S., 348 U.S. 147 (1954); U.S. v. Micieli, 594 F.2d 102 (5th Cir 1979). It would appear that the same reasoning applies in this case, wherein Defendant's Special Plea in the Fraud Counterclaim is premised on the Forfeiture of False Claims Act, 28 U.S.C. § 2514, with its heightened requirement that the fraud be proven by "clear and convincing" evidence. See, Commercial Contractors, Inc. v. United States, 154 F.3d 1357, 1362 (Fed. Cir, 1998); Young-Montenay, Inc. v. United States, 15 F.3d 1040, 1042 (Fed. Cir. 1994).[11]

## III. Conclusion

Plaintiff's Motion to Strike should be granted. Defendant's Motion for Summary Judgment should be denied. Plaintiff's Motion for Summary Judgment should be granted.

Respectfully submitted,

s/ Marc Lamer

**Marc Lamer**
Attorney for Veridyne, Inc.

Date: August 31, 2007

---

[11] In its Amended Answer And Special Plea In Fraud Counterclaim, Defendant specifically grounds in 28 U.S.C. § 2514, the Forfeiture Of False Claims Act. In its Cross Motion For Summary Judgment, Defendant also cites 15 U.S.C. § 637(a)(1)(D). That provision limits non-competitive 8(a) contract actions to $3,000,000. Putting aside the fact that Modification 0023, on its face, is compliant with the statutory provision, Defendant cites no case law holding that where authorized Government contracting officers direct the contractor to do work in excess of the contractually-specified $3,000,000 fund the work and accept the contractor's performance, the original contract action is rendered void ab initio, entitling the Government to a refund of the sums paid to the contractor for the ordered, funded and accepted work.