# In the United States Court of Federal Claims

* * * * * * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| **VERIDYNE CORPORATION,** | * | |
| Plaintiff, | * | |
| v. | * | No. 06-150C |
| **THE UNITED STATES,** | * | (Filed Jan. 24, 2008) |
| Defendant. | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * *

## MEMORANDUM OPINION AND ORDER

This case concerns a 1998 contract modification that extended a 1995 contract for one year and four additional option years, Modification 0023 ("Mod 0023") to Contract No. DTMA91-95-C-00024 ("the Contract") between Veridyne Corporation ("plaintiff") and the Department of Transportation, Maritime Administration ("MARAD"). 1/ Before the court after argument are the parties' cross-motions for summary judgment. Plaintiff's motion, styled as a motion for partial summary judgment, seeks judgment as a matter of law in its favor on Count I of its Amended Complaint in the amount of $2,267,163.96 for services performed and invoiced, but not paid. Count I concerns five invoices submitted to MARAD predating MARAD's suspension of contract performance (Nos. 260-265) and two invoices submitted to MARAD post-suspension (Nos. 266 and 267). Plaintiff also moves to strike portions of two declarations submitted in support of defendant's motion for summary judgment, charging that the objectionable portions of the declarations are either inadmissible hearsay or inadmissible for lack of personal knowledge of the declarant.

---

1/ MARAD awarded the Contract to the Small Business Administration ("SBA") pursuant to the 8(a) program. The 8(a) program directs the SBA to enter into contracts with government agencies for the provision of certain goods or services and to award subcontracts to qualifying economically disadvantaged business concerns that actually will provide the goods or perform the services called for. See 15 U.S.C. § 637(a) (2000). Plaintiff was the 8(a) program participant designated to perform the contract, and, although all relevant dealings were between plaintiff and MARAD, the SBA technically awarded Subcontract No. 0303-95-1-00055 to plaintiff. In the interest of clarity, the Contract is referred to as between plaintiff and MARAD.

Defendant's cross-motion seeks judgment as a matter of law in its favor on all three counts of plaintiff's Amended Complaint. Defendant contends that the extension to the Contract was void *ab initio* due to plaintiff's fraud, thereby rendering the Government not liable for the amounts claimed by plaintiff in Counts I and II. Because Mod 0023 should be declared void *ab initio*, defendant claims entitlement to forfeiture of monies that it paid to plaintiff on invoices for services performed pursuant to work orders issued under Mod 0023. Defendant also seeks judgment as a matter of law in its favor on its counterclaim pursuant to 28 U.S.C. § 2514 (2000), in the amount of $31,134,931.12, representing forfeiture of all monies paid under Mod 0023. Defendant moves for judgment in its favor with regard to Count III of plaintiff's complaint (seeking lost profits due to alleged breach), arguing that, even if Mod 0023 was valid, it did not breach the Contract.

## PROCEDURAL HISTORY

When plaintiff filed its complaint on February 2, 2006, the case was assigned to Judge Lawrence J. Block. Plaintiff amended its complaint on May 16, 2006. Defendant answered and filed its counterclaim under 28 U.S.C. § 2514 on July 31, 2006. It then amended its pleadings by motion granted on November 21, 2006; the amendments were minor, non-substantive changes to its pleading and counterclaim. Plaintiff moved for partial summary judgment on November 13, 2006; defendant cross-moved on March 23, 2007. On May 23, 2007, plaintiff moved to strike portions of two declarations submitted in support of defendant's motion for summary judgment. Following the filing of responsive and reply briefs, the case was transferred to the undersigned pursuant to RCFC 40.1(b) on September 5, 2007.

This court set argument on the cross-motions for summary judgment for September 25, 2007. On September 19, 2007, defendant filed an unopposed motion requesting that the court stay proceedings in the case "to provide the parties with the opportunity to engage in settlement discussions." Def.'s Mot. filed Sept. 19, 2007, at 1. On September 20, 2007, the court stayed proceedings. When the parties filed a Joint Status Report indicating that they were unable to settle their disputes, the court lifted the stay on November 29, 2007, and rescheduled argument for January 8, 2008.

## BACKGROUND

The facts are at a nascent stage of development; those material to the court's findings and legal rulings follow. On March 14, 1995, MARAD awarded the Contract to the SBA, which, in turn, awarded a subcontract on March 27, 1995, to plaintiff under the SBA's 8(a) program, which sets aside government contracts for businesses owned by socially and

economically disadvantaged individuals. The Contract was not subject to competition. The Contract was an indefinite delivery, indefinite quantity ("ID/IQ") cost-plus-award-fee contract that covered services related to MARAD's logistics programs in support of the Ready Reserve Force, which is structured to provide sealift services for the United States Army and United States Marine Corps. Because the Contract was an ID/IQ contract, the amount of services that MARAD would order was not specified. Plaintiff contracted to provide logistic support services in response to work orders issued by MARAD. The Contract included estimated annual costs based on a stated maximum number of labor hours and other direct costs for each performance year. MARAD was obligated to order at least ten percent of each year's listed maximum, and plaintiff was not obligated to provide any more than the maximum number of hours. The Contract period was one base year and up to four option years. Plaintiff performed the Contract from the date of the award, and MARAD exercised each of the four option years.

In late 1997 or early 1998, plaintiff's President, Samuel J. Patterson, approached MARAD officials and inquired as to whether the Contract could be extended for additional performance years, as plaintiff was scheduled to graduate from the 8(a) program in June 1998. Mr. Patterson was advised that plaintiff would no longer be eligible to participate in the 8(a) program. At that time plaintiff's counsel provided MARAD with a legal opinion that the Contract could be extended by adding additional years, even beyond plaintiff's graduation from the 8(a) program, provided that the extension was effected while plaintiff was still in the 8(a) program. MARAD contracting officials then informed plaintiff that an extension of the Contract was possible and would be considered.

On February 19, 1998, MARAD Contracting Officer Rita C. Jackson met with plaintiff, represented by its then-Executive Vice President, Michael C. Genna. In his letter of February 25, 1998, recording plaintiff's understanding of the meeting, Mr. Genna noted that a "question was asked how [plaintiff] would handle pricing and cost proposals for an extension, if so granted." He furnished a "synopsis of salient points in which [plaintiff believes] the government would benefit," including, *inter alia*, that the contract would remain an ID/IQ contract, that "[p]roposed estimates [would not exceed] $3,000,000 in the aggregate," and that "all cert[ifications] and representations would be consistent with the current [contract]." The $3 million value is noteworthy because the 8(a) program requires that contract opportunities be awarded "on the basis of competition" if "(I) there is a reasonable expectation that at least two eligible Program Participants will submit offers and that award can be made at a fair market price, and (II) the anticipated award price of the contract (including options) will exceed . . . $3,000,000 (including options)." 15 U.S.C. § 637(a)(1)(D).

Ms. Jackson responded to plaintiff's letter on March 19, 1998, stating that "[t]he scope of work will remain the same as is established in the current contract. Also, as in the current contract, actual taskings will be assigned using the Work Order and Technical Directive structure." She requested that plaintiff's cost proposal identify "the cost per year for this five year extension." Plaintiff responded with a cost proposal dated March 30, 1998, that did not include a cost-per-year value, but, instead, categorized its submission as follows: "This proposal is based on a representative sample of hours spread across the applicable labor categories." Pl.'s Br. filed Nov. 13, 2006, App. at 93. Plaintiff's cost proposal for the extension was "priced as a Cost Plus Award Fee, IDIQ contract" and recited that "[a]ll contract terms and conditions are the same, and the original scope and technical content remain intact." Id. at 96. The cost proposal outlined the hourly labor rates for each type of worker and included a "Certificate of Current Cost or Pricing Data" certifying that the cost or pricing data, as defined by the Federal Acquisition Regulation, were accurate, complete, and current as of the date of submission. Id. at 114. 2/ The discussions between plaintiff and MARAD culminated in the execution of Mod 0023 by MARAD and plaintiff on May 18, 1998, and by the SBA on May 20, 1998.

Mod 0023 described itself as a modification issued to provide five additional one-year option periods to the Contract. When Mod 0023 was executed, one option period remained in the original Contract. Additional option years provided for in Mod 0023 would be numbered Option Year Five through Option Year Nine; each option period would be exercised at the sole discretion of MARAD. Mod 0023 provided for estimated costs and award fee pools in the amount of $2,999,948.00. On March 25, 1999, MARAD issued

---

2/ "Cost or pricing data" are currently defined in 48 C.F.R. ("FAR") § 2.101 (2007), as:

> [A]ll facts that, as of the date of price agreement or, if applicable, an earlier date agreed upon between the parties that is as close as practicable to the date of agreement on price, prudent buyers and sellers would reasonably expect to affect price negotiations significantly. . . . Cost or pricing data are factual, not judgmental; and are verifiable. While they do not indicate the accuracy of the prospective contractor's judgment about estimated future costs or projections, they do include the data forming the basis for that judgment. Cost or pricing data are more than historical accounting data; they are all the facts that can be reasonably expected to contribute to the soundness of estimates of future costs and to the validity of determinations of costs already incurred.

FAR 2.101.

unilateral Modification 0026 to the Contract, exercising the fourth option year under the original Contract. On March 22, 2000, MARAD issued unilateral modification 0032 to the Contract, exercising the first option year under Mod 0023, *i.e.*, Option Year Five. As recited in this modification, no funds were obligated thereby; as funding would be obligated in the individual work orders issued under the Contract and pursuant to Mod 0023.

On April 12, 2000, MARAD issued the first task orders under Mod 0023 – Task Orders 412 through 419. Including subsequent modifications, the total value of these Task Orders was $7,225,141.30. By September 30, 2000, six months into Option Year Five, plaintiff had invoiced approximately $3,168,088.00 in costs, all incurred in response to work orders issued by MARAD. Based on these orders, MARAD contracting personnel were aware that they had issued work orders sufficient to expend the entire estimated dollar value of Mod 0023, and plaintiff had billed the entire award fee established in Mod 0023. Following a series of communications between plaintiff and MARAD contracting personnel, plaintiff proposed a series of adjustments to the contract award fees. Notwithstanding that the full estimated dollar value of work under Mod 0023 had been ordered, MARAD exercised the second option under Mod 0023, *i.e.*, Option Year Six, thereby extending the contract period through March 26, 2002 by unilateral Modification 0033 on March 23, 2001. Shortly thereafter, MARAD issued Task Orders 512 through 515 and 517 through 519. Including subsequent modifications, the total value of these Task Orders was $4,466,612.00. Plaintiff provided MARAD with all the services ordered under the Task Orders, submitted invoices for those services, and received full payment from MARAD.

Following further discussions between MARAD and plaintiff, MARAD's Contracting Officer, Broderick J. Burnowski, on June 25, 2001, sent plaintiff draft bilateral Modification 0035 ("Mod 0035"). Mod 0035 provided, in part, that MARAD had exceeded the maximum order limitations for Option Years Five through Nine; that plaintiff would honor any and all orders, including those that exceed the maximum order limitation; and that the work necessary to accomplish the requirements of the contract would require an increase in the total estimated cost by $29,614,729.00 – from $2,794,698.39 to $32,409,427.39. Mr. Burnowski's letter stipulated that execution of Mod 0035 by MARAD was conditioned on review and approval by MARAD's Contract Review Team. Pl.'s Br. filed Nov. 13, 2006, App. at 187. Plaintiff executed Mod 0035 and returned it to MARAD. While plaintiff and defendant both agree that MARAD never formally executed Mod 0035, according to MARAD Contracting Officer Erica L. Williams, Mod 0035 was the version of the contract the parties were "working against." Def.'s Resp. to Pl.'s Proposed Findings of Fact ¶ 44, filed Mar. 26, 2007.

Over the next three years, MARAD executed a series of unilateral modifications that exercised additional option years up to and including the last option year under Mod 0023;

issued additional work orders in amounts exceeding $17,119,481.00; authorized plaintiff to invoice for award fees; and incrementally added funding for work orders that MARAD had issued. Plaintiff provided MARAD with all the services ordered under the these work orders, submitted invoices for those services, and received full payment from MARAD. From September 28, 2004, to November 24, 2004, plaintiff submitted to MARAD Invoice Nos. 260 through 264, in the total amount of $1,263,996.80.

Defendant contends that, at the time plaintiff and MARAD were negotiating proposed Mod 0035, concerns arose within MARAD that the estimates provided by plaintiff "may have been fraudulent." Def.'s Br. filed Mar. 26, 2007, at 5. MARAD referred these concerns to the Department of Transportation's Inspector General ("DOT IG") on July 20, 2001. According to defendant, the DOT IG initiated its investigation on July 11, 2003. DOT IG agents interviewed Mr. Patterson on December 15, 2003, and on April 23, 2004. DOT IG agents interviewed Mr. Genna on February 23, 2004. The DOT IG issued its report in September 2004.

On or about December 7, 2004, MARAD informed plaintiff that MARAD considered Mod 0023 to have been void *ab initio*. MARAD suspended plaintiff's contract performance and advised that Invoice Nos. 260 through 264 would not be paid. Subsequently plaintiff submitted three additional invoices, Nos. 265 through 267, totaling $1,003,167.16. MARAD also refused to pay these invoices.

**DISCUSSION**

1. Summary judgment standards

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." RCFC 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The legal issues before the court may be resolved on summary judgment. Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1243-44 (Fed. Cir. 2007). The fact that both parties have moved for summary judgment does not change this standard; a court need not grant summary judgment to one party simply because it has denied summary judgment to its opponent. The "court must evaluate each motion on its own merits, resolving reasonable inferences against the party whose motion is under consideration." First Commerce Corp. v. United States, 335 F.3d 1373, 1379 (Fed. Cir. 2003). On cross-motions for summary judgment, the duty of the court is to "grant judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." Lima Surgical Assocs. v. United States, 944 F.2d 885, 888 (Fed. Cir. 1991) (internal quotations omitted).

If the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, a motion for summary judgment should be denied. "The moving party in a summary judgment motion has the burden to show 'that there is an absence of evidence to support the non-moving party's case.'" Crown Operations Int'l v. Solutia Inc., 289 F.3d 1367, 1377 (Fed. Cir. 2002) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). The benefit of all reasonable presumptions and inferences runs to the party opposing summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1257 (Fed. Cir. 2001); H.F. Allen Orchards v. United States, 749 F.2d 1571, 1574 (Fed. Cir. 1984) (noting that non-moving party shall "receive the benefit of all applicable presumptions, inferences, and intendments"). In its analysis the court may neither make credibility determinations nor weigh evidence and seek to determine the truth of the matter. See Anderson, 477 U.S. at 255.

2. Fraud and forfeiture

Defendant pleads fraud as both an affirmative defense against plaintiff's claims and as a counterclaim, seeking forfeiture of plaintiff's "claims against [defendant] arising from Modification 23." Am. Ans. and Countercl. filed Nov. 21, 2006, ¶ 82. Defendant's position is that Mod 0023 "was void *ab initio* as a result of [plaintiff's] fraudulent estimate of labor and costs to be incurred pursuant to the contract extension." Def.'s Br. filed Mar. 26, 2007, at 7. Because the contract is void *ab initio*, "the United States, therefore, is not liable for the amounts claimed by Veridyne and is entitled to recover from Veridyne the $31,134,931.12 it paid pursuant to the void contract." Id.

Defendant's counterclaim is asserted, according to both its own language and the briefs accompanying defendant's motion for summary judgment, pursuant to 28 U.S.C. § 2514. Section 2514 is titled "Forfeiture of Fraudulent Claims" and often is referred to as "a" or "the" "forfeiture statute." It provides, in full:

> A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.
>
> In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

28 U.S.C. § 2514.

Analysis of the affirmative defense and counterclaim, however, is complicated by defendant's conflation of contracts that are void *ab initio* with the forfeiture statute. The law on contracts void *ab initio* implicates the doctrine of federal common law fraud. Addressing a similarly structured argument (although involving a different factual context) in Long Island Savings Bank, FSB v. United States, 503 F.3d 1234 (Fed. Cir. 2007), the United States Court of Appeals for the Federal Circuit commented that "[p]rocedurally, while the parties' briefs to this court could appear to focus on the government's special plea in fraud under 28 U.S.C. § 2514, the issue of federal common law fraud is properly before this court." Id. at 1244. 3/ Because the parties' briefs in Long Island "meshed fraud under 28 U.S.C. § 2514 together with fraud under the common law," a consideration of common law fraud was "'inextricably linked to, and [was] thus fairly included within, the questions presented.'" Id. (quoting City of Sherrill v. Oneida Indian Nation, 544 U.S. 197, 214 n.8 (2005)). For this reason, it is helpful to analyze each separately.

3. Appropriate remedy for contracts that are void *ab initio*

The thrust of defendant's argument is that, but for plaintiff's alleged fraud in its estimate of performance costs for anticipated work as presented in its proposal, Mod 0023 either would have been subject to competitive bidding or never executed at all. See Am. Answer and Countercl., ¶ 76. Because the contract was tainted by fraud at its inception, defendant argues that the contract was rendered void *ab initio*. Defendant marshals case law that, it argues, holds that the appropriate relief for any contract that is void *ab initio* is (1) cancellation of the contract; and (2) forfeiture of any monies paid under that contract. Defendant relies primarily on four cases to support its arguments: United States v. Mississippi Valley Generating Co., 364 U.S. 520 (1961); K&R Engineering Co. v. United States, 616 F.2d 469 (Ct. Cl. 1980); J.E.T.S., Inc. v. United States, 838 F.2d 1196 (Fed. Cir. 1988); and Godley v. United States, 5 F.3d 1473 (Fed. Cir. 1993). See Def.'s Br. filed Mar. 26, 2007, at 14-17; Def.'s Br. filed Aug. 10, 2007, at 13-16. Evaluating the validity of this argument and its applicability to the case at bar requires a review of the cases on which the Federal Circuit relied in Long Island and that defendant cites.

---

3/ It should be noted that Long Island involved a second panel opinion issued after the first panel opinion was vacated by an en banc decision of the Federal Circuit. See Long Island, 503 F.3d at 1237. This second panel opinion issued after briefing was completed in the instant case and before reassignment to the undersigned. Defendant's briefs cite to the earlier vacated panel opinion, Long Island Sav. Bank, FSB v. United States, 476 F.3d 917 (Fed. Cir. 2007).

In Long Island the Federal Circuit held that federal common law concerning fraud "may prevent the formation of a contract or may make a contract voidable. The difference between the former and the latter is sometimes referred to as the difference between misrepresentations that make a contract 'void' versus 'voidable.'" Long Island, 503 F.3d at 1245 (citations omitted). The court characterized contracts "tainted from [their] inception" as "void *ab initio*." Id. To show that a contract is void *ab initio*, "the government must prove that the contractor (a) obtained the contract by (b) knowingly (c) making a false statement." Id. Although the court held that the contract in question in Long Island was "tainted at its inception by fraud and void *ab initio*," id. at 1251, it did not rule on forfeiture of claims or the forfeiture of any monies already paid to or benefit conferred upon plaintiff. See id. at 1254 ("[W]e do not reach . . . the issues of damages.").

The fraud in Long Island was premised on a conflict of interest; plaintiff's Chairman of the Board and Chief Executive Officer also received compensation from his law firm, the same law firm that was plaintiff's "primary outside counsel." Id. at 1239. Indeed, violation of a federal conflict-of-interest statute has been the sole basis upon which the courts have upheld forfeiture of all monies paid under a contract without ordering that the contractor retain or recover by way of payment for services rendered or goods delivered. See K&R Eng'g, 616 F.2d at 475.

In Mississippi Valley the Supreme Court ruled that a violation of the federal criminal conflict-of-interest statute in the course of contract formation rendered the contract unenforceable against the Government. That statute was codified as 18 U.S.C. § 434. The current statute, now codified as 18 U.S.C. § 208 (2000), is its successor. 4/ The contract in Mississippi Valley called for the construction and operation of a $100-million steam power plant. Before construction on the plant began, but after the Mississippi Valley Generating Company had taken steps towards performing the contract, the agency cancelled it. The Government defended its cancellation primarily on the ground that the contract was unenforceable due to an illegal conflict of interest on the part of one Adolphe H. Wenzell, who "advise[d] the Government and act[ed] on its behalf in negotiations which culminated in" the contract. Miss. Valley, 364 U.S. at 524. Mr. Wenzell also served as "vice President and Director of First Boston Corporation." Id. Even though Mr. Wenzell's actions did not "adversely affect[] the Government in any way," the Court held that Mr. Wenzell's employment with a leading candidate to act as investment bank for the transaction constituted

---

4/ The current statute is at least as broad as its predecessor. See K&R Eng'g, 616 F.2d at 473 & n.6 (Ct. Cl. 1980) ("[T]he predecessor conflict-of-interest statute . . . differed in substance from the present statute only in that its scope was narrower."). For the purposes of this discussion, no substantial difference exists between the statutes.

a violation of 18 U.S.C. § 434, the conflict-of-interest statute, because Mr. Wenzell "entered into a relationship which made it difficult for him to represent the Government with the singleness of purpose required by the statute." Id. at 559. 5/ Having determined that Mr. Wenzell's actions violated the criminal conflict-of-interest statute, the Court explored the purpose of the statute and underlying public policy concerns in deciding whether this violation should render the contract unenforceable against the Government.

The Supreme Court recognized that the "primary purpose" of the statute "is to guarantee the integrity of the federal contracting process and to protect the public from the corruption which might lie undetectable beneath the surface of a contract conceived in a tainted transaction" involving conflicts of interest. Id. at 564. Because of the "inherent difficulty in detecting" this kind of "corruption," the Court held that the principles underlying the conflict-of-interest statute required "that contracts made in violation of [the statute] be held unenforceable, even though the party seeking enforcement ostensibly appears entirely innocent." Id. at 565. The Court recognized that "nonenforcement may seem harsh," yet required it "in order to extend to the public the full protection which Congress decreed by enacting [the statute]." Id. at 566. The contractor had contended that, even if the Court would not enforce the contract, it was entitled to a recovery in *quantum valebat*. 6/ See id. at 566 n.22. The Court acknowledged the possibility that a contractor could recover for completed performance under a contract void *ab initio* due to fraud: "[S]uch a remedy is appropriate only where one party to a transaction has received and retained tangible benefits from the other party. Since the Government has received nothing from the respondent, no recovery [*quantum valebat*] is in order." Id. (citation omitted). The Court thus held expressly that a conflict of interest at the formation of a contract operated like a fraud on the Government and warranted cancellation or nonenforcement of the contract. Because of the factual circumstances, however, the decision is not law on whether a party forfeits monies

---

5/ The statute, then codified as 18 U.S.C. § 434, provided:

> Whoever, being an officer, agent, or member of, or directly or indirectly interested in the pecuniary profits or contracts of any corporation, joint-stock company, or association, or of any firm or partnership, or other business entity, is employed or acts as an officer or agent of the United States for the transaction of business with such business entity, shall be fined not more than $2,000 or imprisoned not more than two years, or both.

See Miss. Valley, 364 U.S. at 524 n.2; 18 U.S.C. § 434 (2000) (repealed since Jan. 21, 1963).

6/ The Latin *valebat* is singular; *valebant* is plural.

paid for work already performed under the contract, even if the contract is void *ab initio*. See id.

In K&R Engineering v. United States, 616 F.2d 469 (Ct. Cl. 1980), the United States Court of Claims confronted a more obvious conflict of interest that it characterized as "a sordid tale." Id. at 470. The case involved contracts let by the United States Army Corps of Engineers (the "Corps") for the rehabilitation of bulkheads at dams on the Mississippi River. The contractor sued to recover damages for breach of a contract terminated by the Government "for its convenience." Id. The Government moved for summary judgment on the affirmative defense that the contract was unenforceable due to violations of the conflict-of-interest statute. The conflict of interest in question was brazen: Allen I. Swenson, an official with the St. Louis District of the Corps, entered into an agreement with the contractor to ensure that it would obtain and perform three rehabilitation contracts. In exchange, Mr. Swenson would receive a portion of the profits that the contractor would realize. Id. at 470-71. After contract award Mr. Swenson continued his relationship with the contractor, instructing on ways to obtain additional money from the Corps, recommending that the Corps pay those additional funds, giving the work only perfunctory inspections, instructing the contractor how to reduce costs by cutting corners, and allowing the contractor to use government employees and machinery without requiring an appropriate reduction of the contract price. Id. at 471.

The Court of Claims held that "the undisputed facts show that Swenson's activities violated" the criminal conflict-of-interest statute, 18 U.S.C. § 208. Id. at 472. The court cited Mississippi Valley for the proposition that Mr. Swenson's violations "preclude[d] the [contractor] from recovering damages for termination." Id. The court observed that the "case is an even stronger one than Mississippi Valley for denying enforcement of the contract" because "there was actual corruption of both the [contractor] and Swenson." Id. at 474. In K&R Engineering and unlike in Mississippi Valley, the contractor performed valuable work for and received partial payments from the Government. The contractor contended that it was entitled to recover under a theory of *quantum meruit* or *quantum valebat* for "work it did under" the contract that "benefitted the government." Id. at 475. The Court of Claims rejected the contractor's claims for recovery, even though the Government received benefits under the contract, restating the Supreme Court's policy analysis in Mississippi Valley:

> [R]ecovery is not permissible where, as here, the firm seeking recovery itself was involved in the corruption of the government official. To the contrary, the same reasoning that led the Court in Mississippi Valley to invalidate the contract because of a conflict of interest [and] that to permit recovery under such a contract would be "affirmatively sanctioning the type of infected

> bargain which the statute outlaws and . . . depriving the public of the protection which Congress has conferred" also requires rejection of the plaintiff's claims for money under *quantum meruit* or *quantum valebat*.

Id. (citations omitted) (quoting Miss. Valley, 364 U.S. at 563). The Court of Claims chose not to apply the discussion of possible recovery in *quantum meruit* or *quantum valebat* contemplated by the Supreme Court in Mississippi Valley, 364 U.S. at 566 n.22.

The Court of Claims addressed the Government's counterclaims to rule on "whether those violations" of the conflict-of-interest statute "also permit the government to recover from the plaintiff the amounts it already has paid the plaintiff under all three contracts." K&R Eng'g, 616 F.2d at 473. The court resolved this issue in the affirmative, holding that the "government is entitled to recover on its counterclaims" and that such a conflict of interest "requires a refund to the government of sums already paid the plaintiff no less than it requires nonenforcement of the contract not yet completed." Id. at 476. The court justified forfeiture by citing the "policy underlying the conflict-of-interest statute" and "[e]ffective implementation of the conflict-of-interest law." Id. Because the "entire contracting process" was "fraught with fraud and corruption, and each was void *ab initio*," the court enforced forfeiture on the ground that "'[t]here should, logically, be no difference in ultimate consequence between the case where a [contractor] has been paid under an illegal contract and one in which payment has not yet been made.'" Id. at 477 (alteration in original) (quoting Getzof v. Sweeney, 22 N.Y.2d. 297, 305 (N.Y. 1968)). Although the Court of Claims noted that "[a]pparently there are no federal decisions dealing with the right of the United States to recover money paid under a contract that subsequently is determined to have been illegal[,] [s]everal state courts, however, have permitted state and local governments to recover." Id. The court held that "the same salutory principles" should apply where a contractor "has participated in an illegal conflict-of-interest situation." Id.

In J.E.T.S., Inc. v. United States, 838 F.2d 1196 (Fed. Cir. 1988), to which defendant inexplicably attaches great weight, the Federal Circuit confronted a contractor's false certification that it was an SBA small business, thereby rendering the contract void *ab initio*. Id. at 1200. This involved an appeal by the contractor from a decision of the Armed Services Board of Contract Appeals that denied the contractor's claim for an equitable adjustment in the contract price. Citing Mississippi Valley and K&R Engineering, the Federal Circuit held that the contractor was not entitled to an equitable adjustment due to its fraud. Id. The court did note, however, that before the false certification, the contractor performed the contract and the Government had paid the contract price for a period of at least three years. Id. at 1198. The court did not suggest that the false certification that rendered the contract void *ab initio* required a forfeiture of monies already paid to the contractor.

Although Godley v. United States, 5 F.3d 1473 (Fed. Cir. 1993), another conflict-of-interest scenario, the decision did not address forfeiture. The contract in Godley concerned a lease of a building to the United States Postal Service (the "USPS"). The USPS contracting officer was indicted for conspiracy and bribery stemming from his involvement with USPS projects. The charges implicated a subcontractor; the plaintiff contractor allegedly lacked any knowledge of the illegal activities. Five months after taking possession of the building and three months after entering a final lease agreement, the USPS informed the contractor that the contract "was not valid because it was tainted" by the contracting officer's illegal conduct. Id. at 1474. The USPS ceased paying the lease amount in the contract and offered, instead, to renegotiate. Id. The trial court granted summary judgment for the contractor, holding that the Government had failed "'to avoid the contract'" in a timely fashion. Id. (quoting Godley v. United States, 26 Cl. Ct. 1075 (1992)) The Federal Circuit, however, deemed significant the distinction that the contractor was not involved in the prohibited conflict of interest with the contracting officer and remanded for a determination of whether the facts rendered the underlying contract void *ab initio* or merely voidable. Id. at 1475-76. The appeals court held that, if the contract was voidable, the trial court could consider to what extent the Government's delay in cancelling the contract "within a reasonable time after discovery of the illegality" precluded such a cancellation, but that delay was irrelevant where a contract was void *ab initio*. Id. at 1476.

Defendant's citation to Godley seizes upon some of its strong language, particularly this infelicitous quotation: "In general, a Government contract tainted by fraud or wrong-doing is void *ab initio*." Id. at 1475. Although Godley cited J.E.T.S. for this assertion, the cited portion of J.E.T.S. only stands for the proposition that "[a] government contract *thus tainted from its inception by fraud* is void *ab initio*." J.E.T.S., 838 F.2d at 1200 (emphasis added). Godley is not authority, in any event, that a contract held void *ab initio*, without more, is the predicate for a forfeiture of monies paid – in other words, it does not speak to whether recovery is available under *quantum meruit* or *quantum valebat* for a contract void *ab initio* for fraud.

The Federal Circuit's comprehensive statement of the law concerning contracts that are either void *ab initio* or voidable and the possibility of relief under *quantum meruit* or *quantum valebat* appears in United States v. Amdahl Corp., 786 F.2d 387 (Fed. Cir. 1986).7/ Amdahl involved the purchase by the Department of Treasury of a used mainframe computer and related equipment from the Federal Home Loan Mortgage Corporation ("Freddie Mac") on a sole-source basis. See id. at 389. The award was held contrary to statute and regulation

---

7/ Neither plaintiff nor defendant cited to Amdahl; it was cited accurately by the court in Godley. See Godley, 5 F.3d at 1475 n.1.

prohibiting certain advance payments. The Federal Circuit agreed that the "payment provisions of this agreement so clearly and substantially violate[d] the statutory prohibition against advance payments," such that "the agreement is plainly illegal and void *ab initio*." Id. at 391. Acknowledging that recission of the contract "might be inequitable," the court pointed out that "Freddie Mac assumed the risk that the [government agency] had actual authority to enter into the bargain to which the parties had agreed." Id. at 392. The court caveated "that Freddie Mac is not entirely without remedy. It is entitled to recover on a *quantum valebant* basis for the reasonable value in the market place of the use that [the government agency] has so far made of the equipment." Id. More generally, the Federal Circuit held:

> Where a benefit has been conferred by the contractor on the government in the form of goods or services, which it accepted, a contractor may recover at least on a *quantum valebant* or *quantum meruit* basis for the value of conforming goods or services received by the government prior to the recision of the contract for invalidity.

Id. at 393 (footnote omitted).

The court in Amdahl recited the well-established proposition that, "though a contract be unenforceable against the Government, because not properly advertised, not authorized, or for some other reason, it is only fair and just that the Government pay for goods delivered or services rendered and accepted under it." Id. This is so even where "an award is plainly or palpably illegal" and "made contrary to statutory or regulatory requirements because of some action or statement by the contractor." Id. at 395. Such a contractor is still "entitled to payment, either on a *quantum valebant* or *quantum meruit* basis." Id. The Federal Circuit did recognize the rule that fraud in procurement could obviate recovery: "[T]he remedy may be different in a case involving fraud or the like," citing to K&R Engineering and referring to situations involving conflicts of interest. Id. at 395 n.8.

Defendant has not alleged a conflict of interest in the case at bar. Forfeiture is an inappropriate remedy for common-law fraud except when a conflict of interest is perpetuated by a contractor involved in facilitating and maintaining a Government agent's conflict of interest or where an agent of the contractor obtains a contract through a conflict of interest. The case law, properly read, does not support defendant's argument that the appropriate remedy for any contract that is void *ab initio* is forfeiture of monies already paid or the denial of recovery in *quantum meruit* or *quantum valebat*. Tellingly, defendant did not cite to Amdahl, even though it is the only case discussing the remedy for contracts that are void *ab initio*, and it involved a similar factual situation where a contract was awarded contrary to a statutory restriction on contract award.

At this juncture genuine issues of material fact are present concerning the gestation of Mod 0023, not the least of which is whether plaintiff's proposal represents that the cost of the hours required to perform the scope of work would not exceed $3 million, or whether plaintiff submitted representative hours for tasks at the rates plaintiff certified in its proposal. Because defendant has not proved the former to date, defendant's motion for summary judgment arguing that Mod 0023 was void *ab initio* due to plaintiff's fraud is denied. Defendant's justification for seeking forfeiture of all monies paid under the post-1998 modifications is yet to be supported by binding case law.

4. Forfeiture of claims under 28 U.S.C. § 2514

The statutory forfeiture contemplated by 28 U.S.C. § 2514 is broad. The Court of Claims has held that, upon a finding that claims are based on "a contract under which [a contractor] practiced fraud against the Government," as defined by this statute, "all of his claims under that contract will be forfeited pursuant to 28 U.S.C. § 2514." Little v. United States, 152 F. Supp. 84, 88 (Ct. Cl. 1957). The statutory language has been construed as proscribing fraud in the prosecution of claims against the United States, not fraud in the performance of the contract. See Baird v. United States, 76 Ct. Cl. 599, 610-13 (1933) (predecessor statute to 28 U.S.C. § 2514 with same operative language does not apply to fraud of subcontractor in performance of contract). In order to prevail on its counterclaim asserting forfeiture pursuant to 28 U.S.C. § 2514, defendant "'is required to establish by clear and convincing evidence that the contractor knew that its submitted claims were false, and that it intended to defraud the government by submitting those claims.'" Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1379 (Fed. Cir. 2001) (quoting Commercial Contractors v. United States, 154 F.3d 1357, 1362 (Fed. Cir. 1998)).

The case at bar does not present the typical case of a contractor presenting to the Government a fraudulent claim by which, as an example, the contractor invoices for work never completed or fraudulently has inflated the dollar or hour amount of a given claim. Defendant does not contend that plaintiff did not provide the services for which it invoiced MARAD. Instead, the defense and counterclaim are premised on the allegation that plaintiff knowingly misrepresented the "true cost of Modification 23" and that this "tainted the contract with fraud." Am. Answer and Countercl., ¶ 80. Indeed, defendant's counterclaim reads less like the claim contemplated by 28 U.S.C. § 2514 and more like a claim that plaintiff committed fraud in the inducement of Mod 0023. This distinction is evident in the phrasing of defendant's assertion of fraud as an affirmative defense to plaintiff's claims. See Am. Answer and Countercl. ¶ 76 ("But for [plaintiff's] knowingly false estimate of performance costs, Modification 23 would not have been executed at that time and would either have been subject to competitive bidding or never executed at all.").

Defendant did not allege that any of plaintiff's invoices constitute claims for work not actually performed or that any invoice reflects other than an accurate number of hours. Defendant has cited to cases holding that violations of 28 U.S.C. § 2514 result in forfeiture of claims, but no cases applying 28 U.S.C. § 2514 in factual circumstances like those presented. Moreover, defendant has not cited to any Federal Circuit opinions interpreting the applicability of 28 U.S.C. § 2514. Defendant also has not proved a fraudulent claim by clear and convincing evidence. See Glendale Fed. Bank, 239 F.3d at 1378 (Government required to establish by clear and convincing evidence elements of forfeiture statute). Although the forfeiture contemplated by 28 U.S.C. § 2514 is broad, defendant has not established as a matter of fact or law that it is entitled to summary judgment in its favor on its amended counterclaim.

5. Plaintiff and defendant's cross-motions for summary judgment

Defendant does not dispute that plaintiff has rendered the services for which it invoiced. See Def.'s Resp. to Pl.'s Proposed Findings of Fact ¶¶ 73-79, filed Mar. 26, 2007. Defendant has not raised any objection to the number of hours or dollar amounts claimed in the invoices. See id. ¶¶ 73-79, 81-83. Nonetheless, defendant has raised genuine issues of material fact concerning how plaintiff obtained Mod 0023 and subsequent modifications to the Contract, so plaintiff's partial motion for summary judgment on Count I of its Amended Complaint must be denied. Defendant understands that, although plaintiff's actions will not be vitiated by the active, knowing participation of MARAD contracting personnel, trial will develop their roles in the procurement and continued performance of the contract — whether their actions constitute incompetence, or misfeasance, or even conflict of interest.

Pursuant to RCFC 56(d), no substantial controversy exists with respect to the amounts claimed by plaintiff in Count I of the Amended Complaint for services performed before MARAD terminated performance.

6. Count III of plaintiff's Amended Complaint

In Count III of its Amended Complaint, plaintiff alleges that the "actions of MARAD's counsel in stopping Veridyne's performance put MARAD in breach of the Contract; as such, Veridyne is entitled to the lost profit it would have realized had the Contract not been breached." Am. Compl. filed May 16, 2006, ¶ 65. Plaintiff asks for $246,394.13 in lost profits. Id. ¶¶ 64-68. The Contract was an ID/IQ contract, and the terms of Mod 0023 obligated MARAD only to order, at a minimum, 10% of the estimated amount for a given option year in the course of exercising that option. By the terms of Mod 0023, the estimated costs for Option Years Five through Eight, inclusive, totaled $2,621,929.00. MARAD's minimum order was $262,192.90. Defendant has shown that it has ordered (and

paid for) work valued at least this amount, and plaintiff does not dispute this showing. See Pl.'s Resp. to Def.'s Proposed Findings of Fact, ¶ 20 (over five-year period MARAD authorized payments to plaintiff in the amount of $31,134,931.12; in Option Year Nine MARAD actually paid plaintiff at least $1,256,554.12). In fact, plaintiff's Amended Complaint acknowledges that plaintiff invoiced over $3 million within the first six months of Option Year Five, the first option year of Mod 0023. See Am. Compl. ¶ 22.

Pursuant to RCFC 56(d), no substantial controversy exists that MARAD ordered and paid for more than 10% of the estimated cost of each of the option years that it exercised. Therefore, defendant's decision to suspend plaintiff's performance of the Contract on December 7, 2004, did not itself constitute a breach of the Contract.

7. Plaintiff's motion to strike

Plaintiff would strike several paragraphs of two declarations filed by defendant: (1) ¶¶ 5 and 7 of the Declaration of Kevin T. Durkin, appended to Def.'s Br. filed Mar. 3, 2007, at 86-87, as inadmissible hearsay; and (2) ¶¶ 3-13 and 20 of the Declaration of Broderick J. Burnowski, id. ¶¶ 1-4, as inadmissible for lack of personal knowledge and as inadmissible hearsay, respectively.

Paragraph 5 of Mr. Durkin's declaration recounts a conversation between Mr. Durkin and Mr. Genna, plaintiff's former Executive Vice President. Mr. Durkin declares that Mr. Genna stated that he was aware that the estimate of hours used in preparing plaintiff's cost proposal for Mod 0023 was not a good-faith estimate. Plaintiff argues that these statements do not qualify as a party admission exception to hearsay because they were not made while Mr. Genna was employed by plaintiff. See Fed. R. Evid. 801(d)(2)(D). Defendant rejoins that the statements are not hearsay because they are not offered to prove the truth of the matter asserted, *i.e.*, the statements are not offered to prove that the estimate was not a good-faith estimate, but to prove that plaintiff had knowledge of the falsity of its proposal. See Fed. R. Evid. 801(c). Defendant is correct. Mr. Genna's statements are not evidence that the estimate was not a good-faith estimate (defendant argues that it can prove this through other admissible evidence); they are offered to prove plaintiff's knowledge.

Paragraph 7 of Mr. Durkin's declaration asserts that the DOT IG issued a report on September 27, 2004, that concluded that the cost estimate plaintiff submitted to MARAD was fraudulent. Mr. Durkin's declaration attests to the contents of a report that is not attached to the declaration or otherwise entered in to evidence and is inadmissible hearsay. For this reason the court strikes ¶ 7 of Mr. Durkin's declaration.

Plaintiff argues that the offensive portions of Mr. Burnowski's declaration must be stricken because they concern events that occurred between March 1995 and May 1998, during which period Mr. Burnowski was not the Contracting Officer. Mr. Burnowski became Ms. Williams's supervisor in January of 2000. Defendant is correct that "'[p]ersonal knowledge, however, is not strictly limited to activities in which the declarant has personally participated.'" Def.'s Br. filed Aug. 10, 2007, at 16 (citing Washington Cent. R. Co. v. Nat'l Mediation Bd., 830 F. Supp. 1343, 1353 (E.D. Wash. 1993)). When Mr. Burnowski assumed his position in January 2000, he acquired sufficient personal knowledge in his capacity as team leader with oversight responsibility for the Contract and as a contracting officer. See Burnowski Decl. ¶ 2. Other paragraphs of Mr. Burnowski's declaration recount the content of documents already in evidence, and those documents speak for themselves. Therefore, the court does not consider ¶¶ 4, 6, 9, and 10 of his declaration.

## CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED**, as follows:

1. Defendant's cross-motion for summary judgment is granted with respect to Count III of plaintiff's Amended Complaint and otherwise is denied. Plaintiff's partial motion for summary judgment is denied.

2. Plaintiff's motion to strike Mr. Durkin's declaration is granted in part, insofar as the court strikes ¶ 7 of Mr. Durkin's declaration; and plaintiff's motion otherwise is denied. Plaintiff's motion to strike paragraphs of Mr. Burnowski's declaration is denied.

3. Pursuant to RCFC 56(d), the following facts are without substantial controversy, and no further proofs shall be required at trial:

> 1) On September 28, 2004, plaintiff submitted Invoice No. 260, in the amount of $246,116.05, for services rendered to MARAD during the period September 1 through September 15, 2004, in connection with Work Orders 812 - 815, 817, 819, and 822;
>
> 2) On October 15, 2004, plaintiff submitted Invoice No. 261, in the amount of $345,740.95, for services rendered to MARAD during the period September 16 through September 30, 2004, in connection with Work Orders 812 - 815, 817, 819, and 822;

3) On November 1, 2004, plaintiff submitted Invoice No. 262, in the amount of $224,416.16, for services rendered to MARAD during the period October 1 through October 15, 2004, in connection with Work Orders 812 - 815, 817, 819, and 822;

4) On November 15, 2004, plaintiff submitted Invoice No. 263, in the amount of $244,905.45, for services rendered to MARAD during the period October 16 through October 31, 2004, in connection with Work Orders 812 - 815, 817, 819, and 822;

5) On November 15, 2004, plaintiff submitted Invoice No. 264, in the amount of $202,818.19, for services rendered to MARAD during the period November 1 through November 15, 2004, in connection with Work Orders 812 - 815, 817, 819, and 822;

6) On December 15, 2004, plaintiff submitted Invoice No. 265, in the amount of $268,871.74, for services rendered to MARAD during the period November 16 through November 30, 2004, in connection with Work Orders 812 - 815, 817, 819, and 822;

7) On December 30, 2004, plaintiff submitted Invoice No. 266, in the amount of $491,185.05, for services rendered to MARAD during the period December 1 through December 31, 2004, in connection with Work Orders 812 - 815, 817, 819, and 822;

8) On March 31, 2005, plaintiff submitted Invoice No. 267, in the amount of $243,109.77 for services rendered to MARAD in connection with closing down its operations; and

9) Defendant received the services invoiced in subparagraphs 1-8, these invoices are correct as to the amount of work that plaintiff has performed.

4. At the parties' request, all discovery shall be completed by May 23, 2008.

5. By March 28, 2008, the parties shall file a Joint Status Report discussing their progress with discovery.

6. A status conference shall be held at 3:00 p.m., on Tuesday, June 10, 2008, in the Howard T. Markey National Courts Building, 717 Madison Place, N.W., Washington, DC. Counsel for plaintiff shall notify the court at 202/357-6620 by May 21, 2008, if he wishes

to participate by telephone conference call to be placed by the court. The parties shall be prepared to schedule all pretrial proceedings and trial.

s/ Christine O.C. Miller

**Christine Odell Cook Miller**
Judge