**No. 06-150C**
**Judge Christine O.C. Miller**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**VERIDYNE CORPORATION**

**Plaintiff,**

**v.**

**THE UNITED STATES OF AMERICA**

**Defendant.**

---

# PLAINTIFF'S RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM OF LAW

---

**Marc Lamer**
**Attorney for Plaintiff**

**Kostos and Lamer, P.C.**
**1608 Walnut Street**
**Suite 1300**
**Philadelphia, PA 19103**
**(215) 545-0570**

## TABLE OF CONTENTS

**Page**

Table of Contents……………………………………………………………………....i

Table of Authorities…………………………………………………………………....ii

Table of Contents for Appendix…………………………………………………….....iii

Plaintiff's Renewed Motion For Partial Summary Judgment…………………………....1

Memorandum of Law In Support of Plaintiff's Renewed Motion
For Partial Summary Judgment………………………………………………………....1

I. Introduction……………………………………………………………………..1

II. Statement of Facts…………………………………………………………......2

III. Argument……………………………………………………………………....2

A. MARAD's Acquisitions And Logistics Personnel Well Understood That Veridyne Was Not Offering To Supply All Of MARAD's Logistics Support Needs For $2.99 Million, Ergo Its Extension Proposal Could Not Have Been Fraudulent……....2

B. Plaintiff's "Certified" Proposal For The Five Year Extension Was "Accurate And Complete" In Accordance With The Truth In Negotiations Act…………………………………………………..9

C. Nearly A Year Prior To The Exercise Of The First Option Under Modification 0023, MARAD Knew The Level Of Logistics Support Services It Would Need For The Entire Five Year Period, Yet It Chose To Acquire Those Services Through Its Contract With Veridyne Rather Than Initiate A New Competition……………………………………………13

D. To The Extent Modification 0023 May Have Been Unauthorized, It Was Ratified By MARAD……………………………17

E. Neither The Limitation of Cost Nor The Limitation Of Funds Clause Defeats Plaintiff's Claim………………………………………..19

IV. Conclusion……………………………………………………………………..25

## TABLE OF AUTHORITIES

**Cases** **Page**

Aerojet Ordinance Tennessee. ASBCA No. 36089, 95-2 BCA ¶ 27,922 at page 139, 437 (1995)…………………………………………………………....13

Am. Heritage Bancorp v. United States 61 Fed. Cl. 376, 386 (2004)…………………..13

Cala Sand & Gravel, Inc. v. United States, 22 Cl. Ct. 19, 27-28 (quoting United States v. Beebe, 180 U.S. 343, 354 (1901))…………………………....18

Glendale Fed. Bank, FSB v. United States, 239 Fed. 1374, 1379……………………...17

Long Island Savings Bank v. United States, 54 Fed. Cl. 607 (2002)…………………...13

Martin Marietta Corp., ASBCA No. 48223, 96.2 BCA ¶ 28,270 at 141,159…………....12

Rosemount, Inc., ASBCA No. 37520, 95-2 BCA ¶ 27,770 at 138,454………………....12

Sylvania Products, Inc. v. United States, 202 Ct. Cl. 16, 479 F2d, 342, 1349 (1973)……………………………………………………………………….12

**Statutes and Regulations**

28 U.S.C. § 2514………………………………………………………………………..13

48 CFR § 15.402-2………………………………………………………………………...10

48 CFR § 15.406-1………………………………………………………………………...11

48 CFR § 15.406-1(b)……………………………………………………………………..11

48 CFR § 15.406-3………………………………………………………………………...11

**TABLE OF CONTENTS FOR**
**PLAINTIFF'S SECOND**
**SUPPLEMENTAL APPENDIX**


**Document** **Page**

1. Memorandum from Richard H. Williams, Chief, Division of Logistics Supports to Timothy P. Roark, Director, Office of Acquisition, Subject: ACTION Contract Extension, dated November 19, 1997……………………………………………………………..1

2. Memorandum, Richard H. Williams, Chief, Division of Logistics Support to Tim Roark, Director, Office of Acquisition, Subject: Logistics Support Contract Extension, dated March 6, 1998……………………4

3. E-mail from Patrick Carlton to Richard Williams, Subject: S. P. [Veridyne] Proposal, dated March 31, 1998………………………………...5

4. Memorandum from Rita Jackson, Contract Specialist to Richard Williams, Chief, Division of Logistics Support, Subject: Technical Evaluation of Cost Proposal Contract Extension DTMA91-95-C-00024, dated April 17, 1998…………….…………...7

5. Memorandum from Richard Williams, Chief, Division of Logistics Support to Rita Jackson, Contract Specialist, Subject: Technical Evaluation of Cost Proposal Contract Extension DTMA91-95-C-00024, dated April 21, 1998………………….…….....8

6. Justification For Other Than Full And Open Competition……………………......9

7. Determination And Finding (undated draft) with hand-written notes……………………………………………………………………….....14

8. Memorandum from Richard Williams, Chief, Division of Logistics Support to Wayne Cutrell, Chief, Division of Marine Acquisition, Subject: <u>ACTION</u>: Contract DTMA91-95-C-00024, dated May 6, 1999……....15

9. Memorandum from Richard H. Williams, Chief, Division of Logistics Support to Ben Burnowski, Contracting Officer Subject: <u>ACTION</u>: Exercise of Option Year Logistics Support Contract DTMA91-95-C-00024, dated Feb 15, 2000…………………………..17

10. Justification For The Exercise Of Option Year Four (sic) Under Contract DTMA91-95-C-00024, dated March 22, 2000……………………......18

**Table of Contents for Plaintiff's Second Supplemental Appendix (cont'd)**

**Page**

11. E-Mail from Benedict Burnowski to Erica Williams, Subject:
S-P [Veridyne] Memo Files, dated April 10, 2001, with attachments……….19

12. E-Mail from Erica Williams to Benedict Burnowski, Subject:
Award Fee Mod, dated April 19, 2001 (3:40 p.m.)…………………………….39

13. E-Mail from Benedict Burnowski to Erica Williams, Subject:
Re: Award Fee Mod, dated April 19, 2001 (3:58 p.m.)………………………..40

14. E-Mail from Erica Williams to Benedict Burnowski, Subject:
Re: Award Fee Mod, dated April 19, 2001 (4:20 p.m.)………………………..41

15. E-Mail for Benedict Burnowski to Erica Williams, Subject:
Re: Award Fee Mod, dated April 19, 2001 (9:42 p.m.)……………………....42

16. Pre-Negotiation Memorandum, Contract DTMA91-95-C-00024,
Modification 0035……………………………………………………………....44

17. Clearance Record For Solicitations Contracts And Modifications,
DTMA91-95-C-00024, Mod 0035…………………………………………......56

18. E-Mail from Robert Ostrom to Iris Cooper, Subject: Re: Veridyne,
Dated October 14, 2004……………………………………………………......62

19. E-Mail from Erica Williams to Iris Cooper, et al, Subject: Veridyne
Invoices, dated December 6, 2004…………………………………………......63

20. Letter from Robert Ostrom, Chief Counsel to R. Kenly Webster, P.C.
Re: Logistics Support Services, dated December 7, 2004……………….......64

21. E-Mail for Benedict Burnowski to Iris Cooper, et al, Subject: Re:
Veridyne Invoices, dated December 15, 2004…………………………………68

**PLAINTIFF'S RENEWED MOTION**
**FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims, Plaintiff Veridyne Corporation respectfully renews its Motion For Partial Summary Judgment and asks that the Court enter partial judgment in its favor on Count I of its Amended Complaint in the amount of $1,263,996.80 This motion is supported by the Plaintiff's Appendix, Supplemental Appendix and Proposed Findings of Uncontroverted Fact, all filed previously with the Court, together with Plaintiff's Additional Proposed Findings of Uncontroverted Fact and Second Supplemental Appendix filed herewith.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S**
**RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I. INTRODUCTION

Plaintiff Veridyne Corporation ("Plaintiff" or "Veridyne") has renewed its previously submitted and denied Motion For Partial Summary Judgment. The basis for the resubmitted motion is that documents received by Plaintiff in discovery demonstrate that there is no basis for Defendant's assertions of fraud, since procurement personnel at the Maritime Administration ("MARAD"), both prior to the execution of Modification 0023, that Plaintiff's extension proposal was not an offer to provide all the logistics support services MARAD would require for $2.99 million. Moreover, MARAD's own documents establish beyond dispute that MARAD's contracting personnel were well-aware, virtually a full year before MARAD chose to avail itself of the first option under Modification 0023, that MARAD's orders under the Contract would be more than TEN (10) TIMES Modification 0023's maximum dollar total of $2.99 million. In its resubmitted

motion, Plaintiff requests that it be granted partial summary judgment in the amount of $1,263,996.80, representing the amount due on Veridyne invoices 260 through 264. Plaintiff is not conceding that it is not due payment on Invoices 265 through 267. However, MARAD's documents establish that Veridyne's entitlement to payment on Invoices 260 through 264 is not only beyond dispute, it is beyond question. Alternatively Plaintiff should be granted summary judgment on Defendant's Counterclaim, even if it is not granted partial summary judgment on its own claim.

## II. STATEMENT OF FACTS

For its Statement of Facts, Plaintiff hereby incorporates its Proposed Findings Of Uncontroverted Fact, filed with its Motion For Partial Summary Judgment, together with its Additional Proposed Findings Of Uncontroverted Fact, filed herewith.

## III. ARGUMENT

### A. MARAD'S ACQUISITIONS AND LOGISTICS PERSONNEL WELL UNDERSTOOD THAT VERIDYNE WAS NOT OFFERING TO SUPPLY ALL OF MARAD'S LOGISITCS SUPPORT NEEDS FOR $2.99 MILLION, ERGO ITS EXTENSION PROPOSAL COULD NOT HAVE BEEN FRAUDULENT

The gist of Defendant's counterclaim in fraud is that Veridyne deceived MARAD into signing Modification 0023 by providing MARAD with a proposal that, according to Defendant, caused MARAD to believe that Veridyne was offering to provide, over the Five (5) additional option years, the same level of services for $2.99 million that it had performed during the first five (5) contract years for $21,000,000. Defendant's argument is summed up on page 6 of its "Reply to Plaintiff's Response To Defendant – Claimant's Cross Motion For Summary Judgment And Response To Motion To Strike," Defendant states:

> Veridyne argues that the phrase "scope of work" referred to the type of work, not the volume of work. Pl. Resp. at 17-18. An examination of the correspondence surrounding the execution of Modification 23, however, indicates that the phrase "scope of work" as used in Veridyne's proposal letter was intended to refer to the anticipated volume of work pursuant to Modification 23.
>
> The most telling indication that the phrase "scope of work" referred to the volume of work is the letter from MARAD Contracting Officer Rita C. Jackson to Samuel Patterson, dated March 10, 1998. Patterson Declaration, Exh. E. Veridyne's proposal was a response to this letter. In the letter, Ms. Jackson indicates that the "scope of work will remain the same" and then asks for "a formal cost proposal" that "should identify the cost per year for this five year extension." The request for cost per year estimates would be meaningless unless related to the amount of work, and the only thing that the letter mentions that could be a source of such guidance is the fact that the extension would be for the same "scope of work." Viewing <u>the proposal</u> in its context as an answer to Ms. Jackson's letter, <u>the only reasonable interpretation of the proposal and its "breakdown of costs for each of the five years" is that it misrepresented the proposal as a cost proposal for the same volume of work as provided pursuant to the original five years of the contract</u>.

At the January 8, 2008 oral argument, counsel for Defendant again asserted to the Court that Veridyne's proposal, which was in response to Rita Jackson's March 10, 1998 letter, represented an estimate of the full cost of supplying MARAD's logistics support needs over the Five (5) years of the extension. Transcript page 28, lines 6-13; page 48, lines 6-21. Defendant has failed, though, to proffer a declaration from anyone at MARAD stating that he or she interpreted Veridyne's proposal in the way Defendant asserts that it should be interpreted. Documents produced in discovery, however, show without doubt that neither Jackson nor anyone else in MARAD's Acquisition or Logistics Divisions believed that Veridyne was offering to provide the same level of services to MARAD over the additional Five (5) years for $2.99 million, as had cost MARAD some

$20 million during the original Five (5) years.

On April 17, 1998, Jackson authored a Memorandum to Richard Williams, Chief of MARAD's Division of Logistics Support ("R. Williams") under subject, "Technical Evaluation of Cost Proposal Contract Extension DTMA91-95-C-00024" ("the Contract"); in it she wrote:

> 1. The Contractor, [Veridyne] provided MAR-614 [i.e., MARAD Division of Logistics Support] on March 30, 1998 with a copy of their cost proposal requesting an extension to their current contract DTMA91-95-C-00024. Based upon your memorandum dated March 6, 1998, the Division of Logistics Support wants this extension for five additional option year periods.
>
> 2. Provide your comments following review of the proposal. All pertinent technical, personnel and cost questions should be adequately addressed and if not, include in your memorandum to this office items that are not clear.
>
> 3. Indicate if the proposal is acceptable or unacceptable. State in writing a list of inadequacies of the proposal or technical deficiencies to the Contracting Officer and give a brief explanation of the reasons. List concerns, comments or recommendations.
>
> * * * *

Second Supp. App., page 7.[1] The final section of Jackson's Memorandum is worth special note, for she makes clear that MARAD's evaluation of the extension is to be kept confidential (which conforms with what Mr. Patterson's repeated assertions that Veridyne had no information regarding MARAD's intentions with respect to the extension):

> Any discussions of your evaluation are sensitive information. Such Information shall not be disclosed to any party outside the Government, or within who is not directly participating in the procurement process

[1] "Second Supp. App., page ______" refers to Plaintiff's Second Supplemental Appendix, submitted herewith.

and do not have a need to know.

By way of a Memorandum dated April 21, 1998, under Subject, "Technical Evaluation of Cost Proposal Contract Extension DTMA91-97 [sic]-C-00024, R. Williams, replied to Jackson's April 17 Memorandum, stating:

> In response to your memorandum of April 17, 1998, requesting that MAR-614 [i.e., MARAD's Division of Logistics Support]] review and approve Shepard-Patterson's proposal submitted March 30, 1998, the following Comments are provided:
>
> * * *
>
> A further review of the contractor's labor pool in the final option years, gave the appearance that labor was being cut by 80%. However, we believe that the contractor showed these cuts in order to remain within SBA's $3,000,000.00 threshold. Therefore, MAR-614 accepts Shepard-Patterson's cost proposal for five more option years, and requests that your office take whatever action is necessary to modify the current contract.

Second Supp. App., page 8, emphasis supplied.[2]

Nor can there be any doubt regarding R. Williams' understanding that Veridyne's proposal assumed a drastic reduction in the level of services it would be providing during the FIVE (5) additional years. Prior to R. Williams' April 21 Memorandum to Jackson, he received an e-mail from Patrick Carlton (R. Williams' Assistant Contracting Officer's Technical Representative) ("Carlton"), dated March 31, 1998 (i.e., the day after Veridyne submitted its unsolicited proposal for the extension). In it Carlton wrote:

> Spent the better part of last night reviewing the [Veridyne] proposal for extension of the logistics support contract. The following points are made:

[2] Veridyne's President has believed that the impetus for contract extension began with his inquiry and an opinion from Veridyne's then counsel in February of 1998. MARAD files suggest, however, that it was R. Williams who initiated the idea of extending this (IDIQ) Contract for an additional five option years some three months earlier. See also, Second Supp. App., page 4.

* * *

Section 2: Labor Rates:

* * *

2. There is a concern with regards to <u>phase-out of contractor staffing, beginning in Option Years 6-9</u>. The contractor in Option Year 9 has reduced its labor pool by 80%. This appears to be confusing. The proposal should emphasis [sic, "emphasize"] reduction vice [sic, "versus"] a phase-out.

Section 4: Cost Proposal:

The Contractor proposed $3,000,000 over five years. The Small Business Administration may object considering the history of this Contract. History shows 3-4 million billed per year.

Second Supp. App., pages 5-6 (emphasis supplied). Clearly, neither R. Williams nor Carlton interpreted Veridyne's proposal in the manner Defendant asserts, and advised Jackson accordingly.

Plaintiff would next direct the court to the one declaration from anyone in the MARAD acquisitions or logistics divisions that Defendant did proffer in support of its cross-motion, <u>i.e.</u>, the Declaration of Benedict Burnowski ("Burnowski"), dated March 23, 2007. In its response to Plaintiff's original motion, Defendant cites Burnowski's declaration in support of its argument that Veridyne's proposal for the Five (5) year extension contained to a false estimate. Specifically, in its Proposed Findings of Fact, Defendant stated:

12. In order to stay below the sole source threshold, Veridyne submitted a certified proposal for the five year extension at $2,999,999. Durkin Decl. ¶¶ 5, 6. Veridyne accomplished this <u>by significantly understating the amount of labor hours necessary for performance of the contract</u>. Burnowski Decl. ¶ 11.

(emphasis supplied). Putting aside the fact that, as Plaintiff pointed out in its Response to Defendant's cross-motion, Burnowski did not become involved with the Contract until some two (2) years after execution of Modification 0023, Defendant's proposed finding No. 12 subtly and significantly alters Burnowski's actual statement. Here is paragraph 11 from Burnowski's declaration:

> 11. Veridyne's proposal priced significantly less labor hours and projected costs than it was billing under the ongoing contract at the time.

(emphasis supplied). Clearly, Burnowski says nothing about any statement by Veridyne regarding the number of hours necessary for whatever level of service MARAD might require. He merely states that Veridyne's proposal "priced less labor hours than it was billing" at the time of the proposal; and that is certainly undisputed.

Burnowski's declaration certainly does imply that after Modification 0023's first additional option year commenced on March 27, 2000, Veridyne proceeded, on its own initiative, to invoice the full amount of the services set forth in Modification 0023:

> 14. In 2000, within six months of the beginning of work on option Year 5, the first option year added by Modification 0023, Veridyne had billed the Government more than entire [sic] estimated cost of the modification for all five years.

(emphasis supplied). As Plaintiff has previously shown, though, all of the services provided by Plaintiff in that initial Modification 0023 option year were pre-authorized, in virtually every case by Burnowski himself, through incremental funding authorizations. Moreover, the contract file also contains an April 19, 2001 e-mail from Burnowski to

Erica Williams ("E. Williams").[3] In it Burnowski wrote (discussing the verbiage in a draft memorandum supporting proposed Modification 0035):

> Erica [Williams]:
>
> Show Patrick [Carlton] the memo from Dick [i.e., R. Williams] dated Apr 21, 1998 subject Technical Evaluation of Cost Proposal Contract Extension DTMA91-97-C-00024' especially in the 3rd paragraph where it says 'A further review of the contractor's labor pool in the final option years, gave the appearance that labor was being cut by 80%. However, we believe that **the contractor showed these cuts in order to remain with SBA's $3,000,000.00 Threshold.' [boldface added].**
>
> I don't mind softening the language [in the draft memorandum] but I do want to make the point that everyone knew the cost for the extension was going to be much higher than $3,000,000 but we executed [Modification 0023] for only $3,000,000 because it was a condition imposed by SBA and we wanted their signature on the mod to keep it in the 8(a) program until that money was expended.
>
> Ben [Burnowski]

Second Supp. App., page 40, bold in original; emphasis added.

What is absolutely clear from MARAD's own files is that no one interpreted Veridyne's extension proposal as offering to provide all of MARAD's required services for $2.99 million. MARAD personnel well understood that Veridyne was simply showing what MARAD could receive for $2.99 million. As such, there cannot have been fraud. Defendant has, of course, suggested that certain unidentified individuals at MARAD who approved the extension held the interpretation of the proposal that Defendant urges. However, without names and evidential support (e.g., a declaration),

[3] This e-mail is dated some six (6) years prior to Burnowski's March, 2007 declaration on which Defendant primarily relies (although, as noted, supra, Burnowski never actually says what Defendant asserts that his declaration says).

Defendant's position amounts to nothing more than argument; and it is, of course, well-settled that Summary Judgment cannot be denied based on argument alone.

**B. PLAINTIFF'S "CERTIFIED" PROPOSAL FOR THE FIVE YEAR EXTENSION WAS "ACCURATE AND COMPLETE" IN ACCORDANCE WITH THE TRUTH IN NEGOTIATIONS ACT.**

Plaintiff would next address Defendant's repeated references to Veridyne's "certified" proposal for the extension, arguing that Veridyne was certifying to MARAD that it could provide all the services that MARAD might require for $2.99 million.[4] Those references to a "certified proposal," show a basic misunderstanding of the purpose of such a certification, and precisely what a contractor is certifying when it provides such a certification.

The Truth in Negotiations Act ("TINA") certificate, signed by Veridyne CFO Michael Genna, and included in the extension proposal, reads:

> CERTIFICATE OF CURRENT COST OR PRICING DATA
> This is to certify that, to the best of my knowledge and belief, the cost or pricing data (as defined in section 15.801 the Federal Acquisition Regulation (FAR) and required under FAR subsection 15.804.1) submitted, either actually or by specific identification in writing, to the contracting officer or to the contracting officer's representative in support of Contract DTMA91-95-C-00024, are accurate, complete and current as of 30 March 1998. The certification includes the cost or pricing data supporting any advance agreements and forward pricing rate agreements between the offeror and the Government that are part of the proposal.
>
> FIRM: Shepard Patterson & Associates, Inc.__________
>
> BY: /s/ Michael C. Genna______________________

---

[4] Elsewhere, Defendant appears to suggest that Veridyne was somehow certifying that $2.99 million worth of services was all the MARAD would require; Defendant seems to argue both interpretations, although how Veridyne would be certifying as to MARAD's future requirements, Defendant does not explain.

NAME: Michael C. Genna

TITLE: Executive Vice President/Chief Financial Officer

DATE OF EXECUTION: 30 March 1998

App. page 114. According to the Defendant, this certification was false because Veridyne had to have known at the time of certifying that all of the work MARAD would need during the five year extension could not be accomplished for $2.99 million.

Where Defendant goes astray is in assuming that Veridyne was certifying that MARAD could get all the services it would require for $2.99 million (or that MARAD would only require $2.99 million worth). FAR 15.402-2 (48 CFR § 15.402-2) is the regulation that covers such certificates. The regulation includes the form for the certificate with explanatory notes. With respect to the two (2) dates required for the certificate, the regulation provides that for the first (in the body of the certificate), it is to be the date when negotiations are concluded. As to the second (below the signature) it is to be "as close as practicable to the date when price negotiations have been concluded and the contract price agreed to." In other words, the certification is to be provided to the Government as soon as practicable once an agreement on price is reached. The point is, there is no requirement that a certificate be included in the body of a proposal, since that would serve little purpose. The certificate is to be provided after an agreement is reached to ensure that all available data was provided to the Government. Of course, that was never done in this instance, and for a very simple reason; the certificate is provided in situations where there are price negotiations, and in the case of Modification 0023, there were no price negotiations. Effectively, Plaintiff 's

proposal simply illustrated what MARAD could receive for the $2.99 million maximum.

FAR 15.406-1 (48 CFR § 15.406-1) provides that in situations where there will be price negotiations, the contracting officer is to prepare a document outlining the Government's pre-negotiation objectives. See 15.406-1(b). This is done in the form of pre-negotiation memorandum. Following the conclusion of negotiations the FAR requires that the negotiations be documented by way of a price negotiation memorandum. See FAR 15.406-3 (48 CFR § 15.406.3). According to Burnowski, there is no such price negotiation memorandum for Modification 0023 in the contract file. See, e.g., Second Supp. App., page 51. All that the file contains, according to Burnowski are (1) Veridyne's proposal, (2) the R. Williams 21 April 1998 Technical Analysis which states that the amount of labor hours in the proposal is reduced by 80% by the final year of the extension (in an apparent effort to comply with the SBA $3 million limitation), and, (3) the Determination and Findings for Option Extension (see, Second Supp. App., pages 9-13. In other words, there were no price negotiations for Modification 0023. This makes sense, since the pricing for the services under each work order was to be negotiated individually and such being the case, no requirement existed for a TINA certificate, except, perhaps, as to the factual data provided, i.e., the labor rates that would be used in the work order negotiations.

Further, in a situation where the Government contends that the contractor has provided defective cost or price data, it must prove:

> (1) That the information is "cost or pricing data" within the meaning of TINA [e.g., facts, not projections]; such cost or pricing data were not disclosed or not meaningfully disclosed; and (3) that the Government relied on the defective data.

Martin Marietta Corp., ASBCA No. 48223, 96.2 BCA ¶ 28,270 at 141,159 (citing Sylvania Products, Inc. v. United States, 202 Ct. Cl. 16, 479 F2d, 342, 1349 (1973), and Rosemount, Inc., ASBCA No. 37520, 95-2 BCA ¶ 27,770 at 138,454.

The information in contention in this instance (the $2.99 million total in Modification 0023) is not "cost or price data;" it necessarily involves judgment. Second, Plaintiff would ask what data is it that Defendant contends Veridyne failed to disclose? The proposal clearly set forth how the $2.99 million figure was derived (i.e., the number of labor hours that MARAD could receive for $2.99 million). If it is Defendant's contention that Veridyne was required to disclose to MARAD the dollar value of the work ordered by MARAD during the initial five year term, that contention would seem absurd. The base term of the Contract signed by MARAD, Veridyne and SBA set forth the figure of some $21 million for all to see. Moreover, the Contract required Veridyne to notify MARAD whenever costs reached 75% of allocated funding. Veridyne regularly provided these notices as part of its invoicing. See, e.g., App. pages 367, 434 and 492.

Additionally, further verifying there was no deception there is the April 21, 1998 memo from R. Williams to Jackson, providing analysis of the Veridyne proposal. In that Memorandum, R. Williams specifically noted that Veridyne had reduced the amount of labor by 80% by year five of the extension and that the total in the proposal appeared to have been geared toward complying with the $3 million SBA sole-source maximum, as Veridyne understood that its extension proposal could not exceed that figure. In this regard, the ASBCA has stated that the TINA requirement for full disclosure is satisfied, "if the Government obtains the data in question in some other manner or had

knowledge." See, Aerojet Ordinance Tennessee. ASBCA No. 36089, 95-2 BCA ¶ 27,922 at page 139, 437 (1995). Clearly, MARAD personnel were well aware of the premises/assumptions in the Veridyne proposal.

Whether Defendant's Counterclaim seeking forfeiture of Plaintiff's claims is grounded in 28 U.S.C. § 2514 or in common law fraud, Defendant must still demonstrate, by clear and convincing evidence, that Veridyne knowingly misrepresented a material fact to MARAD and intended to deceive MARAD thereby. See, e.g., Am. Heritage Bancorp v. United States 61 Fed. Cl. 376, 386 (2004). If Defendant seeks to prevail on a common law fraud theory, it must also show reliance on the misrepresentation as well as injury. See, e.g., Long Island Savings Bank v. United States, 54 Fed. Cl. 607 (2002). As has been demonstrated supra, beyond the interpretation of Veridyne's extension proposal asserted by counsel, Defendant offers no evidence of any material fact that Veridyne misrepresented therein. Thus, the first prong necessary for Defendant to prevail under 28 U.S.C. § 2514 is certainly lacking. Since Defendant has also failed to present evidence from anyone that MARAD relied on anything Veridyne said in its proposal, a second prong, in terms of common law fraud, is also lacking.

**C. NEARLY A YEAR PRIOR TO THE EXERCISE OF THE FIRST OPTION UNDER MODIFICATION 0023, MARAD KNEW THE LEVEL OF LOGISTICS SUPPORT SERVICES IT WOULD NEED FOR THE ENTIRE FIVE YEAR PERIOD, YET IT CHOSE TO ACQUIRE THOSE SERVICES THROUGH ITS CONTRACT WITH VERIDYNE RATHER THAN INITIATE A NEW COMPETITION**

Plaintiff also believes it is of great importance to reiterate that the Five (5) option years added to the Contract were exercisable at MARAD's sole discretion. Effectively,

all Modification 0023 did was give MARAD the right (but not the obligation) to order additional services from Veridyne at specified labor and overhead rates. Modification 0023 as previously noted, was signed in May of 1998; it provided as follows regarding the additional option years:

> 1. This modification is issued to provide five additional (1) year option periods to this contract. The current contract has one option period remaining, Option Period Four, which begins March 27, 1998 through March 26, 2000 (sic). <u>Upon the discretion of the Contracting Officer, a written notice will be provided to the contractor giving notification of the beginning of the first of five additional one year option periods</u>. This first period is designated Option Year Five, beginning March 27, 2000 through March 29, 2001. <u>The option periods will be exercised at the sole discretion of the Government</u>.

App. page 153, emphasis supplied. Stated otherwise, the additional years did not spontaneously spring to life; an affirmative exercise of "discretion" on the part of MARAD was required to activate them. Moreover, MARAD had almost TWO (2) full years (May 18, 1998 to March 26, 2000) to decide whether to exercise that discretion under Modification 0023 or to procure its requirements by way of a new competition. As the record shows, the first option was exercised on March 22, 2000 via unilateral Modification 0032, signed by E. Williams as Contracting Officer. See, App., page 161.

Plaintiff would respectfully now refer the Court to a document included in Defendant's document production. It is a Memorandum dated May 6, 1999, roughly Forty-Six (46) Weeks prior to the exercise of the first of the Modification 0023 options by E. Williams. In it, R. Williams, the Chief of the Division of Logistics Support, provided Wayne Cutrell, Chief of the Division of Marine Acquisition (and the Contracting Officer who executed Modification 0023) ("Cutrell"), with his Division's estimate for the work

that would need be ordered from Veridyne during contract years six through ten (i.e., option years four through nine). The Memorandum, under "Subject: ACTION: Contract DTMA91-95-C-00024" ("the Contract"), stated:

> Forwarded is our estimate for Option Years 4 through 9 of the referenced contract.
>
> The logistics support program has evolved into an effective and Efficient program, in large part because of the effectiveness of the Professional logistics services acquired through the referenced contract. To ensure the continuance of logistics support services throughout the remaining option years, we have enclosed an estimate for each of the remaining option years. This estimate is considered adequate to ensure continuing support of the RRF[Ready Reserve Force] at the predicted level of activity, and to allow us to respond to emergent requirements as they arise.
>
> If you approve of the estimated amounts, please place a memorandum to that effect in the cognizant contract file for future reference if required. Please provide a copy of your action document to MAR-614 for inclusion in its records.
>
> If you should need any additional information, please contact me.

Second Supp. App. page 15; emphasis supplied. The document also reflects that a copy was to be placed in the Contract file. Attached to the R. Williams Memorandum was a sheet showing a year by year estimate of the services that would be required under the Contract (all but the first listed estimate refer to the Modification 0023 option years (i.e., Option Years 5 through 9):

$5,288,921; $5,553,367; $5,831,035; $6,122,587; $6,428,717; $6,428,717

Total $35,974,779

Second Supp. App., page 16. Taking the Modification 0023 option years alone, the total is $30,685,858. Clearly, the MARAD acquisitions division (MAR-380) in general and

Cutrell in particular were on notice, at least Forty-Six (46) weeks prior to the time E. Williams exercised the first of Modification 0023's Five (5) option years, that MARAD's requirements for logistical support would be over TEN (10) times the maximum dollar value of Modification 0023. There is, of course, no evidence, none whatsoever that Veridyne was privy to MARAD's internally-generated estimate.[5]

Rather than initiating a new competition or approaching SBA for authorization to increase the maximum dollar amount in Modification 0023, MARAD proceeded to exercise its discretion, invoking all of the Modification 0023 options and ordering/authorizing some $31 million worth of work. Yet, Defendant would have the Court believe that MARAD was ignorant of the amount of services it would be requiring prior to the exercise of the first of Modification 0023's five option years in March of 2000, and that Veridyne somehow preyed on that ignorance by proceeding on its own volition, to bill MARAD for some $3,000,000 in the first six (6) months of the first Modification 0023 option year.[6]

---

[5] In fact it would not seem to be even relevant if, in May of 1999, MARAD officials had informed Veridyne of the estimate for the additional five years (a "heads-up" so to speak). Counsel for Defendant conceded during oral argument that Veridyne did nothing wrong after execution of Modification 0023. According to Counsel, "only 1998 matters." See, Transcript, page 38, lines 18-24; page 48, lines 6-12. Defendant has offered no evidence suggesting that Veridyne knew or had any reason to know at the time Modification 0023 was executed (beyond the Contract's history), that MARAD would ultimately authorize over $30 million worth of services during years 6 through 10..

[6] Counsel for Defendant conceded during oral argument that Veridyne did nothing fraudulent after execution of Modification 0023. According to Counsel, "only 1998 matters." See, Transcript, page 38, lines 18-24; page 48, lines 6-12. However, Defendant has offered no evidence suggesting that Veridyne had any reason to know or even suspect that MARAD would authorize over $30 million worth of services at the time Modification 0023 was executed. It might have hoped to receive more; nevertheless, Modification 0023 only guaranteed Veridyne 10% of each year's estimate, and then only if MARAD chose, in its "sole discretion," to exercise particular year's option.

Regardless, MARAD's own documents establish that no one at MARAD was deceived by Veridyne's proposal, somehow believing that MARAD had "on the hook" a contractor who had agreed to provide all of MARAD's logistical services for $2.99 million. MARAD officials knew well before the exercise of the first option year under Modification 0023 that MARAD would be ordering some $30 million worth of services from Veridyne. As no one at MARAD was misunderstood or was deceived by Veridyne's proposal and no one relied on any alleged misrepresentation when MARAD exercised the first option year under Modification 0023, Defendant's counterclaim fails again, whether grounded in 28 U.S.C. § 2514 or common law fraud. See Glendale Fed. Bank, FSB v. United States, 239 Fed. 1374, 1379 (Fed. Cir. 2001).[7]

**D. TO THE EXTENT THAT MODIFICATION 0023 MAY HAVE BEEN UNAUTHORIZED, IT WAS RATIFIED BY MARAD**

In its motion as originally submitted, Plaintiff also argued that to the extent that Modification 0023 may have exceeded the authority of Cutrell, the official who executed it, his action was ratified institutionally by MARAD's subsequent actions, including (1) extending the Contract for the second option year under Modification 0023 (after exceeding the $2.99 million in work authorization during the first year), (2) in sending "draft" modification 0035 (which E. Williams wrote that the parties were "working against"), (3) in exceeding the subsequent option years under Modification 0023 and (4) in continuing to authorize Veridyne's work. See Plaintiff's Motion For Partial Summary Judgment And Memorandum Of Law, pages 9-12. However, MARAD documents

[7] Interestingly, the earlier draft of the Determination And Findings reads, "[MARAD] is requesting the Small Business Administration's concurrence with extending . . . ." Second Supp. App., page 14. A lie is drawn through "requesting the Small Business Administration's concurrence with," so that the final version reads, simply, "[MARAD] is extending. . . ."

received in discovery show that MARAD's ratification went far beyond mere "institutional."

In the MARAD files is a "Clearance Record For Solicitation, Contracts And Modifications." Second Supp. App., page 56. The document sets forth the approval of Modification 0035, which raised the Modification 0023 maximum to $33,321,752.00. Persons affixing their signatures in April of 2001 include Burnowski (Contracting Officer), Carr (Deputy Director of the Office of Acquisition) and Edmund T. Summer, Jr. (Assistant General Counsel). The reason for the modification (0035) is given as follows:

> This modification is to replace the costs estimated in Mod 0023 with a cost estimate that more accurately reflects the work to be performed in Option Years 5 through 9.

Second Supp. App., page 56.

This Court has held that ratification requires that the action can "only be based on upon a full knowledge of all the facts upon which the unauthorized action was taken." Cala Sand & Gravel, Inc. v. United States, 22 Cl. Ct. 19, 27-28 (quoting United States v. Beebe, 180 U.S. 343, 354 (1901)). That Carr's signature on the clearance record comes with full knowledge of the facts is established by his signature (along with Burnowski's and E. Williams') on a Pre-Negotiation Memorandum setting forth the entire factual background for Modification 0023 and 0035. See Second Supp. App., pages 44 through 55. It is, therefore clear that the $2.99 million in Modification 0023 was increased by MARAD officials with full knowledge of the facts. Thus ratification was de jure, not institutional.

**E. NEITHER THE LIMITATION OF COST CLAUSE NOR THE LIMITATION OF FUNDS CLAUSE DEFEATS PLAINTIFF'S CLAIM**

Plaintiff would next address the Contract's Limitation of Cost clause (FAR 52.232.20), even though Defendant has never raised it as a defense. The Court has questioned during oral argument whether the clause was incorporated into Modification 0023 and, if so, what its potential impact on Plaintiff's claims would be. As the Court noted, that clause puts, "an absolute limit on the government with respect to the estimated cost." Transcript, page 38, lines 2-7. The Court initially mentioned the Limitation of Cost clause in the context of the reference to it on page B-1 of the Contract (App., page 23). See Transcript page 14, lines 5-21. The specific contractual language to which the Court referred reads as follows:

> B. Limitation of Cost
>
> Subject to the provisions of FAR Clause 52.232-20 <u>of the General Provisions</u>, the total cost to the Government, including all direct and Indirect costs, for the performance of this contract, inclusive of award Fee, shall not exceed the estimated cost of this contract. However, a Ceiling of 20% has been placed upon indirect cost for this contract.

App., page 23; emphasis supplied.

The clause was formally incorporated into the Contract on page I-3 (App., page 62). Plaintiff's assumption has always been that Modification 0023 incorporated all the terms and conditions of the (basic) Contract. See, <u>e.g.</u>, App., page 151, blocks 10A and 14. Thus, it would seem that Modification 0023 included the Contract's Limitation of Cost clause. In this instance, though, that clause, far from defeating Plaintiff's claim, actually supports it, because the MARAD – drafted contract modified the FAR's version

of this clause.

The standard Limitation of Cost clause, as set forth at FAR 52.232.20, states in pertinent part:

> (a) The parties estimate that performance of this contract, exclusive of any fee will not cost the Government more than the estimated <u>cost specified in the Schedule</u>. . . .

The clause further provides in (d):

> (d) Except as required by other provisions of this contract, specifically citing and stated to be an exception to this clause—
>
> (1) <u>The Government is not obligated to reimburse the contractor for costs incurred in excess of the estimated cost specified in the Schedule</u>; and
> (2) The Contractor is not obligated to continue performance under this Contract (including actions under the Termination clause of this contract) or otherwise incur costs in excess of the estimated cost specified in the Schedule, until the Contracting Officer (i) notifies the Contractor in writing that estimated cost has been increased and (ii) provides a revised estimated total cost of performing this contract.

(emphasis supplied). In (a), the clause clearly states, as the Court noted, that contract performance will not cost the Government more than the estimated cost specified in the Schedule, <u>i.e.</u>, the total set forth in Modification 0023 (<u>i.e.</u>, $2.99 million), while in (b) it states that the Government is not obligated to reimburse the contractor for costs incurred in excess of the estimated cost specified in the schedule.

MARAD, though, made a change in the wording of this clause when it incorporated it into the Contract. See App., page 62. Where that clause is listed on page I – 3 of the Contract, it states:

> Substitute "work authorization" for "schedule" wherever the word appears.

Thus, per MARAD, the clause now reads:

> (a) The parties estimate that performance of this contract, exclusive

> of any fee, will not cost the Government more than (1) the estimated cost specified in the work authorization. . . .
>
> * * *
>
> (d) Except as required by other provisions of this contract, specifically citing and stated to be an exception to this clause—
>
> (1) The Government is not obligated to reimburse the contractor for costs incurred in excess of the estimated cost specified in the work authorization, and
> (2) The Contractor is not obligated to continue performance under this Contract . . . or otherwise incur costs in excess of the estimated cost specified in the work authorization. . . .

Id.[8]

It is undisputed (and so found by the Court in its previous decision denying the cross-motions for summary judgment, that Veridyne's invoices 260 through 264 were for service provided to MARAD between September 1 and November 15, 2004 under Work Orders 812 through 815, 817, 819 and 822.[9] MARAD's documents also establish, beyond dispute, that the services Veridyne provided to MARAD and invoiced in nos. 260 through 264, were both authorized and funded. See, Second Supp. App., pages 65-66. These five invoices, however, totaling $1,263,996.80, were not paid by MARAD Veridyne is clearly entitled to payment of that $1,263,996.80 under the modified version of the Limitation of Funds clause incorporated into the Contract by MARAD, because

[8] Plaintiff would also note that the MARAD version of the Limitation of Cost clause was in the Contract when it was originally executed by SBA. Presumably, SBA understood what it was executing. Since all the terms and conditions of the Contract would seem to have been incorporated into Modification 0023, the MARAD-modified was included in Modification 0023 when SBA, again presumably with understanding, executed it.

[9] See, App., pages 365 through 684.

this work was included in the prior work authorizations.[10]

During the Court's most recent status conference, Counsel for Defendant suggested that Plaintiff's claim is barred by the Limitation of Funds clause in the Contract. Defendant has not pleaded this clause as a defense in its Answer to Plaintiff's complaint, nor in its Counterclaim nor in its briefs on the cross-motions for Summary Judgment. The impetus for this tardy raising of the issue being raised now would appear again to be the concern expressed by the Court during oral argument on the cross-motion, regarding the effect of the Contract's Limitation of Costs clause. In any case, the version of the Limitation of Funds clause included in the contract was the April 1984 version, found FAR 52.232-22. It states:

> (a) The parties estimate that performance of this contract will not cost the Government more than (1) the estimated costs specified in the Schedule or, (2) if this is a cost-sharing contract, the Government's share of the estimated cost specified in the Schedule. The Contractor agrees to use its best efforts to perform the work specified in the Schedule and obligations under this contract within estimated cost. . . .

(emphasis supplied). Then in (f), the clause provides:

> (f) Except as required by other provisions of this contract, specifically citing and stated to be an exception to this clause—
>
> (1) The Government is not obligated to reimburse the Contractor for costs incurred in excess of the total amount allotted by the Government to this contract; and
>
> (2) The Contractor is not obligated to continue performance under this contract (including actions under the Termination clause of this contract) or otherwise incur costs in excess of (i) the amount then allotted to the contract by the Government or, (ii) if this is a cost-sharing contract, the amount then allotted by the Government to the contract plus the Con-

[10] It appears that the decision not to pay Veridyne's invoices was made by Robert Ostrom, MARAD Chief Counsel on October 14, 2004. See Second Supp. App., page 62. However Veridyne was kept in the dark and permitted to continue providing services at least until the end of November. See, Second Supp. App., pages 64-67.

> tractor's corresponding share, until the Contracting Officer notifies the Contractor in writing that the amount allotted by the Government has been increased and specifies an increased amount allotted by the Government to this contract.

(emphasis supplied). Superficially, the strict language of this clause would appear to bar Plaintiff's claims, since the "estimated cost in the schedule," i.e., the $2.99 million set forth in Modification 0023, was never formally increased.

It is important to note, however, the language governing reimbursement of contractor costs. It does not anywhere state that the Government need not reimburse the contractor for incurred costs in excess of the total in the schedule. Rather, it states, in (f)(1) that the Government is not obligated to reimburse the Contractor for work done beyond the funds "allotted" to the contract. Funds for the services covered by invoices 260 through 264 were certainly allotted to the Contract. Also of significant import is paragraph (g):

> (g) The estimated cost shall be increased to the extent that (1) the amount allotted by the Government to the contract plus the Contractor's corresponding share, exceeds the estimated cost specified in the Schedule. If this is a cost-sharing contract, the increase shall be allocated in accordance with the formula specified in the Schedule.

(emphasis supplied). That language seems eminently clear: the estimated cost (i.e., $2.99 million) is increased "to the extent that (1) the amount allotted by the Government . . . exceeds the estimated cost specified in the Schedule." Since the funds "allotted" to services ordered by MARAD over the Modification 0023 option years amounted to some $31.5 million, the $2.99 million in estimated cost specified in the Modification 0023 was necessarily increased to the same figure, irrespective of the execution of Modification

0035 or any other formal change to Modification 0023.[11]

One other contract clause merits mention. Page H-6 includes a MARAD clause, "H.13" Incremental Funding Of Task Orders (App., page 58). It reads:

> It may be necessary for the Government to issue Task Orders not fully Funded at the time of award (e.g. Task Orders that cross fiscal years). These orders will be issued with the following clause:
>
> "The total amount of this task order is (Insert Amount), however, only (Insert Amount) is funded with this task order and work is only authorized until (Insert Date). If and when funds are available they shall be added to this task order by unilateral action of the Government. The contractor is notified that the Government is not obligated to reimburse for costs exceeding the funds obligated in this order and the contractor exceeds the ceiling at his own risk. The task order incorporates by reference the clause LIMITATION OF FUNDS (APR 1984) – FAR 52.232-22 which replaces the LIMITATION OF COST (APR 1984) – FAR 52.232-20. This clause applies to the task order amount."

According to this clause, the Limitation of Cost clause is to be replaced with the Limitation of Funds clause for incrementally funded task orders. As shown above, whenever additional funds are allotted to the contract, it has the effect of increasing the "estimate" set forth in the original contractual document (in this case the individual work order). Veridyne invoices 260 through 264 were for services provided pursuant to incrementally-funded work orders 812 through 815, 817, 819 and 822-823. As confirmed by Contracting Officer Burnowski (Second Supp., App., page 65), sufficient funding was allocated to the Contract to pay for the services provided by Veridyne and covered by the five (5) invoices. Thus, this clause also authorizes payment.

[11] Once again, this clause was in the Contract when originally executed by SBA.

**IV. CONCLUSION**

Wherefore, for all the foregoing reasons, Plaintiff requests that the Court grant its Renewed Motion for Partial Summary Judgment and enter judgment in the amount of $1,263,996.80. Alternatively, in the event the Court declines to enter judgment on Plaintiff's claims, Plaintiff requests that the Court enter Summary Judgment dismissing defendant's Counterclaim, Special Plea In Fraud.

Respectfully submitted

/s/ Marc Lamer________
Marc Lamer
Attorney for Plaintiff

Dated: July 10, 2008