No. 06-150C
Judge Christine O.C. Miller

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**VERIDYNE CORPORATION**

Plaintiff,

v.

**THE UNITED STATES OF AMERICA**

Defendant.

---

# PLAINTIFF'S SECOND SUPPLEMENTAL APPENDIX

---

Marc Lamer
Attorney for Plaintiff

Kostos and Lamer, P.C.
1608 Walnut Street
Suite 1300
Philadelphia, PA 19103
(215) 545-0570

# TABLE OF CONTENTS FOR PLAINTIFF'S SECOND SUPPLEMENTAL APPENDIX

**Document** **Page**


1. Memorandum from Richard H. Williams, Chief, Division of Logistics Supports to Timothy P. Roark, Director, Office of Acquisition, Subject: ACTION Contract Extension, dated November 19, 1997 ........ 1

2. Memorandum, Richard H. Williams, Chief, Division of Logistics Support to Tim Roark, Director, Office of Acquisition, Subject: Logistics Support Contract Extension, dated March 6, 1998 ........ 4

3. E-mail from Patrick Carlton to Richard Williams, Subject: S. P. [Veridyne] Proposal, dated March 31, 1998 ........ 5

4. Memorandum from Rita Jackson, Contract Specialist to Richard Williams, Chief, Division of Logistics Support, Subject: Technical Evaluation of Cost Proposal Contract Extension DTMA91-95-C-00024, dated April 17, 1998 ........ 7

5. Memorandum from Richard Williams, Chief, Division of Logistics Support to Rita Jackson, Contract Specialist, Subject: Technical Evaluation of Cost Proposal Contract Extension DTMA91-95-C-00024, dated April 21, 1998 ........ 8

6. Justification For Other Than Full And Open Competition ........ 9

7. Determination And Finding (undated draft) with hand-written notes ........ 14

8. Memorandum from Richard Williams, Chief, Division of Logistics Support to Wayne Cutrell, Chief, Division of Marine Acquisition, Subject: <u>ACTION</u>: Contract DTMA91-95-C-00024, dated May 6, 1999 ........ 15

9. Memorandum from Richard H. Williams, Chief, Division of Logistics Support to Ben Burnowski, Contracting Officer Subject: <u>ACTION</u>: Exercise of Option Year Logistics Support Contract DTMA91-95-C-00024, dated Feb 15, 2000 ........ 17

10. Justification For The Exercise Of Option Year Four (sic) Under Contract DTMA91-95-C-00024, dated March 22, 2000 ........ 18

11. E-Mail from Benedict Burnowski to Erica Williams, Subject:
S-P [Veridyne] Memo Files, dated April 10, 2001, with attachments..........19

12. E-Mail from Erica Williams to Benedict Burnowski, Subject:
Award Fee Mod, dated April 19, 2001 (3:40 p.m.)..................................39

13. E-Mail from Benedict Burnowski to Erica Williams, Subject:
Re: Award Fee Mod, dated April 19, 2001 (3:58 p.m.).............................40

14. E-Mail from Erica Williams to Benedict Burnowski, Subject:
Re: Award Fee Mod, dated April 19, 2001 (4:20 p.m.).............................41

15. E-Mail for Benedict Burnowski to Erica Williams, Subject:
Re: Award Fee Mod, dated April 19, 2001 (9:42 p.m.).............................42

16. Pre-Negotiation Memorandum, Contract DTMA91-95-C-00024,
Modification 0035.....................................................................44

17. Clearance Record For Solicitations Contracts And Modifications,
DTMA91-95-C-00024, Mod 0035...................................................56

18. E-Mail from Robert Ostrom to Iris Cooper, Subject: Re: Veridyne,
Dated October 14, 2004.............................................................62

19. E-Mail from Erica Williams to Iris Cooper, et al, Subject: Veridyne
Invoices, dated December 6, 2004................................................63

20. Letter from Robert Ostrom, Chief Counsel to R. Kenly Webster, P.C.
Re: Logistics Support Services, dated December 7, 2004...................64

21. E-Mail for Benedict Burnowski to Iris Cooper, et al, Subject: Re:
Veridyne Invoices, dated December 15, 2004....................................68

US Department of Transportation
**Maritime Administration**

# Memorandum

Subject: **ACTION**: Contract Extension

Date: November 19, 1997

From: Richard H. Williams, Chief
Division of Logistics Support

Reply to Attn of:

To: Timothy P. Roark, Director
Office of Aquisition

via: M. Delpercio, Jr., Director
Office of Ship Operations

Wayne Cutrell, Chief
Division of Marine Acquisition

1. As you know, the MARAD logistics support contract [Contract Extension (DTMA91-95-C00024)] expires in April, 2000. I am concerned that the expiration time frame might interfere with a number of essential long term efforts that we have initiated in support of the RRF. As such I believe it will be in MARAD's best interests to execute an extension of the current contract continuation of the current contract without interruption will enable us to sustain our present level of success and accommodate other planned program growth.

2. The following issues highlight some of the uncertainties that we face in the next several years, and demonstrate the value to continuing the contract over that period.

a. We have major data system changes in process that require continuity of effort. We have embarked on an upgrade of our information systems to gain needed functionality enhancements, tighter integration of our logistics systems, and an upgrade to the windows environment. I do not expect full deployment of the overall effort before contract expiration, despite the fact that we are using rapid prototyping as a means of expediting the upgrade. Continuity of design, development, implementation, and a firm grasp of the intricacies of the legacy system are essential to our success. I am also concerned about the affect that recompeting the contract will have on our key contractor personnel, and their ability to respond to a RFP In my mind, continuation of the contract avoids the loss of time and expenditure of additional funds that would occur in having another contractor come up-to-speed on the maintenance of our core systems.

b. The need for continuity is further emphasized as we integrate today's logistics systems with other MARAD systems that are expected to be implemented during the period 1998 - 2000. Our current support contractor understands the realities to be faced integrating the systems that affect all facets of the MARAD operation. This experience will ensure reduced cost in meeting these basic system integration requirements, while avoiding the risks of system non-performance due to a basic lack of understanding of MARAD operations.

c. You are aware of the ongoing DOT CFO and GAO audits affecting logistics support. As a result of the increased oversight, we will undoubtedly have to encase ECSMIS and PC-SAL in a financial envelope in the next few years. This emphasis on material valuation will inevitably lead to the requirement to include the details of financial accounting in our inventory control systems. Initiating this type of extensive system modification under one contract (and contractor) and completing it under another has the potential for increased cost and implementation delay. Extending the current contract will alleviate this contingency and further reduce our operational risk.

d. I am also concerned about the impact that uncertain out-year funding can have on our program. We may find it difficult to attract extensive competition from seasoned contractors with a multi-year, low value RFP. However, with an extension of the current contract, we are assured of a technically proficient and experienced cadre of contractor personnel even if the overall level of effort is reduced by funding constraints.

e. As you are aware, there is a possibility of additional ships being transferred from MSC to MARAD control. This would require a rapid surge of contractor effort, which would be more easily accommodated by having an experienced support staff in place. Our current contractor possesses the experience and staff to ensure the acceptance of new ships into the MARAD fleet.

f. Finally, contract administration is simplified by having a process in place that has been fine-tuned over several years (I know that I am preaching to the choir here). Our overall management costs and potential for embarrassing performance failures are significantly reduced if we continue the present contract through this dynamic period of the next several years, and manage it as closely as we have to date.

4. Of course the government should seek favorable consideration from the contractor in the form of reduced costs.

5. I recognize and appreciate the effort that will be required to complete this contract modification, but believe it is in our best interest to implement the modification expeditiously. An extension of five years, or the maximum amount of time allowed by current regulations, is sought.

Please call with any questions you may have.

#

rw / [illegible]
pc / file

U.S. Department of Transportation
**Maritime Administration**

# Memorandum

Subject: Logistic Support Contract Extension

Date: 4200
March 6, 1998

From: Richard H. Williams, Chief
Division of Logistics Support

Reply to Attn of:

To: Tim Roark, Director
Office of Acquisition

I was pleased to hear from you that the Office of Counsel has determined that we can take the necessary actions to extend our logistics support contract beyond its current completion date of March 2000. Based on that review and conclusion, I would like to initiate immediate action to execute an extension to add option years 6 through 10 to the existing logistics support contract.

The scope of work will remain the same as is established in the current contract, with actual tasking being assigned using the Work Order and Technical Directive structure currently in place.

This communication is intended to:

- reaffirm our desire and official request to extend the contract as previously submitted to you via MAR-614 memorandum of November 19, 1997. The justification provided in that memorandum remains valid.
- request that your office send a letter to Shepard-Patterson requesting a formal cost proposal as needed to initiate the extension action with the SBA. I suggest we set a target date of March 16, 1998 to have our letter out to Shepard-Patterson, with a requested reply date of April 1, 1998.
- begin the preparation of the submission package to SBA, to be completed upon receipt of the proposal from Shepard-Patterson. A target date of April 15, 1998 for submission of the package to the SBA is suggested.

I recognize the preponderance of the workload to accomplish this extension falls on your organization. If we may be of assistance in any way please let me know. As you know, it is essential that we complete the action prior to June 30, 1998.

cc: MAR-600, 610, 610.1, 611, 612, 613, 614(2)
W. Cutrel, R. Jackson, P. Carlton
F:\users\614\exhange\extreq~1.wpd:03/05/98:db

US1481

**Williams, Richard <MARAD>**

**From:** Patrick Carlton [Patrick Carlton at MARAD6] on behalf of Patrick Carlton
**Sent:** Tuesday, March 31, 1998 2:15 PM
**To:** Richard Williams
**Cc:** William Whittington
**Subject:** SP Proposal

Dick,

Spent better part of last night reviewing the Shepard-Patterson proposal, for extension of the logistics support contract. The following points are made:

Section 1: Executive Summary:

Paragraph 1.5 Overhead - discussed a reduction in the contractors overhead rate for Option Years 5 - 9. My concern, can the contractor afford to take a 9.4% reduction over the five year period? Inflation and increasing operating costs may put the contractor at risk. Efficiency and support may also suffer.

Paragraph 1.6 General and Administrative Costs (G & A) - discussed a reduction in General and Administrative costs for Option Years 5 - 9. Again, concern for the contractor and its risk, proposing a reduction of 3.5 % over five year period. Can the contractor afford it?

Section 2: Labor Rates:

The contractor has proposed for the Option Years, a flat labor rate for all labor categories. While reviewing the labor rates and categories several points come to mind:

1. The contractor is adding 4 additional people, (1) Senior Logistician, (1) System Analyst II, and (2) Key Entry Operator II. It appears that these people will be or have been hired by the contractor, in Option Years 3, 4, 5.

2. There is a concern with regards to phase-out of contractor staffing, beginning in Option Years 6 - 9. The contractor in Option Year 9 has reduced its labor pool by 80%. This appears to be confusing. The proposal should emphasis reduction vice a phase-out.

Section 4: Cost Proposal:

The contractor proposed $3,000,000.00 over five years. The Small Business Administration may object considering the history of this contract. History shows 3 - 4 million billed per year.

U.S. Department of Transportation
**Maritime Administration**

# Memorandum

Subject

Technical Evaluation of Cost Proposal
Contract Extension DTMA91-95-C-00024

Date.

17 April 1998

From

Rita Jackson, MAR-380
Contract Specialist

Reply to Attn of

To

Richard Williams, MAR-614
Chief, Division of Logistics Support

1. The Contractor, Shephard Patterson provided MAR-614 on March 30, 1998 with a copy of their cost proposal requesting an extension to their current contract DTMA91-95-C-00024. Based upon your memorandum dated March 6, 1998, the Division of Logistics Support wants this extension for five additional option year periods.

2. Provide your comments following review of the proposal. All pertinent technical, personnel and cost questions should be adequately addressed and if not, include in your memorandum to this office items that are not clear.

3. Indicate if the proposal is acceptable or unacceptable. State in writing a list of inadequacies of the proposal or technical deficiencies to the Contracting Officer and give a brief explanation of the reasons. List concerns, comments or recommendations.

4. Any discussions of your evaluation are sensitive information. Such information shall not be disclosed to any party outside the Government, or within who is not directly participating in the procurement process and do not have a need to know.

U.S. Department of Transportation

Maritime Administration

# Memorandum

Subject: Technical Evaluation of Cost Proposal Contract Extension DTMA91-97-C-00024

Date: 4200 Apr 21,1998

From: Richard W. Williams, MAR-614 Chief, Division of Logistics Support

Reply to Attn. of

To: Rita Jackson, MAR-380 Contract Specialist

In response to your memorandum of April 17, 1998, requesting that MAR-614 review and approve Shepard-Patterson's proposal submitted March 30, 1998, the following comments are provided:

Two areas of concern in Shepard-Patterson's proposal ~~hare~~ been comment. First, the reduction of G & A and Overhead and second, labor reduction in the final option years.

After further debate and discussions on these two issues, it was determined that based on the future growth of the contractor, which is speculative, we feel that the contractor can fulfil its offer to reduce G & A and Overhead without adverse impact upon the company or government. A further review of the contractor's labor pool in the final option years, gave the appearance that labor was being cut by 80%. However, we believe that the contractor showed these cuts in order to remain within SBA's $3,000,000.00 threshold.

Therefore, MAR-614 accepts Shepard-Patterson's cost proposal for five more option years, and requests that your office take whatever action is necessary to modify the current contract.

If you have any questions or comments, please feel free to contact myself or Patrick Carlton.

#

U.S. Department of Transportation
**Maritime Administration**

# JUSTIFICATION FOR OTHER THAN FULL AND OPEN COMPETITION

*(See Federal Acquisition Regulations, DOT Acquisition Regulations, and Maritime Administration Acquisition Procedures)*

## I. PROGRAM OFFICE ACTION

A. I recommend that procurement action five (1) year option extensions

for Logistics Support Program.
(Description of Supply or Service)

be conducted under authority checked below.

Cost Estimate $ 3,000,000.00

| | |
|---|---|
| ☐ **FAR 6.302-1** (41 U.S.C. 253(c)(1)) | *Only one responsible source.* |
| ☐ **FAR 6.302-2** (41 U.S.C. 253(c)(2)) | *Unusual and compelling urgency.* |
| ☐ **FAR 6.302-3** (41 U.S.C. 253(c)(3)) | *Industrial mobilization; or experimental, developmental, or research work.* |
| ☐ **FAR 6.302-4** (41 U.S.C. 253(c)(4)) | *International agreement.* |
| ☒ **FAR 6.302-5** (41 U.S.C. 253(c)(5)) | *Authorized or required by statute.* |
| ☐ **FAR 6.302-6** (41 U.S.C. 253(c)(6)) | *National security.* |
| ☐ **FAR 6.302-7** (41 U.S.C. 253(c)(7)) | *Public interest.* |

B. The narrative justification attached is submitted in support of the above recommended action and is prepared in accordance with requirements established by the FAR, TAR, and MAPP. I certify that it is fully and accurately documented.

| Requisitioner *(Name and Title)* | Signature | Telephone No. | Date |
|---|---|---|---|
| Wayne A. Cutrell<br>Contracting Officer | [signature] | 202 366-2656 | 4/20/1998 |
| **Program Manager** *(Name and Title)* | Signature | Telephone No. | Date |
| Richard H. Williams<br>Chief, Div. of Logistics Support (COTR) | [signature] | 202 366-5079 | 4/28/98 |

US1064

## II. CONTRACTING OFFICER ACTION

***Contracting Office:*** (See Attached)

A. COMPETITIVE SOURCES *(Attach narrative explanation for each "Yes" answer.)*

(1) Market search conducted? *(Explain why not for "No" answer; for "Yes" attach results or indicate no response received.)* ☐ Yes ☑ No  WAC

(2) Is the effort a continuation of a previous effort by the proposed contractor? ☑ Yes ☐ No

(3) Has this item or service been procured previously? *(If so, what prior steps were taken to make this procurement a competitive one? What steps are to be taken to insure that the next procurement (if any) will be placed on a competitive basis?)* ☑ Yes ☐ No

B. I have reviewed the justification submitted and certify that, to the best of my knowledge and belief, it is accurate and complete and the anticipated cost to the Government will be fair and reasonable. I (recommend acceptance of) (approve) the proposed action for the procurement of this requirement.

| [signature] | 6-2656 | 4-30-98 |
|---|---|---|
| *Contracting Officer* | *Telephone No.* | *Date* |

## III. REVIEW BOARD ACTION

*(*Reasons for Disapproval Recommendations to be Attached)*

| *Recommendations** | *Name* | *Signature of Board Members* | *Date* |
|---|---|---|---|
| ☑ APPROVAL ☐ DISAPPROVAL | | [signature] | 5/1/98 |
| ☑ APPROVAL ☐ DISAPPROVAL | EDWIN B. SCHIMLER, JR. | Edwin B. Schimler Jr. | 5/1/98 |
| ☑ APPROVAL ☐ DISAPPROVAL | EDMUND T. SOMMER | Edmund T. Sommer | 5/1/98 |

## IV. AGENCY APPROVAL

| | | | |
|---|---|---|---|
| ☐ APPROVED ☐ DISAPPROVED $500,000 to $10,000,000 | *Name and Title* COMPETITION ADVOCATE J L MANN Jr MAR300 | *Signature* J L Mann Jr | *Date* 5-5-98 |
| ☐ APPROVED ☐ DISAPPROVED $10,000,000 to $50,000,000 | *Name and Title* HEAD CONTRACT ACTIVITY | *Signature* | *Date* |
| ☐ APPROVED ☐ DISAPPROVED All over $50,000,000 | *Name and Title* SENIOR PROCUREMENT EXECUTIVE | *Signature* | *Date* |

US1065

## II. CONTRACTING OFFICER ACTION

**A.** **(1)** NO. The review of rates will be based upon historical data and if necessary an audit of the contractors cost and rates or a recent DCAA review of their G&A and overhead rates proposed.

(2) YES. The effort is a continuation of current services provided by the incumbent, SHEPARD PATTERSON. The request is for an extension of the current services.

(3) YES. The service is currently with the Small Business Administration's 8(a) Program. This service has remained within the 8(a) Program for over ten years. This service is forecast as an ongoing procurement within the MARAD 8(a) set-aside program.

**DETERMINATION AND FINDING**
FOR OPTION EXTENSIONS
FOR MARAD CONTRACT DTMA91-95-C-00024

Findings:

The Maritime Administration (MARAD) is extending the Logistics Support Services Contract, DTMA91-95-C-00024 for an additional five (1) year option periods. The periods are to begin immediately following the conclusion of the fourth, and final, option year ending on 27 March 2000. The proposal provided to MARAD indicates a reasonable cost savings to the Government. Additionally, the period during the conclusion of the contract will be a critical period for the Logistics Program and with no interruption will enable us to sustain our present level of success. This period is also the time frame for the agency upgrade to the windows environment. Continuity of design, development, implementation and a understanding of the intricacies of the legacy system are essential to our success. A continuation of the contract avoids any loss of time and expenditure of additional funds that would occur in having another contractor come up-to-speed on the maintenance of our core systems.

The Ready Reserve Force (RRF) provides the resupply capability that would be available on short notice to carry cargo to support the deployment of US armed forces during national emergencies or international crisis. This contract provides the logistics support to the RRF vessels to ensure they are ready to support the deployment of a multi-division force. The operation requirements call for RRF ships to be activated in short time frames of 4, 5, 10, or 20 days.

The Contracting Officer hereby determines that the above described actions may be properly exercised based on the following:

1. Established prices are reasonable and clearly indicate that re-advertising, even if it was possible to remove this contract from the 8(a) program would obviously result in increased costs to the Government.

2. The Government's need for continuity of operation and the cost savings involved by not disrupting operations would be realized by approving this action.

3. The current contract has an overhead rate of 65.4%. The extension period will cap the overhead rates at 64.4%, 62.5%, 61%, 58%, and 56% for Option Years 5 through 9 respectively. The current G & A rate is 14.9%. The extension period proposes capping these rates for Option Years 5 through 9 at 14.4%, 13.5%, 12.3%, 12.2%, and 11.4% respectively. The rates for labor categories will remain constant the entire extension period.

DETERMINATION:

Based on the above, and in accordance with FAR 6.302-5 41 U.S.C. 253(c)(5) and 40 U.S.C. 474(16) approval of this action would be the most advantageous method of fulfilling the Government's need price and others factors considered.

Wayne A. Cutrell
Contracting Officer

4-30-98
Date

Tim P. Roark, Sr.
Director, Office of Acquisition

5-5-98
Date

**DETERMINATION AND FINDING**
FOR OPTION EXTENSIONS
FOR MARAD CONTRACT DTMA91-95-C-00024

Findings:

is

The Maritime Administration (MARAD) ~~is requesting the Small Business Administration~~'s ~~concurrence with~~ extending the Logistics Support Services Contract, DTMA91-95-C-00024 for an additional five (1) year option periods. The periods are to begin immediately following the conclusion of the fourth year, and final, option ending date of 26 March 2000. The proposal provided to MARAD indicates a reasonable cost savings to the Government. Additionally, the period during the conclusion of the contract will be a critical period for the Logistics Program and with no interruption will enable us to sustain our present level of success. This period is also the time frame for the agency upgrade to the windows environment. Continuity of design, development, implementation and a understanding of the intricacies of the legacy system are essential to our success. A continuation of the contract avoids any loss of time and expenditure of additional funds that would occur in having another contractor come up-to-speed on the maintenance of our core systems.

The Ready Reserve Force (RRF) provides the resupply capability that would be available on short notice to carry cargo to support the deployment of US armed forces during national emergencies or international crisis. This contract provides the logistics support to the RRF vessels to ensure they are ready to support the deployment of a multi-division force. The operation requirements call for RRF ships to be activated in short time frames of 4, 5, 10, or 20 days.

The Contracting Officer hereby determines that the above described actions may be properly exercised based on the following:

1. Established prices are reasonable and clearly indicate that re-advertising, even if it was possible to remove this contract from the 8(a) program would obviously result in increased costs to the Government.

2. The Government's need for continuity of operation and the cost savings involved by not disrupting operations would be realized by approving this action.

U.S. Department of Transportation

Maritime Administration

# Memorandum

Subject: ACTION: Contract DTMA91-95-C-00024

Date: 4200
May 6, 1999

From: Richard H. Williams, MAR-614
Chief, Division of Logistics Support

Reply to Attn. of:

To: Wayne Cutrell, MAR-380
Chief, Division of Marine Acquisition

Forwarded is our estimate for Option Years 4 through 9 of the referenced contract.

The logistics support program has evolved into an effective and efficient program, in large part because of the effectiveness of the professional logistics services acquired through the referenced contract. To ensure the continuance of logistic support services throughout the remaining option years, we have enclosed an estimate for each of the remaining option years. This estimate is considered adequate to ensure continuing support of the RRF at the predicted level of activity, and to allow us to respond to emergent requirements as they arise.

If you approve of the estimated amounts, please place a memorandum to that effect in the cognizant contract file for future reference if required. Please provide a copy of your action document to MAR-614 for inclusion in its records.

If you should need any additional information, please contact me.

#

Enclosure

cc: MAR-380, MAR-610, MAR-610.1, MAR-614,
Contract file

US1548

MAR-614's Option Years 4 - 5

| | | | | | | |
|---|---|---|---|---|---|---|
| Estimate: | $5,288,921.00 | $5,553,367.00 | $5,831,035.00 | $6,122,587.00 | $6,428,717.00 | $6,750,152.00 |
| Total Value: | | | | | | $35,974,779.00 |

U.S. Department of Transportation
Maritime Administration

# Memorandum

Subject: **ACTION**: Exercise of Option Year Logistics Support Contract DTMA91-95-C-00024

Date: 4000 FEB. 15, 2000

From: Richard H. Williams Chief, Division of Logistics Support

Reply to Attn of: MAR-614

To: Ben Burnowski Contracting Officer Office of Acquisition

Via: William F. Trost Director, Office of Ship Operations

Enclosed for your convenience is a disc that includes the updated specification for the subject contract. These updates are made necessary by several technological changes, enhancements, and grammatical errors noted in the original specification. The update is provided to support a recently approved 5-year extension to the subject contract.

We have reviewed all aspects of the performance of the MARAD logistics support contractor during the past year. Based on that performance, which has met or exceeded all specified requirements, it is appropriate to retain the services of the contractor for another year.

In accordance with the terms and conditions of contract DTMA91-95-C-00024, please exercise Option Year 5 of the MARAD logistics support contract with Shepard-Patterson and Associates.

Documentation to provide funding for this contractual commitment will be forwarded separately.

If you have any questions or comments, please contact me at (202) 366-6558.

#

cc: 383(WILLIAMS), 610, 610.1, CONTRACT FILE,
F:\EXCHANGE\MAR_614\OPTNYR5

US0592

JUSTIFICATION FOR THE EXERCISE OF OPTION YEAR FOUR
UNDER CONTRACT DTMA91-95-C-00024

Findings:

Clause I.14 "Option to Extend the term of the Contract - Services" of the subject contract allows the Government the option to extend the period of performance for an additional 12 months at the option rates/costs set forth in the contract.

In accordance with the contract, funds are obligated by delivery order; therefore, no funds are committed by the exercise of this option. The requirement is within the allowable extension period; fulfills an existing need of the government and funds are available.

The contracting officer hereby determines that the above described option may be properly exercised based on the following:

1. The contractor is performing satisfactorily and as part of the section 8(a) program, has been certified by the SBA to be responsible within the contemplation of FAR 9.103.

2. A new solicitation would fail to produce a better price than that offered by this option.

3. Established prices are readily ascertainable and clearly indicate that re-advertising, even if it were possible to remove this contract from the 8(a) program would obviously result in increased costs to the Government.

4. The Government's need for continuity of operation and the cost savings involved by not disrupting operations would be realized by exercising the option.

DETERMINATION:

Based on the above, exercise of the option would be the most advantageous method of fulfilling the Government's need with price and other factors considered.

Erica L. Williams
Contracting Officer

3/22/2000
Date

US0591

(24)

**Burnowski, Benedict <MARAD>**

**From:** Burnowski, Benedict
**Sent:** Tuesday, April 10, 2001 5:39 PM
**To:** Williams, Erica
**Subject:** S-P Memo Files

**Attachments:** SP - AWARD FEE LETTER.doc; SP-AWARD FEE JUST-MEMO.doc; SP-AWARD FEE PRENEG111.doc

Erica:

Attached files are the pre-neg memo, memo to amend the justification and letter to S-P.

SP - AWARD LETTER.doc (1 SP-AWARD JUST-MEMO.doc SP-AWARD RENEG111.doc

Ben

Mr. Glenn I. Downer
Vice President
Shepard-Patterson
2001 Jefferson Davis Highway, Suite 610
Arlington, VA 22202

Subj: Contract DTMA91-95-C-00024

Ref: (a) Shepard-Patterson letter dated October 18, 2000
(b) Shepard-Patterson letter dated November 6, 2000

Dear Mr. Downer:

By Modification 0023 (signed by MARAD May 18, 1998) to the subject contract Shepard-Patterson, MARAD and the SBA agreed to extend the period of performance of this contract from five years to ten years. The total estimated cost plus fee of the modification was slightly less than $3 million. Within six months of the start of the first option year covered by the extension modification ('option year 5') your firm had invoiced over $3 million against the contract. Included in those billings was the entire award fee pool for option year 5. When the award fee limit for the year was reached MARAD withheld further fee payments. This resulted in your letter, reference (a), requesting an adjustment to the award fee in the contract.

I agree that the total estimated cost and fee for Modification 0023 should be adjusted, but, I do not concur with your proposed amounts for either. In regard to the total estimated cost exclusive of fee you have not provided enough information for me to analyze their reasonableness. I have done a rough comparison between the estimates for the original contract and your present proposal and I find a great discrepancy between them. Please show that your estimate uses overhead and G&A rates no higher than the capped rates you proposed for Modification 0023. Also please provide the methodology you used to derive the

number of labor hours for each year.

As to your proposed fee adjustment, I believe that your reasoning and methodology are a not valid basis for determining a fair and reasonable adjustment. Your proposal is ultimately based on charging fee as a percentage of costs incurred. This method of contracting is prohibited. I propose that the contract be modified to include the following fee adjustment which I believe is fair and reasonable:

| | AWARD FEE POOL |
|---|---|
| 1. Option Yr 5 | $ 370,099 |
| 2. Option Yr 6 | $ 339,931 |
| 3. Option Yr 7 | $ 311,517 |
| 4. Option Yr 8 | $ 311,517 |
| 5. Option Yr 9 | $ 311,517 |
| 6. Total Pool | $1,644,581 |

It is apparent from Modification 0023 and the available documentation related to it that the cost estimates included in the modification were artificially constructed to match a total dollar amount ($3,000,000) and do not represent a valid estimate of the cost to perform the work the modification required. The key question on developing the fee objective is what would have been the true estimate, not the actual cost which would not have been known but the true projection, of the cost to perform the work required by Modification 0023. Since the cost estimates in Modification 0023 are defective for this purpose another basis has to be used.

The fee objective I propose is based on the award fee pool used in the first five years of the contract. This was done for several reasons. The scope of work is stated to be the same for both five year periods and in fact the total labor hours projected for the first five contract years and the your projections for next five years in your November 6, 2000 letter are almost the same, 314,640 hours versus 316,128 hours. To find out how escalation would affect the cost estimate a loaded labor rate exclusive of fee was computed in each of the first five contract years and the percentage change from year to year was determined. The average change was 1.01%.

Using these elements the fee objective was derived as

follows $1,564,762 (total award fee pool for first five years) X 1.0047292 (projected hrs by contractor for last five yrs (316,128) / estimated hours in contract for first five yrs (314,640)) X 1.0510101 (escalation factor 1.01% compounded for five years) = $1,644,581. The award fee pools for individual years was computed by dividing that year's labor hours by the total labor hours and multiplying that percentage by the total award fee pool invoiced in the evaluation period.

I further propose that it be established that the amounts of available award fee for each performance evaluation period and the amount of provisional fee available for payment be determined in the following manner. The total annual award fee pool shall be divided by four and the resulting amount will be the award fee available for each evaluation period. Provisional fee up to half the available award fee for the evaluation period may billed as it is now in amounts equivalent to 4% of the costs incurred on each invoice submitted in the evaluation period or by billing an amount equal to 1/12 of the award fee pool available for each two week period of performance.

Finally I propose that the terms and conditions applicable to the award fee and provisional fee be updated on any modification resulting from this matter.

I look forward to your response to this matter.

Sincerely,

Benedict J. Burnowski
Contracting Officer

Subject: Amend Justification for other than full and open competition for five (1) year option extensions for logistics support program approved May 5, 1998 ('justification')

From: Tim P. Roark, Sr.
Director, Office of Acquisitions

To: John L. Mann, Jr.
Head of the Contract Activity

In May 1998 Contract DTMA91-95-C-00024 a five year contract for logistics support was extended for an additional five years (Modification 0023). The original contract was awarded to Shepard-Patterson through the SBA 8(a) program. When awarded the estimated cost was in excess of $21,000,000. Although the original contract and the extension have the same scope of work, SBA insisted as a condition of its being a signatory to the extension that the total cost be limited to $3,000,000. Although MARAD executed and approved a justification for Modification 0023, SBA's condition precluded consideration of a higher dollar value sole source award. MARAD acquiesced to SBA's condition because participation by SBA would keep the contract in the 8(a) program thus furthering MARAD's implementation of the Government's socio-economic goals until the $3,000,000 in the contract had been expended. The $3,000,000 threshold has now been surpassed. By imposing its $3,000,000 limitation on the extension MARAD considers that SBA has rejected its offer to have the remainder of the contract's work within the 8(a) program. For the reasons given below you are requested to approve amendment of the subject justification's cited authority and cost estimate as confirmation of its underlying authority to modify contract DTMA91-95-C-00024 for costs and fee in excess of $3,000,000. It is estimated that the total costs plus fee for the entire five year period of performance will be between $35 - $37 million.

SBA's condition for signing the modification was not regulatory. FAR regulations permit sole source awards of any dollar value if there is not a reasonable expectation that at least two eligible and responsible 8(a) firms will submit offers at a fair market value (FAR 19.805-1). SBA's position on the cost limitation precluded an examination of whether this procurement could meet the condition for an award at an unlimited dollar value. It is considered that MARAD could almost certainly have met this condition at the time the modification was issued. It certainly <u>did</u> meet it in 2000.

Shepard-Patterson has a second contract which supports MARAD's logistics support program. This contract DTMA91-97-C-00005 provides spare parts purchasing support. In 2000 this contract was extended on a sole source basis so that its period of performance would run concurrently with that of contract DTMA91-95-C-00024 (this memo's subject contract). A key element of the sole source rationale (Attached) was that its work was so intertwined with the work covered by contract DTMA91-95-C-00024 that they both needed the same period of performance. Notice of this sole source action was published in the Commerce Business Daily for 45 days. No firms responded to the notice and the contract was extended. While this action was conducted to demonstrate that there was only one source that could perform the work required under DTMA91-97-C-00005 and successfully did so, because of the interconnection between the two contracts explained in the justification and used as its rationale, it rightly also applies to contract DTMA91-95-C-00024. Simply put, if it is proved that Shepard-Patterson is the only contractor who can perform the work required on contract DTMA91-97-C-00005 and the principal reason for this is that the work is so intertwined with the work required contract DTMA91-95-C-00024, it is equally proved and for the same reason that Shepard-Patterson is the only contractor who can perform the work required on contract DTMA91-95-C-00024.

Although not required to do so MARAD did execute a sole source justification for Modification 0023 (Attached). This justification was approved by you on May 5, 1998. Under MAG NOTE 6-1 you have the authority to approve sole source justifications up to $50,000,000. For obvious reasons (namely, being bound by the SBA conditions) the cost estimate used by the justification is $3,000,000 and its cited authority is FAR 6.302-5 'Authorized or required by statute'. Nevertheless the fact that the justification was executed prior to the execution of Modification 0023 is contemporaneous evidence of MARAD's affirmative opinion that it could meet the pre-requisite condition of FAR 19.805-1(b)(2) for sole source 8(a) awards of any amount, otherwise it is unnecessary or redundant. If this justification is not amended and both contracts not allowed to expire at the same time it seems apparent that, given the lack of response to the CBD notice of the sole source extension for contract DTMA91-97-D-00024, Shepard-Patterson would indefinitely be the only offeror on either contract competed unless they were competed at the same time. Amending this justification will open this work up for competition when both contracts expire in 2005.

You are requested to approve the amendment of the Justification for other than full and open competition used for Modification 0023 to cover the revised cost estimate ($35 - $37 million) and its exemption changed to 6.302-3 Industrial Mobilization (which was used as the authority for the extension to contract DTMA91-97-C-00005).

Approved___Disapproved___

______________________________

US0385

John L. Mann, Jr. Date
Head of the Contracting Activity

Pre-Negotiation Memorandum

Contract DTMA91-95-C-00024
Modification 0035
Logistics Support Services for the RRF

**1. Introduction and Purpose of the Negotiation**

Contract DTMA91-95-C-00024, awarded March 27, 1995 to Shepard Patterson and Associates under the Small Business Administration 8(a) program, provides MARAD with comprehensive logistics support for the Ready Reserve Force (RRF). It was awarded as a combined indefinite delivery, indefinite quantity and cost-plus-award-fee type contract with a period of performance that included a base year and four one-year options. Modification 0023 (Attachment 1) signed by MARAD May 18, 1998[1] added five additional one-year options to the contract.

The contract's period of performance prior to Modification 0023 extended from March 27, 1995 through March 26, 2000. The first option period ('option year 5') added under Modification 0023 began on March 27, 2000. If all the remaining options that were added by Modification 0023 were exercised the period of performance would extend until March 26, 2005. In both the basic contract and Modification 0023 each contract year corresponds to a CLIN and each of those CLINs includes a minimum order called a 'total guarantee', a maximum total number of labor hours, a total estimated cost, total award fee pool and total amount for the year. The following table compares the five-year totals for these elements between the basic contract and Modification 0023:

| **Item** | **Basic Contract** | **Mod. 0023** | **% Change** |
|---|---|---|---|
| 1. Minimum Order (Tot Guarantee) | $2,112,429 | $299,926 | -85.80% |
| 2. Max Labor Hrs | 314,640 | 83,000 | -73.62% |
| 3. Tot Est Cost | $19,559,527 | $2,794,698 | -85.71% |
| 4. Tot Awd Fee Pool | $1,564,762 | $205,250 | -86.88% |
| 5. Tot 5-Yr Amt | $21,124,289 | $2,999,948 | -85.80% |

[1] There are two modifications to the contract numbered 0023, one signed by MARAD May 18, 1998 and the other signed by MARAD on August 7, 1998. It is modification 0023 signed by MARAD on May 18, 1998 that added the five additional one-year options and all references to modification 0023 in this memo, unless otherwise specified, refer to the modification 0023 signed May 18, 1998.

This comparison would seem to imply a significant reduction in the magnitude of work to be performed in the second five-year period. This is not the case. Although the original contract was awarded for an amount in excess of $21 million, Modification 0023 with the same scope of work and length of performance was issued for approximately $3 million. Modification 0023 was issued with the consent of the Small Business Administration (SBA) who signed the modification on the condition that it not exceed $2.9 million (Attachment 2).

The first option year covered by Modification 0023 estimated a total cost of $1,290,765 for the year and set the award fee pool at $87,783. Although the option started on March 27, 2000, the contractor had billed the entire award fee pool for the year by August 15, 2000 (Invoice 150) under the provisional fee procedures contained in the contract. In the first six months of the option period the contractor was paid $3,315,889.44 inclusive of fee (Invoices 141 through 153). This exceeds not only the first option year total estimated cost but the total estimated cost for the entire five additional options in Modification 0023. When the award fee pool for the first option year was expended the contractor requested that the fee be increased. In making that request the contractor asked that the total estimated cost plus award fee pool of Modification 0023 be increased by $33,321,752 from $2,999,948 to $36,321,700. The purpose of this negotiation is to consider the contractor's request for additional funds and whether the fee should be increased and if so by how much.

**2. Description of the Acquisition**

This is a cost plus award fee type contract to provide MARAD with comprehensive logistics support. Although the primary purpose of this modification is to adjust the contract award fee pool, if executed, it will acknowledge a more than $30,000,000 cost increase on the work covered by Modification 0023 to the contract. It is apparent from Modification 0023 and the available documentation related to it that the cost estimates included in the modification were artificially constructed to match a total dollar amount ($3,000,000) and do not represent a valid estimate of the cost to perform the work the modification required.

In order to replace the cost estimate in Modification 0023 with a cost estimate that addresses the work to be performed two questions must be addressed: 1) Given the basis for the cost estimates used in Modification 0023 and the proposed total dollar amount increase in the contract for this modification, under what authority can the modification be executed and; 2) how do we ensure that any adjustment in fee avoids the prohibited cost-plus-a-percentage-of-cost system (FAR 16.102(c)) but at the same time fairly reflects the amount of work to be performed. The first question is addressed in the section
There follows a list of regulations and contract terms and

provisions applicable to the award fee on this contract; a brief explanation of the fee available, fee paid and procedures for its payment; a discussion of the authority upon which this modification will be based and; a consideration of how the cost estimates and fee agreed upon in Modification 0023 were reached. In order to decide whether it is equitable to adjust the fee in the contract, the contract provisions and procurement regulations pertinent to setting the fee need to be considered. It also important to consider how the cost estimates and fee agreed upon in Modification 0023 was reached.

I. Relevant contract terms and provisions:

a. SF26 block 15A
b. Section B2. Compensation
c. Section B pages with CLINS especially first paragraph re minimum and maximum orders and provisional fee
d. TAR clause 52.212-70 'Level of Effort-Cost Reimbursement Term Contract' referred to in paragraph F.7(h)
e. Paragraph G.6 'Payment of Provisional Award Fee'
f. Paragraph G.11 'Submission of Invoices for Payment of Award Fee'
g. Paragraph G.12 'Adjustment of Potential Award Fees'
h. Paragraph H.11 'Special Contract Requirements'
i. Paragraph H.13 'Incremental Funding of Task Orders'
j. Paragraph I.1.I FAR 52.232-20 'Limitation of Cost'
k. Paragraph I.1.I FAR 52.232-22 'Limitation of Funds'
l. Paragraph I.8 'Estimated Cost, Base Fee, and Award Fee'
m. TAR clause 1252.216-73 'Payment of Base and Award Fee' referred to in paragraph I.8
n. Paragraph I.9 'Payment of Award Fee'
o. Paragraph I.10 'Determination of Award Fee Earned'
p. Paragraph I.11 'Performance Evaluation Plan'
q. Paragraph I.12 'Distribution of Award Fee'

II. Pertinent Regulations

a. FAR 6.304 Approval of the justification [for other than full and open competition]
b. FAR 16.102(c) re cost-plus-percentage-of-cost prohibition
c. FAR 16.301-2 Application [of cost-reimbursement contracts]
d. FAR 19.805-1 re competitive 8(a) thresholds
e. MAG NOTE 6-1 Justification for Other than Full and Open Competition

<u>Fee and Fee Payment Procedures</u>

The entire fee paid under this contract is award fee. Although there is no base fee the contractor is allowed to bill as a provisional fee 4% of its costs. When the award fee is determined, the provisional fee is credited against the fee to be paid.

The total award fee pool for the first five years of the contract is $1,564,762. The contractor was awarded $1,462,756 out of the pool. The five year award fee pool in Modification 0023 is $205,250, of that $87,783 is allotted to option year 5 which is the completed portion of Modification 0023's period of performance. To date MARAD has paid out $283,763 in option year five. The total award fee pool for the entire contract is $1,770,012. The contract the total award fee paid out is $1,746,519, leaving $23,493 to cover the remaining four years of the contract.

Authority to Issue This Modification

This modification is essentially a re-formation of Modification 0023. It needs to be re-formed because the modification's cost estimate reflects a $3 million cost ceiling imposed by the SBA, not a valid estimate of the cost to perform the work. As discussed below it can be re-formed because SBA's imposition of the cost ceiling on the modification was a discretionary act by the Agency as a party to the contract not, a mandatory act required by its role in enforcing section 8(a) regulations. While MARAD may have chosen to agree to this limitation in order to pursue the Government's socio-economic goals to the maximum extent possible, it had the authority at the time of the award of Modification 0023 to make award on a sole source basis to the extent contemplated by this re-formation of Modification 0023.

Under the SBA 8(a) program, acquisitions are competed if they exceed $3 million in value and there is not a reasonable expectation that at least two eligible and responsible 8(a) firms will submit offers at a fair market value (FAR 19.805-1). Under FAR 6.302-5 procurements authorized or required by statute including sole source awards under the 8(a) program are exempted from the requirement for full and open competition. Sole source awards under the 8(a) program do not require written justifications and approvals (FAR 6.302-5(c)(2)(i)).

SBA made three conditions to accepting Modification 0023: MARAD had to submit a copy of its authority to extend the contract for another five years; confirm that the five year extension would not exceed $2.9 million and; rescind Modification 0017. By insisting on its second condition SBA precluded any consideration of the criterion for allowing sole source 8(a) awards over $3 million, that is, whether or not there was a reasonable expectation that at least two eligible offers at a fair market value. There is evidence contemporary with the negotiations and execution of the Modification that MARAD would have addressed this condition if allowed to do so by SBA. And evidence subsequent to the issuance of the modification that if addressed MARAD would have successfully and satisfactorily demonstrated that this procurement action falls under this condition.

Although not required to do so (see relevant citation noted above) MARAD did execute a sole source justification for Modification 0023 (Attachment 3). This justification was approved by its Associate Administrator on May 5, 1998 who under MAG NOTE 6-1 has the authority to approve sole source justifications up to $50,000,000. For obvious reasons (namely, being bound by the SBA conditions) the cost estimate used by the justification is $3,000,000 and its cited authority is FAR 6.302-5 'Authorized or required by statute'. Nevertheless the fact that the justification was executed prior to the execution of Modification 0023 is contemporaneous evidence of MARAD's affirmative opinion that it could meet the pre-requisite condition of FAR 19.805-1(b)(2) for sole source 8(a) awards of any amount, otherwise it is unnecessary or redundant. As the fact that SBA's limitation of the Modification's cost to $2.9 million is a record of its opinion that there is a reasonable expectation that at least two eligible and responsible 8(a) firms will submit offers at a fair market value (FAR 19.805-1), MARAD's written justification and approval is a record of its contrary opinion. The file doesn't show any that any objective test was conducted to resolve the matter, the SBA's opinion simply prevailed. Two years after the modification was executed the question of whether there is more than one responsible offer who could do this work was examined using the procedures for determining the validity 'other than full and open competition' procurements.

Shepard-Patterson has a second contract which supports MARAD's logistics support program. This contract DTMA91-97-C-00005 provides spare parts purchasing support. In 2000 this contract was extended on a sole source basis so that its period of performance would run concurrently with that of contract DTMA91-95-C-00024 (this memo's subject contract). A key element of the sole source rationale (Attachment 4) was that its work was so intertwined with the work covered by contract DTMA91-95-C-00024 that they both needed the same period of performance. Notice of this sole source action was published in the Commerce Business Daily for 45 days. No firms responded to the notice and the contract was extended. While this action was conducted to demonstrate that there was only one source that could perform the work required under DTMA91-97-C-00005 and successfully did so, because of the interconnection between the two contracts explained in the justification and used as its rationale, it rightly also applies to contract DTMA91-95-C-00024. Simply put, if it is proved that Shepard-Patterson is the only contractor who can perform the work required on contract DTMA91-97-C-00005 and the principal reason for this is that the work is so intertwined with the work required contract DTMA91-95-C-00024, it is equally proved and for the same reason that Shepard-Patterson is the only contractor who can perform the work required on contract DTMA91-95-C-00024.

From the above it is concluded that the underlying authority to issue this modification is the authority cited in the

Justification for other than full and open competition used to extend contract DTMA01-97-C-00005, that it was precluded from being used to issue Modification 0023 because of the cost ceiling limitation imposed by SBA and agreed to by MARAD in order to have $3,000,000 of the modification's cost be classified under the section 8(a) program. It will be recommended that the Justification for other than full and open competition used for Modification 0023 be amended to cover the revised cost estimate and its exemption changed to 6.302-3 Industrial Mobilization (which was used as the authority for the extension to contract DTMA91-97-C-00005). Construing SBA imposition of a $3 million as rejecting MARAD's offer of the entire scope of the modification being placed in the 8(a) program the continuation would no longer be classified as an 8(a) award.

Modification 0023 - Cost Estimate and Fee

There is no price negotiation memorandum for Modification 0023 in the file. The documentation available is Shepard-Patterson's cost proposal dated March 30, 1998 (Attachment 5), a memo dated April 21, 1998 on the 'Technical Evaluation of Cost Proposal Extension DTMA91-95-C-00024' (Attachment 6) and a 'Determination and Finding for Option Extensions for MARAD Contract DTMA91-95-C-00024' (Attachment 7).

| | Op Yr 5 | Op Yr 6 | Op Yr 7 | Op Yr 8 | Op Yr 9 | 5-Yr Total |
|---|---|---|---|---|---|---|
| 1 Mar 30th Proposal Total labor | $1,202,982 | $808,316 | $379,669 | $229,752 | $171,014 | $2,791,734 |
| 2 Mod 0023 - Total Est Cost (Includes ODCs) | $1,202,982 | $808,316 | $379,669 | $230,962 | $172,769 | $2,794,698 |
| 3 Mar 30th Proposal ODCs | $87,783 | $57,718 | $27,528 | $19,609 | $15,576 | $208,214 |
| 4 Mod 0023 - Award Fee Pool | $87,783 | $57,718 | $27,528 | $18,400 | $13,821 | $205,250 |
| 5 Mar 30th Proposal Total | $1,290,765 | $866,034 | $407,197 | $249,362 | $186,590 | $2,999,949 |
| 6 Mod 0023 - Total | $1,290,765 | $866,034 | $407,197 | $249,362 | $186,590 | $2,999,948 |
| 7 Mar 30th Proposal Labor Hours | 31,826 | 20,124 | 8,892 | 6,084 | 3,944 | 70,870 |
| 8 Mod 0023 Labor Hours | 32,000 | 23,000 | 17,000 | 7,000 | 4,000 | 83,000 |

Item numbers 1, 3 and 5 are from the spreadsheet entitled 'Price Summary by Option Year' of Shepard-Patterson's March 30, 1998 cost proposal. Item number 7 is from the spreadsheet entitled 'Option Year Labor Hour Summary'. Item numbers 2, 4, 6 and 8 are from section B of Modification 0023. In Option Years 5, 6 and 7 the totals compared by item numbers 1 and 2, and, 3 and 4 match. In all Option Years, item numbers 5 and 6 match. All these matches show that the totals in Shepard-Patterson's cost proposal were used in Modification 0023. It is also evident from the titles given in the cost proposal and modification that identify the costs being totaled, that the modification uses figures from Shepard-Patterson's cost proposal but ways unintended by the proposal. The cost proposal 'Price Summary by Option Year' summary has a subtotal for direct labor and ODCs but no award fee pool. In Modification 0023 the cost proposal's 'direct labor' subtotal becomes the total estimated cost (includes ODCs), the cost proposal's 'ODC' subtotal became the modification's award fee pool. No file documentation explains this result.

Shepard-Patterson's cost proposal proposed 0% labor escalation in the extension years. It does this by lowering and capping it overhead and G&A rates to offset an estimated 2% per year raise in salaries. Both MARAD's technical evaluation memo and its D&F on the option extensions discuss the acceptance of the proposed rate caps by MARAD. While Shepard-Patterson's cost proposal does not propose an award fee pool, it does include in each labor rate and in the ODC total what it calls a 'Provisional Base Fee' of 4%. The narrative states that the proposal is based on the assumption that the contract fee structure of a 0 - 8% award fee with a provisional fee of 4% will continue in the extension.

In summary, the amounts proposed in Shepard-Patterson's cost proposal and the promises it makes (e.g. caps on OH and G&A) are the basis for Modification 0023. However, the connection between them is ambiguous and there is no available documentation to the clears up the ambiguity. As discussed below it was attempted to make a reasonable use of the available documentation in developing the Government pre-negotiation objective.

**3. The Name, Position, and Organization of Each Person Representing the Contractor and MARAD in the Negotiation**

To be determined.

**4. The Current Status of any Contractor Systems to the Extent They Affected and Will Be Considered in the Negotiation**

Several DCAA audits have been performed on this contract including an ongoing cost incurred audit reviewing the contractor's costs on this contract from its inception through the contractor's fiscal

year 1999 (DCAA has completed audit report no. 6201-2001T10160001 on Shepard Patterson's CFY 1996 Direct Costs (Attachment 8)). In accordance with FAR 16.301-3(a) these audits show that the contractor's accounting system is adequate for determining costs applicable to the contract.

**5. If Cost or Pricing Data Were Not Required in the Case of Any Price Negotiation Exceeding the Cost or Pricing Data Threshold, the Exception Used and the Basis for it.**

In accordance with FAR 15.403-2(b) Cost or pricing data are not required for proposals used solely for overrun funding or interim billing price adjustments.

**6. If Cost or Pricing Data Were Required, the Extent to which the Contracting Officer--**

Not applicable.

**(i) Relied on the cost or pricing data submitted and used them in negotiating the price**

Not applicable.

**(ii) Recognized as inaccurate, incomplete, or non-current any cost or pricing data submitted**

Not applicable.

**(iii) Determined that an exception applied after the data were submitted and therefore, considered not to be cost or pricing data**

Not applicable.

**7. Summary of the Offeror's Proposal and the Government's Negotiation Objective**

| ITEM | CONTRACTOR'S PROPOSED MOD 23 | CURRENT/ MOD 23 | GOVERNMENT OBJECTIVE |
|---|---|---|---|
| 1. Minimum Order (Tot Guarantee) | N/A | $299,926 | $299,296 |
| 2. Max Labor Hrs | 316,128 | 83,000 | 316,128 |
| 3. Tot Est Cost | $33,631,204 | $2,794,698 | $24,603,810 |
| 4. Tot Awd Fee Pool | $2,690,496 | $205,250 | $1,644,581 |
| 5. Tot 5-Yr Amt | $36,321,700 | $2,999,948 | $26,547,687 |

<u>Summary</u> - The contractor's proposal provides a revised estimate of the cost to perform the remainder of the contract and concurrently requests an increase in its fee. The Government position is that the proposed costs are higher than can be supported based on

available. To the extent that those revised costs are not a result of original estimates of insufficient accuracy due to the uncertainty of the uncertainties in contract performance but produced to meet a pre-determined amount (i.e. $3,000,000) it is the Government's position that the contractor is due an increase in fee.

Contractor's Proposal - The contractor's proposal consists of its letters dated October 18, 2000 (Attachment 9) and November 6, 2000 (Attachment 10). The Contractor proposes to increase the estimated labor hours covered by Modification 0023 by 233,128 hours from 83,000 hours to 316,128 hours. No basis for the hours is given:

Total Estimated Costs - The contractor proposes an increase of $30,836,506 from $2,794,698 to $33,631.204 in the total estimated cost of the contract. The contractor claims this is due to increased requirements for logistics services experienced in the full range of support provided. The costs included a -10% inflation factor for option years 7 through 9.

Fee - The contractor's October 18th letter references two MARAD letters disallowing provisional fee amounts on invoices $150 and #151 (due to delays in processing the modification $163,551 of additional fee has been released.) The fee was disallowed because the total award fee pool for option year 5 had been paid. The contractor requests an increase in fee because the scope of work had grown substantially. They request the fee be increase by $2,485,246 from $205,250 to $2,690,496.

Government Objective -

1. The Minimum Order - The minimum order required by modification 0023 has been met and is not an issue.

2. Maximum Labor Hours - By email dated March 21, 2001, Richard Williams, MAR-614, the COTR stated the number of hours S-P proposed was sufficient. The email correctly notes the contractor did not provide the methodology used to derive the labor hours estimated. However, original contract and modification 0023 have the same scope of work and the same period of performance. The contractor proposed practically the same number of hours for each period (314,640 hours versus 316,328 hours. These estimates seam to corroborate each other.

3. Total estimated costs - The contractor does not explain the basis of his proposed total estimated costs of $33,631,204 except to say that 4% inflation factor is applied to option years 7, 8 & 9. The total estimated costs for the original 5-year period of performance was $19,559,527. Labor costs were approximately 25% more than originally estimated during the original contract period and there are slightly more labor

hours for modification 0023. If we take these factors into consideration or total estimated cost of $24,603,810, this leaves $9,027,393 unexplained. The contractor will be asked to account for this discrepancy, e.g. whether it is due to increased work or inflation, but most importantly whether the caps proposed in modification 0023 for OH and G&A were used in the estimate.

4. Award Fee Pool

See discussion below in section 10.

**8. The Most Significant Facts or Considerations Controlling the Establishment of the Prenegotiation Objectives**

The most significant fact in establishing the pre-negotiation objectives is that the cost estimates used in Modification 0023 cannot be used as a reliable basis for estimating the cost to performed the work required. Given that fact the most important consideration in establishing the pre-negotiation objectives for the award fee pool is to make sure that the award fee is based on a true estimated cost projection. This cannot be actual incurred cost after the fact as the contractor proposes since that would constitute an illegal cost-plus-a-percentage-of-cost contract.

**9. To the Extent Such Direction Has a Significant Effect on the Action, a Discussion and Quantification of the Impact of Direction Given by Congress, Other Agencies and Higher-Level Officials**

To no extent.

**10. Basis for the Profit or Fee Objective**

**AWARD FEE POOL**

| CONTRACT YEAR | CONTRACTOR'S PROPOSED MOD 23 | CURRENT MOD 23 | GOVERNMENT OBJECTIVE |
|---|---|---|---|
| 1. Option Yr 5 | $560,854 | $87,783 | $370,099 |
| 2. Option Yr 6 | $535,748 | $57,718 | $339,931 |
| 3. Option Yr 7 | $510,601 | $27,528 | $311,517 |
| 4. Option Yr 8 | $531,026 | $18,400 | $311,517 |
| 5. Option Yr 9 | $552,267 | $13,821 | $311,517 |
| 6. Total Pool | $2,690,496 | $205,250 | $1,644,581 |

As discussed above, the key question on developing the fee objective is what would have been the true estimate, not the

actual cost which would not have been known, but the true projection of the cost to perform the work required by Modification 0023. Since the cost estimates in Modification 0023 are defective for this purpose another basis has to be used.

The fee objective is based on the award fee pool used in the first five years of the contract. This was done for several reasons. The scope of work is stated to be the same for both five year periods and in fact the total labor hours projected for the first five contract years and the contractor's projections for next five years in its November 6, 2000 letter are almost the same 314,640 hours versus 316,128 hours. To find out how escalation would affect the cost estimate a loaded labor rate exclusive of fee was computed in each of the first five contract years and the percentage change from year to year was determined. The average change was 1.01%.

Using the elements the fee objective was derived as follows $1,564,762 (total award fee pool for first five years) X 1.0047292 (projected hrs by contractor for last five yrs (316,128) / estimated hours in contract for first five yrs (314,640)) X 1.0510101 (escalation factor 1.01% compounded for five years) = $1,644,581. The award fee pools for individual years was computed by that years labor hours by the total labor hours and multiplying that percentage by the total award fee pool.

**11. Documentation of Fair and Reasonable Pricing**

A determination that the negotiated price for Modification 0035 to Contract DTMA91-95-C-00024 with Shepard-Patterson, Inc. is considered fair and reasonable will be made at the conclusion of negotiations.

Erica L. Williams
Contract Specialist

Date

Benedict J. Burnowski
Contracting Officer

Date

Approving Official

John E. Carr, Deputy Director Date
Office of Acquisition

**List of Attachments**

| Number | Title |
|---|---|
| 1 | Modification 0023 signed by MARAD May 18, 1998 |
| 2 | SBA letter dated April 30, 1998 |
| 3 | Justification for other than full and open competition for five (1) year option extensions for logistics support program |
| 4 | Justification for other than full and open competition for the spare parts purchasing support contract |
| 5 | Shepard-Patterson Cost Proposal dated March 30,1998 |
| 6 | Technical Evaluation Memo dated April 21, 1998 |
| 7 | Determination and Finding for Option Extensions |
| 8 | DCAA Audit Report No. 6201-2001T10160001 |
| 9 | Contractor Proposal Letter dated October 18, 2000 |
| 10 | Contractor Proposal Letter dated November 6, 2000 |

(25)

**Burnowski, Benedict <MARAD>**

**From:** Williams, Erica
**Sent:** Thursday, April 19, 2001 3:40 PM
**To:** Burnowski, Benedict
**Subject:** Award Fee Mod

Ben

I have the mod back from MAR-614, unsigned.

Dick's primary comment is to soften the statement under #3 Description of Acquisition, "...were artificially constructed..." He wants the statement to read the same or similar to "...derived from best available operational estimates...." Dick is concerned about it appearing that MAR-614 intentionally provided MAR-380 with a false estimate, etc.

I explained to Patrick that the intent of the statement is not to lay blame on anyone, but that some sort of explanation has to be spelled out in the memo to aknowledge the extremely low estimate used for the 5 extention years when the scope of work remained the same as the previous 5 years which totalled approx. 10 times that amount.

Suggestion...

Erica

(26)

**Burnowski, Benedict <MARAD>**

**From:** Burnowski, Benedict
**Sent:** Thursday, April 19, 2001 3:58 PM
**To:** Williams, Erica
**Subject:** RE: Award Fee Mod

Erica:

Show Patrick the memo from Dick dated Apr 21, 1998 subject 'Technical Evaluation of Cost Proposal Contract Extension DTMA91-97-C-00024' especially in the 3rd paragraph where it says 'A further review of the contractor's labor pool in the final option years, gave the appearance that labor was being cut by 80%. However, we believe that **the contractor showed these cuts in order to remain with SBA's $3,000,000.00 Threshold.' [boldface added].**

I don't mind softening the language but I do want to make the point that everyone knew the cost for the extension was going to be much higher than $3,000,000 but we executed the mod for only $3.000,000 because it was a condition imposed by SBA and we wanted their signature on the mod to keep it the 8(a) program until that money was expended.

Ben

-----Original Message-----
**From:** Williams, Erica
**Sent:** Thursday, April 19, 2001 3:40 PM
**To:** Burnowski, Benedict
**Subject:** Award Fee Mod

Ben

I have the mod back from MAR-614, unsigned.

Dick's primary comment is to soften the statement under #3 Description of Acquisition, "...were artificially constructed..." He wants the statement to read the same or similar to "...derived from best available operational estimates...." Dick is concerned about it appearing that MAR-614 intentionally provided MAR-380 with a false estimate, etc.

I explained to Patrick that the intent of the statement is not to lay blame on anyone, but that some sort of explanation has to be spelled out in the memo to aknowledge the extremely low estimate used for the 5 extention years when the scope of work remained the same as the previous 5 years which totalled approx. 10 times that amount.

Suggestion...

Erica

(27)

**Burnowski, Benedict <MARAD>**

**From:** Williams, Erica
**Sent:** Thursday, April 19, 2001 4:20 PM
**To:** Burnowski, Benedict
**Subject:** RE: Award Fee Mod

Patrick pointed the statement in that memo out to me, as well. And I re-iterated to him that memo indicates that MAR-614 was aware of the significant reduction and accepted the proposed $3M for the out years. He repeated that the $3M was still the reasonably expected effort needed for those out years and therefore, MAR-614 accepted S-P's proposal.

I still told him that there was no way that during the first 5 years, they spent more that $3M per year so how could they, then and now, say that $3M was an reasonable assumption of need for the 5 additional years.

But anyway, I had told him that I thought the wording could be softened a bit without losing the intended meaning.

-----Original Message-----
**From:** Burnowski, Benedict
**Sent:** Thursday, April 19, 2001 3:58 PM
**To:** Williams, Erica
**Subject:** RE: Award Fee Mod

Erica:

Show Patrick the memo from Dick dated Apr 21, 1998 subject 'Technical Evaluation of Cost Proposal Contract Extension DTMA91-97-C-00024' especially in the 3rd paragraph where it says 'A further review of the contractor's labor pool in the final option years, gave the appearance that labor was being cut by 80%. However, we believe that **the contractor showed these cuts in order to remain with SBA's $3,000,000.00 Threshold.' [boldface added].**

I don't mind softening the language but I do want to make the point that everyone knew the cost for the extension was going to be much higher than $3,000,000 but we executed the mod for only $3,000,000 because it was a condition imposed by SBA and we wanted their signature on the mod to keep it the 8(a) program until that money was expended.

Ben

-----Original Message-----
**From:** Williams, Erica
**Sent:** Thursday, April 19, 2001 3:40 PM
**To:** Burnowski, Benedict
**Subject:** Award Fee Mod

Ben

I have the mod back from MAR-614, unsigned.

Dick's primary comment is to soften the statement under #3 Description of Acquisition, "...were artificially constructed..." He wants the statement to read the same or similar to "...derived from best available operational estimates...." Dick is concerned about it appearing that MAR-614 intentionally provided MAR-380 with a false estimate, etc.

I explained to Patrick that the intent of the statement is not to lay blame on anyone, but that some sort of explanation has to be spelled out in the memo to aknowledge the extremely low estimate used for the 5 extention years when the scope of work remained the same as the previous 5 years which totalled approx. 10 times that amount.

Suggestion...

Erica

(28)

**Burnowski, Benedict <MARAD>**

| | |
|---|---|
| **From:** | Burnowski, Benedict |
| **Sent:** | Thursday, April 19, 2001 9:42 PM |
| **To:** | Williams, Erica |
| **Subject:** | RE: Award Fee Mod |

Erica:

See if replacing 'artificially constructed to match' with 'directed toward matching a total dollar amount ($3,000,000) imposed by SBA conditions to signing the modification' will satisfy their objection.

Thanks
Ben

-----Original Message-----
**From:** Williams, Erica
**Sent:** Thursday, April 19, 2001 4:20 PM
**To:** Burnowski, Benedict
**Subject:** RE: Award Fee Mod

Patrick pointed the statement in that memo out to me. as well. And I re-iterated to him that memo indicates that MAR-614 was aware of the significant reduction and accepted the proposed $3M for the out years. He repeated that the $3M was still the reasonably expected effort needed for those out years and therefore, MAR-614 accepted S-P's proposal.

I still told him that there was no way that during the first 5 years, they spent more that $3M per year so how could they, then and now, say that $3M was an reasonable assumption of need for the 5 additional years.

But anyway, I had told him that I thought the wording could be softened a bit without losing the intended meaning.

-----Original Message-----
**From:** Burnowski, Benedict
**Sent:** Thursday, April 19, 2001 3:58 PM
**To:** Williams, Erica
**Subject:** RE: Award Fee Mod

Erica:

Show Patrick the memo from Dick dated Apr 21, 1998 subject 'Technical Evaluation of Cost Proposal Contract Extension DTMA91-97-C-00024' especially in the 3rd paragraph where it says 'A further review of the contractor's labor pool in the final option years, gave the appearance that labor was being cut by 80%. However, we believe that **the contractor showed these cuts in order to remain with SBA's $3,000,000.00 Threshold.' [boldface added].**

I don't mind softening the language but I do want to make the point that everyone knew the cost for the extension was going to be much higher than $3,000,000 but we executed the mod for only $3,000,000 because it was a condition imposed by SBA and we wanted their signature on the mod to keep it the 8(a) program until that money was expended.

Ben

-----Original Message-----
**From:** Williams, Erica
**Sent:** Thursday, April 19, 2001 3:40 PM
**To:** Burnowski, Benedict
**Subject:** Award Fee Mod

Ben

I have the mod back from MAR-614, unsigned.

Dick's primary comment is to soften the statement under #3 Description of Acquisition, "...were artificially

constructed..." He wants the statement to read the same or similar to "...derived from best available operational estimates...." Dick is concerned about it appearing that MAR-614 intentionally provided MAR-380 with a false estimate, etc.

I explained to Patrick that the intent of the statement is not to lay blame on anyone, but that some sort of explanation has to be spelled out in the memo to aknowledge the extremely low estimate used for the 5 extention years when the scope of work remained the same as the previous 5 years which totalled approx. 10 times that amount.

Suggestion...

Erica

Pre-Negotiation Memorandum

Contract DTMA91-95-C-00024
Modification 0035
Logistics Support Services for the RRF

## 1. Introduction and Purpose of the Negotiation

Contract DTMA91-95-C-00024, awarded March 27, 1995 to Shepard Patterson and Associates under the Small Business Administration 8(a) program, provides MARAD with comprehensive logistics support for the Ready Reserve Force (RRF). It was awarded as a combined indefinite delivery, indefinite quantity and cost-plus-award-fee type contract with a period of performance that included a base year and four one-year options. Modification 0023 (Attachment 1) signed by MARAD May 18, 1998[1] added five additional one-year options to the contract.

The contract's period of performance prior to Modification 0023 extended from March 27, 1995 through March 26, 2000. The first option period ('option year 5') added under Modification 0023 began on March 27, 2000. If all the remaining options that were added by Modification 0023 were exercised the period of performance would extend until March 26, 2005. In both the basic contract and Modification 0023 each contract year corresponds to a CLIN and each of those CLINs includes a minimum order called a 'total guarantee', a maximum total number of labor hours, a total estimated cost, total award fee pool and total amount for the year. The following table compares the five-year totals for these elements between the basic contract and Modification 0023:

| Item | Basic Contract | Mod. 0023 | % Change |
|---|---|---|---|
| 1. Minimum Order (Tot Guarantee) | $2,112,429 | $299,926 | -85.80% |
| 2. Max Labor Hrs | 314,640 | 83,000 | -73.62% |
| 3. Tot Est Cost | $19,559,527 | $2,794,698 | -85.71% |
| 4. Tot Awd Fee Pool | $1,564,762 | $205,250 | -86.88% |
| 5. Tot 5-Yr Amt | $21,124,289 | $2,999,948 | -85.80% |

[1] There are two modifications to the contract numbered 0023, one signed by MARAD May 18, 1998 and the other signed by MARAD on August 7, 1998. It is modification 0023 signed by MARAD on May 18, 1998 that added the five additional one-year options and all references to modification 0023 in this memo, unless otherwise specified, refer to the modification 0023 signed May 18, 1998.

This comparison would ~~seem to~~ imply a significant reduction in the magnitude of work to be performed in the second five-year period. This is not the case. Although the original contract was awarded for an amount in excess of $21 million, Modification 0023 with the same scope of work and length of performance was issued for approximately $3 million. Modification 0023 was issued with the consent of the Small Business Administration (SBA) who signed the modification on the condition that it not exceed $2.9 million (Attachment 2). SBA had full knowledge of the expectation that the requirement would be significantly higher.

The first option year covered by Modification 0023 estimated a total cost of $1,290,765 for the year and set the award fee pool at $87,783. Although the option started on March 27, 2000, the contractor had billed the entire award fee pool for the year by August 15, 2000 (Invoice 150) under the provisional fee procedures contained in the contract. In the first six months of the option period the contractor was paid $3,315,889.44 inclusive of fee (Invoices 141 through 153). This exceeds not only the first option year total estimated cost but the total estimated cost for the entire five additional options in Modification 0023. When the award fee pool for the first option year was expended the contractor requested that the fee be increased. In making that request the contractor asked that the total estimated cost plus award fee pool of Modification 0023 be increased by $33,321,752 from $2,999,948 to $36,321,700. The purpose of this negotiation is to consider the contractor's request for additional funds and whether the fee should be increased and if so by how much.

**2. Description of the Acquisition**

This is a cost plus award fee type contract to provide MARAD with comprehensive logistics support. Although the primary purpose of this modification is to adjust the contract award fee pool, if executed, it will acknowledge a more than $30,000,000 cost increase on the work covered by Modification 0023 to the contract. It is apparent from Modification 0023 and the available documentation related to it that the cost estimates included in the modification were directed toward matching a total dollar amount ($3,000,000) imposed by SBA conditions to signing the modification and do not represent a valid estimate of the cost to perform the work the modification required.

In order to replace the cost estimate in Modification 0023 with a cost estimate that addresses the work to be performed two questions must be addressed: 1) Given the basis for the cost estimates used in Modification 0023 and the proposed total dollar amount increase in the contract for this modification, under what authority can the modification be executed and; 2) how do we ensure that any adjustment in fee avoids the prohibited cost-plus-a-percentage-of-cost system (FAR 16.102(c)) but at the same time fairly reflects the amount of work to be performed. There follows a list of regulations and contract terms and provisions applicable

to the award fee on this contract; a brief explanation of the fee available, fee paid and procedures for its payment; a discussion of the authority upon which this modification will be based and; a consideration of how the cost estimates and fee agreed upon in Modification 0023 were reached.
In order to decide whether it is equitable to adjust the fee in the contract, the contract provisions and procurement regulations pertinent to setting the fee need to be considered. It also important to consider how the cost estimates and fee agreed upon in Modification 0023 was reached.

I. Relevant contract terms and provisions:

a. SF26 block 15A
b. Section B2. Compensation
c. Section B pages with CLINS especially first paragraph re minimum and maximum orders and provisional fee
d. TAR clause 52.212-70 'Level of Effort-Cost Reimbursement Term Contract' referred to in paragraph F.7(h)
e. Paragraph G.6 'Payment of Provisional Award Fee'
f. Paragraph G.11 'Submission of Invoices for Payment of Award Fee'
g. Paragraph G.12 'Adjustment of Potential Award Fees'
h. Paragraph H.11 'Special Contract Requirements'
i. Paragraph H.13 'Incremental Funding of Task Orders'
j. Paragraph I.1.I FAR 52.232-20 'Limitation of Cost'
k. Paragraph I.1.I FAR 52.232-22 'Limitation of Funds'
~~l. Paragraph I.8 'Estimated Cost, Base Fee, and Award Fee'~~
m. TAR clause 1252.216-73 'Payment of Base and Award Fee' referred to in paragraph I.8
n. Paragraph I.9 'Payment of Award Fee'
o. Paragraph I.10 'Determination of Award Fee Earned'
p. Paragraph I.11 'Performance Evaluation Plan'
q. Paragraph I.12 'Distribution of Award Fee'

II. Pertinent Regulations

a. FAR 6.304 Approval of the justification [for other than full and open competition]
b. FAR 16.102(c) re cost-plus-percentage-of-cost prohibition
~~c. FAR 16.301-2 Application [of cost-reimbursement contracts]~~
d. FAR 19.805-1 re competitive 8(a) thresholds
e. MAG NOTE 6-1 Justification for Other than Full and Open Competition

<u>Fee and Fee Payment Procedures</u>

The entire fee paid under this contract is award fee. Although there is no base fee the contractor is allowed to bill as a provisional fee 4% of its costs. When the award fee is determined, the provisional fee is credited against the fee to be paid.

The total award fee pool for the first five years of the contract is $1,564,762. The contractor was awarded $1,462,756 out of the pool. The five year award fee pool in Modification 0023 is $205,250, of that $87,783 is allotted to option year 5 which is the completed portion of Modification 0023's period of performance. To date MARAD has paid out $283,763 in option year five. The total award fee pool for the entire contract is $1,770,012. The contract total award fee paid out is $1,746,519, leaving $23,493 to cover the remaining four years of the contract.

Authority to Issue This Modification

This modification is essentially a re-formation of Modification 0023. It needs to be re-formed because the modification's cost estimate reflects a $3 million cost ceiling imposed by the SBA, not a valid estimate of the cost to perform the work. As discussed below it can be re-formed because SBA's imposition of the cost ceiling on the modification was a discretionary act by the Agency as a party to the contract not, a mandatory act required by its role in enforcing section 8(a) regulations. While MARAD may have chosen to agree to this limitation in order to pursue the Government's socio-economic goals to the maximum extent possible, it had the authority at the time of the award of Modification 0023 to make award on a sole source basis to the extent contemplated by this re-formation of Modification 0023.

Under the SBA 8(a) program, acquisitions are competed if they exceed $3 million in value and there is not a reasonable expectation that at least two eligible and responsible 8(a) firms will submit offers at a fair market value (FAR 19.805-1). Under FAR 6.302-5 procurements authorized or required by statute including sole source awards under the 8(a) program are exempted from the requirement for full and open competition. Sole source awards under the 8(a) program do not require written justifications and approvals (FAR 6.302-5(c)(2)(i)).

SBA made three conditions to accepting Modification 0023: MARAD had to submit a copy of its authority to extend the contract for another five years; confirm that the five year extension would not exceed $2.9 million and; rescind Modification 0017. By insisting on its second condition SBA precluded any consideration of the criterion for allowing sole source 8(a) awards over $3 million, that is, whether or not there was a reasonable expectation that at least two eligible offers at a fair market value. There is evidence contemporary with the negotiations and execution of the Modification that MARAD would have addressed this condition if allowed to do so by SBA. And evidence subsequent to the issuance of the modification that if addressed MARAD would have successfully and satisfactorily demonstrated that this procurement action falls under this condition.

Although not required to do so (see relevant citation noted above) MARAD did execute a sole source justification for Modification 0023 (Attachment 3). This justification was approved by its Associate Administrator on May 5, 1998 who under MAG NOTE 6-1 has the authority to approve sole source justifications up to $50,000,000. For obvious reasons (namely, being bound by the SBA conditions) the cost estimate used by the justification is $3,000,000 and its cited authority is FAR 6.302-5 'Authorized or required by statute'. Nevertheless the fact that the justification was executed prior to the execution of Modification 0023 is contemporaneous evidence of MARAD's affirmative opinion that it could meet the pre-requisite condition of FAR 19.805-1(b)(2) for sole source 8(a) awards of any amount, otherwise it is unnecessary or redundant. As the fact that SBA's limitation of the Modification's cost to $2.9 million is a record of its opinion that there is a reasonable expectation that at least two eligible and responsible 8(a) firms will submit offers at a fair market value (FAR 19.805-1), MARAD's written justification and approval is a record of its contrary opinion. The file doesn't show any that any objective test was conducted to resolve the matter, the SBA's opinion simply prevailed. Two years after the modification was executed the question of whether there is more than one responsible offer who could do this work was examined using the procedures for determining the validity 'other than full and open competition' procurements.

Shepard-Patterson has a second contract which supports MARAD's logistics support program. This contract DTMA91-97-C-00005 provides spare parts purchasing support. In 2000 this contract was extended on a sole source basis so that its period of performance would run concurrently with that of contract DTMA91-95-C-00024 (this memo's subject contract). A key element of the sole source rationale (Attachment 4) was that its work was so intertwined with the work covered by contract DTMA91-95-C-00024 that they both needed the same period of performance. Notice of this sole source action was published in the Commerce Business Daily for 45 days. No firms responded to the notice and the contract was extended. While this action was conducted to demonstrate that there was only one source that could perform the work required under DTMA91-97-C-00005 and successfully did so, because of the interconnection between the two contracts explained in the justification and used as its rationale, it rightly also applies to contract DTMA91-95-C-00024. Simply put, if it is proved that Shepard-Patterson is the only contractor who can perform the work required on contract DTMA91-97-C-00005 and the principal reason for this is that the work is so intertwined with the work required contract DTMA91-95-C-00024, it is equally proved and for the same reason that Shepard-Patterson is the only contractor who can perform the work required on contract DTMA91-95-C-00024.

From the above it is concluded that the underlying authority to issue this modification is the authority cited in the

Justification for other than full and open competition used to extend contract DTMA01-97-C-00005, that it was precluded from being used to issue Modification 0023 because of the cost ceiling limitation imposed by SBA and agreed to by MARAD in order to have $3,000,000 of the modification's cost be classified under the section 8(a) program. It will be recommended that the Justification for other than full and open competition used for Modification 0023 be amended to cover the revised cost estimate and its exemption changed to 6.302-3 Industrial Mobilization (which was used as the authority for the extension to contract DTMA91-97-C-00005). Construing SBA imposition of a $3 million as rejecting MARAD's offer of the entire scope of the modification being placed in the 8(a) program the continuation would no longer be classified as an 8(a) award.

Modification 0023 - Cost Estimate and Fee

There is no price negotiation memorandum for Modification 0023 in the file. The documentation available is Shepard-Patterson's cost proposal dated March 30, 1998 (Attachment 5), a memo dated April 21, 1998 on the 'Technical Evaluation of Cost Proposal Extension DTMA91-95-C-00024' (Attachment 6) and a 'Determination and Finding for Option Extensions for MARAD Contract DTMA91-95-C-00024' (Attachment 7).

| | Op Yr 5 | Op Yr 6 | Op Yr 7 | Op Yr 8 | Op Yr 9 | 5-Yr Total |
|---|---|---|---|---|---|---|
| 1 Mar 30th Proposal Total labor | $1,202,982 | $808,316 | $379,669 | $229,752 | $171,014 | $2,791,73 |
| 2 Mod 0023 - Total Est Cost (Includes ODCs) | $1,202,982 | $808,316 | $379,669 | $230,962 | $172,769 | $2,794,6 |
| 3 Mar 30th Proposal ODCs | $87,783 | $57,718 | $27,528 | $19,609 | $15,576 | $208,2 |
| 4 Mod 0023 - Award Fee Pool | $87,783 | $57,718 | $27,528 | $18,400 | $13,821 | $205,2 |
| 5 Mar 30th Proposal Total | $1,290,765 | $866,034 | $407,197 | $249,362 | $186,590 | $2,999,9 |
| 6 Mod 0023 - Total | $1,290,765 | $866,034 | $407,197 | $249,362 | $186,590 | $2,999,9 |
| 7 Mar 30th Proposal Labor Hours | 31,826 | 20,124 | 8,892 | 6,084 | 3,944 | 70,8 |
| 8 Mod 0023 Labor Hours | 32,000 | 23,000 | 17,000 | 7,000 | 4,000 | 83,0 |

Item numbers 1, 3 and 5 are from the spreadsheet entitled 'Price Summary by Option Year' of Shepard-Patterson's March 30, 1998 cost proposal. Item number 7 is from the spreadsheet entitled 'Option Year Labor Hour Summary'. Item numbers 2, 4, 6 and 8 are from section B of Modification 0023. In Option Years 5, 6 and 7 the totals compared by item numbers 1 and 2, and, 3 and 4 match. In all Option Years, item numbers 5 and 6 match. All these matches show that the totals in Shepard-Patterson's cost proposal were used in Modification 0023. It is also evident from the titles given in the cost proposal and modification that identify the costs being totaled, that the modification uses figures from Shepard-Patterson's cost proposal but ways unintended by the proposal. The cost proposal 'Price Summary by Option Year' summary has a subtotal for direct labor and ODCs but no award fee pool. In Modification 0023 the cost proposal's 'direct labor' subtotal becomes the total estimated cost (includes ODCs), the cost proposal's 'ODC' subtotal became the modification's award fee pool. No file documentation explains this result.

Shepard-Patterson's cost proposal proposed 0% labor escalation in the extension years. It does this by lowering and capping it overhead and G&A rates to offset an estimated 2% per year raise in salaries. Both MARAD's technical evaluation memo and its D&F on the option extensions discuss the acceptance of the proposed rate caps by MARAD. While Shepard-Patterson's cost proposal does not propose an award fee pool, it does include in each labor rate and in the ODC total what it calls a 'Provisional Base Fee' of 4%. The narrative states that the proposal is based on the assumption that the contract fee structure of a 0 - 8% award fee with a provisional fee of 4% will continue in the extension.

In summary, the amounts proposed in Shepard-Patterson's cost proposal and the promises it makes (e.g. caps on OH and G&A) are the basis for Modification 0023. However, the connection between them is ambiguous and there is no available documentation to the clears up the ambiguity. As discussed below it was attempted to make a reasonable use of the available documentation in developing the Government pre-negotiation objective.

**3. The Name, Position, and Organization of Each Person Representing the Contractor and MARAD in the Negotiation**

To be determined.

**4. The Current Status of any Contractor Systems to the Extent They Affected and Will Be Considered in the Negotiation**

Several DCAA audits have been performed on this contract including an ongoing cost incurred audit reviewing the contractor's costs on this contract from its inception through the contractor's fiscal

year 1999 (DCAA has completed audit report no. 6201-2001T10160001 on Shepard Patterson's CFY 1996 Direct Costs (Attachment 8)). In accordance with FAR 16.301-3(a) these audits show that the contractor's accounting system is adequate for determining costs applicable to the contract.

**5. If Cost or Pricing Data Were Not Required in the Case of Any Price Negotiation Exceeding the Cost or Pricing Data Threshold, the Exception Used and the Basis for it.**

In accordance with FAR 15.403-2(b) Cost or pricing data are not required for proposals used solely for overrun funding or interim billing price adjustments.

**6. If Cost or Pricing Data Were Required, the Extent to which the Contracting Officer--**

Not applicable.

**(i) Relied on the cost or pricing data submitted and used them in negotiating the price**

Not applicable.

**(ii) Recognized as inaccurate, incomplete, or non-current any cost or pricing data submitted**

Not applicable.

**(iii) Determined that an exception applied after the data were submitted and therefore, considered not to be cost or pricing data**

Not applicable.

**7. Summary of the Offeror's Proposal and the Government's Negotiation Objective**

| ITEM | CONTRACTOR'S PROPOSED MOD 23 | CURRENT/ MOD 23 | GOVERNMENT OBJECTIVE |
|---|---|---|---|
| 1. Minimum Order (Tot Guarantee) | N/A | $299,926 | $299,296 |
| 2. Max Labor Hrs | 316,128 | 83,000 | 316,128 |
| 3. Tot Est Cost | $33,631,204 | $2,794,698 | $24,603,810 |
| 4. Tot Awd Fee Pool | $2,690,496 | $205,250 | $1,644,581 |
| 5. Tot 5-Yr Amt | $36,321,700 | $2,999,948 | $26,547,687 |

Summary - The contractor's proposal provides a revised estimate of the cost to perform the remainder of the contract and concurrently requests an increase in its fee. The Government position is that the proposed costs are higher than can be supported based on

available. To the extent that those revised costs are not a result of original estimates of insufficient accuracy due to the uncertainty of the uncertainties in contract performance but produced to meet a pre-determined amount (i.e. $3,000,000) it is the Government's position that the contractor is due an increase in fee.

Contractor's Proposal - The contractor's proposal consists of its letters dated October 18, 2000 (Attachment 9) and November 6, 2000 (Attachment 10). The Contractor proposes to increase the estimated labor hours covered by Modification 0023 by 233,128 hours from 83,000 hours to 316,128 hours. No basis for the hours is given:

Total Estimated Costs - The contractor proposes an increase of $30,836,506 from $2,794,698 to $33,631.204 in the total estimated cost of the contract. The contractor claims this is due to increased requirements for logistics services experienced in the full range of support provided. The costs included a -10% inflation factor for option years 7 through 9.

Fee - The contractor's October 18th letter references two MARAD letters disallowing provisional fee amounts on invoices $150 and #151 (due to delays in processing the modification $163,551 of additional fee has been released.) The fee was disallowed because the total award fee pool for option year 5 had been paid. The contractor requests an increase in fee because the scope of work had grown substantially. They request the fee be increase by $2,485,246 from $205,250 to $2,690,496.

Government Objective -

1. The Minimum Order - The minimum order required by modification 0023 has been met and is not an issue.

2. Maximum Labor Hours - By email dated March 21, 2001, Richard Williams, MAR-614, the COTR stated the number of hours S-P proposed was sufficient. The email correctly notes the contractor did not provide the methodology used to derive the labor hours estimated. However, original contract and modification 0023 have the same scope of work and the same period of performance. The contractor proposed practically the same number of hours for each period (314,640 hours versus 316,328 hours. These estimates seam to corroborate each other.

3. Total estimated costs - The contractor does not explain the basis of his proposed total estimated costs of $33,631,204 except to say that 4% inflation factor is applied to option years 7, 8 & 9. The total estimated costs for the original 5-year period of performance was $19,559,527. Labor costs were approximately 25% more than originally estimated during the original contract period and there are slightly more labor

hours for modification 0023. If we take these factors into consideration or total estimated cost of $24,603,810, this leaves $9,027,393 unexplained. The contractor will be asked to account for this discrepancy, e.g. whether it is due to increased work or inflation, but most importantly whether the caps proposed in modification 0023 for OH and G&A were used in the estimate.

4. Award Fee Pool

See discussion below in section 10.

**8. The Most Significant Facts or Considerations Controlling the Establishment of the Prenegotiation Objectives**

The most significant fact in establishing the pre-negotiation objectives is that the cost estimates used in Modification 0023 cannot be used as a reliable basis for estimating the cost to performed the work required. Given that fact the most important consideration in establishing the pre-negotiation objectives for the award fee pool is to make sure that the award fee is based on a true estimated cost projection. This cannot be actual incurred cost after the fact as the contractor proposes since that would constitute an illegal cost-plus-a-percentage-of-cost contract.

**9. To the Extent Such Direction Has a Significant Effect on the Action, a Discussion and Quantification of the Impact of Direction Given by Congress, Other Agencies and Higher-Level Officials**

To no extent.

**10. Basis for the Profit or Fee Objective**

AWARD FEE POOL

| CONTRACT YEAR | CONTRACTOR'S PROPOSED MOD 23 | CURRENT MOD 23 | GOVERNMENT OBJECTIVE |
|---|---|---|---|
| 1. Option Yr 5 | $560,854 | $87,783 | $370,099 |
| 2. Option Yr 6 | $535,748 | $57,718 | $339,931 |
| 3. Option Yr 7 | $510,601 | $27,528 | $311,517 |
| 4. Option Yr 8 | $531,026 | $18,400 | $311,517 |
| 5. Option Yr 9 | $552,267 | $13,821 | $311,517 |
| 6. Total Pool | $2,690,496 | $205,250 | $1,644,581 |

As discussed above, the key question on developing the fee objective is what would have been the true estimate, not the

actual cost which would not have been known, but the true projection of the cost to perform the work required by Modification 0023. Since the cost estimates in Modification 0023 are defective for this purpose another basis has to be used.

The fee objective is based on the award fee pool used in the first five years of the contract. This was done for several reasons. The scope of work is stated to be the same for both five year periods and in fact the total labor hours projected for the first five contract years and the contractor's projections for next five years in its November 6, 2000 letter are almost the same 314,640 hours versus 316,128 hours. To find out how escalation would affect the cost estimate a loaded labor rate exclusive of fee was computed in each of the first five contract years and the percentage change from year to year was determined. The average change was 1.01%.

Using the elements the fee objective was derived as follows $1,564,762 (total award fee pool for first five years) X 1.0047292 (projected hrs by contractor for last five yrs (316,128) / estimated hours in contract for first five yrs (314,640)) X 1.0510101 (escalation factor 1.01% compounded for five years) = $1,644,581. The award fee pools for individual years was computed by that years labor hours by the total labor hours and multiplying that percentage by the total award fee pool.

11. **Documentation of Fair and Reasonable Pricing**

A determination that the negotiated price for Modification 0035 to Contract DTMA91-95-C-00024 with Shepard-Patterson, Inc. is considered fair and reasonable will be made at the conclusion of negotiations.

Erica L. Williams
Contract Specialist

Date 4/23/01

Benedict J. Burnowski
Contracting Officer

Date 4/23/01

Approving Official

John E. Carr, Deputy Director
Office of Acquisition

Date 4/24/01



US0016

U S. Department of Transportation
Maritime Administration

# CLEARANCE RECORD FOR SOLICITATIONS, CONTRACTS, AND MODIFICATIONS

1. SOLICATION/CONTRACT/M MODIFICATION NO.
DTMA91-95-C-00024
Mod. 0035

| 2. NAME OF CONTRACTOR | 3. PROGRAM OFFICE CODE | 4. AMOUNT OF PROCUREMENT ACTION |
|---|---|---|
| SHEPARD-PATTERSON, & ASSOC. INC. | MAR-614 | $33,321,752.00 |

5. REVIEWING OFFICES/INDIVIDUALS

| SIGNATURE | NAME AND TITLE (TYPED) | DATE |
|---|---|---|
| PROCUREMENT OFFICE: | | |
| CONTRACT SPECIALIST [signature] | Erica L. Williams<br>Contract Specialist | 4/13/01 [initials] 4/23/01 |
| CONTRACTING OFFICER ~~See Pre-Neg Memo~~ [signature] | Benedict J. Burnowski<br>Contracting Officer | 4/23/01 |
| NEXT LEVEL OFFICIAL (WHEN REQUIRED) [signature] | John E. Carr<br>Dep. Dir. Office of Acquisition | 4/24/01 |
| PROGRAM OFFICE: | | |
| PROJECT OFFICER [signature] | Patrick Carlon<br>ACOTR | 4/23/01 |
| PROGRAM MANAGER [signature] | Richard H. Williams<br>COTR | 4/23/01 |
| OFFICE OF CHIEF COUNSEL: | | |
| LEGAL COUNSEL [signature] | Edmund T. Sommer, Jr.<br>Ass't General Counsel | 4/24/01 |
| CHIEF COUNSEL (WHEN REQUIRED) | | |
| OTHER APPROVALS: | | |

6. REMARKS:

This modification is to replace the costs estimated in Mod 0023 with a cost estimate that more accurately addresses the work to be performed for Option Years 5 through 9.

FORM MA-882
(Revised 2/86)

US1608

## Option Year Five Period

CLIN

**0006** **Option Year Five** – Non-personal Logistics Support Services in support of the Ready Reserve Force (RRF). Labor Categories, services as specified in Section C.

| | | |
|---|---|---|
| **0006AA** | Total Estimated Cost | $6,962,072.45 |
| **0006AB** | Total Base Fee | $ 189,879.00 |
| **0006AC** | Total Award Fee Pool | $ 316,465.00 |
| | Total Option Year Five | $7,468,416.40 |

## Option Year Six Period

| CLIN | | |
|---|---|---|
| **0007** | **Option Year Six** – Non-personal Logistics Support Services in support of the Ready Reserve Force (RRF). Labor Categories, services as specified in Section C. | |
| **0007AA** | Total Estimated Cost | $6,565,510.32 |
| **0007AB** | Total Base Fee | $ 174,401.37 |
| **0007AC** | Total Award Fee Pool | $ 290,668.95 |
| | Total Option Year Six | $7,030,580.64 |

## Option Year Seven Period

| CLIN | | |
|---|---|---|
| **0008** | **Option Year Seven** – Non-personal Logistics Support Services in support of the Ready Reserve Force (RRF). Labor Categories, services as specified in Section C. | |
| **0008AA** | Total Estimated Cost | $6,166,919.76 |
| **0008AB** | Total Base Fee | $ 159,823.22 |
| **0008AC** | Total Award Fee Pool | $ 266,372.00 |
| | Total Option Year Seven | $6,593,115.00 |

# Option Year Eight Period

| CLIN | | |
|---|---|---|
| **0009** | **Option Year Five** – Non-personal Logistics Support Services in support of the Ready Reserve Force (RRF). Labor Categories, services as specified in Section C. | |
| **0009AA** | Total Estimated Cost | $6,357,462.42 |
| **0009AB** | Total Base Fee | $ 159,823.22 |
| **0009AC** | Total Award Fee Pool | $ 266,372.02 |
| | Total Option Year Eight | $6,783,657.66 |

# Option Year Nine Period

| CLIN | | |
|---|---|---|
| **0010** | **Option Year Nine** – Non-personal Logistics Support Services in support of the Ready Reserve Force (RRF). Labor Categories, services as specified in Section C. | |
| **0010AA** | Total Estimated Cost | $6,529,907.55 |
| **0010AB** | Total Base Fee | $ 159,823.21 |
| **0010AC** | Total Award Fee Pool | $ 266,372.03 |
| | Total Option Year Ten | $6,956,102.79 |

**Cooper, Iris <MARAD>**

| | |
|---|---|
| **From:** | Ostrom, Robert |
| **Sent:** | Thursday, October 14, 2004 12:03 PM |
| **To:** | Cooper, Iris |
| **Cc:** | Wiese, Pat; Rodriguez, Janis |
| **Subject:** | RE: Veridyne |

Iris - Yes, please forward.

-----Original Message-----

| | |
|---|---|
| **From:** | Cooper, Iris |
| **Sent:** | Thursday, October 14, 2004 12:00 PM |
| **To:** | Ostrom, Robert |
| **Cc:** | Wiese, Pat; Rodriguez, Janis |
| **Subject:** | RE: Veridyne |

Bob,

Would you object if I forwarded your message to John Hoban? Accounts sometimes processes invoices without (or prior to receiving) program office and acquisition approval. Please let me know.

Thank you,

Iris

---

**From:** Ostrom, Robert
**Sent:** Thursday, October 14, 2004 9:12 AM
**To:** Roberson, Eileen; Caponiti, James; Wiese, Pat; Sommer, Edmund; Rodriguez, Janis; Cooper, Iris; Portell, John; Trost, William
**Cc:** Schubert, William
**Subject:** Veridyne

Effective immediately, MARAD is to make no payments to Veridyne on any contract, without express approval by me. Thank you for your cooperation.

Bob Ostrom

359

**Burnowski, Benedict <MARAD>**

**From:** Williams, Erica
**Sent:** Monday, December 06, 2004 10:29 AM
**To:** Cooper, Iris; Burnowski, Benedict; Rodriguez, Janis
**Cc:** Truffer, Mark
**Subject:** Veridyne Invoices

All

This morning, Mark received a call from Veridyne HQ inquiring about payments on the logistics contract.

I told him it was ok to give the status of the spares invoice payments, but that this office would follow-up about the logistics invoices.

We are now holding:

| | |
|---|---|
| #260 | $246,116.05 |
| #261 | $345,740.95 |
| #262 | $224,416.16 |
| #263 | $244,905.45 |
| #264 | $202,818.19 |

Erica

U.S. Department
of Transportation
**Maritime
Administration**
Chief Counsel

400 Seventh Street, S.W.
Washington, D.C. 20590
(202) 366-5711
(202) 366-7485 (Fax)

**Robert B. Ostrom**

December 7, 2004

VIA FACSIMILE, MAIL AND EMAIL

R. Kenly Webster, P.C.
1201 Connecticut Avenue N.W., Sixth Floor
Washington, DC 20036

Re: Logistics Support Services

Dear Mr. Webster:

As explained in my letter to Veridyne's previous counsel, Davis Wright Tremaine, L.L.P., dated November 29, 2004, a copy of which is copy enclosed, MARAD has been concerned that the five-year extension to the Logistics Support Services contract, Contract DTMA91-95-C-00024, awarded in 1998 may be void. (Enclosure 1) We have now concluded that it is void. My November 29th letter also indicated that MARAD would obtain new services from a different contractor, and, given the finding of fraud by the Department of Transportation Office of Inspector General, that further payments would not be made on the Logistics Support Services contract.

Ms. Iris Cooper, MARAD's Director, Office of Acquisitions, approached Mr. Patterson regarding Veridyne's willingness to provide for short term services to assist in the transition to a new contractor. Veridyne has been unwilling to enter into such a contract. During a telephone conversation between Mr. Patterson and Ms. Cooper on November 29th, Mr. Patterson indicated that a proposal for these services would not be provided. Irrespective of Mr. Patterson's subsequent statements, this denial forced MARAD to pursue alternatives to ensure that mission-critical functions are maintained.

Mr. Patterson's communiqué sent November 29, 2004, indicated that Veridyne intended to proceed with performance of Contract DTMA91-95-C-00024 and expected payment. Given our conclusion that the contract is void, MARAD cannot accept services from Veridyne under that contract and MARAD expects Veridyne to cease performance immediately.

To ensure MARAD's ability to fulfill its mission in support of Operation Iraqi Freedom, MARAD must immediately retrieve from Veridyne all data and property associated with

Contract DTMA91-95-C-00024. At 9:00 a.m., Wednesday, December 8, 2004, MARAD employees and support personnel will arrive at Veridyne locations to remove the above-described property. MARAD expects Veridyne to cooperate. Pictures and video of the computers, U.S. government property, will be taken to facilitate reassembly. A list is enclosed which details the known property MARAD will remove and the locations from which it will be removed. (Enclosure 2).

As noted above this property is being used to support Operation Iraqi Freedom and removal will not be delayed. In the event of a dispute over property ownership, we will attempt to resolve it immediately. If property not belonging to the U.S. Government is inadvertently removed, it will be returned as soon as possible.

As of December 8th, I will be prepared to discuss the issues associated with Contract DTMA91-95-C-00024, as well as other potential actions related to this matter. Please contact me as soon as possible to arrange for further discussions.

Sincerely,

Robert B. Ostrom
Chief Counsel

Enclosures (2)

cc: Samuel B. Patterson, Veridyne, Inc. (via facsimile)

U.S. Department of Transportation
**Maritime Administration**
Chief Counsel

400 Seventh Street, S.W.
Washington, D.C. 20590
(202) 366-5711
(202) 366-7485 (Fax)

Robert B. Ostrom

November 29, 2004

VIA FACSIMILE AND U.S. MAIL

Richard L. Cys, Esq.
Weldon H. Latham
Davis Wright Tremaine LLP
Suite 450
1500 K Street, N.W.
Washington, D.C. 20005-1272

Re: Veridyne, Inc.

Dear Messers Cys and Latham:

I have received your letter of November 11, 2005, regarding your client Veridyne, Inc. I, too, am glad we were able to meet and discuss this troubling matter.

As you know, because of the OIG finding of fraud in connection with Modification 23 extending the Logistics Support Services contract, Contract DTMA91-95-C-00024, MARAD is concerned that that contract is void. The fact that Modification 035 was never executed is also of concern. MARAD is reviewing the facts and case law and will consider the points you raise when making a determination as to the validity of the contract and the government's ability to make payments for work performed under that contract. Pending a determination as to the validity of that contract, payments under that contract will not be made.

Your letter indicates that a decision by MARAD not to place any more orders under the contract would effectively be unilateral rescission of the contract. MARAD is not rescinding the contract, at this time. The Logistics Support Services contract is an Indefinite-Delivery/Indefinite-Quantity (IDIQ) contract. Even if valid, MARAD is only required to order the minimum quantities under the contract. Since MARAD has more than ordered the minimum quantities for the last contract year, MARAD is free to obtain these services from another contractor. Therefore, no new services will be ordered under that contract.

We have also evaluated the validity of the 1999 extension to the Spare Parts contract, DTMA91-97-C-00005, awarded to Veridyne because it was the Logistics Support Services contractor. We have determined that performance on that contract can continue. Therefore, outstanding invoices under the Spare Parts contract will be paid as expeditiously as possible, payments will be made for parts ordered and delivered under that contract and ordering of spares will continue.

Lastly, as your letter points out, critical services being provided under the Logistics Support Services contract remain to be performed. We discussed the need for performance of some services, on a transition basis, at our meeting on November 10th and indicated a new contractual vehicle would be required to obtain and pay for those services. After that meeting, you indicated your client was interested in such a transition contract. Ms. Iris Cooper, the Director of MARAD's Office of Acquisitions has provided Mr. Patterson a document identifying the transition tasks MARAD would order under such a vehicle. We are interested in expeditiously negotiating that contract.

If you have any questions regarding where we currently stand, I will be happy to discuss them. I will contact you when I am prepared to discuss the Logistics Support Services contract.

Sincerely,

Robert B. Ostrom
Chief Counsel

**Burnowski, Benedict <MARAD>**

(36C)

**From:** Burnowski, Benedict
**Sent:** Wednesday, December 15, 2004 9:21 AM
**To:** Truffer, Mark
**Cc:** Cooper, Iris; Rodriguez, Janis; Williams, Erica; Williams, Richard; Kaag, Bill
**Subject:** RE: Veridyne Invoices

Mark:

These are the Veridyne invoices we are holding unpaid on Logistics Support contract DTMA9195C00024. My understanding is that money was obligated under the contract and is available to pay them should payment be authorized.

Ben

-----Original Message-----
**From:** Williams, Erica
**Sent:** Monday, December 06, 2004 10:29 AM
**To:** Cooper, Iris; Burnowski, Benedict; Rodriguez, Janis
**Cc:** Truffer, Mark
**Subject:** Veridyne Invoices

All

This morning, Mark received a call from Veridyne HQ inquiring about payments on the logistics contract.

I told him it was ok to give the status of the spares invoice payments, but that this office would follow-up about the logistics invoices.

We are now holding:

| | |
|---|---|
| #260 | $246,116.05 |
| #261 | $345,740.95 |
| #262 | $224,416.16 |
| #263 | $244,905.45 |
| #264 | $202,818.19 |

Erica



US0576