**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **VERIDYNE CORPORATION** | **)** | |
| | **)** | |
| **Plaintiff,** | **)** | |
| | **)** | |
| **v.** | **)** | **No. 06-150C** |
| | **)** | **(Judge Christine O.C. Miller)** |
| **THE UNITE STATES** | **)** | |
| | **)** | |
| **Defendant.** | **)** | |

**PLAINTIFF'S ADDITIONAL PROPOSED FINDINGS OF UNCONTROVERTED FACT**

1. On November 19, 1997, Richard H. Williams, Chief of MARAD's Division of Logistics Support ("R. Williams"), authorized a Memorandum to Timothy P. Roark , Director MARAD's Office of Acquisition ("Roark"), with a copy to, among others, Wayne Cutrell, Chief of MARAD's Division of Marine Acquisition ("Cutrell"), Second Supp. App., page 1.[1]

2. The November 19, 1997 Memorandum was captioned, "Subject: ACTION: Contract Extension." Id., emphasis in original. Mr. Weinstein

3. In his Memorandum, R. Williams wrote:

> 1. As you know, the MARAD logistics support contract [Contract Extension (DTMA91-95-C00024)] expires in April, 2000. I am concerned that the expiration time frame might interfere with a number of essential long term efforts that we have initiated in support of the RRF. As such I believe it will be in MARAD's best interests to execute an extension of the current contract continuation of the current contract without interruption will enable us to sustain our present level of success and accommodate other planned program growth,
>
> 2. The following issues highlights some of the uncertainties that we

[1] "Second" Supp. App., page ______." Refers to Plaintiff's Second Supplemental Appendix, submitted herewith.

face in the next several years, and demonstrate the value to continuing the contract over that period.

a. We have major data system changes in process that require continuity of effort. We have embarked on an upgrade of our information systems to gain needed functionality enhancements, tighter integration of our logistics systems, and an effort before contract expiration, despite the fact that we are using rapid prototyping as a means of expediting the upgrade. Continuity of design, development, implementation, and a firm grasp of the intricacies of the legacy system are essential to our success. I am also concerned about the affect that recompleting the contract will have on our key contractor personnel, and their ability to respond to a RFP. In my mind, continuation of the contract avoids the loss of time and expenditure of additional funds that would occur in having another contractor come up-to-speed on the maintenance of our core systems.

b. The need for continuity is further emphasized as we integrate today's logistics systems with other MARAD systems that are expected to be implemented during the period 1998-2000. Our current support contractor understands the realities to be faced integrating the systems that affect all facts of the MARAD operation. This experience will ensure reduced cost in meeting these basic system integration requirements, while avoiding the risks of system non-performance non-performance due to a basic lack of understanding of MARAD operations.

* * *

e. As you are aware, there is a possibility of additional ships being transferred from MSC to MARAD control. This would require a rapid surge of contractor effort, which would be more easily accommodated by having an experienced support staff in place. Our current contractor possesses the experience and staff to ensure the acceptance of new ships into the MARAD fleet.

f. Finally, contract administration is simplified by having a process in place that has been fire-tuned over several years (I know that I am preaching to the choir here). Our overall management costs and potential for embarrassing performance failures are significantly reduced if we continue the present contract through this dynamic period of the next several years, and manage it as closely as we have to date.

* * * *

Second Supp. App., pages 1-2.

4. On March 6, 1998, R. Williams authored another memorandum to Roark; the subject was stated as "Logistic Support Contract Extension." Second Supp. App. page 4.

5. In his March 6, 1998 Memorandum, R. Williams wrote:

> I was pleased to hear from you that the Office of Counsel has Determined that we can take the necessary actions to extend our logistics support contract beyond its current completion date of March 2000. Based on that review and conclusion, I would like to initiate immediate action to execute an extension to add option years 6 through 10 to the existing logistics support contract.
>
> The scope of work will remain the same as is established in the Current contract, with actual tasking being assigned using the Work Order and Technical Directive structure currently in place.
>
> This communication is intended to:
>
> - reaffirm our desire and official request to extend the contract as previously submitted to you via MAR-614 memorandum of November 19, 1997. The justification provided in that memo-random remains valid.
> - request that your office send a letter to Shepard-Patterson re-requesting a formal cost proposal as needed to initiate the extension action with the SBA. I suggest we set a target date of March 16, 1998 to have our letter out to Shepard-Patterson, with a requested reply date of April 1, 1998.
> - begin the preparation of the submission package to SBA, to be completed upon receipt of the proposal from Shepard-Patterson. A target date of April 15, 1998 for submission of the package to SBA is suggested.
>
> I recognize the preponderance of the workload to accomplish this extension falls on your organization. If we may be of assistance in any way please let me know. As you know, it is essential that we complete the action prior to June 30, 1998.

Id.

6. The March 6 Memorandum indicated that copies were to W. Cutrell, R. Jackson (MARAD Contracting Officer Rita Jackson)("Jackson") and P. Carlton (Patrick Carlton, Assistant Contracting officer's Technical Representative ("ACOTR")) ("Carlton"). Id.

7. Following Veridyne's delivery of its March 25 extension proposal to MARAD, Carlton sent an e-mail to R. Williams on March 31, 1998; in it he wrote:

> Dick,
>
> Spent better part of last night reviewing the Shepard-Patterson [Veridyne] proposal, for extension of the logistics support contract. The following points are made:
>
> * * *
>
> Section 2: Labor Rates:
>
> The contractor has proposed for the Option Years, a flat labor rate for all labor categories. While reviewing the labor rates and categories several points come to mind:
>
> 2. There is a concern with regards to phase-out of contractor staffing, beginning in Option Years 6-9. The contractor in Option Year 9 has reduced its labor pool by 80%. This appears to be confusing. The proposal should emphasis [sic, "emphasize"] reduction vice [sic "versus"] a phase-out.

Second Supp. App., page 5.

8. On April 17, 1998, Jackson authored a Memorandum to R. Williams under subject, "Technical Evaluation of Cost Proposal Contract Extension DTMA91-95-C-00024" ("the Contract"); in it she wrote:

> 1. The Contractor, Shephard Patterson [Veridyne] provided MAR-614 [i.e., MARAD Division of Logistics Support] on March 30, 1998 with a copy of their cost proposal requesting an extension to their current contract DTMA91-95-C-00024. Based upon your memorandum dated March 6, 1998, the Division of Logistics Support wants this extension for five additional option year periods.

> 2. Provide your comments following review of the proposal. All pertinent technical, personnel and cost questions should be Adequately addressed and if not, include in your memorandum to this office items that are not clear.
>
> 3. Indicate if the proposal is acceptable or unacceptable. State in writing a list of inadequacies of the proposal or technical deficiencies to the Contracting Officer and give a brief explanation of the reasons. List concerns, comments or recommendations.
>
> 4. Any discussions of your evaluation are sensitive information. Such Information shall not be disclosed to any party outside the Government, or within who is not directly participating in the procurement process and do not have a need to know.

Second Supp. App., page 7.

9. By way of a Memorandum dated April 21, 1998, under Subject, "Technical Evaluation of Cost Proposal Contract Extension DTMA91-97 [sic]-C-00024, R. Williams replied to Jackson's April 17 Memorandum, stating:

> In response to your memorandum of April 17, 1998, requesting that MAR-614 [<u>i.e.</u>, R. Williams] review and approve Shepard-Patterson's proposal submitted March 30, 1998, the following Comments are provided:
>
> * * *
>
> A further review of the contractor's labor pool in the final option years, <u>gave the appearance that labor was being cut by 80%</u>. <u>However, we believe that the contractor showed these cuts in order to remain within SBA's $3,000,000.00 threshold</u>.
>
> Therefore, MAR-614 accepts Shepard-Patterson's [Veridyne's] cost proposal for five more option years, and requests that your office take whatever action is necessary to modify the current contract.

Second Supp. App., page 8; emphasis supplied.

10. On April 30, 1998 Cutrell signed a "Determination And Findings For Option Extension For MARAD Contract DTMA91-95-C-0024," Second Supp. App., page .

11. The Determination And Findings stated:

Findings:

The Maritime Administration (MARAD) is extending the Logistics Support Services Contract, DTMA91-95-C-00024 for an additional Five (1) year option periods. The periods are to begin immediately following the conclusion of the fourth, and final, option year ending on 27 March 2000. The proposal provided to MARAD indicates a reasonable cost savings to the Government. Additionally, the period during the conclusion of the contract will be critical period for the Logistics Program and with no interruption will enable us to sustain our present level of success. This period is also the time frame for the agency upgrade to the windows environment. Continuity of design, development, implementation and a understanding of the intricacies of the legacy system are essential to our success. A continuation of the contract avoids any loss of time and expenditure of additional funds that would occur in having another contractor come up-to-speed on the maintenance of our core systems.

* * *

The Contracting Officer hereby determines that the above described actions may be properly exercised based on the following:

1. Established prices are reasonable and clearly indicate that re-advertising, even if it was possible to remove this contract from the 8(a) program [sic, "it"] would obviously result in increased costs to the Government.

2. The Government's need for continuity of operation and the Cost savings involved by not disrupting operations would be realized By approving this action.

3. The current contract has an overhead rate of 65.4%. The Extension period will cap the overhead rates at 64.4%, 62.5%, 61%, 58%, and 56% for Option Years 5 through 9 respectively. The current G & A rate is 14.9%. The extension period proposes capping these rates for Option Years 5 through 9 at 14.4%, 13.5%, 12.3%, 12.2%, and 11.4% respectively. The rates for labor categories will remain constant the entire extension period.

* * *

DETERMINATION:

> Based on the above, and in accordance with FAR 6.302-5 41 U.S.C 253(c)(5) and 40 U.S.C. 474(16) approval of this action would be the Most advantageous method of fulfilling the Government's need price And others factors considered.

Second Supp. App. pages 12-13 (emphasis supplied).[2]

12. The "Determination And Findings" then was the basis for a MARAD "Justification For Other Then Full And Open Competition." Second Supp. App., pages 9-10.

13. The Determination bore a signature line for Roark to add his signature as Director of the Office of Acquisition; the signature, dated May 5, 1998, was apparently affixed by John E. Carr ("JEC"), the Deputy Director ("Carr"). Second Supp., App., page 10.

14. On May 6, 1999 R. Williams authored a Memorandum to Cutrell, under caption, "Subject ACTION: Contract DTMA91-95-C-00024;" in it R. Williams wrote:

> Forwarded is <u>our estimate for Option Years 4 through 9</u> [<u>i.e.</u>, the years added via Modification 0023] of the referenced contract.
>
> The logistics support program has evolved into an effective and efficient program, in large part because of the effectiveness of the professional logistics services acquired through the referenced Contract. To ensure the continuance of logistic support services throughout the remaining option years, we have enclosed an estimate for each of the remaining option years. <u>This estimate is considered adequate to ensure continuing support of the RRF [Ready Reserve Force] at the predicted level of activity, and allow us to respond to emergent requirements as they arise.</u>
>
> If you approve of the estimated amounts, please place a memo-Random to that effect in the cognizant contract file for future reference if required. Please provide a copy of your action

[2] An earlier draft of the Determination And Findings had a slightly different wording in the first line. It read, "The Maritime Administration is requesting the Small Business Administration's concurrence with extending . . . ." A line was then drawn through all the words from "requesting" to "with," so that the document would then read simply, "is extending." See Second Supp. App., page 14. This was how the signed version read.

> document to MAR-614 for inclusion in its records.
>
> If you should need any additional information, please contact me.

Second Supp. App., page 15, emphasis supplied.

15. In the attached estimate, R. Williams estimated that MARAD's work requirements under the Contract would $35,974,779.00 for year's options years 4-9; for Option Years 5-9 (i.e., the years covered by Modification 0023), the estimate was $30,685,858 ($35,974,779 - $5,288,921). Second Supp., App., page 16.

16. In a Memorandum dated February 15, 2000, Subject: "ACTION: Exercise of" Option Year, Logistics Support Contract DTMA91-95-C-00024." R. Williams wrote to Benedict Burnowski , MARAD Contracting Officer ("Burnowski"), and requested that MARAD exercise its option for Option Year 5 of the Contract (i.e., the first year under Modification 0023), as Veridyne's performance during Option Year 4 had "met or exceeded all specified requirements." Second Supp. App., page 17.

17. In a document dated March 22, 2000 and entitled "Justification For The Exercise Of Option Year Four [sic, "Five"] under Contract DTMA91-95-C-00024," MARAD Contracting Officer Erica Williams ("E. Williams"), determined that the exercise of the next option under the Contract (the first under Modification 0023) was appropriate; the document also noted:

> In accordance with the Contract, funds are obligated by delivery order; therefore, no funds are committed by the exercise of this option.

Second Supp. App., page 18 (emphasis supplied).

18. On April 10, 2001, Burnowski sent an e-mail to E. Williams, stating:

> Erica:

> Attached files are the pre-neg memo ["Pre-Negotiation Memorandum"], memo to amend the Justification and letter to S-P [i.e., Veridyne]

Second Supp. App., page 19.

19. The second file attached to Burnowski's April 10 e-mail was a document entitled "Subject: Amend Justification for other full and open competition for five (1) year option extensions for logistics support program approved May 5, 1998 ("justification"); it read, in pertinent part, as follows:

> From: Tim P. Roark, Sr.
> Director, Office of Acquisitions
>
> To: John L. Mann, Jr.
> Head of the Contract Activity
>
> In May 1998 Contract DTMA91-95-C-00024 a five year contract for logistics support was extended for an additional five years (Modification 0023). The original contact was awarded to Shepard-Patterson through the SBA 8(a) program. When awarded the estimated cost was in excess of $21,000,000. Although the original contract and the extension have the same scope of work, SBA insisted as a condition of its being a signatory to the extension that the total cost be limited to $3,000,000. Although MARAD executed and approved a justification for Modification 0023, SBA's condition precluded consideration of a higher dollar value sole source award. MARAD acquiesced to SBA's condition because participation by SBA would keep the contract in the 8(a) program thus furthering MARAD's implementation of the Government's socio-economic Goals until the $3,000,000 in the contract had been expended. The $3,000,000 threshold has now been surpassed. By imposing its $3,000,000 limitation on the extension MARAD considers that SBA has rejected its offer to have the remainder of the contract's work within the 8(a) program. For the reasons given below your are requested to approve amendment of the subject justification's cited authority and cost estimate as confirmation of its underlying authority to modify contract DTMA91-95-C-00024 for costs and fee in excess of $3,000,000. It is estimated that the total costs plus fee for the entire five year period of performance will be between $35 - $37 million.
>
> SBA's condition for signing the modification was not regulatory. FAR regulations permit sole source awards of any dollar value

> If there is not a reasonable expectation that at least two eligible and responsible 8(a) firms will submit offers at a fair market value (FAR 19.805-1). SBA's position on the cost limitation precluded An examination of whether this procurement could meet the condition for an award at an unlimited dollar value. It is considered that MARAD could almost certainly have met this condition at the time the modification was issued. It certainly <u>did</u> meet it in 2000.
>
> * * *
>
> Although not required to do so MARAD did execute a sole source justification for Modification 0023 (Attached). This justification was approved by you on May 5, 1998. Under MAG NOTE 6-1 you have the authority to approve sole source justifications up to $50,000,000. For obvious reasons (namely, being bound by the SBA conditions) the cost estimate used by the justification is $3,000,000 and its cited authority is FAR 6.302-5 'Authorized or required by statute'. Nevertheless the fact that the justification was executed prior to the execution of Modification 0023 is contemporaneous evidence of MARAD's affirmative opinion that it could meet the pre-requisite condition of FAR 19.805-1(b)(2) for sole source 8(a) awards of any amount, otherwise it is unnecessary or redundant. If this justification is not amended and both contracts not allowed to expire at the same time it seems apparent that, given the lack of response to the CBD notice of the sole source extension for contract DTMA91-97-D-00024, Shepard-Patterson would indefinitely be the only offeror on either Contract competed unless they were competed at the same time. Amending this justification will open this work up for competition when both contracts expire in 2005.
>
> * * * *

Second Supp. App., pages 23-25.

20. In the file entitled "Pre-Negotiation Memorandum Contract DTMA91-95-C-00024, Modification 0035," the following was included:

> **2. Description of the Acquisition**
>
> This is a cost plus award fee type contract to provide MARAD with comprehensive logistics support. Although the primary purpose of this modification is to adjust the contract award fee pool, if executed, it will acknowledge a more than $30,000, 000 cost increase on the work covered by Modification 0023 and the available documentation related to it that the cost estimates

> included in the modification were artificially constructed to match a total dollar amount ($3,000,000) and do not represent a valid estimate of the cost to perform the work the modification required.

Second Supp. App., page 27.

21. On April 19, 2001, E. Williams sent an e-mail to Burnowski stating as follows:

> I have the mod back [apparently referring to proposed Modification 0035] from MAR-614, unsigned.
>
> Dick's [R. William's] primary comment is to soften the statement under #3 Description of Acquisition, "…were artificially constructed…" He wants the statement to read the same or similar to ". . . derived from best available operational estimates…." Dick is concerned about it appearing that MAR-614 intentionally provided MAR-380 with a false estimate, etc.
>
> I explained to Patrick [Carlton] that the intent of the statement is not to lay blame on anyone, but that some sort of explanation has to be spelled out in the memo to acknowledge the extremely low estimate used for the 5 extension years when the scope of work remained the same as the previous 5 years which totaled approx. 10 time that amount.
>
> Suggestion…
>
> Erica [Williams]

See Supp. App., page 39.

22. Burnowski replied to E. Williams by e-mail that same day:

> Erica:
>
> Show Patrick the memo from Dick dated Apr 21, 1998 subject 'Technical Evaluation of Cost Proposal Contract Extension DTMA91-97-C-00024'especially in the 3rd paragraph where it says 'A further review of the contractor's labor pool in the final option years, gave the appearance that labor was being cut by 80%. However, we believe that **the contractor showed these cuts in order to remain with SBA's $3,000,000.00 Threshold.' [boldface added].**
>
> I don't mind softening the language but I do want to make the point that everyone knew the cost for the extension was going to be much higher

than $3,000,000 but we executed the mod for only $3,000,000 because it was a condition imposed by SBA and we wanted their signature on the mod to keep it the 8(a) program until that money was expended.

Ben

Second Supp. App., page 40, emphasis in original.

23. E. Williams replied to Burnowski:

Patrick pointed the statement in that memo out to me, as well. And I re-iterated to him that memo indicates that MAR-614 was aware of the significant reduction and accepted the proposed $3M for the out years. He repeated the $3M was still the reasonably expected effort needed for those out years and therefore, MAR-614 accepted S-P's proposal.

I still told him that there was no way that during the first 5 years, they spent more than $3M per year so how could they, then and now, say that $3M was an [sic] reasonable assumption of need for the 5 additional years.

But anyway, I had told him that I thought the wording could be softened a bit without losing the intended meaning..

Second Supp. App., page 41.

24. Burnowski: then e-mailed back to E. Williams:

Erica:

See if replacing 'artificially constructed to match' with 'directed toward matching a total dollar amount ($3,000,000) imposed by SBA conditions to signing the modification' will satisfy their objection.

Thanks
Ben

Second Supp. App., page 42.

25. A revised version of the Modification 0035 Pre-Negotiation Memorandum was then executed by E. Williams and Burnowski on April 23, 2001 and approved by

John E. Carr, Deputy Director of Acquisitions ("Carr") on April 24; under "Description of the Acquisition," it now reads:

> **2. Description of the Acquisition**
>
> This is a cost plus award fee type contract to provide MARAD with comprehensive logistics support. Although the primary purpose of this modification is to adjust the contract award fee pool, if executed, it will acknowledge a more than $30,000, 000 cost increase on the work covered by Modification 0023 and the available documentation related to it that the cost estimates included in the modification were artificially constructed to match a total dollar amount ($3,000,000) and do not represent a valid estimate of the cost to perform the work the modification required.

Second Supp. App., page 46.

26. In the same document, under Introduction and Purpose of the Negotiation, there is a comparison of the dollars in the contract for the initial five (5) years and those in Modification 0023. Second Supp. App., page 45.

27. The typed version of the document then reads:

> This comparison would seem to imply a significant reduction in the magnitude of work to be performed in the second five-year period. This is not the case. Although the original contract was awarded for And amount in excess of $21 million, Modification 0023 with the same Scope of work and length of performance was issued for approximately $3 million. Modification 0023 was issued with the consent of the Small Business Administration (SBA) who signed the modification on the condition that it not exceed $2.9 million (Attachment 2).

Second Supp. App., page 46.

28. On the signed document, however, someone had crossed out "seem to" in the first line and added the sentence (in handwriting), "SBA had full knowledge of the expectation that the requirement would be significantly higher." Id. [3]

[3] Other documents indicate that the author of the handwriting was Carr.

29. Between April 23 and 24, 2001, various MARAD officials executed a "Clearance Record For Solicitations, Contracts, And Modifications." Second Supp. App., page 58.

30. That Clearance Record indicates that it is a procurement action in referencing contract DTMA91-95-C-00024, Mod 0035, and in the amount of $33,321,752.00; under remarks, it stated:

> This modification is to replace the costs estimated in Mod 0023 with a cost estimate that more accurately reflects the work to be performed for Option Years 5 through 9.

Id.

31. The Clearance Record was signed by the following:

> E. Williams, Contract Specialist
> Burnowski, Contracting Officer
> Carr, Deputy Director, Office of Acquisition
> Carlton, ACOTR [Assistant Contracting Officer's Technical Representative]
> Carlton for R. Williams COTR [Contracting Officer's Technical Representative
> Edward T. Sommer, Jr., Assistant Chief Counsel

Id.

32. In an October 14, 2004 e-mail, MARAD Chief Counsel Robert Ostrom wrote to Iris cooper:

> Effective immediately MARAD is to make no payments
> To Veridyne on any contract without express authorization
> By me. Thank you for your cooperation.

Second Supp. App., page 62.

33. In a December 6, 2004 e-mail, E. Williams informed several MARAD officials that MARAD was "bolding" Veridyne invoices 260 through 264 (total:

$1,263,996.80). Second Supp. App., page 63.

34. In a December 6 letter to R. Kenly Webster, P.C., Veridyne Counsel, Ostrom stated that MARAD had concluded that the Modification extension might be void, and pending a determination, no payments would be made to Veridyne. Second Supp. App., page 64.

35. In a December 15, 2004 e-mail, Burnowski forwarded a copy of the E. Williams December 6 e-mail with the follows notation:

> These are the Veridyne invoices we are holding unpaid on [the Contract] my understanding is that money was obligated under the contract and is available to pay them should payment be authorized.

Second Supp. App., page 68.

Respectfully submitted,

/s/ Marc Lamer
Marc Lamer
Attorney for Veridyne Corporation

Date: July 10, 2008