00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

VERIDYNE CORPORATION, :

Plaintiff, :

v. : No. 06-150C

THE UNITED STATES : (Judge Christine O.C. Miller)

Defendant. :

: Pages 1 - 44

Deposition of RITA JACKSON

Washington, D.C.

Friday, August 15, 2008

Reported by: George W. Tudor, RPR

Job No. 188940B

00002

August 15, 2008

1:10 p.m.

Deposition of RITA JACKSON, held at the offices of:

Department of Transportation

1200 New Jersey Avenue, SE

Washington, D.C.20590-0001

Pursuant to notice, before George W. Tudor, RPR, a Notary Public of the District of Columbia.

ON BEHALF OF THE PLAINTIFF:

Marc Lamer, Esquire
Kostos and Lamer, P.C.
1608 Walnut Street
Suite 1300
Philadelphia, Pennsylvania 19103
215.545.0570
kostos_lamer@msn.com

ON BEHALF OF THE UNITED STATES

Robert Chandler, Esquire
Assistant United States Attorney
U.S. Department of Justice
1100 L Street, NW
Room 12002
Washington, DC 20036

Present: Mr. Samuel Patterson

I N D E X


EXAMINATION OF RITA JACKSON

| BY: | PAGE: |
|---|---|
| MR. LAMER: | 6 |
| MR. CHANDLER: | 39 |

| EXHIBITS | DESCRIPTION | PAGE: |
|---|---|---|
| No. 48 | Contract | 14 |
| No. 49 | Two pages of handwritten notes | 20 |
| No. 50 | One page of notes | 20 |
| No. 51 | Two e-mail messages | 20 |
| No. 52 | Letter dated 3/10/98 | 25 |
| No. 53 | Letter dated 4/28/98 | 32 |
| No. 54 | Letter dated 4/30/98 | 33 |
| No. 55 | Amendment of Solicitation/ Modification of Contract | 33 |


(Copies of exhibits attached hereto.)

00005

Thereupon,

RITA JACKSON,

a Witness, called for oral examination by counsel for the Plaintiff, having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. LAMER:

Q. Would you state your name for the record, please?

A. Rita Jackson.

Q. I'll give you my little preamble. We do this little thing first.

Ms. Jackson, my name is Marc Lamer. I represent Veridyne, Inc., who you probably know better as Shepard-Patterson Associates, Inc., and we're engaged in certain litigation involving the federal government, and specifically the Department of Transportation and the Maritime Administration.

I'm going to ask you a series of questions about facts at issue in that litigation. If at any time you don't hear a question I ask, please tell me

and either I or the court reporter will repeat it.
If I ask you a question and you don't understand it, please tell me and I will try to rephrase it. But if I ask you a question and you answer it, I will assume that you heard the question, you understood the question and that's the answer that you intend.

MR. CHANDLER: And I'm going to object. I don't know that that's necessarily a fair assumption.

MR. LAMER: And beyond that, when you answer a question, please do so verbally. The court rotter's job is tough enough without having to interpret gestures. And finally, when I'm talking, if you would refrain, and when you're talking, I'll refrain, and that will make his job an awful lot easier than to try to figure out who to put where on a sheet of paper.

A. Okay.

Q. Could you give me your educational background, please?

A. Educational background. I have a

00007

bachelor's degree in business administration and a master's degree in public administration.

Q. And what is your bachelor's degree?

A. George Mason University.

Q. And yours master's?

A. Central Michigan University.

Q. And could you give me your employment history?

A. My employment history. How far back should I go?

Q. I don't know. When you got out of college; how's that?

A. When I got out of college, I started working for the Defense Fuel Supply Center, at which time I applied for an internship with the Department of the Navy and I was accepted for that position. Worked with the Military Sealift Command as a contracting officer. Got a promotion and came to the Maritime Administration, and now I am in the office of -- Maritime Work Force Development.

Q. When did you come to the Maritime

Administration?

A. I came to the Maritime Administration in July, 1994.

Q. Okay. And when you came to the Maritime Administration, in what capacity?

A. Contract specialist.

Q. Contract specialist?

A. Yes.

Q. Is there a difference between a contract specialist and a contracting officer?

A. Yes.

Q. What's the difference?

A. A contracting officer has the authority to obligate the federal government for contracts.

Q. And what about a contract specialist?

A. A contract specialist normally does the -- does the day-to-day operations of the actual contract.

Q. Could a contracting officer be a contract specialist for a given contract?

MR. CHANDLER: Objection, vague.

00009

BY MR. LAMER:

Q. Could somebody who has a warrant as a contracting officer, could they act as a contract specialist for a specific contract?

A. I would say yes.

Q. Okay. Now, during your time at MARAD as a contract specialist, did you have occasion to become familiar with a company, Shepard-Patterson Associates?

A. Yes.

Q. How did you become familiar with that company?

A. They submitted a proposal for a -- I'm not sure if it was RFP or request for some services that the agency wanted.

Q. And did they receive a contract?

A. Yes.

Q. Was that what's known as an 8(a) contract?

A. I believe it was, yes.

Q. Do you remember when that was awarded, roughly?

A. No.

Q. Okay. Would the number DTMA 91-95-C-00024 ring a bell?

A. Yes.

Q. What was that contract for? What types of services?

A. Logistic support services.

Q. What does that mean? Tell me what logistic support services means.

A. To the best of my recollection, it was supplying supplies for the Maritime Administration vessels.

Q. What kind of supplies?

A. Parts.

Q. Are you talking about spare parts?

A. Yes.

Q. Now we're talking about logistic support contract. Did Shepard-Patterson have a separate contract for spare parts?

A. I believe it was -- was it separate?

Q. I'm asking you.

A. They had a -- they had a spare parts contract, yes.
Q. And in addition to spare parts, what kind of logistic support services did they provide?
A. I guess I'm not sure. I don't remember.
Q. Okay. When the original contract was awarded, I guess in 1994 or '95, do you remember whether that award was as a result of competition or was it direct negotiation with Shepard-Patterson?
MR. CHANDLER: Objection, assuming facts not in evidence.
MR. LAMER: Go ahead.
MR. CHANDLER: You can answer.
A. Can you repeat the question?
BY MR. LAMER:
Q. Yes. When Shepard-Patterson received the contract that we're talking about, the logistic support contract, I think we agreed that that was an 8(a) contract?
A. Yes.
Q. Minority setaside?

A. Yes.

Q. Do you remember whether there was a competition amongst 8(a) contractors or whether MARAD negotiated directly with Shepard-Patterson?

A. I don't remember.

Q. Okay. Now, at some point -- and I'll direct your attention to late 1987 and early 1998 -- do you recall discussions at MARAD about extending the Shepard-Patterson logistics support contract?

A. Yes.

Q. Okay. And do you remember how those discussions started?

A. No.

Q. I'm going to show you a document that we have previously marked as Plaintiff's Exhibit 37.

Showing you what's been marked as Plaintiff's Exhibit 37, do you recall ever having seen this letter before?

A. Yes.

Q. And directing your attention to the first sentence, it refers to a meeting February 19th,

1998, it appears. Do you recall that meeting?
A. No.
Q. Do you have any recollection whatsoever of attending a meeting with representatives of Shepard-Patterson in 1998 to discuss the extension of the logistic support contract?
A. No.
Q. If you notice in the letter, the letter talks about an extension of the contract, and in the very second sentence, it says "Proposed estimate NTE three million in the aggregate." Did you have any idea at the time what that was referring to?
A. Can you ask the question again?
Q. Yes. When the letter says "Proposed estimates not to exceed $3 million in the aggregate," what did you understand that to mean?
A. What do I understand that to mean?
Q. What did you understand it to mean then?
A. NTE means not to exceed, so they're saying that their proposal will not exceed $3 million.
Q. Do you recall what the approximate dollar

value of this contract was at the time?

A. Which contract?

Q. The logistics support contract. If I say the contract, that's the one I'm referring to.

A. No, I don't.

MR. LAMER: Let's mark this as 48.

(Deposition Exhibit No. 48 marked for identification.)

BY MR. LAMER:

Q. Showing you what's been marked as Plaintiff's 48 and directing your attention to starting on the third page of the document, are you familiar with this document?

MR. CHANDLER: Objection, vague.

BY MR. LAMER:

Q. Showing you what's been marked as Plaintiff's 48, are you familiar with the document?

MR. CHANDLER: Are you asking her about the third page or the entire document.

Q. First I'm asking are you familiar with the document.

A. Yes.
Q. And what is the document?
A. It is the contract --
Q. Let me see that a minute, if you would.
Some extra pages might have gotten stapled in the front.
They did. It's got two sets of -- SBA.
Let's make that 48.
(Document substitution for Exhibit 48.)
BY MR. LAMER:
Q. All right. With the corrected 48, is this the Shepard-Patterson logistics support contract we were discussing a few moments ago?
A. It appears to be, yes.
Q. Directing your attention to the pages that are numbered at the bottom B2, B3, B4, B5 and B6, does this refresh your recollection as to the approximate dollar value of the services that MARAD was procuring from Shepard-Patterson?
A. Yes.
Q. So in terms of cost, it appears to be

anywhere from 2.7 million per year up as high as 4.4 million per year.

Oh, that's easy enough. Look at the first page. It says the total is $21 million. Do you see that?

A. Um-hmm.

Q. Does that refresh your recollection as to the approximate dollar value of the Shepard-Patterson logistic support contract?

A. Yes.

Q. Okay. And this extension that Mr. Jenna was writing about, this was to be a five-year extension; am I correct? And I'll direct your attention to paragraph number three.?

MR. CHANDLER: Objection, vague.

A. Yes.

BY MR. LAMER:

Q. Now, when you saw this letter, did you have any understanding as to how, if the contract was running 2.7 to $4.4 million worth of services a year, Shepard-Patterson would be submitting to you a

proposal for a five-year extension not to exceed $3
million?
A. Say the question again, sir?
Q. Did you have any idea as to how
Shepard-Patterson would be able to provide you with
a proposal to extend this contract for five years at
a total dollars not to exceed three million?
A. Can you rephrase the question?
Q. Sure. The letter says, "We're agreed that
the extension was to be for five years of a contract
that averaged about $4 million worth of work a
year," agreed?
A. Yes.
Q. So when you got this letter and you saw in
paragraph two Mr. Jenna says that -- and this is
follow-up to the meeting -- "The proposed estimates
not to exceed $3 million in the aggregate." Do you
see that?
A. Yes.
Q. Did you have any understanding at the time
as to how Shepard-Patterson would fashion a proposal

for MARAD to continue this contract for five years at an aggregate dollar value not to exceed $3 million?

A. No.

Q. Did you have any idea where the $3 million figure came from?

A. No.

Q. Did you ever hear the figure $3 million mentioned as being a ceiling for the value of an extension?

A. Are you asking me is it unusual for that --

Q. No, I'm asking if, at the time, you ever heard any discussion regarding this extension, that $3 million was the maximum dollar value for which the contract could be extended.

A. That's what the proposal says, yes.

Q. No, the proposal simply says that the -- if I'm reading it, it says proposed estimates not to exceed $3 million in the aggregate.

My question is, did you ever hear any

discussion that an extension was not permitted to exceed $3 million.

MR. CHANDLER: Objection, asked and answered.

MR. LAMER: No, it hasn't been asked and answered.

Q. Answer the question, please. Did you ever hear any discussion at MARAD that there was a $3 million limit on extending an 8(a) contract?

A. Yes.

Q. And where did you hear that from?

Bad English. From whom did you hear that?

A. It was my understanding the proposal that was submitted was not to exceed $3 million.

Q. Why was it not to exceed $3 million, in your understanding. You had a contract, $21 million in the aggregate. Why could the proposal not exceed $3 million?

A. That was a requirement from SBA.

Q. And you knew that then, am I correct, in 1998?

A. In '98? Yes.

MR. LAMER: Okay. Now, this will be 49.

(Deposition Exhibit No. 49 marked for identification.)

BY MR. LAMER:

Q. Showing you what's been marked as Plaintiff's 49, did you recognize the handwriting on this document?

A. No.

Q. No?

A. No.

(Deposition Exhibit No. 50 marked for identification.)

BY MR. LAMER:

Q. Pretty obvious what I want to ask. I'm showing you Plaintiff's Exhibit 50. Do you recognize the handwriting on this document?

A. No.

(Deposition Exhibit No. 51 marked for identification.)

00021

BY MR. LAMER:

Q. Showing you what's been marked as Plaintiff's 51 -- by the way, I think you said you were aware that $3 million was the SBA limit for extending an 8(a) contract. Do you remember how you became aware of that?

A. There was some discussion with SBA.

Q. Okay. Was that discussion before or after the date of Mr. Jenna's letter to you, February 25th letter?

A. I don't recall.

Q. Do you recall anybody at MARAD informing Shepard-Patterson, "Yes, we can extend the contract, but only to the extent of $3 million"?

A. I don't recall, no.

Q. Do you recall how Shepard-Patterson knew that the proposal could not exceed $3 million?

A. Well, they were an 8(a) program. I assume they would know that.

Q. So that's simply an assumption on your part? You don't...

A. I don't what?
Q. Your answer is that you assume they would know it because they were in the 8(a) program?
A. Right, they were in the program.
Q. Let me show you what's been marked as plaintiff's 51, and I would ask -- do you recall this document?
A. No.
Q. Is this an e-mail that you sent?
A. It appears to be, yes, at the bottom.
Q. Do you remember why you sent it?
A. Joyce sort of reviewed the documents in the office. She was like the policy person at one point. It appears that I was informing her of the status of the extension.
Q. What were you requesting from her?
A. Guidance.
Q. Pardon?
A. Guidance.
Q. What kind of guidance?
A. To accomplish the extension.

Q. If you can explain to me, what was her guidance back to you?
A. She's requesting that a justification be prepared.
Q. What kind of a justification?
A. I believe she's requesting a justification to request the extension.
Q. What does she mean by "A justification combining the normal documentation required by FAR 17.205 and a special documentation required by TAM 1217.204, which is applicable when you exceed the five years set forth in the FAR"? Could you explain to me what your understanding was of what she's talking about?
A. She's saying go to these two documents and determine what are the applicable documentation and prepare it? The TAM is Transportation --
Q. Acquisition Manual?
A. Yes.
Q. What did she mean in the last paragraph, "I would recommend a request to SBA to convert this

8(a) contract to the special DOT/SBA MOU authority. Once granted, this would keep the SBA signature/approval within this office in the future"?

A. I'm not sure what she means by that.

Q. Let me see if I understand, and you tell me if I'm wrong. It sounds like what she's saying is, process this under this DOT/SBA, MOU -- would MOU be Memorandum Of Understanding?

A. Yes.

Q. Process it under that, and then MARAD would not need SBA to sign -- it would keep the SBA's signature approval within this office in the future, and then they would no longer need SBA's signature.

A. I would have to see the MOU to see it.

Q. So as of today, you have no recollection of what that meant. You don't know what it says.

A. Right.

Q. Okay. Let me show you --

A. Do you have a copy of the MOU?

MR. LAMER: Mark this as 52.

(Deposition Exhibit No. 52 marked for identification.)

BY MR. LAMER:

Q. Showing you what's been marked as Plaintiff's Exhibit 52, have you ever seen this document before?

A. That's my signature on it, so I'm going to say yes.

Q. And why did you generate this document?

A. I'm requesting that Shepard-Patterson submit a cost proposal.

Q. And you say in the first paragraph, "Based on your presentation provided to this office on February 19, 1998 and legal concurrence, we are making plans to accomplish this effort." Would that be the extension of the contract?

A. Yes.

Q. Okay. Now, we looked before at the February 25 letter from Mr. Jenna that said the proposal was not to exceed $3 million, right? Do

you recall that?
A. Yes.
Q. Your next sentence says, "The scope of work will remain the same as is established in the current contract." What did you mean by that?
A. By the term "scope of work"?
Q. Scope of work.
A. Basically, the same type of services.
Q. Type of services or amount of services?
A. The same type of services.
Q. And it says, "Also, as in the current contract, actual taskings will be assigned using the work order and technical directive structure." What is that? What did that mean?
A. That it would be handled as the current contract is being handled, which is specific work orders for services.
Q. So -- and if I understand it, and you correct me if I'm wrong, if I understand the contract correctly, the contract doesn't give the contractor any work, it's the work orders that gives

the contractor work?
A. Yes, and technical directive, yes.
Q. Right, a tender. So each time MARAD wants the contractor to do work under the contract, there has to be a technical directive and a work order.
A. Right, actual tasking.
Q. Let me show you what's been previously marked as plaintiff's 39. Let me ask you a couple of questions. You don't have to read the whole thing. We will be here for a week.
A. Okay, agreed.
Q. Showing you what's been previously marked as Plaintiff's 39, do you recall having seen this before?
A. I would assume so, yes.
Q. And is this the Shepard-Patterson extension proposal in response to your letter of March 10th?
A. Yes.
Q. And Shepard-Patterson responded and said they understand the scope of work will remain the

same. Do you see that?
A. Where is that?
Q. Fourth line. "We understand the scope of work will remain the same as is established in the current contract."
A. Yes.
Q. And that's what you had said in your letter to them, correct?
A. Correct.
Q. Do you remember what you did with this proposal when you received it?
A. Normally we would submit it to the technical office for them to review it.
Q. And that would be MARAD 714, Richard Williams' group?
A. Yes.
Q. I'm trying to get into the --
A. It's been a long time since I heard the codes.
Q. They don't still use them?
A. I haven't been in that office in over a

decade.

Q. I'm sorry.

Let me show you what's previously been marked as Plaintiff's 41.

Showing you what's been marked as Plaintiff's 41, do you recall ever seeing this before?

A. Yes.

Q. Was this your request to the MARAD technical people to review the proposal --

A. Yes.

Q. -- that Shepard-Patterson sent you, the proposal?

In number four, you wrote, "Any discussions of your evaluation are sensitive information. Such information shall not be disclosed to any party outside the government or within who is not directly participating in the procurement process and do not have a need to know." Why did you write that?

A. It's standard practice. It's proprietary

information that shouldn't be discussed outside.

Q. Let me show you Plaintiff's 42.

Showing you what's been marked as Plaintiff's 42, do you recall having seen that before?

A. I would assume so, yes.

Q. Would that be the MARAD 614, the response to your request that the proposal for the extension be evaluated?

A. Yes.

Q. Okay. The memo says, "A further review of the contractor's labor pool in the final option years gives the appearance that labor was being cut by 80 percent. However, we believe that the contractor showed these cuts in order to remain within SBA's $3 million threshold." And it goes on. "Therefore, MARAD 614 accepts Shepard-Patterson's cost proposal for five more option years and requests that your office take whatever action is necessary to modify the current contract."

When you saw that, did you wonder how, if

the proposal purports to cut the labor for the services by 80 percent, how it could be acceptable, how the proposal could be considered acceptable?

A. No, not really.

Q. Did you ever discuss it with anybody at MARAD 614?

A. Probably Patrick, if anyone else.

Q. Do you recall those discussions?

A. He really didn't get into a lot of details, because Patrick and his supervisor were having some concern, I guess. Patrick and Dick were discussing it, so I really wasn't included in their discussion.

Q. Well, what do you remember, if anything, Patrick told you relative to this 80 percent labor reduction?

A. I believe he's the one that probably brought it to Dick's attention, and Dick said proceed, so...

Q. So your understanding was that if MARAD 614 was okay with the 80 percent reduction, then

MARAD 380, your group, was going to go ahead and extend the contract?

A. Well, right. I mean, we have a dollar figure that we can't exceed, so whenever you reach it, you reach it.

(Brief recess.)

(Deposition Exhibit No. 53 marked for identification.)

BY MR. LAMER:

Q. Showing you what's been marked as Plaintiff's 53, do you recall ever seeing this document before?

A. No.

Q. I thought it was your signature.

A. No, that's my signature; I just don't remember.

Q. Would this be your request to the Small Business Administration to accept the three-year extension of the -- five-year extension of the Shepard-Patterson Logistics support contract?

A. Yes.

Q. And the note at the top, does that relate to what Joyce Harris had suggested in her e-mail back on March 6th, processing it under the SBA and DOT MOU?

A. Yes.

Q. Do you remember what SBA's response was?

A. No.

(Deposition Exhibit No. 54 marked for identification.)

BY MR. LAMER:

Q. Do you recall this letter from SBA addressed to you?

A. No, I don't recall.

Q. Does this letter indicate that SBA had rejected the request to extend the Shepard-Patterson logistics support contract?

A. Yes.

Q. Do you remember what the issue was with modification 17?

A. No.

(Deposition Exhibit No. 55 marked for

identification.)

BY MR. LAMER:

Q. Showing you what's been marked as Plaintiff's Exhibit 55, which is a form, Amendment of Solicitation/Modification of Contract, it has 0017 in the upper left-and corner and your signature in the lower right. Do you recognize this document?

A. No.

Q. Does this appear to be a modification number 17 to contract DTMA 91-95-C-00024?

A. Yes.

Q. Can you tell from this document, this Plaintiff's 55, at all what SBA's objection might have been? This basically says this must be rescinded.

A. No, I don't.

Q. Now, at some point, did you come to learn that this Shepard-Patterson logistics support contract had in fact been extended?

A. Yes.

Q. And were you aware that SBA signed off on

the extension?
A. Yes.
Q. Do you know how that came to be? Well, SBA wrote to you and said they were rejecting the extension?
A. Right.
Q. What I'm interested in is how it came to be that the contract was then extended.
A. Representatives of MARAD actually went to the SBA office and had a meeting with them, and when they returned, the modification was signed.
Q. Who was that representative; do you remember?
A. My supervisor, Wayne Cutrell, went. I believe Dick Williams went, the technical person, and the head of the division, Tim Roark.
Q. Okay. And when they came back, it was all taken care of, the extension was signed?
A. Yes.
Q. Do you remember the dollar value of the extension?

A. No.

Q. Let me show you what's been previously marked as Plaintiff's 2. Does this appear to be the modification that extended the Shepard-Patterson logistics support contract?

A. Yes.

Q. Do you know who drafted this document?

A. I probably drafted the schedules.

Q. Who would have drafted the third page? That's it, you have got it right there. One, two, three. Two of seven. I'm sorry, third page, two of seven.

A. I didn't fill it out. It looks like a different type.

Q. Oh, okay. So you're not sure who drafted page two of seven, but you think you drafted the pages that start three of seven, four of seven, five of seven, six of seven and seven of seven?

A. Yes.

Q. If you look at those five pages and you look at total estimated costs, does it appear to be

about $3 million? Again, starting at three of seven at the bottom, if you look at total estimated costs, the first, three of seven is 1.2, nine million, 808,000 -- that's about two million; 379,000 would be about 2.4; 230 would be about 2.63, and 172, a little under three million.

A. Yes.

Q. So the dollar value with the extension would have been under the $3 million limit that we discussed earlier; am I correct?

A. It appears so, yes.

Q. Let me ask you, and then we're sort of here, this is, I think I, dated sometime in May. At any time when you -- going back to the February 25 letter from Mr. Jenna up to the point when this modification was signed, did you ever suggest to anyone at Shepard-Patterson that they could expect MARAD to order more than the dollar value of the work that was in this modification?

A. No.

Q. Do you know if anybody else at MARAD ever

suggested to Shepard-Patterson that MARAD would
order more than the dollar value of the work that's
in this modification 23?
A. No.
Q. Let me sort of close the loop, here. Did
you or anyone else at MARAD, to your knowledge, ever
suggest to Shepard-Patterson that they might expect
MARAD to order more than $3 million?
A. No.
Q. Let me ask you one other question, and
this goes back to something, a note that I missed.
Regarding this $3 million ceiling, do you
recall anyone at MARAD saying to Shepard-Patterson,
"Yes, we are willing to consider the extension, but
you understand it has to be less than $3 million?"
A. That's what all the documentation
indicates, yes. It says not to exceed $3 million.
Q. But what I'm asking, the discussion
appeared to be earlier on whether MARAD would
consider a proposal to extend the contract. Am I
correct?

A. Yes.
Q. And do you recall anyone at MARAD saying, "Yes, we can consider the proposal to extend the contract, but it cannot exceed $3 million"?
A. To Shepard-Patterson?
Q. Correct.
A. Not to my knowledge, no.
MR. LAMER: Okay. that's all I have. .
EXAMINATION BY COUNSEL FOR THE DEFENDANT
BY MR. CHANDLER:
Q. I just have a couple of quick questions. I remind you you are still under oath and your answers still are subject to the penalties of perjury, essentially.
When did you stop working with MARAD 380?
A. July 6th, 1998.
Q. July 6th, 1998. And did you have any business related to this contract after that date?
A. No.
Q. Did you have any business with Shepard-Patterson after that date?

A. No.
Q. And have you spoken to Mr. Patterson since that date?
A. Since July?
Q. Since July 6th, 1998.
A. Yes.
Q. On how many occasions?
A. Less than a handful.
Q. More than five?
A. I don't think so.
Q. Less than five?
A. I don't think so, no.
Q. It's got to be one or the other, right? Or is it just five?
A. My office was down the hall from the Office of Acquisitions, so there was occasions where he would be coming through the building to see them that I would see him, so we would speak, you know, ask about his kids.
Q. Have you ever spoken to Mr. Patterson outside the office?

A. Yes.
Q. And on how many occasions?
A. That I can recall, one.
Q. Might there be more?
A. I don't think so, no.
Q. And what was your conversation about on that occasion?
A. Colleges.
Q. What about colleges?
A. My daughter was starting college and I asked him about Temple University in Philly.
Q. And why did you ask Mr. Patterson about Temple?
A. Because he lived in the Philadelphia area and I knew that he would give me an honest opinion about the school.
Q. And what did he tell you?
A. He told me it was a good school in a bad neighborhood.
Q. Is that all you talked about during that conversation?

A. Yes. Asked about his family.
Q. Did you talk at all about the contractor, the subject of this litigation?
A. No. I didn't realize that was still an issue.
Q. Did you talk about any business-related matters?
A. No.
Q. Has Mr. Patterson ever called you at home?
A. No.
Q. Have you ever called him at home?
A. No.
Q. Okay. So other than that one occasion on which you spoke about colleges, you and Mr. Patterson have not spoken since July 6th, 1980, other than on occasion in the hallway of the Maritime Administration?
A. Correct.
MR. CHANDLER: I have nothing else.
(Signature not waived.)
(Deposition concluded at 2:15 p.m.)

Ms. Rita Jackson
c/o Robert Chandler, Esquire
Assistant United States Attorney
U.S. Department of Justice
1100 L Street, NW, Room 12002
Washington, DC 20036

In Re: Veridyne Corp. vs. United States

We enclose for your review and signature a copy of the above-referenced transcript. We ask that you read the transcript carefully. If it is necessary to make any corrections, please do so on the enclosed errata sheet, indicating the page, line number, correction, and reason for such correction. The errata sheet must be signed and dated. Also, you must sign the certificate of deponent enclosed in the transcript.

If you do not complete the reading and signing within thirty days, you may have waived your right to make corrections; therefore, your prompt attention to this matter would be appreciated.

Upon completion of your review, please return the transcript with certificate of deponent and errata

sheet to Esquire Deposition Services, 1020 19th Street, N.W., Suite 620, Washington, D.C. 20036.

Sincerely,

George W. Tudor

CERTIFICATE OF NOTARY PUBLIC

I, George W. Tudor, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken stenographically by me and thereafter reduced to typewriting by me or under my direction; that said deposition is a true record of the testimony given by said witness; that I am neither attorney nor counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal.

________________ __________________________

Date George W. Tudor

My Commission expires January 1, 2011

Notary Public in and for the District of Columbia