# In the United States Court of Federal Claims

Nos. 06-150C & 07-647C
(Filed April 16, 2009)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * | * | |
| | * | |
| **VERIDYNE CORPORATION,** | * | Contracts; breach of contract; |
| | * | RCFC 15(a), motion to amend |
| Plaintiff, | * | answer and counterclaim; special |
| | * | plea in fraud, 28 U.S.C. § 2514 |
| v. | * | (2006); False Claims Act, 31 |
| | * | U.S.C. §§ 3729(a)(1), (a)(2) |
| **THE UNITED STATES,** | * | (2006); Contract Disputes Act of |
| | * | 1978, 41 U.S.C. § 604 (2006); |
| Defendant. | * | undue delay; prejudice. |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * | * | |

_____ Marc Lamer, Philadelphia, PA, for plaintiff.

_____ Robert E. Chandler, Washington, DC, with whom was Acting Assistant Attorney General Michael F. Hertz, for defendant. Janis Rodriguez, U.S. Department of Transportation, of counsel.

## MEMORANDUM OPINION AND ORDER

**MILLER**, Judge.

This case concerns a 1998 contract modification that extended a 1995 contract for one year and four additional option years, Modification 0023 ("Mod 0023") to Contract No. DTMA91-95-C-00024 ("the Contract") between Veridyne Corporation ("plaintiff") and the Department of Transportation, Maritime Administration ("MARAD"). Plaintiff was the incumbent contractor. In order to continue using plaintiff, both plaintiff and MARAD knew that the Contract would be opened to competition unless plaintiff satisfied a $3-million qualifying limitation to the Contract value. 1/ Plaintiff was awarded the Contract on the basis

_____

1/ MARAD awarded the Contract to the Small Business Administration ("SBA") pursuant to the 8(a) program. The 8(a) program directs the SBA to enter into contracts with government agencies for the provision of certain goods or services and to award subcontracts to qualifying economically disadvantaged business concerns that actually will provide the

of a proposal estimating the cost of services to be performed that the Government deemed fraudulent.  Moreover, the Government found material discrepancies in plaintiff's billing on the Contract.  Defendant in 2006 pleaded fraud as both an affirmative defense against plaintiff's claims for amounts due and as a counterclaim, seeking statutory forfeiture of plaintiff's claims.  Before the court after argument is defendant's motion for leave to amend its answer and counterclaim to include additional fraud counterclaims.

## PROCEDURAL HISTORY

When plaintiff filed its complaint on February 28, 2006, the case was assigned to Judge Lawrence J. Block.  Plaintiff amended its complaint on May 16, 2006.  Defendant answered on July 31, 2006, asserting as a defense a special plea in fraud, counterclaiming under 28 U.S.C. § 2514 (2006).  Defendant  amended its pleadings by motion granted on November 21, 2006; the amendments were minor, non-substantive changes to its answer and counterclaim.  Plaintiff moved for partial summary judgment on November 13, 2006; defendant cross-moved on March 23, 2007.  Following the filing of responsive and reply briefs, the case was transferred to the undersigned pursuant to RCFC 40.1(b) on September 5, 2007.

Plaintiff's dispositive motion sought judgment as a matter of law in its favor on Count I of its Amended Complaint in the amount of $2,267,163.96 for services performed and invoiced, but not paid.  Count I concerns five invoices submitted to MARAD predating MARAD's suspension of contract performance (Nos. 260-264) and three invoices submitted to MARAD post-suspension (Nos. 265-267).

Defendant's cross-motion sought judgment as a matter of law in its favor on all three counts of plaintiff's Amended Complaint.  Defendant contended that the Contract extension was void *ab initio* due to plaintiff's fraud in submitting a proposal that vastly understated the known value of the total services that MARAD would be ordering.  Defendant alleged that fraudulent conduct absolved the Government of liability for the amounts claimed by plaintiff in Counts I and II.  Because Mod 0023 should be declared void *ab initio*, defendant sought

---

1/ (Cont'd from page 1.)

goods or perform the services called for.  See 15 U.S.C. § 637(a) (2006).  Plaintiff was the 8(a) program participant designated to perform the Contract, and, although all relevant dealings were between plaintiff and MARAD, the SBA technically awarded Subcontract No. 0303-95-1-00055 to plaintiff.  In the interest of clarity, the Contract is referred to as between plaintiff and MARAD.

forfeiture of all monies that MARAD had paid to plaintiff on invoices for services performed pursuant to work orders issued under Mod 0023. Defendant also sought judgment as a matter of law in its favor on its counterclaim pursuant to 28 U.S.C. § 2514, in the amount of $31,134,931.12, representing forfeiture of all monies paid under Mod 0023. Defendant moved for judgment in its favor with regard to Count III of plaintiff's complaint (seeking lost profits due to alleged breach), arguing that, even if Mod 0023 was valid, it did not breach the Contract.

On January 24, 2008, this court granted in part the motion to strike, granted summary judgment for defendant only with respect to Count III of plaintiff's amended complaint, and denied plaintiff's motion for summary judgment. Veridyne Corp. v. United States, Nos. 06-150C, 07-647C (Fed. Cl. Jan. 24, 2008) (unpubl.). This court did not grant summary judgment in respect of Counts I and II of the amended complaint (for either party) and denied defendant's counterclaim. The order also listed the uncontroverted facts without need for further proof at trial. Id. at 18-19. A final deadline for discovery was set by order entered on June 10, 2008, and trial was scheduled to commence on November 17, 2008. Holding trial, the ostensible purpose of reassigning the case, has proved to be illusive.

Before the completion of discovery, plaintiff filed on July 10, 2008, a renewed motion for partial summary judgment on its claims, seeking alternatively to establish that no genuine issue of material fact prevented ruling against the Government on its counterclaim. Plaintiff argued that Mod 0023 was not a fraudulent extension proposal, as defendant contended, because Mod 0023 "was not an offer to provide all the logistics support services MARAD would require for $2.99 million," Pl.'s Br. filed July 10, 2008, at 1; rather, Mod 0023 only proposed the scope of work to be provided by plaintiff, not the amount or quantity of work that plaintiff planned to perform. Plaintiff's money demand was for payment of five invoices, totaling $1,263,996.80, submitted to MARAD predating MARAD's suspension of contract performance (Nos. 260-264).

On August 11, 2008, defendant responded, contending that plaintiff cannot establish its entitlement to collect on unpaid invoices or defend against the fraud counterclaim merely by resting on evidence that MARAD employees knew, and were not deceived, that the full execution of Mod 0023 would exceed $3 million. Defendant argued that it was entitled to $31,134,931.12, representing all money paid to plaintiff under the Contract, because Mod 0023 was void *ab initio*, given that plaintiff obtained the Contract based on a fraudulent estimate of its cost. Alternatively, defendant moved for leave to take discovery pursuant to RCFC 56(f), should the court be inclined to rule in plaintiff's favor. Defendant represented, albeit not by an affidavit, see RCFC 56(f), that a thorough response to plaintiff's motion would require it to conduct additional discovery by "depos[ing] several current and former

Veridyne employees who were involved in the preparation and presentation of Veridyne's proposal and the execution of Mod 23." Def.'s Br. filed Aug. 11, 2008, at 10.

Plaintiff replied on August 25, 2008, accusing defendant of misstating plaintiff's argument in its renewed motion for summary judgment. Plaintiff clarified that it is not arguing the absence of fraud solely because "no MARAD employees [were] deceived by" the actual cost of Mod 0023, Pl.'s Br. filed Aug. 25, 2008, at 1, but that the absence of fraud is supported by the uncontroverted facts of record that establish "there was no misrepresentation or deception by Plaintiff in its extension proposal," id. at 6. Plaintiff maintained that Mod 0023 was not tainted with fraud because no "falsity" inheres in Mod 0023 and "falsity is the *sine qua non* for an action grounded in fraud." Id. at 1. The court granted plaintiff's request to supplement its reply to defendant's response with a deposition transcript that was not received until after plaintiff submitted its reply brief. Through the deposition of Rita C. Jackson, a former MARAD contracting specialist who administered the award of the Mod 0023 to plaintiff, plaintiff sought to establish that the term "scope of work," as used by Ms. Jackson in a written request for cost proposal, referred to the types of services plaintiff offered to provide MARAD in Mod 0023, not the amount. Deposition of Rita C. Jackson, Aug. 29, 2008, at 1.

On September 12, 2008, this court issued a published opinion denying plaintiff's renewed motion for partial summary judgment and defendant's motion to refuse application for judgment as moot. Veridyne Corp. v. United States, 83 Fed. Cl. 575 (2008) (order denying plaintiff's renewed motion for partial summary judgment). The court found that genuine issues of material fact were present concerning whether plaintiff submitted a "fraudulent" proposal to the Government and, if so, whether plaintiff would be compelled to forfeit its claim against the Government pursuant to 28 U.S.C. § 2514. Id. at 589. The court noted that defendant did not allege that any of plaintiff's invoices constituted a claim for work not actually performed or that any invoice reflected other than an accurate number of hours. Id. at 587. Although defendant had cited to case holdings to the effect that violations of 28 U.S.C. § 2514 result in forfeiture of claims, no cases cited applied § 2514 in factual circumstances as those presented. Id. Furthermore, by reviewing the pertinent case law on the issue, the court also pointed out that defendant did not cite to any binding case law establishing that, absent a showing of bribe or a conflict of interest, the appropriate remedy for voiding Mod 0023 *ab initio* would entitle the Government to forfeiture of all monies paid under the post-1998 modifications for services already performed by plaintiff. Id. at 586. [2]

_____

[2] The court's unpublished opinion of January 24, 2008, contained the same legal analysis. Defendant did not address it in the briefing on the renewed dispositive motion, and the court remains uninformed of the law that defendant relies on for its defense and counterclaim for total forfeiture.

4

Trial was scheduled by order entered on June 10, 2008, to commence on November 17, 2008.  On October 14, 2008, pursuant to defendant's request at a status conference held on October 10, 2008, the court stayed trial allowing defendant to file a motion to amend its Answer and Counterclaim originally filed on July 31, 2006.  Following issuance of the court's order, defendant filed one unopposed motion for extension of time on November 26, 2008, and two opposed motions for extension of time on January 9, 2009, and February 3, 2009, respectively.  The latter of these was granted over plaintiff's opposition and disallowed any further extensions.  See Order entered on Feb. 9, 2009.

On February 18, 2009, defendant filed a motion to amend its answer to include additional fraud counterclaims "based upon newly-discovered fraudulent statements" in plaintiff's invoices, Def's Br. filed Feb. 18, 2009, at 1: a special plea in fraud under 28 U.S.C. § 2514 seeking forfeiture of all of plaintiff's claims; a claim under the antifraud provision of the Contract Disputes Act of 1978, 41 U.S.C. § 604 (2006) (the "CDA" or the "Act"), for the unsupported portion of plaintiff's claims, plus any cost incurred by the Government for reviewing such claims; and, pursuant to the False Claims Act, 31 U.S.C. §§ 3729(a)(1), (a)(2) (2006), a civil penalty of not less than $5,000 and not more than $10,000 for each claim presented.  Defendant asserts that the factual bases warranting the new claims stem from plaintiff's falsely representing the level of work-order funding available on Invoice Nos. 260-266 and  overbilling MARAD for Invoice No. 267.  Finally, defendant moves to amend its counterclaim to include an additional cause of action to recover monies paid against fraudulent invoices pursuant to the False Claims Act, 31 U.S.C. §§ 3729(a)(1), (a)(2), not based on "any new facts," but based on all invoices submitted under the "fraudulently acquired" Mod 0023.  Def.'s Br. filed Feb. 18, 2009, at 4.

As originally filed, defendant's defense and counterclaim asserting fraud pleaded, respectively, common law fraud and 28 U.S.C. § 2514.  See Answer and Counterclaim filed July 31, 2006, ¶¶ 78, 82.  Defendant predicated the relief sought on the factual assertion that Mod 0023 was void ab initio because it was "tainted by fraud and wrongdoing and executed in violation of statutory controls upon the procurement process, namely, the Competition Requirements."  Id. ¶ 78.  The only change proposed to the original allegations relates to defendant's claim under 28 U.S.C. § 2514, which now alleges that plaintiff is liable for forfeiture of its claims, not because the Contract was entered into fraudulently, but because plaintiff falsified invoices "with the intent to cause the Government to pay [plaintiff] more than the amount to which [plaintiff] knows it is entitled under the Contract."  Def.'s Br. filed Feb. 18, 2009, App. 17, ¶ 91.  Briefing was completed on March 23, 2009.

## BACKGROUND FACTS

The following facts are the same, unless otherwise noted, as those recited in the earlier opinion in Veridyne Corp. v. United States, 83 Fed. Cl. 575, 578-80 (2008) (order denying

plaintiff's renewed motion for partial summary judgment).  On March 14, 1995, MARAD awarded the Contract to the SBA, which, in turn, awarded a subcontract on March 27, 1995, to plaintiff under the SBA's 8(a) program, which sets aside government contracts for businesses owned by socially and economically disadvantaged individuals.  The Contract was not subject to competition.   The Contract was an indefinite delivery, indefinite quantity ("ID/IQ") cost-plus-award-fee contract that covered services related to MARAD's logistics programs in support of the Ready Reserve Force, which is structured to provide sealift services for the United States Army and United States Marine Corps.  Because the Contract was an ID/IQ contract, the amount of services that MARAD would order was not specified. Plaintiff contracted to provide logistic support services in response to work orders issued by MARAD.  The Contract included estimated annual costs based on a stated maximum number of labor hours and other direct costs for each performance year.  MARAD was obligated to order at least ten percent of each year's listed maximum, and plaintiff was not obligated to provide any more than the maximum number of hours.  The Contract period was one base year and up to four option years.  Plaintiff performed the Contract from the date of the award, and MARAD exercised each of the four option years.

In late 1997 or early 1998, plaintiff's President, Samuel J. Patterson, approached MARAD officials and inquired as to whether the Contract could be extended for additional performance years, as plaintiff was scheduled to graduate from the 8(a) program in June 1998.  Mr. Patterson was advised that plaintiff would no longer be eligible to participate in the 8(a) program.  At that time plaintiff's counsel provided MARAD with a legal opinion that the Contract could be extended by adding additional years, even beyond plaintiff's graduation from the 8(a) program, provided that the extension was effected while plaintiff was still in the 8(a) program.  MARAD contracting officials then informed plaintiff that an extension of the Contract was possible and would be considered.

On February 19, 1998, MARAD Contracting Specialist Rita C. Jackson met with plaintiff, represented by its then-Executive Vice President, Michael C. Genna.  In his letter of February 25, 1998, recording plaintiff's understanding of the meeting, Mr. Genna noted that a "question was asked how [plaintiff] would handle pricing and cost proposals for an extension, if so granted."  He furnished a "synopsis of salient points in which [plaintiff] believe[s] the government would benefit," including, *inter alia*, that the Contract would remain an ID/IQ contract, that "[p]roposed estimates [would not exceed] $3,000,000 in the aggregate," and that "all cert[ifications] and representations would be consistent with the current [contract]."  The $3 million value is noteworthy because the 8(a) program requires that contract opportunities be awarded "on the basis of competition" if "(I) there is a reasonable expectation that at least two eligible Program Participants will submit offers and that award can be made at a fair market price, and (II) the anticipated award price of the

contract (including options) will exceed . . . $3,000,000 (including options)." 15 U.S.C. § 637(a)(1)(D)(i).

Ms. Jackson responded to plaintiff's letter on March 19, 1998, stating that "[t]he scope of work will remain the same as is established in the current contract. Also, as in the current contract, actual taskings will be assigned using the Work Order and Technical Directive structure." She requested that plaintiff's cost proposal identify "the cost per year for this five year extension." Plaintiff responded with a cost proposal dated March 30, 1998, that did not include a cost-per-year value, but, instead, categorized its submission as follows: "This proposal is based on a representative sample of hours spread across the applicable labor categories." Pl.'s Br. filed Nov. 13, 2006, App. at 93. Plaintiff's cost proposal for the extension was "priced as a Cost Plus Award Fee, IDIQ contract" and recited that "[a]ll contract terms and conditions are the same, and the original scope and technical content remain intact." Id. at 96. The cost proposal outlined the hourly labor rates for each type of worker and included a "Certificate of Current Cost or Pricing Data" certifying that the cost or pricing data, as defined by the Federal Acquisition Regulation, were accurate, complete, and current as of the date of submission. Id. at 114. 3/ The discussions between plaintiff and MARAD culminated in the execution of Mod 0023 by MARAD and plaintiff on May 18, 1998, and by the SBA on May 20, 1998.

Mod 0023 described itself as a modification issued to provide five additional one-year option periods to the Contract. When Mod 0023 was executed, one option period remained in the original Contract. Additional option years provided for in Mod 0023 would be numbered Option Year Five through Option Year Nine; each option period would be exercised at the sole discretion of MARAD. Mod 0023 provided for estimated costs and

---

3/ The term "Cost or pricing data" is currently defined in 48 C.F.R. (FAR) § 2.101 (2007), as:

[A]ll facts that, as of the date of price agreement or, if applicable, an earlier date agreed upon between the parties that is as close as practicable to the date of agreement on price, prudent buyers and sellers would reasonably expect to affect price negotiations significantly. . . . Cost or pricing data are factual, not judgmental; and are verifiable. While they do not indicate the accuracy of the prospective contractor's judgment about estimated future costs or projections, they do include the data forming the basis for that judgment. Cost or pricing data are more than historical accounting data; they are all the facts that can be reasonably expected to contribute to the soundness of estimates of future costs and to the validity of determinations of costs already incurred.

award fee pools in the amount of $2,999,948.00.  On March 25, 1999, MARAD issued unilateral Modification 0026 to the Contract, exercising the fourth option year under the original Contract.  On March 22, 2000, MARAD issued unilateral modification 0032 to the Contract, exercising the first option year under Mod 0023, i.e., Option Year Five.  As recited in this modification, no funds were obligated thereby, as funding would be obligated in the individual work orders issued under the Contract and pursuant to Mod 0023.

On April 12, 2000, MARAD issued the first task orders under Mod 0023 – Task Orders 412 through 419.  Including subsequent modifications, the total value of these Task Orders was $7,225,141.30.  By September 30, 2000, six months into Option Year Five, plaintiff had invoiced approximately $3,168,088.00 in costs, all incurred in response to work orders issued by MARAD.  Based on these orders, MARAD contracting personnel were aware that they had issued work orders sufficient to expend the entire estimated dollar value of Mod 0023 and that plaintiff had billed the entire award fee established in Mod 0023. Following a series of communications between plaintiff and MARAD contracting personnel, plaintiff proposed a series of adjustments to the Contract award fees.  Notwithstanding that the full estimated dollar value of work under Mod 0023 had been ordered, MARAD exercised the second option under Mod 0023, i.e., Option Year Six, thereby extending the Contract period through March 26, 2002, by unilateral Modification 0033 on March 23, 2001.  Shortly thereafter, MARAD issued Task Orders 512 through 515 and 517 through 519.  Including subsequent modifications, the total value of these Task Orders was $4,466,612.00.  Plaintiff provided MARAD with all the services ordered under the Task Orders, submitted invoices for those services, and received full payment from MARAD.

Following further discussions between MARAD and plaintiff, MARAD's Contracting Officer, Broderick J. Burnowski, on June 25, 2001, sent plaintiff draft bilateral Modification 0035 ("Mod 0035").  Mod 0035 provided, in part, that MARAD had exceeded the maximum order limitations for Option Years Five through Nine; that plaintiff would  honor any and all orders, including those that exceed the maximum order limitation; and that the work necessary to accomplish the requirements of the Contract would require an increase in the total estimated cost by $29,614,729.00 – from $2,794,698.39 to $32,409,427.39.  Mr. Burnowski's letter stipulated that execution of Mod 0035 by MARAD was conditioned on review and approval by MARAD's Contract Review Team.  Pl.'s Br. filed Nov. 13, 2006, App. 187.  Plaintiff executed Mod 0035 and returned it to MARAD.  While plaintiff and defendant both agree that MARAD never formally executed Mod 0035, according to MARAD Contracting Specialist Erica L. Williams, Mod 0035 was the version of the Contract the parties were "working against."  Def.'s Resp. to Pl.'s Prop. Findings of Uncontro. Fact No. 44, filed Mar. 26, 2007.

Over the next three years, MARAD executed a series of unilateral modifications that exercised additional option years up to and including the last option year under Mod 0023; issued additional work orders in amounts exceeding $17,119,481.00; authorized plaintiff to invoice for award fees; and incrementally added funding for work orders that MARAD had issued.  Plaintiff provided MARAD with all the services ordered under the these work orders, submitted invoices for those services, and received full payment from MARAD.  From September 28, 2004, to November 24, 2004, plaintiff submitted to MARAD Invoice Nos. 260 through 264, in the total amount of $1,263,996.80.

## FACTS RELATING TO DEFENDANT'S MOTION TO AMEND

Defendant contends that, at the time plaintiff and MARAD were negotiating proposed Mod 0035, concerns arose within MARAD that the estimates provided by plaintiff "may have been fraudulent." Def.'s Br. filed Mar. 26, 2007, at 5.  MARAD referred all these concerns to the Department of Transportation's Inspector General (the "DOT IG") on July 20, 2001. According to defendant, the DOT IG initiated an investigation on July 11, 2003. The DOT IG agents interviewed Mr. Patterson on December 15, 2003, and on April 23, 2004.  The DOT IG agents interviewed Mr. Genna on February 23, 2004.  The DOT IG issued its report in September 2004.

On or about December 7, 2004, MARAD informed plaintiff that MARAD considered Mod 0023 to have been void *ab initio*.  MARAD suspended plaintiff's contract performance and advised that Invoice Nos. 260 through 264 would not be paid.  Subsequently, plaintiff submitted three additional invoices, Nos. 265 through 267, totaling $1,003,167.16.  MARAD also refused to pay these invoices.

The newly discovered facts presented by defendant in support of its proposed fraud claims relate to Invoice Nos. 260-267. Def's Br. filed Feb. 18, 2009, at 2-4, App. 12-16. First, defendant alleges that Invoice Nos. 265 through 267 "contained false statements of the current funding levels on the contract" because plaintiff falsely indicated that sufficient funding existed for the amount billed against each work order. Def's Br. filed Feb. 18, 2009, at 2.  As explained by defendant, the Contract was funded on a work-order level, and payment could be disbursed only for work performed pursuant to a specific work order.  See id. The agency's contracting officer must sign a modification before funding could be moved from one work order to another.  See id. at 3.  Defendant alleges that on Invoice No. 265 plaintiff misstated the funding levels in denoting adequate funding for specific work orders

by allocating between deficient orders and those that did not extinguish all allotted funds. 4/
Id.

Plaintiff does not dispute these facts, but explains that, although the work-order-by-work-order funding changed, the total funding level was never changed or increased, and plaintiff only billed for the work it performed. See Pl.'s Br. filed Mar. 9, 2009, at 3. Plaintiff states that Donald Vernon Colley, plaintiff's Program Manager, established a practice with MARAD officials Richard Williams, Chief, Division of Logistics Support, and William Kaag, Assistant Contracting Officer's Technical Representative, for the procedure under which plaintiff would perform the requested services. During each billing period, Mr. Colley would send Messrs. Kaag and Williams a spreadsheet showing a breakdown of the funding that needed to be reallocated among the work orders to reflect the actual level of work performed. Id. at 4, App. 163-66 and 172-73 (e-mails documenting exchange among Messrs. Colley, Kaag, and Williams discussing fund allocations for Invoice Nos. 261, 263-264). Mr. Colley testified by deposition that MARAD kept a parallel spreadsheet tracking the allocation adjustments made between work orders. Deposition of Donald Vernon Colley, Sept. 24, 2008, at 32. After receiving Mr. Colley's suggested allocations and then completing their own funding allocation, MARAD officials would send Mr. Colley a copy of the changes so that he could adjust plaintiff's internal records to reflect the finalized funding allocations. Id. This exchange between the parties continued until September 2004. See id. at 130-32.

Mr. Colley testified that he contacted MARAD on multiple occasions in or around September 2004, but did not receive a response regarding the funding allocations. See id. at 130-55. Mr. Colley testified that prior to December 7, 2004, he did not have a reason to question whether he would have a problem charging MARAD for the work performed before December 8, 2004. Id. at 126. By e-mail correspondence dated November 24, 2004, Mr. Colley communicated to Mr. Kaag the following:

> [Mr. Kaag]:
> Attached are the recommended funds re-allocations for invoice 264 covering services provided to MARAD 1-15 November 2004 in accordance with contract DTMA91-95-C-00024. Please note we estimate ALL current funding on this contract will be exhausted 3 December 2004.
>
> Regards, [Mr. Colley]

_____

4/  Defendant summarizes and refers to the claims arising from these facts as "the false funding claims." Def.'s Br. filed Feb. 18, 2009, at 3. The court will use the same reference.

10

Pl.'s Br. filed Mar. 9, 2009, App. 172.  When he did not receive a response from MARAD about the changes made to the work-order funding allocation, Mr. Colley made the allocations corrections and then submitted the invoice to MARAD.  See Colley Dep. at 139-41.

Plaintiff cites to a number of e-mails exchanged between MARAD officials discussing the work-order allocations and referencing plaintiff's attempts to contact MARAD about the allocations.  Mr. Williams, who was copied on an e-mail Mr. Colley sent to Mr. Kaag on November 1, 2004, forwarded Mr. Colley's e-mail to Iris Cooper, Chief of Acquisitions for MARAD, the same day and wrote the following:

> Iris,
> Below is another inquiry from Veridyne, Inc. seeking technical guidance from the program office.  We are not responding.  Same situation ongoing at regions among LMO offices and contractor personnel aboard two ships receiving logistics support overhauls.
> URGENT WE TAKE APPROPRIATE ACTION TO LIMIT OUR LIABILITY.
>
> PLEASE ADVISE!

Pl.'s Br. filed Mar. 9, 2009, App.178.  Ms. Williams, MARAD's contracting officer, sent the following e-mail correspondence to Mr. Kaag on November 5, 2004:

> [Mr. Kaag]:
> To confirm our discussion this morning regarding the technical review/approval of invoices, please continue to process invoices as you normally would.  This would include requesting corrections by the best means necessary as you normally would.  (Please let me know if you encounter any problems getting invoices corrected.)
>
> Veridyne has not been directed to stop invoicing nor has MAR-614 been advised to suspend processing any invoices that come in.  Our only direction at this point is to withhold payment.  The agency is to continue processing all invoices up to the point of payment.  That way, should we get the go ahead to pay all outstanding invoices, they are ready to be paid as quickly as possible.
>
> Thanks, Erica

Id. App. 179.  Later that same day, Ms. Williams sent an e-mail to Ms. Cooper inquiring whether funds should be transferred between task orders so that MARAD's financial records accurately would reflect the money spent on the invoice. Id. App. 181. Ms. Cooper specified that there was no reason to transfer the funds because MARAD was not planning on paying plaintiff at that time.  Id. App. 180.  Ms. Williams related this information to Mr. Kaag, confirming that Mr. Kaag should certify the invoice and then forward it to Ms. Williams. 5/

Defendant also alleges facts supporting its argument that Invoice No. 267 double-billed MARAD for services and costs because Invoice No. 267 captured costs incurred and billed on prior invoices from September 2004, when MARAD stopped paying plaintiff, to March 31, 2005, the date on which the Contract was scheduled to end. 6/ Defendant states that all of the claimed costs for September through December 2004 already had been charged as overhead and general and administrative expenses ("G&A") on Invoice Nos. 260-266. See Def.'s Br. filed Feb. 18, 2009, at 4.  Furthermore, defendant states that Invoice No. 267 reflects costs for lease payments that extend beyond March 31, 2005.  Id.

Plaintiff does not controvert these facts directly, but refers the court to Invoice No. 267, which contains a breakdown of the $213,688.98 in claim costs that defendant alleges plaintiff double-billed.  See Pl.'s Br. filed Mar. 9, 2009, at 14, App. 261-62.  Plaintiff argues that Invoice No. 267 facially billed for unpaid costs, as the claim costs are itemized by date and cost source. See id. at 14.  Plaintiff concedes that, if MARAD had paid Invoice Nos. 260 through 266, plaintiff would have recovered some of the costs billed on Invoice No. 267 "by virtue of the overhead recovery percentage in those earlier invoices. However, MARAD had not paid [] Invoices 260-267."  Id. at 16.   Plaintiff reminds the court that its original dispositive motion filed on November 3, 2006, did not move for judgment on Invoice No. 267. Moreover, in response to Plaintiff's Proposed Findings of Uncontroverted Fact No. 81, filed Mar. 26, 2007, defendant did not dispute plaintiff's factual assertion that Invoice No. 267, dated March 31, 2005, reflected services rendered to MARAD "in connection with closing down its operations."  See Defendant/Counterclaimant's Resp. to Pl.'s Prop. Findings of Uncontro. Fact No. 81, filed Mar. 26, 2007.

_____

5/  Both parties speculate that the invoice discussed in the referenced e-mails is Invoice No. 263.  See Def's Br. filed Mar. 23, 2009, at 6 n.1; Pl.'s Br. filed Mar. 9, 2009, at 6.

6/  Defendant summarizes and refers to the claims arising from these facts as the "overbilling claims."  Def.'s Br. filed Feb. 18, 2009, at 3.  The court will use this reference or refer to the claims as the "double billing claims."

**DISCUSSION**

1. Standards for motion to amend

A grant or denial of a motion to amend under RCFC 15 is within this court's discretion. <u>Mitsui Foods, Inc. v. United States</u>, 867 F.2d 1401, 1403 (Fed. Cir. 1989). Under RCFC 15(a)(2), once a responsive pleading has been filed, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." The United States Supreme Court in <u>Foman v. Davis</u>, 371 U.S. 178 (1962), set forth the standard for determining when amendment under Rule 15(a) is appropriate:

> Rule 15(a)(2) declares that leave to amend "shall be freely given when justice so requires"; this mandate is to be heeded. If the underlying facts or circumstances relied upon by a plaintiff may be proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason - <u>such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment</u>, etc - the leave sought should, as the rules require, be "freely given." Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

371 U.S. at 182 (citation omitted) (emphasis added). These <u>Foman</u> exceptions have been widely accepted as defining the latitude contemplated by "freely given" amendments under RCFC 15(a)(2). <u>See</u> <u>Mitsui Foods</u>, 867 F.2d at 1403; <u>see also</u> <u>Te-Moak Bands of Western Shoshone Indians of Nev. v. United States</u>, 948 F.2d 1258, 1262-63 (Fed. Cir. 1991) (ruling that delay of eight years was too long under Rule 15(a) because moving party failed to show reasonableness of neglect and delay).

2. Undue delay

Defendant asserts that it acted "with reasonable promptness after discovering the need to amend its answer and counterclaims." Def.'s Br. filed Feb. 18, 2009, at 15. In evaluating undue delay, the court is urged to focus on the point at which the Department of Justice (the "DOJ"), not MARAD, learned of the facts underlying the new fraud claims. Defendant cites to the statutes of limitations provisions regarding acted or imputed knowledge under the

False Claims Act, 31 U.S.C. § 3731(b)(2), and the forfeiture statute, 28 U.S.C. § 2416(c) (2006). Defendant argues that, as exemplified by these statues, "Congress has consistently fixed that point at the time when DOJ learned of the material facts relating to the fraud or should have known those facts, rather than at the point that the [] agency acquired those facts." Def.'s Br. filed Feb. 18, 2009, at 15. The discovery provisions in both statutes start the limitations period from "the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances . . . ." 31 U.S.C. § 3731(b)(2); see also 28 U.S.C. § 2416(c) (stating that in computing limitations periods established in §2415, there shall be excluded the period during which "facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances").

Defendant relies on Martin J. Simko Constr., Inc. v. United States, 852 F.2d 540 (Fed. Cir. 1988), and Jana, Inc. v. United States, 34 Fed. Cl. 447 (1995), to bolster its position that the "'official of the United States charged with responsibility to act' consistently has been held to be an official within DOJ." Def.'s Br. filed Feb. 18, 2009, at 16. The relevant issue addressed by the United States Court of Appeals for the Federal Circuit in Simko dealt with the Contract Disputes Act of 1978 and whether the Government's fraud counterclaims under 41 U.S.C. § 604 "first must be the subject of a contracting officer's (CO) decision before the Claims Court's jurisdiction is properly invoked." 852 F.2d at 542. The trial court concluded that it lacked jurisdiction over the counterclaims based on the fraud provisions of the CDA because § 605(a) was a condition precedent to § 604(a), thereby precluding the Government from raising its fraud counterclaims before it raised the counterclaims to the contracting officer for a written decision. Id. at 541-42. The Federal Circuit reversed, ruling that a fraud claim under the CDA was not a contract dispute, rather a right enforceable by the DOJ and redressable in a court of competent jurisdiction. Id. at 544 (citing S. Rep. No. 1118, at 20 (1978), as reprinted in 1978 U.S.C.C.A.N. 5235, 5254).

The court in <u>Jana</u> concluded that the three-year statute of limitations period under 31 U.S.C. § 3731(b)(2) (1986), 7/ was "triggered by the government's discovery of the fraud." 34 Fed. Cl. at 450.  The court noted that

> the discovery that triggers 31 U.S.C. § 3731(b)(2) is not knowledge of the fraud by *any* government official, but knowledge of the fraud by an official having the authority to initiate litigation under the Act, generally considered to be an official at the Civil Division of the Department of Justice, which has exclusive litigating authority under the False Claims Act, 31 U.S.C. § 3730(a); *see Martin J. Simko Constr.*, 852 F.2d at 547.

<u>Jana</u>, 34 Fed. Cl. at 451 n.6.

This court is hesitant to create the appearance of a confrontation over the facts in ruling on the sufficiency of a motion.  Indeed, plaintiff's counsel conveyed that grant of defendant's motion was anticipated.  Defense counsel, a dedicated litigator for the DOJ and officer of the court, has made the factual averments concerning the incubation of the Government's fraud claims.  However, the circumstances of defendant's evolving embrace of fraud repercussions in this case honor form over substance when the agency enabled the alleged fraudulent contract award and was blind to any potential improprieties in billing until defense counsel last summer asked MARAD to review its billing records.

Defendant represents that the DOJ was not aware of the facts pertaining to the false funding claims until on or about July 31, 2008, when Mr. Kaag and Ms. Rodriguez (agency counsel) "briefed him on the funding facts and the circumstances surrounding [plaintiff's] funding misstatements," Def.'s Br. filed Feb. 18, 2009, at 17, and provided defendant with

---

7/ The 1986 amendment to § 3731(b) stated that the False Claims Act statute of limitations bars claims brought

> (1) more than 6 years after the date on which the violation of § 3729 is committed, or

> (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed,

whichever occurs last.

the documents "designed to demonstrate" to defendant that the amounts billed by plaintiff exceeded the funding levels of certain work orders, id. at 5. "These documents were provided at [defense counsel's] request to assist him in determining the extent to which the Government might be able to defend this lawsuit upon the ground that the Government was not liable for some of the amounts sought" by plaintiff. Id. 8/ It was not until he received the aforementioned documents and information that defense counsel pursued further discovery, which led to the depositions of plaintiff's staff responsible for compiling the funding data for its invoices – Mr. Colley; Louis Vanderhorst, Contracting Manager; and Cathy McGill, Senior Accountant – and provided the factual predicates for DOJ's determination to pursue additional fraud counterclaims. See id. at 7.

On August 28, 2008, the same day that defendant deposed plaintiff's principal Mr. Patterson, agency counsel Ms. Rodriguez informed defendant that MARAD suspected that the amounts billed in Invoice No. 267 had been billed as G&A expenses in Invoice Nos. 260-266. See Def.'s Br. filed Feb. 18, 2009, at 7. Prior to this date, defendant "had no reason to suspect that expenses in Invoice 267 previously had been billed." Id. Defendant asserts that it was not until after the depositions of Mr. Patterson and Ms. McGill on October 1, 2008, that the DOJ concluded it was appropriate to assert fraud based on double-billing. See id. at 8.

Plaintiff jogs defendant's institutional memory that the DOJ had in its possession Invoice Nos. 260 through 267 when plaintiff filed its first motion for partial summary judgment on November 13, 2006. At no point during any of the filings or proceedings thereafter did defendant question the validity of the invoices. Plaintiff asserts that it was "patently obvious" from the invoices that the work-order-by-work-order breakdown changed. Pl.'s Br. filed Mar. 9, 2009, at 3 (citing Pl.'s Br. filed Nov. 13, 2006, App. 623-84 (Invoice No. 264), 685-767 (Invoice No. 265)). Plaintiff then cites the numerous e-mails between MARAD personnel discussing the allocation changes made to the invoices. Pl.'s Br. filed Mar. 9, 2009, at 5-6. Plaintiff submits that DOJ had in its possession all the information relative to defendant's funding claims on the date that defense counsel received the MARAD investigative file. Plaintiff continues: "[defendant's] cho[ice] not to look [at] the information

_____

8/ Defendant concedes that on February 25, 2008, Ms. Rodriguez sent defendant a document revealing an inconsistency between the stated and actual funding levels in Invoice No. 265. See Def.'s Br. filed Feb. 18, 2009, at 17. However, defendant asserts that this inconsistency was not sufficiently apparent to put him on notice of a potential fraud claim. See id. at 18. Defense counsel states that he did not receive the "critical information" to put him on notice of potential fraud until he spoke to the agency on July 31, 2008. See id.

16

and await a visit from Ms. Rodriguez and Mr. Kaag in July of 2008 does not excuse [defendant's] delay." Id. at 7.

Similarly, plaintiff surmises that defense counsel's lack of awareness of the overbilling claims until he took Mr. Patterson's deposition is a consequence of defendant's "choosing not to become aware or negligently failing to take the most basic steps to become aware [of the claims]." Id. at 13. Although plaintiff did not move for judgment on Invoice No. 267, the invoice was included in plaintiff's proposed findings of uncontroverted fact, which defendant did not dispute. Id. at 13-14 (citing Def.'s Resp. to Pl.'s Prop. Findings of Uncontro. Fact, No. 81, filed Mar. 26, 2007). Referring to Invoice No. 267, plaintiff states that it included a document capturing a monthly breakdown of fixed costs, labeled as "claim costs," covering the period of September 2004 to the end of the Contract. Id. at 14, App. 261-62. In light of this document, plaintiff is baffled by defendant's assertion that defense counsel needed to conduct a deposition before alerting him to the fact that Invoice No. 267 attempted to recapture some unpaid costs. See id.

Defendant explains that the change in funding as portrayed by the invoices and the internal e-mails sent between MARAD officials was not sufficient to reveal the nature of the false funding claims. See Def.'s Br. filed Mar. 23, 2009, at 5. Moreover, conceding that Invoice No. 267 clearly includes expenses incurred from September 2004 through the end of the Contract period, defendant represents that no document was available to indicate that those same expenses were billed as G&A expenses in Invoice Nos. 260-266. See id. at 14.

Defendant has not justified the undue delay in reviewing and verifying the invoices at issue on contested motions pending since 2006. As defendant represents in its briefing, agency counsel was privy to the facts underlying the false funding claims, and defense counsel's inquiry to agency counsel made on July 31, 2008, immediately resulted in defendant's obtaining documents and information containing the facts underlying the false funding claims. Furthermore, defense counsel's position that he did not have in his possession the documents that detailed the overbilling claims does not negate the fact that MARAD possessed these documents, and an inquiry verifying the invoices with the agency would have, as it did, disclose the facts underlying the overbilling claims.

The burden of showing reasonableness of delay lies with defendant. See Te-Moak, 948 F.2d at 1263. While defendant argues that the DOJ was not in possession of the relevant information pertaining to the fraud claims until several months before defendant filed its motion to amend, defendant still has not shown the reasonableness of the over three-year delay in obtaining this critical information.

17

After the court probed defense counsel at oral argument on March 26, 2009, for an explanation as to why an inquiry was not made to agency counsel or MARAD regarding the integrity of the invoices before the summer of 2008 and an explanation for the delay in filing defendant's motion to amend, defense counsel adopted the sequence of events leading to DOJ's determination to move to amend to include the proposed fraud claims in its brief:

> As [] with the false funding claims, [defense counsel] raised the possibility of asserting overbilling claims with his direct supervisor and with the Civil Frauds section, and continued to discuss the status of the case with them during the subsequent weeks.
>
> Again, although the facts at this point gave rise to the strong suspicion that [plaintiff] deliberately included inappropriate expenses in Invoice 267, it was not possible to know at this juncture whether [plaintiff's] claims were based on mistake or a reasonable belief that the figures were accurate.  Before the Government could move forward with these counterclaims, then, it would need to depose the two witnesses who had the most information regarding Invoice 267, Mr. Patterson and Ms. McGill. . . .
>
> During their depositions, both Mr. Patterson and Ms. McGill confirmed that [] many of the expenses in Invoice 267 previously had been billed, and they failed to offer a plausible explanation as to why the double-billing of these expenses was not the result of fraud. . . . Mr. Patterson also testified that Invoice 267 included expenses not incurred during the term of the contract, and that he did not have a legitimate basis for believing the Government was liable to repay these expenses.  It was only after these depositions that DOJ concluded that it would be appropriate to proceed in asserting counterclaims based upon the amounts claimed in Invoice 267.

Def.'s Br. filed Feb. 18, 2009, at 7-8.

Defendant explains that it did not unduly delay in requesting leave to amend and that DOJ is mindful of the "seriousness of the allegations," id. at 18, 20; thus, DOJ "proceed[ed] cautiously in the assertion of these claims, in consultation with fraud experts," id. at 18-19.  Yet, when questioned about the delay in concluding that plaintiff overbilled MARAD on Invoice No. 267 by "fraudulently claim[ing] facility and equipment expenses for the period after the contact would have concluded," id. at 4, defendant only could offer that during deposition Mr. Patterson could not point to the source of authority.  Deposition of Samuel J. Patterson, Oct. 1, 2008, at 520-37; cf. Pl.'s Br. filed Nov. 13, 2006, App. 59 (During oral argument plaintiff pointed to ¶ 2 of clause H16 "PHASE-IN/PHASE-OUT TRANSITION"

of the Contract, which states that "(2) The contractor shall be reimbursed for all reasonable phase-in and phase-out costs, i.e., costs incurred within the agreed period after contract expiration that result from phase-in, phase-out operations."). Although defendant reasonably asserts that because the proposed fraud claims require an element of scienter the depositions of Messrs. Patterson, Vanderhorst, Colley and Ms. McGill were critical, on the whole defendant does not provide a reasonable justification for the delay in asserting the additional fraud claims.

3. <u>Prejudice</u>

Plaintiff argues that, as a small business, it will be substantially prejudiced by defendant's amendment of its answer because protracting litigation will result in additional costs and investment of time and will handicap plaintiff's ability to prove and defend the fact-intensive claims, given the "fading memories" of its witnesses. Pl.'s Br. filed Mar. 9, 2009, at 7, 14-15.

Defendant counters that plaintiff had notice of the Government's intent to assert additional counterclaims, based on the false funding claims, as early as September 25, 2008, when defense counsel sent plaintiff an e-mail stating that he intended to seek approval to assert additional fraud claims. <u>See</u> Def.'s Br. filed Mar. 23, 2009, at 13, App. 33. In trivializing any claim to prejudice, defendant seizes upon the "rule" quoted in <u>Croskey v. United States</u>, 24 Cl. Ct. 420, 422 (1991) (order granting second motion to amend complaint), that plaintiff has the burden of showing "'that it will be severely disadvantaged or incapable of presenting facts or evidence' with regard to the issues at hand." <u>Id.</u> (quoting <u>Cornell & Co. v. Occup. Saf. & Health Serv. Comm'n</u>, 573 F.2d 820, 823 (3d Cir. 1978)); <u>see</u> Def.'s Br. filed Mar. 23, 2009, at 3. Beyond this recapitulation by the court on the legal standards in the Third Circuit to defeat a motion to amend pleadings, <u>Croskey</u> does not provide any meaningful guidance, as the non-movant in that case did not argue prejudice as a basis for contesting the *pro se* movant's amendment of her pleading. <u>See</u> <u>Croskey</u>, 24 Cl. Ct. at 422-23.

Defendant also cites <u>Alaska v. United States</u>, 15 Cl. Ct. 276, 279-80 (1988) (order granting motion to amend complaint), an earlier opinion by the judge in <u>Croskey</u>, which held that, although a party can prove prejudice by establishing that new claims would require the non-movant to conduct "extensive research shortly *before* trial," the non-movant's showing of potential extensive discovery was not a severe enough burden to warrant a finding of prejudice. This case is distinguishable, however, because in <u>Alaska</u> trial was not imminent and had not been scheduled. <u>Id.</u> at 280 (citing <u>Nevels v. Ford Motor, Co.</u>, 439 F.2d 251 (5th Cir. 1971) (finding that plaintiff would suffer undue prejudice due to additional discovery given imminence of trial)). In the same vein, defendant's citation to <u>Design & Production,</u>

Inc. v. United States, 10 Cl. Ct. 80 (1986), is not particularly helpful, given that the movant in that case was not attempting to add new claims, and the non-movant only had "undertaken some discovery" and just commenced preparing for trial; therefore, the need to take additional discovery, while inconvenient, did not amount to prejudice.  Id. at 81-82.

Nevertheless, the burden to demonstrate prejudice is plaintiff's, and plaintiff has not substantiated how fading memories or absent documents would cause evidentiary prejudice to plaintiff, particularly because discovery was not scheduled to close until September 26, 2008.  The cost, even to plaintiff as a small business, and burden of undertaking additional discovery do not substantiate the level of prejudice needed to overcome the liberal standard of RCFC 15(a)(2).  The claims of prejudice put forth by plaintiff relate to allegedly new facts; consequently, at the least, the court must allow defendant to amend its proposed cause of action pursuant to the False Claims Act, 31 U.S.C. §§ 3729(a)(1), (a)(2), which is a new cause of action not based on newly asserted facts.  See Def.'s Br. filed Feb. 18, 2009, at 4. The court would be inclined to deny defendant's motion to amend pursuant to the False Claims Act, 31 U.S.C. §§ 3729(a)(1), (a)(2); the CDA, 41 U.S.C. § 604; and 28 U.S.C. § 2514 based on alleged false funding and overbilling claims if plaintiff's showing of prejudice had been more substantial.  In view of all facts and circumstances, and the need to preserve already aging evidence, the court grants defendant's motion to amend its answer and counterclaim. 9/

## CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED**, as follows:

1.  Defendant's motion for leave to file an amended answer and counterclaim is granted, and the Second Amended Answer and Counterclaim are filed this date.

2.  Pursuant to RCFC 7.2(a)(3), plaintiff shall file its response by April 26, 2009.

---

9/  On March 26, 2009, during oral argument the court discussed candidly with both parties the vulnerabilities in their respective cases.  Each time the court has been asked to review the merits of this case, it has been evident that defendant may not be able to prevail at trial, and plaintiff may well succeed.  See 28 U.S.C. § 2412 (2006).

3.  All discovery shall be completed by October 20, 2009.  Any further dispositive motion by defendant shall be filed so that its briefing and disposition will not interfere with this schedule.

4.  A status conference shall be held at 2:00 p.m. on Thursday, November 12, 2009, in the Howard T. Markey National Courts Building.  Counsel for plaintiff shall notify the court at 202/357-6620 by November 6, 2009, if he wishes to participate by telephone conference call to be placed by the court.  Counsel shall be prepared to schedule all pretrial proceedings and trial.

s/ Christine O.C. Miller

_____

**Christine Odell Cook Miller**
Judge