# In the United States Court of Federal Claims

No. 06-150C
(Filed July 6, 2012)

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * * | * |
| | * |
| **VERIDYNE CORPORATION,** | * Contracts; breach of contract; |
| | * Contract Disputes Act, 41 |
| Plaintiff, | * U.S.C.A. §§ 7101-09 (2011) |
| | * ("CDA"); common law fraud; |
| v. | * special plea in fraud, 28 U.S.C. |
| | * § 2514 (2006); False Claims |
| **THE UNITED STATES,** | * Act, 31 U.S.C. § 3729(a)(1), |
| | * (a)(2) (2006); CDA counter- |
| Defendant. | * claim, 41 U.S.C.A. § 7103(a)(3) |
| | * (2011). |
| * * * * * * * * * * * * * * * * * * * * * * | * |

<u>Marc Lamer</u>, Philadelphia, PA, for plaintiff.

<u>Robert E. Chandler</u> and <u>David M. Finkelstein</u>, Washington, DC, with whom was <u>Acting Assistant Attorney General Stuart F. Delery</u>, for defendant.  <u>Janis Rodriguez</u>, U.S. Department of Transportation, of counsel.

## MEMORANDUM OPINION AND ORDER

**MILLER**, Judge.

This case concerns Modification 0023 ("Mod 0023") to Contract No. DTMA91-95-C-00024 ("the Contract") between Veridyne Corporation ("plaintiff" or "Veridyne") and the United States Department of Transportation, Maritime Administration ("MARAD").  The Contract was awarded through the Small Business Administration's (the "SBA's") 8(a) program. 1/ Mod 0023 in 1998 extended the Contract for one year and four

---

1/ SBA's 8(a) program was established by an amendment to the Small Business Act, 15 U.S.C. §§ 631-57 (2006), on October 24, 1978. <u>See</u> Act of Oct. 24, 1978, Pub. L. No. 95-507, § 202, 92 Stat. 1757, 1761 (codified as amended at 15 U.S.C. § 637).  In an effort to "maintain and strengthen the overall economy of the Nation," the Small Business Act assists eligible small business concerns by "insur[ing] that a fair proportion of the total purchases and contracts or subcontracts for property and services for the Government" are completed

additional option years.  Plaintiff was the incumbent contractor.  In order to continue using plaintiff, both plaintiff and MARAD knew that plaintiff would be ineligible for an SBA award and that the Contract would be open to competition unless plaintiff satisfied a $3-million qualifying limitation to the Contract value.  MARAD awarded the Contract to plaintiff on the basis of a proposal that the Government later deemed fraudulent.  Moreover, the Government also found material discrepancies in plaintiff's billing under the Contract after performance was halted.  In 2006 defendant pleaded fraud as both an affirmative defense against plaintiff's claims for amounts due and as a counterclaim, seeking statutory forfeiture of plaintiff's claims.  Defendant's forfeiture claim was based on the assertion that Mod 0023 was void *ab initio* due to plaintiff's fraud.  In 2009 this court granted defendant's motion to amend its answer to include additional fraud counterclaims.  Veridyne Corp. v. United States, 86 Fed. Cl. 668 (2009) (granting defendant's motion to add additional counterclaims) ("Veridyne III").  Trial proceeded on plaintiff's affirmative claim for monies due under the fully performed Contract at the time a stop-work order issued and on defendant's counterclaims for damages in the amount of all monies paid under the Contract that was void *ab initio*; for forfeiture of plaintiff's claims; for statutory penalties and damages because plaintiff falsified invoices with the intent that MARAD pay plaintiff more than what plaintiff knew was due; and for damages as a result of plaintiff's inability to support portions of its claim.  Id. at 672.

---

1/  (Cont'd from page 1.)

by small businesses.  15 U.S.C. § 631(a).  Under section 8(a) a small business concern is one "owned and controlled by socially and economically disadvantaged individuals," and which has participated in the small business and capital ownership development program. Id. § 637(a)(1)(C).  The statute defines socially disadvantaged individuals as "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities."  Id. § 637(a)(5).

Pursuant to the 8(a) program, MARAD awarded the Contract to the SBA, which has the authority to enter into contracts with government agencies, such as MARAD, for the provision of certain goods or services and to award subcontracts to qualifying economically disadvantaged business concerns that actually will provide the goods or perform the required services.  See id. § 637(a).  Plaintiff was the 8(a) program participant designated to perform the Contract, and, although all relevant dealings were between plaintiff and MARAD, the SBA technically awarded Subcontract No. 0303-95-1-00055 to plaintiff.  In the interest of clarity, the Contract is referred to as between plaintiff and MARAD.

## PROCEDURAL HISTORY

On February 28, 2006, plaintiff filed a complaint in No. 06-150C, and the case was assigned to Judge Lawrence J. Block. Plaintiff filed an amended complaint on May 16, 2006. The three-count amended complaint in No. 06-150C sought (1) to recover $2,267,163.96 owed to Veridyne by MARAD on Invoice Nos. 260-267, which had been submitted for payment (Count I); (2) reimbursement of $77,737.36 in legal fees incurred in connection with a criminal investigation initiated by MARAD and as a result of attempts to obtain payment from MARAD on Invoice Nos. 260-267 (Count II); and (3) lost profits on account of MARAD's alleged breach of the Contract, totaling $246,394.13. See Am. Compl. filed May 16, 2006, ¶¶ 48-55, 63, 68 (No. 06-150C).

Defendant filed its answer on July 31, 2006, asserting fraud as a defense and counterclaiming for forfeiture under 28 U.S.C. § 2514 (2006). Plaintiff moved for partial summary judgment in No. 06-150C on November 13, 2006. Shortly thereafter, defendant amended its pleadings by unopposed motion granted on November 21, 2006. The amendments were minor, non-substantive changes to its answer and counterclaim. Defendant cross-moved for summary judgment in No. 06-150C on March 23, 2007. Following the filing of responsive and reply briefs, the case was transferred to the undersigned pursuant to RCFC 40.1(b) on September 5, 2007.

On September 4, 2007, plaintiff filed a complaint in No. 07-647C, and the matter was assigned to Judge Block. Plaintiff's second complaint sought to recover adjustments based on its actual rates for its indirect costs, which previously had been billed at rates determined by the Defense Contract Audit Agency ("DCAA") for the first four years of the Contract extension. Inclusive of a credit that Veridyne deemed was due to MARAD, Veridyne sought to recover $443,104.39 in No. 07-647C.

On September 20, 2007, No. 07-647C also was transferred to the undersigned. That same day, pursuant to an unopposed motion filed September 19, 2007, the court stayed proceedings in No. 06-150C for the first of several attempts by the parties to settle the case. See Order entered Sept. 20, 2007, ¶ 1. On September 21, 2007, the court entered an order staying proceedings in No. 07-647C. Order entered Sept. 21, 2007, at 1 (reciting that "[t]his case . . . shall be subject to the order entered in No. 06-150C on September 20, 2007"). On November 21, 2007, in accordance with the court's September 21, 2007 order, the parties filed a Joint Status Report in No. 06-150C, informing the court that "further settlement discussions would not be productive at this time." Def.'s Jt. Status Rep. filed Nov. 21, 2007. The court lifted the stay in No. 06-150C on November 29, 2007, and scheduled argument on the parties' cross-motions for summary judgment in No. 06-150C.

Argument was held on January 8, 2008.  Plaintiff's dispositive motion sought judgment as a matter of law in its favor on Count I of its amended complaint in the amount of $2,267,163.96 for services performed and invoiced, but not paid.  Count I concerned five invoices submitted to MARAD predating MARAD's suspension of contract performance (Invoice Nos. 260-264) and three invoices submitted to MARAD post-suspension (Invoice Nos. 265-267).

Defendant's cross-motion sought judgment as a matter of law in its favor on all three counts of plaintiff's amended complaint.  Defendant contended that the Contract extension was void *ab initio* due to plaintiff's fraud in submitting a proposal that vastly understated the known value of the total services that MARAD would be ordering.  Defendant alleged that fraudulent conduct absolved the Government of liability for the amounts claimed by plaintiff in Counts I and II.  Because Mod 0023 should be declared void *ab initio*, defendant demanded forfeiture of all monies that MARAD had paid to plaintiff on invoices for services performed pursuant to work orders ("WOs") issued under Mod 0023.  Defendant also sought judgment as a matter of law in its favor on its counterclaim pursuant to 28 U.S.C. § 2514, in the amount of $31,134,931.12, representing forfeiture of all monies paid under Mod 0023.  Defendant moved for judgment in its favor with regard to Count III of plaintiff's complaint (seeking lost profits due to alleged breach), arguing that, even if Mod 0023 was valid, it did not breach the Contract.

On January 24, 2008, this court granted summary judgment in No. 06-150C for defendant only as to Count III of plaintiff's amended complaint and denied plaintiff's motion for summary judgment.  Veridyne Corp. v. United States, Nos. 06-150C, 07-647C (Fed. Cl. Jan. 24, 2008) (unpubl.) ("Veridyne I").  Summary judgment as to Counts I and II of the amended complaint was withheld from both parties.  The order also listed the uncontroverted facts without need for further proof at trial.  Id. at 18-19.

Also on January 24, 2008, the court entered an order lifting the stay in No. 07-647C.  The order entered *nunc pro tunc* to November 29, 2007—the date the stay was lifted in No. 06-150C.  Defendant filed its answer and counterclaim in No. 07-647C on February 4, 2008.  Although never consolidated, the cases effectively proceeded together after the next dispositive motion was considered.

Trial in both cases was scheduled by order entered on June 10, 2008, to commence on November 17, 2008.  Before the completion of discovery on July 10, 2008, plaintiff filed a renewed motion for partial summary judgment in No. 06-150C on the ground that no genuine issue of material fact prevented ruling against the Government on its counterclaim.  Plaintiff argued that Mod 0023 was not a fraudulent extension proposal, as defendant contended, because Mod 0023 "was not an offer to provide all the logistics support services

MARAD would require for $2.99 million," Pl.'s Br. filed July 10, 2008, at 1; rather, Mod 0023 only proposed the scope of work to be provided by plaintiff, not the amount or quantity of work that plaintiff planned to perform. Plaintiff's money demand was for payment of five invoices (Nos. 260-264), totaling $1,263,996.80, submitted to MARAD before MARAD's suspension of contract performance.

On August 11, 2008, defendant opposed, contending that plaintiff could not establish its entitlement to collect on unpaid invoices or defend against the fraud counterclaim merely by resting on evidence that MARAD employees knew, and were not deceived, that the full execution of Mod 0023 would exceed $3 million. Defendant argued that it was entitled to $31,134,931.12—representing all money paid to plaintiff under the Contract—because Mod 0023 was void *ab initio*, given that plaintiff obtained the Contract based on a fraudulent estimate of its cost. Alternatively, defendant moved for leave to take discovery pursuant to RCFC 56(f), should the court be inclined to rule in plaintiff's favor. Defendant represented, albeit not by an affidavit, see RCFC 56(f), that a thorough response to plaintiff's motion would require the Government to conduct additional discovery by "depos[ing] several current and former Veridyne employees who were involved in the preparation and presentation of Veridyne's proposal and the execution of Mod 23." Def.'s Br. filed Aug. 11, 2008, at 10.

Plaintiff replied on August 25, 2008, accusing defendant of misstating plaintiff's argument in its renewed motion for summary judgment. Plaintiff clarified that it was not arguing the absence of fraud solely because "no MARAD employees [were] deceived by" the actual cost of Mod 0023, Pl.'s Br. filed Aug. 25, 2008, at 1, but that the absence of fraud is supported by the uncontroverted facts of record that establish "there was no misrepresentation or deception by Plaintiff in its extension proposal," id. at 6. Plaintiff maintained that Mod 0023 was not tainted with fraud because no "falsity" inheres in Mod 0023 and "falsity is the *sine qua non* for an action grounded in fraud." Id. at 1.

On September 12, 2008, this court issued a published opinion denying both plaintiff's renewed motion for partial summary judgment and defendant's motion to refuse application for judgment as moot. Veridyne Corp. v. United States, 83 Fed. Cl. 575 (2008) (order denying plaintiff's renewed motion for partial summary judgment) ("Veridyne II"). Reviewing the pertinent case law on the appropriate remedy for contracts that are held void *ab initio* for common law fraud, see id. at 581-86, the court pointed out that defendant did not cite to any binding case law establishing that, absent a showing of a bribe or a conflict of interest, the appropriate remedy for common law fraud that voided Mod 0023 *ab initio* would require plaintiff to forfeit all monies paid under the post-1998 modifications for services that it already performed. Id. at 586. With respect to 28 U.S.C. § 2514, the court ruled that genuine issues of material fact were present concerning whether plaintiff submitted a "fraudulent" proposal to the Government and, if so, whether plaintiff would be compelled

to forfeit its claim against the Government. Id. at 589. The court noted that defendant did not allege that any of plaintiff's invoices constituted a claim for work not actually performed or that any invoice reflected other than an accurate number of hours. Id. at 587. Although defendant had cited to case law to the effect that violations of 28 U.S.C. § 2514 can result in forfeiture of claims, no cases cited applied § 2514 in factual circumstances similar to those presented. Id.

On October 14, 2008, pursuant to defendant's request at a status conference held on October 10, 2008, the court stayed trial allowing defendant to file a joint motion to its answer and counterclaim in both cases. Following issuance of the court's order, defendant filed one unopposed motion for extension of time on November 26, 2008, and two opposed motions for extension of time on December 31, 2008, and February 3, 2009, respectively. 2/ The latter two were granted over plaintiff's opposition, but the court prohibited any further extensions. See Order entered on Feb. 9, 2009.

On February 18, 2009, defendant filed a motion in both cases to amend its answer to include additional fraud counterclaims "based upon newly-discovered fraudulent statements" in plaintiff's invoices. Def's Br. filed Feb. 18, 2009, at 1. Defendant asserted that the justification for the new claims stemmed from plaintiff's falsely representing the level of work-order funding available on Invoice Nos. 260-266 and overbilling MARAD for Invoice No. 267. In No. 06-150C the additional fraud counterclaims included the following: a special plea in fraud under 28 U.S.C. § 2514 seeking forfeiture of all of plaintiff's claims; a claim under the antifraud provision of the Contract Disputes Act of 1978, 41 U.S.C. § 604 (2006) (the "CDA"), for the unsupported portion of plaintiff's claims, plus any cost incurred by the Government for reviewing such claims; and, pursuant to the False Claims Act, 31 U.S.C. §§ 3729(a)(1), (a)(2) (2006) (the "FCA"), a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each claim presented. See Am. Answer & Countercl. filed Apr. 22, 2009, ¶¶ 92, 95, 98, 101 (No. 06-150C). Defendant's forfeiture counterclaim in No. 07-647C was identical to its special plea in fraud in No. 06-150C and was based on the same newly discovered evidence. See Am. Answer & Countercl. filed Apr. 22, 2009, ¶ 53 (No. 07-647C). Defendant also moved to amend its counterclaim in No. 06-150C to include an additional cause of action to recover monies paid against fraudulent invoices pursuant to the FCA, not based on "any new facts," but based on all invoices submitted under the "fraudulently acquired" Mod 0023. Def.'s Br. filed Feb. 18, 2009, at 4.

_____

2/ Defendant's November 26, 2008 and December 31, 2008 motions were filed only in No. 06-150C, despite the fact that the court's October 14, 2008 order permitted defendant to file a joint motion to amend its pleadings in both cases. Defendant's third request for an extension of time dated February 3, 2009, was filed in both cases.

As originally filed in both No. 06-150C and No. 07-647C, defendant's defense and counterclaim asserting fraud pleaded, respectively, common law fraud and 28 U.S.C. § 2514. See Answer & Countercl. filed July 31, 2006, ¶¶ 78, 82 (No. 06-150C); Answer & Countercl. filed Feb. 4, 2008, ¶¶ 39, 42, 43 (07-647C). Defendant's factual predicate for the relief sought was that Mod 0023 should be held void *ab initio* because it was "tainted by fraud and wrongdoing and executed in violation of statutory controls upon the procurement process, namely, the Competition Requirements." Def.'s Answer & Countercl. filed July 31, 2006, ¶ 78 (No. 06-150C); Def.'s Answer & Countercl. filed Feb. 4, 2008, ¶ 39 (No. 07-647C). The only change proposed to the original allegations related to defendant's claim under 28 U.S.C. § 2514, which, following amendment, alleged that plaintiff should be held liable for forfeiture of its claims, not because Mod 0023 was entered into fraudulently, but because plaintiff falsified invoices "with the intent to cause the Government to pay [plaintiff] more than the amount to which [plaintiff] knows it is entitled under the Contract." Def.'s Br. filed Feb. 18, 2009, App. 17, ¶ 91. Briefing was completed on March 23, 2009. On April 16, 2009, the court issued a published opinion granting defendant's motion to amend in both cases. Veridyne III, 86 Fed. Cl. at 681. The court reasoned that, although defendant did not fully justify its delay in asserting the additional counterclaims, plaintiff's failure to demonstrate evidentiary prejudice—particularly in light of the liberal standard applied to motions to amend—warranted a ruling in defendant's favor. Defendant filed its second amended answer and counterclaim in No. 06-150C and its amended answer and counterclaim in No. 07-647C on April 22, 2009.

The parties proceeded with discovery, the deadline for which was extended multiple times, and the cases were scheduled for trial on November 14, 2011. See Order entered Apr. 7, 2011, ¶ 6. On May 23, 2011, the court entered an order at the parties' request transferring both matters to Senior Judge Robert H. Hodges, Jr., who graciously consented to conduct settlement efforts. On June 27, 2011, the matters were returned to the undersigned after attempts at settlement proved futile. Thereafter, the court received full briefing on defendant's motion for partial summary judgment in No. 06-150C, and oral argument was held on September 28, 2011. On the following day, the court entered an order rescheduling trial in both cases to begin on January 9, 2012. The court on October 5, 2011, granted in part and denied in part defendant's motion for partial summary judgment. Specifically, the court held that no genuine issue remained as to plaintiff's right to recover its indirect overhead costs for 2000 to 2003 because plaintiff conceded that it did not comply with the statutory prerequisite for recovery of such expenses. Order entered Oct. 5, 2011, at 2. The court further found that no genuine issue of material fact existed as to plaintiff's claim for recovery of expenses incurred after March 31, 2005—the scheduled end of the Contract. Id.

On October 19, 2011, plaintiff filed a motion *in limine* to exclude the testimony of defendant's witness, Eugene Cornelius, an SBA official who was proposed to testify about

7

the "SBA 8(a) program and the impact of contractor fraud and abuse on program goals and integrity." Pl.'s Br. filed Oct. 19, 2011, at 2 (internal quotation marks omitted).  Response and reply briefs were filed, and, on December 5, 2011, the court entered an order precluding defendant from offering Mr. Cornelius's testimony, reasoning that, to the extent Mr. Cornelius would testify as to the impact of plaintiff's actions on future SBA efforts to make similar contracts available to small businesses, he would be doing no more than speculating on the unquantifiable impact of the alleged fraud.  See Order entered Dec. 5, 2011, at 7.

The court permitted Mr. Cornelius to offer "generalized opinion testimony on the 8(a) Program and how fraud, abuse or manipulation are detrimental to its goals," id. at 5 (citation omitted) (internal quotation marks omitted), but held that "any testimony offered to support defendant's counterclaims and to explain the impact of plaintiff's actions on the modification or the 8(a) program amounts to a specific opinion based on the facts of the case at bar," id. Because defendant had not demonstrated that Mr. Cornelius was an expert whose testimony would qualify as expert opinion testimony, such a specific opinion was inadmissible. Moreover, the proffered testimony was inadmissible as lay opinion testimony because the court concluded that, in accordance with Fed. R. Evid. 403, "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues . . . or by considerations of undue delay [or] waste of time."  Id. at 7 (citation omitted) (internal quotation marks omitted).  Although the court cannot claim prescience, the astounding documentary evidence introduced at trial of MARAD's complicity in sidestepping the SBA's 8(a) program requirements would have rendered Mr. Cornelius's proposed opinion fatally prejudicial to plaintiff, given that its sister government agency MARAD was a willing partner in subverting SBA's goals.

An initial pretrial conference was held on December 8, 2011; plaintiff requested that a final pretrial conference be held on January 5, 2012.  Trial commenced on January 9, 2012,

and proceeded for eight days, through January 19, 2012. 3/ Plaintiff submitted its initial post-trial brief on March 20, 2012, and the final post-trial brief was filed on May 31, 2012.

## FACTS 4/

I. Genesis of plaintiff's cost proposal for Contract extension

On March 14, 1995, MARAD awarded the Contract to the SBA, which, in turn, awarded a subcontract containing the same terms on March 27, 1995, to Veridyne—then doing business as Shepard-Patterson & Associates—under the SBA's 8(a) program, which sets aside government contracts for businesses owned by socially and economically disadvantaged individuals. See JX 1; see also supra note 1. The Contract, which was not subject to competition, was an indefinite delivery, indefinite quantity ("IDIQ") cost-plus-award-fee contract that covered services related to MARAD's logistics program in support of the Ready Reserve Force, which is structured to provide sealift services for the United States Army and United States Marine Corps. See Transcript of Proceedings, Veridyne Corp. v. United States, Nos. 06-150C, 07-647C, at 58-59 (Fed. Cl. Jan. 9-19, 2012) ("Tr.") (Samuel J. Patterson, Veridyne's Co-founder and President).

--------------------------------------------------

3/ Although No. 07-647C was tried, on May 31, 2012, the parties jointly moved for entry of judgment, agreeing that judgment may enter for defendant in that case in which Veridyne sought reimbursement of its indirect costs from 2000-2003. On October 5, 2011, the court partially granted defendant's motion for summary judgment in No. 07-647C on the issue of whether Veridyne was entitled to recover its overhead costs from 2000-2003. See Order entered Oct. 5, 2011, at 2. Because defendant conceded that genuine issues of material fact remained as to Veridyne's entitlement to recover general and administrative ("G&A") expenses for that same period, the court denied summary judgment on that issue. See id. at 1-2. The parties' recent joint motion memorialized their agreement that no genuine issue of fact exists with respect to Veridyne's claim for G&A expenses and that the court's rationale for denying reimbursement of overhead expenses also precludes recovery of G&A expenses for 2000-2003. See Jt. Mot. filed May 31, 2012, at 2. The parties jointly requested that judgment enter in defendant's favor in No. 07-647C, and the court granted the motion on June 11, 2012. The Clerk of the Court entered judgment on June 15, 2012. Accordingly, this opinion will not discuss No. 07-647C further.

4/ The facts set forth in the "Facts" and "Discussion" sections of this opinion constitute the court's findings of fact pursuant to RCFC 52(a)(1), (c). Rulings on mixed questions of fact and law also are set forth in the "Discussion" section.

Because the Contract was an IDIQ contract, the amount of services that MARAD would order was not specified.  The Contract's Statement of Work (the "SOW") instructed Veridyne to provide specified logistics support services "as needed in accordance with authorized written work orders [issued by MARAD]."  JX 1, at 0011. 5/  The Contract included estimated annual costs based on a stated maximum number of labor hours and other direct costs for each performance year.  See id. at 0005-09.  MARAD was obligated to order at least ten percent of each year's listed maximum, and plaintiff was not obligated to provide any more than the maximum number of hours.  See id.  The Contract period was one base year and up to four option years.  Id.  Plaintiff performed the Contract from the date of the award, and MARAD exercised each of the four option years.  In total, MARAD paid plaintiff $20,324,289.15—$2,582,051.20 in the initial Contract period (1995-1996), $3,774,669.32 in the first option year (1996-1997), $4,316,679.61 in the second option year (1997-1998), $4,036,100.25 in the third option year (1998-1999), and $5,266,646.04 in the fourth option year (1999-2000).  See Def./Counter-Claimant's Resps. to Pl.'s Prop. Findings of Fact filed Mar. 26, 2007, at ¶¶ 13, 17 ("DRPPFF"). 6/

MARAD was satisfied with Veridyne's performance, and Mr. Patterson was interested in continuing to provide the same services to MARAD.  Indeed, MARAD preferred continuing with Veridyne—a known and competent service provider—rather than beginning anew with another SBA-qualified business.  In late 1997 or early 1998, Mr. Patterson approached MARAD officials and inquired as to whether the Contract could be extended for additional performance years.  See Tr. at 60 (Patterson).  At that time Mr. Patterson knew that Veridyne was scheduled to graduate from the 8(a) program on June 30, 1998. 7/  See Tr. at 61 (Patterson).  In effect, plaintiff had attained net revenues that rendered it ineligible for an award under the SBA's 8(a) program unless a contract were valued at no more than $3 million.  Veridyne's counsel at the time provided MARAD with a legal opinion that the

---

5/  For more lengthy documents, citations will include the Bates number(s) corresponding to the specific page(s) referenced.  For exhibits that do not carry Bates numbers, but are identified with consecutive numbers, those numbers will be used in place of the Bates numbers.

6/  The court refers to this summary judgment submission, instead of the corresponding trial exhibits, when the relevant exhibits were not offered at trial and therefore were not admitted.

7/  In June 1989 Veridyne was admitted to the SBA's 8(a) program for a nine-year term, after which time Veridyne would be said to have "graduated" from the program, making it ineligible for award of contracts that had been set aside solely for 8(a) program participants.

Contract could be extended by adding additional years, even beyond plaintiff's graduation from the 8(a) program, provided that the extension was effected while plaintiff was still in the 8(a) program. See Tr. at 60 (Patterson). MARAD contracting officials then informed plaintiff that an extension of the Contract was possible and would be considered. See Tr. at 60 (Patterson). Based on discussions between Veridyne's then-Executive Vice President and Chief Financial Officer ("CFO"), Michael C. Genna, and MARAD officials, Mr. Patterson understood that plaintiff's proposal for additional option years should not exceed $3 million. See Tr. at 60-62 (Patterson). Although Mr. Patterson stated that no one from MARAD suggested that plaintiff submit a proposal below $3 million, he explained that he knew that contracts projected to exceed $3 million are awarded subject to competition requirements. See Tr. at 60-61 (Patterson); see also Tr. at 231 (Patterson). Mr. Patterson on the witness stand was a study in evasiveness. He appeared to be a successful, competent businessman who may have convinced himself, but not the court, that his testimony was straightforward.

It is interesting to distinguish those testifying participants in the charade that was the Contract extension, stop-work order, wind-down, and claims process from those whose actions speak unequivocally through exhibits. Although the court draws no inferences from the lack of visibility at trial of MARAD contracting officials, the documents authored by these government employees brook no misinterpretation: MARAD contracting officials knowledgeable in approving the proposal vehicle and fully aware of the need to befog the SBA in order to obtain its approval actively participated in securing that approval. And, in the ironic dénouement of this and similar debauched procurements, the key MARAD players still work for MARAD.

On February 19, 1998, MARAD Contracting Specialist Rita C. Jackson met with Mr. Genna regarding a possible Contract extension. In a letter to Ms. Jackson dated February 25, 1998, Mr. Genna recorded plaintiff's understanding of the meeting, noting that a "question was asked how [Veridyne] would handle pricing and cost proposal issues for an extension, if so granted." JX 11, at 0001. He then furnished a "synopsis of salient points in which [Veridyne] believe[d] the government would benefit," including, inter alia, that the Contract would remain an IDIQ contract, that "[p]roposed estimates [would not exceed] $3,000,000 in the aggregate," and that "[a]ll cert[ifications] and representations would be consistent with the current [contract]." Id. The $3 million value is particularly noteworthy because the 8(a) program requires that contract opportunities be awarded "on the basis of competition" if "(I) there is a reasonable expectation that at least two eligible Program Participants will submit offers and that award can be made at a fair market price, and (II) the anticipated award price of the contract (including options) will exceed . . . $3,000,000 (including options)." 15 U.S.C. § 637(a)(1)(D)(i) (2006).

11

On March 6, 1998, Richard H. Williams, Chief of MARAD's Division of Logistics Support ("MAR 614"), 8/ sent a memorandum to Timothy Roark, Director of MARAD's Office of Acquisition ("MAR 380"), indicating MAR 614's desire to extend its contract with Veridyne and requesting that MAR 380 seek a formal cost proposal from plaintiff for the additional option years.  See JX 15.  Richard Williams indicated that "[t]he scope of work [for the extension] will remain the same as is established in the current contract."  Id.  On March 10, 1998, Ms. Jackson, on behalf of MAR 380, sent a letter to Mr. Patterson requesting that plaintiff submit a cost proposal for the Contract extension.  See JX 16.  She stated that "[t]he scope of work will remain the same as is established in the current contract" and that, "as in the current contract, actual taskings will be assigned using the Work Order and Technical Directive structure."  Id.  Ms. Jackson instructed Veridyne to "identify the cost per year for th[e] five year extension" and to submit its cost proposal by March 30, 1998, so that it could be forwarded to the SBA by mid-April 1998.  Id.  Neither Richard Williams nor Ms. Jackson testified, but they contributed an unalloyed documentary record that tracked their efforts to facilitate the award of the Contract extension as an SBA set-aside for which Veridyne was not eligible.

Plaintiff responded with a cost proposal dated March 30, 1998.  JX 18.  The proposal was the result of a combined effort by Mr. Genna; Glenn I. Downer, Veridyne's then-Program Manager for the Contract; and two Senior Analysts from Mr. Downer's staff—Leonard S. Freiberg, Jr., and Donald V. Colley.  Tr. at 312 (Downer); Tr. at 1242 (Genna).  Mr. Downer explained that the typical practice used to prepare a proposal involved reviewing the SOW provided by the agency issuing the request for proposal (the "RFP") and developing a "solution," which included establishing labor categories and labor-hour estimates.  Tr. at 314 (Downer).  Those categories and figures then would be forwarded to plaintiff's corporate or financial departments and used to determine a cost proposal.  Tr. at 314 (Downer).  This practice, however, was not followed in preparing the proposal for Mod 0023 because MARAD did not issue an RFP for the additional option years.  Tr. at 315 (Downer).  Mr. Downer further noted that plaintiff already possessed the SOW from the base contract and previously had established labor rates and categories that could be used in drafting the proposal.  Tr. at 315 (Downer).

Mr. Downer testified that, in preparing the proposal, Mr. Genna instructed him "[t]o develop a scenario that would provide a portrayal of the services that MARAD could obtain as a sample for under $3 million."  Tr. at 312 (Downer).  According to Mr. Downer, that scenario was neither a response to, nor an estimate of, MARAD's expected needs over the

_____

8/  Erica L. Williams served as Contract Specialist.  To avoid confusion, the Williams witnesses will be identified as Erica Williams and Richard Williams, respectively.

five additional option years.  Tr. at 316 (Downer).  Mr. Downer noted at trial that he was aware of a $3-million SBA limit on a Contract extension, which appeared to him to be the basis for Mr. Genna's instruction.  Tr. at 312-13, 320, 437-38 (Downer).  Mr. Downer acknowledged MARAD's instruction that the scope of work—which he understood to mean the "range of services" that MARAD could request from plaintiff—was to remain the same as that stated in the Contract.  Tr. at 316-17 (Downer).

The proposal did not include a cost-per-year value, but, instead, self-described the submission, as follows: "This proposal is based on a representative sample of hours spread across the applicable labor categories."  JX 18, at 0001.  Veridyne's cost proposal for the extension was "priced as a Cost Plus Award Fee, IDIQ contract" and recited that "[a]ll contract terms and conditions are the same, and the original scope and technical content remain intact."  Id. at 0004.  The cost proposal outlined the hourly labor rates for workers in various labor categories for each year and included a "Certificate of Current Cost or Pricing Data" ("Truth in Negotiations Act ("TINA") Certificate"), certifying that the cost or pricing data, as defined by the Federal Acquisition Regulation (the "FAR"), were accurate, complete, and current as of the date of submission.  Id. at 0022.  9/  The proposal provided that the total cost to MARAD for the five additional option years would be $2,999,949.00, id. at 0016, 0028, despite plaintiff's knowledge that, under the current contract, it had been billing MARAD between $5 million and $6 million each year, see Tr. at 60-61 (Patterson); Tr. at 316 (Downer).  Mr. Downer testified that Veridyne could have performed Mod 0023 without the assistance of a subcontractor and, therefore, did not include subcontractor labor costs in the proposal.  Tr. at 324, 327 (Downer).

---

9/  The term "Cost or pricing data" is currently defined in 48 C.F.R. (FAR) § 2.101 (2012), as:

[A]ll facts that, as of the date of price agreement or, if applicable, an earlier date agreed upon between the parties that is as close as practicable to the date of agreement on price, prudent buyers and sellers would reasonably expect to affect price negotiations significantly.  Cost or pricing data are factual, not judgmental; and are verifiable.  While they do not indicate the accuracy of the prospective contractor's judgment about estimated future costs or projections, they do include the data forming the basis for that judgment.  Cost or pricing data are more than historical accounting data; they are all the facts that can be reasonably expected to contribute to the soundness of estimates of future costs and to the validity of determinations of costs already incurred.

FAR § 2.101.

The proposal also provided a "Price Summary By Option Year," which identified the various labor categories, the hourly rates for workers within those categories, and a proposed number of labor hours to be provided by each labor category in each additional option year. JX 18, at 0016. This summary indicated that the number of labor hours to be provided would decrease from one option year to the next and that the use of some labor categories would be phased out completely, with the result that some labor categories were proposed to provide "0" hours in the final option years. See id. In explaining this decreasing trend, Mr. Downer stated that plaintiff's proposal "contemplate[d] a phaseout of [plaintiff's] involvement" in the logistics support program, subject to a request to reconstitute from MARAD. Tr. at 321 (Downer).

## II. MARAD's action on plaintiff's proposal

On March 31, 1998, Patrick A. Carlton, MARAD Logistics Management Specialist and a refreshingly straightforward employee-witness, sent an e-mail to Richard Williams outlining his thoughts on plaintiff's proposal. See JX 19. Mr. Carlton was concerned that the proposal provided for an 80% labor phase-out, as opposed to a mere reduction in the number of people employed in the latter option years. Id. at 0001. Additionally, he commented that the SBA might object to the $3-million proposal, given that "[h]istory shows 3-4 million billed per year." Id. at 0002. On April 21, 1998, Richard Williams, on behalf of MAR 614, sent a memorandum to MAR 380, via Ms. Jackson, stating that MAR 614 accepted plaintiff's proposal. See JX 22. Richard Williams's memorandum dismissed any concerns based on the 80% labor cut, stating, "[W]e believe that the contractor showed these cuts in order to remain within SBA's $3,000,000.00 threshold." Id. He concluded by requesting that MAR 380 take whatever action would be necessary to modify the Contract. Id. On April 28, 1998, Ms. Jackson sent a letter to the SBA, via Ollie Adams, an SBA employee in the Philadelphia District Office, indicating MARAD's intention to enter into a follow-on contract with Veridyne. See JX 23. Ms. Jackson represented to the SBA that "[t]he acquisition . . . will be a follow-on or renewal contract with no change in the scope of work" and that "[t]he total estimated amount of [the follow-on contract] is $3,000,000." Id. Concluding that "[t]his extension will be a substantial savings to the Government," Ms. Jackson asked the SBA to notify MARAD of its decision regarding acceptance of the extension offer. Id.

On April 20, 1998, and April 28, 1998, respectively, Wayne A. Cutrell, then-MARAD Contracting Officer, and Richard Williams signed a "Justification for Other than Full and Open Competition" (the "Justification") prepared by MAR 380, see Tr. at 1425 (John L. Mann, Jr., MARAD's then-Associate Administrator for Administration), by which they recommended that MARAD approve an extension of the Contract to Veridyne. See JX 26, at 0001. The Justification indicated that the cost estimate for the extension was $3 million.

14

See id. Despite Richard Williams's and Mr. Cutrell's endorsements, the Justification was subject to review by a sole-source review panel (the "Review Board"), which was comprised of three individuals: Joyce Tencher-Harris, a member of MAR 380 who served as the procurement/acquisitions expert, see Tr. at 1428 (Mann); Edwin B. Schimler, Jr., an engineer who served as the technical expert, see Tr. at 1427-28 (Mann); and Edmund T. Sommer, Jr., MARAD Assistant General Counsel who served as the legal expert, see Tr. at 1426-27 (Mann). See JX 26, at 0002. The Review Board, which was "responsible for making sure that the proposed action was consistent with the laws and regulations, and that it met all the requirements and that the documentation was consistent and accurate," Tr. at 1427 (Mann), unanimously approved the recommended procurement action on May 1, 1998, JX 26, at 0002.

The Justification then was reviewed by Mr. Mann, whose responsibilities as MARAD's Associate Administrator for Administration included serving as Competition Advocate to review recommendations from the Review Board. See Tr. at 1426, 1428-29 (Mann). Although Mr. Mann acted as the final check to ensuring the propriety of the recommended extension, he testified that "[i]f all the members of the [Review Board] and if the contracting officer and the program manager . . . had all recommended approval and there w[ere] no objections, I typically approved it." Tr. at 1428-29 (Mann). Aware that the contract in question was awarded pursuant to the 8(a) program, Mr. Mann stated that he "relied on [the legal and procurement members of the Review Board] to make sure that all the rules and regulations were followed," as well as on the "certifications and recommendations for approval or disapproval from the contracting officer." Tr. at 1429-30 (Mann). Accordingly, Mr. Mann signed and approved the Justification on May 5, 1998. That same date, Mr. Roark signed off on the "Determination and Finding for Option Extensions for MARAD Contract DTMA91-95-C-00024" (the "D&F") that had been approved by Mr. Cutrell on April 30, 1998, two days after he signed and approved the Justification. See JX 26, at 0004-05. The D&F concluded that "approval of [the extension] would be the most advantageous method of fulfilling the Government's need[,] price and other factors considered." Id. at 0005.

The discussions between plaintiff and MARAD culminated in the execution of Mod 0023 by MARAD and Veridyne on May 18, 1998, and by the SBA on May 20, 1998. See JX 28, at 0002. Mod 0023 was described as a modification "issued to provide five additional (1) year option periods to this contract." Id. at 0003. When Mod 0023 was executed, one option period—Option Year Four—still remained in the original Contract. Id. Additional option years provided for in Mod 0023 would be numbered Option Year Five through Option Year Nine, and each option period would be exercised at the sole discretion of MARAD. Id. Mod 0023 provided for estimated costs and award fee pools totaling $2,999,948.00. Id. at 0004-08. The estimated costs, including award fees, for each option year ranged from a high

of $1,290,765.00 in Option Year Five, the first option year in Mod 0023, to a low of $186,590.00 in Option Year Nine, the final option year under Mod 0023. See id. As stated in Mod 0023, MARAD was only obligated to order ten percent of the total estimate. See id.

On March 25, 1999, MARAD issued unilateral Modification 0026 to the Contract, exercising the fourth (and final) option year under the original Contract, which would expire on March 26, 2000. DRPPFF ¶ 28. 10/ If executed by MARAD, Option Year Five—the first option year under Mod 0023—would begin on March 27, 2000. See id. at 0003. During spring 1999, nearly one year before Option Year Five could be exercised, MARAD personnel from MAR 614 and MAR 380 were engaged in discussions aimed at increasing the funding available on the Contract. See Tr. at 1219-21 (Carlton); see also JX 31 (referencing memorandum regarding increase in contract ceiling prepared by Mr. Carlton and Contract Specialist Erica L. Williams). Mr. Carlton testified that he assisted in preparing an estimate of the funding that would be required for the remaining option years. Tr. at 1221 (Carlton); see also JX 32, at 0002 (Mr. Carlton's estimate for increase in Contract funding ("MAR 614's cost estimate")). On May 6, 1999, Richard Williams sent a memorandum to Mr. Cutrell, seeking approval to increase funding for the remaining option years in accordance with MAR 614's cost estimate, which was included with the memorandum. See JX 32, at 0001-02. Including Option Year Four, which was not within Mod 0023 and was assigned a cost estimate of approximately $5 million, the total estimated cost for the five option years was $35,974,779.00, see id. at 0002, as compared to the $3-million estimate originally provided for the four option years within Mod 0023.

On March 22, 2000, MARAD issued unilateral Modification 0032 to the Contract, exercising the first option year under Mod 0023, i.e., Option Year Five, which extended the Contract period through March 26, 2001. See DRPPFF ¶ 29; 11/ see also Tr. at 1654 (Benedict J. Burnowski, MARAD's then-Senior Contract Specialist Team Leader). As recited in this modification, no funds were obligated thereby, as funding would be obligated in the individual WOs issued under the Contract and pursuant to Mod 0023. On April 12, 2000, MARAD issued the first WOs under Mod 0023—WOs 412 through 419. See DRPPFF ¶ 30. 12/ Including subsequent modifications, the total value of these WOs was $7,225,141.30. Id. By September 30, 2000, six months into Option Year Five, plaintiff had invoiced approximately $3,168,088.00 in costs, all incurred in response to WOs issued by MARAD. Id. ¶ 31; see also Tr. at 1660 (Burnowski). Based on these orders, MARAD

---

10/  See supra note 6.

11/  See supra note 6.

12/  See supra note 6.

16

contracting personnel were aware that they had issued WOs sufficient to expend the entire estimated dollar value of Mod 0023 and that plaintiff had billed the entire award fee established in Mod 0023.  DRPPFF ¶ 32.

III.  Mod 0023 plays out in the real world

On August 14, 2000, Erica Williams e-mailed Messrs. Carlton and Burnowski after discovering that the available award-fee pool would not be sufficient to cover the awards to which plaintiff would be entitled each option year.  See JX 38.  Erica Williams noted that the documentation supporting Mod 0023's extension of the Contract failed to explain the insufficient award-fee pool.  Id.  ("None of the documentation I have for the mod that extended the contract the additional 5 years [Mod 0023] explains [the fact that the award-fee pool declines each option year]. . . . The amounts will definitely not cover the awards. (Option Year Ten only has $13,821.00!!!)").  On August 29, 2000, Mr. Carlton, MARAD's Logistics Management Specialist, e-mailed Mr. Downer, Veridyne's Program Manager, requesting justification for MAR 614's cost estimate—espoused in JX 32, at 0002—for Mod 0023.  See JX 39.  Mr. Carlton testified that he made this request at the direction of Richard Williams.  Tr. at 1228 (Carlton).  On September 26, 2000, before Mr. Downer responded to Mr. Carlton, Erica Williams sent a letter to Mr. Patterson informing him that MARAD was disallowing the award fee that plaintiff included in Invoice No. 150 [13] because plaintiff already had exhausted the award-fee pool for Option Year Five.  See JX 40; Tr. at 510 (Freiberg).  Erica Williams stated that MARAD intended to meet with plaintiff in October 2000 to discuss updating the estimates provided in Mod 0023 for option years five through nine "to better reflect the anticipated efforts required by MAR-614 for MARAD's Logistics Support program."  JX 40; see also JX 28, at 0004-08.

---

[13] Mr. Freiberg provided a synopsis of how plaintiff was permitted to bill its award fee:

> Under this contract we were targeted to have the potential for an award fee up to eight percent [of the cost to the Government].  [Veridyne was] permitted to go ahead and bill on a provisional basis four percent of the cost against the award fee.  Then subsequent to that on a quarterly basis [plaintiff] would have a review done . . . by MARAD to determine if [plaintiff] could get any additional award fee or if [MARAD] w[as] dissatisfied with [plaintiff's] performance, then [MARAD] could go ahead and require [plaintiff] to return the provisional fee.

Tr. at 509-10 (Freiberg).

On October 2, 2000, Mr. Downer sent an e-mail to Richard Williams and Mr. Carlton in response to Mr. Carlton's August 29, 2000 e-mail. See JX 41. Noting that the MARAD officials would be meeting with MAR 380 without a Veridyne representative present, Mr. Downer identified the two issues to be addressed: (1) "the need to revise the current contract estimates for Option Years 5 & 6," and (2) "the needed adjustment of the award fee pool to reflect the revised estimates [i.e., MAR 614's cost estimate] for all Option Years." Id. Mr. Downer was aware that MARAD had disapproved plaintiff's award fee in various invoices submitted during Option Year Five, see Tr. at 495 (Downer), and noted in his e-mail that MAR 380 had not adjusted the award-fee pool after receiving MAR 614's cost estimate, see JX 41. Shortly after this exchange, Veridyne transferred the issue of the disallowed fees from Mr. Downer to Mr. Freiberg, then-Vice President for Finance and Administration. See Tr. at 511 (Freiberg). Although the parties did not present evidence of what transpired at this meeting, the subsequent record of events is illuminating.

On February 7, 2001, Erica Williams sent a letter to Mr. Patterson, stating that "MARAD is currently reviewing the proposal submitted by [Veridyne] covering option periods five through nine, which better reflect the anticipated efforts required by MAR-614." JX 45. Acknowledging that it would take some time to complete the reviews necessary for any contract modification, she provided a list of the previously disallowed provisional fee amounts and instructed plaintiff to submit an invoice entitled "Previously Disallowed Provisional Fees" to obtain payment, subject to later adjustment, of the total amount—$91,448.36. Id.

Notwithstanding that the full estimated dollar value of work under Mod 0023 had been ordered while a contract modification had not yet been executed, MARAD exercised the second option under Mod 0023, i.e., Option Year Six, by unilateral Modification 0033 on March 23, 2001, thereby extending the Contract period through March 26, 2002. See DRPPFF ¶ 37. 14/ Shortly thereafter, MARAD issued WOs 512 through 515 and 517 through 519. Id. ¶ 38. Including subsequent modifications, the total value of these WOs was $4,466,612.00. See id. Plaintiff provided MARAD with all of the services ordered under the WOs, submitted invoices for those services, and received full payment from MARAD.

In April 2001 various MARAD officials, including Erica Williams as Contract Specialist, Mr. Burnowski as Contracting Officer, Mr. Carlton—on behalf of himself as Assistant Contracting Officer's Technical Representative and Richard Williams, the Contracting Officer's Technical Representative—Mr. Carr as Deputy Director of MAR 380, and Mr. Sommer as Assistant General Counsel, signed a clearance record, JX 48, at 0001,

---

14/ See supra note 6.

approving the Pre-Negotiation Memorandum (the "PNM"), JX 49, that was intended to justify an increase in Mod 0023's cost schedules and award-fee pool in accordance with MAR 614's cost estimate, Tr. at 1666-69 (Burnowski); see also JX 48, at 0001 ("This modification is to replace the costs estimated in Mod 0023 with a cost estimate that more accurately addresses the work to be performed for Option Years 5 through 9."). The clearance record contained updated cost schedules for each option year, which projected a total cost of approximately $33 million to MARAD for the five option years. See JX 48, at 0002-06; Tr. at 1670 (Burnowski).

IV. <u>MARAD admits that it sidestepped the SBA's limitations for the value of Mod 0023</u>

Mr. Burnowski, who prepared the PNM, see Tr. at 1669 (Burnowski), testified that, even though the next option was not due to be exercised until March 2002 and MARAD knew in April 2001 that the five option years would cost the Government approximately $33 million, MARAD did not initiate a competition for the remaining option years, see Tr. at 1670 (Burnowski). In the PNM Mr. Burnowski candidly provided the following explanation for the necessity of proposed bilateral Modification 0035 ("Mod 0035"), which would implement the increased cost estimate:

> Although the primary purpose of this modification is to adjust the contract award fee pool, if executed, it will acknowledge a more than $30,000,000 cost increase on the work covered by Modification 0023 to the contract. It is apparent from Modification 0023 and the available documentation related to it that the cost estimates included in the modification were directed toward matching a total dollar amount ($3,000,000) imposed by SBA conditions to signing the modification and do not represent a valid estimate of the cost to perform the work the modification required.

> . . . .

> This modification is essentially a re-formation of Modification 0023. It needs to be re-formed because the modification's cost estimate reflects a $3 million cost ceiling imposed by the SBA, not a valid estimate of the cost to perform the work.

JX 49, at 0002, 0004. Testimony revealed that previous iterations of Mr. Burnowski's PNM contained more striking language, viz., "It is apparent from Modification 0023 and the available documentation related to it that the cost estimates included in the modification were *artificially constructed* to match a total dollar amount ($3,000,000) and do not represent a valid estimate of the cost to perform the work the modification required." PX 40, at 2

(emphasis added).   MAR 614, via Richard Williams, objected to the use of "artificially constructed" and instructed Mr. Burnowski to "soften" the language so that it would not "appear[] that MAR-614 intentionally provided MAR-380 with a false estimate."   PX 41 (Apr. 19, 2001 e-mail exchange between Erica Williams and Mr. Burnowski); see also Tr. at 1676-78 (Burnowski).

> Mr. Burnowski responded, as follows:
>
> I don't mind softening the language but I do want to make the point that everyone knew the cost for the extension was going to be much higher than $3,000,000 but we extended the mod for only $3,000,000 because it was a condition imposed by SBA and we wanted their signature on the mod to keep it [in] the 8(a) program until that money was expended.

PX 41.  Notwithstanding the revised language, the PNM continued to reflect that the $3-million estimate bore no relation to the actual cost of performing the work.  Moreover, to the extent the $3-million estimate was proposed to satisfy a mandatory SBA condition for award, the PNM indicated that MARAD was willing to pay Veridyne an increased fee: "To the extent that those revised costs are not a result of original estimates of insufficient accuracy due to the uncertainty of the uncertainties in contract performance but produced to meet a pre-determined amount . . . it is the Government's position that the contractor is due an increase in fee." JX 49, at 0009.  Mr. Burnowski and Erica Williams signed off on the PNM on April 23, 2001.  See id. at 0012.  John E. Carr, Deputy Director of MAR 380, added his signature the following day, and, according to testimony from Mr. Burnowski, inserted by hand the following language: "SBA had full knowledge of the expectation that the requirement [imposed by Mod 0023] would be significantly higher," JX 49, at 0002.  Tr. at 1671-72 (Burnowski).

By letter dated April 25, 2001, and addressed to Mr. Downer, Mr. Burnowski proposed a new award-fee pool, totaling $1,644,581.00.  See JX 50, at 0002.  Veridyne responded by facsimile transmission on May 14, 2001, see JX 51 (May 14, 2001 letter from Mr. Freiberg to Mr. Burnowski), wherein Veridyne

> (1) identified the indirect rates that [it] used in estimating costs, (2) provided expanded information on the elements used in defining the cost estimates, (3) provided details on the development of labor hour estimates, (4) addressed [MARAD's] concerns about the appropriate methodology to be used in developing the award feel pool and recommended an award fee pool of $2,606,551, a 3.1% reduction from [Veridyne's] November 6, 2000

recommendation; and (5) agreed with [MARAD's] proposed methodology for
award fee execution.

JX 54 (June 14, 2001 letter from Mr. Freiberg to Mr. Burnowski explaining contents of
Veridyne's May 14, 2001 letter); see also JX 51.

V.   Mod 0035 attempts to meet the real-world requirements of the Contract extension

Following discussions between MARAD and Veridyne on June 25, 2001, Mr.
Burnowski sent plaintiff a draft of Mod 0035.  See JX 53, at 0001 (undated letter from Mr.
Burnowski to Mr. Patterson following June 25, 2001 meeting between MARAD and
Veridyne regarding Mod 0035); Tr. at 1681 (Burnowski).  The draft of Mod 0035 provided,
in part, that MARAD had exceeded the maximum order limitations for Option Years Five
through Nine; that plaintiff would honor any and all orders, including those that exceed the
maximum order limitation in Mod 0023; and that the work necessary to accomplish the
requirements of the Contract would require an increase in the total estimated cost by
$29,614,729.00—from  $2,794,698.39 to $32,409,427.39.   See JX 53, at 0003.   Mr.
Burnowski's letter stipulated that execution of Mod 0035 by MARAD was conditioned on
review and approval by MARAD's Contract Review Team.  Id. at 0001.  Veridyne executed
Mod 0035 on July 18, 2001, and returned it to MARAD.  See JX 56, at 0001.  Mod 0035, as
executed by Veridyne, increased the total estimated cost of performance to $32,581,872.50
and the fee to $2,250,000.00, of which $1,406,250.00 was the total award-fee pool.  See id.
at 0002.  While plaintiff and defendant both agree that MARAD never formally executed
Mod 0035, MARAD Contracting Officer Burnowski testified that the parties "proceeded
with the contract according to the terms and conditions of mod 35." Tr. at 1682 (Burnowski).
For example, on September 28, 2001, MARAD approved Modification 0036, which added
$263,152.00 to the award-fee pool in accordance with Mod 0035.  See JX 59; Tr. at 1682-83
(Burnowski).

According to Mr. Burnowski, at the time plaintiff and MARAD were negotiating
proposed Mod 0035, concerns arose within MARAD regarding the estimates provided by
plaintiff that led to the non-competitive award of Mod 0023.  Decl. of Benedict J. Burnowski,
Mar. 23, 2007, ¶ 17; see also Tr. at 73-74 (Patterson) (testifying that there were "rumors
starting as early as 2001" that the Department of Transportation, Office of Inspector General
(the "DOT OIG") was investigating execution of Mod 0023).  MARAD referred all these
concerns to the DOT OIG in the summer of 2001.  Burnowski Decl. ¶ 18.  The DOT OIG
initiated an investigation on July 11, 2003.  See DX 46, at 0002 (September 27, 2004 DOT
OIG Report of Investigation prepared by Kevin T. Durkin, then-DOT OIG Special Agent).

During the three years following plaintiff's execution of Mod 0035, MARAD issued a series of unilateral modifications that exercised additional option years up to and including the last option year—Option Year Nine—under Mod 0023; issued additional WOs in amounts exceeding $17,119,481.00; authorized plaintiff to invoice for award fees; and incrementally added funding for WOs that MARAD had issued.  See Veridyne II, 86 Fed. Cl. at 674.  Plaintiff provided MARAD with all the services ordered under the WOs issued in conjunction with Option Year Seven and Option Year Eight, submitted invoices for those services, and received full payment from MARAD.

On April 20 and 21, 2004, Contracting Officer Erica Williams issued a series of WOs authorizing Veridyne's performance during Option Year Nine.  DRPPFF ¶¶ 63-64. 15/ On April 20, 2004, Erica Williams issued WOs 812, 813, 814, 815, and 817 in the amounts of $114,000.00, $80,000.00, $935,000.00, $382,000.00, and $51,000.00, respectively.  See id. ¶ 63.  On April 21, 2004, Erica Williams issued a unilateral modification, increasing the funding available under WO 813 by $20,000.00.  See id. ¶ 65.  On that same date, Erica Williams issued WO 819 in the amount of $10,000.00 and WO 822 in the amount of $90,000.00.  See id. ¶ 64.  Throughout Option Year Nine, MARAD issued unilateral modifications that increased the funding available on these WOs.  This process will be discussed in greater detail.

Veridyne obtained payment for services rendered during Option Year Nine through August 31, 2004.  The following invoices, which were submitted and not paid and thus made a part of plaintiff's CDA claim, are no longer in question because defendant has conceded plaintiff's entitlement to payment on these invoices in the event defendant does not prevail on its counterclaims: (1) Invoice No. 260 in the amount of $246,116.05 on September 28, 2004, for services rendered from September 1-15, 2004, see id. ¶ 75; (2) Invoice No. 261 in the amount of $345,740.95 on October 15, 2004, for services rendered from September 16-30, 2004, see id. ¶ 76; (3) Invoice No. 262 in the amount of $224,416.16 on November 1, 2004, for services rendered from October 1-15, 2004, see id. ¶ 77; (4) Invoice No. 263 in the amount of $244,905.45 on November 15, 2004, for services rendered from October 16-31, 2004, see id. ¶ 78; (5) Invoice No. 264 in the amount of $202,818.19 on November 24, 2004, for services rendered from November 1-15, 2004, see id. ¶ 79.

## VI.  WO funding

Following its exercise of an option year under Mod 0023, MARAD would issue a series of WOs, comprised of various technical directives ("TDs"), and would allocate

---

15/ See supra note 6.

contract funding among those WOs. See Tr. at 719 (William G. Kaag, MAR 614 Fiscal Officer). Payment could be disbursed only for work performed pursuant to a specific WO. Funding could be moved from one WO to another if the agency's contracting officer authorized a modification. See Tr. at 719 (Kaag). During each option year under Mod 0023, MARAD and Veridyne engaged in a practice whereby Mr. Colley, in his role as Veridyne's Program Manager, would request funding reallocations among WOs from MARAD's Fiscal Officer, Mr. Kaag, before submitting an invoice for payment. To obtain payment for the work it performed, Veridyne was required to submit an invoice that charged its services to the specific TD that encompassed the work performed. This practice ensured that sufficient funding was available on each WO to compensate Veridyne for the actual tasks performed.

During each billing period, Mr. Colley would send Mr. Kaag a table identifying WO-to-WO and TD-to-TD reallocations that needed to be made to ensure that Veridyne's invoices would reflect the actual work performed. See, e.g., JX 119 (June 10, 2004 e-mail from Mr. Colley to Mr. Kaag requesting reallocation of funds among WOs); Tr. at 728-31, 764-65 (Kaag); Tr. at 1697-98 (Colley). Mr. Kaag testified that he kept a parallel spreadsheet tracking the allocation adjustments made between WOs and TDs. Tr. at 847 (Kaag). After receiving Mr. Colley's suggested allocations and making the requested transfers, Mr. Kaag would send Mr. Colley a Funds Tracking Sheet, which provided up-to-date funding information, including the requested changes, so that Mr. Colley could adjust plaintiff's internal documentation—the Program Manager's Spreadsheet (the "PM Spreadsheet")—to reflect current funding levels in each WO. See JX 122 (June 14, 2004 e-mail from Mr. Kaag to Mr. Colley containing WO funding spreadsheets depicting the funding reallocations requested in Mr. Colley's June 10, 2004 e-mail, JX 119); Tr. at 731-35 (Kaag); Tr. at 1697-99 (Colley).

Mr. Kaag effected the WO-to-WO reallocations before Erica Williams, acting as Contracting Officer, issued a formal modification authorizing the reallocations, although Mr. Kaag testified that he received verbal approval to make the reallocations from Erica Williams before sending an updated Funds Tracking Sheet to Veridyne. See Tr. at 737-38, 767-69 (Kaag). After receiving an e-mail response from MARAD authorizing the reallocations, Mr. Colley would adjust the PM Spreadsheet to account for the reallocations and submit Veridyne's invoice, which contained a funding chart that depicted total funding available in each active WO. See Tr. at 1697-99 (Colley). Each invoice also was accompanied by Mr. Colley's PM Spreadsheet, which tracked reallocations between WOs. Mr. Colley testified that, typically, he did not update the PM Spreadsheet to reflect the reallocations until after he received a Funds Tracking Sheet from Mr. Kaag confirming that the requested reallocations had been approved. Tr. at 1699 (Colley). This exchange between the parties continued through September 2004. See, e.g., JX 119; JX 122; JX 124 (July 1, 2004 e-mail from Mr. Kaag to Mr. Colley containing WO funding spreadsheets depicting the funding

23

reallocations requested by Veridyne on June 29, 2004); JX 125 (July 9, 2004 e-mail from Mr. Kaag to Mr. Colley containing WO funding spreadsheet reflecting reallocations requested by Veridyne); JX 139 (July 27, 2004 e-mail from Mr. Kaag to Mr. Colley depicting the same); JX 143 (August 13, 2004 e-mail from Mr. Kaag to Mr. Colley depicting the same).

VII.   The extended honeymoon flatlines

On September 28, 2004, Mr. Colley, in accordance with the parties' practice to date, e-mailed Mr. Kaag a request to reallocate $200.00 from WO 814 to WO 819 for payment of Invoice No. 260, which sought compensation for work performed from September 1-15, 2004.  See JX 151.  On that same date, Mr. Colley submitted Veridyne's Invoice No. 260. DRPPFF ¶ 75. 16/  Mr. Kaag responded on October 5, 2004, and attached to his e-mail a Funds Tracking Sheet, which depicted the $200.00 reallocation.  See JX 153; Tr. at 745-46 (Kaag).  Upon receipt Mr. Colley updated the PM Spreadsheet to reflect the reallocation, see Tr. at 1699 (Colley), and presumably submitted it to MARAD to accompany its Invoice No. 260.

On October 14, 2004, Mr. Colley e-mailed Mr. Kaag requested WO reallocations for Invoice No. 261.  Invoice No. 261 was submitted that same day.  Also on October 14, 2004, Robert Ostrom, MARAD's Chief Counsel, e-mailed certain MARAD officials, instructing that "[e]ffective immediately, MARAD is to make no payments to Veridyne on any contract without express approval by [Mr. Ostrom]."  Pl.'s Br. filed Mar. 20, 2012, at 12 (internal quotation marks omitted).  The record indicates that Mr. Kaag received this instruction on November 5, 2004.  See PX 7 (Nov. 5, 2004 e-mail chain between Iris Cooper, then-Lead Contracting Officer, Erica Williams, and Mr. Kaag, indicating that, at the time, MARAD was not making payment on Veridyne's invoices).  On that date Erica Williams sent an e-mail to Ms. Cooper, with a copy to Mr. Kaag.  Id.  She stated that MAR 614 was reviewing an invoice from Veridyne that required that funds be transferred between TDs to ensure that "[Veridyne's] financial records accurately reflect how money was spent based on the invoice."  Id.  She inquired as to whether MAR 614 was permitted to process the requested transfer of funds, noting that "there is money already in the contract."  See id.  In response, Ms. Cooper advised Erica Williams not to transfer the funds, explaining that "[t]ransferring of the funds is not necessary right now because we [MARAD] are not actually paying the invoice.  [MAR 614 is] currently only verifying that the services/goods were delivered and

_____

16/   The court will refer to this summary judgment submission when identifying the date on which an invoice was submitted because, although the invoices admitted at trial bear the dates on which they were prepared, the date stamps reflecting MARAD's receipt are illegible.

accepted." Id. Erica Williams forwarded Ms. Cooper's response to Mr. Kaag, who replied that he would "simply certify the invoice and forward it to [Erica Williams]." Id.

Before receiving notice that MARAD was not paying Veridyne's invoices, Mr. Kaag, on October 22, 2004, e-mailed Mr. Colley a Funds Tracking Sheet in response to Mr. Colley's October 14, 2004 reallocation request. See JX 158. Because Veridyne had requested only TD-to-TD reallocations—and not any WO-to-WO reallocations—for Invoice No. 261, Mr. Kaag was able to approve the request without consulting Erica Williams, see Tr. at 719 (Kaag), and the Funds Tracking Sheet merely updated all amounts that had been billed against existing WOs to date, see Pl.'s Br. filed Mar. 20, 2012, at 12.

On November 1, 2004, Mr. Colley sent Veridyne's funding-reallocation request—totaling $11,000.00—for Invoice No. 262, which covered the period of October 1-15, 2004, to Mr. Kaag and MARAD. See JX 162. Invoice No. 262 also was submitted on November 1, 2004. See DRPPFF ¶ 77. 17/ The invoice included a funding chart that depicted available funds as if the requested reallocations already had been made as well as the PM Spreadsheet, which also reflected the reallocations. See Pl.'s Br. filed Mar. 20, 2012, at 12. On that same date, Mr. Colley, by separate e-mail, contacted Mr. Kaag and other MARAD officials in an attempt to schedule a meeting between Veridyne and MARAD to discuss funding for the remainder of the Contract. See JX 163. Mr. Colley did not receive a response from Mr. Kaag or MARAD. See Tr. at 1700 (Colley). Mr. Kaag testified that, although he received Mr. Ostrom's instruction, he did not inform Mr. Colley or Veridyne that MARAD was no longer going to process Veridyne's recommended funding reallocations because he was not authorized to do so. See Tr. at 749 (Kaag).

## VIII. Veridyne initiates self-help invoicing

Despite having not received a response from Mr. Kaag regarding reallocations for Invoice No. 262, Mr. Colley, on November 12, 2004, e-mailed Mr. Kaag and requested that $44,000.00 be reallocated among WOs for Invoice No. 263, which billed MARAD for services that Veridyne provided from October 16-31, 2004. See JX 166. Mr. Colley submitted Invoice No. 263 to MARAD for payment on November 15, 2004. See DRPPFF ¶ 78. 18/ Following his usual practice, Mr. Colley included a funding chart and a copy of the PM Spreadsheet with the invoice. See JX 167, at 0002-03 (Invoice No. 263 dated November 15, 2004); see also JX 161 (color-coded copy of PM spreadsheet that accompanied Invoice No. 263). Although Mr. Colley had not received an e-mail from MARAD approving the

---

17/ See supra note 16.

18/ See supra note 16.

reallocations, the PM Spreadsheet depicted funding as if the reallocations had been made. See JX 167, at 0002.  The funding chart, however, did not include the reallocations.  See id. at 0003.

On November 24, 2004—again despite the absence of any communication from MARAD—Mr. Colley e-mailed Mr. Kaag with a funding reallocation request—totaling $178,015.00—for Invoice No. 264, which was submitted that same date and covered the period of November 1-15, 2004.  See JX 171; DRPPFF ¶ 79. 19/ MARAD did not respond to Mr. Colley's request.  Nonetheless, the PM Spreadsheet accompanying Invoice No. 264 depicted the reallocations as though they had been approved; the funding chart, however, listed current funding without the reallocations.  See JX 170, at 0002, 0005.

IX.  Veridyne's invoicing after the December 7, 2004 stop-work order

On December 7, 2004, Veridyne's counsel, R. Kenly Webster, received via letter a stop-work order from Mr. Ostrom stating that MARAD had concluded that Mod 0023 was void *ab initio* and that MARAD would not make any further payments to Veridyne.  20/ See

_____

19/ See supra note 16.

20/ MARAD's determination that Mod 0023 was void *ab initio* was based on the findings in the September 27, 2004 DOT OIG report prepared by Special Agent Kevin T. Durkin.  See DX 46.  The report contained Mr. Durkin's summaries of his interviews with personnel from MARAD and Veridyne.  The interviews revealed that both MARAD and Veridyne were aware that the $3-million proposal was intended to avoid the SBA's competition requirements.  See id. at 0022 ("PATTERSON again confirmed that the $2.9 million estimate was modeled only after the SBA sole-source threshold."); id. at 0038 ("CUTRELL reiterated that ROARK exerted 'a lot of strong pressure' on keeping the contractor."); id. at 0055 ("ROARK reiterated on several occasions that there was significant agency pressure to award 8(a) contracts.  In fact, MARAD gave out awards for employees who met 8(a) goals."); id. at 0059 ("ROARK agreed that MARAD encouraged VERIDYNE to submit an estimate under the SBA threshold . . . ."); id. at 0066 ("When asked whether he told MAR-380 that the operational budget estimate he provided to them was based solely on the 8(a) sole-source threshold and not on any real budgetary data, [Richard] WILLIAMS said, 'I don't know that I told 380 this.  I kept it from them, yes.'").

Despite these material statements, the court did not rely on the DOT OIG report on account of the inaccuracies that were established during trial.  Specifically, the DOT OIG's investigation began under the assumption that when the Contract originally was awarded to Veridyne in 1995, it was competitively awarded.  See id. at 0003.  But see JX 207 (Post-

JX 175.  Mr. Ostrom explained that "[g]iven [MARAD's] conclusion that the contract is void, MARAD cannot accept services from Veridyne under that contract and MARAD expects Veridyne to cease performance immediately."  Id.  Accordingly, Mr. Ostrom informed Mr. Webster that MARAD personnel would visit Veridyne locations the following morning to retrieve "all data and property associated with [the Contract]," adding that "MARAD expects Veridyne to cooperate" with retrieval efforts.  Id.  A list of items to be returned to MARAD accompanied Mr. Ostrom's letter.  See id. at 0005-06.  This included MARAD-furnished equipment, employee work products, software and licenses, and security badges.  See id.; Tr. at 485-87 (Downer).  The list also referenced a separate contract between Veridyne and MARAD—the Spare Parts Contract—and instructed Veridyne not to turn over spare parts that had not been inspected or billed to the Government under the Spare Parts Contract.  21/  See JX 175, at 0006.

_____

20/  (Cont'd from page 26.)

Negotiation Memorandum for original Contract indicating that Contract was "sole source, 8(a) procurement" not awarded subject to competition).  This falsity was repeated throughout Mr. Durkin's summaries in the DOT OIG report and in his interviews with key players.  Mr. Durkin also identifies Veridyne's proposal as an "estimate," which Veridyne has denied.  See DX 46, at 0003.  Moreover, the DOT OIG report treats Mod 0023 as a five-year extension, thereby creating a ten-year Contract when, in reality, Mod 0023 added five option years that could be exercised at MARAD's discretion.  Mr. Durkin's summary contains four paragraphs regarding Ms. Jackson's testimony, yet Mr. Durkin's summary of his interview with Ms. Jackson is not included in the DOT OIG report, despite Mr. Durkin's admission that it should have been included.  See DX 46, at 0006; Tr. at 1151 (Durkin).  Finally, Mr. Durkin's summaries of his interviews with various personnel do not always capture the information conveyed by the interviewee.  Compare DX 46, at 0004 (stating that Mr. Genna "unequivocally" stated that $3 million was not a good faith estimate), with id. at 0026 (summarizing Mr. Genna's statement in response to questioning regarding the discrepancy between the $3-million proposal amount and the total cost for the first five years of the Contract that $3 million was not a good faith estimate).  These inaccuracies, among others, rendered this exhibit less than probative and therefore not relevant.

21/  Plaintiff took the position before trial that, following its receipt of the stop-work order, it properly billed to WO 823—which by its terms was intended to cover costs incurred in transitioning Contract performance to the follow-on contractor—costs that were incurred in continuing performance on the Spare Parts Contract.  See Pl.'s Br. filed Aug. 12, 2011, at 20-21.  Acknowledging that the stop-work order expressly stated that plaintiff was to continue processing spare parts—a task that always had been billed to the logistics Contract—plaintiff argued that it had no choice but to bill its costs to WO 823, which

Following its receipt of the stop-work order, Veridyne submitted three additional invoices to MARAD: (1) Invoice No. 265, which was submitted on December 15, 2004, and covered work performed on the Contract from November 16-30, 2004, see JX 180; (2) Invoice No. 266, which was submitted on December 31, 2004, and covered work performed from December 1-7, 2004, as well as other expenses incurred from December 8-31, 2004, to close down the Contract, see JX 184; Tr. at 346 (Downer); and (3) Invoice No. 267, which was submitted on March 31, 2005, and purported to bill MARAD for termination expenses and other expenses incurred in winding up the Contract, see JX 199. Defendant disputes plaintiff's entitlement to payment of these three invoices.

Invoice No. 265's funding chart and PM Spreadsheet depicted funding as though MARAD had approved not only the requested reallocations for Invoice No. 264, but also those necessary for the full payment of services billed in Invoice No. 265. Compare JX 170, at 0002, 0005, and JX 171, at 0002, with JX 173, and JX 180, at 0005-06. See also Tr. at 1722-27 (Colley) (testifying that figures in Invoice No. 265's PM Spreadsheet, which tracks and depicts funding reallocations, are identical to figures in Invoice No. 265's funding chart, which depicts then-available funding). The reallocations necessary for Invoice No. 265 amounted to $274,000.00. See JX 173. In total, Invoice No. 265 contained approximately $452,015.00 in requested, but unapproved, funding reallocations.

By Veridyne's own admission, Invoice No. 266 was prepared differently than its earlier invoices. See Pl.'s Br. filed Mar. 20, 2012, at 15 ("Prior to Invoice 266 Veridyne had made it a point to include overhead and G&A ["general and administrative expenses"] in its invoices at rates slightly below its actual rates . . . . For Invoice 266 . . . Veridyne billed overhead at its actual projected 2004 rate."). DCAA annually would review and audit Veridyne's invoices to determine its allowable billing rates for overhead and G&A. Because it would submit invoices on an ongoing basis over the course of an option year, Veridyne—to avoid owing money to MARAD after DCAA conducted its audit and determined Veridyne's rates—would bill these expenses at rates slightly lower than its actual rates. See id. Veridyne would enter a lower-than-actual rate into its government-approved accounting software, known as Deltek, and the software would generate the amount for which MARAD should be charged in each invoice to compensate Veridyne for its overhead and G&A. However, when preparing Invoice No. 266, Veridyne billed both overhead and G&A at its

---

21/  (Cont'd from page 27.)

contained adequate funding. See id. & n.18. Plaintiff has not revisited this argument in its post-trial briefs, and the court finds that it does not mitigate plaintiff's liability for the fraudulent misstatements and misrepresentations alleged by defendant.

actual projected rates.  See id.; Tr. at 83 (Patterson).  According to Mr. Patterson, Veridyne interpreted MARAD's December 7 letter as a termination of the Contract and was advised by its legal and accounting personnel to bill at actual rates.  See Tr. at 83 (Patterson).

In order to bill at actual rates, Veridyne personnel were required to manually change the overhead and G&A billing rates in the Deltek software.  Tr. at 592-93 (Freiberg). Although this change was intended to apply only to overhead and G&A billed in Invoice No. 266, the software, which calculates costs on a year-to-date basis, applied the new, actual rate retroactively to all invoices prepared during the option year.  See Tr. at 1482-83 (Kathy J. McGill, Veridyne's Accounting Manager).  After retroactively applying the new rate, the software would account for amounts previously billed—and presumably paid—at the "old" rates to determine the current amount due in light of the rate change.  See Tr. at 1483 (McGill).  This had the effect of charging MARAD for overhead and G&A at Veridyne's actual rates for the entirety of Option Year 9 instead of simply for the period covered by Invoice No. 266, which greatly inflated the amount billed to MARAD.

In addition to billing overhead and G&A at actual rates, Invoice No. 266 also differed from previous invoices in that Veridyne billed against WO 823, which had a start date of January 1, 2005.  See JX 142, at 0002.  By its terms, the tasks to be billed to WO 823 were those "necessary to accomplish a smooth transition of Veridyne, Inc.'s responsibilities under the current logistics services contract to the contractor awarded the follow-on MARAD logistics services contract."  Id. at 0001.  Included in the expenses charged to MARAD under WO 823, however, were labor costs for Veridyne employees and former employees incurred before WO 823's designated start date.  See Tr. at 425 (Downer).  In an e-mail dated December 9, 2004, and bearing the subject "IMPORTANT MESSAGE FROM GLENN DOWNER — re: Transition Process," Mr. Downer instructed various Veridyne employees to report to work on December 14, 2004, "to accomplish the transition review of [the employees'] personal work files and to provide information on benefits, procedures, and administrative cleanup."  DX 76 (December 9, 2004 e-mail from Veridyne employee Lisa Taylor, on behalf of Mr. Downer, to Veridyne personnel addressing various administrative and transitional tasks that would occur).  The e-mail explained that, during the day, Timothy L. Graham, a Vice President at Veridyne, and Mr. Colley would meet with employees to review their files and computer contents to determine what needed to be turned over to MARAD.  See id.  It also stated that a meeting would be held that morning to address "benefits and administrative matters," including payout for vacation time, COBRA, and completion of timesheets; that parking passes, keys, and ID badges would be collected; that employees should collect their personal belongings; and that employees should bill their time for that day to WO 823.  Id.  Veridyne then passed these labor costs on to MARAD in Invoice No. 266.  See JX 184, at 0005.

Finally, plaintiff submitted Invoice No. 267 on March 31, 2005. See JX 199. This invoice billed MARAD for three categories of expenses: (1) services performed pursuant to WOs 812-822, (2) transition work undertaken pursuant to WO 823, and (3) claim costs. See id. at 0004. The claim costs were individually set forth in a Claim Costs Spreadsheet that Veridyne included with Invoice No. 267 and represented amounts for which Veridyne claimed it was entitled to reimbursement on account of MARAD's termination of the Contract. See id. at 0005. Mr. Patterson testified that he tasked Mr. Downer; Mr. Freiberg; and Ms. McGill, who was considered within Veridyne to be an expert on allowability issues, Tr. at 1447 (McGill), with identifying those costs and preparing a spreadsheet depicting them. See Tr. at 92 (Patterson).

On January 21, 2005, Mr. Downer e-mailed a proposed spreadsheet to Mr. Patterson. See DX 105. Mr. Downer shared this spreadsheet with Ms. McGill on February 11, 2005. See id. In a February 14, 2005 e-mail to Mr. Patterson, Ms. McGill listed various expenses, including lease expenses for offices and business equipment, that could be included in the Claim Costs Spreadsheet. See id. Ms. McGill's list did not include all of the expenses listed in Mr. Downer's spreadsheet. Tr. at 1455 (McGill). Specifically, while Mr. Downer's spreadsheet included expenses that plaintiff would incur from December 2004 through June 2005 and thereafter (i.e., to the end of the lease period for various leases), see DX 104, at 5, Ms. McGill's e-mail to Mr. Patterson only included expenses from December 2004 through March 31, 2005, which would have been the Contract end date, see DX 105. 22/ During her deposition and when pressed at trial as to why she narrowed the claim costs identified by Mr. Downer, Ms. McGill indicated that she would have relied on her background and understanding of the FAR to determine allowable costs to be billed to MARAD and included in her e-mail. DX 236, Deposition of Kathy J. McGill, Veridyne, Inc. v. United States, No. 06-150C, at 380-81 (Fed. Cl. Feb. 17, 2011); cf. Tr. at 1458-59 (McGill).

Ms. McGill testified that she spoke with Mr. Patterson shortly after he received her e-mail on February 14, 2005, and that he instructed her to make changes to the costs to be included in the Claim Costs Spreadsheet. See Tr. at 1459-60 (McGill). This resulted in a second February 14, 2005 e-mail from Ms. McGill to Mr. Patterson, which contained the Claim Costs Spreadsheet that ultimately would be submitted to MARAD in Invoice No. 267. See DX 106; Tr. at 1460-61 (McGill). The Claim Costs Spreadsheet differed from Mr. Downer's spreadsheet and Ms. McGill's earlier e-mail in that it included charges incurred for various items from September to November 2004. See DX 106, at 0002; JX 199, at 0005. Ms. McGill had excluded these costs from her first e-mail because they already had been

---

22/ Ms. McGill's e-mail included plaintiff's lease expense for its Newport News office through May 2005. It is unclear why Ms. McGill treated this expense differently.

billed to MARAD, albeit as components of overhead and not as individual line items as depicted in the Claim Costs Spreadsheet. See Tr. at 1466-68 (McGill). Notwithstanding that these items were included in previous invoices, Mr. Patterson instructed Ms. McGill to treat them as claim costs because they remained due and unpaid. See Tr. at 1469-72 (McGill). When questioned as to why she listed these expenses as individual line items instead of identifying them as previously billed overhead charges, Ms. McGill responded that she was operating under the direction of Mr. Patterson. See Tr. at 1472 (McGill).

Additionally, in contrast to the allowable costs identified in Ms. McGill's first e-mail on February 14, 2005, but similar to the costs included in Mr. Downer's spreadsheet, the Claim Costs Spreadsheet claimed lease expenses that Veridyne would incur after the Contract's scheduled end date as allowable costs. See Tr. at 1463 (McGill). Ms. McGill explained that she added these expenses at Mr. Patterson's behest. She had not included them in her first February 14, 2005 e-mail regarding allowable costs because she knew that, had Veridyne performed under the Contract through March 31, 2005, Veridyne would not have been entitled to bill MARAD for expenses incurred post-March 31, 2005. See Tr. at 1473-74 (McGill). Nonetheless, Ms. McGill added these amounts to the Claim Costs Spreadsheet because Mr. Patterson instructed her to do so. See Tr. at 1474 (McGill).

Finally, the Claim Costs Spreadsheet from Ms. McGill's second February 14, 2005 e-mail listed as a claim cost the buyout cost for the Xerox copier that Veridyne had been leasing. See DX 106, at 0002; JX 199, at 0005. Although Ms. McGill deemed Veridyne's copier expenses to be allowable claim costs in her first February 14, 2005 e-mail, she had only considered Veridyne's lease expenses for the copier—not the total buyout amount, which ultimately was charged to MARAD in Invoice No. 267.

The discrepancies between what Ms. McGill presented to Mr. Patterson as allowable claim costs in her two February 14, 2005 e-mails were not the only issues that led the Government to question the propriety of the charges in Invoice No. 267. Although prepared on February 14, 2005, the Claim Costs Spreadsheet was not submitted to MARAD until April 7, 2005. See Tr. at 1475 (defense counsel). At that time plaintiff sought reimbursement of lease expenses for its Newport News office for the period of March to May 2005, despite the fact that Veridyne had been released from its lease obligations for that period and thus never incurred the claimed expenses. See Tr. at 1475 (McGill); Tr. at 114 (Patterson). Similarly, Veridyne claimed all of its lease expenses for its Arlington office and did not update the Claim Costs Spreadsheet to reflect that it had subleased a portion of its Arlington office and received payment accordingly. See Tr. at 1475-76 (McGill). Although Veridyne personnel never updated the Claim Costs Spreadsheet to account for the credits for the Newport News and Arlington facilities, plaintiff did update all of its labor costs before submitting Invoice No. 267. See Tr. at 1476-77 (McGill); DX 236, McGill Dep., at 492. Plaintiff concedes that

31

these credits should have been applied to the Claim Costs Spreadsheet. See Tr. at 114 (Patterson).

Mr. Patterson testified that he had several communications with Veridyne's counsel, Mr. Webster, to determine "allowable" and "recoverable" claim costs to be included in the Claim Costs Spreadsheet. See Tr. at 92 (Patterson); see also PX 18, at 3 (Invoice from Mr. Webster to Mr. Patterson for legal services rendered to Veridyne from January 1-31, 2005); PX 19, at 2-3 (Invoice from Mr. Webster to Mr. Patterson for legal services rendered to Veridyne from February 1-28, 2005); PX 43, Deposition of Leonard S. Freiberg, Veridyne, Inc. v. United States, No. 06-150C, at 83-84 (Fed. Cl. Sept. 26, 2011). According to Mr. Patterson, he sent a number of spreadsheets presenting various claim scenarios to Mr. Webster for review. Pl.'s Br. filed Mar. 20, 2012, at 16. At least one of these spreadsheets included as claim costs Veridyne's lease expenses to the end of the facility and equipment leases, i.e., beyond what would have been the end date of the Contract, which totaled $147,312.00. See id.; JX 206 (Veridyne's internal spreadsheet depicting potential claim costs to pass on to MARAD). Mr. Patterson explained that these lease expenses, as well as the previously billed lease expenses incurred from September through November 2004, were charged to MARAD as claim costs because Mr. Webster approved of their inclusion as such. 23/

───────────────

23/ Throughout discovery Mr. Freiberg served as Veridyne's RCFC 30(b)(6) witness. Defendant offered four depositions, all of which were admitted. See DX 242; DX 243; DX 244; DX 245. With respect to DX 243, Deposition of Leonard S. Freiberg, Jr., Veridyne, Inc. v. United States, No. 06-150C, at 288-89 (Fed. Cl. Sept. 17, 2009) ("Freiberg Dep. II"), Mr. Freiberg stated that no one informed Mr. Webster when he was assisting Veridyne with identifying claim costs that thirty-three lease payments would remain on the copier after March 31, 2005. See DX 243, Freiberg Dep. II, at 288-89. Plaintiff sought admission of designated portions of the fifth volume of Mr. Freiberg's RCFC 30(b)(6) deposition, PX 43, Deposition of Leonard S. Freiberg, Jr., Veridyne, Inc. v. United States, No. 06-150C, at 109-10 (Fed. Cl. Sept. 26, 2011) ("Freiberg Dep. V"). See Tr. at 1974-75 (plaintiff's counsel). During that deposition Mr. Freiberg testified that spreadsheets sent to Mr. Webster revealed that some lease payments extended beyond March 31, 2005. See Freiberg Dep. V, at 109-10. Defendant objected on grounds of hearsay, see Tr. at 1958-59 (defense counsel), and, although the court initially sustained the objection, it revisited its ruling after learning that defendant had held open Mr. Freiberg's earlier depositions, such that the depositions were not treated individually and that the material plaintiff designated properly served to complete earlier answers. See Tr. at 1975 (court); Tr. at 1972 (plaintiff's counsel). The court thus allowed the designations in the fifth volume insofar as Mr. Freiberg was testifying with reference to documents admitted at trial. Tr. at 1975 (court).

In a letter to MARAD's Chief Counsel Ostrom dated January 4, 2005, Mr. Webster stated that "[t]ermination costs, increased by the suddenness of the termination, are anticipated to exceed $150,000." JX 182, at 0002. That letter referenced a separate letter in which Mr. Webster requested that MARAD pay the unpaid invoices dating back to September 2004. Id. Shortly thereafter, in a second letter to Mr. Ostrom dated January 24, 2005, Mr. Webster reiterated his request that MARAD pay the unpaid invoices and noted that "termination costs as permitted under FAR principles . . . currently total $147,312." JX 183. At trial Mr. Patterson testified that this figure was derived by adding together the facilities and equipment lease expenses incurred by Veridyne after receipt of the stop-work order on December 7, 2004. Tr. at 95-96 (Patterson). Veridyne included as claim costs for some items only expenses that were incurred through March 2005; however, for other items—such as computer leases in the Arlington office and copier maintenance expenses in the Newport News office—plaintiff treated as claim costs all expenses that would be incurred through the lease end date for each individual item. See JX 206, at 3. These expenses—even those that would be incurred after the Contract end date—were included in the $147,312.00 estimate that Mr. Webster provided to Mr. Ostrom.

During February 2005 Mr. Webster drafted yet another letter to Mr. Ostrom. This letter was an attempt to resolve the situation between MARAD and Veridyne. The record contained various versions of this letter. The first draft, dated February 17, 2005, referenced MARAD's "refusal to pay any termination expenses which [total] approximately $[no amount provided], which are awardable under FAR principles." JX 193, at 0002. The blank space was replaced with "$200,000" in a subsequent draft that was also dated February 17, 2005. JX 194, at 0001. The meta data in the subsequent draft revealed that Mr. Patterson was the author of the draft, resulting in defendant's urged inference that it was he, and not Mr. Webster, who input the $200,000.00 figure. See id. at 0002; Tr. at 197-99 (Patterson). The final version of the letter, dated February 22, 2005, estimated termination expenses as "approximately $200,000." JX 197, at 0001. That letter, similar to the February 17, 2004 draft, treated termination expenses as separate from prior-billed expenses from September to November 2004, see id., contradicting Mr. Patterson's assertion that he included prior-billed lease expenses in termination costs because Mr. Webster directed him to do so.

On June 13, 2005, Veridyne re-submitted Invoice Nos. 260-267, totaling $2,267,163.96, as a certified claim pursuant to the CDA (the "Claim"). See JX 201 (June 13, 2005 letter from Mr. Patterson to Erica Williams explaining that Veridyne will submit its unpaid invoices as formal claims pursuant to the CDA). By letter dated August 29, 2005, MAR 380 informed Veridyne that it would not issue a final decision on the Claim because the matter involved allegations of fraud. Veridyne treated this as a "deemed denial." See 41 U.S.C.A. § 7103(f)(5) (2011).

Veridyne submitted a second CDA claim on June 13, 2006, seeking $443,104.39 for indirect expense adjustments for the five options years added by Mod 0023. See Pl.'s Br. filed Mar. 20, 2012, at 17. Veridyne again requested a final decision from the Contracting Officer. Id. As with the first Claim, a final decision was not forthcoming.

## DISCUSSION

I. Plaintiff's affirmative claim and defendant's common law fraud defense

Veridyne asks for an award representing payment of eight unpaid invoices up to the amount of funding available on the Contract as of December 7, 2004, see Tr. at 29 (plaintiff's counsel), which the parties agree is $1,161,058.43, see Tr. at 1993 (plaintiff's counsel); DX 233, at 4. Five of the unpaid invoices—Nos. 260-264—billed MARAD for services rendered from September 1 to November 15, 2004, pursuant to authorized work orders, and were submitted prior to Veridyne's receipt of MARAD's instruction to stop performing on the Contract. Because Veridyne performed and MARAD accepted the services billed in each invoice, Veridyne claims that it is entitled to compensation under the Contract. See Am. Compl. filed May 16, 2006, ¶ 48.

Although the remaining three unpaid invoices—Nos. 265-267—were submitted after issuance of the stop-work order, all of the expenses billed in Invoice No. 265 and some of the expenses in Invoice No. 266 were incurred before Veridyne received the stop-work order on December 7, 2004. See, e.g., PX 30, at 111, 128, 131, 134, 137, 149. Invoice No. 267 was comprised almost completely of claim costs, totaling $213,688.98. See id. at 153. As with Invoice Nos. 260-264, plaintiff contends that it is entitled to be paid for services rendered and accepted before issuance of the stop-work order, despite the fact that Veridyne did not bill MARAD for these services until after it was instructed to cease performance under Mod 0023. Although Veridyne has conceded that some of the line-item charges invoiced in Invoice No. 267 previously had been billed to MARAD as overhead in Invoice Nos. 260-266, it claims entitlement to other amounts billed in Invoice No. 267—claim costs—that were incurred in closing down operations following the stop-work order. Removing the previously billed amounts from Invoice No. 267, Veridyne's claims total $2,093,327.94. See id. at 15, 37, 54, 75, 92, 111, 128, 152. 24/

———————————————

24/ This number was computed by adding together the total amounts billed in Invoice Nos. 260-266, as well as $69,273.75 billed in Invoice No. 267. On its face Invoice No. 267 purported to bill MARAD $243,109.77, of which $213,688.98 was for claim costs. See PX 30, at 152-53. In its summary judgment order dated October 5, 2011, the court ruled that Veridyne was not entitled to recover expenses that would have been incurred after March 31,

Although defendant does not argue that Veridyne failed to perform the services charged to MARAD, it asserts common law fraud as a defense, contending that Veridyne's submission of a knowingly false proposal rendered Mod 0023 void *ab initio*, thereby tainting as fraudulent all invoices submitted thereunder. See Answer & Countercl. filed July 31, 2006, ¶¶ 75, 78 (No. 06-150C). Proof of federal common law fraud generally requires the Government to show: (1) misrepresentation of a material fact; (2) intent to deceive; (3) justifiable reliance on the misrepresentation by the deceived party; and (4) injury to the party deceived. See generally Kellogg Brown & Root Servs., Inc. v. United States, 99 Fed. Cl. 488, 514-16 (2011) (order granting motion to dismiss counterclaims). "[A] misrepresentation may prevent the formation of a contract or may make a contract voidable. The difference between the former and the latter is sometimes referred to as the difference between misrepresentations that make a contract 'void' versus 'voidable.'" Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1245 (Fed. Cir. 2007) (citing Restatement (Second) of Contracts §§ 7 cmt. a, 163–64, 163 cmt. c (1981)). A contract is void *ab initio* under the common law if a misrepresentation "as to the character or essential terms" of a proposed contract "induces conduct that appears to be a manifestation of assent by one who neither knows nor has reasonable opportunity to know of the character or essential terms of the proposed contract," because there has not been an effective "manifestation of assent." Restatement (Second) of Contracts § 163.

A contract that is "tainted from its inception by fraud is void *ab initio*." J.E.T.S., Inc. v. United States, 838 F.2d 1196, 1200 (Fed. Cir. 1988) (noting that contract at issue was "procured by and therefore permeated with fraud"). To prove that a contract is void *ab initio*, defendant must show that plaintiff "(a) obtained the contract by (b) knowingly (c) making a false statement." Long Island, 503 F.3d at 1246. "[T]he record must show some causal link between the fraud and the contract." Id. at 1250 (citing Godley v. United States, 5 F.3d 1473, 1476 (Fed. Cir. 1993)). Similarly, a conflict of interest at the formation of the contract operates like a fraud and warrants nonenforcement. Id. at 1246 ("The government contracts [were] held void because [they were] similarly tainted by a prohibited conflict of interest."

---

24/  (Cont'd from page 34.)

2005—the Contract's scheduled end date. See Order entered Oct. 5, 2011, at 2-3. This had the effect of reducing the amount billed for claim costs by $54,997.27. Moreover, Veridyne's concession that the claim-costs figure in Invoice No. 267 contained amounts previously billed to MARAD in earlier invoices resulted in a further decrement, thereby reducing the amount sought for claim costs to $39,852.96 if Invoice Nos. 260-266 had been paid. See Pl.'s Br. filed May 3, 2012, at 22.

(citing United States v. Miss. Valley Generating Co., 364 U.S. 520 (1961); K & R Eng'g Co. v. United States, 616 F.2d 469 (Ct. Cl.1980))).

Noting Veridyne's admission that "'the costs established in Modification 0023 were never intended to reflect MARAD's actual needs, but were developed to meet SBA's $3 million limit,'" defendant argues that Veridyne committed fraud by submitting a proposal that misrepresented the cost to MARAD for the services to be provided.  Def.'s Br. filed Apr. 19, 2012, at 10 (quoting Pl.'s Br. filed Mar. 20, 2012, at 29).  According to defendant, Veridyne attempted to conceal its misrepresentation by posturing its proposal as presenting a scenario that was available to MARAD for $3 million and one that contemplated a phase-out of various labor categories over the five option years.  See id. at 11.  Yet, when plaintiff offered this scenario and submitted a $3-million proposal for a five-year period, it did so with full knowledge that (1) the scope of work for Mod 0023 would remain the same as that in the Contract and (2) historically, Veridyne had been billing MARAD approximately $3.5 million each Contract year.  See id. at 10-11.  Citing a 1998 internal MARAD budget document, defendant proffers that MARAD "anticipated no dramatic cuts to the Contract" that would lead Veridyne to believe its involvement would be limited.  See id. at 2 (citing DX 9).

Defendant next points to Veridyne's certification that the Mod 0023 proposal was prepared in accordance with Veridyne's established estimating practices as further evidence of Veridyne's intent to deceive MARAD and entice it to award Mod 0023 to Veridyne.  See id. at 10-11.  During trial, defendant recapitulates, Mr. Downer, plaintiff's former Program Manager, testified that the proposal was not prepared consistent with established practices; to the contrary, Mr. Downer stated that Veridyne could not follow such practices because MARAD did not issue an RFP or statement of work for Mod 0023, which would have been necessary for developing a "solution" (proposal) for the Government's requirements.  See id.; see also Tr. at 313-15 (Downer).

Defendant emphasizes that "[n]o one at MARAD instructed Veridyne to keep its Proposal under $3 million," Def.'s Br. filed Apr. 19, 2012, at 2 (citing Tr. at 1282 (Genna)), nor did anyone at MARAD tell Veridyne that its involvement in Mod 0023 should be phased out over time, see Tr. at 250 (Patterson).  Defendant thus suggests that, having informed Veridyne that the scope of work would remain the same and having been presented with a certification that the Mod 0023 proposal was prepared in accordance with standard estimating practices, MARAD justifiably relied on Veridyne's proposal as accurately portraying costs for the Contract extension.

In an attempt to trivialize defendant's fraud argument, plaintiff contends that "[c]learly, both parties were well-aware of the $3 million limit and that the proposal was prepared to comply with it."  Pl.'s Br. filed May 3, 2012, at 2.  Plaintiff highlights an intra-

MARAD e-mail between Mr. Carlton, MARAD's Logistics Management Specialist, and Richard Williams, Chief of MARAD's Logistics Management Division, in which Mr. Carlton expressed concern that the proposal provided for a phase-out and estimated that the five option years would cost less than annual billings under the earlier iteration of the Contract. See id. (citing JX 19). Mr. Carlton even commented that the SBA may notice the cost differential and "'object considering the history of the contract [billings].'" See id. (citing JX 19, at 0002). Despite these concerns, Mr. Carr, Deputy Director of MAR 380, certified to the SBA that Mod 0023 would not exceed $3 million. See id. at 2 n.3 (citing DX 46, at 0003).

Plaintiff also highlights that MARAD, not Veridyne, prepared Mod 0023 and that MARAD alone possessed the authority to exercise options under Mod 0023. See id. at 5 & n.10. MARAD was under no obligation to exercise any option years, nor was it obligated to order services in excess of the 10% guaranteed minimum because Mod 0023, like the Contract that it extended, was an IDIQ contract. See id. at 5. And, even though MARAD did exercise option years under Mod 0023, two years passed from the date of Mod 0023's execution to MARAD's exercise of the first option year, see id. at 6—a period during which MARAD personnel from MAR 614 and MAR 380 were engaged in discussions aimed at increasing the funding available on the Contract. See Tr. at 1219-21 (Carlton); see also JX 31 (referencing memorandum regarding increase in contract ceiling prepared by Mr. Carlton and Contract Specialist Erica Williams). Notwithstanding its knowledge that the services to be provided under Mod 0023 would cost more than what was initially proposed, "MARAD took no steps toward awarding any other contract(s) for logistics support services at any time during the additional option years." Pl.'s Br. filed May 3, 2012, at 6. These discussions culminated in Mod 0035, which increased both the cost estimate and funding available for Mod 0023 and which "does not fit with Defendant's theory of a scheme by Veridyne with cooperation from a few bad apples at MARAD." Id. at 7. Plaintiff relies on Contracting Officer Burnowski's recitation in Mod 0035's PNM of the history of Mod 0023. Id. The detailed account, which was revised and "softened" numerous times, demonstrated that MARAD was aware that Mod 0023 was not a valid cost estimate because it was prepared to satisfy an SBA condition. See JX 49, at 0002 ("It is apparent from Modification 0023 and the available documentation related to it that the cost estimates included in the modification were directed toward matching a total dollar amount ($3,000,000) imposed by SBA conditions . . . and do not represent a valid estimate of the cost to perform the work . . . . ").

Although defendant makes much of the fact that Veridyne's proposal provided a phase-out scenario that was out of line with MARAD's instruction that the scope of work would remain the same as that in the original Contract, Veridyne responds that it interpreted "'scope of work' [to] refer[] to types of services that might be required, not the amount [of services to be provided]." Pl.'s Br. filed May 3, 2012, at 1-2. Moreover, Veridyne argues,

defendant's reference to a MARAD budget document indicating that the agency did not project any cutbacks during the additional option years is of little value because defendant failed to demonstrate that Veridyne was ever shown the document. See id. at 5.

Despite defendant's zealous advocacy to convince the court that MARAD had no basis to recognize the inadequacy of Veridyne's proposal for Mod 0023, the record undermines defendant's assessment of the situation. From the outset of discussions concerning extension of the Contract, MARAD was aware that annual billings on the Contract had been "3-4 million" each year. JX 19, at 0002. Mr. Carlton recognized the discrepancy between annual billings and Veridyne's proposal and cautioned his boss, Richard Williams, that the SBA might object to the $3-million proposal. Id. Nonetheless, MARAD never questioned Veridyne about its proposal. Indeed, Richard Williams encouraged MAR 380 to take whatever steps would be necessary to award the Contract extension to Veridyne, dismissing any concern regarding the phase-out apparent in plaintiff's proposal. See JX 22 ("[W]e believe that the contractor showed these cuts in order to remain within SBA's $3,000,000.00 threshold."). Less than one month later, Mod 0023 was executed.

During the two-year period between Mod 0023's execution and the time when the first option year under Mod 0023 could be exercised, MARAD and Veridyne discussed increasing the funding available for Mod 0023. In fact, it was Mr. Carlton—a MARAD employee—who prepared a cost estimate to support MAR 614's request to add funding to the Contract. See Tr. at 1221 (Carlton); see also JX 32, at 0002. That estimate led to the issuance of Mod 0035, resulting in an approximately $30-million increase in the cost estimate for Mod 0023's requirements. See JX 49, at 0002. Seeming to sense the red flags that could be raised at the SBA by a ten-fold increase in anticipated cost, Mr. Carr, on behalf of MAR 380, added a notation in the PNM indicating that SBA, as well as MARAD, knew that the cost of the services to be rendered pursuant to Mod 0023 "would be significantly higher" than $3 million. See id.; see also Tr. at 1671-72 (Burnowski). In the face of this mountain of record evidence, it is inconceivable that MARAD justifiably relied on Veridyne's $3-million proposal. Absent justifiable reliance—a necessary element of common law fraud—the record cannot support a finding that Mod 0023 was void *ab initio*.

As noted in Veridyne II, even if the court had concluded that Mod 0023 was void *ab initio* on account of fraud, the possibility of relief under *quantum meruit* still would be available to Veridyne. 25/ See Veridyne II, 83 Fed. Cl. at 583-

---

25/ *Quantum meruit* contemplates recovery that is equitable in the circumstances and may not always be actual amounts billed pursuant to a contract. See United States v. Amdahl Corp., 786 F.2d 387, 393 n.6 (Fed. Cir. 1986) (noting that recovery in *quantum meruit*

86.  The undersigned noted that the United States Court of Appeals for the Federal Circuit in United States v. Amdahl Corp., 786 F.2d 387 (Fed. Cir. 1986), established that

_____

25/  (Cont'd from page 38.)

translates into "as much as he merited").  The court might not have accepted billings under Mod 0035 as evidence of reasonable costs because the court has found that the value of the awarded Contract extension exceeded $3 million and was based on a pretextual proposal, absent which MARAD would have been required to recompete the Contract and justify any award as a fair and reasonable price.  See Tr. at 1633 (Burnowski).  However, defendant did not offer evidence of what that fair and reasonable price would have been.  Prior to the beginning of trial, the court granted plaintiff's motion in limine that foreclosed defendant from introducing two Fed. R. Evid. 1006 summaries of information regarding a logistics support contract between MARAD and a contractor called Prolog that was in effect from 2006-2011.

Defendant had sought to introduce these summaries in support of what plaintiff deemed defendant's "11th hour" damages theory that compared the Mod 0035 award fees with those paid to Prolog.  See Pl.'s Br. filed Jan. 3, 2012, at 4.  Plaintiff objected that the summaries were disclosed too late to allow plaintiff a fair opportunity to defend against this evidence, arguing that, because defendant had not pursued this theory, Veridyne never sought discovery regarding the subsequent contract.  See id.  The court also granted plaintiff's motion because defendant's précis of witness testimony, filed on November 21, 2011, did not disclose that the two witnesses who would testify about the summaries would discuss damages (ultimately, only one identified witness—Mr. Burnowski—testified).  See Order entered Jan. 5, 2012.

It should be pointed out that defendant made its proffer in connection with proving actual damages under the FCA.  See generally Tr. at 1628-33 (colloquy among court and counsel).  Defendant was on notice since September 12, 2008, that, based on the briefing to date, the court considered that defendant had not put forward case law in support for its contention that plaintiff's contract was void ab initio and ineligible for quantum meruit.  See Veridyne II, 83 Fed. Cl. at 586.  Defendant could have offered this evidence on either the issue of the appropriate measure for quantum meruit recovery or the Government's actual damages under the CDA had it alerted plaintiff about the issue during the course of any deposition, in defendant's summary of topics on which witnesses would testify, or in timely identified and disclosed trial exhibits.

39

> [w]here a benefit has been conferred by the contractor on the government in the form of goods or services, which it accepted, a contractor may recover at least on a *quantum valebant* or *quantum meruit* basis for the value of the conforming goods or services received by the government prior to the recission of the contract for invalidity.

Id. at 393.  The Federal Circuit qualified this statement, noting that a conflict of interest between the contractor and the Government's agent could obviate recovery on the basis of *quantum meruit*.  See id. at 395 n.8 (citing K & R Eng'g, 616 F.2d 469).  In Veridyne II the undersigned expressed agreement with this statement of the law and noted that, at the time, defendant had not cited to any binding case law establishing that, absent a showing of a bribe or a conflict of interest, voiding Mod 0023 *ab initio* would entitle the Government to forfeiture of all monies paid to plaintiff for services already rendered or would deny plaintiff recovery in *quantum meruit*.  See Veridyne II, 83 Fed. Cl. at 586.  Defendant still has not provided the court with such authority.

Because defendant did not carry its burden of proof to establish that Mod 0023 was fraudulently procured, Veridyne is entitled to compensation for services rendered.  Determining the amount of compensation due, however, is not as straightforward as totaling the outstanding invoices for which Veridyne has not yet received payment.  Defendant has not taken the position that Veridyne failed to perform the services billed to MARAD in Invoice Nos. 260-264, and Veridyne is entitled to be compensated for services billed in those invoices—but only to the extent funding was available for the particular services rendered and as of the date payment for the services was invoiced. 26/

Plaintiff's Program Manager, Mr. Colley, in accordance with the parties's past practice of reallocating funding among various WOs, requested reallocations for each of these five invoices.  The parties had adopted a practice whereby, following receipt of an e-

---

26/  At the conclusion of plaintiff's case-in-chief, defendant moved pursuant to RCFC 52(c), for application of the limitation-of-cost provision to any recovery that may be due to plaintiff because plaintiff had failed to show that the Contract permitted Veridyne to be paid an amount exceeding the available funding in WOs without explicit authorization from MARAD.  See Tr. at 887-88 (defense counsel).  The court granted the motion, ruling that plaintiff's potential recovery would be limited to the amount of funding available in each WO to which plaintiff billed, despite the fact that plaintiff may have charged to a particular WO an amount in excess of available funding.  See Tr. at 915-17 (court).  The ruling applied to invoices submitted after October 22, 2004—the date on which the parties' course of dealing regarding reallocation requests ceased.  See Tr. at 915-16 (court).

mail request for reallocation, Mr. Kaag for MARAD would confirm the reallocations via e-mail, and Mr. Colley would submit an invoice.  This practice was followed for Invoice Nos. 260 and 261, and Veridyne is entitled to recover the total unpaid amounts billed in those invoices, subject to the court's finding on defendant's counterclaim for forfeiture to be discussed *infra*.  These invoices total $591,857.00.

Although it is undisputed that Veridyne provided the services charged to MARAD in Invoice Nos. 262-264, MARAD did not approve the funding reallocations necessary to ensure that sufficient funds were available to pay Veridyne.  Consequently, amounts billed to certain WOs exceeded the funding available to pay for services performed under a given WO.  Without the reallocations the funding in (1) WO 812 was depleted with Invoice No. 262; (2) WO 813 was depleted with Invoice No. 265; (3) WO 814 was depleted with Invoice No. 264; and (4) WO 815 was depleted with Invoice No. 264.  See DX 233, at 3.  Defendant concedes, however, that, despite insufficient funding in certain WOs, a total of $1,161,058.43 was available on the Contract.  Id.  Although Invoice Nos. 260-267 billed in excess of that amount, that figure represents the maximum recovery available to plaintiff, given the incorporation of the FAR's "Limitation of Funds" provision into Mod 0023, providing that "[t]he Government is not obligated to reimburse the Contractor for costs incurred in excess of the total amount allotted by the Government to this contract," FAR 52.232-22(f)(1) (Apr. 1984).

In response to instructions in the court's order dated October 5, 2011, the parties prepared exhibits identifying available funding within various WOs and the date(s) on which funding was exceeded.  See PX 30; DX 233.  These exhibits indicate that funding shortfalls occurred in Invoice Nos. 262-264 because Mr. Kaag did not make the requested reallocations to ensure that sufficient funding was available in the WOs pursuant to which Veridyne performed services.  Both parties agree that the practice was such that Mr. Kaag would e-mail a confirmation to Mr. Colley verifying that funds were reallocated among WOs.  When Mr. Kaag did not respond to Mr. Colley's November 1, 2004 reallocation request for Invoice No. 262, see Tr. at 1700 (Colley), the parties' course of dealing changed, and Veridyne no longer could rely on past practices.  The court recognizes that the practice of billing for services that already have been performed presents a risk of nonpayment to Veridyne, but Veridyne was aware of, and appreciated, that risk.  See Tr. at 458-59 (Downer); DX 63 (Nov. 10, 2004 e-mail from Mr. Colley to Messrs. Downer and Graham regarding unanswered request for funding reallocations) ("When I pointed out we would be working at risk after 15th he said they were 'painfully aware' of that.").  Consequently, although plaintiff is entitled to compensation for services billed in Invoice Nos. 262-264, it may only recover to the extent funding was available in the WOs pursuant to which it performed.

Based on the parties' exhibits detailing funding shortfalls, Veridyne is entitled to the following compensation: (1) $214,988.66 for Invoice No. 262, see PX 30, at 54; DX 233, at 3; (2) $230,900.31 for Invoice No. 263, see PX 30, at 75; DX 233, at 3; (3) $24,819.33 for Invoice No. 264, see PX 30, at 92; DX 233, at 3. 27/  Accordingly, plaintiff has established entitlement to $1,062,565.30 under Invoice Nos. 260-264.

Although Invoice No. 265 was submitted to MARAD after Veridyne received the stop-work order, it billed for services rendered before the order issued.  Defendant does not dispute that Veridyne performed the work billed to MARAD in Invoice No. 265, but challenges Veridyne's entitlement to payment, arguing that Veridyne submitted with Invoice No. 265 funding data that portrayed WO funding as though Mr. Kaag had approved all requested reallocations and all WOs contained sufficient funding when this was not the case. Defendant's argument in this regard may have merit with respect to its counterclaims under the FCA and 28 U.S.C. § 2514, but, at this point, because the court is only finding liability for payment to the extent WOs were adequately funded, defendant's arguments would not bar plaintiff's recovery.  The court thus finds that Veridyne is entitled to payment in the amount of $5,374.78 on Invoice No. 265.

Invoice Nos. 266 and 267 introduce additional complexities.  Not only were these invoices submitted to MARAD after it issued the stop-work order, but they included charges for work undertaken to close down operations.  Defendant takes issue with plaintiff's including its actual overhead costs in Invoice No. 266, as opposed to billing for overhead at rates previously determined by DCAA.  See Def.'s Br. filed Apr. 19, 2012, at 27.  Because of the manner in which the Deltek software processes a rate change, this adjustment by plaintiff had the effect of including in Invoice No. 266 actual overhead costs for all invoices submitted during the fiscal year, even if the invoice charging overhead at the 65.4% rate already had been paid.  Defendant also argues that Veridyne improperly billed non-transition-related costs to WO 823 and a TD relating to the return of government-furnished equipment. See id. at 26.  These costs included expenses related to a post-stop-work order employee meeting, including employee time.  See id. at 26.  Finally, Invoice No. 266 contained charges incurred for the benefit of the Spare Parts Contract as certain tasks associated with the Spare Parts Contract always were invoiced under the logistics Contract.

---

27/  In calculating these totals, the court utilized exhibits from plaintiff and defendant indicating the amount of funding available, as well as the total amount invoiced.  The court adjusted the funding available to account for the requested and approved reallocations for Invoice Nos. 260 and 261.

To the extent that Invoice No. 266 contains charges for work performed before Veridyne received the stop-work order, the court finds that Veridyne is entitled to recover costs incurred in rendering those services if funding is available in the applicable WOs. Plaintiff's recovery includes indirect expenses attributable to that period of time, which appears to be December 1-6, 2004. The court also finds that plaintiff is entitled to recover amounts billed in Invoice No. 266 that relate to the work performed for the benefit of the Spare Parts Contract because the stop-work order indicated that Veridyne should continue performing that contract. Moreover, although the court has ruled that the stop-work order did not constitute a termination, Veridyne is entitled to recover those amounts—which Veridyne billed to WO 823, covering transition expenses—incurred in holding its employee close-out meeting because those costs necessarily were incurred in properly closing out the Contract. Veridyne is not entitled to recover costs, including indirect costs, incurred for performance after issuance of the stop-work order.

Unfortunately for Veridyne, because funds were not reallocated among WOs, almost all WOs are without sufficient funding. Plaintiff billed $49.87 to WO 817, see DX 233, at 3; PX 30, at 143, and $133.06 to WO 819, see DX 233, at 3; PX 30, at 144. These WOs contained available funding of $60.13 and $56.42, respectively. Notwithstanding this minimal available funding, Veridyne cannot recover the amounts billed because it has not demonstrated that the costs associated with these charges were incurred before issuance of the stop-work order. Given that the expenses charged to WOs 817 and 819 are overhead and G&A expenses, it is likely that plaintiff could not accurately allocate costs to particular dates of incurrence. These amounts are *de minimis*, and it is neither in the parties' interest nor the interest of justice to undertake the painstaking investigation that would be required at this juncture to determine how much of the charges were incurred before Veridyne received the stop-work order.

Plaintiff billed $12,269.82 to WO 822, see DX 233, at 3; PX 30, at 145-47, which contained sufficient funding, see DX 233, at 3. However, a portion of the amount billed is identified in PX 30 as having been incurred after Veridyne's receipt of the stop-work order, rendering these charges nonrecoverable. See PX 30, at 146. As for the remaining portion, Veridyne has failed to identify the dates on which the expenses—subcontractor costs, overhead, and G&A expenses—were incurred. The court cannot determine whether such costs were incurred while Veridyne still was authorized to perform. Accordingly, Veridyne may not recover amounts billed to WO 822, despite the availability of funding.

The court does agree with Veridyne that it properly billed costs from its close-out meeting to WO 823, notwithstanding defendant's objection that such expenses do not constitute transition expenses and thus are not properly allocable to WO 823. Veridyne necessarily incurred these costs in order to comply with the stop-work order, which indicated

43

that MARAD sought immediate return of government-furnished and -owned property. WO 823 contains sufficient funding, and the court finds that Veridyne is entitled to recover these expenses. However, while plaintiff has identified the expenses allocated to WO 823, it has not shown which of these expenses were incurred because of the employee close-out meeting. Consequently, the court lacks the analytical benchmarks to determine the specific amount to which Veridyne is entitled.

Veridyne may recover amounts related to the Spare Parts Contract to the extent the WOs to which these funds have been allocated are adequately funded. Veridyne billed such amounts to WO 812, which was depleted of funds, and WO 823, which contained sufficient funding. See DX 233, at 3; PX 30, at 150. Veridyne therefore is entitled to recover the $696.14 that it incurred performing work for the benefit of the Spare Parts Contract and that it billed to WO 823. See PX 30, at 150, 172.

Turning to Invoice No. 267, because plaintiff is awarded recovery on Invoice Nos. 260-266, it is not entitled to its previously billed expenses charged to MARAD in Invoice No. 267. Moreover, because Invoice No. 267 is comprised entirely of indirect expenses incurred after December 7, 2004, see PX 30, at 152 ("Invoice Period Jan 1-Mar 31, 2005"), Veridyne may not recover these amounts. What Veridyne may recover from Invoice No. 267 are any costs incurred for the benefit of the Spare Parts Contract to the extent that funding was available in the applicable WOs. As in Invoice No. 266, Veridyne billed expenses incurred on the Spare Parts Contract to WOs 812 and 823. Although WO 823 had funding available, Veridyne's calculations indicate a negative amount owed. See PX 30, at 173. Therefore, Veridyne's recovery on Invoice No. 267 is $0.00, and Veridyne's total recovery on its affirmative claim amounts to $1,068,636.22.

II. Defendant's special plea in fraud

    1. Standards

Defendant pleaded a Special Plea in Fraud for the forfeiture of plaintiff's claims. See Def.'s Second Am. Answer & Countercl. filed Apr. 22, 2009, ¶¶ 90-92 (No. 06-150C). The forfeiture statute provides, as follows:

> A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

> In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

44

28 U.S.C. § 2514.  A predicate for forfeiture under this statute is the establishment of fraud, although the statute itself does not articulate the elements of fraud.

The Federal Circuit has held that, to prevail on a counterclaim alleging fraud under 28 U.S.C. § 2514, defendant is required to "'establish by clear and convincing evidence that the contractor knew that its submitted claims were false, and that it intended to defraud the government by submitting those claims.'"  Daewoo Eng'g & Constr. Co. v. United States, 557 F.3d 1332, 1341 (Fed. Cir. 2009) (quoting Commercial Contractors, Inc. v. United States, 154 F.3d 1357, 1362 (Fed. Cir. 1998)); accord Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1379 (Fed. Cir. 2001); Young-Montenay, Inc. v. United States, 15 F.3d 1040, 1042 (Fed. Cir. 1994).  Proof of negligence or ineptitude does not meet the standard of clear and convincing evidence; rather, "[a]n intent to deceive the Government must be proved."  Miller v. United States, 550 F.2d 17, 22 (Ct. Cl. 1977).  The court may, however, consider circumstantial evidence in making its determination.  Kamen Soap Prods. Co. v. United States, 124 F. Supp. 608, 620 (Ct. Cl. 1954) ("About the only way a just conclusion can be reached is by placing the questioned documents and statements alongside well-known and established facts.").  "[F]orfeiture under 28 U.S.C. § 2514 requires only part of the claim to be fraudulent."  Daewoo Eng'g, 557 F.3d at 1341; see also Little v. United States, 152 F. Supp. 84, 87-88 (Ct. Cl. 1957).

2.  Plaintiff's claim for services furnished prior to the stop-work order

As noted previously, in Veridyne II the undersigned analyzed the potential for recovery in *quantum meruit* following a finding that a contract is void *ab initio* or that the contractor must otherwise forfeit amounts claimed, concluding that binding Federal Circuit precedent permits a contractor to recover for services already rendered where the situation does not involve a bribe or conflict of interest.  See Veridyne II, 83 Fed. Cl. at 585-86.  Then, as now, defendant has failed to advance an argument that, despite the absence of a bribe or conflict, plaintiff is not entitled to recover under a theory of *quantum meruit*.  Accordingly, a finding of forfeiture does not deprive plaintiff of any affinities, as the court already has found in Veridyne's favor on its affirmative claim.  Because MARAD received full value for the services, plaintiff is entitled to compensation by the Contract measure therefor. 28/

3.  Plaintiff's claims under Invoice Nos. 265-267

Defendant's claim for forfeiture is based on alleged material misstatements of amounts due to Veridyne in Invoice Nos. 265-267 and Veridyne's CDA claim, all of which

---

28/  See supra note 25.

were submitted after Veridyne was ordered to stop work. See Def.'s Br. filed Apr. 19, 2012, at 23.  According to defendant, plaintiff "took virtually every opportunity it had to gouge the Government after MARAD shut down the logistics contract." Id.

Defendant maintains that, having not received the anticipated response from Mr. Kaag approving the requested reallocations, Veridyne knew that funding had not been shifted between WOs.  See id.  Nonetheless, Veridyne modified its funding data to reflect the reallocations and submitted the falsified funding data with Invoice No. 265, making it appear as though MARAD had approved Veridyne's requested funding shifts.  See id. at 23-24. Defendant charges that Veridyne knew that it had falsely represented funding and submitted the funding data in an attempt to deceive MARAD into believing that sufficient funding was available to pay Veridyne's claim.  See id.  As further evidence of Veridyne's intent to deceive MARAD, defendant emphasizes that Veridyne knew that MARAD was not obligated to pay for unfunded work and thus "submitted false funding data in an attempt to overcome this problem." Id. at 24.

Plaintiff responds that, although the PM Spreadsheet accompanying Invoice No. 265 depicted funding as if Veridyne's requested reallocations had been approved, Veridyne knew that MARAD maintained its own documents to monitor available funding.  See Pl.'s Br. filed Mar. 20, 2012, at 31-32.  Moreover, the PM Spreadsheet—which functioned as a road map identifying reallocations—only could be understood with reference to earlier submissions. Pl.'s Br. filed Mar. 20, 2012, at 31.  Veridyne thus suggests that it is only accused of fraud because MARAD officials responsible for monitoring and reviewing funding and invoices did not consult their own records.  See Pl.'s Br. filed May 3, 2012, at 12-13.  Because MARAD had ceased paying and processing invoices, yet failed to provide any guidance to Veridyne as to how it should proceed to ensure sufficient funding in applicable WOs, Veridyne argues that it made and documented the reallocations and submitted its claim for payment in such a way that MARAD personnel could identify and follow the funding shifts. See id. at 11; Pl.'s Br. filed Mar. 20, 2012, at 31.

Defendant discounts Veridyne's argument that it had no choice but to alter the parties' past practice by taking it upon itself to approve its requested reallocations because MARAD had not communicated to Veridyne how it should proceed.  See Def.'s Br. filed May 31, 2012, at 5.  As defendant explains, "Veridyne's claim that the reallocations were necessary demonstrates only that its falsehoods were material; it does not excuse its fraud." Id.  Nor does Veridyne's argument that it submitted the PM Spreadsheet to provide a road map of reallocations vitiate Veridyne's intent to deceive MARAD.  See id. at 5-6.  Defendant contends that, in altering its practice of including only approved funding reallocations on the PM Spreadsheet without alerting MARAD to the misstatements, Veridyne intentionally misled MARAD to obtain payment of Invoice No. 265.  See id. at 6.

46

Turning to Invoice No. 266, defendant asserts that Veridyne knowingly billed non-transition tasks to WO 823 despite knowing that such costs were not properly chargeable to that WO. See Def.'s Br. filed Apr. 19, 2012, at 26. Aware that MARAD was not paying invoices for services rendered and had ordered Veridyne to cease performance, Veridyne identified costs as transition-related to deceive MARAD into paying its claim. Specifically, defendant argues that costs incurred in connection with an employee meeting following Veridyne's receipt of the stop-work order improperly were charged to WO 823. See id. This included employees' time while attending the meeting, even though the TD to which this item was charged was intended solely to cover expenses incurred in the return of government-furnished equipment. See id.

Veridyne retorts that "[d]efendant's attempt to convince the Court that Veridyne committed fraud by including employee time for the meeting in Invoice No. 266 and submitting the invoice to MARAD based upon one aspect of an all-day close-out meeting borders on the farcical." Pl.'s Br. filed Mar. 20, 2012, at 33. The e-mail that plaintiff sent to employees inviting them to the meeting set forth a number of tasks that would be accomplished. See id. (citing DX 76). Although defendant seizes upon the statement instructing that the meeting would cover benefits and administrative matters, the e-mail also stated that the meeting would cover "'transition review'" and "'proper disposition'" of work files, as well as collection and return of government property. See id. (quoting DX 76). These tasks, Veridyne argues, undoubtedly constitute transition tasks that properly are allocable to WO 823. See id. Veridyne thus attempts to neutralize defendant's argument that Veridyne's inclusion in WO 823 of employee time spent attending the meeting was fraudulent. See Pl.'s Br. filed May 3, 2012, at 14-15.

Defendant also highlights the manner in which Veridyne billed overhead in Invoice No. 266 as constituting a knowing misstatement intended to deceive MARAD into paying an amount to which Veridyne was not entitled. See Def.'s Br. filed Apr. 19, 2012, at 26-27. Defendant explains that, "[f]or nearly ten years, Veridyne had billed MARAD at an overhead rate of 65.4% of direct labor. . . . [and] never sought to recover its actual overhead rates." Id. Yet, in Invoice No. 266, Veridyne, for the first time, billed overhead at its actual rate. Id. at 27. Veridyne defends by noting that it was acting upon advice of counsel and had relied on its government-approved Deltek software to calculate the amount to be charged. See Tr. at 80-83 (Patterson) ("In our humble estimation, we believed it was a termination, and in conversation with our accounting people, [and] the legal folks, the decision was made to bill our actual [overhead] rate."). Further, Veridyne suggests that use of its anticipated final rate was appropriate because the FAR permits a contractor to bill at its anticipated final rate as determined by the contracting officer pending DCAA's determination of its annual indirect cost rate. See Pl.'s Br. filed May 3, 2012, at 15-16 (citing FAR 52.216-7(e)(1)

(1991)).  In this case, although the record is devoid of any evidence indicating that the contracting officer set a rate for Veridyne to use, plaintiff argues that it used a rate expressly permitted by the FAR.  See id. at 16.  To defendant's argument that Veridyne failed to inform MARAD that it was altering the manner in which it billed overhead, plaintiff rejoins that, because MARAD had cut off communication with Veridyne, it was unable to inform MARAD of the change in practice.  See Pl.'s Br. filed Mar. 20, 2012, at 33.  The court, however, agrees with defendant that the status of the parties' interactions did not impede Veridyne from informing MARAD as to how overhead was billed.  See Def.'s Br. filed Apr. 19, 2012, at 27 n.13.

Defendant also identifies Veridyne's preparation and submission of Invoice No. 267 as warranting forfeiture of Veridyne's claims.  Defendant explains that Veridyne's "selection of particular charges to be included [in the Claim Costs Spreadsheet] and the manner in which those charges were expressed . . . indicate an intent to obscure the overbilling."  See id. at 28.  For example, the Claim Costs Spreadsheet charged MARAD for previously billed expenses, yet failed to inform MARAD that it would not be liable for these expenses if earlier invoices were paid.  See id. at 29-30.  Defendant contends that the deceitful nature of Veridyne's billing was exacerbated because Veridyne described previously billed expenses differently in Invoice No. 267 than it had in Invoice Nos. 260-266.  See id. at 29.  Although lease expenses always had been lumped into overhead as a single sum, they were listed as separate line items in Invoice No. 267.  Additionally, although plaintiff rebilled the typically conglomerated lease expenses, it did not rebill unpaid labor expenses, which had been described in detail in earlier invoices.  See id. at 29-30.  Veridyne's response is essentially that no manner of billing these previously billed expenses would have satisfied the Government.  See Pl.'s Br. filed May 3, 2012, at 17-18.  Defendant contends that Veridyne itemized the rebilled lease expenses in an effort to obscure the truth, and Veridyne argues that it did so in order to make them more visible, not less, in the Claim Costs Spreadsheet.  See id. at 17.

The Claim Costs Spreadsheet also included charges for expenses that Veridyne never incurred, such as computer lease expenses through June 2006—fourteen months after the Contract's scheduled end date.  See Def.'s Br. filed Apr. 19, 2012, at 30.  Defendant relies on Ms. McGill's testimony that, because Veridyne could not have billed for expenses extending beyond the Contract's scheduled end date had Veridyne performed the Contract to completion, she did not include those amounts in her compilation of potential claim costs.  See id.; Tr. at 1473-74 (McGill).  Notwithstanding Ms. McGill's evaluation, Mr. Patterson instructed her to include such costs in the Claim Costs Spreadsheet.  See Def.'s Br. filed Apr. 19, 2012, at 30; Tr. at 1474 (McGill).  Veridyne defended this instruction by explaining that the court has permitted a contractor to recover such costs when the contract has been terminated and the costs continue for a reasonable time thereafter.  See Pl.'s Br. filed May

48

3, 2012, at 18 (citing <u>Sundstrand Turbo v. United States</u>, 389 F.2d 406, 415 (Ct. Cl. 1968)). According to Veridyne, although the court has since ruled that the Contract was not terminated and Veridyne may not recover costs extending beyond the Contract's schedule end date, <u>see</u> Order entered Oct. 5, 2011, at 2, at the time that Veridyne was identifying costs to be passed along to MARAD, it believed that MARAD had terminated the Contract, thereby entitling Veridyne to recover its to-be-incurred costs, <u>see</u> Pl.'s Br. filed May 3, 2012, at 18.   Defendant questions Veridyne's reliance on this belief in light of Ms. McGill's opinion as in-house FAR expert that such costs should not be included as claim costs chargeable to MARAD.   <u>See</u> Def.'s Br. filed May 31, 2012, at 8.

Veridyne also put forth an advice-of-counsel defense in explaining why certain expenses were included as claim costs.   <u>See</u> Tr. at 152-53 (Patterson).   Charging that Veridyne manufactured this defense, defendant contends that the record contains no evidence—other than Mr. Patterson's self-serving testimony—indicating that Veridyne received any legal advice as to what expenses could properly be charged to MARAD.   <u>See</u> Def.'s Br. filed Apr. 19, 2012, at 31-32.   Noting that "Mr. Patterson testified that he did not recall receiving any specific advice, and that he does not recall the details of any of his conversations with Mr. Webster," defendant concludes that plaintiff has not demonstrated that it is entitled to rely on an advice-of-counsel defense.   <u>See</u> <u>id.</u> at 31; Tr. at 152-56 (Patterson).   To rely on the defense, defendant claims, Veridyne would have had to have (1) made a complete disclosure to counsel of all material facts, (2) sought advice as to the legality of including certain costs in the Claim Costs Spreadsheet, (3) been advised that its proposed action was lawful, and (4) relied on counsel's advice in good faith.   <u>See</u> Def.'s Br. filed Apr. 19, 2012, at 31 (citing <u>United States v. West</u>, 392 F.3d 450, 457 (D.C. Cir. 2004)).

The court evaluates Veridyne's defense as based on its alleged submission of spreadsheets depicting potential claim costs to Mr. Webster.   <u>See</u> <u>id.</u>  Although Mr. Patterson could neither recall the specific advice he received from Mr. Webster nor produce any document suggesting that Mr. Webster provided any advice, Veridyne contends that Mr. Webster's use of the total claim amount in the spreadsheets in his correspondence with MARAD is proof that he approved the claim costs passed along to MARAD.   <u>See</u> <u>id.</u> Defendant questions this assertion and notes that, "in commenting on a draft interrogatory response relating to the transmission of one of those spreadsheets . . . Mr. Patterson changed the language of the interrogatory to state that the spreadsheet *had* been sent, telling the drafter that 'In the absence of countertestimony and/or documentation that refutes my testimony, [Goverment counsel] has to live with my story.'"   <u>See</u> <u>id.</u> at 32 (alteration in original) (quoting DX 229).   Even if  Veridyne had shared the spreadsheets with Mr. Webster, the record indicates that it was Mr. Patterson who inserted the total amount of claim costs in Mr. Webster's letter to MARAD.   <u>See</u> <u>id.</u>  Furthermore, the record is devoid of evidence suggesting that plaintiff made complete disclosure of all material facts to Mr.

Webster to enable him to form an opinion as to what claim costs could be charged to MARAD.  See id.

Defendant identifies various discrepancies between Mr. Webster's drafts and Mr. Patterson's assertions.  First, Mr. Webster's drafts treated prior-billed costs and termination expenses as separate and distinct expenses, which defendant contends indicates that Mr. Webster did not believe that claim costs should include previously billed items.  See id. at 32-33.  Second, Mr. Webster's draft only contained expenses through March 31, 2005, but Mr. Patterson included as claim costs expenses that would be incurred after that date.  See id. at 33.  Defendant also points out Mr. Patterson's shifting story regarding Invoice No. 267. Initially, Mr. Patterson implied that he was not involved in preparing Invoice No. 267. See DX 230, Deposition of Samuel [J.] Patterson, Veridyne, Inc. v. United States, No. 06-150C, at 579 (Fed. Cl. Oct. 1, 2008) ("Patterson Dep. I").  Later, however, he identified himself as a key actor, stating that he communicated with and shared drafts of claim costs scenarios with Mr. Webster.  See Def.'s Br. filed Apr. 19, 2012, at 33.  Mr. Patterson's description of Mr. Webster's advice also was inconsistent—in his March 25, 2011 deposition, he stated that Mr. Webster specifically instructed him to include prior-billed expenses in the Claim Costs Spreadsheet, but at trial, he testified that Mr. Webster's "actions" led him to include such expenses.  See DX 230, Deposition of Samuel [J.] Patterson, Veridyne, Inc. v. United States, No. 06-150C, at 174 (Fed. Cl. Mar. 25, 2011) ("Patterson Dep. II"); Tr. at 152-53 (Patterson).  Finally, despite Mr. Patterson's reliance on JX 206—Veridyne's internal spreadsheet depicting potential claim costs to pass on to MARAD—as the basis for his advice-of-counsel defense, he never mentioned this document in his certified interrogatory responses.  See Def.'s Br. filed Apr. 19, 2012, at 33 n.14.

Plaintiff rejects defendant's suggestion that it did not rely on Mr. Webster's advice in preparing the Claim Costs Spreadsheet.  Pl.'s Br. filed May 3, 2012, at 20.  Veridyne identifies various time logs in which Mr. Webster recorded time spent exchanging e-mails with Mr. Patterson regarding termination costs and drafting a letter to be sent to MARAD requesting reimbursement of Veridyne's termination expenses.  See id. at 20-21.  Noting that Mr. Webster's time log states that he billed Veridyne for a total of 13.4 hours spent drafting two letters concerning termination expenses to MARAD, Veridyne argues the absurdity of Mr. Webster's going to such effort only to allow Mr. Patterson to insert whatever amount for claim costs that he deemed appropriate.  See id. at 21-22 (citing PX 18, at 2-4; PX 19, at 2-3).

The court commends both counsel for keen advocacy.  While the attempts of plaintiff's dedicated counsel to paint the evidence in the best light possible were valiant, Veridyne cannot escape the fact that it knew its submitted claims were false and intended to deceive MARAD into paying those claims.  A plaintiff's claim will be forfeited under 28 U.S.C. § 2514 even if only part of its claims is false.  See Daewoo Eng'g, 557 F.3d at 1341.

In this case Veridyne submitted Invoice No. 265 with knowledge that the accompanying PM Spreadsheet falsely represented current funding levels. Veridyne thus depicted the WOs as containing sufficient funding with which to pay Veridyne for its services because Veridyne knew that MARAD was not obligated to pay it for work performed pursuant to a WO with insufficient funds. This is exactly why Messrs. Colley and Kaag established a course of dealing whereby Veridyne would not submit an invoice until MARAD had reallocated funding among WOs.

Veridyne's argument that MARAD could have discovered that various WOs did not contain the level of funding recorded in the PM Spreadsheet does not assist plaintiff because it does not change the fact that Veridyne (1) knew the submitted invoice contained material misstatements and (2) intended for MARAD to rely on the falsely represented figures and to pay the invoice accordingly. Moreover, Veridyne's defense that it knew MARAD maintained its own spreadsheets to track funding actually weakens plaintiff's argument that it did not intend to deceive MARAD. If Veridyne believed that MARAD would rely on its own documentation, it would not have gone to the trouble of preparing and submitting an inconsistent version. Finally, the court deems irrelevant plaintiff's argument that it had no choice but to reallocate funding on its own because MARAD had cut off the lines of communication between the parties. Veridyne recognized the risk involved in rendering services and thereafter billing for those services. Plaintiff also knew that the Contract did not require MARAD to accede to requests to reallocate funds among WOs. Veridyne's argument based on necessity does not shield it from forfeiture, and the court finds that forfeiture is an appropriate remedy as Veridyne knowingly submitted false information with Invoice No. 265 in an attempt to deceive MARAD into believing sufficient funding was available to pay its claims.

Although the court does not agree with defendant that Veridyne committed fraud by charging various costs, including employee time, incurred during the termination meeting with its employees to WO 823, the court does find that Invoice No. 266 contained material misstatements by which Veridyne intended to deceive MARAD. After nearly ten years of following a particular practice for billing overhead, Veridyne suddenly changed course and billed overhead at its actual rates, as opposed to the 65.4% rate that had been determined in a previous DCAA audit. Veridyne justifies its action by noting that, because it believed that MARAD had terminated the Contract, it had the right pursuant to the FAR to bill at its actual rate. However, the FAR provision on which Veridyne relies permits a contractor to bill at its "anticipated final rate" as determined by the contracting officer. See FAR 52.216-7(e)(1). In the case at bar, the contracting officer had not established an interim rate at which Veridyne would bill its overhead expenses. Most likely this did not occur because it was understood that Veridyne would bill at the 65.4% rate that theretofore had been used until it again came time for DCAA to conduct an audit.

51

Invoice No. 267 presents the most striking action warranting forfeiture. Although Veridyne is correct that a mere rebilling of unpaid charges ordinarily would not be considered an attempt to deceive the Government, Veridyne's conduct in preparing and submitting Invoice No. 267 indicates something more contrived than an intention to remind MARAD of amounts due and owing. Tellingly, the only unpaid amounts that Veridyne rebilled to MARAD were lease expenses that were, for all intents and purposes, hidden in past invoices because they were billed as a portion of overhead and not as separate line items. Labor expenses, however, were listed as separate line items and described in detail and subsequently were not rebilled to MARAD. Veridyne offers no explanation for this anomaly. Veridyne explains that, by separately listing the lease expenses, it certainly was not seeking to hide anything, but this does not necessarily follow. Because they were identified in a manner different than that used when they were first billed, the lease expenses were not easily identifiable as twice-billed items, nor did Veridyne annotate the invoice with a note indicating that the lease expenses were owed only to the extent the earlier invoices remained unpaid. The evidence supports a finding that Veridyne altered its billing practices to deceive MARAD into twice paying the unpaid lease expenses charged in earlier invoices. Veridyne's advice-of-counsel defense does not bolster its position in this regard. Mr. Webster initially treated as separate termination claim costs and prior-billed expenses, indicating that his position was that the unpaid lease expenses should not be re-billed in Invoice No. 267 as termination claim costs. See JX 197, at 0001.

Veridyne's conduct in seeking reimbursement for expenses that would be incurred after the scheduled end of the Contract is similarly suspect in that it chose to ignore the recommendation of its in-house FAR expert, Ms. McGill, who did not include such amounts in her compilation of claim costs. Instead, Veridyne contends that it included these to-be-incurred expenses on the advice of counsel. Veridyne's insistence that Mr. Webster approved of inclusion of post-March 31, 2005 expenses as claim costs does not find support in the record. Mr. Webster's drafts of the letters to be sent to MARAD did not include expenses that would be incurred after March 2005. Plaintiff's reliance on an advice-of-counsel defense is further undermined by Mr. Patterson's bold remark after he modified an interrogatory response to remove any uncertainty as to whether or not Veridyne shared draft claim costs spreadsheets with Mr. Webster: "In the absence of counter testimony and/or documentation that refutes my testimony, [Government counsel] has to live with my story." See DX 229. Veridyne has offered no more than Mr. Patterson's assertions as evidence that plaintiff made a complete disclosure of all material facts to Mr. Webster in an attempt to obtain legal advice as to what items could properly be included as claim costs.

Moreover, not only did Mr. Patterson fail to recall the advice from Mr. Webster instructing him to include these expenses as claim costs, but he changed his story, remarking at trial that it was Mr. Webster's actions that led him to deem the post-March 31, 2005

expenses allowable despite earlier deposition testimony in which he stated that Mr. Webster specifically advised him to include those expenses. Compare Tr. at 152-53 (Patterson), with DX 230, Patterson Dep. II, at 174. Indeed, Mr. Patterson changed his story on multiple occasions, at times saying he was not involved in the preparation of Invoice No. 267 and at other times claiming that he was a lead actor.

Taken together, defendant has adduced clear and convincing evidence to support findings that Veridyne knew that its invoices contained false statements and submitted them in an effort to deceive MARAD into paying them. Although the court held in favor of Veridyne on its affirmative claim, those amounts are subject to forfeiture pursuant to 28 U.S.C. § 2514. Nonetheless, to the extent that Veridyne performed services and is entitled to be compensated for its performance, recovery in *quantum meruit* is warranted. The court ruled in connection with defendant's unsuccessful common law fraud defense that plaintiff had established its entitlement to recovery in *quantum meruit*. That finding applies to negate the net monetary penalty represented by the statutory forfeiture. However, as noted previously, plaintiff was aware that by rendering services to MARAD before ensuring that MARAD would effect the funding reallocations necessary to ensure payment to Veridyne, it was performing at risk. Having implicitly accepted this risk, Veridyne cannot now be heard to argue that it is entitled to the full value of services rendered even if the WOs pursuant to which it performed did not contain sufficient funding. This is particularly true with respect to those invoices submitted after the parties' course of dealing regarding WO reallocations abruptly changed.

Invoice Nos. 260-265 billed MARAD for services that Veridyne performed. Adjusting the totals to permit reimbursement only when a WO contained sufficient funding, Veridyne is entitled to $1,068,636.22.

III. <u>Defendant's False Claims Act claim</u>

1. <u>Standards</u>

Defendant also counterclaims that plaintiff violated the FCA, 31 U.S.C. § 3729(a)(1). The FCA recognizes a cause of action when any person "knowingly presents, or causes to be presented . . . a false or fraudulent claim for payment or approval," <u>id.</u>, or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," <u>id.</u> § 3729(a)(1)(B). <u>29</u>/ A person found liable under these provisions "is

---

<u>29</u>/ The False Claims Act was amended on May 20, 2009, by the Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4(a), 123 Stat. 1617, 1621-22 (to be

liable to the United States Government for a civil penalty of not less than $5,000 [now $5,500] and not more than $10,000.00 [now $11,000.00], plus 3 times the amount of damages which the Government sustains because of the act of that person."  Id. 30/ "Knowingly" applies to a person who has "(1) actual knowledge of the information; (2) [who] acts in deliberate ignorance of the truth or falsity of the information; or (3) [who] acts in reckless disregard of the truth or falsity of the information."  Id. § 3729(b). 31/ Critically, "no proof of specific intent to defraud is required" to prove knowledge.  Id.

"The government must establish a violation of the False Claims Act by a preponderance of the evidence."  Daewoo Eng'g, 557 F.3d at 1340 (citing 31 U.S.C. § 3731(c); Commercial Contractors, 154 F.3d at 1362).  To bring an FCA claim, the Government is not tasked to show that it incurred damages, although a showing of damages as a result of the fraudulent claim is required if the Government seeks to recover damages. See id. at 1341 ("Because the court did not find that the government incurred damages from

---

29/  (Cont'd from page 53.)

codified at 31 U.S.C. § 3729).  31 U.S.C. § 3729(a)(1) is now codified at 31 U.S.C. § 3729(a)(1)(A). However, the former § 3729(a)(1) is the relevant provision for the purposes of this case, so the court cites to this provision.  See id. § 4(f), 123 Stat. at 1625 (making applicable new provisions to "conduct on or after the date of enactment").  By comparison, the court applies the reformulated 31 U.S.C. § 3729(a)(1)(B) in analyzing defendant's Count IV under the FCA.  See id. § 4(f), 123 Stat. at 1625 (making applicable new provisions to "conduct on or after the date of enactment" except that "subparagraph (B) of section 3729(a)(1) of title 31, United States Code . . . shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act that are pending on or after that date" (citation omitted)).  Defendant filed its counterclaim alleging a violation of 31 U.S.C. § 3729(a)(2) on April 22, 2009, so newly formulated § 3729(a)(1)(B) is applicable to this case.

30/  Section 5 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 note (2006), authorizes Executive agency adjustments for inflation of civil fines and penalties.  The Department of Justice, by regulation, has increased the penalties for FCA violations to a minimum of $5,500.00 and a maximum of $11,000.00.  See 28 C.F.R. § 85.3(a)(9) (2012).

31/  Similar to § 3729(a)(1), § 3729(b) has been reformulated so that it is codified at § 3729(b)(1), see Pub. L. No. 111-21, § 4(a), 123 Stat. at 1622, but the court applies the former § 3729(b), see id. § 4(f), 123 Stat. at 1625.

Daewoo's false claim, the court properly assessed only the statutory penalty."); see also Young-Montenay, 15 F.3d at 1043 (absent proof of harm, Government can recover penalties, but not damages). In Young-Montenay the Federal Circuit set forth the required showing for a damages award:

> In order to recover damages for violation of the False Claims Act, the government must establish that
>
> (1) the contractor presented or caused to be presented to an agent of the United States a claim for payment;
> (2) the claim was false or fraudulent;
> (3) the contractor knew the claim was false or fraudulent; and
> (4) the United States suffered damages as a result of the false or fraudulent claim.

Young-Montenay, 15 F.3d at 1043.

### 2. Modification 0023 as a basis for FCA liability

Defendant's chief argument in favor of FCA liability is that plaintiff procured Mod 0023 by fraud and therefore is subject to FCA liability for making and using a false record for the purpose of obtaining payment from the Government. See Def.'s Br. filed Apr. 19, 2012, at 9. Defendant cites a number of cases that stand for the proposition that a contractor may be subject to FCA liability when the contract pursuant to which it obtains payment was procured by fraudulent means, even if its claims for payment do not contain false statements. See id. (citing U.S. ex rel. Longhi v. Lithium Power Techs., Inc., 575 F.3d 458, 467-68 (5th Cir. 2009); U.S. ex rel. Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 787-88 (4th Cir. 1999); U.S. ex rel. Alexander v. Dyncorp, Inc., 924 F. Supp. 292, 298 (D.D.C. 1996)). Noting that "[f]raud in the procurement of a contract '[does] not spend itself with the execution of the contract,'" id. at 15 (quoting United States ex rel. Marcus v. Hess, 317 U.S. 537, 543-44 (1943)), defendant contends that "each claim for payment submitted to the United States pursuant to [the] fraudulently obtained [Mod 0023] is necessarily a separate false claim under the FCA," id.

According to defendant, Veridyne's proposal for Mod 0023 is fraught with at least three inconsistencies, rendering it, at a minimum, misleading. See id. at 10-11. First, Veridyne's proposal was developed to meet an SBA limit, not to reflect MARAD's needs. Id. at 10. It thereby presented a false estimate because the proposed labor schedule was not correlative to Veridyne's actual expectations. Id. Moreover, it "was dramatically out of line

with Veridyne's actual historical costs," indicating that Veridyne was aware of the falsity inherent in its estimate.  Id.

Second, defendant contends that Veridyne did not prepare Mod 0023 in accordance with its established estimating practices, despite certifying in the proposal that it had.  See id. at 10-11.  Mr. Downer admitted this fact under cross-examination.  Tr. at 442-43 (Downer).  Third, although Veridyne attempts to justify its $3-million proposal for Mod 0023—despite historical costs averaging $3.5 million per year—by arguing that Veridyne's involvement with the Contract would be phased out over the duration of Mod 0023, the record fails to support this argument.  Mr. Downer admitted that no one told him that MARAD intended to phase down operations and that he was aware that MARAD was enthusiastic about plaintiff's involvement with the logistics support program.  See Tr. at 434-35 (Downer).  Further, Mr. Carlton, in a memorandum to Richard Williams, suggested that the proposal was "confusing" because it appeared to involve a phase-out of various labor categories, as opposed to a reduction in the number of personnel to be provided in each category.  See JX 19, at 0001.  He recommended modifying the proposal to emphasize "reduction [versus] a phase-out."  Id.  Thus, defendant challenges, Veridyne knew that MARAD did not contemplate a phase-out, but nonetheless characterized its proposal as such to mislead MARAD and SBA.  See Def.'s Br. filed Apr. 19, 2012, at 10.  This intent was evidenced further by Veridyne's offer to buy out its subcontractor "based on revenue projections *to the subcontractor* that were significantly greater than $3 million over five years."  Id. at 11.

In a memorandum drafted by Mr. Genna in support of the subcontractor buyout, he anticipated that the subcontractor's invoices for the first three option years under Mod 0023 would be approximately $4.5 million.  See id.; DX 8, at 0004.  Defendant acknowledges that the offer period for the subcontractor buyout was listed in the memorandum as May 31, 1998, close in time to when Mod 0023 was executed by MARAD and SBA—May 18 and 20, 1998, respectively.  See Def.'s Br. filed Apr. 19, 2012, at 11.  Thus, "at the same time Veridyne was telling the Government that it was expecting 80-percent cuts to the Contract, it was willing to commit its own money to buy out its subcontractor based on revenue projections far in excess of those it announced to the Government."  Id. at 12.  Accordingly, defendant concludes that plaintiff is liable under the FCA because it knew—i.e., had actual knowledge—that its estimate for Mod 0023 was false at the time it submitted it to MARAD.  See id.

Veridyne characterizes defendant's argument as confusing the Contract's scope of work with its schedule of hours.  See Pl.'s Br. filed Mar. 20, 2012, at 20.  The scope of work, Veridyne explains, is found in the SOW and details the types of services that MARAD may require, while the schedule sets forth the projected number of hours that MARAD would

require.  See id.  Thus, that the scope of work for Mod 0023 remained the same as that for the Contract meant only that Veridyne must be capable of providing the same types of services; it had nothing to do with the amount of services to be provided.  See id.  Veridyne notes that it was fully capable of performing the listed services.  See id.  Although plaintiff's proposal listed zero hours for some labor categories in the later option years, this does not indicate an inability to perform, particularly because Veridyne provided a billing rate for each labor category.  See id. at 21.

Veridyne also maintains that its proposal preparation was consistent with its established estimating practices.  See id. at 22.  The use of a representative-sample methodology was necessitated by the absence of a solicitation "or other specific guidance as to how the proposal should be structured," but the proposal still was prepared using standard labor categories and rates and the same procedure for recoupment of indirect expenses.  Id.  Moreover, Veridyne argues, any alleged false statements were not material to MARAD's decision to add five option years to the Contract and did not influence MARAD in any way.  See id. at 22-24.  The D&F supporting execution of Mod 0023 did not refer to the $3-million figure as an estimate of any kind.  See id. at 22.  Plaintiff postulates that MARAD personnel knew that the figure was not an estimate.  In expressing MAR 614's approval of Veridyne's proposal to MAR 380, Richard Williams dismissed any concerns based on the comparatively low proposal amount, commenting that "we believe that the contractor showed these cuts in order to remain within SBA's $3,000,000.00 threshold."  JX 22.  According to Veridyne, this memorandum demonstrates that MARAD was aware that Veridyne, while proposing to provide the same types of services that it provided under the Contract, was not proposing to provide the same amount of services.  See Pl.'s Br. filed Mar. 20, 2012, at 23.

Veridyne continues that a comparison of the schedules in the Contract and in Mod 0023 makes this point even clearer.  See id.  The Contract's schedule provided for 314,460 labor hours, see JX 1, at 0005-09, while Mod 0023's schedule called for only 83,000, see JX 28, at 0004-08.  See Pl.'s Br. filed Mar. 20, 2012, at 23.  Despite this discrepancy, Mod 0023—prepared by MARAD—stated that the scope of work would remain the same, weakening defendant's argument that scope of work correlates to amount of services.  See id.  The evidence thus indicates, plaintiff concludes, that MARAD was aware of exactly what Veridyne was proposing.  See id. at 26.  Citing the Government's amicus brief in United States ex rel. Kreindler & Kreindler v. United Techs. Corp., 985 F.2d 1148 (2d Cir. 1993), Veridyne proffers that the Government has taken the position that knowledge of an allegedly false claim should prevent FCA liability.  See Pl.'s Br. filed Mar. 20, 2012, at 26.  According to Veridyne, "if the Government knows and approves of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim.  The Government's knowledge effectively negates the fraud or falsity required by the FCA."  See id. (citation omitted).

57

The Government's brief in <u>Kreindler & Kreindler</u> argued that, "[i]n some cases, the fact that government officials knew of the contractor's actions may show that the contract has been modified . . . and therefore that the claim submitted by the contractor was not 'false.'" Def.'s Br. filed Apr. 19, 2012, App. at 16. Veridyne touts this statement as particularly relevant to the situation that followed execution of Mod 0035. Even assuming that various MARAD actors were unaware in 1998 of the facts now challenged as constituting FCA violations, they surely became aware of those facts at the time Mod 0035 was being considered. <u>See</u> Pl.'s Br. filed Mar. 20, 2012, at 30. Nonetheless, MARAD proceeded with execution of Mod 0035 in order to retain Veridyne. <u>See id.</u> Thus, Veridyne proffers, the Government's knowledge of the circumstances of execution of Mod 0023 precludes it from arguing that claims for payment submitted thereunder are tainted as false claims. Alternatively, Veridyne argues that all claims submitted after April 2001—when Veridyne and MARAD were negotiating Mod 0035—do not create FCA liability because MARAD was well aware of the falsity. <u>See</u> <u>id.</u> at 30.

Defendant rejects the notion that the Government's position in <u>Kreindler & Kreindler</u> is inconsistent with its position in the case at bar. <u>See</u> Def.'s Br. filed Apr. 19, 2012, at 17. The Government's amicus brief was making the point that knowledge of agency officials should not automatically preclude an action under the FCA because such a rule of law would "'confront[] the government with a Hobson's choice whenever it receives initial evidence suggesting a false claim,'" but does not yet have sufficient evidence to ensure that immediate termination of payments to the contractor would not result in contractual liability to the Government. <u>Id.</u> at 18 (quoting Def.'s Br. filed Apr. 19, 2012, App. at 15). As a result, defendant argues, the practical import of its position in <u>Kreindler & Kreindler</u> is that, while Government knowledge may indicate that a contractor did not knowingly submit a false claim, "where a contractor *does* knowingly submit false claims[,] the government is not required to terminate the contract as soon as it receives evidence of fraud." <u>See</u> <u>id.</u>

With respect to Mod 0035, defendant admits that

the parties' negotiations after April 2001 show that MARAD authorized Veridyne to bill against a higher award fee pool, and continued to fund work orders under the Contract after Veridyne had exceeded the total estimated cost of the extension. However, MARAD never directed Veridyne to engage in the conduct that rendered Veridyne's claims false in the first place—that is, MARAD never instructed Veridyne to misrepresent what the Contract was worth in the Proposal—and could not have done so after April 2001.

Id. at 16-17.  Defendant thus concludes that, because MARAD was not responsible for the initial falsity, FCA liability results and taints all claims submitted thereafter, which includes those post-April 2001.

Defendant correctly asserts that, if Veridyne's Mod 0023 proposal was fraudulent, so, too, are all 127 invoices submitted thereunder.  Although the Government's amicus brief in Kreindler & Kreindler addressed the narrow issue of whether the Government's knowledge would preclude an action under the FCA, that analysis and that presented in similar cases, such as United States ex rel. Hagood v. Sonoma County Water Agency, 929 F.2d 1416 (9th Cir. 1991), lend support to the proposition that agency knowledge of a false claim may vitiate a contractor's liability under the FCA.

In Hagood the United States Court of Appeals for the Ninth Circuit, also in receipt of an amicus brief from the United States that discussed the same issue addressed in its brief filed in Kreindler & Kreindler, held on review of a dismissal for failure to state a claim that government knowledge of an alleged FCA violation does not automatically preclude the filing of an FCA claim.  Hagood, 929 F.2d at 1420-22.  The court reasoned that, while knowledge of government officials "may show that the defendant did not submit its claim in deliberate ignorance or reckless disregard of the truth. . . . this comforting conclusion . . . cannot be reached by mere inspection of [the] complaint." Id. at 1421.  When addressing the merits of a dispute, the court noted—and the Government asserted in its amicus brief—that courts should examine the circumstances of the government officials' knowledge.  Id.; see also Def.'s Br. filed Apr. 19, 2012, App. at 13.

Similarly, in United States ex rel. Butler v. Hughes Helicopters, Inc., 71 F.3d 321 (9th Cir. 1995), the Ninth Circuit affirmed a directed verdict for a government contractor, ruling that the United States Army's knowledge of false test results submitted prior to a contract award negated the contractor's intent to defraud the Army in making those statements.  Id. at 328-29.  Analyzing Hagood and other cases, the court determined that FCA liability would not attach if the contractor and the Army "so completely cooperated and shared all information . . . [such] that [the contractor] did not 'knowingly' submit false claims." Id. at 327; see also Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 519, 534 (10th Cir. 2000) (agreeing that "extensive [government] knowledge" and cooperation between Government and contractor can negate FCA intent requirement).  Accordingly, the Butler court explained that, because the Army knew and approved of the noncomplying information that formed the basis of the relator's FCA claim against the contractor and because the discrepancy was the subject of dialogue between the Army and the contractor, the contractor did not knowingly submit a false claim.  See id. at 328.  This reasoning was echoed by the United States Court of Appeals for the Seventh Circuit in United States ex rel. Durcholz v. FKW Inc., 189 F.3d 542 (7th Cir. 1999).  In Durcholz the court affirmed the district court's grant of summary

judgment, effectively dismissing two claims for FCA violations, reasoning that "[i]f the government knows and approves of the particulars of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim." Id. at 545.

Examining the circumstances in the instant case—as defendant, citing Hagood, has invited the court to do—reveals an abundance of probative evidence that MARAD contracting personnel knew of the facts that defendant now contends constitute falsities. Defendant admits that "some people within MARAD may have deduced that Veridyne was not seriously proposing to [perform the functions listed in the proposal's schedule] . . . and that the proposed labor schedule was merely an artifice to get around the SBA's $3 million limit." See Def.'s Br. filed Apr. 19, 2012, at 14. Defendant is too modest. MARAD personnel knew that the $3-million amount was merely a pretext to get around having to award Mod 0023 subject to competition. See JX 22 ("[W]e believe that the contractor showed these cuts in order to remain within SBA's $3,000,000.00 threshold.").

MARAD personnel knew that Veridyne's $3-million proposal had more to do with avoiding competition requirements than with providing an actual estimate of the costs of performing Mod 0023. Pleased with Veridyne's performance and interested in a continuing association for the five additional option years, MARAD employees/officials ushered Veridyne's proposal through the various MARAD and SBA approval channels. Because it was aware of what the $3-million figure represented and proceeded anyway, MARAD effectively approved the statements in the proposal. The inquiry, however, does not end with a finding of MARAD's knowledge.

The court has considered the fact that the SBA, not MARAD, was the agency that actually contracted with Veridyne. No evidence of record suggests that the SBA was aware that the Mod 0023 proposal was a pretext aimed at avoiding SBA's competition requirements. In fact, MARAD not only failed to share its knowledge of the proposal's falsity, i.e., its true nature, with the SBA, but it also encouraged the SBA to approve Veridyne's proposal, explaining that "[t]his extension will be a substantial savings to the Government." JX 23. A ruling that absolves plaintiff of FCA liability because the SBA did not have knowledge of the falsity could be pernicious and is rejected.

Government agencies not infrequently contract for one another or act as an approving authority. A ruling that FCA liability attaches if the complicit agency was not the sole contracting agency would absolve a government contractor if an unwitting agency were in the chain of approval. This is how a legal ruling can morph from one tailored to a lack of culpable knowledge by an agency that signs the contract to one that applies if any agency

60

without such knowledge otherwise participates in the award, approval, or administration of the contract.

All the cited decisions that would neutralize FCA liability based on agency knowledge have been *qui tam* actions. The focus of the act is to bring to light an FCA violation. See 31 U.S.C. § 3730(b)(1) (2006). The Government may, or may not, intervene. 31 U.S.C. § 3730(b)(5). If the Government elects to proceed, it has sole responsibility for prosecuting the action. 31 U.S.C. § 3730(c)(1). In other words, the Government elects to prosecute the "person" (corporation) allegedly committing the FCA violation. While this court would not distinguish these cases because they are *qui tam* actions, one significant attribute shared by government-initiation of FCA claims and *qui tam* actions is that both statutes, like the forfeiture statute, confine proof of knowledge to the claimant's knowledge. This court views the three opinions as engrafting on the FCA a requirement that the agency's knowledge can vitiate the requisite knowledge of the claimant. Therefore, the court does not follow the reasoning of these decisions. And, as next discussed, this court finds them distinguishable on the facts, in any event.

Assuming that the Federal Circuit would follow Hagood, Butler, and Durcholz as persuasive authority, they stand for the proposition that government knowledge can vitiate FCA liability, depending on the circumstances. Hagood did no more than allow an FCA claim to proceed beyond the complaint stage in order to develop the record on the extent of agency knowledge. In Butler the court characterized the agency conduct as complete cooperation and noted the sharing of all information. Durcholz involved a contract award. The agency instructed bidders to price work for dredging using line items for excavation, when no line items for dredging were available. The contractor billed accordingly. The appeals court, not surprisingly, held that the agency's direction negated the knowing submission of a false claim.

The circumstances in the case at bar differ significantly. MARAD officials neither engaged in the development of the proposal, nor directed that it be presented as a scenario of services that MARAD could obtain for $3 million. The court finds that MARAD's institutional knowledge of plaintiff's performance history, coupled with its knowledge that the proposal was pretextual, do not displace Veridyne's knowledge that its proposal was false.

Veridyne knew from its historical costs and based on its offer to buy out its subcontractor that it would perform at a level exceeding that proposed in its schedule and thus would incur costs in excess of $3 million. Moreover, plaintiff readily admits that it fought to keep its proposal under $3 million to avoid the competition requirements, see Pl.'s Br. filed Mar. 20, 2012, at 24; Tr. at 60-62 (Patterson). Liability under the FCA attaches if

the contractor "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).  In this case Veridyne prepared a proposal that falsely depicted the services it intended to provide and now seeks payment for services rendered based on that same false proposal.  The court therefore finds that Veridyne is subject to FCA liability based on a fraudulently submitted proposal.  Because the proposal leading to award of Mod 0023 itself was fraudulent, all invoices submitted thereunder are tainted by that fraud.  The execution of a contract does not delimit the fraud in procuring it.  "Its taint enter[s] into every swollen estimate which [i]s the basic basic cause for payment of every dollar paid."  Marcus, 317 U.S. at 543-44.  The court assesses the maximum penalty to each of the 127 invoices submitted under Mod 0023, for a total penalty of $1,397,000.00.

   3.  Invoice Nos. 265-267 as bases for FCA liability

   Defendant also bases its claim for FCA liability on Veridyne's submission of Invoice Nos. 265-267, contending that Veridyne presented these invoices for the purpose of obtaining payment.  See Am. Answer & Countercl. filed Apr. 22, 2009, ¶¶ 97-98 (No. 06-150C).  The parties' arguments regarding the alleged falsity of these invoices are the same as those made in support of and in opposition to defendant's special plea in fraud and need not be repeated.  Regardless of the extent of MARAD's knowledge of the alleged falsity inherent in Veridyne's proposal for Mod 0023, it cannot be charged with knowledge of the alleged falsities contained in the invoices submitted after issuance of the stop-work order.

   The court agrees with defendant that these three invoices each contain falsities that subject Veridyne to FCA penalties.  In submitting Invoice No. 265, Veridyne knew that it had misrepresented funding levels but countered that, because MARAD's internal documentation revealed actual funding levels such that MARAD would know that it had not approved funding reallocations that appeared in Invoice No. 265, the submitted invoice was not a fraudulent claim for payment.  Although it may be true that MARAD could have discovered that the funding reallocations had not been approved, that does not change the fact that plaintiff knew that Invoice No. 265 contained false information and presented it to MARAD for the purpose of obtaining payment, thereby satisfying all requirements for FCA liability, and the maximum penalty will be assessed.  32/

   Similarly, MARAD did not cooperate with Veridyne with respect to Invoice No. 266 under which Veridyne changed its billing practice for indirect expenses and allegedly billed

_____

   32/  Although the court has found an additional and independent ground on which Invoice Nos. 265-267 violate the FCA, only one penalty will be assessed on each invoice.

tasks to WOs that were not intended to cover those tasks.  The parties' expectation was that Veridyne's rate for indirect expenses was 65.4% of direct labor expenses.  See Tr. at 1443-44 (McGill).  Nonetheless, at the direction of Mr. Patterson, Ms. McGill changed Veridyne's billing rate in its Deltek software, thereby billing Veridyne for actual overhead for all of fiscal year 2004—not just the period covered by Invoice No. 266.  See Tr. at 1446 (McGill).  Despite Veridyne's internal justifications for the appropriateness of this change, plaintiff knew when it submitted Invoice No. 266 that the amount billed for overhead was false.  Notwithstanding this fact, Veridyne neither informed MARAD of this change in practice nor sought any guidance as to whether such a change was appropriate.  See Tr. at 1446-47 (McGill).  It merely submitted the invoice containing false information to MARAD for the purpose of obtaining payment thereon.

Furthermore, although Veridyne is not entitled to recover termination expenses because, as the court has ruled, the stop-work order did not constitute a termination, the court does not find that Veridyne's billing various expenses to WO 823 is as problematic as defendant argues.  Veridyne was instructed to cease performance and informed that MARAD personnel would be visiting Veridyne offices to collect government-owned items.  The amounts billed to WO 823 were *de minimis* and necessarily incurred in order for Veridyne to close down operations on Mod 0023 in compliance with the stop-work order.  The majority of these charges were incurred during a close-out meeting held one week after Veridyne's receipt of the stop-work order.  See DX 76.  Topics discussed at the meeting included employee benefits and return of property and documents belonging to the Government.  See id.  That WO 823 had a start date of January 1, 2005, is not of great concern given the court's finding that these costs were legitimately and necessarily incurred and *de minimis*.  Nonetheless, the maximum FCA penalty still will be assessed against this invoice on account of plaintiff's billing of indirect expenses.  See supra note 32.

Finally, the court finds that Veridyne also is subject to FCA liability for its submission of Invoice No. 267 in which Veridyne rebilled certain expenses to MARAD in such a way as to camouflage the fact that these items already had been charged to MARAD in earlier invoices.  While a mere rebilling of expenses due and unpaid is not in itself fraudulent, the manner in which Veridyne billed previously billed expenses in Invoice No. 267, as noted above, evidences "an intent to obscure the overbilling." Def.'s Br. filed Apr. 19, 2012, at 28.  Specifically, Veridyne identified the expenses in a manner different than it had in the past and only rebilled expenses that previously had not been billed on a line-item basis.  See id. at 29-30.  Moreover, Veridyne ignored the advice of Ms. McGill, its internal FAR expert, regarding what costs were "allowable" and included in the Claim Costs Spreadsheet various charges that it either did not incur or would not incur until after the Contract's scheduled end date.  See id. at 30.  Although plaintiff argues that these items were included on the advice of counsel, this defense was not supported.  Veridyne has failed to satisfy the elements

necessary to invoke the defense, e.g., that it made a full disclosure of all material facts to Mr. Webster for the purpose of obtaining advice. The only evidence supporting this defense was testimony from the evasive and self-serving Mr. Patterson, to whom the court ascribes little credibility. Accordingly, the court finds that because Veridyne submitted Invoice No. 267 with knowledge that it contained falsities, Veridyne is subject to the maximum FCA penalty for this submission. See supra note 32.

IV. Defendant's counterclaim pursuant to the CDA's fraud provision

Defendant also counterclaimed pursuant to the antifraud provision of the CDA, which provides, as follows:

> If a contractor is unable to support any part of the contractor's claim and it is determined that the inability is attributable to a misrepresentation of fact or fraud by the contractor, then the contractor is liable to the Federal Government for an amount equal to the unsupported part of the claim plus all of the Federal Government's costs attributable to reviewing the unsupported part of the claim.

41 U.S.C.A. § 7103(c)(2). 33/ A misrepresentation of fact is "a false statement of substantive fact, or conduct that leads to a belief of a substantive fact material to proper understanding of the matter in hand, made with intent to deceive or mislead." Id. § 7101(9). The Government bears the burden of demonstrating the misrepresentation and intent by a preponderance of the evidence. See Daewoo Eng'g, 557 F.3d at 1335 (citing Commercial Contractors, 154 F.3d at 1362).

In addition to restating arguments regarding fraud in Invoice Nos. 265-267, defendant hastens to note that Mr. Patterson not only rebilled various expenses in Invoice No. 267 because they remained due and unpaid, but he also twice submitted those amounts in Veridyne's CDA claim. Def.'s Br. filed Apr. 19, 2012, at 36. "[S]urely [he] could not have believed he was entitled to add the original billing and the rebilling of those expenses together and then submit a claim to MARAD that double-billed those expenses." Id.

---

33/ Congress amended and recodified the CDA while these cases were pending. See Act of Jan. 4, 2011, Pub. L. No. 111–350, 124 Stat. 3677. The amendment has no substantive effect on this case, despite the fact that defendant filed its counterclaims under the earlier provisions, because, as Congress explained, "the intent [of the amendment] is to conform to the understood policy, intent, and purpose of Congress in the original enactments, with such amendments and corrections as will remove ambiguities, contradictions, and other imperfections." Id. sec. 2(b).

(footnote omitted).  Defendant challenges Veridyne's support for $263,496.62 billed in Invoice No. 265 and made a part of its CDA claim because that figure represents the total billed against WOs that did not contain sufficient funding.  See id. at 37-38.  Invoice No. 266 overstated the amount of overhead due by $131,469.35 and thus cannot support that portion of its CDA claim.  See id. at 38.  Invoice No. 267 overstated amounts due by $173,836.12, with plaintiff admitting that, if other invoices are paid, its claim costs total only $39,852.86.  See id. at 39.  Veridyne's CDA claim listed $213,688.98 due on Invoice No. 267, and Veridyne could only support $39,852.86 of that amount.  See id.  Defendant thus concludes that it is entitled to recover CDA damages totaling $568,802.09, representing the total unsupported amounts set forth in Veridyne's CDA claim.  See id.

Veridyne disputes that it is not enough for defendant to show that Veridyne cannot support portions of its claim and thus may not recover those amounts; rather, defendant must demonstrate that Veridyne's inability to support portions of its claim is due to its having misrepresented information in its claim.  See Pl.'s Br. filed Mar. 20, 2012, at 36.  The CDA's definition of a misrepresentation requires that the claimant act with the intent to deceive or mislead.  See id. at 37 (citing 41 U.S.C. § 7101(9)).  According to plaintiff, any suggestion that Veridyne acted with intent to deceive or mislead is negated by the fact that Veridyne obtained counsel to prepare its claim.  See id.  Plaintiff bolsters this assertion with a letter from the law firm that assisted in preparing its CDA claim, indicating that counsel had completed review of the documents provided.  See id.; see also PX 21 (May 20, 2005 letter from Blank Rome LLP to Mr. Patterson).  Ultimately, Veridyne contends that the Government has shown no more than that there were errors within Veridyne's CDA claim that would reduce the amount claimed.

The court finds that Veridyne's reliance on an advice-of-counsel defense is once again to no avail.  While Blank Rome LLP's letter to Veridyne shows legal review of certain documents, the letter also reveals that the law firm sought additional documentation.  See PX 21 ("We have completed reviewing the documents you[] furnished but will need several additional documents before we proceed[] with MARAD.").  The record—other than Mr. Patterson's testimony, which, as noted, the court did not find credible on point—does not support a finding that the requested documents thereafter were provided to Blank Rome LLP.  The only facts supporting this defense are that Veridyne provided Blank Rome LLP with certain documents and that Blank Rome LLP drafted a claim letter for Mr. Patterson to sign and deliver to MARAD.  These facts are insufficient to support a finding that Blank Rome LLP advised Veridyne to duplicate billing for certain expenses or include in its claim expenses not yet incurred.  Furthermore, despite Veridyne's argument that its CDA claim merely contains errors and overstatements of amounts owed by MARAD, Veridyne's specific misrepresentations have been established.  It is particularly telling that Veridyne included in its CDA claim those amounts billed in Invoice No. 267 because Veridyne has admitted that

most of the charges billed in Invoice No. 267 were owed to Veridyne only to the extent the earlier invoices, i.e., Invoice Nos. 260-266, were not paid in full. See Pl.'s Br. filed May 3, 2012, at 22.

Utilizing defendant's calculation, the court finds that plaintiff cannot support $568,802.09 of its CDA claim. This amount consists of $263,496.62 of misstated funding in Invoice No. 265; $131,469.35 of overstated overhead in Invoice No. 266; and $173,836.12 of prior-billed and unincurred expenses in Invoice No. 267. Defendant did not offer evidence of any government costs attributable to reviewing the unsupported part of the claim. Accordingly, the Government is entitled to recover CDA damages in the amount of $568,802.09.

## CONCLUSION

1. Plaintiff has proved by a preponderance of the evidence that it is entitled to recovery in *quantum meruit* for the services that it performed before the stop-work order issued (Invoice Nos. 260-265) to the extent that sufficient funding was available in the relevant WOs at the time the invoices were submitted for payment. On Invoice No. 266, plaintiff has proved by a preponderance of the evidence that it is entitled to recover expenses incurred for the benefit of the Spare Parts Contract. Accordingly, plaintiff is entitled to recover a total of $1,068,636.22, plus interest under 41 U.S.C.A. § 7109(a)(1), from June 14, 2005, the date on which MARAD's contracting officer received plaintiff's claim.

2. Defendant has carried its burden of proof on its forfeiture, FCA, and CDA claims, respectively. Defendant is entitled to recover a total of $1,965,802.09 on these counterclaims.

3. The Clerk of Court shall enter judgment for defendant in the amount of the difference between the minuend $1,965,802.09, and the subtrahend $1,068,636.22, including interest on the latter amount.

**IT IS SO ORDERED**.

No costs.

/s/ Christine O.C. Miller

_____

**Christine Odell Cook Miller**
Judge

66